**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| **LANA CANEN,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case Number: 3:14-CV-00315 |
| ) | |
| **DENNIS CHAPMAN**, in his Individual ) | |
| capacity as Deputy for the Elkhart County ) | |
| Sheriff Department, and **MARK DAGGY**, ) | |
| in his individual capacity as Officer for ) | |
| the Elkhart Police Department, ) | |
| ) | |
| Defendants. ) | |

---

**DEFENDANT MARK DAGGY'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

---

Defendant, Mark Daggy, by counsel, submits the following Memorandum of Law in

support of his Motion for Summary Judgment.

## Introduction

A jury in Elkhart Circuit Court convicted Lana Canen of felony murder in 2005 and the

court sentenced her to serve 55 year's incarceration.  In 2012 she was released after the State of

Indiana agreed to vacate her conviction because a fingerprint introduced as evidence in her trial

was erroneously identified as being hers by the State's expert witness, Dennis Chapman.  Canen

was remanded by the Court of Appeals for re-trial and the State later voluntarily dismissed the

charge without prejudice to refile.

Canen filed this suit against Chapman, an Elkhart County Deputy Sheriff, in his

individual capacity, and Mark Daggy, an Elkhart City police officer, in his individual capacity,

under 42 U.S.C. §1983 alleging  "willful and wanton violations of her civil rights to be secure in

her person and liberty under the Fourth and Fourteenth Amendments to the United States

1

Constitution." [DE 1-1]  Her suit "seeks to redress her false imprisonment, malicious prosecution [1] and violation of her right of due process." [DE 1-1 p. 4]   Specifically, she alleges that Chapman was unqualified to give an expert opinion on the fingerprint and that his opinion was false and that Daggy knew that he was unqualified and he did not fully disclose that fact to her lawyer but instead endorsed and advocated Chapman's expert testimony.  [DE 1-1, pp. 4-5] Canen claims that the only evidence against her was the testimony from Chapman and Daggy that her fingerprint was found on a plastic container and that she would not have been arrested for murder had they fully disclosed Chapman's lack of qualifications.  [DE 1-1 pp. 3 and 5]

The facts are uncontroverted that Officer Daggy was not involved with processing or handling of any print evidence, did not know Chapman or his qualifications  communicate with and did not testify about the fingerprint evidence.  Because there is no genuine issue of material fact in dispute involving Canen's claims against Daggy, he requests that the Court grant him summary judgment.

In addition, Canen and her attorneys knew that no facts supported her claims against Daggy yet she pursued this suit to harass him in retaliation for his investigation of her on a prior criminal matter and he asks the Court to award fees and costs incurred in his defense of this frivolous lawsuit.

## Statement of Material Facts

### *Daggy background and training*

Mark Daggy is a Detective with the City of Elkhart Police Department, having begun his employment with the department in 1994 as a patrolman in the uniform division.  Before becoming a police officer, Daggy graduated from college with a Bachelor's Degree in Criminal Justice and worked as a jail and juvenile probation officer in St. Joseph County.  Ex. 2,

---

[1] In the introduction to the Complaint, Canen states that she seeks compensation under 42 U.S.C. §1983 to redress her malicious prosecution but she made no allegations in support of that claim in the remainder of the Complaint nor

Deposition of Mark Daggy, 10/28/14, pp. 8, l. 10-25; 9, l. 12-25; 10, l. 21-25.  Upon being hired by the Elkhart Police Department, Daggy attended and passed the Indiana State Law Enforcement Police Academy course and underwent supervised, on the job training through a field training officer for several months and has continued his formal training and certification in various types of police work, including investigations.  *Id.* at pp. 17, l. 2-25; 18, l. 1-25; 28, l. 2-25; 29, l. 1-5.  After patrol work, Daggy worked in the anti-crime unit targeting street crime for several years and then as an undercover officer for five years and became a detective in the Criminal Investigation Unit in 2001 where he investigated burglaries, thefts and domestic battery cases.  *Id.*, pp. 34, l. 1-25; 35, l. 1-20.   Daggy was working burglary cases at the time Helen Sailor was murdered.  *Id.,* at p. 40, l. 12-25.

*Helen Sailor's murder*

On Thursday, Thanksgiving Day, November 28, 2002, ninety four year old Helen Sailor was murdered in her apartment at the Waterfall Drive Highrise apartment building, in Elkhart, Indiana. [DE 1-1, p. 3, Complaint.]  Waterfall is an income subsidized housing unit and many of its tenants are elderly or disabled. Ex. 2, Daggy dep., pp. 50, l. 11-25; 51, l. 1-8; Ex. 4 , Lana Canen deposition, 5/12/15, p. 102, l. 10-12.  Canen lived in an apartment in the same complex at the time. Ex. 4, Canen dep. pp. 100. l. 25; 101, l. 1-10. Sailor's body was discovered in her bedroom by her relatives, Larry and Carol Converse, and her home health nurse, Carolyn Hoffer, on Friday morning, November 29, 2002, after they used their key to gain entrance into her locked apartment door when she failed to respond to their calls. Ex. 1, Trial Transcript, *State v. Canen*, Cause No. 20CO1-0309-MR-00155, Elkhart Circuit Court, 8/8/2005, C. Hoffer Trial Tr., pp. 312-313; 324-328;  Ex. 1,  C. Converse Trial Tr., pp. 335-336, 341, l. 8-2 and 342, l. 1-18. Converse reported to Elkhart Police Officer Stockman upon his arrival at the apartment that Sailor's apartment door had a deadbolt and it could not be locked just by pulling the door shut

---

does she make any allegations of malicious prosecution against Daggy.  *Compare*, DE #1-1, p. 1 and p. 5.

but instead it required that a key be used.  *Id.*; Ex. 5, Officer Barnard L. Stockman, 11/29/02

Case Supplemental Report, p. 3 of 3; Ex. 1, C. Converse Trial Tr., p. 341, l. 21-25;  Ex, 1, C.

Hoffer, Trial Tr. p. 326, l. 11-21.

An autopsy was performed later that same day that found the cause of Sailor's death was

strangulation by use of a rope with evidence that she also suffered blunt force injuries to her

head, face, upper extremities and back.  Ex. 1, Dr. Joseph Prahlow, forensic pathologist, Trial

Tr., pp. 348-352, 356-357, 373, 375-385 and 390-393.

