**STATE'S WITNESS - MARK DAGGY - (DIRECT)**

1          MR. ZOOK:  Oh, yes, sir.

2          THE COURT:  He'll be released on his subpoena.

3   Call your next witness.

4          MS. BECKER:  Thank you.  The state would call

5   Detective Mark Daggy.

6          THE COURT:  Raise your right hand, sir.

7              (The witness was sworn.)

8       THE WITNESS:  I do.

9       THE COURT:  Take the witness stand.

10                     **MARK DAGGY**

11  **called on behalf of the State, having been first duly**

12  **sworn, testified as follows:**

13                  **DIRECT EXAMINATION**

14  BY MS. BECKER:

15    Q    Mr. Daggy, would you please introduce yourself to

16         our jury?

17    A    My name is Mark Daggy.

18    Q    What do you do for a living?

19    A    I'm a detective with the Elkhart Police Department.

20    Q    Is there an area of the detective bureau at the

21         Elkhart Police Department in which your specialize?

22    A    Yes, I do.

23    Q    What area would that be?

24    A    It's the homicide unit.

25    Q    In order to become a detective and then specialize

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1      in the homicide unit, what kind of training and

2      experience have gone to?

3   A   I went to a two-week homicide school at the

4      Southern Police Institute that was about two years

5      ago.  That's located at the University of

6      Louisville, and I also went to Cold Case School a

7      year ago at an Annapolis, Maryland that was put on

8      by NCIS Naval Criminal Investigative Service in

9      Annapolis, Maryland.

10   Q   In addition to that and prior to you homicide

11      school as well as you cold case school, did you

12      have training and experience as a detective with

13      the police department?

14   A   Yes, I did.

15   Q   How long had you been a detective?

16   A   I'd say around -- before coming to the homicide

17      unit, about a year and a half two years as a

18      regular detective.

19   Q   How long had you been a police officer before you

20      came out?

21   A   Ten years.

22   Q   Did you also have to go to the academy, the police

23      academy in order to get training and experience to

24      become a police officer?

25   A   Yes, I did.

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1    Q   Have you also gone through many continuing

2         education type seminars to teach you different

3         skills in being a police officer and detective?

4    A   Yes, I have.

5    Q   What kinds of schools have you gone to to become a

6         detective?

7    A   Went to Reid Interrogation Schools.  That's one

8         that really comes to mind as far as being a

9         detective.  There was a lot of on-the-job training.

10        I have been to several undercover schools.

11   Q   In fact, part of the time that you were a police

12        officer you did serve undercover.  Correct?

13   A   That's correct.

14   Q   As part of your undercover duties, was it important

15        for you to have communication with individuals that

16        may be suspects, may be criminal witnesses, and

17        that type of thing?

18   A   Yes.

19   Q   Did you find that the skills that you learned at

20        some of these training schools as well as your

21        experience enabled you to have good communication

22        and learn things that maybe somebody else wouldn't

23        be able to learn?

24   A   Yes.

25   Q   Okay.  Do you believe that these skills have

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1      enabled you to be well-rounded as a homicide

2      detective?

3   A   Yes, I do.

4   Q   All right.  And based upon the training and

5      experience that you have, have you been assigned as

6      lead investigator in certain homicide cases

7      currently pending, specifically this one, at

8      Elkhart City Police Department?

9   A   Yes, I have.

10  Q   Let's go ahead and talk about Thanksgiving of 2002

11     and the murder of Helen Sailor.  First of all, were

12     you lead detective on that murder in thanksgiving

13     of 2002?

14  A   No, I wasn't.

15  Q   All right.  Are you familiar with the officers who

16     were?

17  A   Yes, I am.

18  Q   Who were the officers that were the lead

19     investigators at the time Helen Sailor was

20     murdered?

21  A   At that time, the lead officer was Detective

22     Thayer.  He's now a sergeant, uniform division, and

23     Detective D'Andre Christian.

24  Q   Okay.  Now, at the time that the murder occurred,

25     was there an investigation done by Detective Thayer

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1          and Detective Christian?

