STATE'S WITNESS - CARL CONWAY - (DIRECT)

1          THE COURT:  You may step down.  Watch your
2     step, please.  Is she released?
3          MS. BECKER:  Yes, your Honor.
4          THE COURT:  Mr. Zook, Mr. Crawford.
5          MR. ZOOK:  Yes, sir.
6          MR. CRAWFORD:  Yes, your Honor.
7          THE COURT:  She'll be released on her subpoena.
8     Call your next witness.
9          MS. BECKER:  Thank you.  State of Indiana would
10    call Detective Carl Conway.
11         THE COURT:  Raise your right hand, sir.
12              (The witness was sworn.)
13         THE WITNESS:  Yes, sir.
14         THE COURT:  Take the witness stand, please.
15                    **CARL CONWAY**
16    **called on behalf of the State, having been first duly**
17    **sworn, testified as follows:**
18                 **DIRECT EXAMINATION**
19    BY MS. BECKER:
20    Q   Good afternoon.  Would you please introduce
21        yourself to our jury?
22    A   I'm Carlton Dean Conway.
23    Q   Mr. Conway, what do you do for a living?
24    A   I am currently employed as a Detective with the
25        Elkhart City Police Department.

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1   Q   How long have you been at the Ekhart City Police

2       Department?

3   A   I've been with Elkhart City since 1998.  I was with

4       South Bend Police Department since 1996 before

5       that.

6   Q   Okay.  Before you became a police officer, did you

7       attend any special schooling?

8   A   Yes.

9   Q   Where did you go?

10  A   Went to the Indiana State Law Enforcement Academy.

11  Q   During the academy, did you learn different tactics

12      as far as policing is concerned and interviewing

13      tactics?

14  A   Yes, ma'am.

15  Q   Since that time, have you received additional

16      training in the areas of interviewing -- well, why

17      don't you tell us what your training is?

18  A   Since back in the detective bureau, I have gone to

19      two different interview schools.  One for basic

20      interviewing and interrogation also an advanced

21      interview and interrogation school put on by the

22      Reid Corporation.  And I've also gone down to the

23      Southern Police Institute which is a homicide

24      school.  It's put on down at the University of

25      Louisville.

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1   Q   A couple of years ago, were you a part of the

2       homicide team that was formed at the Elkhart Police

3       Department?

4   A   Yes, ma'am, I was.

5   Q   During that time, did you have the occasion to take

6       over the investigation of the murder of Helen

7       Sailor?

8   A   Yes, ma'am, I did.

9   Q   What did you do when you first got this case?

10  A   When I first got the case, I spent a long duration

11      of time just reviewing documentation that already

12      existed from the previous investigator.

13  Q   Okay.  Who were the previous investigators?

14  A   D'Andre Christian was the primary that originally

15      had the case.

16  Q   Was Detective Todd Thayer involved in the original

17      investigation as well?

18  A   Yes.  Detective Todd Thayer and D'Andre Christian

19      they work in -- in conjunction with each other as

20      part of a homicide investigation before the

21      homicide unit was organized.

22  Q   Now, when you got this case and started looking at

23      it, at the time that you picked it up, was it

24      considered a cold case, or was it considered just

25      one that you needed to look at?

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1    A    A cold case is when you go ahead and you've
2         exhausted every avenue, every lead, and then we
3         also have what we call unresolved cases where there
4         still may be some work that could be looked into.
5         At our opinion, it was more of an unresolved case.
6    Q    Okay.  And when you looked at this case, did you
7         then go back through with a fine tooth comb and
8         follow up on all of these leads?
9    A    Yes, ma'am.
10   Q    All right.  Now, after following up on all of these
11        leads, did there come a time when the attention
12        shifted to two specific individuals?
13   A    Yes, ma'am.
14   Q    Who were those people?
15   A    Lana Canen and Andrew Royer.
16   Q    Now, after -- let me ask you this.  Did there come
17        a time when you or a member of your team spoke to
18        Nina Porter?
19   A    Yes, ma'am.
20   Q    Did she provide you information that assisted in
21        this investigation?
22   A    Yes, ma'am, she did.
23   Q    After speaking to Nina and getting that
24        information, who did you directly go to?
25   A    Andrew Royer.

