STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    MS. BECKER:  Detective Joel Bourdon.

2    THE COURT:  Raise your right hand.

3         (The witness was sworn.)

4    THE WITNESS:  I do.

5    THE COURT:  Take the witness stand, please.

6              JOEL BOURDON

7    called on behalf of the State, having been first duly

8    sworn, testified as follows:

9              DIRECT EXAMINATION

10   BY MS. BECKER:

11   Q    Good morning, sir.  Would you please introduce

12        yourself to our jury?

13   A    My name is name Joel Bourdon.

14   Q    Mr. Bourdon, what do you do for a living?

15   A    I'm a police detective technician.

16   Q    How long have you been with the police department.

17   A    Since April of 1987, 18 -- a little over 18 years.

18   Q    When you first joined the police department were

19        you required to go through any training or gather

20        any schooling in order to become a police officer?

21   A    Yes.

22   Q    What kind of training did you receive?

23   A    I attended the Indiana Law Enforcement Academy the

24        basic training session.

25   Q    Okay.  When you first joined the police agency,

541

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1        what was your capacity?

2    A   I was a uniform patrol officer.

3    Q   How long were you a uniform patrol officer?

4    A   About a year and a half.

5    Q   What did you do next for the police department?

6    A   I went to the detective bureau.

7    Q   While you were in the detective bureau did you

8        receive further training and schooling regarding

9        interview techniques, evidence techniques, things

10       like that?

11   A   Yes, I did.

12   Q   Can you explain to the jury what kind of schoolings

13       you went to and different certifications you have

14       obtained?

15   A   Initially, actually, I believe I was still in

16       uniform division when I first started attending

17       Northwestern University Traffic Institute for

18       accident reconstruction.  It was taken down at

19       Plainfield, Indiana is actually where I took my

20       initial courses; and then also through the course

21       of the years then I've attended classes on arson

22       investigation to -- over in Ohio that's both the

23       basic and advanced and then subsequently I received

24       training in a lot of different topics.

25   Q   Okay.  You received training in processing crime

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1      scenes?

2  A   Yes.  Most of that was done after 1992 which is

3      when I started doing what I do now, a detective

4      technician.

5  Q   Why don't you tell us exactly what a detective

6      technician is first?

7  A   Basically, my -- my duties consist of responding --

8      upon being requested, responding out to crime

9      scenes.  Most of them are of serious nature, death

10     investigations of different types.  And when I get

11     there, my job is to document, photograph, videotape

12     collect evidence, take measurements, diagram and

13     then subsequently then we may process evidence

14     further.  We may send it to laboratories, a variety

15     of things, and then eventually prepare it and bring

16     it to court if needed.

17 Q   Since 1992 when you started as a Detective

18     technician until present day, any idea how many

19     hours of advanced schooling you've obtained?

20 A   A lot.

21 Q   Okay.  What types of courses?

22 A   I -- I initially started by taking a course from

23     the Federal Bureau of Investigation on physical

24     evidence, preservation, and collection.  That was,

25     I believe, a one -- week course.  And then since

543

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1      then I've taken classes through Northwestern

2      Traffic Institute up in Evanston, Illinois on crime

3      scene work.  I believe I took a photography class

4      from them.  I also took a facial reconstruction

5      course, and then I attended several seminars

6      through Wayne State University up in Michigan,

7      death investigation type courses.

8           And then most recently this last fall I

9      attended ten week -- the National Forensic Academy

10     down in Knoxville, Tennessee.  I attended that.

11  Q   In fact, the academy that you just attended, did

12     you rank in your graduating class?

13  A   Yes, ma'am.

14  Q   What was your rank in your graduating class?

15  A   I receive -- I -- I don't know that we would call

16     it a ranking, I -- they issue one award.  It's call

17     the Doctor Bass Award for achievements in forensic

18     investigations, and I received that out of my class

19     of 16 people.

20  Q   Okay.  So since 1992 or approximately 13 years that

21     you have been doing this detective technician

22     position, any idea how many death scenes you have

23     teched?

24  A   I think I could safely say over 100, probably

25     hundreds.  It's very difficult to say.  A lot of

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    them -- it may vary on our involvement.  It may be

2    something where my services are not needed, and one

3    of the other technicians would complete those

4    tasks.

5  Q  As part of all of the schools that you have been

6    to, have you been trained regarding fingerprint

7    detection and lifting or preserving?

8  A  Yes.

9  Q  What about serum or bodily fluid for purposes of

10   DNA testing?

11 A  Yes, I have.

12 Q  Are there very detailed procedures that must be

13   followed in order to preserve evidence like this?

14 A  Yes.

15 Q  In your experience in the crime scenes that you

16   have -- or in the scenes that you teched, do you

17   find that it's easy to gather forensic evidence

18   such as DNA or fingerprints or bodily fluids?

19 A  Is it easy.  There are occasions where it's a

20   relatively simple process after you've done it for

21   a while, and there's been lots of changes over the

22   years on how all of this is done and advancements

23   in technology.  It becomes more difficult with time

24   actually because of the sensitivity of testing.

25 Q  Let me ask you this, Detective Bourdon.  Is it easy

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1      to find -- actually, I shouldn't say it that way.

2      What characteristics are necessary before you can

3      detect something like a fingerprint?

4    A  Well, in that case, much of it is just making it

5      become visible.  Most -- most latent impressions,

6      most fingerprint impressions left behind are

7      difficult to see with the naked eye unless you

8      process them further.  Once they're located, the

9      actually recovery process is relatively simple.

10   Q  Have you been trained on the different ways to

11     locate fingerprints?

12   A  On a large variety of them.  I'm sure not all of

13     them.

14   Q  Okay.  And could you just briefly explain a couple

15     of the ones that are ones that you typically use?

16   A  Well, probably the most common way of -- of

17     locating fingerprint impressions is dusting.  It's

18     nothing more than using a -- there's several

19     different types of brushes that you use.  They're

20     very fine, and you apply a powder.  There's a

21     multitude of powders out there that can be used,

22     and basically it's applying that dust to the

23     impression left behind it.  It makes it become

24     visible.

25   Q  Now, we'll talk about fingerprints a little bit

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1      more in a few minutes, but let's go ahead and move

2      onto November 29 of 2002.  Did you receive a

3      request to arrive at the Waterfall Highrise

4      approximately November 29, 2002?

5   A   Yes, I did.

6   Q   Any idea what time of day it was?

7   A   I believe I got there shortly after eight o'clock

8      in the morning.

9   Q   Okay.  When you arrived on that scene, first of

10     all, do you remember what you did when you first

11     got there?

12  A   When I first got at the scene, I met with the

13     supervisor at the time which was Lieutenant Tom

14     Lerner.  He's -- actually, I believe he's the one

15     requested that I respond to that location.  And

16     then from there, he provided me with the initial

17     information they he had at that point.

18  Q   Do you get briefed by officers on the scene as much

19     as possible so that you can start narrowing down a

20     crime scene?

21  A   Yes, yes.

22  Q   Based upon the information you had received thus

23     far, what did you believe to be the actual crime

24     scene regarding Helen Sailor's death?

25  A   Helen Sailor's apartment.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    Q    Did you then go to Helen Sailor's apartment?

2    A    Yes.

3    Q    When you begin an investigation and specifically in

4         Helen Sailor's investigation after the briefing and

5         after figuring out where the crime scene is, what

6         is the first course of action that you take?

7    A    I normally at that point in time physically look at

8         it myself.

9    Q    Why do you just take a look at it to begin with?

10   A    Just to see in my eyes what I see that appears to

11        be relevant to what the crime we're investigating,

12        in this case, her death.  What items might -- could

13        possibly be related.  You don't always know because

14        you've got -- it's like anybody else's home,

15        there's lot of stuff, and so you have to kind of

16        get a feel for what might be related to it because

17        it is -- so much of it is unknown at that point in

18        time.

