UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

LANA CANEN,                            )
                                       )
            Plaintiff,                 )
                                       )
      vs                               ) Case No.
                                       ) 3:14-cv-315-RL-CAN
DENNIS CHAPMAN and MARK DAGGY,         )
                                       )
            Defendants.                )
                                       )


              The Deposition of MARK DAGGY

              Date:    Tuesday, October 28, 2014

              Time:    10:30 a.m.

              Place:   Elkhart Police Department
                       175 Waterfall Drive
                       Elkhart, Indiana

         Called as a witness by the Plaintiff

         in accordance with the Federal Rules of Civil

         Procedure for the United States District

         Court, Northern District of Indiana, South Bend

         Division, pursuant to Notice.


Before Charolette A. Martinez, CSR 11983
Notary Public, St. Joseph County, Indiana

              MIDWEST REPORTING, INC.
              1448 Lincolnway East
              South Bend, Indiana  46613



EXHIBIT
2

8

```
 1    Q.   You might have to speak up a little bit.  I'm hard
 2         of hearing.  Sorry about that.
 3              So there -- is one of them still at home?
 4    A.   They're both at home.
 5    Q.   They're still both at home.  Okay.
 6              Tell me where you went to high school and when
 7         you graduated.
 8    A.   I went to Mishawaka High School in Mishawaka,
 9         Indiana.  Graduated in 1986.
10    Q.   And after high school did you go on to college?
11    A.   Yes.
12    Q.   Tell me where you went to college.
13    A.   First year was IUSB.  Then the following year --
14         following years, three years, I graduated from
15         Ball State University.
16    Q.   Okay.  And what was your major?
17    A.   Criminal justice and criminology.
18    Q.   And when did you graduate?
19    A.   1991 officially.
20    Q.   1991.  And was that a Bachelor's Degree or
21         Associate's Degree?
22    A.   Bachelor's.
23    Q.   That was Ball State.  Okay.
24              Have you attended any post secondary
25         institutions since completing your Bachelor's at
```

1    Ball State?

2  A.   No.

3  Q.   So we've covered all your educational experiences,

4       formal education, I should say?

5  A.   Correct.

6              MR. KUS:   That's excluding any

7              training, anything like that?

8              MR. SUTHERLIN:   Right.   We'll get to

9              that.

10  BY MR. SUTHERLIN:

11  Q.   So we've covered that.

12       Let's go back to your employment history.

13       After graduating from high school, if you had any

14       full-time jobs, I want to talk about those.   If you

15       didn't have any full-time jobs until you completed

16       your Bachelor's Degree, let's start with the first

17       full-time job.

18  A.   Well, after -- after high school I was -- I worked

19       at -- kind of my high school -- I worked at a

20       convent, like lawn crew.   And then like a year out of

21       college I worked at the convent full-time.   And then

22       I got into -- I was a probation officer in St. Joe

23       County for juveniles.

24  Q.   Okay.   So let's see if we can put some dates to

25       that.

10

```
 1            So after high school you worked at the convent
 2        for --
 3   A.   For a -- yeah.
 4   Q.   For about a year or so?
 5   A.   Well, after high school I went right into college.
 6   Q.   Okay.
 7   A.   So, I mean, that was more or less my -- that was more
 8        or less my summer job.
 9   Q.   Summer job?
10   A.   Summer and -- yeah.
11   Q.   Okay.  So then when you finished college in 1991,
12        then you worked --
13   A.   I worked full-time at the convent.
14   Q.   Yeah.  Okay.  You don't need to smile about that.
15        That's fine.  It's a job.
16            All right.  Full-time at the convent.  Cutting
17        grass job, maintenance, that kind of thing?
18   A.   Maintenance, right.
19   Q.   What's the name of the convent?
20   A.   St. Francis Convent.
21   Q.   Okay.  And then after working there for a while,
22        you applied for a parol officer position,
23        probation --
24   A.   Probation officer.  Juvenile probation officer in
25        St. Joe County.
```

1     six to eight months.

2          Then the year -- like 2000- -- I'm sorry -- 1995

3     rolled around.  You get like shift bid, and then I

4     got moved to afternoons.  And I believe I was on

5     afternoons for roughly a year.

6          Then we had a -- in our department we had an

7     anti-crime unit, which dealt, with, like street

8     crimes.  You don't -- whatever -- whatever the

9     problem in the city is.  It could be prostitution.

10    It could be street-level drugs.  Kind of put out

11    fires wherever they are in the city.

12  Q.  Did you apply for the anti-crime unit?

13  A.  Yes.

14  Q.  Now, did you at some point have any training after

15    you were hired on?

16  A.  I went to the police academy, if that's what you're

17    talking about.

18  Q.  Yes.  When did you go there?

19  A.  1994.

20  Q.  Okay.  You were hired.  And did you go immediately

21    to the police academy?

22  A.  I think it was immediately, but it was -- it could

23    have been whenever they have classes.

24  Q.  But relatively within the first couple months or

25    so?

18

1   A.   Yes.

2   Q.   All right.  Were you on probation when you were

3        first hired?

4   A.   I believe there is a probation period, and I -- I

5        think it's a year.

6   Q.   One year.  That's pretty standard.

7             After you complete your training at the State

8        Law Enforcement Academy, you graduated with the

9        class.  Do you remember when you graduated?

10  A.   I remember my class was 94-118.  And I believe it was

11       July of 1994.

12  Q.   July of 1994.  All right.

13            Tell me about any subsequent training.  For

14       example, were you assigned an FTO to work with?

15  A.   Yes.

16  Q.   Tell me how that works in Elkhart.

17  A.   I remember back then there wasn't -- it wasn't a set

18       period like, you know, you're going to be on FTO for

19       two months and then you're on your own.  I think it

20       was you go at the rate of -- the speed of the person

21       being trained.

22            And my primary field training officer was

23       Frank Thomas, but I'd been with, I'm sure, several

24       other cops, officers, that I would ride with and

25       learn from.

1     don't get too many accidents, like involving
2     vehicles.
3         So I think some of the things you look for
4     mostly is like burglaries, suspicious, you know,
5     people, DUIs.
6  Q. When you worked a burglary, did you work it by
7     yourself or did you work it with somebody else or a
8     team?
9  A. When you got -- as a uniform police officer, when you
10    got dispatched, you'd usually -- you would have --
11    you'd never work by yourself when you respond to it.
12        If it looked like it was in progress, you would
13    wait until someone got there or a canine, who -- if
14    need be, they could search -- search the structure.
15    You'd always await -- you always would wait until
16    someone got there, if you could.
17        I believe that answers your question.
18 Q. After you were, I guess, notified by dispatch there
19    was a burglary, would you stay involved in
20    developing the evidence from the crime scene?
21 A. If -- if there was evidence, like a kicked-in door or
22    evidence that was physical that was laying around,
23    you would note it.  Or I would note it.
24        I'm not an evidence technician.  There are
25    evidence technicians that are uniform police

```
 1          officers.  That would -- that would be their -- one
 2          of their duties.  They can photograph a kicked-in
 3          door or, you know, physical evidence that may have
 4          came in or out of the house or something that was
 5          touched.  I would note it for an evidence technician
 6          at the uniform division -- or at the uniform division
 7          level of it.
 8              Then that case would eventually be passed off to
 9          a detective, either assigned to a detective the next
10          day or the next two days.
11     Q.   What role, if any, did you play, then, in the
12          continuing investigation if, say, we're talking
13          about a burglary?
14     A.   As a uniformed officer?
15     Q.   As a uniformed officer.
16     A.   I don't understand your question.
17     Q.   Well, did you pass the entire crime off to a
18          detective, or did you stay involved in any way?  So
19          what was your role, if any --
20     A.   Oh, okay.
21     Q.   -- involving the continuing investigation and the
22          prosecution of that burglary?
23     A.   You would do an initial report what you see, what you
24          saw, anything that you note of interest.  Type that
25          all and document it all.  And that would eventually
```

28

 1   A.   No.

 2   Q.   All right.  Now, from 2004 until 2012 had you

 3        received any additional training -- let's call it

 4        formal training for the time being -- where you

 5        went to a classroom structure, tests were given,

 6        that kind of thing, other than the Indiana Law

 7        Enforcement Academy?

 8   A.   I've been to a -- I've been to a lot of training as

 9        far as like where tests were given.

10   Q.   Well, let me clarify that.  If I went through your

11        personnel file, I might find certificates for you

12        going to the FBI training program on polygraphs or

13        something like that.  They typically do test you,

14        but maybe not always.

15             So what I'm talking about is something other

16        than just on-the-job training.  I'm talking about a

17        formal classroom setting where you're handed

18        materials.  You have to review the materials.

19        You're expected to know the materials.  And they

20        typically would ask you -- ask you to demonstrate

21        your knowledge by testing you.

22   A.   I was -- I've been to a certified -- certified voice

23        stress analysis school.  It's like truth

24        verification.

25   Q.   Sort of like a polygraph?

1  A.  Right.

2  Q.  And you were certified in that?

3  A.  Yes.  And I've been recertified, I think since then,

4      three times.  Every two to three years I get

5      recertified.

6  Q.  So you're the go-to polygraph guy here?

7  A.  Voice stress -- we have two polygraph guys.  There's

8      three voice stress guys -- people.

9  Q.  Okay.  All right.

10  A.  I'm one of them.

11  Q.  You're one of them.  Who are the other two?

12  A.  Lieutenant John Hammel and Detective Michael Miller.

13      And then we have two polygraph operators as well.

14  Q.  Tell me what's involved in voice stress testing.

15  A.  It measures stress in your voice.  I'm trying to put

16      it simple.

17  Q.  How does it do that?

18  A.  Through frequencies.  Through frequencies in your

19      voice that aren't picked up --

20  Q.  Walk me through one.  Maybe that's the best way to

21      do it.

22  A.  Okay.  There's -- when you speak, there's amplitude.

23  Q.  I'm talking about give the instruction to the

24      person you're about to test, and walk me through

25      it.

34

1    A.    Yes.   I was in -- in 1994 I was basically in uniform,

2          for, I believe about a year and a half.   And then

3          that takes us to about 1996.   I was on anti-crime

4          unit for two to three -- I think it was --

5    Q.    Was that considered a uniform position, anti-crime

6          unit?

7    A.    They kind of fell under Detective Bureau.   I mean,

8          you would -- you wear blue jeans with a gun and a

9          badge and -- just so somebody could identify you as a

10         police officer.   Maybe grow your beard out or --

11   Q.    Was this undercover, then?

12   A.    No.   I did anti-crime unit, I think, for two or three

13         years.   Then I went undercover for five years.

14   Q.    That's where you grew your beard out?

15   A.    That's where you grow the beard out and the long

16         hair.

17   Q.    Okay.   And what special training did you have

18         before you went undercover?

19   A.    I know one of the basic schools they always send a

20         detective to -- and you're basically a detective

21         being undercover because you're doing investigations.

22   Q.    So did you have the rank of detective at that time?

23   A.    Yes.

24   Q.    Is that a merit position or is it just an appointed

25         position?

35

1    A.   Appointed.

2    Q.   Who appoints you?

3    A.   At the time it was the captain of the Detective

4         Bureau.

5    Q.   And who was that?

6    A.   Larry Towns.

7    Q.   And it's called a bureau?

8    A.   Yes.  Or, well, we call it criminal investigations

9         division or CID.

10   Q.   All right.  And so can you give me a year when you

11        went undercover as a detective?

12   A.   I'm going to go back.  I believe 2001 is when I went

13        into the bureau, so probably five years before that,

14        19- -- I believe I went undercover in 1996.  Did

15        about five years.  Then went to the criminal

16        investigations division.

17   Q.   And the criminal investigation division began when?

18   A.   2001.

19   Q.   And you were a detective then?

20   A.   Yes.

21   Q.   Did that involve an increase in pay when you became

22        a detective?

23   A.   I think it's right about the same as being

24        undercover.  I think you're still classified --

25        it's -- I don't think it's an increase in pay,

1      University of Illinois.

2  Q.  What was the first part?

3  A.  I did go to a homicide school.

4  Q.  Okay.

5  A.  Which was at the University of Illinois, which is

6      also called the Southern Police Institute.  And I'm

7      trying to think -- I believe that was in 2002.  I'm

8      not sure of the dates.

9  Q.  Okay.  Do you think it was before or after the

10     murder?

11 A.  Are we talking about Helen Sailor?

12 Q.  Helen Sailor, which was on Thanksgiving Day, 2002.

13 A.  Boy, I don't remember.  It was right around 2002.  I

14     don't remember.  It was before I joined the homicide

15     unit.

16 Q.  But before you joined the homicide.  Okay.

17        So is the homicide unit a more -- I guess a

18     special unit within the criminal investigative

19     division?

20 A.  Yes.

21 Q.  And when did you join the homicide unit?

22 A.  2003.

23 Q.  2003.  And how did that come about?  Was that your

24     choice?

25 A.  To join, yes, it was my choice.

41

1   Q.   I'm sorry.  Say that again.

2   A.   To join, it was my choice.

3   Q.   Okay.

4   A.   I was asked -- at the time our chief wanted to start

5        a homicide unit.

6   Q.   Okay.  And the chief at that time was?

7   A.   Pam Westlake.

8   Q.   Wessly?

9   A.   Westlake.

10  Q.   And she specifically asked you to be a homicide

11       detective and join that unit?

12  A.   It may -- she had a -- she had specific -- hadn't

13       specifically asked me, no.  I was asked by a sergeant

14       at the time, who is -- who was asked to join the

15       homicide unit as well.

16  Q.   Okay.  So who was it that asked you to join?  The

17       sergeant did?

18  A.   Yes.

19  Q.   Okay.  I misunderstood you, then.

20            So this sergeant asked you to join, but the

21       decision to put you in that assignment is the

22       chief's?

23  A.   I would say yes.

24  Q.   Okay.  And that, again, is an appointed position,

25       not a merit position?

48

1       deposition in the same manner, with the same

2       seriousness that you would have prepared to prepare

3       to testify in a criminal case?

