```
                                                              1

              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF INDIANA
                   SOUTH BEND DIVISION

LANA CANEN,                           )
                                      )
     Plaintiff,                       )
                                      )
     -vs-                             )  Case No.
                                      )  3:14-cv-00315
DENNIS CHAPMAN, in his Individual     )
Capacity as Deputy for the            )
Elkhart County Sheriff Department,    )
and MARK DAGGY, in his Individual     )
Capacity as Officer for the           )
Elkhart Police Department.            )
                                      )
     Defendants.                      )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )


          THE DEPOSITION OF LANA RAE CANEN


     Date:    Tuesday, May 12, 2015

     Time:    2:00 p.m.

     Place:   Wieser & Wyllie, LLP
              429 West Lincoln Highway
              Schererville, Indiana


          Called as a witness by Defendant Dennis
          Chapman in accordance with the Rules of the
          United States District Court, Northern
          District of Indiana, South Bend Division,
          pursuant to Notice.


Before Sharon L. Brady, Court Reporter
and Notary Public


              MIDWEST REPORTING, INC.
              1448 Lincolnway East
              South Bend, Indiana 46613
                  (574) 288-4242
```

EXHIBIT 4

79

1                    it that way.
2                         MR. SUTHERLIN:  You didn't.
3                    You said, "When did you decide to sue
4                    him?"  That was your last question.
5                         MR. KUS:  Okay.
6    BY MR. KUS:
7    Q  All right.  So, when did you decide to sue
8       Officer Daggy?
9                         MR. SUTHERLIN:  That's the --
10                   okay.  I just finished saying I don't
11                   think she decided.  We decided.  Her
12                   lawyers did.
13                        MR. KUS:  Okay.  That's fair.
14                        MR. SUTHERLIN:  If you ask her
15                   when did she -- what did she believe
16                   Officer Daggy did to violate her
17                   rights, if that's what you're asking,
18                   I'll let her answer.
19                        MR. KUS:  I thought she said
20                   she didn't understand that question.
21   BY MR. KUS:
22   Q  You understand what your lawyer just said?  You
23      can go ahead and answer that.
24         When did you -- what did you think Officer
25      Daggy did to violate your rights?

```
 1   A   Malicious intent towards me.
 2   Q   Malicious intent towards you.  Okay.  Tell us
 3       about that.
 4           What kind of intent?  What happened?  Tell
 5       us the facts.  See, that word -- those two --
 6                   MR. SUTHERLIN:  Well --
 7                   MR. KUS:  Excuse me.
 8   A   No.
 9   BY MR. KUS:
10   Q   Just wait a minute.
11   A   I just want to know if I can answer because I
12       don't want, you know --
13                   MR. SUTHERLIN:  I'll make an
14               objection if I don't want you to
15               answer.  So, you don't need to look
16               at me and --
17   A   Yeah.  But, I mean, if I say something, then it's
18       already heard.
19                   MR. SUTHERLIN:  Well, go ahead.
20   BY MR. KUS:
21   Q   Well, your attorney won't let that happen.  And
22       we'll try to go slow here.  You've used two
23       words, malicious intent.  Those are lawyer words.
24                   MR. SUTHERLIN:  She didn't use
25               them.  We did.
```

```
 1   BY MR. KUS:
 2   Q  Well, they were used, malicious intent.  I
 3      thought you said it was malicious intent.  So, I
 4      have to ask this.
 5          Is it fair that everything that you're --
 6      that you're thinking about Officer Daggy that did
 7      you wrong, like malicious intent -- it's fair
 8      that came from the attorneys?
 9   A  And from stuff I told the attorneys.
10   Q  Okay.  So, let's go -- I don't want to hear about
11      the attorneys.  Let's go with the stuff you told
12      the attorneys about Officer Daggy that got his
13      name in this lawsuit.
14               MR. SUTHERLIN:  I'm sorry.
15          What did she tell the attorneys?  Is
16          that what you're telling her?
17               MR. KUS:  No.
18   BY MR. KUS:
19   Q  The stuff that you think -- the stuff that you
20      think that Officer Daggy did to get you in -- to
21      have you -- have your rights violated, let's put
22      it that way, go ahead and tell us about that.
23      What stuff?
24   A  That he harassed me.
25   Q  Okay.  And when and how?
```

