# CASE SUPPLEMENTAL REPORT

Printed: 02/26/2014 15:23

**Elkhart Police Department**

OCA: **20021129008**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*  
**Offense:** *HOMICIDE*

**Case Mng Status:** *CLEARED BY ARREST*

**Occurred:** *11/28/2002*

**Investigator:** *BOURDON, J. A. (147)*  
**Supervisor:** *PRICE, S. R. (308)*  
**Contact:**

**Date / Time:** *03/24/2003 00:00:00, Monday*  
**Supervisor Review Date / Time:** *02/26/2014 00:00:00, Wednesday*  
**Reference:** *Evidence Tech Report*

---

On November 29, 2002, I was contacted and advised to respond to 303 Waterfall Drive, Apartment 1002, Elkhart, regarding a woman found deceased in the apartment. Responding officers suspected this was a suspicious death. After retrieving the necessary equipment, I responded to this scene arriving at approximately 0815 hrs.

Upon arrival I noted the uniform officers had begun a crime scene log. Present were Officer Stockman, Officer McConnell, and Lt. Tom Lerner, who advised the apartment had been initially locked and the victim was a 94 year old woman by the name of Helen Sailor. He advised her relatives, Carol and Larry Converse reportedly brought her home, on Thanksgiving Day, November 28, 2002, at approximately 5:00 p.m. When no one had heard from her, Carolyn Hoffer, who was her home health care nurse, and the Converses went to her apartment where they found her deceased in the east bedroom. Reportedly upon their arrival, the front door was locked and secured.

Lt. Lerner escorted me into the apartment, which was headed north off the main hallway to the apartment building. Upon entering the apartment, there is a door to the left that leads into a pantry/closet area and on the right is a small kitchen counter along with a stove and refrigerator. I noticed two empty juice bottles in the sink basin towards the south end of the counter and on the counter south of this was a Planters Peanut oil bottle. The stove was on the north end of the counter and I observed a plastic tray containing numerous prescription bottles and medications. On the counter slightly to the south of this were four prescription bottles and a pill divider container. Lt. Lerner informed me one of the first things family members noticed was that the throw rug that normally runs north/south in front of the kitchen counter was laying on a more northwesterly/southeasterly direction farther out in the living room area.

Upon entering this area there is a small kitchen table to the left and the table was a red and rainbow colored heart shaped key chain with no keys. Reportedly this is the key ring the victim had her keys on. There was also a white plastic pill bottle on the table that was later found to contain what was believed to be Nitroglycerin tablets, which was normally worn around the victim's neck on a lanyard with a medical alert emergency button so she could request assistance if necessary. Towards the northwest corner of this room was a hospital style bed. A bible was laid out on the bed along with miscellaneous papers. In front of this was a plastic ziploc style bag that appeared to contain some type of antacids. The family members had discovered that the bible, which is normally kept in a box and where the victim normally hides money, had been moved. They discovered the money gone along with the box that normally contains the bible. Towards the right side, or east side, of this room was a recliner and to the north of this was a television on a small shelf. Slightly to the west of this was a radio on top of a small table and underneath this table is where the bible was normally kept. I observed a purse, which was believed to be the victim's, between the recliner and the television. Reportedly the family members had gone through this purse. Proceeding to the south was a recliner that had a cushion in a black plastic garbage bag on the seat. This appeared to be some type of towel or blanket laid to the back of the recliner as if it had been moved. Immediately to the south of this was a small telephone table with the

**EXHIBIT A**

**Investigator Signature:** _____

*Elkhart Police Department*                                                                OCA: **20021129008**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*       **Case Mng Status:** *CLEARED BY ARREST*       **Occurred:** *11/28/2002*
         **Offense:** *HOMICIDE*

**Investigator:** *BOURDON, J. A. (147)*                  **Date / Time:** *03/24/2003 00:00:00, Monday*
**Supervisor:** *PRICE, S. R. (308)*                      **Supervisor Review Date / Time:** *02/26/2014 00:00:00, Wednesday*
**Contact:**                                              **Reference:** *Evidence Tech Report*

---

telephone setting on it in tact. Reportedly this is where the call to 911 had come from. Immediately next to this was a walker was initially believed to have been placed in this position by an unknown subject, however, it was later learned the family members had moved the walker out into the room. I was informed the victim had a difficult time in seeing and was very careful to place the items in her home in a certain location so she could easily locate them.

