UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

| | |
|---|---|
| LANA CANEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs | ) Case No. |
| | ) 3:14-cv-315-RL-CAN |
| DENNIS CHAPMAN and MARK DAGGY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

The Deposition of VICKI ELAINE BECKER

Date:     Wednesday, October 29, 2014

Time:     9:26 a.m.

Place:    Elkhart Prosecutor's Office
          301 South Main Street
          Elkhart, Indiana

Called as a witness by the Plaintiff

in accordance with the Federal Rules of Civil

Procedure for the United States District

Court, Northern District of Indiana, South Bend

Division, pursuant to Notice.


Before Charolette A. Martinez, CSR 11983
Notary Public, St. Joseph County, Indiana

MIDWEST REPORTING, INC.
1448 Lincolnway East
South Bend, Indiana  46613


EXHIBIT 14

39

1                   It is very clear to me that you and I
2              have different definitions of things.
3              And until I'm comfortable with what you
4              mean by "complex," that's not a question
5              I can answer for you.
6  BY MR. SUTHERLIN:
7  Q.  What is a ten-print examination?
8  A.  Ten-print examination, to my understanding, is when
9      you have an inked fingerprint card involving the ten
10     fingers of most human's hands, right and left.  And
11     you can look at that inked fingerprint card, which is
12     a patent print, and draw conclusions or make
13     observations about that ten-print card.
14 Q.  Did you make the decision to hire Mr. Chapman?
15 A.  Mr. Chapman was not hired.
16 Q.  Brought into the case?
17 A.  I think so, yes.
18 Q.  But you're not sure?
19 A.  I'm not sure.
20 Q.  Why didn't you use the Indiana State Police Crime
21     lab?
22 A.  Because they were backlogged so bad that we had to
23     ask them to give the fingerprints back because we
24     asked them to do it and they couldn't get it done in
25     a timely fashion.

1  Q. So first you sent them there?
2  A. Yes.
3  Q. And they couldn't get them back in two and a half
4     years?
5  A. That's correct. Well, I don't know when they sent
6     them.
7  Q. Two years.
8  A. I can't answer that question. But I didn't know that
9     they did not have them done and they told us they
10    could not get them done.
11       And when I say "us," it was Joel Borden, I
12    believe, that had the direct communication with the
13    Indiana State Police Laboratory. I could be wrong
14    about that, but Joel was the crime scene investigator
15    for Elkhart Police Department at the time, and that
16    would, generally, be how it occurred.
17       I was under the impression that Indiana State
18    Police could not finish the evaluation in time for
19    Andrew Royer's trial. And, therefore, we wanted to
20    be able to have those questions answered before
21    Mr. Royer's trial, the first trial. And so we
22    started brainstorming about other individuals that
23    may have expertise in this area to determine whether
24    or not they could help.
25 Q. Were you involved in the preparation of Mr. Chapman

```
 1   A.  I honestly don't know what he meant, to be quite
 2       frank.
 3           And, you know, I should probably go back.  You
 4       asked me if I thought the outcome would be different
 5       had he testified that it was not her print.  I can't
 6       say that to any degree of certainty, because the
 7       amount of other evidence against Ms. Canen was pretty
 8       significant.  And I think that it is possible that
 9       the jury would have felt the same way we did, that
10       she was definitely part of it.
11           So I can't sit here and honestly say that the
12       jury would have had a different outcome.
13           Do I think their conversations would have been
14       different?  Absolutely.
15           Do I think that their assessment of the case
16       would have been different?  Absolutely.
17           Can I sit here and say there would have been a
18       different outcome?  No, I can't.
19   Q.  Well, in fact, you did say that, but deciding not
20       to file -- refile the charges.  Isn't that correct?
21   A.  Yes.  But that doesn't say that there would have been
22       a different outcome.  It says that we as a
23       prosecutor's office do not feel that it is
24       appropriate use of resources to attempt to retry
25       Ms. Canen for this case given what has occurred.
```

50

1  Q.  And Mr. Royer was represented by Chris Crawford.
2      Is that correct?
3  A.  Yes.
4  Q.  I wonder if you could turn to the date 7/29/2005.
5  A.  I have it.
6  Q.  Part of the Court's entry states that, "Court
7      confirms trial date of August 8, 2005, at 8:30 a.m.
8      with joint trial to be conducted of each
9      defendant."
10         Do you see where I'm at?
11 A.  I do.
12 Q.  "Court also confirms that each defendant will
13     employ the defense that they did not commit this
14     offense.  And the Court also notes from counsel
15     that discovery has been completed."
16         Do you see that entry?
17 A.  I do.
18 Q.  So my question is:  Do you recall specifically --
19     I'm sorry.
20                  (Off the record.)
21 BY MR. DE BONI:
22 Q.  Do you recall in this specific case what discovery
23     was conducted?
24 A.  No.  I do not recall specifically what discovery was
25     conducted.  During this period of time we had more of

