# EXHIBIT A

Affidavit of Dennis Chapman dated September 9, 2015 with Exhibit A to Affidavit of Dennis Chapman-Supplementary Report on Offense of Murder, Incident #2002-1129-008

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LANA R. CANEN, | ) |
| Plaintiff | ) ) ) |
| v. | ) CASE NO. 3:14-CV-00315 |
| DENNIS CHAPMAN, *et. al.*, | ) ) ) |
| Defendant | ) |

## AFFIDAVIT OF DENNIS E. CHAPMAN

Dennis E. Chapman, being first duly sworn upon his oath, deposes and says:

1. I am a defendant in the above captioned lawsuit.

2. I am of adult age and competent to testify to the facts set forth in this affidavit.

3. The facts set forth in this affidavit are true based upon my personal knowledge of such facts, and if called upon to testify as a witness, I would duly testify to these facts.

4. I graduated from Michigan State University, East Lansing, Michigan, in August 1975, with a Bachelor of Science degree in Social Science.

5. In February 1976, I began a full-time position with the Federal Bureau of Investigations ("FBI"). Shortly after beginning my employment with the FBI, I attended a twelve-week training program taught by the FBI on identifying fingerprints. The primary training textbook for the twelve-week program was titled *Identification Division Technical Section, Fingerprint Training Manual*, U.S. Department of Justice, Federal Bureau of Investigations.

6. The FBI's twelve-week fingerprint training program taught me how to classify and compare fingerprints. The classification system taught in this program was called *The Henry System*, with some modifications made by the FBI. The Henry System is a methodology whereby

*Lana Canen v. Dennis Chapman, et al.*
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

**Affidavit of Dennis Chapman**
**September 9, 2015**
Page 2 of 11

fingerprints are classified by pattern types (e.g., arches, loops, and whorls) and further classified into sub-types (e.g., plain arch, tented arch, ulnar loop, radial loop, plain whorl, central pocket loop, double loop, and accidental). In general, the Henry System is a way to classify fingerprints into categories based on similarity of characteristics. Thus, in order to appropriately utilize the Henry System, the students in this program had to learn how to recognize and distinguish between the various pattern types and subtypes of fingerprints.

    7.    I successfully completed the twelve-week FBI fingerprint program and thereafter worked with the FBI as a fingerprint examiner. As a fingerprint examiner I examined "ten print" cards. Ten print cards, also called fingerprint cards, are inked fingerprints placed on an identification card, as shown in the following image:



My job was to analyze a ten print card that was received from an outside law enforcement agency to determine if the FBI had matching fingerprints in its files of ten print cards. The FBI files at that

*Lana Canen v. Dennis Chapman, et al.*
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

**Affidavit of Dennis Chapman**
**September 9, 2015**
Page 3 of 11

time contained millions of fingerprint cards. This is the manner in which I conducted an analysis of a ten print card.

    A.    When I received a ten print card it had already been initially classified by: (i) gender, determined by the information on the card, not my analysis of the fingerprint; and (ii) by fingerprint type (e.g., arches, loops, whorls), determined by an examination of the fingerprints. This initial classification would determine which unit would receive the ten print card for further classification and comparison.

    B.    After I received a ten print card I further examined the fingerprints on the card with a magnifying glass to further classify the fingerprints by type. This further classification was necessary so that I would know what section of the FBI fingerprint files I should search for matches.

    C.    After I completed my classification of the ten print card, I would compare the ten print card to other fingerprint cards in the FBI fingerprint files of a similar classification. The number of other fingerprint cards in the FBI fingerprint file of a similar classification could range from five to hundreds of cards; I would then examine each card, comparing the fingerprints on the card to the ten print card to determine if there was a match. Once I found a match, I stopped my search and submitted the ten print card and the matched card to my supervisor.

    D.    Therefore, to do my job, I had to know how to classify and compare fingerprints.

*D.C.C*

*Lana Canen v. Dennis Chapman, et al.*
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

**Affidavit of Dennis Chapman**
**September 9, 2015**
**Page 4 of 11**

8. I worked for the FBI as a fingerprint analyst comparing ten print cards from June 1976 to June 1978, at which time I resigned from the FBI. During the time period that I worked for the FBI I estimate that, on the average, I examined 240 fingerprints cards per day.

9. In October 1978, I began working for the Cook Nuclear Plant in Bridgman, Michigan. I was in a supervisory position in charge of scheduling and supervising other security officers. One of my duties was to review fingerprint cards of new hires, to ensure they were acceptable for submission. I resigned from Cook Nuclear Plant in 1984.

10. After resigning from Cook Nuclear Plant, I was a U.S. Border Patrol trainee for approximately four months, and then I worked for a period of time as a correctional officer for the Juvenile Detention Center in Berrien County, Michigan. I also worked at the Juvenile Detention Center in Elkhart County, Indiana, as a youth specialist.