*Crime scene investigation*

The first Elkhart Police officer to arrive at the scene was Lt. Thomas Lerner and he

immediately requested that Detective Joel Bourdon, the Department's evidence technician who is

trained in crime scene investigations, come to the apartment to process evidence.  Ex. 6 affidavit,

Joel Bourdon, 7/9/15, ¶ 3 with attached Exhibit A, 3/24/03 Case Supplemental Report/Evidence

Tech Report; Ex. 1,  Joel Bourdon Trial Tr., pp. 541-546,  and p. 547, l. 1-17; Ex. 5, Stockman

Case Supplemental Report, 11/29/02, p. 2 of 3. Bourdon arrived at about 8:15 a.m. and noted that

the scene was secured by an officer at the door and that there was no evidence of forced entry or

damage to the locking mechanism in the apartment door. Ex. 6, Bourdon aff., with attached Ex.

A, 3/24/03 Case Report, p. 3 of 10.  With the assistance of a uniformed technician officer,

Timothy McConnell, Bourdon took photographs and video of the scene, gathered and secured

evidence, dusted and lifted prints, placed the evidence in sealed plastic bags and maintained their

chain of custody.  Ex. 1, Bourdon Trial Tr.  pp. 541-547; 570, l. 25 to 571, l. 1-15; 587, l. 22-25

and 588, l. 1,  591, l. 20-25 and 592, l. 1-2 and l. 15-25; 593, l. 11-18; 595, l. 7-25 and 596, l. 1-

25; 599, l. 20-25; 600-601 and 602, l. 1-17.  Bourdon collected samples of a glimmer substance

and a pink tinted substance that was spread over Sailor's left hand and some of the items

recovered from the scene and samples were collected.  *Id.*, Trial Tr. pp. 555, l. 12-25, 556, l. -4.

One of the items bagged and removed from the apartment was a plastic tub that was filled with medicine bottles setting on the stove.  Ex. 6, Bourdon affidavit with attached Ex. A, 3/24/03 Case Supplemental Report, page 1of 10; Ex. 1, Bourdon Trial Tr., pp. 558, l. 3-9 with trial exhibit #22 (photo of plastic tub on stove); 592, l. 11-25.

Elkhart Police detectives, Todd Thayer and D'Andre Christian, were the initial investigators for the Sailor murder.  Ex. 2, Daggy dep., p. 43, l. 11-19, Ex. 1, Todd Thayer, trial testimony, pp. 637, 638, l. 1-6.  Thayer and Christian went to each apartment in the complex asking the residents if they saw anything that might help in the investigation.  Ex. 1, Thayer Trial Tr., p. 639, l. 7-15.  Thayer and Christian went to Canen's apartment several times but no one answered so they left a business card but when she did not call them they returned within a few days.  When Thayer knocked on her door he could see light and shadows moving under the door as if someone was standing on the other side.  Ex. 1, Thayer Trial Tr., pp. 639, l. 16-25, 640, l. 1-10.  With the recent murder in the same building, Thayer was concerned that something might be wrong inside the apartment that prevented Canen from answering and he requested the building maintenance person to open her door.  Once the door was unlocked, however, Canen spoke up while standing at the door that was still closed with a chain. Thayer asked her if she was aware of Sailor's death and Canen answered that she knew Sailor and had heard about her death but that she was out of town visiting friends and family over the Thanksgiving holiday.  Ex. 1, Thayer Trial Tr., pp. 640, l. 12-25,  641, l. 1-17; Ex. 4, Canen dep. p. 99, l. 1-10.  By 2003, the initial group of investigators did not charge anyone in the Sailor murder and the case was unresolved. Ex. 2, Daggy dep. p. 160, l. 4-16; Ex. 1, Daggy Trial Tr.,  pp. 395, 400, l. 25, 401, l. 1-25, 402, l. 1-3; Ex. 1, Conway Trial Tr., pp. 478, l. 20-25, 479-480, 481, l. 1-5

On May 8, 2003, Bourdon sent items that he had processed from Sailor's apartment including clothing, hair, blood, fingernail clippings, liquid substance, saliva swabs and adhesive

lifters of fingerprint impressions and foot impressions to the Indiana State Police Laboratory requesting serology examinations, DNA tests and any matches of any unknown contributors to the Combined DNA Index System known as "CODIS." He also requested Finger/palm print examinations and impression comparisons and entering any unidentified prints into the Automated Fingerprint Identification System "AFIS." Ex. 6, affidavit, J. Bourdon, ¶ 5 with attached Exhibit B, Request for Laboratory Examination.

*Prior investigation of burglaries at Waterfall*

At the time of Sailor's murder, Daggy was still working burglary cases and heard about the discovery of her body on the news and at a morning squad briefing when Det. Thayer spoke with him about discussing his investigation of a string of eight burglaries at the Waterfall Highrise building that occurred from March through May 2002.  Ex. 2, Daggy dep., pp. 48, l. 5-25; 49, l. 1-25; 50, l. 1-10; 140, l. 10-20.  Daggy told Thayer that Canen was the prime suspect in those burglaries which all had in common the fact that there was no forced entry into the victim's apartments and it appeared that someone used a key to unlock the doors. Ex. 2, Daggy dep., pp. 49, l. 19-24; 50, l. 1-25; 51, l. 16-18, 155, l. 11-15, with attached deposition Exhibit 2, 4/9/02 Burglary Incident/Investigation Report.  Canen became a suspect after a resident of the apartment, Paula Sjogren, told Daggy that prior to the burglary of her apartment, Canen asked to use her bathroom and when she allowed her to do so Canen commented about the medications she saw in the bathroom cabinet.  Sjogren told Daggy that she warned Canen not to look into her private things and later Canen returned to her apartment to apologize but after she left Sjogren discovered that her car keys were missing. Ex. 2, Daggy pp. 51, l. 16-25; 52, l. 1-25; 53, l. 1-8; 146, l. 4-25; 147, l. 1-25; 178, l. 2-11; deposition Ex. 9, 4/9/02 Burglary Case Supplemental Report, p. 2 of 2; deposition Ex. 7, 4/2/02 Burglary Incident/Investigation Report, p. 2 narrative. The manager of Waterfall, Danalee Meitzler, told Daggy that Canen had dated the building's