2     A    Yes, there was.

3     Q    What kinds of things were done during that initial

4          investigation?

5     A    Initially they would -- they canvassed the entire

6          apartment complex, witnesses, neighbors.  They --

7          initially the scene was secured.  Detective

8          technicians came in and processed the entire scene,

9          performed interviews, just kind of hit the road and

10         asking questions of people that were near or

11         resided inside the Waterfall Highrise.

12    Q    Based upon -- well, first of all, what is a canvass

13         of the area?

14    A    Basically, canvassing the area, you can go door to

15         door asking if -- you've seen the residents inside

16         the doors, if they've heard anything, something

17         unusual.  And to me canvassing is, you know, if you

18         seen anything in the immediate area that presents a

19         red flag or need to be -- possibly might be

20         evidence.  It could be in and around the building.

21    Q    Within the first three days of the investigation,

22         were you able to gather or was the police

23         department able to gather quite a bit of

24         information about what had been going on?

25    A    Yes.

399

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1  Q  Even though they gathered a significant amount of
2     information, were there really any red flags to
3     begin with?

4  A  No, I don't believe so.  I don't -- I don't think
5     that at the very beginning a suspect rose to the
6     top.

7  Q  Did there come a time when some information
8     involving a person by the name of Lana Canen threw
9     a red flag into the investigation?

10 A  Yes.

11 Q  All right.  Now, we can't talk about specifically
12    what that is at this point.  But let's go ahead and
13    discuss what happened with this case after the
14    first three days.

15 A  I'd say -- well, in November of 2002 when this
16    occurred -- can you repeat that?

17 Q  Sure.  What happened -- after the first three days,
18    you know, those first three hot days when you
19    talked about the canvassing of the neighborhood,
20    interviewing witnesses, gathering information, were
21    there any suspects at that time?

22 A  No.

23 Q  Okay.  Did the investigation continue past that
24    time?

25 A  I would say it continued, but it wouldn't -- slowed

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1      down within the first two to three months.  I mean,

2      it pretty much slowed down.

3   Q   Why was that?

4   A   I believe the investigators at the time ran out of

5      leads.

6   Q   When in an investigation you get a lead, what I

7      would characterize as a red flag, do you send

8      people out, do interviews, try and get to the

9      bottom of that?

10  A   Yes, we do.

11  Q   And as a result of following up on these leads, did

12     a suspect emerge?

13  A   No suspect or suspects emerged.

14  Q   Okay.  Any idea how many detective, officers, ect.,

15     had been working on this investigation?

16  A   Well, initially there probably was a handful of

17     them, maybe four or five; but it -- ultimately at

18     the beginning I would say Detective Todd Thayer and

19     Detective Christian had the responsibility of this.

20  Q   Did they also have other detectives that would go

21     out and interview people so that they wouldn't have

22     to spread themselves so thin?

23  A   Yes, they did.

24  Q   And did they from time to time, I call it powwow,

25     confer with each other to see what each other had?

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1  A   Yes, they did.

2  Q   Even with all this work, any suspects?

3  A   No.

4  Q   Did there come a time when the homicide unit was

5      formed so that you could devote more time to this

6      type of case?

7  A   Yes, we did.

8  Q   When the homicide unit was formed, was this one of

9      first cases that you took up?

10 A   I think it was the first case.

11 Q   All right.  What was special about the homicide

12     unit that enabled you to focus exclusively on this

13     case and give it intense attention?

14 A   We had the luxury -- I mean, this is -- our

15     department formed a homicide unit.  We never had

16     this before.  So we had the luxury of four or five

17     fresh cases looking at a case, not developing any

18     tunnel vision, and concentrating all their time on

19     this homicide.