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1    Q    When you came into contact with Andrew Royer,
2         explain to us how that came about?
3    A    After obtaining the information from Nina Porter,
4         we collectively thought about it.  We decided to go
5         try to take -- try to interview Andy about the
6         homicide; and we went to this apartment, introduced
7         ourselves told him why we wanted to speak to him,
8         invited him down to the police department.  He
9         willingly accompanied us.
10   Q    Who is we?
11   A    I'm not quite sure who was with me at the time.  I
12        believe it might have been Lieutenant Posthuma or
13        Sergeant Bill Wargo.  I'm not quite sure.
14   Q    And at that time, did the defendant, Andy Royer,
15        come with you?
16   A    Willingly, absolutely.
17   Q    All right.  Who drove him there?
18   A    I did.
19   Q    On the way there, did you talk about anything?
20   A    No.  He was over at the Waterfall Highrise.  It's
21        only about a block and a half from the police
22        department, relatively a quick drive.
23   Q    Okay.  Once you got to the police department, what
24        happened?
25   A    We got to the police department.  Went ahead and

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1      escorted Andy into one of the interview rooms.  At
2      that time we, like I said, once again, we
3      reiterated why we were talking to him, advised him
4      of his Miranda Rights, told him that we were
5      looking at him in reference to having possible
6      involvement in Helen Sailor homicide.  He waived
7      his right to writing, and then we proceeded to have
8      an interview.
9    Q  Okay.  Let's back up just a little bit.  Do you
10      remember specifically what you told him as far as
11      why you were talking to him?
12   A  I told him that we had obtained information saying
13      that he was involved with the murder of Helen
14      Sailor.
15   Q  When you told the defendant, Andrew Royer, that,
16      how did he respond?
17   A  He had been -- originally, he was out of denial,
18      but he was -- wasn't very confrontational about it.
19      He seemed pretty relaxed about the whole situation.
20   Q  You also indicated that you read him his Miranda
21      Warnings.  What are the Miranda Warnings?
22   A  Anytime we start an interview with any potential
23      suspect, we have a legal rights advise form which
24      we'll go ahead and advise him of the Miranda
25      Warnings kind of what you see on TV and -- and if

483

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1        they agree to talk to us, we request a signature,

2        and then we go ahead and sign as a witness where

3        it's time and dated.

4    Q   Did you have a conversation with Andrew Royer about

5        his Miranda Warnings?

6    A   Yes, ma'am.

7    Q   Did he appear to understand you?

8    A   Yes, ma'am, completely.

9    Q   In fact, did you have different conversations with

10       him.

11               (The witness coughed.)

12   Q   I'm sorry.  Do you need some water?

13   A   No.  I'm okay.  Thank you.

14   Q   Did you have conversations with him so that you

15       could get a feel for what his level of

16       understanding was?

17   A   Yes, ma'am.

18   Q   Okay.  Did you believe that he understood the

19       Miranda Warnings when you provided them to him?

20   A   100 percent.

21   Q   And did he execute that sheet indicating he

22       understood and was waiving his right?

23   A   Yes, ma'am.  He reviewed it.  We reviewed it

24       together.  He signed it in agreement to speak with

25       me.

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1  Q    Okay.  Now, how did you conduct an interview with

2       Mr. Royer?

3              (A cell phone rang in the courtroom.)

4          THE COURT:  Anybody who has a cell phone, let's

5  get it turned off right now.  Does everybody have their

6  cell phone or pager turned off?

7  BY MS. BECKER:

8  Q    How did you conduct an interview with Andrew Royer?

9  A    Well, obviously due to the nature of the topic, we

10      originally start off what we call a preinterview at

11      that time.  But we'll sit there.  We'll just have

12      casual conversation, just trying to build a base

13      rapport with the individual, and then gradually

14      ease our way into the topic at hand.

15 Q    Okay.  Is this something that takes time to do?

16 A    It can take a long time to do.

17 Q    What time, if you recall just general, did you

18      bring Andrew Royer to the police department that

19      day?

20 A    It was -- if I can refer to the Miranda Rights

21      Form, I believe the time would be on that.

22 Q    I'm going show you what's been marked for

23      identification purposes as State's Exhibit 15.  Do

24      you recognize this?

25 A    Yes, ma'am.  This is the Miranda Rights Form filled

485

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1      out by me and Mr. Royer.

2    Q   Okay.  Does this accurately depict the -- the

3        Miranda Rights form that you personally executed

4        with the defendant, Andrew Royer?

5    A   Yes, ma'am.  This is a carbon copy of it yes,

6        ma'am.

7    Q   What date did that interview occur?

8    A   September 3, 2003.

9    Q   All right.  And what time did that occur?

10   A   As written on here, it was 9:34 a.m.

11       MS. BECKER:  Okay.  Thank you.  State would

12   move to admit what's been marked for identification

13   purposes as State's Exhibit 15.