19   Q    Now, prior to your arriving, is the scene or the

20        area that might be involved secured in any way?

21   A    Yes.

22   Q    And the normal course of practice ever since you've

23        been a police officer, how is a scene secured?

24   A    Normally what takes place, every scene is

25        different, but normally what takes place is that

548

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1   there will be an officer posted, a uniform officer

2   normally, to secure the location and that can be

3   done in a variety of ways.  In this particular

4   case, it was an officer standing at the doorway to

5   the apartment.  This was on the tenth floor so

6   access was extremely limited of course naturally.

7   Q   When you arrived at the Helen Sailor's apartment,

8       was a uniform officer standing at the door guarding

9       the scene?

10  A   Yes.

11  Q   And when you went into the apartment, did you have

12      to basically log in or identify the fact that you

13      are now present?

14  A   Yes.  They logged -- that's that officer's job also

15      to maintain a log of who enters and exits the

16      scene.

17  Q   Okay.  So from the time that the scene is secured

18      by the police department whatever time that may be

19      until the time that you arrive, do you believe the

20      scene is usually secure?

21  A   Yes.

22  Q   Obviously you have no way of knowing what occurred

23      before police got involved.  Correct?

24  A   That's correct.

25  Q   Okay.  But once police get involved, do you feel

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1           comfortable with the security of scene?

2    A    Yes.  Our officers are good at it.

3    Q    Now, on November 29 in the morning hours after you

4         got a good look at Helen Sailor's apartment, what

5         was the next function?

6    A    After I reviewed that, it was determined that

7         Officer McConnell, he was the uniform technician,

8         would assist me in the processing of the scene and

9         then I began videotaping.

10   Q    Why do you videotape a scene first?

11   A    Just to get a -- it's -- it's difficult to show

12        everything.  Part of my job is to be able to show

13        this to everyone else whether it be investigators,

14        prosecutors, anybody including the jury later on,

15        what as best we can portray it, and one of the good

16        ways in doing that is videotaping.  We normally do

17        that first just to show the -- what we see as best

18        we can in the human eye.

19   Q    I'm going to show you what's been marked for

20        identification purposes as State's Exhibit 19.

21        Will you take a look at this and tell me if you

22        recognize it?

23   A    Yes, I recognize the label on this.

24   Q    What is it?

25   A    This is the copy of the scene videotape related to

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1          this case.

2     Q    All right.  And this case means the Helen Sailor

3          homicide?

4     A    Yes.

5     Q    All right.  Does this videotape accurately depict

6          what personally observed in Helen Sailor's

7          apartment the morning of November 29, 2002?

8     A    Yes, it does.

9     Q    Thank you.  Do you believe that this videotape will

10         enlighten the jury and illustrate your testimony as

11         not only the layout but also the way that the scene

12         appeared on the morning you discovered it?

13    A    Yes, it would.

14              MS. BECKER:  Thank you.  State moves to admit

15    what's been marked for identification purposes as State's

16    Exhibit State's 19.

17              MR. ZOOK:  No objection.

18              MR. CRAWFORD:  No objection, your Honor.

19              THE COURT:  Without objection, State's Exhibit

20    19 will be admitted.

21              MS. BECKER:  State would move to publish

22    State's Exhibit 19 by showing it to the jury.

23              MR. ZOOK:  No objection.

24              MR. CRAWFORD:  No objection, your Honor.

25              THE COURT:  And without objection, State's

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1   Exhibit 19 will be published electronically.

2            (State's Exhibit 19 was published to

3            the jury.)

4   Q   What are we looking at in this view?

5   A   This is the hallway of the tenth floor of the

6       Waterfall Highrise.

7   Q   Are you the person actually behind the video camera

8       in this?

9   A   Yes, I am.

10   Q   Why did you take this scene?

11   A   This is just showing the overall view of what we

12       see out in the hallway, just showing the

13       surrounding area, what kind of environment it was.

14   Q   What apartment number was Helen Sailor's apartment?

15   A   1002.

16   Q   Is this the door to Helen Sailor's apartment?

17   A   Yes, ma'am, it is.

18   Q   Why are you focussing on the locking mechanism?

19   A   It was just part of the normal course of

20       investigation.  You -- you would review what access

21       ways there are.  And in this case it would be that

22       door whether there's damage to the doorway or not.

23   Q   Now, you're entering into Helen's apartment.  What

24       area are you seeing now?

25   A   You're facing towards the north -- actually, right

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    now you're seeing the floor area in the entry

2    hallway.

3  Q  Why do you do that?

4  A  Try to show everything that you can: up, down, show

5     all the views, show what we see.  Just like you

6     would if you walked into her room.

7  Q  To your knowledge, had anyone disturbed anything

8     prior to your getting there?

9  A  I believe from the information I received was that

10    family members had looked in the victim's person

11    purse.

12 Q  Do you wear gloves or any other kind of protective

13    material while you are even doing this process?

14 A  Yes.

15 Q  Why?

16 A  Just to protect everything so if I inadvertently

17    tripped or had to catch myself that I wouldn't

18    transfer anything.  I normally wear gloves and

19    footwear protection.

20 Q  This key ring that you're focussing on right now,

21    were there any keys on that key ring?

22 A  No, ma'am.

23 Q  Did anybody advise you that they had removed those

24    keys prior to your arriving?

25 A  No.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    Q   The thing that you focussing on right there, the
2        little white bottle that was off on the table, was
3        that exactly where you found it?
4    A   Yes, ma'am, it was.
5    Q   Did you find any ropes or strings or anything like
6        that in that vicinity?
7    A   No.
8    Q   In fact, did you find anything like that anywhere
9        in the apartment?
10   A   No.
11   Q   This small bed right here and the Bible that is on
12       it, do you have any information that anyone had
13       manipulated or touched that Bible prior to your
14       arriving, or do you know?
15   A   Not that I'm aware of.
16   Q   What is this little package?
17   A   It was a Ziplock style bag, and it appeared to have
18       antacids in it.
19   Q   What are we looking at here?
20   A   This was believed to be the victim's purse.  The
21       black edge of it is shown in the video right now.
22   Q   Where are you standing when you're taking this
23       shot?
24   A   Right now I'm at the doorway leading from that
25       first room that we saw into the -- what I described

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1      as the east bedroom.

2   Q  Why do you focus on that box so much?

3   A  Because it was damaged.  The lock mechanism

4      appeared to be pried.

5   Q  Why do you make a point to document the position --

6      the exact position of a body in a crime scene so

7      early on?

8   A  Just because you -- it might assist in determining

9      the events.

10  Q  Does the body get moved usually early on?

11  A  No.

12  Q  There's a bit of glimmery substance that we just

13     saw on the left hand of Helen?  Did you make note

14     of this and collect samples of it during your

15     processing the scene?

16  A  If I recall correctly, that was not collected --

17     the items -- what was on her hand was not collected

18     at the scene.  That would have been done later on.

19  Q  Was there other areas in this apartment or right

20     around Helen's body that also had that same

21     glimmering substance?

22  A  Yes.

23  Q  Did you collect samples of that?

24  A  It was on some of the items that were recovered.

25  Q  There's also kind of pinky substance that was

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1       around the body, a liquid.  Did you collect samples

2       of that?

3  A   Again, that was also on some of the items which we

4       collected so, yes, they were collected.

5  Q   And did you later find bottles of things that might

6       be consistent with those things in the apartment?

7  A   Could be.

8  Q   Do you videotape those as well?

9  A   I believe so.

10  Q   What are we seeing here?

11  A   Right now I'm showing the closet door.  This is on

12       the east wall of the -- kind of the small hallway

13       leading from the bathroom into that east bedroom,

14       and now it's showing a stain that was on the door

15       itself behind the handle.