4    A.  Yes.

5    Q.  All right.  When did you first come to learn of the

6       murder of Helen Sailor?

7    A.  It was probably -- I probably saw it in the news the

8       day it happened or the day it was reported in the

9       news back in 2002.

10       I remember -- I remember at briefing, which is

11      right across the hallway behind us,

12      Detective Thayer, he came in and I believe he said

13      something to the people in briefing.  The people in

14      briefing would be uniformed officers, and I think at

15      that time Detective Bureau was attending the morning

16      briefing.  I think he said something a little bit

17      about it.

18       And I believe at the time he knew that I was

19      working burglary cases involving that same building

20      where Helen Sailor was murdered, and he said he would

21      like to get with me regarding those burglaries.

22   Q.  Okay.  So you had been working burglaries in that

23      building prior to her homicide?

24   A.  Yes.

25   Q.  Okay.  Can you tell me what you remember about

49

1          those burglaries.

2    A.    Yes.   I remember there was about eight reported

3          burglaries.

4    Q.    Eight?   In what period of time?

5    A.    I believe it was around -- this is to the best --

6          this is my best memory.  I believe it was around May,

7          there were a series of burglaries that happened in

8          this building, and --

9                        MR. KUS:   May of what year?

10                       THE WITNESS:   May of 2002.

11                       MR. KUS:   Okay.

12                       THE WITNESS:   And what all these

13                  burglaries had in common is it appears

14                  that whoever committed these burglaries

15                  just used the key to -- used a key to get

16                  inside the door --

17   BY MR. SUTHERLIN:

18   Q.    Okay.

19   A.    Instead of, like kicking a door down or causing some

20         kind of forced entry into that apartment.

21             Items that were taken.  Usually things that were

22         small that can be carried.  I remember like

23         checkbooks.  I think trinkets.  Things of that

24         nature.

25   Q.    Different victims?

50

1   A.   At least eight different victims.

2   Q.   Uh-huh.  Were you the only detective working those

3        burglaries in that building?

4   A.   I believe so, yes.

5   Q.   And did you solve the burglaries?

6   A.   No.

7   Q.   As of today have the burglaries been solved?

8   A.   No.

9   Q.   Tell me what sort of activities you engaged in as a

10       detective to solve those burglaries.

11  A.   Well, you go over there and you try to meet with

12       every victim.  And at the time the victims -- a lot

13       of them are elderly.  I'd say probably most of them

14       are probably now deceased.  You interview them, and

15       just -- you know, and they are just remembering what

16       appears out in the open that has been taken.

17            And they didn't really have a whole lot of

18       suspect information other -- because it appears

19       that -- obviously they were gone when the burglaries

20       were committed.  And it just appeared that someone

21       came into their door with a key.

22            Just kind of go -- you go over the -- to that

23       building over there, and you -- you'll talk to

24       people.  Even if people aren't victims, you ask them

25       if anything's unusual and -- or who they suspect.

51

1    Q.   Does the building complex have a name?

2    A.   Waterfall High Rise.

3    Q.   And is it a -- would you say a subsidized apartment

4         complex, or what they call affordable?

5    A.   Yes.

6    Q.   Rental?

7    A.   Yes.  At the time there were -- they had people on

8         Social Security.  And they had elderly people.  Yes.

9    Q.   So since there was no forced entry on any of the

10        eight --

11   A.   Correct.

12   Q.   -- burglaries, did you find a hypothesis of how

13        this might have happened?

14   A.   Yes.

15   Q.   What was your hypothesis?

16   A.   It appeared that someone used a key to get in these

17        apartments.

18   Q.   Did you determine who had access to keys?  Did you

19        develop sort of a suspect list?

20   A.   Yeah.

21   Q.   And who was the suspect?

22   A.   Well, Lana Canen was one that came to the forefront.

23   Q.   Did she have a key?

24   A.   She was suspect as of having a key.

25   Q.   She was suspected of having a key?

52

1  A.  Yes.

2  Q.  Okay.  And how did you form the opinion that she

3      might have a key?

4  A.  Because she had a boyfriend who was a maintenance man

5      that was in the building who had a master key.  And

6      after interviewing him --

7  Q.  And who -- can we have some names?

8  A.  I'm sorry.  Curtis Pratcher.

9  Q.  And you're assuming that they were boyfriend and

10     girlfriend?

11 A.  According to Curtis.

12 Q.  As opposed to just friends?

13 A.  Yes.

14 Q.  So it was a romantic relationship?

15 A.  I would say yes.

16 Q.  Based upon what?

17 A.  Based upon interviews.

18 Q.  Their specific testimony?

19 A.  I don't know if it came out in testimony, but I would

20     believe it was through statements taken.

21 Q.  Well, you know, that's what I'm asking you.  Was

22     this your impression or did someone say, "That's my

23     boyfriend.  We have a romantic relationship"?

24 A.  I believe Curtis told me that it was romantic.  And I

25     believe there may have been some other statements

```
 1         from people inside Waterfall High Rise that told me
 2         this.
 3    Q.   And all of that was information that you recorded
 4         in your burglary files?
 5    A.   Yes.
 6    Q.   Okay.  Including your suspicion that Lana Canen had
 7         access to a key?
 8    A.   Yes.
 9    Q.   All right.  And these burglaries took place in
10         2002.  But prior to May of 2002 -- or in -- up to
11         and including May of 2002?
12    A.   To my recollection.
13    Q.   When you were working the burglaries, did you talk
14         to Lana Canen?
15    A.   Yes.
16    Q.   Okay.
17    A.   I tried to talk to her several times.
18    Q.   Okay.  When you say you "tried," did you talk to
19         her?  You did talk to her?
20    A.   Yes, I did.
21    Q.   Okay.  And where and what -- at what location did
22         you talk to her?
23    A.   I remember talking to her here at the police
24         department.  But before I remember talking to her at
25         Waterfall High Rise.  She wasn't -- I think she was
```

1    Q.   Was there any other suspect besides Lana and a
2         property manager?
3    A.   For?
4    Q.   The burglaries.
5    A.   No.
6    Q.   Did you ever charge anybody with the burglaries?
7    A.   No.
8    Q.   In the course of your investigation did you take
9         any fingerprints -- and I'm talking about the
10        investigation of the burglaries.  Did you take any
11        latent fingerprints?  Or collect any, I guess is
12        the term.
13   A.   I can't remember if fingerprints were taken.
14   Q.   Would that have been something that you would want
15        to take?
16   A.   If it's available, yes.
17   Q.   Well, how do you know it's not available until you
18        try to take them?
19   A.   That's up -- that is up to the uniformed officer that
20        arrives at that scene, if he -- after talking with
21        the victim, if they feel that such and such was
22        handled in this area, I would think that would have
23        been done.  But that -- that's before I get the case.
24   Q.   So it's the investigating officer that's first
25        called to the scene on report of a burglary who

1      uniformed officer that took the call -- or in the

2      report.  And I was assigned it.

3  Q.  Did you talk to anybody other than just the victim?

4  A.  No.

5  Q.  Up to this point had you talked to Lana Canen?

6  A.  I know during this time I made several attempts to

7      contact her to get her to talk.  I don't think up to

8      this point I had a formal interview with her, no.

9  Q.  What about her boyfriend, Mr. Pratcher?

10 A.  He was talked to, but I don't know the exact date of

11     when I -- when I chatted with him.

12 Q.  Did you ever advise the landlord, the property

13     manager to change the locks since you suspected

14     early on that -- since there was no forced entry,

15     that it had to be somebody with keys?

16 A.  I remember there was a conversation to that.  I don't

17     know if I advised her to change it or not, but I

18     remember there was a conversation with the property

19     manager that it appeared someone had a key to get

20     into these rooms.

21 Q.  Okay.  So you can't recall about whether or not you

22     had talked to Lana Canen by 3/27/02?

23 A.  Formally I know I didn't.  I know I made several

24     attempts to go up there to get her to come to the

25     door.

1              At one point I remember getting the property
2         manager, talking to her about trying to get Lana to
3         talk to me.  And I believe she actually felt
4         something was wrong with Lana, so she opened the
5         door, and Lana was hiding behind the door.
6    Q.   Did you ever determine whether or not Lana Canen
7         had a Restraining Order, Protective Order issued?
8    A.   I knew there was a Restraining Order between her and
9         Curtis Pratcher, the maintenance man.
10   Q.   When was that issued?
11   A.   It was prior -- it was prior to this date, I believe.
12                  MR. KUS:  Would it help for you to
13                  look at the document that the counsel is
14                  referring to?
15                  THE WITNESS:  Yes.
16                  MR. KUS:  Why don't you do it.  It's
17                  No. 4 -- or No. 3.  Excuse me.  He's
18                  asking you questions again about No. 3.
19                  Take your time.  Take a look at it.
20                  THE WITNESS:  This is 5?
21                  MR. SUTHERLIN:  That's 3.
22                  MR. KUS:  Emma Cox.
23                  THE WITNESS:  Oh, I'm sorry.
24                  MR. KUS:  Have you got the one for
25              Emma Cox?

1    Q.   Okay.  And she came out from the back on that

2         occasion?

3    A.   A back room, yes.

4    Q.   Okay.  Did you announce your -- that you were

5         coming into the apartment, if you remember?

6    A.   I didn't announce.  The property manager was checking

7         to see if everything was okay.

8    Q.   Okay.  So you don't recall whether she even

9         announced herself coming in?

10   A.   I don't recall.

11   Q.   On that particular occasion have you run across any

12        other reports -- you're looking at 6.  Have you

13        seen any reports where you document that

14        interaction with Ms. Canen?

15   A.   Yes.  I talked -- it's basically a closure I added to

16        all the case -- all these burglaries.  I'll read what

17        I typed.  "I talked with Lana.  She signed and waived

18        her Miranda Rights and agreed to talk after many

19        attempts to talk with her."

20   Q.   Okay.  And do you recall that interview?

21   A.   Yes.

22   Q.   Where did it take place?

23   A.   Took place here at the police department in one of

24        the interview rooms.

25   Q.   Okay.  And you conducted the interview?

71

1   A.   Yes.

2   Q.   It was taped?

3   A.   I believe so, yes.

4   Q.   All right.  Did you ask her about the burglaries?

5        We have the tape, but I'm just wondering.

6   A.   Yes.

7   Q.   Did she deny having any involvement with the

8        burglaries?

9   A.   She denied it.

10  Q.   Did the burglaries -- did the burglaries continue

11       after that interview?

12  A.   If I remember correctly, the interview was on, I

13       believe, April 22nd.  And I don't think -- I don't

14       remember if they did or not.  I don't believe they --

15       I don't believe they did.  Probably one wasn't

16       reported to me.

17  Q.   Let me hand -- you've got 6 in front of you.  Let

18       me hand you 3.  This indicates here that you spoke

19       with her on the 28th, if I'm reading that

20       correctly?

21  A.   Are you referring to October 28th of 2002?

22  Q.   Yes.

23  A.   That's not -- this is just when this report was

24       generated, I believe.  That's not when -- this was a

25       summary of a lot of different things.

77

1    Q.  All right.  So you took notes, and then on the

2        basis of your interview, you then developed this

3        document which he then agrees to be accurate?

4    A.  Yes.

5    Q.  Is that what you're saying?

6            So why didn't you take -- tape statements back

7        then?

8    A.  I don't know if it was department policy.  I think we

9        taped all suspects.

10   Q.  Okay.  So you can't recall why you didn't tape this

11       particular interview?

12   A.  No.

13   Q.  Did you draw any conclusions after speaking to this

14       subject?

15   A.  Yeah.  It appeared that he got a master key taken

16       from him.

17   Q.  That's what he alleged?

18   A.  That's what he alleged.

19                    MR. KUS:  Objection.  Form of the

20               question; argumentative.

21                    MR. SUTHERLIN:  It's not

22               argumentative.  It's clarification.

23                    MR. KUS:  Counsel, I'm just making

24               objections for the record.  I've been

25               very good to you.  We're not even talking

```
 1                        about what this lawsuit is about.  It's
 2                        argument; that's my objection.
 3                             Go ahead.  Continue.
 4    BY MR. SUTHERLIN:
 5    Q.   Okay.  So is it fair to say that that's an
 6         assertion; you have no way of knowing whether it's
 7         truth or not?
 8                        MR. KUS:  You may answer that
 9                        question if it's fair to say that.
10                             THE WITNESS:  I'm not sure of the
11                        question.
12                             MR. KUS:  He wants to know what's
13                        fair.  You're the police officer.  He's
14                        asking you if it's fair to say something.
15    BY MR. SUTHERLIN:
16    Q.   I think the question specifically was:  When you
17         take a statement from somebody, do you have any way
18         of knowing whether that statement is truthful?
19    A.   No.
20    Q.   Okay.  So he has alleged that the keys were taken.
21         Do you have any independent verification that the
22         keys were taken from him?
23    A.   Other than him telling me, no.
24    Q.   And what keys were actually taken, if you know?
25    A.   If I remember correctly, it was all his keys in --
```

1          all his keys were the master key to Waterfall High

2          Rise.

3    Q.    All right.  Well, a master key is one key.  What

4          were the other keys to, if you know?

5    A.    I don't know.

6    Q.    Okay.  Can I have that, please.

7                Did you report to the building authority, the

8          property manager that the -- that Curtis Pratcher

9          had indicated to you that his keys had been taken?

10   A.    I don't remember if I did or not.

11   Q.    This statement was taken on October the 7th, but he

12         had told you that much earlier than October the 7th

13         when you had talked to him that his keys had been

14         taken.  Isn't that correct?

15   A.    He may have.  I don't remember.

16   Q.    I'll hand you what is marked as Plaintiff's

17         Exhibit 2, and call your attention to the

18         supplemental case report dated 3/18/02.