1   A  Well, I had already answered questions when the
2       two police officers came to my door. It happened
3       on a Thursday. I got back Monday morning.
4       Tuesday morning, they were at my house. I let
5       them in, and I let them search my apartment.
6          That was three days after or four after the
7       murder. They didn't have a search warrant. I
8       told them, "Go ahead." I had nothing to hide. I
9       was not home. And I let them search my
10      apartment.
11   Q  Now, have you ever given your deposition before,
12      like a statement like this, in front of somebody
13      that's taking it all down?
14   A  No, I have not.
15   Q  Have you testified at any proceedings in court
16      where somebody's taking things down?
17   A  When -- before I was arrested for murder, there
18      was a notice on my door to go to a bank building
19      on Main Street in Elkhart, 301 Main Street, at
20      the Prosecuting Attorney's Office maybe, and said
21      it was for a deposition.
22   Q  And what was that for?
23   A  That was for the murder.
24   Q  Okay. All right. And what did you do then?
25   A  I went.

1   Q   All right.
2   A   Because an officer also went to my mother's and
3       told her, "You get ahold of your daughter and
4       tell her she better be there at 3 --" I think it
5       was 3:00 o'clock I was supposed to be there or
6       2 -- and said, "If she's not there, we will put a
7       warrant out for her arrest."
8   Q   So, you had to take a deposition?  They wanted
9       you to take a deposition?
10          And, by that, I -- that's a fancy word.  Did
11      you give a -- did they want you to give a
12      statement in front of a person taking the thing
13      down, the statement down?
14  A   There was me and a guy and a lady in there, and
15      that's it.
16  Q   And you gave a statement?
17  A   And I don't remember a lady like this being
18      there.
19  Q   Do you remember if it was on a machine or were
20      they just --
21  A   Writing it down.
22  Q   Writing it down?
23  A   They told my mom it was a deposition.  I don't
24      know.
25  Q   All right.  Now, have you ever lived in Waterfall

1       Highrise Apartments?
2   A   Yes, I have.
3   Q   And when did you live there?
4   A   Let's see.  I moved in -- the murder happened in
5       2002.  I probably moved in in 1999 right after I
6       got on my disability.
7   Q   And when did you move out?
8   A   February.
9   Q   Of what year?
10  A   2003.
11  Q   Okay.
12                  MR. SUTHERLIN:  Second time
13              she's answered that.  But go ahead.
14                  MR. KUS:  I'm trying to -- I'm
15              just trying to keep a timeline.
16  A   I lived there three years before I moved out in
17      February.
18  BY MR. KUS:
19  Q   Pardon?
20  A   I lived there three years prior to moving out in
21      February.  So, that was 2003.  So, I would've
22      lived there three years before that.  So --
23  Q   So, you were there '99 to 2002, you think?
24  A   To 2003.
25  Q   2003.  About three years?

```
 1   A   Yes.  It was three years exactly, just about.
 2   Q   All right.  And that's where the murder victim
 3       lived, correct?
 4   A   Correct.
 5   Q   And which apartment did you live in?
 6   A   802.
 7   Q   Okay.  Do you remember which apartment
 8       Ms. Sailor -- Mrs. Sailor lived in?
 9   A   I do not.
10   Q   How did you come to live in the Waterfall
11       Apartments?
12   A   You had to either be disabled or elderly.
13   Q   And you were disabled?
14   A   Disabled.  I just had got on -- I had just
15       finally gotten on -- I'd worked up to that time
16       and finally decided to go on disability.  I tried
17       to work as long as I could.
18   Q   Now, had you ever -- when you had moved into the
19       Waterfall Apartments, were you living by
20       yourself?
21   A   No.  I had lived with Mike, and I moved out of
22       his house.  And I lived with my brother Nick.
23   Q   And Mike is --
24   A   Burger.
25   Q   -- your husband at the time?
```

191

## CERTIFICATE

1    I, SHARON L. BRADY, a Notary Public in and for the County of Cass and State of Michigan, do hereby certify:

    That LANA RAE CANEN appeared before me on Tuesday, May 12, 2015, and was duly sworn to testify the truth, the whole truth, and nothing but the truth to questions propounded at the taking of the foregoing deposition in a cause now pending and undetermined in said court;

    That I further certify that I then and there reported stenographically the proceedings at the said time and place; that the proceedings were then transcribed from my original shorthand notes; and that the foregoing transcript is a true and correct record thereof;

    That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action;

    That the deposition was adjourned for completion at a future date and time.

    IN WITNESS WHEREOF, I have hereunto set my Notarial seal this 28th day of May, A.D., 2015.

*Sharon L. Brady*

_____
**Sharon L. Brady**
Notary Public, State of Michigan
Residence: Cass County
My commission expires: 6-29-19