From this point you head thru a pass thru door, which was standing open. You then enter into what will be described as the east bedroom. The central area of this room was a linoleum floor. Found lying towards the east side of this room was the victim. She was laying with her head towards the north and her feet towards the south. She was wearing a pair of slacks that were pulled partially down her thighs and was wearing a pair of white underpants. She was wearing a brown and black and white striped sweater that had been raised up slightly below the area of her chest. She was also wearing two outer sweaters that were bunched up towards the area of her right arm. Observed in and around the victim was a pinkish colored substance that appeared to be partially dried on the floor. During the course of this it would appear as though the juice bottles in the sink were probably the pinkish red colored substance. I also observed in this what appeared to be an oily substance that was believed to be the Planters Peanut oil. Observed on the floor slightly to the west of the victim was a set of dentures and I observed several patterns on the floor where it appeared as though these may have been moved several times during the process of the pinkish substance drying as there was residue in the shape of the denture plate on the floor. In northwest corner of this room was a bed with a large amount of items on it including drawers from the dresser, which was immediately east of the bed. It appeared as though numerous items had been removed from these drawers and strewn about on the bed. There was also the red colored substance on and around the drawers as well as a small amount on the west wall. A pedestal fan was found laying on the small section of carpet in between the bed and the dresser. There was an area of what appeared to be apparent blood on this also. Moving towards the south from the victim's location was a small hallway closets on both sides and then you proceed into the bathroom area.

In examining the area of the victim's body, it appeared as though this oil substance and the pink substance had been dumped onto her body and clothing by an unknown subject. She had what appeared to be some type of injury in the area of her chin and there also appeared to be some type of injury to her neck. However, with the position of her clothing, it was very difficult to see any specific details. It should be noted, in the area of the southeast corner of the bed was a red or burgundy colored jewelry box laying on the floor that appeared as though the lock mechanism had been pried off of it. Immediately next to this were two ziploc style bags containing items of jewelry.

Uniform Technician McConnell was assigned to assist me with the processing of the crime scene. I retrieved the necessary equipment from the crime scene vehicle and began video taping the scene, basically following the same path I previously described. At 0905 hrs., I video taped the overall condition of the apartment, the position of the victim,

**Investigator Signature:**_____

**Elkhart Police Department**　　　　　　　　　　　　　　　　　　　　　OCA: *20021129008*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*　　　**Case Mng Status:** *CLEARED BY ARREST*　　**Occurred:** *11/28/2002*
**Offense:** *HOMICIDE*

**Investigator:** *BOURDON, J. A. (147)*　　　　　　　**Date / Time:** *03/24/2003 00:00:00, Monday*
**Supervisor:** *PRICE, S. R. (308)*　　　　　**Supervisor Review Date / Time:** *02/26/2014 00:00:00, Wednesday*
**Contact:**　　　　　　　　　　　　　　　　　　**Reference:** *Evidence Tech Report*

the surrounding area, and the items that could be observed without disturbing their locations. At 0925 hrs., I began photographing the scene using 20mm lens starting at the front door and then proceeding throughout the apartment. I then photographed the scene using 35mm, both overall shots and close-ups of various items.

It should be noted, the front door of this residence had a deadbolt and a chain style lock. In examining this lock, there did not appear to be any type of damage to the locking mechanisms. We had received information from family members that they had given her several items containing food, which were found in the refrigerator of the apartment as described.

During the course of photographing this scene, I observed an area on the pantry door near the handle that appeared to have a smear of possible blood. On the linen closet door in the hallway leading from the bedroom to the bathroom, I observed a similar smear of possible blood. The contents of the trash receptacles were viewed in the living room and the bathroom. It should be noted, a pair of rubber gloves was observed in the bathroom trash. It was believed the home health care personnel had previously left these as they stated they normally left the gloves there after cleaning the apartment.

During the course of taking close-up photographs of the victim, numerous contusions were noticed on the top side of her for forearms and hands. In the area of her fingers on her left hand, there appeared to be a fairly large amount of apparent blood. In addition to the apparent injury to her chin and her neck, there was an apparent injury to the top of her nose and forehead.