1    an open-file type of discovery process where we would
2    allow the defense to review our entire file,
3    including notes, anything that wasn't really
4    confidential.
5         We also were at a practice of making photocopies
6    of police reports as well as, you know, summaries,
7    narratives, et cetera, et cetera, and providing
8    physical evidence such as audio, video, anything that
9    was physically documented.  We tried to be as open as
10   we could.
11 Q. This open-file process you just described, that
12   would have been in place at the time of the
13   Lana Canen case?
14 A. I believe so.  I believe so.  At least at the
15   beginning of it, because we -- it wasn't -- I don't
16   remember when we went more to the "We'll provide
17   everything for you," as opposed to "Come over and
18   take a look."  It was kind of a combination, a
19   carry-over from the previous administration.
20       But Mr. Zook and Mr. Crawford and I, all of us,
21   had a very open relationship such that, you know,
22   "Whatever I have, you're welcome to" type of thing.
23 Q. Did you have that you recall now -- I know it's
24   been a few years -- any discovery disputes with
25   Mr. Zook such that he wanted something and the

```
 1          prosecuting -- the prosecutors refused to turn it
 2          over?
 3     A.   No.  Nothing.
 4     Q.   Do you recall in this case whether the police
 5          reports involving the murder of Helen Sailor would
 6          have been available to Mr. Zook and Mr. Crawford?
 7     A.   Yes, I am positive they were.
 8     Q.   Okay.
 9     A.   In fact, we may have burned photocopies for them.
10              (Plaintiff's Exhibit No. 22 marked.)
11     BY MR. SUTHERLIN:
12     Q.   Exhibit 22, do you see that in front of you, ma'am?
13     A.   Yes, I do.
14     Q.   Is the report authored by Dennis Chapman?  Correct?
15     A.   It appears to be, yes.
16     Q.   Would this report have been turned over to Mr. Zook
17          and Mr. Crawford prior to the trial?
18     A.   Yes.  I am sure it was.
19     Q.   That would be your normal procedure?
20     A.   Yes.
21     Q.   Would this be considered part of what criminal
22          attorneys call Brady material the prosecutor turns
23          over?
24     A.   No.  This would not really be Brady material.  Brady
25          material is more along the lines of material that
```

1       would be shown to exonerate someone as opposed to
2       incriminate someone.
3   Q.  Okay.
4   A.  This would be part of the standard discovery just
5       regarding evidence that we would anticipate at trial.
6       And by this time, obviously we intended to call
7       Detective Chapman as a witness, so this would be a
8       summary of his observations in preparation for his
9       being a witness.
10  Q.  Are you confident sitting here today that Mr. Zook
11      would have received Exhibit 22?
12  A.  Yes.
13  Q.  Prior to the criminal trial?
14  A.  Yes.
15              (Plaintiff's <u>Exhibit No. 23</u> marked.)
16  BY MR. SUTHERLIN:
17  Q.  Now, what is Exhibit 23.
18  A.  23 appears to be the State's witness and exhibit list
19      bearing my signature that was filed in July of 2005,
20      so prior to the trial.  And then we provided an
21      addendum on August 5th, 2005.  And then again on
22      August 8th, 2005, another addendum.  All on what
23      appears to be my signature.
24  Q.  So you list on behalf of the State or the
25      prosecutor all the witnesses and exhibits that you

68

1  provided me as exhibits in the upcoming jury trial.
2  Q. Now, you had used Detective Canen (sic) and prior
3     cases?
4  A. Detective Chapman?
5  Q. Chapman. I'm sorry.
6  A. I had used Detective Chapman in prior cases.
7     Specifically I remember using him for habitual
8     enhancements.
9  Q. Okay.
10 A. I know for sure it was one. It probably was two that
11    I had actually had him testify in habitual
12    enhancements regarding fingerprint comparison.
13 Q. You've reviewed the testimony of Mr. Chapman, now,
14    at the Canen criminal trial?
15 A. Yes.
16 Q. Is there anything in Mr. Chapman's testimony that's
17    inconsistent with what he told you in your pretrial
18    preparations?
19 A. No.
20 Q. You went through Mr. Chapman's background and
21    qualifications as demonstrated in the trial
22    transcript; correct?
23 A. During the trial testimony or during our preparation?
24 Q. During the trial.
25 A. During the trial, yes.