11. In November 1993, I began my employment with the Elkhart County, Indiana, Sheriff's Department ("ECSD"). Beginning in January 1994, I attended the Indiana Law Enforcement Academy ("ILEA"), in Plainfield, Indiana. ILEA is a twelve-week training program that is required for all officers in the state of Indiana. Part of the curriculum at the ILEA pertained to fingerprints. The ILEA training manual was titled, *Instructions for Completing Fingerprint Cards-Adult and/or Juvenile,* ILEA-1994, and the lecture was titled, *Fingerprints,* ILEA-1994. In part, the lecture covered the history and development of the Henry Classification System.

12. After I graduated from the police academy in 1994, I began working at the ECSD as a patrolman. Part of my duties as a patrolman included dusting for and retrieving fingerprint impressions from crime scenes.

*DCC*

*Lana Canen v. Dennis Chapman, et al.*
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

**Affidavit of Dennis Chapman**
**September 9, 2015**
**Page 5 of 11**

    13.    In January 1999, I was promoted to detective with the ECSD. I was initially assigned to investigate property crimes. In August 2000, I attended a four week training program that was taught by the Indiana State Police. This program was designed to enhance skills and teach detectives how to process crime scenes, collect fingerprints, shoe impressions, tire impressions, and reconstruct crime scenes by drawing. My course textbook was titled, *Techniques of Crime Scene Investigation,* Barry A.J. Fisher. I also participated in the lecture titled, *Latent Prints.*

    14.    After I completed the four week training program taught by the Indiana State Police, I was promoted to crime scene technician and I held this position until my retirement from the ECSD in December 2013.

    15.    As a crime scene technician with the ECSD, one of my responsibilities included examining fingerprints. In addition to analyzing fingerprints, I was responsible for processing major crime scenes, burglaries and thefts of more than $10,000.00. I photographed crime scenes, checked for evidence, collected fingerprints and DNA. I processed items for fingerprints by dusting and photographing the item and then lifting the prints with a lifter. I processed and developed photographs and supervised the evidence room.

    16.    As a crime scene technician, I was often called upon to examine fingerprints. First, I was called upon to examine and compare ten print cards to ten print cards, as I did when I was employed by the FBI. Second, from time to time, I was asked to examine latent fingerprints that were taken from a crime scene and compare those fingerprints to "known prints." Known prints can also be called exemplars, inked prints, record prints, or standards. A ten print card is a known print.

D.CC

*Lana Canen v. Dennis Chapman, et al.*
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

**Affidavit of Dennis Chapman**
**September 9, 2015**
**Page 6 of 11**

     17.    In addition to requests made by members of the ECSD to me to examine latent fingerprints taken from crime scenes, requests were also made to me from time to time by members of the Goshen City, Indiana, Police Department, and the Elkhart City, Indiana, Police Department to examine latent fingerprints taken from crime scenes. From the time I first became a crime scene technician with the ECSD until the time when I was asked to examine fingerprints pertaining to the Helen Sailor murder case, I conducted approximately thirteen fingerprint examinations involving latent fingerprints taken from crime scenes. During this same time period, I conducted numerous fingerprint examinations involving the comparison of ten print cards.

     18.    When I examined latent fingerprints taken from a crime scene, I utilized the training that I had received at the FBI. Additionally, I made reference from time to time to fingerprint books that were kept in the ECSD crime scene laboratory library. Some of the books that I used as references were, *The Science of Fingerprints,* U.S. Department of Justice, Federal Bureau of Investigation (Rev. 12-84); *FBI Advanced Latent Fingerprint School,* U.S. Department of Justice, Federal Bureau of Investigations; *FBI Identification Division Technical Section, Fingerprint Training Manuel,* U.S. Department of Justice, Federal Bureau of Investigations (Rev. 1987); *Techniques of Crime Scene Investigation (Sixth Edition),* Barry A.J. Fisher and *Friction Ridge Skin, Comparison and Identification of Fingerprints,* James F. Cowger (1983).

     19.    After becoming a crime scene technician with the ECSD, I testified in court three times concerning fingerprint analysis. On two occasions I testified concerning the identity of individuals after having examined ten print cards. On the third occasion, I testified in the case

*D.C.C*

*Lana Canen v. Dennis Chapman, et al.*
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

**Affidavit of Dennis Chapman**
**September 9, 2015**
**Page 7 of 11**

involving Lana Canen: *State of Indiana v. Lana R. Canen*, Elkhart Circuit Court, Cause No. 20C01-0409-MR-0118.