former maintenance man, Curtis Pratcher, who had a master key for all the apartments in the building and that Canen may have duplicated it.  Ex. 2, Daggy pp. 51, l. 16-25; 52, l. 1-25; 53, l. 1-8; 146, l. 4-25; 147, l. 1-25; 178, l. 2-11; deposition Ex. 9, Case Supplemental Report 4/8/02 interviews with D. Meitzler.  Daggy made several attempts to interview Canen about the burglaries in March 2002 at her Waterfall apartment, but she didn't answer her apartment door.  Ex. 2, Daggy pp. 65, l. 6-25; 66, l. 1-5; 150, l. 20-25; 151, l. 1-5.  Daggy interviewed Canen at the police station on April 22, 2002, when, after signing her Miranda warnings, she denied any knowledge of the burglaries and told Daggy that she would say more but was afraid of getting evicted from the Waterfall Apartments because drugs were somehow involved.  Ex. 2, Daggy dep. pp. 70, l. 11-25; 71, l. 1-9; 152, l. 11-25; 153, l. 1-14; with attached deposition Ex.10, 4/22/02 signed Legal Rights Form and deposition Ex. 12, 10/28/02 Burglary Case Supplemental Report.

Daggy interviewed Pratcher on October 7, 2002, who told him that he dated Canen in August 2001 and that she stayed the night at his apartment and the next day he discovered that his keys, including the master key to the Waterfall apartments, were missing and that Canen was the only person in his apartment and the only one who could have taken the keys.  Ex. 2, Daggy dep. pp. 52, l. 2-24; 77, l. 13-18; 78, l. 24-25; 79, l. 1-2; 149, l. 5-11 with attached deposition Ex. 11, 10/7/02 signed statement of C. Pratcher and Deposition Exhibit 12,  10/28/02 Case Supplemental Report.  Daggy, however, could not independently verify that the master key was taken by Canen and because no key was ever found he did not think he had probable cause or enough evidence to convict so he did not charge her and the burglary investigation was inactivated.  Ex. 2, Daggy dep. pp. 55, l. 1-7; 78, l. 16-23; 98, l. 9-12; 149, l. 16-17; 159, l. 22-25; 160, l. 1-3.

On April 14 2003, Canen had an outstanding warrant for check deception and Daggy saw her walking on Johnson Street in downtown Elkhart and arrested her and transported her to the city jail, where she was booked, photographed and printed, although he did not question her. Ex. 2, Daggy dep. pp. 153, l. 22-25; 154, l. 1-11 with Deposition Exhibit 13, booking photo, Arrest Report and ink and rolled finger/palm prints.

*Homicide Unit investigates Sailor murder*

On July 28, 2003, the Elkhart Police Department created a Homicide Unit to investigate unresolved murder cases and Daggy volunteered for that duty. Ex. 2, Daggy dep. pp. 40, l. 16-25, 41, l. 1-25; 42, l. 1, 99, l. 18-19; Ex, 1, Daggy Trial Tr. pp. 412, l. 21-25 and 413, l. 1-11; Ex. 3, Affidavit of Mark Daggy, 7/14/15 ¶2.  Other members of this new unit were Lt. Paul Converse, Detective Carl Conway, Lt. Detective Peggy Snider, and Sergeant William Wargo.  Ex. 2, Daggy dep. p. 88, l. 14-17. The Sailor murder case was the first unresolved case to come up for review by the Homicide Unit and Detective Conway was one of the investigators.  Ex. 2, Daggy dep. p. 88, l. 7-9; p. 89, l. 23-25 and 90, l. 1; 100, l. 6-9; C. Conway, Trial Tr., pp. 478, l. 20-25, 479-480, 490, l. 1-9.  The decision to pursue that case and to divide responsibilities for the investigation was made by Lt. Converse.  Ex. 2, Daggy dep. p. 88, l. 18-25.  Daggy's job was to interview witnesses.  Ex. 2, Daggy dep. p. 90, l. 13-16.  The concept of officers of a Homicide Unit all working on one case allowed for concentrated effort in reviewing and analyzing the evidence.  Ex.1, Daggy Trial Tr., pp. 402, l. 4 -25, 403, l. 1-20.  When the case was picked up by the Homicide Unit, Detective Conway reviewed in detail all the documents from Thayer and Christian in order to follow up on possible leads and all the detectives in the Homicide Unit re-interviewed witnesses including the Waterfall apartment residents.  Ex. 2, Daggy dep. p. 100, l. 1-5; Ex. 1, Daggy Trial Tr., p. 403, l. 4-8; Ex.1, C. Conway, Trial Tr.,  pp. 478, l. 20-25, 479-480, 481, l. 1-8. As a result of the information gathered names of suspects were eliminated .

Ex.1, Daggy Trial Tr., pp. 413, l. 11-25 - 419, l. 1-2.  Other leads created during these interviews

led to Canen as a suspect in Sailor's murder. Ex. 2, Daggy dep. pp. 161, l. 1-3; Ex. 1, C. Conway

Trial Tr., pp. 506-515.

> *Macioce and Lambert tell police that they saw Canen at Waterfall on the evening of the*
> *murder.*

On August 8, 2003, Florence Macioce, who lived at Waterfall Highrise, was interviewed

by Conway and Daggy and told them that on Thanksgiving evening she was in the lobby of the

building waiting for her son to visit and she saw Canen outside pacing back and forth looking as

if she were upset.  About ten minutes later she saw a man named Charlie Lambert exit the

elevator and talk with Canen in the parking lot and then saw them both leave together in

Lambert's vehicle.  She also said that weeks later Lambert was with her in the laundry room at

Waterfall and told her not to say anything about seeing him with Canen that night because he did

not want to get involved.  Ex. 2, Daggy dep. p. 162, l. 17-24; Ex. 8, 9/12/03, C. Conway Case

Supplemental Report.[2]  Macioce testified to these facts at Canen's trial (with the exception as to

what Lambert said to her in the laundry room.)  Ex.1, F. Macioce Trial Tr. 47l-477, l. 1-3.