20         And usually, we would work just one homicide

21     case, whether it we cold or a fresh case, we'd look

22     at that one case.  And in the past, we wouldn't

23     have that luxury.  You'd have -- you'd have a

24     detective that would get assigned a homicide case,

25     plus he'd have all these other cases, burglaries or

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1      robberies so their -- their case load will build

2      up. We had the luxury of just working on just this

3      one case. Five heads looking into it.

4   Q  When homicide took this case on, did you go

5      reinterview individuals that had been originally

6      interviewed back at the time of the murder?

7   A  Yes, we did.

8   Q  And when was that?

9   A  I believe it was August of 2003 is when we started

10     this.

11  Q  Okay. And in August of 2003, were able to locate

12     most of the people that had provided information

13     originally?

14  A  Yes.

15  Q  Were all those people reinterviewed?

16  A  Yes.

17  Q  After they were reinterviewed, did you learn some

18     additional information that started to kind of fall

19     into a context at this point?

20  A  Yes, we did.

21  Q  Now, although we can't talk specifically, you

22     indicated earlier that there was a red flag that

23     surrounding Lana Canen's name. Correct.

24  A  Correct.

25  Q  Now, did there come a time when Lana Canen was

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1           known to be with another person by the name of

2           Nina -- Nina Porter?

3     A     Yes.

4     Q     Did somebody go talk to Nina Porter after she had

5           been with Lana Canen from your Police Department?

6     A     Yes.

7     Q     And after that, did the leads start to develop and

8           things fall into place?

9     A     Yes.

10    Q     After that occurred, did one of the detectives from

11          homicide actually go interview a person?

12    A     Yes.

13    Q     Who was that person?

14    A     Nina Porter.

15    Q     After Nina Porter.

16    A     Andrew Royer, sorry.

17    Q     Okay.  Based upon what you had learned from Nina

18          and the information that you had at that time, did

19          the interview of Andrew Royer provide crucial

20          information about the murder of Helen Sailor?

21    A     Yes.

22          MR. ZOOK:  Objection, your Honor.  I believe

23    that's a multiple question.

24          THE COURT:  Rephrase your question.

25    ////

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1   BY MS. BECKER:

2   Q   Okay.  After you had gained this information from

3       Nina Porter and the interview with Andy Royer, did

4       the investigation take on a new character?

5   A   Yes, it did.

6   Q   Were you able to identify suspects at that time?

7   A   Yes, we were.

8   Q   Now, did you actually conduct the interview with

9       Andrew Royer when he was first interviewed in

10      August or September of 2003?

11  A   No, ma'am, I did not.

12  Q   Did you observe some of it?

13  A   Some of it I did.

14  Q   And were you privy to the information obtained

15      during that interview?

16  A   Yes.

17  Q   Was there a subsequent interview of Andrew Royer

18      just a day later?

19  A   Yes, there was.

20  Q   Did you conduct that interview?

21  A   No, I did.

22  Q   Were you -- did you observe that interview?

23  A   I don't believe I did.

24  Q   Were you privy to information in that interview?

25  A   Maybe from a supplement or a statement.

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1    Q   Was it consistent with the information that he
2        provided the first day?

3    A   It varied.

4    Q   Now, after you had these things and later on, did
5        you actually interview Andrew Royer?

6    A   Yes, I did.

7    Q   When did that take place?

8    A   It's about a year ago.  It was June of 2004.

9    Q   Okay.  When you interviewed Andrew Royer, did you
10       advise him of his rights?

11   A   Yes, I did.

12   Q   How did that come about?

13   A   I read -- I read his Miranda Form right to him.
14       There were two attorneys present.  He stated
15       that -- Andy -- Andy stated that he wanted to come
16       clean.