14       MR. ZOOK:  No objection.

15       MR. CRAWFORD:  No objection, your Honor.

16       THE COURT:  State's Exhibit No. 15 will be

17   admitted without objection.

18       MS. BECKER:  State declines publication at this

19   time.

20   BY MS. BECKER:

21   Q   So about 9:30 in the morning you go through rights

22       and then you do this preinterview process.

23   A   Yes, ma'am.

24   Q   What -- why do you do a pre-interview?

25   A   Like I said, just to go ahead and build a rapport

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1       at first, and then obviously due the topic at hand
2       there is denials.  It's kind of almost like a -- I
3       mean, it's -- it's an interview where we're trying
4       to go ahead basically sift through, I guess, the
5       nonsense that's going on.  In fact, it can take
6       quite a long amount of time.
7    Q  Okay.  Is this recorded either audiotaped or some
8       other method?
9    A  At that time, no, it was not.
10   Q  Why not?
11   A  Well, that was the procedure that our police
12      department had established at the time.
13   Q  Okay.  And how long did it normally take to get
14      through a pre-interview with an individual who is a
15      suspect in a homicide?
16   A  It -- it -- it -- there's no set time.  This
17      particular one was only a matter of a couple of
18      hours, two or three hours.
19   Q  All right.  You started about 9:30.  Did you
20      provide any breaks in there?
21   A  Yes, ma'am.
22   Q  What kind of breaks.
23   A  We brought Mr. Royer food.  He was allowed to use
24      the restroom.  He basically -- we made him -- we
25      made very well aware that he was -- basically any

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1              need -- any need he had he was allowed to let us
2              know and we would try to accommodate him anyway we
3              could.   He was allowed to have cigarette breaks.
4      Q   During this pre-interview, was there any
5          question that -- where he was understanding you?   I
6          mean, were you able to communicate with him?
7      A   Absolutely.
8      Q   Okay.   During the preinterview, did there come a
9          time when the defendant, Andrew Royer, began to
10         make some admissions to you about Helen Sailor's
11         murder?
12     A   Yes, ma'am.
13     Q   Before we go any further, first of all, do you see
14         person that you were speaking to that you've
15         referred to as Andrew Royer in the courtroom today?
16     A   Yes, ma'am.
17     Q   Would you please describe what he is wearing and
18         where he is seated in the courtroom?
19     A   Dark haired gentleman wearing a cream colored
20         short-sleeve shirt, glasses sitting just beside
21         Mr. Crawford.
22             MS. BECKER:   Thank you.   Would the record
23     please reflect this witness has identified the defendant,
24     Andrew Royer.
25             THE COURT:   The record will so reflect.

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1   BY MS. BECKER:

2   Q   When you were talking to the defendant, were there

3       any techniques that you have used that you found

4       helpful in getting the defendant to open up to you?

5   A   Just basically it was what we refer to as a

6       retechnique.  It's one of the techniques we learned

7       during interview school.

8   Q   What is that?

9   A   Basically, we -- as we talk to the person, we

10      openly confront them with the situation and the

11      knowledge that we have in reference to their

12      participation in the crime, and Mr. Royer was very

13      susceptive to it, and he openly admitted that he

14      committed the homicide.

15  Q   How much information do you actually give?

16  A   Oh, we would try -- we try not to give any at all.

17  Q   Okay.  When -- help us understand what you're

18      talking about here.  For example, you confront them

19      with something, but yet what do you hold back?

20  A   We basically hold the back primary details.  When

21      we confront them with very vague generalized

22      information that we have whether we say, you know,

23      we do have witness statements.  There is evidence.

24      We are very vague and generalized.  And what it is

25      and then when it comes time when they do confess to

489

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1       them that way it gives them the opportunity to give

2       us the details of the incident that we'll go ahead

3       and corroborate that they did actually commit the

4       crime.

5    Q  Okay.  Why would you hold back details?  I mean,

6       that's a way to get them to talk, isn't it?

7    A  Well, it's also a way you can also feed them

8       information that they can go ahead and either

9       one -- it can -- they can go ahead and -- they can

10      go ahead and create their own defense on, or it can

11      also -- they can also use that as saying that we

12      forced them to say these things.

13   Q  Okay.  In your experience as a detective, do you

14      give details in your interviews?

15   A  Very limited; very limited.

16   Q  Okay.  When you were interviewing the defendant,

17      Andrew Royer, for first time on September 3, did

18      you give him any details about Helen Sailor's

19      murder?

20   A  No.  As a matter of fact, in Mr. Royer's case I

21      made a point not to do it.