16  Q   What are you focussing on now?

17  A   Just showing the overall condition of the bed and

18       the surrounding.  There were stains observed on the

19       wall showing the drawers and items that were kind

20       of strewn about on the bed.

21  Q   Did you also find some of this -- or what appeared

22       to be consistent with the liquid on the floor in

23       the drawers?

24  A   Yes.  That red colored -- reddish pink colored

25       substance.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1              (The video was turned off.)

2    BY MS. BECKER:

3      Q    Now, detective, after you finished taking the

4           video, what did you do next?

5      A    Normally, in this process we started taking

6           35-millimeter photographs.

7      Q    Why do you also take photographs?

8      A    Just as another way of documenting what we

9           observed.

10     Q    May I approach?

11              THE COURT:   You may.

12     Q    I'd like to show you what's been marked for

13          identification purposes as State Exhibit 20.   Do

14          you recognize this?

15     A    Yes, I do.

16     Q    What is it?

17     A    This is a photograph, and in the central area of

18          the photograph it's depicting a door knob and door

19          lock this being to the apartment door that we're

20          speaking of 1002.

21     Q    All right.   Next I'd like to show you what's been

22          marked for identification purpose as State's

23          Exhibit 21.   Do you recognize this?

24     A    Yes, I do.

25     Q    What is it?

**STATE'S WITNESS - JOEL BOURDON - (DIRECT)**

1    A   This is a photograph taken standing at the front

2         doorway to the apartment facing towards the north.

3    Q   Thank you.  Next I'd like to show you what's been

4         marked for identification purpose as State's

5         Exhibit 22.  Do you recognize this?

6    A   Yes, I do.

7    Q   What is it?

8    A   This is a photograph taken showing the sink and

9         stove area of this same apartment.

10   Q   Okay.  Next I'd like to show you what's been marked

11       for identification purpose as State's Exhibit 23.

12       Do you recognize this?

13   A   Yes, I do.

14   Q   What is it?

15   A   This is photograph showing the kitchen table and

16       basically the west wall and adjoining furniture

17       items in the same apartment.

18   Q   Thank you.  Next I'm showing you what's been marked

19       for identification purpose as State's Exhibit 24.

20       Do you recognize this?

21   A   Yes, I do.

22   Q   What is it?

23   A   This is a photograph showing the kitchen table area

24       and it's content.

25   Q   Okay.  Is this photograph a little bit closer up

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1      than the one prior to it?  The one prior to it

2      would be State Exhibit 23.

3  A  Yes, it is.  It's more directed towards the

4      specifically the table.

5  Q  Okay.  Thank you.  Next I'm showing you what's been

6      marked for identification purposes as State Exhibit

7      25.  Do you recognize this?

8  A  Yes, I do.

9  Q  What is it?

10  A  This is a photograph showing the bed in the west

11      room or the living room area of this apartment

12      showing the items that were laying on the bed.

13  Q  Okay.  Would that specifically be the Bible?

14  A  The Bible and the associated envelope and a small

15      paper there.

16  Q  Next I'm showing you what's been marked for

17      identification purposes as State's Exhibit 26.  Do

18      you recognize this?

19  A  Yes, I do.

20  Q  What is it?

21  A  This is photograph taken showing -- basically

22      facing towards the east showing a recliner with

23      a -- with a seat cushion inside of a bag and then a

24      purse is laying on the floor next to that, and off

25      to your left is a television.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    Q    Thank you.  We're all these photograph; namely,

2         what's been identified as state's Exhibit 20

3         through and including State's Exhibit 26, taken the

4         morning of November 29, 2002 or thereabouts?

5    A    Or thereabouts.  It could have been the later on

6         that same day also.

7    Q    Are these true and accurate representations of what

8         you personally observed in the apartment of Helen

9         Sailor as you were teaseling it on or about

10        November 29, 2002?

11   A    Yes.

12   Q    Do you believe they will assist the jury in

13        understanding the crime scene and being able to

14        illustrate your testimony?

15   A    Most certainly.

16        MS. BECKER:  Thank you.  State would move to

17   admit what's been marked for identification purposes as

18   State's Exhibit 21 through 26 inclusively.

19        THE COURT:  Mr. Zook.

20        MR. ZOOK:  No objection.

21        THE COURT:  Mr. Crawford.

22        MR. CRAWFORD:  Your Honor, I would only object

23   to No. 21 in that it appears to be a similar shot to what

24   was already shot in the video and would be cumulative.

25   As for the other ones, I see that they're close pictures

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    and maybe not picked up in the video, but 21 I would

2    object to.  Seems to be a similar shot to what was in the

3    video.

4         THE COURT:  Well, all of these are similar to

5    what appeared in the video.

6         MR. CRAWFORD:  They're closer than that

7    particular overall view.

8         THE COURT:  Exhibits 19 -- excuse me --

9    Exhibits 20, 22, 23, 24, 25, and 26 will be admitted

10   without objection by either counsel.  Exhibit 21 will be

11   admitted over the objection of counsel for the defendant

12   Royer.

13        MS. BECKER:  State moves for publication of

14   State's Exhibits 20 to 26 inclusive.

15        THE COURT:  Mr. Zook, any problems that?

16        MR. ZOOK:  No objection.

17        MR. CRAWFORD:  Still noting my objection, your

18   Honor.  I have no objection to the others.

19        THE COURT:  Exhibits 20, 22, 23, 24, 25, and 26

20   will be published without objection.  Exhibit 21 will be

21   published over the objection of the defendant Royer.

22   They'll be published in the manner of the choosing by the

23   state.

24        MS. BECKER:  Thank you, your Honor.  State's

25   Exhibit 20, 21 22, 23, 24, 25, 26.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1           (State's Exhibits 20, 21, 22, 23, 24,

2           25, and 26 were published to the

3           jury.)

4   BY MS. BECKER:

5   Q    May I approach?

6        THE COURT:   You may.

7   Q    Detective, next I'd like to show you what's been

8        marked for identification purposes as State's

9        Exhibit 27.  Do you recognize this?

10  A    Yes, I do.

11  Q    What is it?

12  A    This is a photograph of the victim, Helen Sailor,

13       laying on the floor in the east bedroom area.

14  Q    Now, when you arrived on scene, had anybody come in

15       and moved the clothing or moved the body to your

16       knowledge yet?

17  A    No.

18  Q    All right.  So this is a depiction of what you

19       actually observed when you first arrived?

20  A    That is correct.

21  Q    Thank you.  Next I'd like to show you what's been

22       marked for identification purposes as State's

23       Exhibit 28.  Do you recognize this?

24  A    Yes, I do.

25  Q    What is it?

STATE'S WITNESS – JOEL BOURDON – (DIRECT)

1    A    This is a photograph of the victim's left hand and
2         the surrounding area.
3    Q    Thank you.  Next I'd like to show you what's been
4         marked for identification purposes as State's
5         Exhibit 29.  Do you recognize this?
6    A    Yes, I do.
7    Q    What is it?
8    A    This is a photograph of the victim's right hand and
9         surrounding area.
10   Q    Next I'd like to show you what's been marked for
11        identification as purposes as State's Exhibit 30.
12        Do you recognize this?
13   A    Yes, I do.
14   Q    What is it?
15   A    This is a photograph of a set of dentures and the
16        surrounding area.
17   Q    Thank you.  I'm showing you what's been marked for
18        identification purposes as State's Exhibit 31.  Do
19        you recognize this?
20   A    Yes.
21   Q    What is it?
22   A    This is a photograph showing the front of the
23        clothes dresser or bureau on the east wall of the
24        east bedroom.  It's showing that there were two
25        drawers out of it.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    Q   Did you find those two drawers somewhere in the
2        apartment?