19   A.    Do you have a question for me?

20   Q.    I think the question was:  Hadn't you been informed

21         earlier by Mr. Pratcher that the keys had allegedly

22         been taken from him, his set of master keys, by

23         Lana, and he informed you on that particular day?

24         Isn't that correct?

25   A.    On October 7th, 2002, yes.

81

```
 1    Q.   Okay.   And you prepared that document?

 2    A.   Yes.

 3    Q.   What's the date of it?

 4    A.   Appears that it's October 20th, 2002, but could have

 5         been just printed on that day.

 6    Q.   Okay.   And this is a summary report that you

 7         created?

 8    A.   Yes.

 9    Q.   And did you type it yourself, or did you dictate

10         it?

11    A.   It appears that I typed it.

12    Q.   Okay.   All right.

13              Would you look at the next exhibit, please.

14         What is that?

15    A.   It's a Deposition Exhibit No. 13.   This is a booking

16         photo of Lana Canen.

17              And following it is -- was like an arrest

18         booking sheet.   I believe it was a Warrant that Lana

19         had for check deception -- is what she was arrested

20         for.   And following is like her -- like her

21         fingerprint card -- fingerprint cards.

22    Q.   Okay.   So you are -- that's sort of a book-in

23         record --

24    A.   Yes.

25    Q.   -- on Lana Canen?
```

84

1                          MR. SUTHERLIN:   Back on the record.

2     BY MR. SUTHERLIN:

3     Q.   I'd like to clear up a couple things that came to

4          mind over lunch, Mr. Daggy.

5               I forgot to give you the chance to tell us

6          whether you've had any awards or certificates or

7          recognition as a police officer?

8     A.   Yeah.   I've had some recognition awards that were

9          given by captains.   I don't know what they are off

10         the top of my head, but I've had some awards.

11    Q.   This had to do with your performance as a police

12         officer in solving a crime or doing something

13         extraordinary?

14    A.   Yes.

15    Q.   Okay.

16    A.   I actually got an award in this case and an award --

17         I think when I was on the drug task force.

18    Q.   So did they take the award back?

19    A.   No.

20    Q.   Have you had any training in fingerprint

21         identification?

22    A.   No.

23    Q.   Have you had any training at all in how

24         fingerprints, latent fingerprints, are, I guess,

25         taken up or collected?

85

```
 1   A.   I've had no training at all in any kind of
 2        fingerprint-taking.
 3   Q.   Okay.  Now, we've identified yourself and
 4        Dennis Chapman as defendants in this matter.  When
 5        was the last time the two of you talked about a
 6        case of -- the case of Lana Canen?
 7   A.   I don't believe I've ever talked to him about the
 8        case of Lana Canen.
 9   Q.   You've never talked to him?
10   A.   I don't believe I've ever talked to him at all, ever.
11   Q.   Prior to trial in 2004 you didn't have any
12        conversation with him?
13   A.   I've never had any conversation with Dennis Chapman.
14   Q.   We'll get there, then.
15            At some point did you tell Lana Canen before
16        the murder that you were going to arrest her for
17        the burglaries?
18   A.   I may have.
19   Q.   Did you discuss that decision to arrest her with
20        anyone else?
21   A.   I don't think so.
22   Q.   Do you want to refer to any of these records to
23        refresh your memory whether you've discussed this
24        with a supervisor or with any other detective?
25   A.   If I need to, sure.
```

1            for that Warrant.

2    Q.   After you were -- you learned of the death of

3         Helen Sailor, I think you said you were asked to

4         work the case because of your experience and

5         history in investigating the burglaries.  Is that

6         correct?

7    A.   No.  The homicide unit was formed, and I just

8         happened to be in the homicide unit at the time.  And

9         this was, I believe, the first case that we took.

10   Q.   So the whole homicide division took this case, and

11        you weren't the -- you weren't specifically

12        assigned to investigate it?

13   A.   That is correct.

14   Q.   All right.  Who else was working it with you, then?

15   A.   Sergeant Bill Wargo, Detective Carl Conway,

16        Detective Peggy Snider, myself, and

17        Lieutenant Paul Converse.

18   Q.   Okay.  And how did you divide up the

19        responsibilities or decide collectively how to

20        pursue this investigation?

21   A.   I didn't -- I don't make that decision.  That

22        decision is dependant on our sergeant and lieutenant,

23        who does what during an investigation.

24   Q.   Who would that have been?

25   A.   It would have been Lieutenant Paul Converse and

89

1      Lieutenant Wargo.

2   Q.   So was there, in fact, sort of a meeting where you

3        decided who was going to do what and discussed who

4        was going to do what?

5   A.   If there's a meeting, Sergeant tells what to do, and

6        you just do it.

7   Q.   Well, don't you have some sort of sense on what the

8        other folks are going to do as well?  I'm assuming

9        that you're sitting down around a table at some

10       point when you get started?

11  A.   I guess that's fair to say, so --

12  Q.   Okay.

13  A.   -- you don't do something twice that someone else has

14       done.

15  Q.   Sort of a very practical way of coordinating

16       things; you know what you're doing, you know what

17       everyone else is doing, so you know who to talk to

18       if you have a question.  Is that fair?

19  A.   Fair.

20  Q.   All right.  So what was your specific role, then,

21       in conduct -- involvement in the investigation of

22       the homicide of Helen Sailor?

23  A.   I'd say -- I'd say the beginning of the

24       investigation -- this case was -- this case was

25       assigned to Carl Conway.  Carl Conway did the bulk of

90

1       the investigation.

2              At some point Carl Conway left the homicide

3       division, and this thing -- this case had been given

4       to the prosecutor's office and was going to go to

5       trial.

6              I sat at the table with the prosecuting office.

7       I've done -- I mean, I've done some work in it.

8              I'm not sure what your question is.

9    Q.  Well, that's the next part, I guess.  But -- so you

10       had done some work in the case along with other

11       detectives.  Is that --

12   A.  That's correct.

13   Q.  And you were given specific assignments.  So I'm

14       asking you in the course of the investigation, what

15       was your specific assignments?

16   A.  I interviewed witnesses.

17   Q.  All right.  We have been, I guess, given over a

18       thousand pages, which constitute the file.  And is

19       that the file you were referring to earlier, that

20       you reviewed?

21   A.  Yes.

22   Q.  In preparation for today's deposition?

23   A.  (Witness nods head.)

24   Q.  All right.  And that -- I didn't mean to cut you

25       off.

1          Does that file, then, constitute, as far as

2     you know, the complete investigative file of the

3     Elkhart City Police Department?

4                    MR. KUS:   Just let me interpose this

5                    objection:   I'm not sure which papers

6                    you're actually referring to.   So just a

7                    reservation, I don't want him saying that

8                    everything is in there if it's not, or if

9                    there's things in there he hasn't

10                    reviewed from your -- what you've got,

11                    what you're referring to.

12                    With that -- with that caveat, I will

13                    not repeat it again.

14                    If you're going to refer just in bulk

15                    to that -- Mike, you understand where I'm

16                    going with that.

17                    MR. SUTHERLIN:   Okay.   Let me go off

18                    the record.

19                    (Off the record from 2:13 to 2:18.)

20                    MR. SUTHERLIN:   Let's go back on the

21                    record.

22     BY MR. SUTHERLIN:

23     Q.   Officer Daggy, I'm going to hand you a number of

24     materials that have been Bates-stamped.   And your

25     attorney has interjected an objection, which is

98

1  A.  No.

2  Q.  All right.  After you arrested her, did you

3      continue with your investigation on the burglaries

4      or on the homicide in such a way as to occlude her

5      as a suspect?

6  A.  When I arrested her for the Warrant, I wasn't in the

7      homicide unit, so I did not work on -- on the

8      homicide.

9          As far as the burglaries, the burglaries are

10     inactivated.  Those are always -- those are always --

11     they can always be re-opened.  They're not officially

12     closed.

13 Q.  Well, my question, then, is just that.  Did you

14     consider that now that she was under arrest for

15     this, that you wanted to continue your burglary

16     investigation?

17 A.  I don't know.  I know the burglaries are always still

18     there if anything new comes -- comes along.

19 Q.  Well --

20 A.  I mean, I always want to solve a crime.

21 Q.  Sure.  It wasn't about intent, but did you

22     specifically do anything after Lana Canen was

23     arrested for forgery in furtherance of your

24     investigation of the burglaries?

25 A.  I don't believe so.

1    Q.   Now, at this time it would have been, what, five,

2         six months after -- after the homicide?

3    A.   She was arrested in April of 2003.  Homicide was in

4         '12 of -- about five months, maybe.

5    Q.   Okay.  I'm just estimating.  What had happened, if

6         you know, with regard to the homicide investigation

7         in those five months?

8    A.   I don't know.  I didn't work on it then.

9    Q.   Okay.  All right.

10             At some point you explained that there was

11        another officer who was primarily involved in the

12        homicide.  Is this what we -- are we referring to a

13        new phase where there was a group of detectives now

14        working this as a cold case?

15   A.   No.  I think the -- I'm not sure what -- I don't

16        understand your question.  I'm not sure what your

17        time frame is.

18             We formed the homicide unit -- I believe it was

19        August 2003.  That's when we picked this case up.

20   Q.   Yes.  And that's when Detective Chapman was

21        involved in his fingerprint analysis?

22   A.   I have no idea when he was involved with it.

23   Q.   All right.  But you weren't aware that he was

24        involved in this as a fingerprint analysis expert?

25   A.   No.

1  Q.  In August of 2003 what was your role?  What was

2      your position in the investigation?

3  A.  I did interviews -- I did initial interviews when we

4      picked the case up, interviews from people at the

5      high rise.

6  Q.  All right.  Was there any one particular officer

7      who was in charge of the investigation?

8  A.  Detective Carl Conway was the lead guy in the

9      Helen Sailor homicide case.

10  Q.  And you worked with him?

11  A.  Yes.

12          (Plaintiff's Exhibit No. 14 marked.)

13  BY MR. SUTHERLIN:

14  Q.  I'm going to hand you what is marked as Deposition

15      Exhibit No. 14.  Ask if you've ever seen that

16      before?

17  A.  Are you asking if I've seen this before?

18  Q.  Yes.

19  A.  I don't know if I have or not.  I don't -- I've got a

20      legal paper that I've been shown, but I don't know if

21      I've seen this -- this one.  I may have.  I'd have to

22      look, but --

23              MR. DE BONI:  May I see the exhibit?

24              MR. SUTHERLIN:  Yes.  I actually have

25              another copy here, somewhere.

1    Q.   Who made the decision, if you know, to involve the

2         Indiana State Police in reviewing the fingerprint

3         evidence?

4    A.   I don't know.

5    Q.   Who made the decision not to include them, if you

6         know that?

7    A.   I don't know.

8    Q.   Who made the decision to involve Mr. Chapman?

9    A.   I don't know.

10   Q.   So you had no -- you have no knowledge today how he

11        was brought into the case?

12   A.   I have no knowledge because I don't work -- I don't

13        work the evidence side of things.  That's a whole

14        other beast.  That's a whole other part in this

15        department.  I don't deal with evidence.

16             No, I have no idea.  I don't collect evidence.

17        I don't process scenes.  That's not done by the

18        detective.  That's done by evidence technicians,

19        evidence -- evidence detectives.  They handle all

20        that decision.

21             That's part of prosecution when they -- they

22        choose the witnesses that they want for this -- for a

23        case that's presented to them.

24   Q.   Are you suggesting that there's no one in the

25        detective division, homicide division, that you can

1          point to who's in charge of this prosecution that

2          represents the police department in gathering all

3          this evidence?

4    A.   I don't understand your question.

5    Q.   Well, if I'm a prosecutor and I call up a person

6          who is involved in this investigation and I say, "I

7          need to talk to the person who conducted this

8          investigation and knows it backward and forwards so

9          we can sit down and develop a strategy on

10         prosecution," who would that person be in this

11         case?

12   A.   That could be a lot of people.  There's a --

13         there's -- you know, there's five, six people who

14         have their hands in this, including evidence

15         technicians.  Everyone -- evidence technicians -- I

16         told you, it's a different beast.  They're

17         specialized in the evidence part of it, the

18         collection of it, and where it gets sent to.

19   Q.   You know, this is the problem with the Homeland

20         Security.  It was fragmented.  It's fixed.  I know

21         it's fixed.  Who -- if you just don't know, just

22         say, "There's nobody in charge."  Just say it that

23         way.

24                    MR. KUS:  You've never asked him the

25                    question.  Why don't you ask him the

111

```
 1   Q.   All right.  And -- but according to your testimony
 2        you said you did familiarize yourself with all of
 3        the evidence and all of the documents in the
 4        investigative file?
 5   A.   Yes.
 6   Q.   All right.  And so at some point Mr. Chapman was
 7        hired.
 8            Did you make yourself familiar with his
 9        involvement in the case?
10   A.   No, I did not.
11   Q.   And why not?
12   A.   Because that's a totally -- that's a totally
13        different -- that's a totally different beast, like I
14        said earlier.  That is -- that pertains to the
15        Evidence Bureau, which is the other side of the
16        building.  They do all that.
17            Our evidence -- "they" being our evidence
18        technicians at the time.  They -- they deal with all
19        the evidence that gets sent out to be looked at or
20        get examined at.  That's not your run-of-the-mill
21        detective that does that.
22   Q.   Is that what you are, run-of-the-mill?
23   A.   No.
24   Q.   Okay.  All right.
25            So you're sitting at counsel table when the
```

112

1          trial begins.  And who's the prosecutor?

2    A.   Vicky Becker and Joel Williams.

3    Q.   Okay.  Did they from time to time talk to you about

4         various aspects of the case and the strength of the

5         evidence?

6    A.   I'm sure they did.

7    Q.   Okay.  And how did you become -- what did you tell

8         them about Mr. Chapman and his contribution to the

9         case then?

10   A.   I didn't tell them anything about Mr. Chapman.

11   Q.   They didn't ask?

12   A.   No.

13   Q.   What was the evidence that you guys had which

14        linked Mrs. Canen to the case?

15   A.   We had -- we had a lot of evidence in statements, in

16        numerous statements; statements that Lana gave

17        herself.  Lana told Detective Thayer early on in the

18        investigation she was out of town.  And we had two or

19        three people that said she was pacing back and forth

20        out in front of the high rise.