With the assistance of Officer McConnell, we began taking measurements locating the victim's body position and the items of furniture starting at approximately
1200 hrs. During this process, Elkhart County Coroner Landrum viewed the scene, obtained the necessary information on the victim, and then left the scene. He returned to the scene at approximately 1309 hrs. on the same date, at which time the victim was placed into a body bag and representatives from Billings Funeral Home transported the body to the Elkhart General Hospital morgue under the supervision of the Coroner.

I was later informed the autopsy would be conducted this same day at a later time. Therefore since the victim's keys for the apartment were missing, we had the deadbolt key way mechanism removed from the door and at 1308 hrs., I took this into our custody as evidence. The changing of the lock was done by maintenance personnel for the apartment complex, Mike Nelson, which was viewed and done under the direction of Officer McConnell and myself. At 1406 hrs., the apartment was secured using the keys for the new lock, which maintenance personnel had given me all the keys for. However, we still left an officer maintaining the crime scene. Arrangements were made with Officer

**Investigator Signature:**

*Elkhart Police Department*                                                                     OCA: **20021129008**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*     **Case Mng Status:** *CLEARED BY ARREST*     **Occurred:** *11/28/2002*
**Offense:** *HOMICIDE*

**Investigator:** *BOURDON, J. A. (147)*                **Date / Time:** *03/24/2003 00:00:00, Monday*
**Supervisor:** *PRICE, S. R. (308)*                    **Supervisor Review Date / Time:** *02/26/2014 00:00:00, Wednesday*
**Contact:**                                             **Reference:** *Evidence Tech Report*

---

McConnell that I would be contacting him later that same evening so he could return to the scene to continue to assist me in processing the scene.

After sealing the scene, I returned to the Elkhart Police Department where I prepared the necessary equipment and proceeded to the Elkhart General Hospital morgue. Present for the autopsy, which began at approximately 1530 hrs., were Dr. Joseph Prahlow, Diener Wayne Netzen, Det. D'Andre Christian, Elkhart County Coroner Dr. Jeff Landrum, and myself. The victim was found to be Helen C. Sailor, white female, DOB: 1/13/08, 200 pounds, 61 inches, gray hair, hazel eyes. Dr. Prahlow conducted his external examination while I photographed the body, noting the specific articles of clothing and the apparent signs of injury.

Det. Christian assisted me in taking notes and the recovery of items from Dr. Prahlow. Beginning at 1540 hrs., he made four adhesive lifts from various locations on the body. A lift was made from an unknown substance on the striped short sleeved sweater the victim was wearing, which was identified as A. Lift B was a hair from the right front part of the victim's underpants. Lift C was a possible hair from the victim's left hand and lift D was made from trace items on the victim's lower left leg.

The following articles of clothing were then recovered: shoes, hose, tan colored slacks, and underwear. Found underneath her underwear was a disposable style adult diaper. After collecting these items, Dr. Prahlow completed a sexual assault kit including oral, vaginal, and rectal swabs and smears. He also took head hair standards and combings, and pubic hair combings. He then obtained fingernail clippings from both the left and right hands. He made swabs from the area of the victim's abdomen and her facial area. It should be noted as these items were recovered, they were turned over to my custody, at which time they were sealed in the individual envelopes identifying the contents. Dr. Prahlow resumed the collection of the victim's clothing, which included three sweaters and a white bra. She was wearing a turquoise colored ring on her right ring finger and a digital watch on her right wrist, which were recovered. He then recovered the upper dentures that had been left in her mouth.

After removing the clothing, Dr. Prahlow continued with the external examination. We observed a large surgical type scar in the area of her abdomen and another scar in the area of her right knee. As Dr. Prahlow noted injuries to the victim, photographs were taken both with and without scales present. (See his report for exact description of these injuries.) He noted during the course of this autopsy that there was a large amount of petechia in the area of the eyes, face, and mouth, which close-up photographs were taken of. In examining the neck, there was one specific area that appeared to have a definite pattern to whatever may have been used to apply pressure to her neck. This was photographed in detail both with and without a scale.