1      that opinion, Mr. Zook could have stood up and
2      asked to question Mr. Chapman on his
3      qualifications; right?
4   A. Absolutely.
5   Q. And if he felt that -- if Mr. Zook felt that he was
6      unqualified to give that opinion, he could have
7      raised that objection at that time to
8      Judge Shewmaker; correct?
9   A. Yes.
10  Q. That was not done?
11  A. Correct.
12  Q. To be clear, Dennis Chapman at the time that he
13     provided the fingerprint analysis for the
14     Lana Canen murder case was employed by the
15     Elkhart County Sheriff's Department; correct?
16  A. Yes.
17  Q. And to the best of your knowledge, Mr. Chapman did
18     not come forward to the Elkhart City Police or the
19     Elkhart County Prosecutor and -- and say, "Hey, I
20     want to get involved in your investigation"?
21  A. No.  That's not the case at all.  This was --
22  Q. You reached out to him -- or either the Elkhart
23     City Police or the Elkhart County Prosecutor
24     reached out to Mr. Chapman and said, "Would you
25     assist us?"

73

1  A. Yes.
2         (Plaintiff's Exhibit No. 25 marked.)
3  BY MR. SUTHERLIN:
4  Q. Exhibit 20- -- I think it's like 25. Do you see
5     25?
6  A. I do. I have it.
7  Q. Ms. Becker, we just received this yesterday from
8     the Elkhart City Police, but I'll represent to you
9     that it's State's Exhibit 46. And it's a
10    three-page document, and it State's Exhibit 47 from
11    the
12    Lana Canen murder case.
13 A. Okay.
14 Q. For some reason the Elkhart City Police -- I think
15    because of the appeal, still had those. We didn't
16    have them when we asked for the entire record from
17    the court reporter.
18        So page -- page 1 of Exhibit 25 is State's
19    Exhibit 46; correct?
20 A. Yes.
21 Q. And that's the lifter card?
22 A. Yes. It appears to be. I recognize my handwriting
23    on the number.
24 Q. Please explain what a lifter card is.
25 A. A lifter card is a tool that forensic crime scene

82

1   BY MR. SUTHERLIN:
2   Q.  Go ahead and answer.
3   A.  Should I answer?  I understood, absolutely, that what
4       he did for the FBI was compare what they call in the
5       field as "known prints."  I was aware that he did
6       that hundreds of thousands of times.  I mean, there
7       was one comment in here he did that 40 times an hour
8       in one unit that he was in.
9           I was also aware, though, that with his
10      experience -- this is based on what he told me --
11      based upon his experience at the Elkhart County
12      Sheriff's Department that he had done latent
13      comparisons with unknowns.  That was my belief.
14  Q.  That was not my question.
15  A.  Well, then I misunderstood your question.
16  Q.  Yeah.  I asked -- I asked you about the Nuclear
17      Regulatory Agency and the FBI.
18          Did you understand that -- and worked for
19      those agencies, it did not involve latent
20      fingerprint identifications at all?
21  A.  I cannot say that I asked that specific question of
22      him.  I understood that was accurate at the FBI.  But
23      I do not know about -- I do not know about the Cook
24      Nuclear Power Plant.
25  Q.  What did he do for them?

83

1  A.  I know that he did background checks.  And I know
2      that he provided other services or other -- like they
3      would come to him with questions, "Hey, can you do
4      this?  Hey, can you do this?"  But we never got into
5      details on that, because it was so long ago that I
6      didn't think it was important as was his experience
7      with the sheriff's department.
8  Q.  You indicated that he was often brought in to
9      testify in habitual criminal cases.
10 A.  On at least one occasion; maybe two.
11 Q.  Okay.  But that was his area; is that what he
12     promoted -- presented to you, that that's how he
13     was used, to testify primarily on habitual criminal
14     cases?
15 A.  No, not at all.  He set himself out to be an
16     individual who could analyze and compare prints.
17 Q.  Okay.  But in a habitual criminal case, what are
18     you comparing?
19 A.  You are comparing known patent prints during a
20     habitual case.
21 Q.  So you have the known patent prints from either his
22     book-in or from some source?
23 A.  Correct.
24 Q.  You just have to say this is the same person or not
25     the same person?

84

1  A.  No, that's not true.  You have to do an analysis of
2      the ridge detail, the points, the ridges, the whirls,
3      the loops, and say does that print match this print
4      to say, yes, it is the same person.  Because in the
5      habitual phase, identity is the critical element.
6  Q.  I understand, but that's what he's supposed to do
7      is he's supposed to say it is or is not the same
8      person?
9  A.  No.  He's supposed to do the analysis and then
10     testify to his conclusion.
11 Q.  And his conclusion would be?
12 A.  Either he is the right person or he is not the person
13     that made this card.  Yeah.
14 Q.  Well, so, we're saying the same thing.  He does the
15     analysis.  Then he reaches his conclusion, and he
16     presents his conclusion?
17 A.  Absolutely, but the analysis is what matters.
18 Q.  Do you know when the -- I guess, the area of
19     expertise in examining fingerprints dropped the
20     ten-point classificator -- classifier system?
21 A.  No, I do not.
22 Q.  Do you know when they began using the ACE Roman
23     Numeral V system?
24 A.  No, I do not.
25 Q.  Was it your understanding that he had been involved