20. In August 2003, I was contacted by Detective Joel Bourdon of the Elkhart City, Indiana, Police Department ("EPD"). Detective Bourdon inquired as to whether I could assist in one of Elkhart City Police Department's murder investigations by examining the fingerprints lifted from the crime scene and comparing the crime scene fingerprints with known prints from suspects. The murder investigation that Detective Bourdon asked me to assist in was the Helen Sailor murder. This was the first time that I became aware of the Helen Sailor murder. Prior to being contacted by Detective Bourdon in August 2003, I had no involvement in the Helen Sailor murder investigation, and I did not participate in collecting evidence from the crime scene.

21. Upon Detective Bourdon's request, I agreed to analyze the fingerprints. I agreed to compare the prints because I wanted to help out EPD as they did not have a fingerprint examiner. It was not unusual for me to help other law enforcement organizations with analyzing and comparing fingerprints. It was my understanding that I was asked to help because the Indiana State Police (ISP) lab was backlogged and would take too long to analyze the fingerprints for the EPD.

22. Based on my prior training with the FBI and my continued work with the ECSD after I left the FBI, I believed that I had the appropriate experience and training to analyze the fingerprints related to the Helen Sailor murder investigation.

23. On August 29, 2003, I received from the EPD the following items pertaining to the Helen Sailor murder investigation: thirteen sealed plastic bags containing latent print lifts; one of the bags consisted of a pill bottle with latent prints on it; sixteen fingerprint cards of suspects and other

D-S.C

*Lana Canen v. Dennis Chapman, et al.*
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

**Affidavit of Dennis Chapman**
**September 9, 2015**
**Page 8 of 11**

individuals who may have been in the residence of the murder victim; and, the rolled (i.e., inked) prints of the murder victim. The print lifts that I received from the EPD were fingerprints taken from the crime scene and preserved on fingerprint tape mounted on a card.

24. I kept the fingerprints that I had received from the EPD in my possession until March 5, 2004, at which time I returned the fingerprints to the EPD. During the approximately six months that I was in possession of the fingerprints, I was also doing my regular work for the ECSD. So, I did not spend the entire six month period only analyzing the fingerprints received from the EPD.

25. After analyzing the fingerprints received from the EPD, I concluded that the fingerprint from a suspect by the name of Lana Canen matched the latent fingerprint on lifter M. Lifter M was labeled med tub. This conclusion was based on my comparison of ten print card identified as that of Lana Canen with lifter M. I used a small magnifying glass to conduct my analysis and comparison and used the skills that I had been taught while employed with the FBI.

26. I did feel some pressure to complete the fingerprint analysis for the EPD in a timely manner while at the same time keeping up with my regular duties at the ECSD. However, I did not rush my analysis of the fingerprint materials received from the EPD. I conducted my analysis comparison in the same manner in which I had been trained to do by the FBI and in the manner in which I conducted previous fingerprint examinations for the ECSD and other law enforcement organizations. I considered the overall quality of the latent prints that I received from the EPD to be fair. I focused on the entire print, like I was trained to do at the FBI.

*Lana Canen v. Dennis Chapman, et al.*
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

**Affidavit of Dennis Chapman**
**September 9, 2015**
**Page 9 of 11**

27. I drafted my fingerprint analysis report asserting my opinion and forwarded it to EPD Detective Joel Bourdon. A copy of my report is attached to this affidavit as Exhibit A.

28. In August 2005, the criminal trial for Lana Canen and Andrew Royer was conducted. I was a witness for the State of Indiana and testified as to my analysis of the fingerprint materials provided to me by the EPD.

29. During questioning, Ms. Becker asked me if I had any idea how many fingerprint comparisons I had made in the past several years. My response was, "Not right off the top of my head. Several--maybe 100 or so." I understood that anytime I had been tasked to compare one set of fingerprints to another set of fingerprints—whether the comparison was a latent fingerprint taken from a crime scene to a ten print card, or one ten print card to another ten print card—this was a "comparison." I did not understand Ms. Becker's question to be limited to comparisons of latent fingerprints taken from a crime scene to a ten print card.

30. A hearing for Lana Canen's Petition for Post-Conviction Relief ("PCR") was held on August 16, 2012, and I testified at that hearing. A few weeks prior to the hearing, I was provided with a power point presentation that I understood was prepared by an independent fingerprint analyst retained by Lana Canen, Ms. Kathleen Bright-Birnbaum.

31. I reviewed Ms. Bright-Birnbaum's fingerprint analysis report. After looking through her report, I recognized that I had erred in my opinion when I identified Lana Canen as the source of the fingerprint found on lifter M. I then contacted the Elkhart County, Indiana, Prosecutor's Office and spoke to a Deputy Prosecutor.