After talking to Macioce, Detective Conway interviewed Charlie Lambert, who told him

that he saw Canen at Waterfall Highrise on Thanksgiving evening and she asked him to give her

a ride to her boyfriend's apartment, which he did.  He told Lt. Converse in a taped statement that

Canen kept looking around the corner of the building and that she had a large bag with her when

she left in his car. Ex. 2, Daggy dep. pp. 162, l. 6-25 and 163, l. 1; Ex. 9, C. Conway 9/4/03 Case

Supplemental Report; Ex, 10, Lambert transcribed statement of 9/10/03, pp. 1-6.  Lambert said

that he later saw Macocie in the laundry room and told her not to tell anyone that he gave Canen

a ride and that he was scared of Canen because she was capable of breaking into apartments and

---

[2] The detectives documented what the witnesses said in their Case Supplementary Reports, which were kept in
the normal course of business etc. Ex. 3, Affidavit of Mark Daggy, 7/14/15.

taking checkbooks.  Ex. 2, Daggy dep. pp. 162, l. 22-25, 163, l. 1-14, Ex. 12, 9/10/03 Case

Supplemental Report, pp. 8-9.  Lambert testified at trial about seeing Canen at Waterfall, her

pacing and giving her a ride.  C. Lambert Trial Tr. 457-468, l. 1-11.

*The plastic tub is processed for print analysis*

On August 12, 2003, Detective Wargo of the Homicide Unit reviewed the photos taken of

the apartment crime scene and noticed that there was a plastic container or tub holding

medication bottles that was on the top of the stove.  Ex. 7, 8/20/2003 W. Wargo Case

Supplemental Report, crime scene photo review of plastic tub.

On August 27, 2003, Detective Snider of the Homicide Unit asked Bourdon to process

for prints items found at Sailor's apartment, including the plastic tub holding the medicine

bottles pictured in the photograph Wargo reviewed.   Bourdon lifted 8 prints from the tub,

including one that he marked "M" from the backside of the container.  Ex. 6, aff. J. Bourdon, ¶'s

6-8; with attached Affidavit Exhibit C, 9/2/03 Case Supplementary Report; Bourdon Trial Tr.

592–600. These items had not been previously processed for prints and were not sent to the

Indiana State Police Laboratory on May 8, 2003. Ex. 6, Bourdon aff. at ¶ 6. Det. Conway asked

Bourdon to compare any print impressions that were lifted from these items to any known prints

of Canen so Bourdon retrieved from the Elkhart Police Department Records Division an ink

rolled fingerprint card of Canen's April 14, 2003 arrest. Ex. 6, Bourdon aff.at ¶ 7 with attached

Affidavit Exhibit C, p. 2; Bourdon Trial Tr., pp. 599, l. 20-25, 600, 601, l. 1-3.   Because the

Indiana State Police Laboratory had not yet responded to the May 8 request for print analysis and

to avoid delay in analyzing the additional prints, Bourdon asked Deputy Chapman on August 29,

2003, if he was willing to perform the latent print examination and give an opinion on any

match. Ex. 6, Bourdon aff. ¶10; Ex.1, Bourdon Trial Tr., p. 601, l. 4-25, 602, l. 1-17.  Chapman

agreed to review the prints and Bourdon delivered the lifted impressions and the ink and rolled

print card to him.  *Id.* Chapman was selected by Deputy Prosecuting Attorney Becker because he held himself out in the law enforcement community as an experienced Federal Bureau of Investigation's trained fingerprint examiner and forensic witness who could testify about his opinion and because the Elkhart Police Department and the Elkhart Prosecuting Attorney had used him in cases where he examined latent prints and offered opinions in past trials and neither Bourdon nor Becker had any information that Chapman was unqualified to render such opinions. Ex. 6, Bourdon aff. ¶ 10; Ex. 14, Deputy Prosecuting Attorney Vicki Becker 10/29/14 deposition, pp. 39, l. 14-19, 68, l. 2-12, 72, l. 17-25 and 73, l. 1; 82-87; Ex. 1, Dennis Chapman Trial Tr. 613-620, l. 1-4.

> *Porter tells police that Canen said that she and Royer went into an older woman's apartment to get money resulting in death on Thanksgiving*

In 2003, Nina Porter was a friend and neighbor of Canen's and they both lived in the same four unit apartment house on Johnson Street in Elkhart. Ex. 1, N. Porter Trial Tr., pp. 698, l. 24-25, 699, 700, l. 1-18, 708, l. 3-5, 709, l. 20-23.   On September 2, 2003, Porter was pulled over by Cpl. B. Kruzynski of the Elkhart Police Department in her vehicle and ticketed for driving without a license.  Canen, who was in the car at the time, was arrested on an outstanding warrant for check deception. Ex. 1, Porter Trial Tr., p. 708, l. 7-12.  Later that day, Porter was brought to the Elkhart Police Department where she was interviewed by Detective Conway and gave a tape recorded statement that Canen and her were drinking on the evening of July 3, 2003, at the patio of their apartment house and Canen told her that she went into an older lady's apartment to get money from the woman but when she refused Canen brought a man named Andy Royer back to scare the older lady and that no one was supposed to get hurt.  Porter said that as Canen got up to get another drink she said "Thanksgiving.  Thanks for giving death." Conway trial testimony, p. 481, l. 16-25; Ex. 11, C. Conway 9/2/03 Supplemental Case Report, N. Porter transcribed statement, pp. 9-12.  At trial, Porter testified to these same facts as well as

11

the fact that Canen exerted extraordinary control over Royer and that he would do anything she said.  Ex. 1, Porter Trial Tr., pp. 696, l. 10-25,  p. 709, l. 10-17.