17   Q   Did he review his rights?

18   A   Yes, he did.

19   Q   Did he acknowledge that he understood them?

20   A   Yes, he did.

21   Q   Did he waive those rights in your presence?

22   A   Yes, he did.

23   Q   All right.  Now, did you ask him questions about
24       the murder of Helen Sailor at that time?

25   A   Yes, I did.

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1    Q    Now, you were aware of what he had said earlier.
2         Correct?
3    A    Correct.
4    Q    When you go into a subsequent interview knowing
5         what hasn't been said earlier, do you suggest or do
6         you remind them of what they said earlier as
7         they're giving new information?
8    A    Yes.  If they get to a point where it's -- well,
9         no, I don't.  But if it gets to a point where the
10        story is totally different, we might remind them
11        that, hey, your story is different.
12   Q    In fact, why don't you educate us a little bit on
13        how you take a statement.  What do you do in order
14        to get information from an individual that you
15        believe may be involved in a crime?
16   A    What I usually do is I would -- in this case, I
17        took Andy back to the Thanksgiving of 2002, start
18        from the morning when he woke up, and I just let
19        him talk like he did, let him answer, you know,
20        what happened next.  Okay.  What happened next.
21        Okay.  And just kind of go from there.  I don't
22        know if that answers your question.
23   Q    Uh-huh.  Even though you're aware of things that
24        such as physical evidence or what he said before,
25        do you interject that to try to get him back on

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1.              track, or do you just let him do his thing?

2.     A    I let him do his thing.  I don't want to provide

3.          him with anything.

4.     Q    Why is that?

5.     A    Because that would appear to be leading.

6.     Q    When you spoke to Mr. Royer about a year ago and

7.          you started asking him questions abut what happened

8.          on Thanksgiving, what did Mr. Royer tell you

9.          happened on Thanksgiving of 2002?

10.    A    He said that his mother came over to highrise,

11.         picked him up.  He said that he left the highrise

12.         with his mom at 1:00 p.m. and got back to the

13.         highrise being dropped off by his mother at 4:00

14.         p.m.  He said he came back to his room, he took a

15.         nap --

16.              MR. ZOOK:  Your Honor, may we approach.

17.                   (An off-the-record discussion was held

18.                   at the bench.)

19.              THE COURT:  Correct, Mr. Zook, not necessary to

20.    have that recorded.  Is that correct?

21.              MR. ZOOK:  That's right.

22.              THE COURT:  Ms. Becker, proceed.

23.    BY MS. BECKER:

24.    Q    Okay.  So, the defendant Andy Royer indicated that

25.         he had been picked up at one dropped off at four.

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1          What happened next?

2     A    He stated to me that he came back to the apartment,

3          took a nap, woke up, went to Martins Supermarket,

4          bought a case of beer, drank about eight years, and

5          got really drunk, and came back to his room.

6     Q    Did he say what he did when he came back to his

7          room after getting -- or came back, got really

8          drunk, and then what did he do?

9     A    Went back to bed.

10    Q    All right.  Was this consistent with the

11         information that Mr. Royer had provided before?

12    A    No.

13    Q    Okay.  Did you point that out to him?

14    A    I believe I did.

15    Q    Did he change his story at all?

16    A    He didn't change his story.

17    Q    Okay.  In fact, how many different versions from

18         the defendant were you aware of by this point?

19         THE COURT:  Excuse me.  When you say "the

20    defendant," are you referring to Mr. Royer.

21         MS. BECKER:  I'm sorry.  Andrew Royer.

22         THE WITNESS:  I believe three or four.

23    BY MS. BECKER:

24    Q    In an investigation, does that throw up some red

25         flags for you?

409

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1    A    Yes.

2    Q    Now, the defendant Andy Royer told you during your

3         interview he wasn't there.

4    A    Correct.

5    Q    Okay.  Did that alone make him a suspect just the

6         fact that he was lying to you?

7              MR. CRAWFORD:  Objection, your Honor.

8              THE COURT:  Rephrase your question.

9    BY MS. BECKER:

10   Q    The fact that it had been inconsistent from

11        previous statements?

12   A    Yes.

13   Q    Are you also familiar with the investigation as it

14        focussed around Lana Canen?