22   Q  Why not?

23   A  I mean, I -- we were well aware of Mr. Royer,

24      and -- and of -- we had limited knowledge about his

25      mental background.  So I definitely wanted to make

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1        a point not to give to Mr. Royer just for the sheer

2        fact that he might go ahead and dispose of the

3        concept that we might have been spoon feeding him

4        information.

5     Q  Okay.  Now, during this preinterview when the

6        defendant, Andrew Royer, started giving you details

7        about the murder of Helen Sailor, what specifically

8        did he tell you he did?

9     A  He gave renditions of it; but for the most part, he

10       openly admitted that he went into Helen Sailor's

11       apartment and he strangled her, and then he was

12       able to give us details about how he committed the

13       strangulation along with what he did to dispose of

14       some of the evidence that was -- that we found

15       during the original investigation that corroborated

16       what he was saying.

17    Q  Okay.  Did he demonstrate anything for you?

18    A  Yes, ma'am, he did.

19    Q  What specifically did the defendant, Andrew Royer,

20       demonstrate for you?

21    A  During the interview when he was talking about how

22       he strangled Ms. Sailor, I -- I took my tie off,

23       and I -- and I -- and I asked him, please, show me

24       how you did it.  And without hesitation he reached

25       forward and acted like he grabbed the collar of my

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1      shirt, and he twisted his hand like this.  He said

2      I grabbed her, and I twisted, and I held her like

3      this.

4   Q  Okay.  Did he continue to provide details that

5      were corroborated by other physical evidence?

6   A  Yes, ma'am.

7   Q  Anything specific?

8   A  He talked about the fact that there was a rope that

9      was used.  That was a piece of information that no

10     one was aware of.  We did find marks on

11     Ms. Sailor's neck that indicated she was strangled

12     by a rope.  He talked about areas of her apartment

13     that was cleaned up, along with items that were

14     used from her apartment that no one knew about.

15         MR. CRAWFORD:  Objection, your Honor.

16  Speculation as to what no one knew about who may or may

17  not have known it.

18         MS. BECKER:  I'll rephrase it.

19         THE COURT:  Let's, you know, let's stick to

20  question and answer and probably we won't have that

21  happen.  The objection will be sustained.  Rephrase.

22  BY MS. BECKER:

23  Q  Did the defendant refer to items of -- or cleaning

24     up things that were details not released to the

25     public?

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1   A   Yes, ma'am.

2   Q   Were there other details that were not released to

3       the public which the defendant seemed to have

4       intimate knowledge of?

5   A   Yes, ma'am.

6   Q   What were those?

7   A   Locations within the apartment that were rummaged

8       through, where some of the evidence was disposed

9       at.

10  Q   Where was that?

11  A   Waterfall Highrise has an internal garbage chute

12      that goes to every floor where you can drop items

13      down, and they will go down into a main hopper

14      down -- actually adjoined to the building outside

15      the parking lot.  Some of the items -- some of the

16      towels that were used to clean up the area of the

17      scene were actually thrown in the garbage chute,

18      and we found them in the hopper.  He knew this.  No

19      one else -- we did not ever disseminate that

20      information to him.

21  Q   Okay.  So there were some details that you kept

22      completely private.

23  A   Yes, ma'am.

24  Q   Yet he had intimate knowledge.

25  A   Absolutely.

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1   Q   Now, by this time, did you figure out you probably

2       ought to get this on tape?

3   A   Yes, ma'am.

4   Q   All right.  What did you do at that point?

5   A   After we -- after we finalized the pre-interview

6       then I openly told Mr. Royer, pulled out a tape

7       right in front of us, and we went ahead and

8       conducted a audiotape confession.

9   Q   Did the defendant Andrew Royer's demeanor change

10      when he saw that tape recorder?

11  A   Very much.

12  Q   Did you still get -- try to take a statement from

13      him?

14  A   Yes, ma'am.

15  Q   I'm going to show you what's been marked for

16      identification purposes as State's Exhibit 16.  Do

17      you recognize this?

18  A   Yes, ma'am.

19  Q   What is it?

20  A   It is a dubbed copy of the confession statement

21      taken from Mr. Royer on September 3, 2003.

22  Q   Have you had an opportunity to listen to what's

23      been identified at State's Exhibit 16?

24  A   Yes, ma'am.

25  Q   Is this an accurate recording of the interview that

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1        you did with Andrew Royer on September 3, 2003?

2    A    For the most part, yes, ma'am.

3    Q    Are there areas that have been blanked out for

4        evidentiary purposes?