3    A   Yes.

4    Q   Where were they?

5    A   Laying on the bed in that same room.

6    Q   Now, I'm showing you what's been marked for
7        identification purposes as State's Exhibit 32.  Do
8        you recognize this?

9    A   Yes, I do.

10   Q   What is it?

11   A   This is a photograph of one of the dresser drawers
12       laying on the bed in that same room?

13   Q   Okay.  Next is what's been identified as State's
14       Exhibit 33.  Do you recognize this?

15   A   Yes, I do.

16   Q   What is it?

17   A   This is a photograph of the red jewelry box that
18       was underneath the southeast corner of the bed in
19       that room in the east bedroom.

20   Q   Thank you.  Next I'm showing you what's been marked
21       for identification purposes as State's Exhibit 34.
22       Do you recognize this?

23   A   Yes, I do.

24   Q   What is it?

25   A   This is a photograph of partially the interior of

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1        the closet located on the east wall of the east
2        hallway leading from the bedroom into the bathroom.
3     Q  Thank you.  And then finally, I'll show you what's
4        been marked for identification purposes as State's
5        Exhibit 35.  Do you recognize this?
6     A  Yes, I do.
7     Q  What is it?
8     A  This is a photograph of the kitchen sink or
9        actually the south end of the kitchen sink and part
10       of the refrigerator and countertop in the kitchen
11       at this apartment.
12    Q  Why did you take this photograph?
13    A  Just showing the overall condition of things,
14       showing the surrounding items that were both in the
15       sink, around the sink.
16    Q  Okay.  The bottles that are in the sink, what did
17       you observe them to be?
18    A  They're juice bottles.
19    Q  What kind of juice?
20    A  Ocean Spray.
21    Q  What kind of Ocean Spray juice?
22    A  I believe it was cranberry.
23    Q  Was it red cranberry or white cranberry, do you
24       remember?
25    A  It was a reddish color.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    Q   And all of these photographs we've just discussed;

2         namely, what's identified as State's Exhibit 27

3         through State's Exhibits 35 inclusive, are these

4         accurate representations of what you personally

5         observed on the morning -- I'm sorry.  During the

6         day of November 29, 2002 at Helen Sailor's

7         apartment?

8    A   Yes.

9    Q   Do you believe that they accurately depict what you

10       saw and would assist the jury in understanding your

11       testimony?

12   A   Yes.

13   Q   Thank you.

14       MS. BECKER:  State moves to admit what's been

15 marked for identification purposes as State's Exhibits 27

16 through 35 inclusive.

17       THE COURT:  Mr. Zook, any objection.

18       MR. ZOOK:  No, sir.

19       THE COURT:  And, Mr. Crawford, any objection?

20       MR. CRAWFORD:  No, your Honor.

21       THE COURT:  State's Exhibits 27, through and

22 inclusive of 35 will be admitted without objection.

23       MS. BECKER:  State moves for publication of

24 State's Exhibit 27 through 35 inclusive through

25 electronic publication.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    THE COURT:  Any objection, Mr. Zook.

2    MR. ZOOK:  No, your Honor.

3    THE COURT:  Mr. Crawford.

4    MR. CRAWFORD:  No, your Honor.

5    THE COURT:  State's Exhibit 27 through 35 will

6  be published in any manner of choosing by the state.

7    MS. BECKER:  27, 28, 29, 30, 31, 32.

8        (State's Exhibits 27, 28, 29, 30, 31,

9        and 32 were published to the jury.)

10  BY MS. BECKER:

11   Q   Now, Detective Bourdon, the box that is located in

12       32 you characterized it as a jewelry box.  Why did

13       you do that?

14   A   Because later in collecting that and that's what I

15       found as its content.

16   Q   Did you actually identify the contents and keep

17       that as evidence?

18   A   Yes.  That box and contents were recovered.

19        (State's Exhibits 33, 34, and 35 were

20        published to the jury.)

21   Q   Detective, after you had the opportunity to

22       document all of the items in the apartment either

23       by video and/or with 35-millimeter film, what did

24       you do next?

25   A   Then we begin the process of taking measurements to

567

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    locate furniture items, the victim' position.  I

2    did this with the assistance of Officer McConnell.

3  Q  Why do you do that?

4  A  Just another way of documenting.  Just another way

5    of as accurately as we possibly can documenting

6    locations.

7  Q  In the event that it becomes important in a case

8    later, can you then make a diagram; for example, if

9    the measurements or distances become important?

10  A  Yes.

11  Q  After you've done the measurements and done this

12    rough sketch or whatever comes next, then what do

13    you do?

14  A  Then you would begin in the process of collection

15    and recovery of items.

16  Q  Okay.  Did you collect items such as the Bible, the

17    jewelry box, ect.

18  A  Yes, later that day.

19  Q  Okay.  Now, why do you actually collect those kinds

20    of items?

21  A  With -- with many of them in this particular

22    circumstance was for the possibility of impressions

23    left by someone.

24  Q  What do you mean by impressions?

25  A  Fingerprint impressions, palm prints.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    Q    Okay.  For example, the medicine container, why did
2         you collect that?
3    A    Because it was -- its positioning was such that is
4         was out on the counter with lots of other items and
5         it just -- medications just by their nature -- it
6         just seemed an odd positioning.  I don't -- that's
7         the best answer I can give to that.
8    Q    Fine.  Why did you collect the bottles from the
9         sink?
10   A    Because of their positioning.  They were out -- the
11        red substance or pinkish red substance that was
12        left in the bottle kind of coincided with what we
13        saw in the second room, in the east room.  I don't
14        know that for sure, but that's why they were
15        collected initially.
16   Q    Okay.  And after you collected all of these items,
17        did you what we call bag them and tag them?
18   A    Yes.  They were -- they were bagged and then
19        returned to the evidence area at the Elkhart Police
20        Department.
21   Q    Okay.  Once you have bagged them and at your first
22        opportunity, do you seal them?
23   A    Yes.
24   Q    Why?
25   A    The bags are sealed after we're done processing.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1     That can take an extended period of time.  Until

2     that time, they're secured; and then once they're

3     sealed, it would be important for -- when they're

4     transported somewhere else if they went to a

5     laboratory to protect them.

6   Q  Okay.  Do you also ensure that -- well, by the

7     seal, do you ensure that there's been no tampering

8     with the item?

9   A  Yes.

10  Q  Do you have to use different types of articles in

11     order to bag them or package them depending upon

12     the substance that you're -- or the items that

13     you're collecting?

14  A  Yes, certainly.

15  Q  Why do you have to worry about that?

16  A  If you're submitting -- if it's an item that could

17     be submitted later on for further examination for

18     serology exam sent to a laboratory for testing,

19     certain items, serology items need to be in paper

20     unless there's -- and there's qualifiers to that

21     even.  Some can be in plastic depending on what

22     they are, how they were obtained.  It's just to be

23     able to protect them so they don't degrade, the

24     samples wouldn't deteriorate, for those issues.

25  Q  Did you also try and take any kind of latent

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1       impressions whether they be footprint, fingerprint

2       anything like that?

3  A   Yes, I did.

4  Q   In what areas did you try and take prints?

5  A   I worked in the -- on the doorways to the pantry

6       closet which was on your left in the apartment, the

7       floor in that area, the countertops of the kitchen

8       counter, the stove, the telephone, a lot of the

9       items that were recovered were subsequently

10      processed later on.  But in the apartment

11      specifically the floor inside of the east bedroom

12      near where the victim was laying, that was

13      processed.  The door to the closet in the --

14      leading towards the bathroom was processed for

15      impressions, a multitude of areas.