21             Helen was -- Helen was, you know, strangled.

22        She died by strangulation.  Well, we have evidence --

23        I have evidence that Lana Canen strangled three

24        people.  She strangled her daughter.  She strangled

25        her stepfather, and might have strangled -- well, I

1                    MR. SUTHERLIN:  "Forensic."

2                    MR. KUS:  I mean, what did you say

3               about it?  Emphasis on the word

4               "forensic"?

5                    MR. SUTHERLIN:  Yes.

6                    MR. KUS:  Thank you.

7                    THE WITNESS:  Do I find anything in

8               here that links her forensically; is that

9               what you're asking me?

10   BY MR. SUTHERLIN:

11   Q.  Yes.

12   A.  I'm not -- I don't look at evidence and say it

13       matches up to someone forensically.  That's not what

14       I do.  I'm not -- I'm not an evidence technician.

15       I'm not an analyst.  So I can't answer that question.

16   Q.  Do you know what the word "forensic evidence" is?

17       I mean, what it means.

18   A.  I think it's kind of general.  It could mean DNA.  It

19       could mean hair samples, fiber samples.  It's kind of

20       a general term.

21   Q.  Yes.  That's exactly what it is, but that's

22       forensics.  So -- and a latent fingerprint would be

23       forensic evidence, would it not?

24   A.  I guess.

25   Q.  Okay.  So -- you just guess?  You don't know?

1    A.   I don't know -- I don't deal with fingerprints.  So I

2         can't -- I'm not -- I can't say what fingerprint

3         belongs to you or to her or to him.  I don't deal

4         with fingerprints.  I don't deal with evidence.

5    Q.   That wasn't the question, Officer.

6    A.   What was the question?

7    Q.   I said, "Is fingerprint evidence forensic"?

8                    MR. KUS:  Actually, you said, "You

9              guess?"  I think that's what you said,

10             honestly.  When he said, "I guess," you

11             said, "You just guess?"  And he was

12             explaining.

13                  But go --

14                  THE WITNESS:  I'll say, yeah,

15             fingerprints can be found under the term

16             "forensics."

17   BY MR. SUTHERLIN:

18   Q.   And you were trained, were you not, someplace along

19        the line to distinguish between forensic evidence

20        and, say, circumstantial evidence or non-conclusive

21        evidence, that kind of thing?

22   A.   I was trained -- I know there's circumstantial

23        evidence and there's hard evidence.  But I wasn't

24        trained to collect it or analyze it.

25             You know, if I -- if you see like a bloody

1    towel, you know, that could be hard evidence.  He

2    would collect it.

3  Q.  You would collect it, and what would you do with

4    it?

5  A.  Well, I wouldn't collect it.  An evidence technician

6    would collect it and take it to the wet room or the

7    Evidence Bureau.  And they would run tests on it.

8  Q.  Do you know what kind of tests they might run?

9  A.  No.

10  Q.  Okay.  Did you ever speak to anybody about the

11    latent fingerprint which was identified as that

12    belonging to Lana Canen?

13  A.  No.

14  Q.  So the first time you heard of this evidence is

15    when Mr. Chapman testified?

16  A.  I think in preparation for the trial, I heard -- I

17    had heard from Evidence Technician Joe Bourdon that

18    there was a fingerprint match.

19  Q.  From Bill Voorhees?

20  A.  No.  Evidence Technician Joe Bourdon.

21  Q.  Joe Bourdon.  Okay.

22    And did you just happen to casually talk to

23    him about it, or was this something that you wanted

24    to find out about?

25  A.  I think it was shared amongst the homicide -- the

1        entire homicide unit.

2   Q.   Okay.  Tell me how it was shared.

3   A.   Well, any time -- any time there's a DNA hit or some

4        kind of hit that matches it to a suspect, we usually

5        get a -- we usually get a lab report saying that it's

6        identified -- this evidence has been identified.

7              There's a lab report, and that's usually brought

8        from an evidence technician to the homicide unit with

9        the findings.

10  Q.   Okay.  Was there such a lab report in this case?

11  A.   I believe there was.

12  Q.   And who prepared that lab report, if you know?

13  A.   I believe it was prepared by Dennis Chapman.

14  Q.   Okay.  And when you were referring -- refer to it

15       as a "lab report," I normally think of just at a

16       laboratory where there was an examination very

17       carefully done with microscopes and things like

18       that.

19             Did Mr. Dennis Chapman, to your knowledge,

20       conduct such an investigation of the -- and compare

21       the latent fingerprints with that of Lana Canen?

22  A.   To my knowledge there was a report done.

23  Q.   Just that there was a report done; you don't know

24       how he did it?

25  A.   How he did the report?  Or how he did the exam?

124

1    Q.   How he gathered the information and concluded that
2         there was a match.
3    A.   Yeah.   I'm not sure how he did that.
4    Q.   Okay.   And you didn't question him before at the
5         trial -- before his testimony about his
6         methodology?
7    A.   No.
8    Q.   Did you question him at all about his expertise?
9    A.   No.
10   Q.   Or his experience?
11   A.   No.
12   Q.   Did anybody?
13   A.   I don't know.
14   Q.   Okay.   To your knowledge, you don't know of
15        anybody?
16   A.   I don't know if anyone talked to Dennis Chapman or
17        not.
18   Q.   Okay.   I understand the answer.
19                  (Defendant's Exhibit No. 17 marked.)
20   BY MR. SUTHERLIN:
21   Q.   I'm going to hand you what is marked as Plaintiff's
22        Exhibit No. 17, which is Defendant Mark Daggy's
23        Answer to Complaint.
24            Have you seen that before?
25   A.   I have seen this, yes.

1          heard of those types of hearings?

2     A.   Yes.

3     Q.   Was one of those types of hearings done in this

4          particular case, that you know of, regarding the

5          prosecution of Ms. Canen for murder?

6     A.   Not that I know of.

7     Q.   Who would make that decision to vet that -- that is

8          analyze -- an expert witness in a criminal case?

9     A.   That's totally up to the prosecutor.

10    Q.   Now, you have been asked a series of questions this

11         morning on burglaries.  I just wanted to get a

12         timeline because some different years were used.

13              What year were these eight burglaries?  When

14         did they occur?

15    A.   They occurred in 2002.  And I believe they started

16         from March, and I believe ended in May at some point.

17    Q.   And at that point in time where did you work?

18    A.   I worked in the Detective Bureau.

19    Q.   So you were not in the homicide unit?

20    A.   No, sir.

21    Q.   Now, opposing counsel, counsel for the plaintiff in

22         this case, has asked you questions where he

23         referred to as a cold case, and you made a comment

24         about that.  Do you refer to your unit as a cold

25         case unit?

```
 1          before Thayer talked to you.  I'm talking about
 2          when you were on duty as an
 3          investigator/detective for the burglaries, when did
 4          Ms. Canen come to your attention during that
 5          investigation as someone who was a suspect in the
 6          burglaries?
 7    A.    It was after several interviews with some of the
 8          victims.  It was through the interviews with the
 9          victims.  They immediately -- I mean, she arose
10          immediately as a person who did it.
11    Q.    Let's talk why.  First, what was -- you said there
12          was a commonality among the eight when you were
13          testifying on direct examination.  What was one
14          common aspect of these particular burglaries?
15    A.    Somebody used a key to get in.
16    Q.    How do you -- go ahead.  I'm sorry.
17    A.    I'm sorry.  Somebody used a key to get in these
18          apartments.
19    Q.    And how did you know someone used a key?
20    A.    Because that's what the victims told me, and there
21          was no forced entry into the apartment.  There was no
22          damage to the doorjambs.
23    Q.    So -- as someone with -- who had been investigating
24          at this time, did you draw a conclusion about there
25          being no -- no damage to the doorjambs or to the
```

147

1      locks?

2   A.   Yes, I did.

3   Q.   And that was that there was a key used?

4   A.   Yes.

5   Q.   Okay.   So how do we get from that piece of evidence

6        or eight pieces of evidence -- because as I

7        understand, it was all eight apartments were not

8        damaged, their doors were not damaged?

9   A.   That is correct.

10  Q.   All eight of them?

11  A.   There was no damage on all eight.

12  Q.   Have you ever investigated a burglary where -- that

13       short of time where there were burglaries in an

14       apartment or a building where there was no damage

15       to a -- to the lock or to the doorjamb on eight

16       different occasions?

17  A.   No.

18  Q.   Okay.   So how did we get -- how did you get to the

19       point where you thought Ms. Canen could be a

20       suspect or was, in fact, a suspect in the

21       burglaries?

22  A.   I interviewed a maintenance man over there,

23       Curtis Pratcher.   And in the interview he told me

24       that he used to be intimate or romantic with

25       Lana Canen.

1    Q.   And that's the second paragraph?

2    A.   Yes, he is.

3    Q.   Now, what connected, in your mind, Ms. Canen with

4         the break -- eight break-ins at the apartments?

5    A.   Mr. Pratcher had told me that he was inmate or

6         romantically involved with Lana Canen.  He had lived

7         in the apartment away from -- away from the high

8         rise.

9             She had stayed the night with him.  He had woke

10        up the next morning.  Lana was gone and his master

11        key to the high rise was gone.

12   Q.   Now, Counsel for Plaintiff asked you, "Is that it?

13        Is that all there is?"  That is, what evidence do

14        you have of Ms. Canen taking keys?  And he asked

15        you questions about the keys, what they were.

16            First question:  Did you ever see the keys?

17   A.   Never found the key.

18   Q.   Did you ever see the key chains?

19   A.   No.

20   Q.   Do you rely on witnesses to bring forth evidence

21        when you are investigating a case?

22   A.   Yes.

23   Q.   Was Mr. Pratcher a potential witness?

24   A.   Yes.

25   Q.   And did he tell you a possible reason that he would

1      lie?  Did he give you anything that caused you

2      concern that he might be lying?

3   A. I don't know why he would lie to me regarding this --

4      him getting his keys stolen.

5   Q. How about a motive?  Did he say anything?  Did he

6      say his relationship was good, bad, or indifferent

7      with Ms. Canen?

8   A. No.  It was bad.  In fact, there was a battery charge

9      alleged against him.  And she had gotten a

10     Restraining Order against him.

11  Q. So there might have been tension between the two of

12     them?

13  A. Yes.

14  Q. Did that in any way take away from your suspicion

15     of Lana Canen?

16  A. No.

17  Q. Why not?

18  A. I'm -- there's a whole bunch of other -- I mean,

19     there's a lot of other evidence that --

20  Q. Okay.  Let's talk about it.  What other evidence of

21     the burglaries did you have?

22  A. She wouldn't come to the door when I tried -- when I

23     tried to get her for an interview.  This happened

24     several times until I finally went and got a -- you

25     know, like I said earlier, went and got a property

1      manager.

2            She checked on her, and Lana was hiding behind

3      the door.  She was evasive.  Things that were being

4      taken -- I mean, it was reported to me that things

5      were taken, like trinkets --

6   Q.  Did anyone mention Lana Canen's name in the

7      interviews, Exhibit 1 through 9?  Did any residents

8      mention Lana Canen specifically?

9   A.  Yeah.  Yes.

10  Q.  All right.  So when you interviewed her or when you

11     brought her in in April -- what was the date of

12     her --

13  A.  I think it was April 22nd of 2003.

14  Q.  Okay.  You were asked some questions about this

15     exhibit, this Exhibit No. 12.  And I think you

16     started reading from the first -- from the first

17     line of that fourth paragraph.

18            Is this your product?  Did you type this up?

19  A.  Yes, I did.

20  Q.  Why don't you tell -- for the record, just tell us

21     what Lana said to you.  What did she say on the

22     time of that interview when you brought her in?

23                  MR. SUTHERLIN:  The document speaks

24            for itself.

25                  MR. KUS:  I understand.

152

```
 1                    MR. SUTHERLIN:  Let me --
 2                    MR. KUS:  I understand.
 3                    MR. SUTHERLIN:  Let me finish my --
 4                    MR. KUS:  I appreciate that.
 5                    MR. SUTHERLIN:  Speaks for itself.
 6             It's a summary.  It's not a signed
 7             statement.
 8   BY MR. KUS:
 9   Q.  Go ahead.  First of all, I want to make sure --
10       honoring Counsel's objection -- let me just ask
11       you:  Did you bring her in and talk with her?
12   A.  Yes, I brought her in.
13   Q.  And did you -- were you with her when you walked
14       out?
15   A.  Yes.
16   Q.  Okay.  Did she continue to talk with you after you
17       left your office?
18   A.  She did.
19   Q.  Do you remember what she said?
20   A.  She would tell me more -- after she contacted an
21       attorney, she said there was drugs involved.
22   Q.  Did she volunteer that, or did you ask the
23       question?
24   A.  She volunteered that.
25   Q.  So she said she would tell you more, but there were
```

153

1          drugs involved; is that what you've --
2    A.   That's correct.
3    Q.   Okay.  And was she, for some reason, afraid to give
4         you information?
5    A.   She knows --
6                    MR. SUTHERLIN:  Objection; calls for
7                    speculation on the state of mind of a
8                    person.
9                    THE WITNESS:  She told me that there
10                   was drugs involved, and she would be
11                   kicked out of the Waterfall High Rise if
12                   they found out because they have like a
13                   zero-tolerance of drug use being used in
14                   that building.  They get booted out.
15   BY MR. KUS:
16   Q.   Do you know if Ms. Canen was kicked out of the
17        Waterfall High Rise?
18   A.   Yes, she was.
19   Q.   Was that before or after the murder of Helen
20        Sailor?
21   A.   It was after the murder.
22   Q.   Okay.  Now, let's go, then, to the next time you're
23        involved with Ms. Canen.  That is, after the
24        burglary.
25             When was it after the burglary that you had

```
 1       anything to do with her where her name came up, and

 2       as well as the check deception?

 3   A.  After the burglaries I remember seeing her again in

 4       2003 walking on Johnson Street.

 5   Q.  That's here in Elkhart?

 6   A.  That's here in Elkhart.  Just not even a half mile

 7       from here.

 8           I checked her for Warrants.  There was Warrants,

 9       and she was arrested for that.

10           She was brought down.  I didn't question her on

11       anything.  She was just brought down.

12   Q.  That brings us, then, to the time, then, I think

13       you said there was a meeting.  And you said it was

14       a room here at the Elkhart PD where there was --

15       someone approached you concerning Lana Canen and

16       the burglary investigation.  Who was that

17       individual?

18   A.  That was Detective Thayer.

19   Q.  Okay.  And he said he wanted to talk to you?

20   A.  Yes.

21   Q.  Okay.  And was Detective Thayer involved in the

22       investigation of the murder of Helen Sailor?

23   A.  Yeah.  He was -- he was lead, along with

24       Detective D'Andre Christian.

25   Q.  And I think it's established that the murder
```

155

1       happened on November 28th, 2002.  Does that ring

2       a --

3   A.  That's correct.

4   Q.  Does that sound about right?

5   A.  Yes.

6   Q.  Were you involved in the investigation of that

7       murder at that time?