**Investigator Signature:**

*Elkhart Police Department*                                                    OCA: **20021129008**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*     **Case Mng Status:** *CLEARED BY ARREST*     **Occurred:** *11/28/2002*
**Offense:** *HOMICIDE*

**Investigator:** *BOURDON, J. A. (147)*     **Date / Time:** *03/24/2003 00:00:00, Monday*
**Supervisor:** *PRICE, S. R. (308)*     **Supervisor Review Date / Time:** *02/26/2014 00:00:00, Wednesday*
**Contact:**     **Reference:** *Evidence Tech Report*

He then began the internal examination. He recovered a vial of the victim's blood, which he provided to me as evidence and I also recovered a set of inked fingerprint impressions from the victim. At the completion, Dr. Prahlow and Coroner Landrum advised the manner of death was a homicide and cause of death was strangulation as well as blunt trauma. Dr. Prahlow also provided me with copies of the wound sketches he had made. I then returned to the Elkhart Police Department where these items of evidence were secured.

Officer McConnell arrived at the Elkhart Police Department and we returned to the scene, arriving at approximately 2002 hrs. We found the door seal in tact, which was photographed, and Officer Robbins #355 was maintaining the crime scene log. After the items of evidence were photographed and documented, we began with the collection of evidence. At 2228 hrs., we recovered the trash bag and contents from the bathroom. We recovered the lower dentures from the bedroom floor after taking numerous close-up photographs with and without scale. We recovered a tissue from the floor in this same area, which was believed to have come from the victim's hand or sweater area as we had seen several others during the collection of her clothing at the autopsy.

It should be noted, letter designations were given to specific items that were used for the purposes of diagramming and measuring the scene. We recovered the two plastic ziploc style bags containing jewelry from the bedroom floor, which were labeled as N. Recovered was a red jewelry box, which was identified as L and M. We recovered a floral pattern photo album from on the southeast corner of the bed in the east bedroom. Recovered a pair of eyeglasses that had metal frames from on the bed in the east bedroom. In examining the area of this bed further, I observed the pillow and pillowcase on the head of the bed had spots of apparent blood on them. These items were recovered at that time.

We moved to the living room area. We recovered the bible and the papers that were near it from the bed along the west wall. Recovered next was the plastic bag with antacids, which was labeled I. We recovered the victim's purse and contents along with the items near it. This was identified as V. I recovered the trash bag and contents from near this area. Recovered was a cardboard watch box that was believed to have been setting on top of the box containing the bible underneath the table along the north area of this room.

Recovered from the kitchen table area were the white medication bottle, the heart shaped key ring, several miscellaneous paper items, a pair of scissors, a checkbook and contents, and several other miscellaneous items including a whistle and small metal expandable metal rings. Recovered from the kitchen counter area were numerous medications in the paper sack, the prescription bottles, the plastic tupperware style tray, and the pill planner plastic case. Recovered next were two bills from a basket slightly above this kitchen table. I recovered the two empty Ocean Spray juice bottles from the kitchen sink and the Planters Peanut oil bottle from the kitchen counter, which was specifically between the sink and the stove. I recovered the black trash bag and the seat cushion from on the recliner,

**Investigator Signature:**

**CASE SUPPLEMENTAL REPORT**                                    Printed: 02/26/2014 15:23

*Elkhart Police Department*                                          OCA: **20021129008**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*    **Case Mng Status:** *CLEARED BY ARREST*    **Occurred:** *11/28/2002*
**Offense:** *HOMICIDE*

**Investigator:** *BOURDON, J. A. (147)*       **Date / Time:** *03/24/2003 00:00:00, Monday*
**Supervisor:** *PRICE, S. R. (308)*            **Supervisor Review Date / Time:** *02/26/2014 00:00:00, Wednesday*
**Contact:**                                    **Reference:** *Evidence Tech Report*

---

which I previously described.

We located the position of the throw rug on the living room floor, which was identified as S and T. After it was recovered, several spots of possible blood were found underneath the rug. This area was identified as U and a cutting was made from this area and collected. The final items recovered were the two drawers on the bed in the east bedroom that had been removed from the dresser along with the contents. It was determined I would return the following morning to continue processing the scene. At 2356 hrs., the door was locked, sealed, photographed, and Officer McConnell and I returned to the Elkhart Police Department where the items of evidence were secured.