1            in 100 latent print prosecutions?
2     A.    No.
3     Q.    100 what?
4     A.    My understanding is that he had personally performed
5            over 100 evaluations of latent print comparisons.
6     Q.    Okay.  Would you look at page 34 of your exhibit
7            there or just about 617.
8     A.    617?
9     Q.    Yeah.
10    A.    Yes.
11    Q.    Where does it say that he made a hundred latent
12           prints?
13    A.    It doesn't.
14    Q.    Where does it say that you asked him whether he had
15           compared latent prints or just compared
16           fingerprints?
17    A.    It doesn't.
18    Q.    You just assumed that he was referring to latent
19           prints, even though you didn't ask him?
20    A.    Well, based upon the context of my relationship with
21           him, my knowledge of his experience, what he did in
22           my pretrial prep with him, yeah, I was assuming it
23           was latent print comparisons, especially in light of
24           the fact that when he was doing known print
25           comparisons, he was doing 40 an hour.  So that would

86

```
 1        put him more around the -- probably hundreds of
 2        thousands of comparisons of knowns.
 3             This was clearly a different topic we were
 4        talking about.
 5   Q.   Well, if he's so good and you're so confident, how
 6        did he get it so wrong as soon as he was
 7        confronted?
 8   A.   I have no idea.
 9                  MR. DE BONI:  Object to the form of
10             the question; it's argumentative.
11   BY MR. SUTHERLIN:
12   Q.   The next page, you ask, "In your experience do you
13        often find fingerprints at a crime scene?"
14             "Not often."
15             And then you go on to there.
16             Is there anyplace in here where you develop
17        his expertise as a latent fingerprint expert?
18   A.   No, sir.
19   Q.   There is a difference between comparing two rolled
20        prints and comparing a latent fingerprint.
21   A.   Absolutely, but when I asked him specifically, "Do
22        you also have training and experience in attempting
23        to recover latent prints from a crime scene, and he
24        says, "Yes," "Is that part of your responsibilities
25        at the Sheriff's Department?"  "Yes, it is," I would
```

87

1              have thought that that would have been sufficient to
2              show that we're talking about latent prints here.
3              And that's at the top of page 618 in the record.
4        Q.   If that statement was not true, then that would
5              be -- that would be dishonest?
6        A.   If it was not true, then it would be dishonest.  I
7              just don't know whether it is true or not, especially
8              in light of hindsight.
9        Q.   And this talks about attempting to recover as
10             opposed to examining, too?
11       A.   Oh, absolutely.
12       Q.   Yeah.
13       A.   Absolutely.
14       Q.   But it was your understanding that he had training
15             in latent fingerprint examination?
16       A.   Yes.
17       Q.   Okay.  That's all I have.
18       A.   And that needs to be clarified.  Training to include
19             on-the-job training with mentors and experience,
20             because that counts as training, too.
21                  Just as in court, every time you try a case,
22             it's training for a litigator.  Every time you do a
23             deposition, it's training for a litigator.
24       Q.   Right.
25       A.   It's training.

92

## CERTIFICATE

I, Charolette A. Martinez, a Notary Public, in and for the County of St. Joseph and State of Indiana, do hereby certify there appeared before me, VICKI ELAINE BECKER, on Wednesday, October 29, 2014, who was duly sworn to testify the truth, the whole truth, and nothing but the truth to questions propounded at the taking of the foregoing deposition in a cause now pending and undetermined in said court;

I further certify that I then and there reported stenographically the proceedings at the said time and place; that the proceedings were then transcribed from my original shorthand notes; and that the foregoing transcript is a true and correct record thereof;

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 3rd day of November, 2014.

Charolette A. Martinez, CSR
Notary Public, State of Indiana
Residence:   St. Joseph County
Commission Expires:   12-18-2022

93

```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF INDIANA
                         SOUTH BEND DIVISION

LANA CANEN,                          )
                                     )
             Plaintiff,              )
                                     )
    vs                               ) Case No.
                                     ) 3:14-cv-315-RL-CAN
DENNIS CHAPMAN and MARK DAGGY,       )
                                     )
             Defendants.             )
                                     )
```

                    VICKI ELAINE BECKER

I hereby acknowledge that I have read the foregoing deposition transcript regarding the case of Canen Vs. Daggy, taken on October 29, 2014, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the additions or changes, if any, as noted on the attached errata sheet.

```
                         _____
                         VICKI ELAINE BECKER

                         Subscribed and sworn to me
                         this _____ day of _____,
                         2014, A.D.


                         Notary Public or Witness_____
                         State of _____
                         County of _____
                         My commission expires:_____
```