*D.E.C*

*Lana Canen v. Dennis Chapman, et al.*
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

**Affidavit of Dennis Chapman**
**September 9, 2015**
**Page 10 of 11**

     32.    A few days before the PCR hearing, I went to the Elkhart County Courthouse, Goshen, Indiana, and examined lifter M and compared lifter M with Lana Canen's fingerprint card. It was now my opinion that the fingerprint on lifter M did not match Lana Canen's inked print. I agreed with Ms. Bright-Birnbaum's evaluation and acknowledged that my original opinion was an error, and I testified as such at the PCR hearing.

     33.    I did not know of Ms. Canen until I identified her name on a suspect card that was given to me by the EPD to use in my fingerprint analysis. I saw Ms. Canen for the first time at her criminal trial in August 2005.

     34.    I never had any malicious intent to have Ms. Canen convicted. I made a mistake and admitted to it immediately upon discovery.

     Further affiant sayeth not.

     DATED this 9th day of September, 2015.

*/s/ Dennis E. Chapman*
Dennis E. Chapman

*Lana Canen v. Dennis Chapman, et al.*
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

**Affidavit of Dennis Chapman**
**September 9, 2015**
**Page 11 of 11**

STATE OF INDIANA              )
                              )   SS:
COUNTY OF ELKHART             )

Subscribed and sworn to before me, a Notary Public in and for said County and State, this 9th day of September, 2015.

_____
Katherine J. Taft
Notary Public
Residing in Elkhart County, Indiana

My Commission expires:
August 18, 2017

**ELKHART COUNTY SHERIFF**
GOSHEN, INDIANA

SUPPLEMENTARY REPORT ON OFFENSE OF: **MURDER**

COMPLAINANT: State of Indiana
STREET ADDRESS: 175 Waterfall Dr.
CITY AND STATE: Elkhart, Indiana

INCIDENT # 2002-1129-008
DATE:
TIME:

SUMMARY: On August 29, 2003, at the request of Detective Joel Bourdon of the Elkhart City Police Department, I agreed to examine some fingerprint lifts for a possible match to suspects in a murder that occurred in the City of Elkhart. Detective Hammel and Detective Conway also delivered fingerprint cards and fingerprint lifts to the Sheriff's Department for examination.

In total, there were thirteen sealed plastic bags containing latent print lifts. One of these bags consisted of a pill bottle with latent prints on it. There were sixteen fingerprint cards and the rolled prints of the victim.

Not all of the fingerprint cards were of suspects, but of persons that may have been in the residence of the victim.

The fingerprint lifts were examined first for identifiable prints. There was some ridge detail present on a majority of the lifts, but in most cases, there was not enough ridge detail for a comparison. The lifts were then separated into possible comparison possibilities and those that there was not enough ridge detail present for a comparison.

One lift labeled med tub "M" 0937 E2803, had sufficient ridge detail for a comparison. The pattern was a loop with a possible ridge count of 7-17. I then began examining the print cards for possible matches. The victim's prints were eliminated right away as there was very little to no ridge detail present in her prints.

One of the suspect's was a Lana Canen. I examined her fingerprint card from Elkhart City and also one that was on file in the Sheriff's Department. The print on file with the Sheriff's Department was used because the quality was a little better, but they were both the prints of Lana Canen.

As mentioned earlier, the latent print being examined was a loop. Checking Lana Canen's print card, she did appear to have a radial loop of the right index finger. This finger was examined first, but it did not match the latent. If the print was from Lana, then it would have to be an Ulnar loop from the left hand. The left thumb was a Whorl so it was eliminated. The left index was a possible Whorl or a Radial loop, so it was eliminated. This left the left middle, ring, and index. The left middle had a small ridge count so this



EXHIBIT A

was eliminated. The left ring finger appears to be a Whorl with a possible reference to a loop so it was eliminated. This left the left little as a possible.

After studying the left little finger on the fingerprint card of Lana Canen and the latent print from the med tub "M" 0937 E2803, I found several points that matched up with each other. Based on my experience as a Fingerprint Examiner with the Federal Bureau of Investigation from 1976-1978 and my continued examination of fingerprints with the Elkhart County Sheriff's Department, the latent print from the med tub is the left little finger of Lana Canen.

On fingerprint lift "D from the bottom of Pill Divider without blk lettering", there was another possible latent print. There was some ridge detail, but it was very faint. Since Lana Canen's print was found on the med tub, I compared this with her fingerprint card.

The latent print appeared to be a Central Pocket Loop with a inner tracing or a loop. The only finger that fit this pattern was Lana Canen's left ring finger. I could find a couple points that matched, however I did not find enough points to make a positive identification. The other fingerprint cards were then checked but none had a similar pattern.

The only identification was the left little finger of Lana Canen on the Med Tub.

*Det Dennis E. Chapman #170*

Detective Dennis E. Chapman #170
Detective Bureau
ELKHART COUNTY SHERIFF'S DEPARTMENT