*Andrew Royer admits that he and Canen killed Saylor*

After hearing Porter's statement, Det. Conway interviewed Royer at the police station on September 3, 2003. Ex. 1, Conway Trial Tr., pp. 481, l. 16-22, 482, l. 1-18; Ex. 2, Daggy dep. p. 161, l. 9-14.   On September 3, 2003, after giving Royer his *Miranda* rights and after Royer signed his legal rights form, Conway questioned Royer for about an hour and a half in a pre-interview process which was a casual conversation used to build rapport with the individual.  Ex. 1, Conway Trial Tr.,   pp. 484, l. 14-17, 485, l. 8-14, 486, l. 2-25, 487, 488, l. 1-7, 489, trial exhibit 15.   During this pre-interview session, Royer made admissions about Sailor's murder. *Id*., at p. 488, l. 8-12. Conway prepared a written summary of what Royer told him.  Ex. 12, Conway's Case Supplemental Report, pp. 1-6.  In the pre-interview process, Royer told Conway that he was there with Canen when Sailor was killed in her apartment and that Canen went there because she needed money and that she actually killed Sailor by striking her left temple with a metal bar when she kept refusing to give her money and that he and Canen went through Sailor's apartment looking for things to take and he took a ring, watch and necklace and that he attempted to clean the apartment with some towels that he disposed of by putting in the garbage chute and they then both left the apartment and separated.  *Id*. p. 2.  Royer's statement corroborated some of the evidence that was gathered from the original crime scene investigation such as the fact that Sailor was strangled, that it was done with a rope, how the towel was disposed of and items used from the apartment.  Conway Trial Tr., pp. 491, l. 5-25, 492-493.

Conway decided to audio tape Royer's confession because Royer was getting tired.  *Id.*, p. 494, 1-14.  During the taped confession, which was transcribed, Royer's recollection of events was different.  He stated that he and Canen smoked marijuana that day and Canen suggested that

they go to Sailor's apartment to see if she had any money.     Ex. 13, Case Supplemental Report, transcription of 9/3/03 taped statement of A. Royer, pp. 2-3.   Royer said he knew Sailor from seeing her in the hallways but had never actually been in her apartment before.  *Id.,* p. 4.  Royer said that and when they got there Canen asked her for $200. Sailor said she didn't have that kind of money on her and Canen was upset and hotheaded about that response.  Royer stated that he told Sailor that she better give them money and slapped her in the face and she gave Canen only $20 and they left.  Royer said he didn't get any of the money from Canen so he went back to Sailor's apartment and demanded money and chocked her with his hands or a rope and she fell to the kitchen floor.  He said the he took jewelry and before he left he cleaned the apartment by using a hand towel and throwing it down the garbage shoot.  This tape was played to the jury at trial excluding any references to Canen. Conway Trial Tr. 494, l. 15-25, 495, 496, l. 1-5.

Conway ended Royer's first taped interview to let him rest and eat and placed him under arrest for Sailor's murder. *Id.,* p. 500, l. 8-23.  The following day, September 4, 2003, Conway again gave Royer his Miranda warnings and he signed the advice form and a second taped interview was held.  *Id.,* pp. 502-503, with trial exhibit 17.  In this taped statement, which was also transcribed, Royer changed his recollection of events again and said that he went to Sailor's apartment alone on the evening of Thanksgiving day to talk to her about religion, got into an argument about money and he hit her in the face, strangled her with his hands in the kitchen and used a rope around her neck to drag her into the bedroom where he poured some glimmery lotions on her body.  Ex. 13, Case Supplemental Report, transcription of 9/4/03 taped statement of A. Royer, pp. 1-7.  He told Conway that he went through her jewelry box and took a watch, earrings, necklace and bracelets and then cleaned the apartment with wet towels and put them in the garbage shoot and left.  *Id.,* pp. 8-13.  This statement was played to the jury at trial.  Conway, Trial Tr., pp. 504-505.

13

*Chapman gives his opinion that one of Canen's known fingerprints matches the lifted print "M" from medicine tub.*

On March 5, 2004, Chapman sent his written report to Bourdon with his opinion that Canen's left little fingerprint from the print card matched the latent print "M" lifted by Bourdon from the medicine tub. Ex. 6, aff. Bourdon with attached Ex. D; Ex. 15, Chapman dep. 11/18/14, pp. 86, l. 22-25 and 87, l. 1-1, Chapman, Trial Tr. 620-621. He did not have any conversations about the report or the prints with Bourdon after he delivered the report. *Id.*, pp. 85, l. 4-8; 89. At the time, Chapman had worked for the Elkhart County Sheriff's Department for 12 years and was trained by the Federal Bureau of Investigation and worked for it as a fingerprint examiner for two years and had experience in over 100 cases to make fingerprint comparisons and had experience in attempting to recover latent prints from a crime scene. Ex. 1, Chapman, Trial Tr., pp. 613-618, l. 1-6. Chapman examined the prints and made comparisons of characteristics of the known and latent prints gave his opinion that the print in lifter "M" matched the known print of Canen's left hand little finger. Ex. 1, Trial Tr., pp. 620-627.

On September 2, 2004, Canen was charged with Felony Murder while committing a Robbery. Daggy signed the information and accompanying affidavit to show probable cause reciting the evidence collected in support of the charge. Ex. 16, Information and Affidavit. By the time of trial, Conway had left the Homicide Unit and Daggy sat at counsel table with the prosecutors. Ex. 2, Daggy dep. p. 90, l. 2-8. Daggy did not interview Porter, Canen or Royer in 2003 although he observed parts of their interviews and interviewed Royer in 2004. Ex. 1, Daggy Trial Tr. 395-412.

Gathering, storing and transferring fingerprint evidence is performed by a trained evidence technician of the Elkhart Police Department. Daggy is not an evidence technician nor is he trained in fingerprint identification and did not collect, store or handle fingerprint evidence. Ex. 2, Daggy dep. at pp. 21, l. 24-25; 22, l. 1-10; 84, l. 20-25; 85, l. 1-2; 120, l. 12-25; 121-124.

14

The print evidence was lifted, maintained and forwarded to the Indiana State Police Laboratory and Deputy Chapman for analysis by Detective Technician, Joel Bourdon, of the Elkhart Police Department.  Ex. 2. Daggy dep., p. 122, l. 5-20.  Daggy did not gather or handle the prints from the Saylor murder scene.  *Id*.  He did not know what happened in the Sailor investigation from April 2003, after he arrested Canen on the outstanding warrant, until August 2003 when he joined the Homicide Unit.  Ex. 2, Daggy dep. p. 99, l. 5-9. Daggy did not know when Chapman became involved in the investigation nor did he know that he was involved in the case as a fingerprint expert.  *Id*., p. 99, l. 20-25.  Chapman never spoke to Daggy.  *Id*., p. 81, l. 1-4. Chapman never heard of Daggy endorsing his personal qualifications or advocating his expertise as a print examiner.  *Id.*, p. 91, l. 1-7.  Daggy was not involved in the forensic analysis of evidence in the Sailor case and did not communicate with the Indiana State Police or Chapman about reviewing the print evidence nor was he familiar with Chapman's involvement in the investigation and he did not speak with the prosecuting attorneys about Chapman.  *Id.,* pp. 102-103, 111-112.