15   A    Yes, I was.

16   Q    Was Lana Canen originally interviewed by detectives

17        back when this murder occurred in 2002?

18   A    Well, they made several attempts to get ahold of

19        her, but I do not believe there was any formal

20        statement taken from her at all.

21   Q    Okay.  Do you know if they ever actually just

22        talked to her?

23   A    They did talk to her.

24   Q    Some time later, did a detective with the homicide

25        division, well, in August of 2003 have an

410

STATE'S WITNESS - MARK DAGGY - (DIRECT)

1      opportunity to interview Lana Canen?

2   A   Yes.

3   Q   Okay.  Did you actually conduct that interview

4      yourself?

5   A   No, I did.

6   Q   Did you observe that interview or parts thereof?

7   A   I believe parts of it I did.

8   Q   Okay.  Did Lana Canen provide a story or a version

9      of where she was on Thanksgiving of 2002?

10   A   Yes, she did.

11   Q   Subsequent to that, were you able to interview

12      additional witnesses to corroborate or contradict

13      that information?

14   A   Yes, I was.

15   Q   Did they corroborate it or contradict it?

16      MR. ZOOK:  Objection, your Honor.

17      THE COURT:  Sustained.

18      MR. ZOOK:  This is just hearsay.

19      THE COURT:  Sustained.

20 BY MS. BECKER:

21   Q   Has it been your experience that when an

22      investigation does not have any suspects to begin

23      with it's difficult to put things in context?

24   A   Yes.

25   Q   Once you obtained the additional statements from

STATE'S WITNESS - MARK DAGGY - (CROSS)

1          Andrew Royer and Lana Canen, were you able then to

2          go back and look at the original information

3          obtained and put it into context?

4     A    Yes.

5     Q    Once you have done that, do you put the entire

6          investigation together for purposes of presenting

7          it at a trial?

8     A    Yes, we do.

9          MS. BECKER:  Can I have just a moment, your

10   Honor.

11         THE COURT:  You may.

12             (An off-the-record discussion was held

13             between counsel for the state.)

14         MS. BECKER:  No further questions at this time.

15         THE COURT:  Mr. Zook, any questions?

16         MR. ZOOK:  No, sir.

17         THE COURT:  And, Mr. Crawford, any questions?

18         MR. CRAWFORD:  Thank you, your Honor.

19                     **CROSS-EXAMINATION**

20   BY MR. ZOOK:

21    Q    Detective, when was it that you first got involved

22         in this homicide investigation?

23    A    I believe it was August of 2003.

24    Q    And you made references to the early stages of the

25         investigation.  Am I to assume that you relied upon

412

STATE'S WITNESS - MARK DAGGY - (CROSS)

1        information in making those statements earlier in

2        your testimony?

3    A   I don't understand the question.

4    Q   You made statements concerning how your -- how the

5        initial investigation began.  How were you able to

6        come up with that information?

7    A   I -- I read it.

8    Q   So you read it.  You actually were not a

9        participant in that initial investigation.  Is that

10       correct?

11   A   That's correct.

12   Q   Now, in reading those statements, did you come

13       across the various -- the various names of people

14       during the course of the investigation early on?

15   A   Yes.

16   Q   And of those individuals was an individual by the

17       name of Larry Woodridge?

18   A   Yes.

19   Q   And I believe he was resident of the Highrise.  Is

20       that correct?

21   A   That's correct.

22   Q   And also an individual by the name of Tony Thomas.

23       Is that correct?

24   A   That's correct.

25   Q   And you mentioned that the first red flags were

STATE'S WITNESS - MARK DAGGY - (CROSS)

1       Andrew Royer and Lana Canen.  Isn't that correct?

2  A   When we -- when we took it.

3  Q   Just your portion of the investigation, not the

4       initial investigation.

5  A   That's correct.

6  Q   Okay.  So you were -- when you spoke that way, you

7       were relying upon only your portion of the

8       investigation.