5    A    Yes, ma'am, there has been.

6    Q    All right.  Other than that, is it accurate in it's

7        entirety?

8    A    Yes, ma'am.

9    Q    Thank you.

10        MS. BECKER:  State would move to admit what's

11   been marked for identification purposes as State's

12   Exhibit 16.

13        MR. CRAWFORD:  No objection.

14        MR. ZOOK:  No objection, your Honor.

15        THE COURT:  Without objection, Exhibit 16 will

16   be admitted, and I have a question.

17            (An off-the-record discussion was held

18            at the bench.)

19        THE COURT:  Proceed.  16 is admitted without

20   objection.

21        MS. BECKER:  State would move to publish

22   State's Exhibit 16 by playing it for the jury.

23        THE COURT:  Any objections?

24        MR. CRAWFORD:  No objection, your Honor.

25        MR. ZOOK:  No sir.

495

1    THE COURT:  Without objection, State's Exhibit

2  16 will be published to the jury at this time.  Ladies

3  and gentlemen, we're going to play this tape for you.  If

4  you cannot hear it, get your hand up, let us know, and

5  we'll make adjustments.

6              (State's Exhibit 16 was published to

7              the jury.)

8    MR. ZOOK:  Your Honor, there's a point

9  objection that I want to make to the next statement that

10  the jury will hear on this.

11    THE COURT:  The next statement.

12    MR. ZOOK:  Yes.  Once it finally comes back on

13  again.

14    THE COURT:  Well, the exhibit has been

15  introduced.

16    MR. ZOOK:  I guess I was misunderstood what was

17  taken out of it.

18    MS. BECKER:  Excuse me.  May we approach.

19              (An off-the-record discussion was held

20              at the bench.)

21    THE COURT:  The objection will be overruled.

22    MS. BECKER:  Thank you.

23              (State's Exhibit 16 continued to be

24              published to the jury.)

25    MS. BECKER:  May we approach.

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1              courtroom and the following
2              proceedings were had.)
3         THE COURT:  Be seated, please.  Ms. Becker.
4         MS. BECKER:  Thank you, your Honor.
5              (State's Exhibit 16 continued to be
6              published to the jury.)
7    BY MS. BECKER:
8    Q    Detective Conway, why did you end the interview at
9         that point?
10   A    It -- it was very obvious that you could tell that
11        Mr. Royer was starting to get very fatigued and
12        just go ahead and for the preservation of his right
13        (unintelligible) the case we decided to go ahead
14        and conclude the interview at that point so he
15        could go ahead and get some rest.
16   Q    Did you then allow Mr. Royer to leave?
17   A    No.  At that point, Mr. Royer was placed under
18        arrest for murder.
19   Q    Then did you allow him to go somewhere so that he
20        could sleep?
21   A    Yes, ma'am.  He was -- he was escorted back to the
22        detention area where he was, I mean, given food,
23        allowed to sleep.
24   Q    Okay.  Do you know if he did sleep?
25   A    I couldn't testify to that.  I assume he did.

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1    Q    The next day did you again try to continue your
2         interview?

3    A    Yes, ma'am, I did.

4    Q    Did Mr. Royer appear to be refreshed?

5    A    Yes, he did.

6    Q    Tell us about how he appeared as far as his state
7         of mind at that point in time?

8    A    You could tell he was -- you could tell he was
9         obviously concerned.  He had made comments how he
10        was afraid of talking to me because he was afraid
11        that he was gonna' -- cause he knew that he would
12        get in trouble because from what he had done.

13             We went ahead and talked and kind of rebuild
14        that rapport again.  At one point in time I even
15        made a point to tell him that, you know, he
16        would -- he would probably feel better if he would
17        just be straight with me and come out with
18        everything.

19   Q    At this point in time, did you believe he was
20        telling you everything that he knew?

21   A    No.

22   Q    Was that based upon what you already knew about the
23        scene?

24   A    Correct.

25   Q    Okay.  Even though you know they're not telling you

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1      the truth, or what you believe to be the truth, do

2      you still do what you did by taking that audio

3      recording so that you could produce that later?

4 A   Yes, ma'am.

5 Q   All right.  So the next day, namely, September 4,

6      did you try to go at him again to try to get the

7      truth out?

8 A   Yes, ma'am, I did.

9 Q   I'm going to show you what's -- oh, I'm sorry.

10     Before you began the next interview, did you

11     Mirandise him once again?

12 A   Yes, ma'am, we did.  He was -- submit another form

13     where he went ahead and signed and waived his

14     rights again.