16  Q   Okay.  Do you have to narrow down where you're

17      going to dust for impressions, or can you do the

18      entire room?

19  A   Just out of a sheer time frame involvement, you

20      kind of have to focus on what appears to be out of

21      place or related somehow, but you believe it may be

22      tied in or could be tied into this.

23  Q   Okay.  In the Helen Sailor apartment, did you do

24      just that: Focus on the areas that looked out of

25      place, looked like they could have been touched

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1        somehow?

2   A   Yes.

3   Q   How did you attempt to identify or to see as you

4        previously talked about any type of latent print?

5   A   Basically, at the scene I dusted just using the

6        dusting powders just like we've described before

7        just making them visible.

8   Q   Okay.  And at that point in time, did you find some

9        type of latent print that you thought might be able

10       to be recovered?

11   A   Yes.

12   Q   Let's go ahead and start with the latent markings

13       that you found on -- or in the kitchen area.

14   A   Okay.

15   Q   Do you recall processing any part of the stove?

16   A   Yes.

17   Q   Why did you process the stove?

18   A   Because of it's proximity to where the victim was

19       located.  It's near to where you would have to walk

20       in that area, and it could be touched, you know,

21       it's -- it's a possibility.

22   Q   Okay.  Was there any specific area on the stove

23       that you were able to find some kind of a latent

24       impression you thought was worth collecting?

25   A   Yes.  There were two areas.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1  Q   What did you find?

2  A   On the -- as you face the stove now on the top left

3       side, I recovered one latent impression that was up

4       near the corner; and then I also located an

5       impression down on the bottom right hand drawer,

6       broiler drawer, clear at the very bottom and to the

7       right.

8  Q   The top left, what kind of an impression was that

9       if you could tell?

10 A   Well, it looked like a fingerprint impression, but

11      it had ridge lines like a finger or palm

12      impression.

13 Q   Okay.  Now, while we -- we aren't going to go into

14      detail as far as your abilities to analyze

15      fingerprints.  Is that something that you've been

16      trained to do?

17 A   Not to the extent of a true identification work,

18      no, ma'am.

19 Q   Have you been to enough training that you can at

20      least get a general feel whether it's a fingerprint

21      or whether it's something that has enough quality

22      or enough detail that it could possibly be

23      processed further?

24 A   Yes.

25 Q   Okay.  This print that you -- the latent impression

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    you found at the top left, did you believe it had

2    enough ridge detail that it might worth trying to

3    do something with later?

4  A   Yes, it could be.

5  Q   Did you go ahead and take a lifter or preserve that

6    print?

7  A   Yes.

8  Q   Let's now talk about the bottom right-hand corner.

9    What kind of a latent impression did that appear to

10   be?

11 A   That was different.  That -- it appeared as though

12   it could be like hair.  It was linear in pattern.

13   It was just an odd impression.

14 Q   Okay.  After the stove, do you remember moving into

15   the what we'll call the bedroom or the room where

16   the body lie?

17 A   (No audible response.)

18 Q   Did you find anything that you tried to lift or

19   tried to preserve in there?

20 A   Yes.

21 Q   What areas?

22 A   Basically, in that main area I focussed on the

23   floor because it was pretty much open.  It was

24   obviously near to the victim's location.

25   Obviously, you would have to cross that path to get

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1          to her position.

2    Q   Okay.  What did you do to process that area?

3    A   I used dusting powders.

4    Q   Were you able to see by using the dusting powder

5          any kind of detail of an impression that you

6          thought was able to be taken or preserved?

7    A   There were several.

8    Q   What did you do?

9    A   I first after dusting it examined it further.  I

10        found several impressions, possible footwear

11        impressions on the floor on the linoleum area.

12        They were photographed, and their position was

13        documented with measurements, and then they were

14        collected.

15    Q   How do you collect a footwear impression?

16    A   In this particular case, I used adhesive lifters.

17        It's just similar to a piece of tape, a big piece

18        of tape; and then it has a backer on it to protect

19        it so once you lift it, identify it, basically peel

20        it up from whatever substance you would have placed

21        it down onto and then you close it, and it adheres

22        to itself.

23    Q   Okay.  Once it's closed, can it be reopened again?

24    A   Not unless there was something causing it not to

25        seal.  A wet liquid could cause it to possibly

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1  separate.

2 Q Okay.  Would there be obvious changes or

3  manipulations in the paper, the backing, if

4  something wet had touched it?

5 A Well --

6 Q Let me ask you this:  Can you visually look at it

7  and see whether it's been tampered with?

8 A Oh, certainly, certainly.

9 Q Okay.  All right.  Now, after you took these

10  impressions of footwear detail, where did you go

11  next?

12 A I already had worked in that area, and then I moved

13  to the bathroom area in the hallway, that small

14  hallway.

15 Q What did you dust, or what did you try to obtain

16  prints from in that area?

17 A In the -- I was not able to locate any impressions

18  upon the closet doors which I processed, but I also

19  worked on the area of the bathroom floor.  In there

20  I did observe I believe it was one impression in

21  that area.  It had some detail present.

22 Q Any areas -- or any other areas that you processed

23  at this time?

24 A Well, prior to doing the kitchen, I had worked in

25  the pantry area, and I had processed the floor in

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1      that area and then also -- excuse me -- the doors
2      leading into that pantry.
3    Q   Were you able to obtain any sample - or any samples
4      of ridge detail or any samples of detail that you
5      thought might be available for further processing?
6    A   Yes.
7    Q   What manner did you use to collect those items as
8      well?
9    A   The same which I described before with the adhesive
10     lifters on the floor.
11   Q   Next I'm going to show you what's been marked for
12     identification purposes as State's Exhibit 36.  Do
13     you recognize this?
14   A   Yes, I do.
15   Q   What is it?
16   A   This is a photograph showing the lifter in place on
17     the front of the stove the bottom right showing
18     it's location.
19   Q   Okay.  I'm now showing you what's been marked for
20     identification purposes as State's Exhibit 37.  Do
21     you recognize this?
22   A   Yes, I do.
23   Q   What is it?
24   A   This is a view showing that same area on the stove
25     only in closer -- closer proximity showing the

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1           impression that I observed.

2      Q    Thank you.  Next I'm showing you what's been marked

3           for identification purposes as State's Exhibit 38.

4           Do you recognize this?

5      A    Yes, I do.

6      Q    What is it?

7      A    This is a photograph showing the area what would be

8           towards the west and slightly north from where the

9           victim was located showing the impressions -- some

10          of the impressions which I had obtained from that

11          floor area.

12     Q    Thank you.  Next I'm showing you what's been marked

13          for identification purposes as State's Exhibit 39.

14          Do you recognize this?

15     A    Yes, I do.

16     Q    What is it?

17     A    This is the pantry door leading -- this is on the

18          outside of the pantry door showing the location

19          near the handle where I made a lift.

20     Q    Okay.  And then next I'd like to show you what's

21          been marked for identification purposes as State's

22          Exhibit 40.  Do you recognize this?

23     A    Yes, I do.

24     Q    What is it?

25     A    This is a photograph of the closet door in that

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1        small hallway where there was that substance
2        located leading towards the bathroom.  It's a close
3        view of it.
4     Q  Thank you.  And all of these photographs; namely,
5        State's Exhibit 36 through and including what's
6        been identified as State's Exhibit 40, are these
7        accurate representations of what you personally
8        observed while you were processing the Helen Sailor
9        apartment on November 29, 2002?
10    A  These actually -- they were not taken on that date.
11    Q  When were these taken?
12    A  These were taken the following day, the 30th.
13    Q  Okay.  Had you been processing the scene pretty
14       much this entire time?
15    A  I had gone home for a -- I finished at
16       approximately midnight on the 29th and then came
17       back in, and it was about noon when I started the
18       following day.
19    Q  Had the scene been secured to your knowledge in the
20       same manner as you described before prior to your
21       coming back?
22    A  The doors were sealed and locked.  I did not have
23       an officer standing on it all night long.
24    Q  Did you check the seals before your entered again
25       on the 30th?