8   A.  No.

9   Q.  Did you ever talk with Detective Thayer?

10  A.  Yes, I believe I did.

11  Q.  What did you tell him and what information, if any,

12      did you give him?

13  A.  I told him that -- involving these eight burglaries,

14      that Lana Canen's name pretty much rose to the top on

15      the suspect list.

16  Q.  What about the check deception?  What was the

17      factual circumstances of that involving Ms. Canen?

18  A.  There was victim, Emma Cox, she had --

19  Q.  She was a victim of the burglary?

20  A.  Victim of the burglary.

21  Q.  So I want to understand this.  This was back in

22      March or maybe April of 2002.  She was a victim?

23  A.  Yes.

24  Q.  One of the eight?

25  A.  Yes.

| 1 | Q. | Did you do anything with that -- with that check |
| 2 | | and talk with anyone about it? |
| 3 | A. | I did.  I -- at the time my lieutenant was |
| 4 | | Peggy Snider, and I -- I thought we could send it off |
| 5 | | to a handwriting expert, who could compare the two. |
| 6 | | And she said at the time we weren't going to do that. |
| 7 | Q. | Did she give a reason? |
| 8 | A. | No, she didn't.  She didn't. |
| 9 | Q. | Did you discuss the amount of the check or the |
| 10 | | amount of the matter? |
| 11 | A. | Yeah, I'm sure I did.  I knew it was for $88.65 and |
| 12 | | who I thought it was, but wasn't given a reason.  It |
| 13 | | stopped right there.  I didn't -- and I don't recall |
| 14 | | ever sending something to a handwriting analyst or |
| 15 | | requesting it be sent. |
| 16 | Q. | Now, Ms. Canen is alleging in this lawsuit that you |
| 17 | | got -- as I said before, you got together with |
| 18 | | Mr. Chapman and decided to charge her, knowing |
| 19 | | evidence was -- was -- did not support the charge. |
| 20 | | You've seen that allegation; right? |
| 21 | A. | Yes. |
| 22 | Q. | Did you charge her in the burglaries? |
| 23 | A. | No. |
| 24 | Q. | Why not? |
| 25 | A. | Because I didn't -- I don't think -- I think there |

```
 1         was probable cause.  I didn't have enough to convict.
 2         And, really, it would stop -- it would stop at my
 3         supervisors.
 4    Q.   All right.  So, now, let's go -- we're going to go
 5         to 2003.
 6              At some point in time you do get involved in
 7         the investigation of the murder of Helen Sailor.
 8         Is that correct?
 9    A.   Yes.
10    Q.   This is after the initial group of investigators
11         had taken the case; correct?
12    A.   Yes.
13    Q.   And those investigators, then -- they did not
14         return a charge or indictment.  Is that what your
15         understanding is?
16    A.   They did not.
17    Q.   Then there was a homicide unit created?
18    A.   Correct.
19    Q.   At that point in time did you do any interviews or
20         do any investigation with Ms. -- on Ms. Sailor's
21         death as to the involvement of anyone, in
22         particular the involvement of Lana Canen?
23    A.   Did I do any investigation into this?
24    Q.   Yeah.
25    A.   Yeah.  Sure.
```

```
 1    Q.   Was any evidence gathered that you thought led to
 2         making Lana Canen a suspect in the murder?
 3    A.   Yes.
 4    Q.   I want you to just go through the evidence.  Just
 5         list it in your mind.  Just start from wherever
 6         you're comfortable and list at the completion of
 7         your investigation what you thought pointed to
 8         Lana Canen as a suspect.
 9    A.   Well, I think the biggest one is a statement from
10         Nina Porter where Nina Porter was told directly by
11         Lana Canen that basically she confessed to
12         Nina Porter that she did it, that no one was supposed
13         to get hurt.
14              Andy was brought in to scare her.
15    Q.   Who's Andy?
16    A.   Andy Royer, the other defendant.
17    Q.   Okay.  Did you know anything about Andy Royer and
18         his relationship with Ms. -- with Ms. Canen before
19         you heard about Nina Porter's comment?  Do you know
20         what kind of relationship they had?
21    A.   I don't know if we knew about it before then, but as
22         we dug more into the investigation, everyone said
23         that those two were always together.
24    Q.   Does that mean anything to you as an investigator
25         in criminal matters when you see two people who are
```

1      together a lot, or it's reported?

2  A.  Yeah.   I think if you got -- if they're together,

3      they could both be potential suspects in a crime or a

4      case.

5  Q.  So you had -- you talked to Nina Porter or

6      Nina Porter gave information.  Did you have any

7      eyewitnesses identifying Lana Canen at or near the

8      scene of the crime?

9  A.  Yes, we did.

10 Q.  Who and when?

11                     MR. SUTHERLIN:  Which crime are we

12               talking about?

13                     MR. KUS:  Only one.  The one you're

14               making an allegation against, of murder.

15 BY MR. KUS:

16 Q.  Go ahead.

17 A.  Yes.  There was -- there were at least a couple

18     witnesses.  Florence Macioci.

19                     THE WITNESS:  I'll get that for you.

20 A.  She -- she saw Lana pacing out in front of the

21     building.

22         There's a Charlie Lambert.  He actually saw her

23     pacing outside the building in the front and gave her

24     a ride later in the evening.  And there might have

25     been a handful of other witnesses that seen her --

1        seen her in the building.

2   Q.  Did Mr. Lambert make any comments or give any

3        statements to you that drew your suspicion toward

4        Ms. Canen about this ride and what occurred?

5   A.  Well, he said that he took Lana out to -- it wouldn't

6        be one of her ex-husbands, but it was a -- an old

7        boyfriend or a man that she had -- they had a child

8        together.  His name was Michael Burger.  He said that

9        he took her to his residence.

10           There were other people that -- there were other

11       witnesses that Charlie Lambert said to them that, "I

12       hope no one saw Lana get in my car."  I can find that

13       in the report.  I know that that was documented.  I'm

14       not sure.

15  Q.  Would you like to look at that document?  Go right

16       ahead.  They're right in front of you.

17  A.  Charlie Lambert's --

18  Q.  Yeah.

19  A.  -- or the -- I think it was -- I don't know if it was

20       marked specifically marked as evidence, but I

21       remember there being a person that was interviewed in

22       this case.  It might have been Florence Macioci.  And

23       he had made a comment to her, "I hope no one saw Lana

24       get in my car on Thanksgiving night."

25  Q.  Did you have -- did you interview anyone else that

ERRATA SHEET

41184cm

Deposition of: **Mark Daggy**                    Date:   **October 28, 2014**

| Page | Line | Change | To | Reason For Change |
|------|------|--------|-----|-------------------|
| 42 | 7 | Forum | Form | Wrong word |
| 43 | 16 | His | Her | Wrong word |
| 68 | 3 | Wouldn't | Would | Wrong word |
| 89 | 1 | Lieutenant | Sergeant | Wrong word |
| 149 | 5 | Inmate | intimate | Wrong word |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

MIDWEST REPORTING, INC.
1448 Lincolnway East
South Bend, Indiana 46613
(574) 288-4242

Signature: _Mark Daggy_

Date: _12-02-14_

1    replacements whether they were replaced?

2  A.  That would have been Danalee Meitzler.  I can't --

3    I'm going to have to refer to my report.  I don't

4    know if copies were made or not.

5  Q.  Well, I gathered that, but I think -- I asked you

6    that on direct, and you couldn't tell me when you

7    were looking through the reports.  If you want to

8    look through them again, go ahead.

9  A.  Danalee -- Danalee felt a duplicate was made and

10    probably given to Lana Canen; that was her -- that's

11    what she had told me.

12  Q.  And where are you finding that?

13  A.  I'm finding that on Exhibit 9, top paragraph.

14  Q.  Okay.  This is not what it says.  Shall I read it

15    to you?

16  A.  If you want to.

17  Q.  I guess I'm going to have to.

18           MR. KUS:  Wait a minute.  I'll

19           object.  The document speaks for itself.

20           Do you have a question on the

21           document?

22           MR. SUTHERLIN:  I'm going to read it

23           to him and then I'm going to ask him the

24           question, because apparently --

25           MR. KUS:  I'll object.

190

1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
2                    SOUTH BEND DIVISION

3    LANA CANEN,                          )
                                          )
4                   Plaintiff,            )
                                          )
5         vs                              )  Case No.
                                          )  3:14-cv-315-RL-CAN
6    DENNIS CHAPMAN and MARK DAGGY,       )
                                          )
7                   Defendants.           )
                                          )
8

9                      MARK DAGGY

10        I hereby acknowledge that I have read the foregoing

11   deposition transcript regarding the case of Canen Vs.

12   Daggy, taken on October 28, 2014, and that the same is a

13   true and correct transcription of the answers given by me

14   to the questions propounded, except for the additions or

15   changes, if any, as noted on the attached errata sheet.

16

17

18                    _____
                      MARK DAGGY

19
                           Subscribed and sworn to me
20                         this  2nd   day of December,
              SEAL         2014, A.D.
21

22
                           Notary Public or Witness Joan Upde
23                         State of Indiana
                           County of Elkhart
24                         My commission expires: 6-19-17

25

ORIGINAL

1                          **CERTIFICATE**

2          I, Charolette A. Martinez, a Notary Public, in and

3     for the County of St. Joseph and State of Indiana, do

4     hereby certify there appeared before me, MARK DAGGY, on

5     Tuesday, October 28, 2014, who was duly sworn to

6     testify the truth, the whole truth, and nothing but the

7     truth to questions propounded at the taking of the

8     foregoing deposition in a cause now pending and

9     undetermined in said court;

10         I further certify that I then and there reported

11    stenographically the proceedings at the said time and

12    place; that the proceedings were then transcribed from

13    my original shorthand notes; and that the foregoing

14    transcript is a true and correct record thereof;

15         IN WITNESS WHEREOF, I have hereunto set my hand

16    and affixed my notarial seal this 3rd day of November,

17    2014.

18

19

20

21

22                        Charolette A. Martinez, CSR
                          Notary Public, State of Indiana
23                        Residence:  St. Joseph County
                          Commission Expires:  12-18-2022

24

25

| | | | |
|---|---|---|---|
| **Agency Name** | **INCIDENT/INVESTIGATION** | | Case# |
| *Elkhart Police Department* | **REPORT** | | *2002-0318-044* |

ORI *IN 0200100*

Date / Time Reported *03/18/2002 16:52 Mon*
Last Known Secure *03/18/2002 14:45 Mon*
At Found *03/18/2002 16:30 Mon*

Location of Incident *303 Waterfall Dr Apt. 801, Elkhart IN 46516-*
Premise Type *Home Of Victim - Other*   Zone/Tract *Z3, 3*

**IDENT DATA**

#1 Crime Incident(s) *Burglary - Unlawful Entry - No Force* (Com)
*BURG UNLAWFUL*
Weapon / Tools *NOT APPLICABLE/NONE*   Entry   Exit   Security   Activity

#2 Crime Incident ( )   Weapon / Tools   Entry   Exit   Security   Activity

#3 Crime Incident ( )   Weapon / Tools   Entry   Exit   Security   Activity

MO

# of Victims *1*   Type: INDIVIDUAL (NOT A LE OFFICER)   Injury: None

**VICTIM**

V1 Victim/Business Name (Last, First, Middle) *CLARK, JANET*   Victim of Crime # *1,*   DOB Age *64*   Race *W*  Sex *F*  Relationship To Offender   Resident Status *Resident*   Military Branch/Status

Home Address *Waterfall Dr   1, Elkhart IN 46516-*   Home Phone *574-296-*

Employer Name/Address   Business Phone   Mobile Phone

VYR  Make  Model  Style  Color  Lic/Lis  VIN

CODES: V- Victim (Denote V2, V3)  O = Owner (if other than victim)  R = Reporting Person (if other than victim)

**OTHERS INVOLVED**

Type:   Injury:
Code  Name (Last, First, Middle)   Victim of Crime #   DOB Age   Race Sex Relationship To Offender  Resident Status  Military Branch/Status
Home Address   Home Phone
Employer Name/Address   Business Phone   Mobile Phone

Type:   Injury:
Code  Name (Last, First, Middle)   Victim of Crime #   DOB Age   Race Sex Relationship To Offender  Resident Status  Military Branch/Status
Home Address   Home Phone
Employer Name/Address   Business Phone   Mobile Phone

1 = None  2 = Burned  3 = Counterfeit / Forged  4 = Damaged / Vandalized  5 = Recovered  6 = Seized  7 = Stolen  8 = Unknown ("OJ" = Recovered for Other Jurisdiction)

**PROPERTY**

| VI# | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| 1 | 17 | 7 | $75.00 | | 1 | JEWELRY / PRECIOUS METALS | | |
| 1 | 250 | 7 | $0.00 | | 1 | CHECK BOOK | | |
| 1 | 20 | 7 | $20.00 | | 1 | MONEY / CASH | | |
| 1 | 09 | 7 | $0.00 | | 1 | CREDIT / DEBIT CARDS | | |

Officer/ID# *STUFF, M. A. (197)*   Outstanding Stolen Val [Total Stolen]: $95.00 [$95.00]
Invest ID# *DAGGY, M. A. (192)*   Supervisor *DEWITT, T. (112)*
Status  Complainant Signature   Case Status *Inactive / Suspended 11/04/2002*   Case Disposition:   Page 1
Printed By: DAGGYMAR,   Sys#: 51924   03/28/2014 14:27:26

INCIDENT/INVESTIGATION REPORT By: DAGGY,MAR, 03/28/2014 14:27

Page 2

*Elkhart Police Department*

Case# | 2002-0318-044

| | IBR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| | | | | | | |

Status: 1 = None  2 = Burned  3 = Counterfeit / Forged  4 = Damaged / Vandalized  5 = Recovered  6 = Seized  7 = Stolen  8 = Unknown

D R U G S

Assisting Officers
*WEAVER, J.R. (199)*

Suspect Hate / Bias Motivated:

Page 2

NARRATIVE

On Monday, 3/18/02, at approximately 1652 hours I was dispatched to 303 Waterfall Dr. reference to a burglary form apartment 801. Upon arrival I spoke to Janet Clark. Ms Clark advised she left her residence at approximately 1445 hours. When she returned at approximately 1630 hours she unlocked her deadbolt and went inside. Once inside she noticed a candy box on her bedroom dresser was gone. Inside the candy box was several ear rings. Ms Clark advised none of the ear rings were expensive. There were approximately 15-20 pairs.