On November 30, 2002, I returned to the scene at approximately 1212 hrs. and found the seals on the door still in tact, which I photographed. I began processing various locations for any latent impressions. I processed the pantry door underneath the handle where I observed the possible blood. A lifter was placed on this sample, which was identified as L-1, photographed in place, and recovered. Using dusting powders, I processed the pantry floor and in doing so, I noticed several areas with apparent footwear impressions. Most notably was a pattern that appeared to be diamond shaped. Three lifters were placed in this area and were photographed both with and without scales, which were notified as L-2, L-3, and L-4. I processed a Diet Pepsi can that was on a shelf in the pantry that appeared to be somewhat out of place. I was unable to observe any impressions on this can. I noted there was a vinegar bottle on the second shelf up from the floor that also appeared to be out of place as this was a very organized pantry due to the victim's sight condition. In processing this item, I observed one area that appeared to have identifiable detail. A lifter was placed, identified as L-5, and lifted after being photographed.

I moved to the kitchen area. On the stove was a blue colored vase, which I processed and observed two areas that appeared to have impressions with detail. I placed lifters and identified them as L-6 and L-7, which were photographed and recovered. It was shortly thereafter when Det. Hammel arrived at the scene requesting to view it, which he did. I continued processing the stove itself and in doing so, I observed an impression on the top left corner above the dials. On the bottom right face of the stove by the floor was a pattern that appeared as though it might possibly be a hair pattern or something similar to that. Lifters were placed in these areas and the top of the stove was identified as L-8 and the bottom was identified as L-9. These were photographed and recovered.

At 1416 hrs., I had to go to the tech van to get more supplies, at which time I locked the door. It should be noted for the purpose of securing this scene, we had placed a hasp on the door itself with a padlock, which I had the only keys. This was the lock that was used to maintain the security of the scene. After obtaining the necessary supplies, I returned to the apartment where I continued processing the kitchen counter near the refrigerator. I observed an unknown substance on the counter. I placed a lifter, which I identified as L-10 and made the lift, however, it did not collect on

**Investigator Signature:**_____

**CASE SUPPLEMENTAL REPORT** Printed: 02/26/2014 15:23

*Elkhart Police Department*  OCA: **20021129008**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*   **Case Mng Status:** *CLEARED BY ARREST*   **Occurred:** *11/28/2002*
**Offense:** *HOMICIDE*

**Investigator:** *BOURDON, J. A. (147)*   **Date / Time:** *03/24/2003 00:00:00, Monday*
**Supervisor:** *PRICE, S. R. (308)*   **Supervisor Review Date / Time:** *02/26/2014 00:00:00, Wednesday*
**Contact:**   **Reference:** *Evidence Tech Report*

---

the lifter. So I took a swab kit and made a swabbing area of this area in an attempt to recover it. At 1444 hrs., I recovered the trash bag and contents from under the kitchen sink. It was requested that I collect the items of food that had been previously described, which I did. I processed the handset and the telephone itself, which was on the table next to the recliner in the living room. I observed three separate areas on the telephone that appeared to have detail, which were identified as L-11, L-12, and L-13. They were photographed in place and recovered.

I then moved towards the area of the east bedroom where the victim had been located. I processed the floor using dusting powders in an attempt to observe any possible impressions. In doing so, I observed several areas with identifiable impressions, which were identified as L-14, L-15, L-16, and L-17. I placed scales on the floor next to their position, photographed them, and recovered them. I dusted the east closet door in the bedroom hallway and observed two areas with unknown substances, possibly blood. Lifters were placed and they were identified as L-18 and L-19, which were photographed and recovered. I dusted the bathroom floor and observed an apparent footwear impression on the area in front of the sink. A lifter was placed, it was identified as L-20, and recovered. Since I had noted an area of possible blood on the pedestal fan, I made swabbings of this substance and was recovered at 1743 hrs. The final item I recovered this date was a lift of possible blood that was identified as L-21. This was observed on a shower seat along the east wall of the east bedroom near the location where the victim had been laying.