Chapman erroneously identified the print as belonging to Canen. [DE 1-1, p. 4] Ex. 15, Chapman, dep. p. 80, l. 24-25.

Canen's became upset with Daggy harassing about her involvement in the burglaries at the Waterfall apartments and that is one of the reasons she sued him. Ex. 4, Canen dep. p. 79, l. 24-25, 80, l. 1, p. 81, l. 1-25.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Rule 56(c) further requires the entry of summary

judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, the record must reveal that no reasonable jury could find for the non-moving party. *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994).

<u>Argument</u>

I.      **There is no evidence that Daggy handled the fingerprint evidence, communicated with Chapman or knew of his qualifications.**

A.      <u>**Individual liability standard**</u>

Canen asserts liability against Daggy in his individual capacity under 42 U.S.C. §1983 alleging that her rights to due process and to be free from false imprisonment were violated when:

- Daggy originally sent evidence to the Indiana State Police that was later withdrawn for unknown reasons.  [DE #1-1, p. 3, ¶ 10];

- Daggy testified that Canen's fingerprint was found on a Tupperware container believed to have been handled by the killer inside Sailor's apartment [DE #1-1, p. 3, ¶ 13];

- Daggy endorsed and advocated Chapman's expert testimony.  [DE #1-1, p. 5, ¶ 28];

- Daggy did not fully disclose Chapman's lack of qualifications in fingerprint identification, and had he done so she would not have been arrested for Sailor's murder.  [DE #1-1, p. 5, ¶ 30].

Individual capacity lawsuits seek to impose personal liability on government officials for actions taken under color of state law. *Townsend v. Fairman*, 1996 U.S. Dist. LEXIS 2502, No. 95 C 0882, 1996 WL 9914, at *2 (March 1, 1996 N.D. Ill.)  To state a claim for personal liability under section 1983, Canen must show evidence that Daggy was personally involved in the deprivation of her constitutional rights. *Whitford v. Boglino*, 63 F.3d 527, 530-31 (7th Cir. 1995). "Personal involvement" requires an overt act, or a failure to act "with a deliberate or reckless

disregard of plaintiff's constitutional rights  . . . " *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994); *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985). The official need not have directly participated in the alleged constitutional deprivation but the conduct causing the constitutional deprivation must occur at the direction or knowledge and consent of the defendant official. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).  There is no evidence that Daggy was involved in handling fingerprint evidence or communicating with the Indiana State Police Crime Lab or Chapman.  Daggy had nothing to do with the processing or analyzing of the prints from the Sailor crime scene.  Because Daggy did not know Chapman's expert qualifications or communicate with him on the investigation, the plaintiff cannot prove that he willingly suppressed exculpatory evidence from her attorney and summary judgment on plaintiff's claims against him is appropriate.

   **B.    Daggy did not handle any print evidence or send evidence to the Indiana State Police Lab**

   Canen claims that Daggy sent evidence from the Sailor crime scene to the Indiana State Police Crime Lab and then withdrew the evidence and gave it to Chapman.  However, it is undisputed that Evidence Technician, Lt. Joel Bourdon processed all the Sailor crime scene evidence from November 29, 2002 to December 14, 2002, and on May 8, 2003 he sent evidence, including prints, to the State Police Crime Lab for analysis.  Ex. 1, Bourdon, Trial Tr. 547-602; Ex. 6, aff. J.  Bourdon with attached Ex.'s A-D.  On August 27, 2003, at the request of Detectives Snider and Conway, Bourdon lifted additional prints from items recovered at the crime scene, including the plastic tub pictured on one of the crime scene photographs, and sent them to Chapman.  These Case Supplementary Reports were produced to Canen prior to her criminal trial, and confirmed by Daggy's deposition testimony.  Ex. 1, Bourdon Trial Tr. 541-602; Ex. 6, aff. Bourdon, with attached Ex, A, B, C, D, E, and F; Ex. 2, Daggy dep. pp. 85, l. 1-13, 102, 111, l. 12-21, 120, l. 10-25; Ex. 14, V. Becker dep., p. 40, 50, l. 22-25, 51-52, 53, l. 1-

14.  Bourdon wrote in his Case Supplementary Reports the steps he took to process and secure the evidence, including print evidence, and later testified at the trial consistent with what the reports stated and explained the reason that he and Prosecutor Becker used the State Police Lab and later Chapman for analysis was because of the Crime Lab's delay in processing print evidence. Ex 6, aff. Bourdon.  Daggy was not involved in sending the prints and there are no records showing he processed evidence or communicated with the State Police Crime Lab or Chapman.  He testified that he did not know who made the decision to involve the Indiana State Police or Chapman in reviewing the fingerprint evidence and that testimony is uncontroverted. Ex. 2, Daggy dep. p. 102.

> ### C.   Daggy did not testify that Canen's fingerprint was found on a Tupperware container nor did he endorse and advocate Chapman's expert testimony.

Daggy testified at trial that his responsibility on the newly created Homicide Unit was to re-interview witnesses and follow leads from any statements given.  He also testified that he observed certain witnesses being interviewed by other officers and he did not interview Porter, Canen, or Royer before his arrest.  Daggy did not testify about the fingerprint found on the plastic tub nor did he testify about Chapman's qualifications or expert opinion. Ex. 1, Daggy Trial Tr. 395-421.  Moreover, Chapman only testified at Canen's trial and Daggy neither advocated nor endorsed his testimony.  Canen's claim that Daggy testified on these matters is therefore not supported by any facts and must fail as a matter of law.