9  A   Yes.  But we looked at the old -- we looked at the

10      old information.  We take that into account so that

11      when we start the new investigation, you know, we

12      form our own investigation and our -- our own

13      suspects.

14  Q   But if there were any red flags early on, those

15      might have come from either Detective Thayer or

16      Detective Christian.  Is that correct?

17  A   That's correct.

18  Q   Because they were the private investigators?

19  A   That's correct, but we still -- we still check

20      those out.

21  Q   Okay.  Now, you mentioned that you were only

22      actually involved specifically with the last

23      interview of Mr. Royer.  Is that correct?

24  A   That's correct.

25  Q   Did you have any participation whatsoever in the

STATE'S WITNESS - MARK DAGGY - (CROSS)

1         initial interviews or interrogations with Mr.

2         Royer?

3    A  I didn't sit in -- sit on in with Mr. Royer.  There

4         were portions of -- of it that I witnessed on a

5         close circuit television, but I did not participate

6         in the room.

7    Q  Were you there when he was driven to the Elkhart

8         Police Department?

9    A  Yes.

10   Q  And were you present with him when you went to

11        the -- or when he was taken to the Elkhart Police

12        Department?

13   A  Yes, I was.

14   Q  Did he comply with your request to go?

15   A  He certainly did.

16   Q  And that first time that you spoke with him, do you

17        recall the date of that?

18   A  Not off the top of my head.

19   Q  Okay.  The first time that he was spoken with, was

20        that the date of the first initial report was done

21        with Mr. Royer that same day, to your knowledge?

22   A  Yes, sir.

23   Q  And when you picked him up, do you know if he had

24        his medication before he was taken to the police

25        station?

STATE'S WITNESS - MARK DAGGY - (REDIRECT)

1   A   I don't know for sure if he had his medication or

2       not.

3   Q   Do you know if he had it with him when he went to

4       the police station?

5   A   I don't think he did.

6   Q   That's your recollection (intelligible)?

7   A   That's my recollection.

8   Q   Do you recall what time it was that you took him to

9       the police station the first time?

10  A   It was in the morning.  I would say around close to

11      9:00 a.m.

12  Q   Now, you mentioned that you had interviewed or

13      reinterviewed a lot of witnesses in the beginning

14      of August of 2003.  Is that correct?

15  A   Yes, sir.

16  Q   Were a lot of these individuals present or located

17      at the highrise where Ms. Sailor had died?

18  A   Yes.

19      MR. CRAWFORD:  No further questions, your

20  Honor.

21      THE COURT:  Ms. Becker, any other questions?

22      MS. BECKER:  Yes, thank you.

23              **REDIRECT EXAMINATION**

24  BY MS. BECKER:

25  Q   You indicated that you do refer back to the

416

STATE'S WITNESS - MARK DAGGY - (REDIRECT)

1      original detectives and their written documentation

2      in beginning your case review.  Is that correct?

3  A   Yes.

4  Q   Is it a requirement that you go ahead and provide

5      supplements or police reports whenever you do

6      things on a case?

7  A   Yes.

8  Q   All right.  And is that something that you put in

9      as many details as you can remember?

10  A   Yes.

11  Q   And then do you rely on that when you are

12      furthering an investigation?

13  A   Yes.

14  Q   Do you take it as gospel, or do you do your own

15      investigation?

16  A   We do our own investigation.

17  Q   After reviewing what had been previously been done,

18      did you then go back out and ensure that you had

19      all of your questions answered as well?

20  A   Yes.

21  Q   All right.  Now, several names were mentioned.

22      Larry Williams, Tony Thomas.  Was further

23      investigation done with those individuals?

24  A   Yes.

25  Q   In fact, Matt Johnson, Martha Haff, many other

1      people were mentioned in this investigation.

2      Correct?

3    A    That's correct.

4    Q    Now, did the detectives in homicide focus on

5      following up on those types of leads?