15 Q   I'm going he show you what's been marked for

16     identification purposes as State's Exhibit 17.  Do

17     you recognize this?

18 A   Yes, ma'am.  This is a carbon copy of the Miranda

19     Form dated September 4, 2003, and the time he was

20     advised was 8:25 a.m.

21 Q   Okay.  Is this a true and accurate representation

22     of the actual Miranda form that -- or a carbon copy

23     of the Miranda form that you provided to the

24     defendant, Andy Royer, and had him sign?

25 A   Yes, ma'am.

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1   Q   Once again, you did you communicate with him his

2       rights, and did he waive those rights?

3   A   Yes, he did.

4   Q   Did he appear to understand you?

5   A   100 percent.

6       MS. BECKER:  State would move to admit what's

7   been marked for identification purposes as State's

8   Exhibit 17.

9       MR. ZOOK:  No objection.

10      MR. CRAWFORD:  No objection, your Honor.

11      THE COURT:  State's Exhibit No. 17 will be

12  admitted without objection.

13      MS. BECKER:  State declines publication at this

14  time.

15  BY MS. BECKER:

16  Q   Detective Conway, I'm now showing you what's been

17      marked for identification purposes as State's

18      Exhibit 18.  Do you recognize this?

19  A   Yes, ma'am.

20  Q   What is it?

21  A   This is a dubbed copy of the second confession

22      given by Mr. Royer on September 4, 2003.

23  Q   Okay.  Does this -- or have you had an opportunity

24      to review this audiotape?

25  A   Yes, ma'am, I have.

STATE'S WITNESS - CARL CONWAY - (DIRECT)

1    Q    Is it an accurate copy of the audiotaped interview

2         that you did with Andrew Royer on September 4?

3    A    Yes, ma'am, it is.

4         MS. BECKER:  Thank you.  State would now move

5    to admit what's been marked for identification purposes

6    as State's Exhibit 18.

7         THE COURT:  Mr. Zook.

8         MR. ZOOK:  No objection.

9         THE COURT:  Mr. Crawford.

10        MR. CRAWFORD:  No objection.

11        THE COURT:  Exhibit 18 will be admitted without

12   objection.

13        MS. BECKER:  State moves to publish State's

14   Exhibit 18 by playing the same to the jury.

15        THE COURT:  Mr. Zook.

16        MR. ZOOK:  No objection.

17        THE COURT:  And Mr. Crawford.

18        MR. CRAWFORD:  No objection, your Honor.

19        THE COURT:  State's Exhibit 18 will be

20   published without objection.

21             (State's Exhibit 18 was published to

22              the jury.)

23        MS. BECKER:  No further questions at this time.

24        THE COURT:  Mr. Zook, cross-examination.

25        MR. ZOOK:  Yes, sir.

STATE'S WITNESS - CARL CONWAY - (CROSS)

1                    CROSS-EXAMINATION

2    BY MR. ZOOK:

3      Q   Detective Conway, you made these two recordings of

4          Andrew, and yet there's nothing leading up to the

5          recordings.  I believe you said it's department

6          procedure that you not record anything until the

7          time of the actual statement.

8      A   At the time we have what we call a pre-interview,

9          yes, sir.

10     Q   And it was your procedure that you would not record

11         the pre-interview.

12     A   That's correct.

13     Q   Was that true for other people you talked to as

14         well, no recording the pre-interview?

15     A   At that time, that was the homicide unit's

16         procedure.  At the time that we had the Royer

17         case -- that we started the Helen Sailor case, the

18         homicide unit was kind of in it's -- in it's

19         infantile stages, and we were trying to go ahead

20         and set parameters on how we would go and conduct

21         interviews, and how we would go ahead, and the

22         procedures and policies that we would go ahead and

23         have, and at the time this is the way that they

24         went ahead and decided to go ahead and do it.

25     Q   The -- the -- the tape recorder was there

                              506

STATE'S WITNESS - CARL CONWAY - (CROSS)

1      obviously.  Right?

2   A   That is correct.

3   Q   And you had access to tapes.  Is that right?

4   A   That is correct.

5   Q   But because of department procedure, you

6       deliberately did not record the pre-interview?

7   A   That is correct.

8       MR. ZOOK:  All right.  No more questions.

9       THE COURT:  Mr. Crawford.

10      MR. CRAWFORD:  Thank you, your Honor.

11                  **CROSS-EXAMINATION**

12  BY MR. CRAWFORD:

13  Q   Detective Conway, I believe the first time you

14      mentioned that you had spoken with Andrew Royer was

15      on September 3rd of 2003.  Is that correct?