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1   A   Yes.

2   Q   Were they intact?

3   A   Yes, they were.

4   Q   Okay.  Any reason to believe that they had been

5       tampered with in any way?

6   A   No.

7   Q   All right.  Other than that, are they the same or

8       substantially the same condition as they were when

9       you personally observed them while you were at

10      Helen Sailor's apartment?

11  A   Yes.

12  Q   Do you believe that these will assist the jury in

13      understanding your testimony and showing the detail

14      of what you collected?

15  A   Yes, it will.

16  Q   Thank you.

17          MS. BECKER:  State moves to admit what's been

18  marked for identification purposes as State's Exhibit 36

19  through 40 inclusive?

20          THE COURT:  Mr. Zook any objections?

21          MR. ZOOK:  No, sir.

22          THE COURT:  Mr. Crawford, any objections.

23          MR. CRAWFORD:  No, your Honor.

24          THE COURT:  State's Exhibits 36, 37, 38, 39 and

25  40 will be admitted without objection.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1          MS. BECKER:  State moves for a publication of
2     36 through 40 inclusive.
3          THE COURT:  Any objections, counsel?
4          MR. ZOOK:  No, sir.
5          MR. CRAWFORD:  No, your Honor.
6          THE COURT:  State's Exhibit 36 through 40
7     inclusive will be published without objection in the
8     manner of choosing by the state.
9          MS. BECKER:  State's Exhibit 36, 37, 38, 39,
10    40.
11               (State's Exhibit 36, 37, 38, 39 and 40
12               were published to the jury.)
13         THE COURT:  Ladies and gentlemen, we're going
14    to give you a break at this time.  During the recess, I
15    need to tell you.  You are all jurors in this case.  I
16    must tell you now and I will repeat this again each time
17    you are permitted to separate.
18          Generally, you should not express any opinion
19    about the case before it is submitted to you for
20    deliberation; however, you are permitted to discuss the
21    evidence presented in this case amongst yourselves in the
22    jury room during recesses from trial.  All jurors and
23    alternates must be present during these discussions, and
24    you must reserve judgment about the outcome of the case
25    until your deliberations begin.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1      You are admonished that you may not discuss the
2  facts of the case with anyone other than your fellow
3  jurors.
4      You may not discuss this case with me or with
5  the lawyers, parties or with any of the witnesses.
6      You should not listen to or read any outside or
7  media accounts of the trial.  You may not investigate the
8  case or attempt to obtain information outside the
9  courtroom.  It is highly improper for you to do so.  You
10  are to consider and decide this case only upon the
11  evidence received during the course of the trial in the
12  courtroom.
13          (A short recess was taken.)
14          (The Court convened with all the
15          parties present.  The jury entered the
16          courtroom and the following
17          proceedings were had.)
18      THE COURT:  Be seated, please.  Ms. Becker.
19  BY MS. BECKER:
20  Q   Now, detective, we just talked about those
21      photographs about the latent processing that you
22      did.  Can you explain for the jury what it takes to
23      leave a latent print whether it be fingerprint,
24      footprint, footwear impression, something like
25      that?  Help us understand.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    A    Basically, there's several different ways it could
2         take place the actual process with regards to
3         fingerprints, handprints.  It's basically
4         leaving -- for the most part -- leaving something
5         behind.  The oils from your skin, it could be a
6         substance you have on your hand that was
7         transferred and the residue that's left behind
8         dries out and leaves an impression there.  If you
9         made an impression with, say, footwear or with your
10        hand into something soft that would retain that
11        impression, that could be possible also.
12   Q    So if you have clean hands, really clean hands, not
13        even the oils on your hands are present, can you
14        leave a print on anything you touch?
15   A    Not always.  I mean, there's -- there's not 100
16        percent thing on this.  It's -- it's -- sometimes
17        it's left behind and sometimes it's not, or we're
18        not able to locate it.
19   Q    In your experience processing crime scenes, it is
20        usual that you actually do find fingerprints that
21        are of such a quality that they can actually be
22        compared to something else later?
23   A    I wouldn't say it's the norm.  It's a -- most cases
24        we don't end up with a lot of usable impressions.
25   Q    Why is that, or what is it -- why is it that it's

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1        so difficult to get a usable impression?

2   A   Because in order to be able to identify it, I mean,

3        you've got to have specific detail present to do

4        that for the examiners.  And with normal activities

5        when you think about it, if you take you hand and

6        you lay it on the arm of your chair and you move

7        your hand just as you would to get yourself up or

8        move or shift, it smears.  So that -- in that

9        occasion, then, it's going to make that unusable.

10   Q   Okay.  So just because you touch something doesn't

11        necessarily mean that it's going to leave a

12        fingerprint or a latent print that you can use.

13   A   That's correct.

14   Q   What exactly does latent mean?

15   A   Hidden.

16   Q   Hidden?

17   A   Yes.

18   Q   Okay.  And you indicated earlier that it's a

19        process of becoming able to see it is what the

20        dusting powder or other means are used for?

21   A   Yes, that's correct.

22   Q   Have you also made attempts at the scene of Helen

23        Sailor to gather other types of prints?  We've

24        already talked about the hair, or what appeared to

25        be the hair on the stove, you talked about the

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1      footwear, and you talked about some fingerprint

2      impressions.  Were there any other types of

3      impressions that you tried to get?

4  A   Not really as far as impressions go, no.

5  Q   All right.  Now, talk about the footwear

6      impressions.  In your responsibilities as a

7      detective technician, are you responsible for part

8      of the evidence room and knowing what evidence is

9      submitted in a case?

10 A   Yes.

11 Q   All right.  Were there several comparison

12     footprints submitted in the case regarding Helen

13     Sailor's homicide?

14 A   There were -- actually submitted into evidence,

15     yes, there were several different shoes that had

16     been submitted.

17 Q   Okay.  Was there an attempt to make comparisons in

18     the footwear impressions, or the latent footwear

19     impressions that you found in the apartment?

20 A   Well, they were basically examined as far as the

21     footwear that was recovered whether it was even

22     remotely similar to what we observed at the scene,

23     and then if that was -- and then there were others

24     that were just sent to the laboratory for that

25     testing or other testing.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1   Q   Now, it's a floor.  Correct?

2   A   Yes.

3   Q   Is there any way of knowing how long a latent

4       impression that you may have been able to pick up

5       came from that floor, or has been on that floor?

6   A   In most circumstances, no.

7   Q   Now, in this circumstance; namely, the fact that

8       there was a body and then some liquid around that

9       body, were there any latent impressions that

10      appeared to be in that liquid or on top of that

11      liquid?

12  A   Yes.

13  Q   Did you collect those?

14  A   Yes.

15  Q   All right.  Did you make an attempt to identify

16      those?

17  A   Yes.  Those were sent to be identified.

18  Q   Were they identified?

19  A   Yes.

20  Q   Was it a known person?

21  A   Yes, it was.

22  Q   Okay.  Was it someone that you had record had been

23      in with the body?  Actually, let me just ask you

24      this.  Who was it?

25  A   It was Larry Converse's shoe.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    Q   Okay.  Now, were any of the other latent shoeprints

2       in the liquid substance or clearly part of this

3       crime scene?

4    A   No.  Most of the others were in the surrounding

5       areas nearby.

6    Q   Okay.  Is there any way that you could say with

7       certainty that they were left by someone who would

8       have been involved in this crime?