Ms Clark also advised approximately $20.00 worth of quarters were missing form the living room. Also taken was a check book, numbers 1620-1626. The check book was Elcose Federal Credit Union. A Merchant Bank credit card and a Capitol One credit card was also taken. Ms Clark has already contacted the bank to cancelled the checkbook and credit cards.

There was no forced entry to the residence. Ms Clark has lived in this apartment for seven years. She advised she locked the deadbolt when she left. She advised someone had to have a key to get into the apartment. No tech was called due to no forced entry. Ms Clark and a friend had already went thought the apartment looking to see what was disturbed.

## Incident Report Related Property List

*Elkhart Police Department*

OCA: *2002-0318-044*

---

**1** 

| Property Description | | Make | | Model | | Caliber | |
|---|---|---|---|---|---|---|---|
| *JEWELRY / PRECIOUS METALS* | | | | | | | |

| Color | Serial No. | Value | Qty | Unit | Jurisdiction |
|---|---|---|---|---|---|
| | | *$75.00* | *1.000* | | *Locally* |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| *Stolen* | *03/18/2002* | | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex |
|---|---|---|---|---|
| *CLARK, JANET* | *05/26/1937* | *64* | *W* | *F* |

Notes

---

**2**

| Property Description | | Make | | Model | | Caliber | |
|---|---|---|---|---|---|---|---|
| *CHECK BOOK* | | | | | | | |

| Color | Serial No. | Value | Qty | Unit | Jurisdiction |
|---|---|---|---|---|---|
| | | *$0.00* | *1.000* | | *Locally* |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| *Stolen* | *03/18/2002* | | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex |
|---|---|---|---|---|
| *CLARK, JANET* | *05/26/1937* | *64* | *W* | *F* |

Notes

*Elcose Federal Credit Union, check numbers 1620 - 1626.*

---

**3**

| Property Description | | Make | | Model | | Caliber | |
|---|---|---|---|---|---|---|---|
| *MONEY / CASH* | | | | | | | |

| Color | Serial No. | Value | Qty | Unit | Jurisdiction |
|---|---|---|---|---|---|
| | | *$20.00* | *1.000* | | *Locally* |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| *Stolen* | *03/18/2002* | | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex |
|---|---|---|---|---|
| *CLARK, JANET* | *05/26/1937* | *64* | *W* | *F* |

Notes

---

**4**

| Property Description | | Make | | Model | | Caliber | |
|---|---|---|---|---|---|---|---|
| *CREDIT / DEBIT CARDS* | | | | | | | |

| Color | Serial No. | Value | Qty | Unit | Jurisdiction |
|---|---|---|---|---|---|
| | | *$0.00* | *1.000* | | *Locally* |

| Status | Date | NIC # | State # | Local # | OAN |
|---|---|---|---|---|---|
| *Stolen* | *03/18/2002* | | | | |

| Name (Last, First, Middle) | DOB | Age | Race | Sex |
|---|---|---|---|---|
| *CLARK, JANET* | *05/26/1937* | *64* | *W* | *F* |

Notes

*Capital One card and a Merchants Bank Card*

---

CASE SUPPLEMENTAL REPORT

Printed: 03/28/2014 14:27

*Elkhart Police Department*                                                         OCA: *20020318044*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *INACTIVE / SUSPENDED*        **Case Mng Status:** *INACTIVE / SUSPENDED*        **Occurred:** *03/18/2002*

**Offense:** *BURGLARY - UNLAWFUL ENTRY - NO*

**Investigator:** *DAGGY, M. A. (192)*                 **Date / Time:** *04/09/2002 12:20:39, Tuesday*

**Supervisor:** *PRICE, S. R. (308)*               **Supervisor Review Date / Time:** *03/05/2014 00:00:00, Wednesday*

**Contact:**                                        **Reference:** *Additional*

On 04-08-02, I met with Danalee Meitzler (                    Res.              , Elk.). Danalee is the Project Manager for Riverside and Waterfall Highrises. I met with Danalee in reference to (7) seven burglaries that took place in Waterfall Highrise. Danalee stated around 6 months ago a former employee by the name of Curtis Pratcher was working as a maintenance man. Pratcher was and still is dating a resident at Waterfall Highrise by the name of Lana Canen. Canen lives in apartment #802. Danalee stated Pratcher was released from the Highrise at Waterfall because employers are not supposed to date residents. To Danalee's knowledge, Pratcher turned the key in. Danalee feels that a duplicate master key was made and could have been given to Pratchers girlfriend Lana Canen. Pratcher still works at Riverside Highrise and all the other public housing, however he is not allowed in Waterfall Highrise.

The first victim I talked to was Janet Clark (          ', tx. 296-        .Res. #     ). Clark was the first resident to report items missing from the burglaries. Clark stated she noticed several earrings missing from a candy box, a check book, cash and some credit cards were taken between the hours of 1445-1630 on 03-18-03. Clark stated that when she left her room, she locked the dead bolt. When she came back to her room, she had to unlock it again. She feels that someone used a key to get in her room. Clark showed me a copy of a receipt that was written out to her from resident Lana Canen, Canen lives next door in #802. Clark bought some T-shirts from Canen. Clark then showed me a returned check that was taken from resident Emma Cox. Comparing the hand writing on the check to the receipt showed similarities to being Lana Canens handwriting.

The second victim I talked to was Emma Cox (          , tx. 523-    , Res. #   ). Cox stated that she had a check book and a billfold taken out of her apartment between 1500 hrs. on 03-18-02 and 0555 hrs. on 03-19-02. Cox stated that whoever entered that apartment had to use a key, because her door was always locked when she left and came back to her apartment. No forced entry or damage was done to the door. Cox gave me a copy of a returned check that was used the night her check was stolen. I called Martins Super Markets office and they stated that they do not have video of the transaction.

I talked with third victim, Sylvia Wilson ('          , tx. 295-      , wk. tx. 875-    ' Res. #    )n 04-09-02). She had two gold necklaces, a pair of diamond rings and a Dream Cicle figurine taken from her apartment on 03-21-02 between the hours of 0715 and 2230. Wilson also stated on 03-28-02 at 0130 hrs. she saw feet at her door and someone was turning her handle. On 04-02-02 at 0630 hrs. Wilson stated that she was taken a shower, when she exited her shower she noticed that her door to her apartment was open. It was locked before her shower. No forced entry during the burglary.

I attempted to talk with Edward Walsh (          , tx. 522-     , Res. #   '); I left an answer on his machine and left a business card at his door, but I was unable to talk to him.

I talked to Patricia Floyd (          , Res. #     ). Floyd stated that she had canned goods and a 6 pak of Pepsi taken. The canned goods were above her refrigerator in a cabinet. Floyd stated that her items were taken between 1830 hrs. on 03-26-02 and 1230 hrs. on 03-27-02. No forced entry.

I talked with Dorothy Horton (          , tx. 522-     Res. #    ). Horton stated that she got her leather coat taken

**Investigator Signature:**_____

*Elkhart Police Department*                                                    OCA: *20020318044*

| THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY |
| --- |

Case Status: *INACTIVE / SUSPENDED*     Case Mng Status: *INACTIVE / SUSPENDED*          Occurred: *03/18/2002*

    Offense: *BURGLARY - UNLAWFUL ENTRY - NO*

Investigator: *DAGGY, M. A. (192)*                                    Date / Time: *04/09/2002 12:20:39, Tuesday*

Supervisor: *PRICE, S. R. (308)*                    Supervisor Review Date / Time: *03/05/2014 00:00:00, Wednesday*

    Contact:                                                              Reference: *Additional*

---

out of her apartment between 1500 and 1900 hrs. on 03-28-02. The day I talked to her (04-08-02) she said that her apartment was unlocked when she returned to it but no one was inside. No forced entry.

    I talked with Paula Sjogren (        , tx. 295-    Res. #    ). Paula stated that between 1300 and 1830 hrs. on 04-02-02 someone took her diamond ring valued at $1500.00. Paula feels that Lana Canen is the suspect in her burglary. Paula stated around 4 months ago, Lana Canen wanted to use her bathroom. Paula let Canen use her bathroom. When Canen came out of her bathroom she commented on the medication that was in Paula's medicine cabinet. Paula told Canen not to be snooping in her cabinet. Approximately 3 weeks ago, Canen returned to Paula's apartment to say she was sorry for the incident with the medicine cabinet. Paula stated that Canen came into her apartment for awhile. After Canen left the apartment, Paula noticed that her car keys were missing. Canen was the only one in the apartment when her car keys came up missing and Paula thinks she took them.

    I have made attempts to talk to Lana Canen, I knocked on the door and left my business card on her door, but I have not talked to her yet.

Det. M.A.Daggy #192

---

**Investigator Signature:** _____

**CASE SUPPLEMENTAL REPORT**

| | |
|---|---|
| *Elkhart Police Department* | OCA : **20020318044** |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *INACTIVE / SUSPENDED*    **Case Mng Status:** *INACTIVE / SUSPENDED*    **Occurred:** *03/18/2002*

**Offense:** *BURGLARY - UNLAWFUL ENTRY - NO*

**Investigator:** *DAGGY, M. A. (192)*    **Date / Time:** *10/07/2002 15:54:11, Monday*

**Supervisor:** *PRICE, S. R. (308)*    **Supervisor Review Date / Time:** *03/05/2014 00:00:00, Wednesday*

**Contact:** *Pratcher, Curtis Lee*    **Reference:** *Witness Statement*
*1513-B Prairie St, Elkhart 574- -*

THE FOLLOWING FREE AND VOLUNTARY STATEMENT IS GIVEN TO DETECTIVE MARK DAGGY, WHO HAS IDENTIFIED HIMSELF AS A POLICE DETECTIVE WITH THE ELKHART CITY POLICE DEPARTMENT

DATE: 10-07-02
NAME: Curtis Pratcher
DOB:
SS#
ADDRESS:                        , Elkhart, In
HOME PHONE:
EMPLOYMENT: Elkhart Housing Authority
ADDRESS: 1396 Benham, Elkhart,In
PHONE: 295·

My name is Curtis Pratcher and I have resided at the above address for about a year,I am talking to Det. Daggy about a burglary case he is working. I have worked for the Elkhart Housing Authority for 4 years. I used to date a Lana Canen. She is a female that resides in Waterfall High rise. Her room number is #802.

I got a battery charge from Lana Canen in August of 2001and shortly after this I stopped dating her and I wasn`t allowed to work in the Waterfall high rise building. I still am not allowed to work in this building; the judge put a restraining order on me and for a year after the battery incident, I was not allowed to be around Lana.

After the battery incident and before my court date and the restraining order, Lana came over to my house, I`m not sure of the date. I was living at 181 North Riverside Apt. #102. Lana stayed the night. I woke up the next morning and all of my keys that belonged to the Housing Authority including the Master Key to Waterfall High rise were gone. Lana was gone too. When the keys came up missing there was no one there but me and her. I feel that Lana took the keys. I have not seen her since.

I heard that rooms were being Burglarized at Waterfall High rise. My brother in law, Milton Banks heard a rumor that Lana my have the keys because we used to date. Milton also works for the Housing Authority. I have not been in the Waterfall High rise for over a year now.

This statement is true and complete to the best of my knowledge.

I, swear, or affirm, under the penalty for perjury, as specified by I.C. 35-44-2-1, that the foregoing representations are true.

WITNESS:_____    SIGNATURE_____

Investigator Signature:_____

**CASE SUPPLEMENTAL REPORT**                    Printed: 03/28/2014  14:27

Elkhart Police Department                               OCA: *20020318044*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *INACTIVE / SUSPENDED*      Case Mng Status: *INACTIVE / SUSPENDED*       Occurred: *03/18/2002*

Offense: *BURGLARY - UNLAWFUL ENTRY - NO*

Investigator: *DAGGY, M. A. (192)*                   Date / Time: *10/28/2002 16:26:24, Monday*

Supervisor: *PRICE, S. R. (308)*            Supervisor Review Date / Time: *03/05/2014 00:00:00, Wednesday*

Contact:                                         Reference: *Closure*

---

In reference to this case, approximately (8) eight rooms at the Waterfall Highrise were broken into. All of the rooms involved had no forced entry and a master key was believed to be used. The suspect in this case is a Lana Canen, she resides in apartment #802. The residents in the Highrise feel that Canen is a suspect due to the fact that she used to date a maintenance worker. His name is Curtis Pratcher. Pratcher used to date Canen and work in Waterfall Highrise.