I then conducted a further search in various areas of the apartment. In moving the blinds in the living room, there was a flowerpot containing plastic flowers that had been on the ledge, which I knocked off and broke. (This is noted for documentation purposes.) After completing the search, I placed the lock back on the door, retrieved the evidence, and sealed the door, which I photographed and returned to the Elkhart Police Department where all the items were secured as evidence.

On December 1, 2002, Det. Lt. Snider informed me Larry Converse, who was making the necessary funeral arrangements, needed to retrieve a photograph of the victim from the bedroom for the service. Det. Lt. Snider authorized this and I returned to the scene where I met with family members. I photographed the seals and entered the apartment. At 1317 hrs., I retrieved one 8x10 photograph in a frame of the victim, which was turned over to Mr. Converse after he signed a tag for its custody. I sealed the doors, photographed the seals, and returned to the Elkhart Police Department.

On December 2, 2002, Det. Thayer, Det. Lt. Snider, and I returned to the scene at 0940 hrs. I found the door seals secure, which were photographed and we entered the apartment. We conducted a further search of the apartment, which we completed at 1000 hrs. and cleared the scene after collecting the padlock and giving the keys for the apartment, which I had gotten from the maintenance person, to Det. Thayer. He would be releasing the apartment to

**Investigator Signature:**

**Elkhart Police Department**  OCA: **20021129008**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *CLEARED BY ARREST*  Case Mng Status: *CLEARED BY ARREST*  Occurred: *11/28/2002*
Offense: *HOMICIDE*

Investigator: *BOURDON, J. A. (147)*  Date / Time: *03/24/2003 00:00:00, Monday*
Supervisor: *PRICE, S. R. (308)*  Supervisor Review Date / Time: *02/26/2014 00:00:00, Wednesday*
Contact:  Reference: *Evidence Tech Report*

the next of kin.

On December 4, 2002 at 1105 hrs., Det. Thayer gave me a pair of blue denim gum sole shoes with a diamond pattern on the soles. I ran a copy of these soles to document the pattern. In looking at this pattern, the diamond pattern appeared to be much too small to be that of the pattern we observed in the footwear impressions I recovered from the scene. It should be noted, Lt. Lerner informed me the medic who had gone into the apartment to check the status of the victim, had done so under his supervision. He also informed me this medic had been contacted and inked footwear impressions were obtained from his footwear. This was done to document the footwear worn by the individuals who entered the scene. Officer McConnell and I wore protective footwear while processing the scene. I examined Coroner Landrum's and Lt. Lerner's footwear.

At this point I began to further process the recovered items, which consisted of laying them, photographing them with and without a scale, doing a visual examination, processing them, and doing another visual examination. If evidence or impressions were located at this point, it was documented accordingly. I used an alternate light source that provides different spectrums of light to assist in viewing to locate any possible evidence.

On December 11, 2002, I began to process the items recovered from on top of the kitchen folding table. This consisted of purple handled scissors, papers, checkbook with check register and pad, a heart shaped key ring, a medication container that had the name of Regional on it, and a coin purse with contents. It should be noted, there was a second whistle recovered from this location as well as two audio cassettes and two cases. I began processing these items after having photographed them. While I was not able to obtain any latent impressions from the purple handled scissors, stains were observed so they were packaged separately as evidence. There was also a piece of paper recovered from the table that did not have enough detail for any type of latent identification, there was a stain on it also. This was subsequently packaged separately also. I was unable to locate any latent impressions on any of the other items. There were multiple smudges on the key ring and the medication container.

Next I processed the three containers of food from the refrigerator. There was a container that apparently had some type of cranberry sauce and I observed two separate areas that appeared to have latent detail. Lifters were placed, identified, photographed, and recovered. I observed an area on the cellophane wrap that was covering the black plastic plate with meat on it with some type of detail present, which a lift was made. On the final container that apparently contained some type of stew, I observed some smudges but was unable to see any identifiable impressions.