Canen may attempt to characterize Daggy's affidavit of probable cause in support of the State's charging information as "testimony" in an attempt to argue that the affidavit improperly advocated or endorsed Chapman's lack of qualifications. Ex. 16, Aff. Prob. Cause, 9/2/2004. Such an argument fails for the several reasons.  First, there is no evidence that Daggy (or anyone else) knew of Chapman's lack of qualifications to review the prints.  Daggy's probable cause affidavit does not mention Chapman or his qualifications and does not endorse or vouch for him.

18

Secondly, as stated above, the first time Chapman testified about the fingerprint was at Canen's trial on August 8, 2005, nearly a year after Daggy signed the probable cause affidavit so there was no testimony by Chapman that Daggy could have endorsed or advocated when he signed the probable cause affidavit.

Finally, an affidavit of probable is not testimony, rather it is a sworn statement of facts which the State believes are sufficient to show that the crime charged has been committed by the defendant. See I.C. 35-33-5-2. An affidavit need not be based upon the officer's personal knowledge and he may rely upon hearsay, which in this case is Chapman's written expert opinion, as long as a totality of the circumstances corroborates the hearsay. The probable cause standard is a "practical, nontechnical conception." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id., at 175*; *Illinois v. Gates*, 462 U.S. 213; 103 S. Ct. 2317; 76 L. Ed. 2d 527; (1983). As the *Gates* court observed in citing to its opinion in *United States v. Cortez*, 449 U.S. 411, 418 (1981), its observation regarding the standard for "particularized suspicion," is also applicable to the probable-cause standard:

> "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same -- and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."

In *Gates,* the court indicated that the trustworthiness of hearsay for purposes of proving probable cause can be established in a number of ways, including where (1) the informant has given correct information in the past; (2) independent police investigation corroborates the informant's statements; (3) some basis for the informant's knowledge is shown; or (4) the informant predicts conduct or activities by the suspect that are not ordinarily easily predicted.

19

462 U.S. at 227.  "Depending on the facts, other considerations may come into play in establishing the reliability of the informant or the hearsay." *Id*.

Similarly, under Indiana law, probable cause means a probability of criminal activity, not a prima facie showing. *Seltzer v. State*, 489 N.E.2d 939, 941 (Ind. 1986).  Under Indiana's criminal procedure statute, a warrant for an arrest filed with a judge must be supported by an affidavit setting forth the facts then in knowledge of the affiant or from information based upon hearsay constituting probable cause.  See I.C. 35-33-5-2 (a).  When based on hearsay, a probable cause affidavit must either: (1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or (2) contain information that establishes that the totality of the circumstances corroborates the hearsay. I.C. 35-33-5-2 (b)  *Fry v. State*, 25 N.E. 3d 237 (Ind. App. 2015)(when relying upon known witnesses as opposed to confidential informants, a court may properly rely upon hearsay to support an arrest warrant where totality of the circumstances corroborates the hearsay.)  The hearsay must exhibit some hallmarks of reliability.

Chapman had been used by the prosecutor in prior cases involving fingerprint examinations and had the reputation of someone who could examine latent fingerprints and that is why he was asked to review the prints in the Sailor murder case.  The information gathered by the Homicide Unit certainly corroborated Chapman's opinion that Canen was at the scene of Sailor's murder and was involved with Royer.  Daggy's probable cause was not an endorsement of Chapman nor is it evidence that Daggy had any knowledge of Chapman's lack of qualifications as a latent print examiner.

> **D.**    **Daggy did not know Chapman's qualifications and therefore could not disclose them.**

Daggy did not know Chapman's lack of qualifications to give an opinion on the latent print and what he did not know about Chapman, he could not disclose.  Still, it must be noted

that Canen's allegation that she would not have been *arrested* for Sailor's murder had

Chapman's lack of qualifications in fingerprint identification been disclosed is simply not

supported by the following facts known to the officers as a result of their investigation:

- Several months before Sailor's murder, residents of eight apartments in the Waterfall Highrise told police they were burglarized by someone using a key.

- Waterfall Highrise Maintenance man Charlie Pratcher told police that he Canen stayed over at his apartment one night and the master key to the apartments was missing the next day.

- The officers investigating Sailor's murder noticed that the apartment door was not forced open and the door could only be locked from the outside by someone with a key.

- Canen refused to answer her apartment door when the police were knocking and when questioned she told the detectives that she was out of town the night of Sailor's murder.

- Florence Macioce told police that she saw Canen at Waterfall Highrise on the night of the murder and that she was nervously walking outside the building.

- Charlie Lambert told police that he saw Canen on the night of the murder at Waterfall Highrise pacing back and forth in front of the building with her bags packed and asking for a ride to her boyfriend's apartment.

- Lambert later told Macocie not to tell anyone that he gave Canen a ride because he didn't want to be involved and he told the police that he suspected Canen of taking checkbooks out of apartments.

- Nina Porter heard Canen make statements that she and Andrew Royer were involved in the robbery and death of an older woman who wouldn't give them money.

- Royer confessed in two of his three interview with the police that he and Canen robbed and murdered Sailor.

The evidence cited above supports probable cause for an arrest for felony murder and

would support a conviction. When Deputy Prosecutor Becker was asked whether Chapman

testifying that the print was not a match would have caused a different verdict, she did not agree

and stated:

A. I honestly don't know what he meant, to be quite frank. And, you know, I should probably go back. You asked me if I thought the outcome would be different had he testified that it was not her print. I can't say that to any degree of certainty, because the amount of other evidence against Ms. Canen was pretty significant. And I think that it is possible that the jury would have felt the same way we did, that she was definitely part of it. So I can't sit here and honestly say that the jury would have had a different outcome. Do I think their conversations would have been different? Absolutely. Do I think that their assessment of the case would have been different? Absolutely. Can I sit here and say there would have been a different outcome? No, I can't.

Q. Well, in fact, you did say that, but deciding not to file -- refile the charges. Isn't that correct?

A. Yes. But that doesn't say that there would have been a different outcome. It says that we as a prosecutor's office do not feel that it is appropriate use of resources to attempt to retry Ms. Canen for this case given what has occurred.