6    A    Yes.

7    Q    In fact, how far did you push those kinds of leads?

8    A    We pushed them until we couldn't follow anymore.

9    Q    During this time did any evidence arrive?

10   A    No evidence.

11   Q    Well, that showed that anyone other than the

12     defendants were responsible for Helen Sailor's

13     death?

14   A    No.

15   Q    Okay.  Was there any evidence you could put your

16     finger on at all that would indicate that Tony

17     Thomas or Larry Wood or any of these other people

18     had anything to do with this?

19   A    There was no evidence.

20   Q    Mr. Crawford mentioned any other red flags.  Even

21     if it wasn't a name or a person, if there was a red

22     flag or something that didn't sit right with you in

23     the investigation, did you follow-up on it?

24   A    Yes.

25   Q    Did anything lead to any place other than the

STATE'S WITNESS - MARK DAGGY - (REDIRECT)

1         defendants in this case?

2    A    Nothing else.

3    Q    And when you reinterviewed people in August of

4         2003, did you find that the information that you

5         obtained from them -- actually, strike that.  What

6         was one of the biggest challenges that you found in

7         the witnesses in this case?

8    A    The biggest challenge when reinterviewing all these

9         witnesses, a lot of them had mental -- diminished

10        mental capabilities, that was really hard.  A lot

11        of them were elderly, so a lot of them had -- they

12        had trouble communicating to you.

13             We had to, you know, we had to slow down when

14        we talked to the elderly and not be too fast just

15        so they could understand our -- our questions.  The

16        Waterfall Highrise just has a lot of tough

17        witnesses because you have the elderly, and you got

18        people with mental -- diminished mental capability.

19        That was the toughest aspect of this case.

20   Q    In light of the fact that you had these types of

21        witnesses -- well, let me ask you this.  When you

22        get a statement from somebody, even if it doesn't

23        seem to be accurate, do you still record it the way

24        that they say it?

25   A    Yes.

STATE'S WITNESS - MARK DAGGY - (CROSS)

1   Q   Why?

2   A   Because it's their words.  It's accurate to them.

3   Q   Okay.  Can you make any firm decisions just based

4       upon looking at one statement from one person and

5       saying, boy, this is it?

6   A   No.  It's just a part of the puzzle.

7   Q   Has it been your experience that you have to wait

8       until you get everything?

9   A   Yes.

10  Q   I'm sorry.  Before you can start putting things

11      together?

12  A   That's correct.

13  Q   Is that what happened in this case?

14  A   That's what happened in this case.

15          MS. BECKER:  I don't have anything further.

16  Thanks.

17          THE COURT:  Does anybody have any other

18  questions, Mr. Crawford?

19          MR. CRAWFORD:  I do, your Honor.

20                  **RECROSS-EXAMINATION**

21  BY MR. CRAWFORD:

22  Q   You mentioned that several of the people that you

23      spoke to had diminished mental capacity.  Is that

24      correct?

25  A   That's correct.

**STATE'S WITNESS - MARK DAGGY - (CROSS)**

1    Q   During the course of your conversations with Mr.

2         Royer and your involvement with him, would you

3         classify him in that category?

4    A   Yes, I would.

5    Q   During the course of your investigation, did you

6         come into contact with a lady by the name of Mary

7         Jane Dejong?

8    A   Yes, I did.

9    Q   And did you specifically interview her?

10   A   Yes, I did.

11   Q   Was she -- do you recall during the course of your

12        investigation where she resided?

13   A   I believe it was on the tenth floor room 1001.

14   Q   About the same location area where Helen Sailor

15        resided?

16   A   Yes.

17   Q   Did you follow-up on any leads that she gave you?

18   A   Yes.  Yes, I did.

19   Q   Did those take you anywhere?

20   A   No.

21        MR. CRAWFORD:  Nothing further, your Honor.

22        THE COURT:  Mr. Zook, any questions?

23        MR. ZOOK:  No questions.

24        THE COURT:  Ms. Becker, any other questions?

25        MS. BECKER:  No questions.