16  A   No, that was not correct.

17  Q   When was the first time you spoke with Mr. Royer?

18  A   Actually, the first time I spoke with Mr. Royer was

19      through the initial investigation during the Helen

20      Sailor case where I was assisting Detective

21      Christian in a building canvas.

22  Q   And when was that exactly?

23  A   I can't remember the exact date, sir.

24  Q   Was that early on in the investigation process?

25  A   That was within the days following the homicide.

STATE'S WITNESS - CARL CONWAY - (CROSS)

1    Q    Would you have made an assessment concerning your

2         feelings of the mental abilities of Andrew Royer at

3         the time you initially had come into contact with

4         him?

5    A    At the time I initially came into contact with

6         Mr. Royer, I was assisting Detective Christian.  I

7         had just came back to the homicide unit.

8         Correction.  Back to the detective bureau, and I

9         was assisting Detective Christian.  She was the one

10        who spoke to Mr. Royer.

11   Q    So were you with Detective Christian when she spoke

12        to Mr. Royer?

13   A    Oh, yes, sir, I was.

14   Q    Were you able to observe his demeanor during the

15        course of those interviews?

16   A    We spoke for a few minutes, yes, sir.

17   Q    So were you able to get an impression of his mental

18        abilities at the time you first spoke with him when

19        you were with Detective Christian?

20   A    I knew that there were some mental issues, yes,

21        sir.

22   Q    How much involvement did you have with the case

23        initially on in its early stages after Ms. Sailor's

24        body was found?

25   A    Not much.  Just with the initial 24/48 hours worth

STATE'S WITNESS - CARL CONWAY - (CROSS)

1           of the investigation.

2     Q     Do you recall how many people you assisted with in

3           speaking with or how many you spoke with directly

4           at the time of your involvement in that first

5           couple of days?

6     A     No, sir.  Like I said, I was pretty much just

7           attached to other detectives assisting them.

8     Q     No idea how many you had talked to?

9     A     No, sir.

10    Q     Did you gather a lot of information during those

11          first couple of days in your involvement with the

12          initial investigation?

13    A     Like I said, I was assisting other detectives.  I

14          was pretty much kind of, I guess what you say, a

15          gopher.  I was kind of just a person who would be

16          there to assist the other detectives while they

17          went ahead and handled the investigation.

18    Q     But did you learn things while you were being a

19          gopher?

20    A     Yes, sir.

21    Q     Okay.  And was it only the first initial couple

22          days that you were involved in this before you were

23          later involvement again?  When specifically did you

24          get reinvolved with the investigation?

25                THE COURT:  I think we got a two-part question.

STATE'S WITNESS - CARL CONWAY - (CROSS)

1    One at a time.

2              MR. CRAWFORD:  I'm sorry.  I'll rephrase that.

3    Thank you, your Honor.

4    BY MR. CRAWFORD:

5    Q    When did you stop being actively involved initially

6         in the investigation?

7    A    Like I said, it was probably within the first 24/48

8         hours.  I was just extra manpower to assist other

9         detectives.

10   Q    And it was in -- during that course of time when

11        you spoke with Detective Christian and Andrew

12        Royer.

13   A    Yes.

14   Q    When exactly did you get back involved in the

15        investigation again?

16   A    After I was assigned to the homicide unit, the case

17        was assigned to me for investigation.

18   Q    Do you recall specifically when that was?

19   A    No, I don't.  I know it was within a couple weeks

20        of us speaking to Royer.

21   Q    At the time that you got back involved in this

22        investigation again, did you thoroughly review the

23        file including case reports and supplements?

24   A    Yes, I did.

25   Q    And did you look at all of the same statements that

STATE'S WITNESS - CARL CONWAY - (CROSS)

1    were given by these at the time that you reviewed

2    the file?

3  A  Yes, I did.

4  Q  Outside of looking at the file, did you talk with

5    other representatives of the police department and

6    gather additional information that may not have

7    been included in the file?

8  A  I did ask if there was anything I needed to know,

9    yes, sir.

10  Q  Who specifically was involved in the homicide unit

11    at the time of your initial involvement in this

12    case?

13  A  At the time it was being lead by Lieutenant Paul

14    Converse, second in command was Sergeant Bill

15    Wargo, and then there was Detective Mark Daggy,

16    Lieutenant Posthuma, and myself.

17  Q  Now, you mentioned when you -- so the second time

18    that you would have come involved -- come in

19    contact with Mr. Royer was when you picked him up

20    to bring him in the Elkhart Police Department.  Is

21    that correct?