9    A   No.

10   Q   Do you try and collect them anyway just in case?

11   A   Make the attempt.

12   Q   All right.  And all of the latent prints --

13      footprints that you collected, did you make

14      attempts to have them identified them by sending

15      them for processing or other means?

16   A   Yes.  If they were -- appeared to be usable

17      impressions after you lifted them, yes, we did

18      attempt it.

19   Q   Okay.  And based upon the footwear impressions, was

20      an identity of a perpetrator ever found?

21   A   No, no.

22   Q   Let's now talk about the fingerprint impressions.

23      Were you able to get some fingerprint impressions

24      that had enough ridge detail that you thought could

25      be used for later processing?

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1   A   Yes.

2   Q   Did you make lifters like you talked about before

3       of those fingerprint impressions?

4   A   Yes, I did.

5   Q   Specifically let's talk about some additional items

6       that were admitted into evidence.  Were there items

7       that had been recovered from the trash chute that

8       were admitted into evidence?

9   A   Yes.

10  Q   Now, did you retrieve some of those items at a

11      later date for purposes of further processing?

12  A   Yes, I did.

13  Q   What kind of items were they?

14  A   They were, if I recall correctly, it was juice

15      bottles and then an envelope I believe it was.

16  Q   Okay.  Were there also some towels that were

17      submitted into evidence from that same location?

18  A   Yes.

19  Q   Okay.  But can you process cloth for fingerprints?

20  A   It is possible.

21  Q   Did you do it in this case?

22  A   No, I did not.

23  Q   Are you familiar with how to do that?

24  A   Vaguely, yes.

25  Q   Okay.  Did you try and process the juice bottles?

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    A    Yes.

2    Q    What kind of juice bottles were they?

3    A    The one -- I don't remember the brand name on the

4         one.  The one was an Ocean Spray, I believe, and

5         then the other one I believe it was an Old Orchard

6         brand.

7    Q    I may I approach?

8              THE COURT:  You may.

9    BY MS. BECKER:

10   Q    I'm going to show you what's been marked for

11        identification purposes as State's Exhibit 41.  Do

12        you recognize this?

13   A    Yes, I do.

14   Q    What is it?

15   A    This is a photograph of the process of processing

16        the one Ocean Spray cranberry juice bottle.

17   Q    Next I'm going to show you what's been marked for

18        identification purpose as State's Exhibit 42.  Do

19        you recognize this?

20   A    Yes, I do.

21   Q    What is it?

22   A    This is a photograph of that same bottle with

23        different adhesive lifters attached to it.

24   Q    All right.  Does this accurately demonstrate the

25        process that you go through in trying to make these

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1        lifters from the print?

2    A   Yes.

3    Q   Does it also show a decent view of how to -- or of

4        all the different prints and latent marks on these

5        bottles that make it difficult for you to get

6        lifters?

7    A   Could you rephrase that question, ma'am?

8    Q   Sure.  Let me rephrase that question.  Does this

9        also show the various other marks that are present

10       on these bottles that are also latent, in other

11       words, they're brought up with the dusting powder?

12   A   Oh, yes, certainly.

13   Q   And do those sometimes interfere with your

14       abilities to take ridge prints or fingerprints?

15   A   Yes, they can.

16   Q   All right.  Do these two photos accurately

17       represent what you personally observed when you

18       processed this bottle?

19   A   Yes.

20   Q   And do you believe that they will assist the jury

21       in understanding your testimony?

22   A   Yes.

23   Q   Thank you.

24       MS. BECKER:  State would move to admit what's

25   been marked for identification purpose as State's

590

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1  Exhibits 41 and 42.

2          THE COURT:  Mr. Zook, any objections?

3          MR. ZOOK:  No, sir.

4          THE COURT:  Mr. Crawford, any objections?

5          MR. CRAWFORD:  No, your Honor.

6          THE COURT:  Exhibits 41 and 42 will be admitted

7  without objection.

8          MS. BECKER:  State would move to publish

9  State's Exhibit 41 and 42 in digital publication.

10          THE COURT:  Any objection, counsel?

11          MR. ZOOK:  No, sir.

12          MR. CRAWFORD:  No, your Honor.

13          THE COURT:  Exhibits 41 and 42 will be

14  published in any manner of choosing by the state without

15  objection.

16          MS. BECKER:  41, 42.

17              (State's Exhibits 41 and 42 were

18              published to the jury.)

19  BY MS. BECKER:

20   Q   Now, detective, you indicated that you dusted for

21       prints and -- fingerprints in numerous areas of the

22       apartment, and in some circumstances you were able

23       to take lifters.  Correct?

24   A   That's correct.

25   Q   Were those lifters submitted to laboratory or

591

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1           submitted somewhere for further analysis?

2      A    Yes.

3      Q    Were any of them of sufficient -- well, aside from

4           one print on a tub, were any of them of sufficient

5           quality to be able to identify a perpetrator?

6      A    I can't really answer that.

7      Q    Let me ask you this.  Did -- the results that you

8           got from the lab, did they assist in the

9           investigation in identifying the perpetrator?

10     A    No.

11     Q    Okay.  Let's now talk about this plastic tub.  May

12          I approach?

13             THE COURT:  You may.

14  BY MS. BECKER:

15     Q    I'm going show you what's been marked for

16          identification purposes as State's Exhibit 43.  Do

17          you recognize this?

18     A    Yes, I do.

19     Q    What is it?

20     A    This is the plastic tub and then the medication

21          bottles contained in it that was on the stove at

22          Helen Sailor's apartment.

23     Q    Is this is the same plastic container that we saw

24          in the photograph previously?

25     A    Yes.  Yes, it is.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    Q   All right.  Now, other than the fact that this has

2        been repackaged and appears to have been processed,

3        does it appear to be in the same or substantially

4        the same condition as it was when you personally

5        retrieved it from the Helen Sailor's apartment?

6    A   The tub is substantially in the same condition.

7        The medications have -- appear to be shifted

8        around.

9    Q   All right.  Just in their positioning?

10   A   Yes.

11   Q   Now, were some of these -- the plastic tub itself,

12       was it processed for fingerprints?

13   A   Yes.

14   Q   Did you do that personally?

15   A   Yes, I did.

16   Q   All right.  Is that what the black coating is on

17       the tub?

18   A   Yes.  That's some of the dusting powder.

19   Q   All right.  And then I'd also liked to show you

20       what's been marked for identification purposes as

21       State's Exhibit 44.  Do you recognize this?

22   A   Yes, I do.

23   Q   What is it?

24   A   These are three bottles of prescription type

25       medication and a dosage cup that were on the

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1       kitchen counter in front of the pill planners at

2       the apartment of Helen Sailor.

3   Q   All right.  Was there also a fourth bottle in front

4       of the pill planners?

5   A   Yes, there was.

6   Q   Is that packaged in a different bag?

7   A   Yes, it is.

8   Q   All right.  Did you process or attempt to process

9       all of these four bottles for latent prints?

10  A   Yes, I did.

11  Q   All right.  And are these the only bottles that

12      were separate on the counter which we saw in the

13      photograph earlier?

14  A   Yes.  The only ones sitting out, yes.

15  Q   Did the -- other than that, are they in the same or

16      substantially the condition as they were when you

17      retrieved them?

18  A   Yes.

19  Q   Thank you.

20          MS. BECKER:  State would move to admit what's

21  been marked for identification purposes as State's

22  Exhibit 43 and 44?

23          THE COURT:  Counsel, any objection?

24          MR. ZOOK:  No, sir.

25          MR. CRAWFORD:  No, your Honor.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1        THE COURT:  Exhibits 43 and 44 will be admitted
2    without objection.