I interviewed Pratcher, he stated that he did in fact date Canen. Pratcher stated that in August of 2001 Canen stayed at his house and when he woke up the next morning, his master keys to Waterfall Highrise were missing. Pratcher stated that Canen was the only person that was in his apartment and the only person that could have taken his keys. Pratcher also stated that around this time, he had a battery charge placed on him by Canen and she he had a restraining order placed on him from Canen. Pratcher stated that he wasn't allowed to work in the Highrise or even be around Canen for a year. That restraining order has since expired.

One resident, Emma Cox had a check book taken from the burglary. The check was cashed at Martin's Grocery with her check cashing card the check was also written out to Emma Cox. The writing on the check matched Lana's handwriting. I compared this writing to a receipt that was hand written by Lana and also her handwriting on a Miranda form that was read to her and signed by her.

I talked with Lana, she signed and waved her Miranda rights and agreed to talk after many attempts to talk with her. Lana stated that she had no knowledge at times, but stated that she would tell me more after she requested a lawyer. After the interview, I walked Lana out and I told her that I was thinking about getting a warrant for her arrest. Lana stated that she would tell me more, but was afraid to give me more information because drugs were somehow involved and the Housing Authority would kick her out if they found out.

Recently I have been advised that the Housing Authority is going to terminate Lana from residing at the Highrise. Since I talked with Lana, new chain locks have been put on the doors and the burglaries have stopped. Due to the fact that I exhausted all leads in this case, I request this case become inactivated until further information derives. See Case 2002-0318-044.


Det. M.A.Daggy #192


**Investigator Signature:**_____

r_supp3                                                            Page 1

## CASE SUPPLEMENTAL REPORT

*Elkhart Police Department*                                         OCA: *20020318044*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status:       *Open / Active*
Case Mng Status:   *Assigned*                                       Printed: 10/07/2002  16:18

Investigator: *DAGGY, M. A. (192)*                    Date / Time:  *10/07/2002 15:54:11, Monday*
Supervisor: *(0)*                              Supervisor Review Date / Time:

    Contact: *Pratcher, Curtis*                     Reference: *Witness Statement*

THE FOLLOWING FREE AND VOLUNTARY STATEMENT IS GIVEN TO DETECTIVE MARK DAGGY, WHO
HAS IDENTIFIED HIMSELF AS A POLICE DETECTIVE WITH THE ELKHART CITY POLICE DEPARTMENT

DATE: 10-07-02
NAME: Curtis Pratcher
DOB:
SS#
ADDRESS:                          . Elkhart, In
HOME PHONE:
EMPLOYMENT: Elkhart Housing Authority
ADDRESS: 1396 Benham, Elkhart,In
PHONE: 295-

My name is Curtis Pratcher and I have resided at the above address for about a year,I am talking to Det. Daggy about a burglary case he is working. I have worked for the Elkhart Housing Authority for 4 years. I used to date a Lana Canen. She is a female that resides in Waterfall High rise. Her room number is #802.

I got a battery charge from Lana Canen in August of 2001and shortly after this I stopped dating her and I wasn`t allowed to work in the Waterfall high rise building. I still am not allowed to work in this building; the judge put a restraining order on me and for a year after the battery incident, I was not allowed to be around Lana.

After the battery incident and before my court date and the restraining order, Lana came over to my house, I'm not sure of the date. I was living at 181 North Riverside Apt. #102. Lana stayed the night. I woke up the next morning and all of my keys that belonged to the Housing Authority including the Master Key to Waterfall High rise were gone. Lana was gone too. When the keys came up missing there was no one there but me and her. I feel that Lana took the keys. I have not seen her since.

I heard that rooms were being Burglarized at Waterfall High rise. My brother in law, Milton Banks heard a rumor that Lana my have the keys because we used to date. Milton also works for the Housing Authority. I have not been in the Waterfall High rise for over a year now.

This statement is true and complete to the best of my knowledge.   *C.P*

I, swear, or affirm, under the penalty for perjury, as specified by I.C. 35-44-2-1, that the foregoing representations are true.

WITNESS _____   SIGNATURE ) *Curtis Pratcher*

## INCIDENT/INVESTIGATION REPORT

| | |
|---|---|
| Agency Name: **Elkhart Police Department** | Case# **2002-0402-040** |
| ORI **IN 0200100** | Date / Time Reported **04/02/2002 19:44 Tu** |

Last Known Secure **04/02/2002 13:00 Tu**
At Found **04/02/2002 18:30 Tu**

### INCIDENT DATA

Location of Incident **303 Waterfall Dr, Elkhart IN**
Premise Type **Home Of Victim - Other**  Zone/Tract **Z3, EPD**

| | | | | |
|---|---|---|---|---|
| #1 | Crime Incident(s) **Burglary - Unlawful Entry - No Force BURG UNLAWFUL** | (Com) | Weapon / Tools **UNKNOWN/NOT STATED** | Activity |
| | | | Entry   Exit   Security | |
| #2 | Crime Incident ( ) | | Weapon / Tools | Activity |
| | | | Entry   Exit   Security | |
| #3 | Crime Incident ( ) | | Weapon / Tools | Activity |
| | | | Entry   Exit   Security | |

MO

### VICTIM

# of Victims **1**   Type: **INDIVIDUAL (NOT A LE OFFICER)**   Injury: **None**

| | Victim/Business Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| V1 | **SJOGREN, PAULA C** | **1,** | Age **45** | **W** | **F** | | | |

Home Address **Waterfall Dr -   . Elk IN 46516-**   Home Phone **219-295-**

Employer Name/Address **DISABLED**   Business Phone   Mobile Phone **574- -**

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

### OTHERS INVOLVED

CODES:  V- Victim (Denote V2, V3)  O = Owner (if other than victim)  R = Reporting Person (if other than victim)

Type:   Injury:

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

Home Address   Home Phone

Employer Name/Address   Business Phone   Mobile Phone

Type:   Injury:

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

Home Address   Home Phone

Employer Name/Address   Business Phone   Mobile Phone

### PROPERTY

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| 1 | 17 | 7 | $1,500.00 | | 1 | DIAMOND RING AND WEDDING BAND | | |

Officer/ID# **STUFF, M. A. (197)**   Outstanding Stolen Val [Total Stolen]: $1,500.00 [$1,500.00]

Invest ID# **DAGGY, M. A. (192)**   Supervisor **(0)**

| | | | |
|---|---|---|---|
| Status | Complainant Signature | Case Status Inactive / Suspended **11/04/2002** | Case Disposition: |

Page 1

Printed By: DAGGYMAR,   Sys#: 52989   03/28/2014 14:32:25

## INCIDENT/INVESTIGATION REPORT

Page 2

By: DAGGYMAR,       03/28/2014 14:3

*Elkhart Police Department*

| Case# | 2002-0402-040 |

Status Codes    1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown

|  | IBR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| D | | | | | | |
| R | | | | | | |
| U | | | | | | |
| G | | | | | | |
| S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

Page 2

**NARRATIVE**

On Tuesday, 4/2/02, at approximately 1945 hours I was dispatched to 303 Waterfall Dr. reference to a burglary report. Upon arrival I spoke to Paula Sjogren. Ms Sjogren was in the lobby of the high rise and advised her apartment, 1003, was burglarized. Ms Sjogren advised she left to go to a friends at approximately 1300 hours. When she left she locked her apartment door. When she returned at approximately 1830 hours her door was still locked. Once inside she noticed her diamond ring and wedding band were gone. She advised nothing else was disturbed or taken.

Ms Sjogren has heard for other residents at the high rise of similar burglaries. She advised a maintenance man was recently fired. He has a girlfriend that lives in apartment 808. She thinks he kept a master key and is going into rooms and stealing items. She did not have names for the above mentioned.

No tech was called.

## Incident Report Related Property List

*Elkhart Police Department*

OCA: *2002-0402-040*

| 1 | Property Description *DIAMOND RING AND WEDDING BAND* | | | Make | | Model | | | Caliber |
|---|---|---|---|---|---|---|---|---|---|
| | Color *Gold* | Serial No. | | Value *$1,500.00* | Qty *1.000* | Unit | | Jurisdiction *Locally* | |
| | Status *Stolen* | Date *04/02/2002* | NIC # | State # | | Local # | | OAN | |
| | Name (Last, First, Middle) *SJOGREN, PAULA C* | | | | DOB *10/19/1954* | | Age *47* | Race *W* | Sex *F* |

Notes

**CASE SUPPLEMENTAL REPORT**
*NOT SUPERVISOR APPROVED*

Printed: 03/28/2014 14:32

*Elkhart Police Department*

OCA: *20020402040*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *INACTIVE / SUSPENDED*    Case Mng Status: *INACTIVE / SUSPENDED*    Occurred: *04/02/2002*

Offense: *BURGLARY - UNLAWFUL ENTRY - NO*

Investigator: *DAGGY, M. A. (192)*    Date / Time: *10/28/2002 17:25:07, Monday*

Supervisor: *(0)*    Supervisor Review Date / Time: *NOT REVIEWED*

Contact:    Reference: *Closure*

In reference to this case, approximately (8) eight rooms at the Waterfall Highrise were broken into. All of the rooms involved had no forced entry and a master key was believed to be used. The suspect in this case is a Lana Canen, she resides in apartment #802. The residents in the Highrise feel that Canen is a suspect due to the fact that she used to date a maintenance worker. His name is Curtis Pratcher. Pratcher used to date Canen and work in Waterfall Highrise.

I interviewed Pratcher, he stated that he did in fact date Canen. Pratcher stated that in August of 2001 Canen stayed at his house and when he woke up the next morning, his master keys to Waterfall Highrise were missing. Pratcher stated that Canen was the only person that was in his apartment and the only person that could have taken his keys. Pratcher also stated that around this time, he had a battery charge placed on him by Canen and she he had a restraining order placed on him from Canen. Pratcher stated that he wasn't allowed to work in the Highrise or even be around Canen for a year. That restraining order has since expired.

One resident, Emma Cox had a check book taken from the burglary. The check was cashed at Martin's Grocery with her check cashing card the check was also written out to Emma Cox. The writing on the check matched Lana's handwriting. I compared this writing to a receipt that was hand written by Lana and also her handwriting on a Miranda form that was read to her and signed by her.

I talked with Lana, she signed and waved her Miranda rights and agreed to talk after many attempts to talk with her. Lana stated that she had no knowledge at times, but stated that she would tell me more after she requested a lawyer. After the interview, I walked Lana out and I told her that I was thinking about getting a warrant for her arrest. Lana stated that she would tell me more, but was afraid to give me more information because drugs were somehow involved and the Housing Authority would kick her out if they found out.

Recently I have been advised that the Housing Authority is going to terminate Lana from residing at the Highrise. Since I talked with Lana, new chain locks have been put on the doors and the burglaries have stopped. Due to the fact that I exhausted all leads in this case, I request this case become inactivated until further information derives.

Det. M.A.Daggy #192

*Elkhart Police Department*    OCA: *20020318044*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *INACTIVE / SUSPENDED*    Case Mng Status: *INACTIVE / SUSPENDED*    Occurred: *03/18/2002*

Offense: *BURGLARY - UNLAWFUL ENTRY - NO*

Investigator: *DAGGY, M. A. (192)*    Date / Time: *04/09/2002 12:20:39, Tuesday*

Supervisor: *PRICE, S. R. (308)*    Supervisor Review Date / Time: *03/05/2014 00:00:00, Wednesday*

Contact:    Reference: *Additional*

On 04-08-02, I met with Danalee Meitzler (                    : Res.                Elk.). Danalee is the Project Manager for Riverside and Waterfall Highrises. I met with Danalee in reference to (7) seven burglaries that took place in Waterfall Highrise. Danalee stated around 6 months ago a former employee by the name of Curtis Pratcher was working as a maintenance man. Pratcher was and still is dating a resident at Waterfall Highrise by the name of Lana Canen. Canen lives in apartment #802. Danalee stated Pratcher was released from working in the Highrise at Waterfall because employers are not supposed to date residents. To Danalee's knowledge, Pratcher turned the key in. Danalee feels that a duplicate master key was made and could have been given to Pratchers girlfriend Lana Canen. Pratcher still works at Riverside Highrise and all the other public housing, however he is not allowed in Waterfall Highrise.

The first victim I talked to was Janet Clark (          ', tx. 296-        Res. #801). Clark was the first resident to report items missing from the burglaries. Clark stated she noticed several earrings were missing from a candy box, a check book, cash and some credit cards were taken between the hours of 1445-1630 on 03-18-03. Clark stated that when she left her room, she locked the dead bolt. When she came back to her room, she had to unlock it again. She feels that someone used a key to get in her room. Clark showed me a copy of a receipt that was written out to her from resident Lana Canen, Canen lives next door in #802. Clark bought some T-shirts from Canen. Clark then showed me a returned check that was taken from resident Emma Cox. Comparing the hand writing on the check to the receipt showed similarities to being Lana Canens handwriting.

The second victim I talked to was Emma Cox (              tx. 523-        , Res. #      ). Cox stated that she had a check book and a billfold taken out of her apartment between 1500 hrs. on 03-18-02 and 0555 hrs. on 03-19-02. Cox stated that whoever entered that apartment had to use a key, because her door was always locked when she left and came back to her apartment. No forced entry or damage was done to the door. Cox gave me a copy of a returned check that was used the night her check was stolen. I called Martins Super Markets office and they stated that they do not have video of the transaction.

I talked with third victim, Sylvia Wilson (          , tx. 295-      wk. tx. 875-.      Res. #      ,on 04-09-02). She had two gold necklaces, a pair of diamond rings and a Dream Cicle figurine taken from her apartment on 03-21-02 between the hours of 0715 and 2230. Wilson also stated on 03-28-02 at 0130 hrs. she saw feet at her door and someone was turning her handle. On 04-04-02 at 0630 hrs. Wilson stated that she was taken a shower, when she exited her shower she noticed that her door to her apartment was open. It was locked before her shower. No forced entry during the burglary.