I processed the two Ocean Spray Cranberry Blend juice bottles from the kitchen sink and was unable to locate any identifiable latent impressions. However, I did make two swabs from the edge of the mouth on each bottle. I placed

**Investigator Signature:**

Page 8

| | |
|---|---|
| **Elkhart Police Department** | OCA: **20021129008** |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*          **Case Mng Status:** *CLEARED BY ARREST*          **Occurred:** *11/28/2002*
**Offense:** *HOMICIDE*

**Investigator:** *BOURDON, J. A. (147)*          **Date / Time:** *03/24/2003 00:00:00, Monday*
**Supervisor:** *PRICE, S. R. (308)*                 **Supervisor Review Date / Time:** *02/26/2014 00:00:00, Wednesday*
**Contact:**                                                     **Reference:** *Evidence Tech Report*

---

the letters A and B on the bottom of the bottles for identification purposes and the swabs were labeled accordingly. I processed the wristwatch box recovered from the living room and the blue plastic lid found near the box on the ground. I was unable to observe any impressions on either item. I processed the floral pattern photo album that was located on the bed and I did not observe any identifiable impressions. In processing the eyeglasses recovered from the bed in the east room, I did not observe any latent impressions. I also processed the ziploc style bag identified with the letter I that was recovered from the living room floor and again received a negative result.

On December 12, 2002, Det. Christian obtained a waiver of search and seizure from Larry Wood for body standards. He also consented to the taking of finger and palm print impressions from him. This was done December 12, 2002 at 1029 hrs. and at 1107 hrs. I obtained a saliva sample, head hair standard and public hair standard while at U.S. Health Works where Det. Christian and I had transported Mr. Wood. They also attempted to obtain a blood sample from Mr. Wood but the nurses were unable to do so. I contacted the Indiana State Police Laboratory who informed me to obtain swabbings from the Mr. Wood's mouth as these could be used for standards also. After responding to Mr. Woods apartment at the Waterfall High Rise, I obtained swabs from his mouth at 1215 hrs. All of these items were subsequently secured as evidence.

On December 14, 2002, I continued to process the recovered items of evidence. I processed the two ziploc style bags containing jewelry that had been recovered from the east bedroom, which met with negative results. I processed the bible and found it be giant print. Also with this were an envelope, a paper, a penny, and two partial pills. All of these items were recovered from the bed in the living room area. After processing the envelope and paper with powders and ninhydrin, I was unable to observe any identifiable impressions. I observed stains in the bible that appeared to be possible blood. Also in the bible were a postcard and pamphlet that had similar smears of possible blood on them. These were all photographed with and without scales present. The postcard was packaged separately as was the pamphlet, which was a church bulletin. All these items were then resecured. I processed the red jewelry box from the east bedroom and did not observe any identifiable impressions, however, there were numerous smudges. I processed and photographed the black purse and contents and was unable to observe any identifiable impressions. Processed next was the Planters Peanut Oil bottle recovered from the kitchen counter. In doing the visual examination, I observed a reddish colored stain near the threads on the mouth of the bottle. I took swabs from this and collected them as evidence. I then processed the bottle using super glue and various techniques. I observed one area that appeared to have some type of detail present. I placed a lift and recovered this. It was found to have extremely poor detail, however, was retained as evidence. I processed the drawers that were recovered from the bed in the east bedroom, which met with negative results. These drawers were identified as drawer #1 and drawer #2 and were returned to evidence.

**Investigator Signature:**_____

# CASE SUPPLEMENTAL REPORT

Printed: 02/26/2014 15:23

**Elkhart Police Department**

OCA: **20021129008**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*   **Case Mng Status:** *CLEARED BY ARREST*   **Occurred:** *11/28/2002*
**Offense:** *HOMICIDE*

**Investigator:** *BOURDON, J. A. (147)*   **Date / Time:** *03/24/2003 00:00:00, Monday*
**Supervisor:** *PRICE, S. R. (308)*   **Supervisor Review Date / Time:** *02/26/2014 00:00:00, Wednesday*
**Contact:**   **Reference:** *Evidence Tech Report*

PHOTOGRAPHS:

1. Scene processing on November 29th - photo pack #64604.
2. Autopsy - photo pack #64605.
3. Scene processing on November 30th - photo pack #64606.
4. Processing of items for latent impressions - photo pack #64607.
5. Scene processing on December 2nd and photographs of picture turned over to family members - photo pack #62563.

INFORMATION REFERRED TO CASE.

Det. Joel Bourdon 0147

JB/jy

**Investigator Signature:** _____