## II.    Canen cannot show a Brady violation against Daggy.

Canen alleges that Daggy violated *Brady v. Maryland,* 373 U.S. 83 (1963) and to succeed on such a claim she must prove three elements: (1) that the evidence at issue was favorable to her, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the evidence must have been material, meaning there is a reasonable probability that the result of the proceeding would have been different. *Beaman v. Freesmeyer,* 776 F.3d 500 (7th Cir. 2015) This last element is often referred to as "prejudice." *Carvajal v. Dominguez,* 542 F. 3d 561, 566. (7th Cir. 2008) "The reasonable probability standard for materiality of suppressed evidence is less rigorous than a preponderance of the evidence standard in that a petitioner need only show that the new evidence undermines confidence in the verdict." *Goudy v. Basinger,* 604 F.3d 394, 399 (7th Cir. 2010) (citing *Kyles v. Whitley,* 514 U.S. 419 (1995). Canen has not satisfied the second and third elements of the *Brady* test.

Regarding the second element, there are no facts to support the claim that Daggy willingly or inadvertently suppressed Chapman's qualifications. Daggy didn't know Chapman's qualifications because he didn't work with him. He could not disclose what he didn't know.

In addition, it is not reasonably probable that the outcome of Canen's trial would have been different had Chapman testified there was no match. Deputy Prosecuting Attorney Becker, who was well aware of all the evidence presented to the jury in Canen's case, testified at her deposition that she could not say that the jury would have decided differently had Chapman not testified. Becker dep. at 46. The testimony of Macocie and Lambert placed Canen at Waterfall and Detective Thayer testified that Canen earlier denied being there. Porter's testimony that Canen told her that Royer and her went to get money from an old lady and although no one was supposed to get hurt but that she said "Thanksgiving, thanks for giving death" when considered in light of Det. Conway's testimony that Royer confessed to killing Sailor in her apartment over a demand for money was sufficient evidence to convict Canen of participation in the robbery resulting in Sailor's death. As such, Canen cannot show that she has met the third element to prove a claim under *Brady*.

### III. Daggy is entitled to Qualified Immunity for a claim that he had a duty to investigate Chapman's qualifications.

Daggy is entitled to qualified immunity for conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); *Steidl v. Fermon*, 494 F.3d 623, 628 (7th Cir. 2007). Two questions must be answered when determining whether an official is entitled to qualified immunity: first, whether the plaintiff has alleged a deprivation of a constitutional right at all, and second, whether the right at issue was clearly established at the time and under the circumstances presented. *Id*.

Willful or inadvertent non-disclosure of *known* exculpatory evidence is certainly a depravation of a constitutional right so the first question is answered.   *Beaman,* 776 F.3d 508. However, the right at issue as alleged by Canen against Daggy in this case, is not clearly established.   Daggy did not know that exculpatory evidence exists and there is no clearly established right granted to a defendant to have an officer initiate inquiries to discover the State's approved expert's qualifications.   Not inquiring about the evidence it is not the same as "withholding" evidence as contemplated under *Brady*. More to the point in this case, Daggy did not know and had no reason to suspect Chapman's qualifications because he did not work as forensic analyst and his duties in the investigation did not bring him into contact with Chapman. Daggy is therefore entitled to qualified immunity from Canen's claims.

### IV.    Daggy is entitled to an award of fees.

Canen has filed her suit against Daggy without facts to support her allegations.   There is evidence from her testimony that the reason she filed the suit is because she was mad at him for investigating her for the Waterfall burglaries.   Should the court grant summary judgment, Daggy requests an award of fees incurred for his defense.   Section 1988 provides for the award of attorneys' fees to the prevailing party in a §1983 action. 42 U.S.C. § 1988(b). Although the statute specifies the award of such fees is within the court's discretion, it is clear that prevailing defendants have a much harder row to hoe than do prevailing plaintiffs. See *Gonzales v. Transfer Techs., Inc.*, 301 F.3d 608, 609 (7th Cir. 2002). A prevailing defendant may be entitled to fees only in cases in which the plaintiff's action was frivolous, unreasonable, or groundless. *Cf. Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 54 L. Ed. 2d 648, 98 S. Ct. 694 (1978); see also *Hughes v. Rowe,* 449 U.S. 5, 14-15, 66 L. Ed. 2d 163, 101 S. Ct. 173 (1980) (extending Christianburg's Title VII fee-shifting standard in the § 1983 context); *Khan v. Gallitano,* 180 F.3d 829, 837 (7th Cir. 1999); *Hamer v. County of Lake,* 819 F.2d 1362, 1367

24

(7th Cir. 1987). We have defined a suit as frivolous "if it has no reasonable basis, whether in fact or in law." *Tarkowski v. County of Lake,* 775 F.2d 173, 176 (7th Cir. 1985).  As shown by the evidence stated above, Canen has no basis in fact to file suit against Daggy and he has met the standard to award him fees.

## Conclusion

For the above stated reasons, Daggy respectfully requests the Court grant his motion for summary judgment as to all claims, and award him fees for the defense of this frivolous suit.

**NEWBY, LEWIS, KAMINSKI & JONES, LLP**

By:      /s/Martin W. Kus
Martin W. Kus, Attorney ID No. 5377-46
*Attorney for Defendant, Mark Daggy*
916 Lincolnway, P.O. Box 1816
La Porte, IN 46352-1816
(219) 362-1577
mwkus@nlkj.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| **LANA CANEN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 3:14-CV-00315 |
| | ) | |
| **DENNIS CHAPMAN**, in his Individual | ) | |
| capacity as Deputy for the Elkhart County | ) | |
| Sheriff Department, and **MARK DAGGY,** | ) | |
| in his individual capacity as Officer for | ) | |
| the Elkhart Police Department, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**PROOF OF SERVICE**
_____

I hereby certify that on the 14th day of July, 2015, I electronically filed a complete copy of Defendant, Mark Daggy's Memorandum in Support of Motion for Summary Judgment and this Proof of Service with the Clerk of the Court using the CM/ECT system to the following:

Michael F. DeBoni: mdeboni@yaub.com
Michael K. Sutherlin: msutherlin@gmail.com
Nathaniel M. Jordan: njordan@yaub.com
Samuel M. Adams: msutherlin@gmail.com
Cara Schafer Wieneke: cara@wienekelaw.com

**NEWBY, LEWIS, KAMINSKI AND JONES, LLP**

By:    /s/ Martin W. Kus
Martin W. Kus, # 5377-46

26