22  A  That's correct.

23  Q  And that was on September 2 of 2003.  Is that

24    correct?

25  A  That is correct.

STATE'S WITNESS - CARL CONWAY - (CROSS)

1   Q   And I believe that you mentioned at that time that
2       you were accompanied by -- who exactly do you
3       remember being accompanied by you went to pick up
4       Andrew Royer?
5   A   If I do recall I said I really -- I couldn't
6       recall.
7   Q   Any reason to believe it might not have been
8       Detective Mark Daggy?
9   A   Like I said, I couldn't recall.  I knew it was
10      somebody from the unit.  I couldn't tell you for
11      certain whom.
12  Q   Do you recall when you went to pick up Andrew Royer
13      and questioned him whether he took his medication
14      with him to the Elkhart Police Department?
15  A   No, sir, he did not.
16  Q   He did not not take it.
17  A   No, sir.
18  Q   Do you recall if he -- if you had asked him if he
19      had taken his medication before going to the
20      Elkhart Police Department?
21  A   No, sir.  I do not recall if I did or not.
22  Q   Now, I believe you testified that it was
23      approximately at 9:34 a.m. or somewhere around
24      there when you gave him his Miranda Warning.  Is
25      that correct?

STATE'S WITNESS - CARL CONWAY - (CROSS)

1    A    That is correct.

2    Q    And it was after that that you conducted a

3         interview with him.  Is that correct?

4    A    That is correct.

5    Q    And it wasn't until approximately 1:30 or

6         1:00 o'clock in the afternoon that the tape

7         recorder began to role.  Is that correct?

8    A    That is correct.

9    Q    And you mentioned when Mr. Zook was up here that it

10        was not a departmental policy to record the audio

11        statements of the accused or alleged accused at the

12        time of the events when you first spoke with him?

13   A    The pre-interview, sir.

14   Q    Right.  And did you have access to videotape

15        cameras at that time?

16   A    Yes, sir, we did.

17   Q    And is that something that you could have used

18        either at the pre-interview time or at the time the

19        person was making the statement?

20   A    Once again, that was not policy at that time.

21   Q    And you've indicated I believe during direct

22        examination that you did not take any specific

23        notes at the time during the pre-interview phase.

24        Is that correct?

25   A    No, I didn't state that, sir.

STATE'S WITNESS - CARL CONWAY - (CROSS)

1    Q   Did you take specific notes at the time of the

2        pre-interview stage?

3    A   I took notes throughout the duration of our

4        interview, yes, sir.

5    Q   You mentioned, I believe, during direct examination

6        that you were careful in this particular interview

7        because you potentially had some issues or knew the

8        status of Mr. Royer concerning some mental

9        deficiency problems.  Is that correct?

10   A   I didn't say I knew the status.  I said I knew that

11       there was obviously something there.

12   Q   Potential concerns.

13   A   Yes.

14   Q   Did you seek to obtain any information concerning

15       that particular issue before questioning Mr. Royer?

16   A   Yes, we did.

17   Q   Did you seek to have a case manager or someone

18       available with him when you questioned him from

19       Oaklawn?

20   A   No, sir, we did not.

21   Q   But again, you testified that you were somewhat

22       aware of his mental status at the time you

23       questioned him.  Correct?

24   A   Yes, sir.

25   Q   To your knowledge, while he was being housed in the

STATE'S WITNESS - CARL CONWAY - (CROSS)

1      Elkhart Police Department September 3rd through
2      September 4th prior to your second interview with
3      him did, Mr. Royer have his medication?
4    A    Yes, sir, he did.
5    Q    When specifically do you recall him taking that?
6    A    After Mr. Royer was arrested for the murder of
7      Helen Sailor, we went back -- he gave us permission
8      to go back to his apartment and obtain his medicine
9      so he could have it.
10    Q    So to your knowledge this would be after the tape
11      recorded statement.  Is that correct?
12    A    The first one yes, sir.
13    Q    Okay.  I believe you mentioned during the course of
14      direct examination that there appeared at time or
15      times that Mr. Royer appeared mentally fatigued.
16    A    Yes, sir.
17    Q    Do you feel that he would appear tired
18      concentration abilities?
19    A    Yes, sir.
20    Q    Problems associated with that.
21    A    I'm sorry.  I don't understand, sir.
22    Q    Problems associated with his concentration at one
23      point in time.  Is that correct?
24    A    Yes, sir, as well as myself.
25    Q    You're not being treated at Oaklawn, are you?

515