3        MS. BECKER:  State would reserve publication at
4    this time.

5        THE COURT:  All right.

6    BY MS. BECKER:

7    Q    Detective, you indicated that you did process this
8         medicine tub what's been identified as 43 for
9         latent prints.  Correct?

10   A    That is correct.

11   Q    Were you able to see enough ridge detail anywhere
12        on there to try and take some lifters for further
13        processing?

14   A    Yes, I did.

15   Q    How many, do you rememberer?

16   A    I believe it was eight.

17   Q    Were one of those lifters identified as lifter M?

18   A    Yes.

19   Q    From where or what area of the medicine tub did you
20        take lifter M?

21   A    From on the back side, the opposite side of where
22        the label is located?

23   Q    All right.  So if we look at State's Exhibit 43 and
24        we see that the label is at the end of the bag
25        where the exhibit sticker is --

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1   A   That's correct.

2   Q   -- what are you referring to the back side of the

3       container?

4   A   The opposite side from the label.  This side right

5       here where I'm pointing now.

6   Q   Okay.  Did you photograph your process of taking

7       lifter M at the time you were processing the

8       medical tub?

9   A   Yes.

10  Q   I'm going show you what's been marked for

11      identification purposes as State's Exhibit 45.  Do

12      you recognize this?

13  A   Yes, I do.

14  Q   What is it?

15  A   This is a photograph of that tub with the lifters

16      in place, or at least two sides are shown here,

17      with the lifters in place with M, and you can see

18      the edge of H.

19  Q   Okay.  Does this photograph accurately depict what

20      you were observing as you processed the medical

21      container?

22  A   Yes, it did.

23  Q   Thank you.  Does it also show the positioning of

24      that lifter on the medical container?

25  A   Yes.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1   Q   Do you believe this will assist the jury in

2       understanding your testimony?

3   A   Yes, it will.

4   Q   And was that done at the same time that you

5       processed that medical container subsequent to

6       recovering it from Helen Sailor's apartment?

7   A   The photograph was taken when it was processed,

8       yes, ma'am.

9   Q   Thank you.  Next I'd like to show you what's been

10      marked for identification purposes as State's

11      Exhibit 46.  Do you recognize this?

12  A   Yes, I do.

13  Q   What is it?

14  A   This is the lifter which was depicted in the

15      previous photograph identified as M.

16  Q   Okay.  Now, there are two chunks out of the center

17      of that lifter.  What are those chunks

18      representing?

19  A   I believe those were removed from the lifter during

20      the subsequent laboratory processing.

21  Q   All right.  Did you request certainly laboratory

22      processing that would require them having a piece

23      removed?

24  A   Yes.

25  Q   What kind of processing would that have been?

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    A    Processing the -- the -- what's in between the

2         adhesive lifter and the backer for DNA.

3    Q    Oaky.  Did -- or were there chunks taken out of

4         areas that effected identifying this print to your

5         knowledge?

6    A    Not to my knowledge.

7    Q    Okay.  And does what's been identified as State's

8         Exhibit 46 appear to be in same or substantially

9         the same condition as it was when you took it off

10        the medical tub except for the two chunks taken

11        out?

12   A    Except for the chunks, and there's several other

13        markings on this that weren't there at that point

14        in time.

15   Q    Do you recognize the markings?

16   A    They appear to be laboratory markings.

17   Q    Are they markings that you're familiar with?

18   A    Yes.

19   Q    Thank you.

20        MS. BECKER:  State now moves to admit what's

21   been marked for identification purposes as State's

22   Exhibit 45 and 46.

23        THE COURT:  Counsel, any objections?

24        MR. ZOOK:  No, sir.

25        MR. CRAWFORD:  No, your Honor.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1          THE COURT:  Exhibits 45 and 46 will be admitted
2    without objection.
3          MS. BECKER:  State would move to publish
4    State's Exhibit 45 by digital publication and 46 by
5    passing to the jury.
6          THE COURT:  Any objection?
7          MR. ZOOK:  No, sir.
8          MR. CRAWFORD:  No, your Honor.
9          THE COURT:  State's Exhibit 45 and 46 will be
10   published in the manner of choosing by the state.
11              (State's Exhibit 45 and 46 was
12               published to the jury.)
13         THE COURT:  Ladies and gentlemen, take as long
14   as you wish to examine Exhibit No. 46.  It's being passed
15   amongst you.  These exhibits will be sent, generally
16   speaking, to the jury room with you during your
17   deliberations.  You'll have another opportunity to
18   examine them at that time.
19   BY MS. BECKER:
20   Q    Now, detective, after you were able to process the
21        medical tub and you were able to get lifter M, did
22        it appear to you to have enough ridge detail that
23        you thought it might be sufficient for comparison
24        purposes?
25   A    Yes.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    Q    Were you instructed to obtain another print, or a

2         sample print, for purposes of submitting for

3         comparison?

4    A    Yes.

5    Q    Where did you go to obtain a sample print?

6    A    From -- it was a print card, and I obtained that at

7         the Elkhart Police Department Records Division.

8    Q    Okay.  Does the Elkhart Police Department keep

9         certain records in the normal course of their

10        business?

11   A    Yes, they do.

12   Q    Among those do you have fingerprint cards on

13        record?

14   A    Yes, we do.

15   Q    Next I'm going to show you what's been marked for

16        identification purposes as State's Exhibit 47.

17        Take a look at that.  Do you recognize this?

18   A    Yes, I do.

19   Q    What is it?

20   A    This is a Elkhart Police Department fingerprint

21        card with inked impressions on it.

22   Q    Okay.  Where did you obtain this?

23   A    From the records division.

24   Q    Okay.  Did you personally seal it?

25   A    Yes, I did.

STATE'S WITNESS - JOEL BOURDON - (DIRECT)

1    Q    Is this the same fingerprint card that you
2         submitted for purposes of comparison?
3    A    Yes, it is.
4    Q    To whom did you submit this card for purposes of
5         comparison?
6    A    To Detective Chapman with the Elkhart County
7         Sheriff's Department.
8    Q    Why did you submit a fingerprint to Detective
9         Chapman with the Elkhart County Sheriff's
10        Department?
11   A    Because he's a latent prints examiner?
12   Q    Okay.  Why didn't you just send the latent print,
13        the fingerprint, with this much detail to the
14        Indiana State Police Lab?
15   A    Because it was requested we go through him because
16        he could get it done sooner so -- because he would
17        be able to start his examination sooner.
18   Q    In your experience with the Indiana State Police
19        Lab, how long does it typically take to get
20        fingerprint comparisons done?
21   A    It varies a great deal, depends on their -- their
22        bag lock.  Anywhere -- I've had them come back
23        within a few months, and sometime it's been several
24        years.
25   Q    What about DNA testing?

STATE'S WITNESS - JOEL BOURDON - (CROSS)

1    A   Pretty much more than a year is the routine.

2    Q   Now, after you were able to gather all of the

3          evidence that you collected from Helen Sailor's

4          apartment whether it be the latent fingerprint or

5          the latent ridge detail, whatever you could get,

6          the foot impressions, samples of bodily fluids from

7          the autopsy or what from what you got around the

8          scene or the items at the scene, did you submit

9          some of these items to the Indiana State Police

10         lab?

11   A   Yes.

12   Q   Why did you do that?

13   A   For further testing in an attempt to identify the

14        contributor.

15   Q   Other than lifter M, that fingerprint, was the lab

16        able to assist in identifying another perpetrator?

17   A   No.

18        MS. BECKER:  No further questions at this time.

19        THE COURT:  Mr. Zook.

20               **CROSS-EXAMINATION**

21  BY MR. ZOOK:

22   Q   Good morning, Joel?

23   A   Good morning, sir.

24   Q   I understand that you got a jewelry box from

25        underneath a bed.  Is that right?