I attempted to talk with Edward Walsh (          ', tx. 522-      Res. #      ; I left an answer on his machine and left a business card at his door, but I was unable to talk to him.

I talked to Patricia Floyd (          , Res. #      ). Floyd stated that she had canned goods and a 6 pak of Pepsi taken. The canned goods were above her refrigerator in a cabinet. Floyd stated that her items were taken between 1830 hrs. on 03-26-02 and 1230 hrs. on 03-27-02. No forced entry.

I talked with Dorothy Horton (          , tx. 522-      Res. #      ). Horton stated that she got her leather coat taken

Investigator Signature:

r_supp3



Page 1

# CASE SUPPLEMENTAL REPORT

Printed: 03/05/2014 15:23

*Elkhart Police Department*

OCA: **20020318044**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *INACTIVE / SUSPENDED*     **Case Mng Status:** *INACTIVE / SUSPENDED*     **Occurred:** *03/18/2002*

**Offense:** *BURGLARY - UNLAWFUL ENTRY - NO*

**Investigator:** *DAGGY, M. A. (192)*       **Date / Time:** *04/09/2002 12:20:39, Tuesday*

**Supervisor:** *PRICE, S. R. (308)*       **Supervisor Review Date / Time:** *03/05/2014 00:00:00, Wednesday*

**Contact:**       **Reference:** *Additional*

---

out of her apartment between 1500 and 1900 hrs. on 03-28-02. The day I talked to her (04-08-02) she said that her apartment was unlocked when she returned to it but no one was inside. No forced entry.

I talked with Paula Sjogren (          , tx. 295-          Res. #          ). Paula stated that between 1300 and 1830 hrs. on 04-02-02 someone took her diamond ring valued at $1500.00. Paula feels that Lana Canen is the suspect in her burglary. Paula stated around 4 months ago, Lana Canen wanted to use her bathroom. Paula let Canen use her bathroom. When Canen came out of her bathroom she commented on the medication that was in Paula's medicine cabinet. Paula told Canen not to be snooping in her cabinet. Approximately 3 weeks ago, Canen returned to Paula's apartment to say she was sorry for the incident with the medicine cabinet. Paula stated that Canen came into her apartment for awhile. After Canen left the apartment, Paula noticed that her car keys were missing. Canen was the only one in the apartment when her car keys came up missing and Paula thinks she took them.

I have made attempts to talk to Lana Canen, I knocked on the door and left my business card on her door, but I have not talked to her yet.

Det. M.A.Daggy #192

**Investigator Signature:**

$7.00 X 5 TeeShirt    35.00
$9.00 X 1 SweatShirt Elvis   9.00
25.00 X Misc Kick Knacks   25.00

           Grand Total   69.00
1-31-2002 Payment   15.00
L.C./JC   Bal Due $54.00
                20.00

2-3-2002 New Bal 34.00
L.C./J.C.        14 00
3-10.2002 new Bal 20.00
LC/JC

3-17-02 - I put a note in Lana door with
$7.00 - in ones for a blue Tee shirt. She
      sold me.

JC

Case No. _____

## ELKHART POLICE DEPARTMENT
## LEGAL RIGHTS ADVICE FORM

DATE _4/22/2002_

TIME _1:04 p.m._
(Time Warning Started)

*L.R.C.*

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can and will be used against you in court.

You have a right to consult with a lawyer before we ask you any questions, and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. *L.R.C.*

**Waiver:**

*L.R.C.* I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. *L.R.C.*

WITNESS _____ #192

WITNESS _____

TIME _1:06 pm_

PLACE _Rm #24_
(Exact Location)

(Signature of person being advised of his/her rights)
_Lana R. Canen_

DATE _4/22/2002_

TIME _1:05 p.m._
(Time signed by person advised of his/her rights)

PLACE _Elk Police Dept_
(Exact Location)

## CASE SUPPLEMENTAL REPORT

*Elkhart Police Department*                                                    OCA: *20020318044*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status:       *Open / Active*
Case Mng Status:  *Assigned*                                              Printed: *10/07/2002  16:18*

Investigator: *DAGGY, M. A. (192)*              Date / Time: *10/07/2002 15:54:11, Monday*
Supervisor: *(0)*                        Supervisor Review Date / Time:

Contact: *Pratcher, Curtis*                      Reference: *Witness Statement*

THE FOLLOWING FREE AND VOLUNTARY STATEMENT IS GIVEN TO DETECTIVE MARK DAGGY, WHO
HAS IDENTIFIED HIMSELF AS A POLICE DETECTIVE WITH THE ELKHART CITY POLICE DEPARTMENT

DATE: 10-07-02
NAME: Curtis Pratcher
DOB:
SS#
ADDRESS: _ _ _ _            , Elkhart, In
HOME PHONE:
EMPLOYMENT: Elkhart Housing Authority
ADDRESS: 1396 Benham, Elkhart,In
PHONE:

My name is Curtis Pratcher and I have resided at the above address for about a year,I am talking to Det. Daggy
about a burglary case he is working. I have worked for the Elkhart Housing Authority for 4 years. I used to date a
Lana Canen. She is a female that resides in Waterfall High rise. Her room number is #802.

I got a battery charge from Lana Canen in August of 2001and shortly after this I stopped dating her and I wasn't
allowed to work in the Waterfall high rise building. I still am not allowed to work in this building; the judge put a
restraining order on me and for a year after the battery incident, I was not allowed to be around Lana.

After the battery incident and before my court date and the restraining order, Lana came over to my house, I'm not
sure of the date. I was living at 181 North Riverside Apt. #102. Lana stayed the night. I woke up the next morning
and all of my keys that belonged to the Housing Authority including the Master Key to Waterfall High rise were gone.
Lana was gone too. When the keys came up missing there was no one there but me and her. I feel that Lana took the
keys. I have not seen her since.

I heard that rooms were being Burglarized at Waterfall High rise. My brother in law, Milton Banks heard a rumor
that Lana my have the keys because we used to date. Milton also works for the Housing Authority. I have not been in
the Waterfall High rise for over a year now.

This statement is true and complete to the best of my knowledge.    *C.P*

I, swear, or affirm, under the penalty for perjury, as specified by I.C. 35-44-2-1, that the foregoing representations are
true.

WITNESS _____ SIGNATURE _)_ *Curtis Pratcher*

DEPOSITION
EXHIBIT

**Elkhart Police Department**  OCA: *20020318044*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *INACTIVE / SUSPENDED*   Case Mng Status: *INACTIVE / SUSPENDED*   Occurred: *03/18/2002*

Offense: *BURGLARY - UNLAWFUL ENTRY - NO*

Investigator: *DAGGY, M. A. (192)*     Date / Time: *10/28/2002 16:26:24, Monday*

Supervisor: *PRICE, S. R. (308)*     Supervisor Review Date / Time: *03/05/2014 00:00:00, Wednesday*

Contact:     Reference: *Closure*

In reference to this case, approximately (8) eight rooms at the Waterfall Highrise were broken into. All of the rooms involved had no forced entry and a master key was believed to be used. The suspect in this case is a Lana Canen, she resides in apartment #802. The residents in the Highrise feel that Canen is a suspect due to the fact that she used to date a maintenance worker. His name is Curtis Pratcher. Pratcher used to date Canen and work in Waterfall Highrise.

I interviewed Pratcher, he stated that he did in fact date Canen. Pratcher stated that in August of 2001 Canen stayed at his house and when he woke up the next morning, his master keys to Waterfall Highrise were missing. Pratcher stated that Canen was the only person that was in his apartment and the only person that could have taken his keys. Pratcher also stated that around this time, he had a battery charge placed on him by Canen and she had a restraining order placed on him from Canen. Pratcher stated that he wasn't allowed to work in the Highrise or even be around Canen for a year. That restraining order has since expired.

One resident, Emma Cox had a check book taken from the burglary. The check was cashed at Martin's Grocery with her check cashing card the check was also written out to Emma Cox. The writing on the check matched Lana's handwriting. I compared this writing to a receipt that was hand written by Lana and also her handwriting on a Miranda form that was read to her and signed by her.

I talked with Lana, she signed and waved her Miranda rights and agreed to talk after many attempts to talk with her. Lana stated that she had no knowledge at times, but stated that she would tell me more after she requested a lawyer. After the interview, I walked Lana out and I told her that I was thinking about getting a warrant for her arrest. Lana stated that she would tell me more, but was afraid to give me more information because drugs were somehow involved and the Housing Authority would kick her out if they found out.

Recently I have been advised that the Housing Authority is going to terminate Lana from residing at the Highrise. Since I talked with Lana, new chain locks have been put on the doors and the burglaries have stopped. Due to the fact that I exhausted all leads in this case, I request this case become inactivated until further information derives. See Case 2002-0318-044.

Det. M.A.Daggy #192



Investigator Signature:

User: GORBYREB                 **ELKHART POLICE DEPARTMENT**                04/08/14 02:17:57

### CANEN, LANA RAE



Photo Date: 04/14/03 12:00:00 AM

CANEN, LANA RAE     (W F



# ARREST REPORT

| AGENCY INFO | Agency Name Taken | ORI | | Date/Time Arrested | | Case # | |
|---|---|---|---|---|---|---|---|
| | **Elkhart Police Department** | **0200100   E0005** | | **04/14/2003  16:40    Mon** | | **20030414045** | |
| | | Arrest Tract | | Residence Tract | | Arrest Number **18247** | |

| ARRESTEE INFO | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name (Last, First, Middle) **CANEN, LANA RAE** | | | D.O.B. | Age **43** | Race **W** | Sex **F** | Place of Birth **South Bend,  In** | Citizenship **US** | |
| Current Address **6 Sunrise Dr, ELKHART, IN 46517-** | | | | Phone **574-** | | Occupation | Residence Status **Resident** | | |
| Employer's Name | | Address | | | | | Phone | | |
| Also Known As (Alias Names) | | | | | Hgt **5'04** | Wgt **110** | Hair **Brown** | Eyes **Brown** | Skin To **Fair** |
| Scars, Marks, Tattoos | | | Social Security # | | OLN and State | | Misc. # and Type | | |
| Nearest Relative Name **CANEN, NICK** | | Address | | | **ELKHART, IN** | | Phone **574-** | | |

| ARREST INFO | If Armed, Type of Weapon | Type of Arrest **TAKEN INTO CUSTODY / WARRANT** | | Place of Arrest **PRAIRIE/JACKSON, ELKHART** | | | | |
|---|---|---|---|---|---|---|---|---|
| | Charge #1 **Check Deception Wrt** | | Type **Misd** | Counts **1** | IBR Code **1100** | Warrant/Summons # **20H010210CM21326** | Statute # **35-43-5-5 AM** | Warr. Date **11/04/20** |
| | Charge #2 | | Type | Counts | IBR Code | Warrant/Summons # | Statute # | Warr. Date |
| | Charge #3 | | Type | Counts | IBR Code | Warrant/Summons # | Statute # | Warr. Date |

| VEH INFO | VYR | Make | | Model | | Style | |
|---|---|---|---|---|---|---|---|
| | Color | | Plate #/State/Plate Year | | VIN | | |
| | Vehicle | | | | | | |

| CONFINED BOND | Date/Time Confined **04/14/2003 17:08:45** | Place Confined **EPD** | | | | Committing Magistrate | |
|---|---|---|---|---|---|---|---|
| | Type Bond **Surety Bond/bondsman** | Bond Amount **$1,000.00** | Trial Date | Time | Court Of | City | |
| | Arresting Officer Name/ID #/Bureau **DAGGY, M. A. (192)  CID** | | | | | | |
| | Assisting Officer Name/ID #/Bureau **Not Found: 287  Not Found: 287** | | Released By (Name/Department/ID #) | | | Date/Time Released | |

| Status Codes | 1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown/Lost |
|---|---|

| DRUGS | ARREST | Code | Status | Quantity | Type Measure | Suspected Type |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Other Name | Name | Address | Phone |
|---|---|---|---|
| | Name | Address | Phone |

| NARRATIVE | |
|---|---|
| | |

| STATUS | Arresting Officer Signature/ID #/Bureau     **DAGGY, M. A. (192)  CID** | |
|---|---|---|
| | Case Status | Arrestee Signature |

r_ar1ibr



Canen Lana Rae

**ELKHART POLICE DEPARTMENT**
175 Waterfall Dr.
Elkhart, IN 46516

ORI
IN 0200 100

| SIGNATURE OF PERSON FINGERPRINTED | DATE | SIGNATURE OF OFFICIAL TAKING FINGERPRINTS | EPD FILE # |
|---|---|---|---|
| Lana R. Canen | 4/14/03 | | |

| 1. RIGHT THUMB | 2. RIGHT INDEX | 3. RIGHT MIDDLE | 4. RIGHT RING | 5. RIGHT LITTLE |
|---|---|---|---|---|

Elkhart P.D.

--- Fort Wayne Laboratory ---
Lab #: 03F-1574    Item #: 002
Elkhart Police Department



NBM
03F-1574
#002

L

| 6. LEFT THUMB | 7. LEFT INDEX | 8. LEFT MIDDLE | 9. LEFT RING | 10. LEFT LITTLE |
|---|---|---|---|---|

LEFT PALM



Canen Lana Rae

NBM
03F-1574
#002

# ELKHART POLICE DEPARTMENT
## 175 Waterfall Dr.
## Elkhart, IN 46516

R

ORI
IN 0200 100

| SIGNATURE OF PERSON FINGERPRINTED | DATE | SIGNATURE OF OFFICIAL TAKING FINGERPRINTS | EPD FILE # |
|---|---|---|---|
| Lana R. Canen | 4/14/03 | Canen 3134 | 17992 |



| 1. RIGHT THUMB | 2. RIGHT INDEX | 3. RIGHT MIDDLE | 4. RIGHT RING | 5. RIGHT LITTLE |

RIGHT PALM

NBM
03F-1574
#002

L



| 6. LEFT THUMB | 7. LEFT INDEX | 8. LEFT MIDDLE | 9. LEFT RING | 10. LEFT LITTLE |
| --- | --- | --- | --- | --- |

LEFT PALM

