# EXHIBIT B

Cited portions of Deposition of Dennis Chapman
dated 11/18/2014 taken in *Lana Canen v. Dennis Chapman, et al.*,
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

1

```
1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF INDIANA

3                       SOUTH BEND DIVISION

4    LANA CANEN,                      )
                                      )
5              Plaintiff,             )
                                      )
6        vs                           ) Case No.
                                      ) 3:14-cv-315-RL-CAN
7    DENNIS CHAPMAN and MARK DAGGY,   )
                                      )
8              Defendants.            )
                                      )
9

10

11           The Deposition of DENNIS E. CHAPMAN

12           Date:   Tuesday, November 18, 2014

13           Time:   10:20 a.m.

14           Place:  Yoder, Ainlay, Ulmer & Buckingham
                     130 North Main Street
15                   Goshen, Indiana

16

        Called as a witness by the Plaintiff
17
        in accordance with the Federal Rules of Civil
18
        Procedure for the United States District
19
        Court, Northern District of Indiana, South Bend
20
        Division, pursuant to Notice.
21

22
     Before Charolette A. Martinez, CSR 11983
23   Notary Public, St. Joseph County, Indiana

24              MIDWEST REPORTING, INC.
                 1448 Lincolnway East
25             South Bend, Indiana  46613
```

```
 1    APPEARANCES:

 2

 3    MR. MICHAEL K. SUTHERLIN
            MICHAEL K. SUTHERLIN & ASSOCIATES
 4          334 North Senate Avenue
            Indianapolis, Indiana 46204
 5          msutherlin@gmail.com
            317.634.6313

 6

      For the Plaintiff;

 7

 8    MR. MARTIN W. KUS
            Newby, Lewis, Kaminski, Jones, LLP
 9          916 Lincolnway
            La Porte, Indiana 46350
10          219.362.1577
            mwkus@nlkj.com

11

      For the Defendant, Mark Daggy;

12

13    MR. MICHAEL F. DE BONI
            -- and --
14    MR. NATHANIEL M. JORDAN
            Yoder, Ainlay, Ulmer & Buckingham, LLP
15          130 North Main Street
            P.O. Box 575
16          Goshen, Indiana 46527-0575
            574.533.1171
17          mdeboni@yaub.com

18    For Defendant, Dennis Chapman.

19

      ALSO PRESENT:  Cindy Bennett
20                   Nathasha Felton

21                         *      *      *

22

23

24

25
```

1          there one year.  Then final two years I went to

2          Michigan State University, and graduated from there.

3     Q.   Okay.  And when did you graduate?

4     A.   August 1975.

5     Q.   And what was your degree in?

6     A.   It's a social science multiple disciplinary.

7     Q.   This would have been the school of what?

8     A.   Social Science.

9     Q.   Social Sciences?  School of Social Sciences?

10    A.   Right.

11    Q.   And that was 1975, you said?

12    A.   Correct.

13    Q.   Any other post secondary education?

14    A.   No.

15    Q.   Any graduate studies?

16    A.   No.

17    Q.   Okay.  All right.

18              Let's begin, then, with your first full-time

19         job after graduation in 1975?

20    A.   That would have been in February of '76 with the

21         Federal Bureau of Investigation.

22    Q.   All right.  And you applied to that FBI position?

23    A.   Correct.

24    Q.   Any other Federal positions that you applied to?

25    A.   Not at that time, no.

```
 1   Q.  Okay.  Did you apply to any law enforcement

 2       positions?

 3   A.  Not at that time.

 4   Q.  All right.  So you applied and -- going from your

 5       previous testimony -- you were hired?

 6   A.  Yes.

 7   Q.  Okay.  What was your position?

 8   A.  I was started out as a clerk.

 9   Q.  And what were your responsibilities and duties as a

10       clerk?

11   A.  I was assigned to card index, and then we would check

12       the files for criminals with previous records.  A

13       card would come in and we'd check the cards.

14   Q.  How would you check the cards?

15   A.  Manually.

16   Q.  What were you looking for when you were checking

17       them?

18   A.  This would be by name.

19   Q.  So you look at the card.  You identified the name

20       on the card.  What do you do with that information?

21   A.  Look up the files and see if there's another card

22       with that same name.

23   Q.  Okay.  And so what were you trying to determine by

24       the matching?

25   A.  Well, then we would send it on and they would check
```

1       and see if the prints were the same.  That wasn't my

2       job at that time.

3  Q.  Okay.  So you were just trying to match up names?

4  A.  Right.

5  Q.  If there was a similar name or identical name, you

6       would send those two cards to whom?

7  A.  Oh, we'd just put them in the file.  Then someone

8       else would pick them up.

9  Q.  All right.  Okay.

10          And how long did you hold that position?

11  A.  Just a couple months.

12  Q.  Then what did you do after that?

13  A.  Put in for a fingerprint examiner.  I went through a

14       12-week course for that.

15  Q.  And who -- who presented the 12-week course?

16  A.  That was the FBI instructors.

17  Q.  All right.  And after completing that course --

18       we're in, what, 2000- -- I'm sorry, 19- --

19  A.  -- '76.

20  Q.  -- '76.  All right.

21          Did you then -- were you, then, assigned a

22       different position, then, within the FBI?

23  A.  I became a fingerprint examiner.

24  Q.  Okay.  So you applied.  You were chosen.  And then

25       they sent you to the school?

12

1    A.   That's what I did.  FBI headquarters, Washington, DC.

2    Q.   Okay.  But I'm just trying to get the sequence.

3    A.   Right.

4    Q.   You applied, you were selected, and then you went

5         to the school?

6    A.   Right.

7    Q.   Tell me what was involved in your position as a

8         fingerprint examiner.

9    A.   As a fingerprint examiner?

10   Q.   Well, wasn't that the title --

11   A.   Correct.

12   Q.   Yeah.

13   A.   Our position was we worked -- do you want me to

14        explain a little bit about what we did actually or --

15   Q.   What your job was.

16   A.   Oh, okay.

17   Q.   If you need to talk about what you do, fine.

18   A.   We were assigned to a unit.  At that time all prints

19        were searched manually.  Nowadays a lot of times

20        they're searched by a computer, initially.  But we

21        didn't have that back then.  So we had to the search

22        the files by hand.

23            We would get a card that were assigned to each

24        unit.  Cards would come in, either criminal or civil

25        cards.  We'd pick a card up, classify it, and then

1    search the files for that card, see if they're a

2    match.

3    Q.   Okay.  And this would be matching a card that had

4         a -- what I call a ten-point print with another

5         card that had a ten-point print?

6    A.   Correct.

7    Q.   Okay.  There were no latent fingerprints

8         involved in any of your duties?

9    A.   Not at that time.

10   Q.   That's what we're talking about.  Yeah.  All right.

11        Okay.  How long did you continue in that

12        position?

13   A.   From '76 till June of '78.

14   Q.   Okay.  And then what position did you -- were you

15        assigned to in June of '78?

16   A.   That's when I left.

17   Q.   Oh, that's when you left?

18   A.   Right.

19   Q.   Why did you leave?

20   A.   Well, I applied for the Indiana State Police, took

21        the test, had the physical, oral interview.  So I

22        quit, thought I'd come back to Michigan, where I was

23        living at the time, waiting to be hired, and I never

24        heard from Indiana State Police.  So I called and

25        they said well, they -- budget cuts.  They didn't

```
 1   Q.  So you just left?

 2   A.  Without a job, yes.

 3   Q.  Without a job; huh?  And you were married at the

 4       time?

 5   A.  Yes.

 6   Q.  Pretty brave.

 7           Okay.  So then you came back to Indiana?

 8   A.  No.  Michigan.

 9   Q.  Michigan?

10   A.  Right.

11   Q.  Was it -- I misunderstood.  I thought you applied

12       to the Indiana State --

13   A.  I did.  But I was living in Michigan at the time.

14   Q.  Okay.  Why were you living in Michigan?

15   A.  That's where I was born.

16   Q.  So you went back there, waiting for the results

17       from Indiana State Police?

18   A.  Right.

19   Q.  Was there -- how long did you stay in Michigan?

20   A.  Actually, because I done started a job up there.

21   Q.  What was your job there?

22   A.  I worked security at the Cook Nuclear Plant.  That's

23       in Bridgman, Michigan.

24   Q.  And what was your job?  Describe your security job

25       at the Cook Nuclear Plant.
```

```
 1        law, firearms, pursuit driving, defensive tactics,

 2        and Spanish.

 3   Q.   And what position were you expected to be assigned

 4        to after completing this training?

 5   A.   If I would have completed it, I would have been at

 6        Las Cruces Border Patrol Station, New Mexico.

 7   Q.   All right.  Did you complete the training?

 8   A.   No, I did not.

 9   Q.   Why not?

10   A.   Failed at Spanish.

11   Q.   I'm sorry?

12   A.   I failed the Spanish portion.

13   Q.   Okay.  So then what happened?

14   A.   Then I went back to Michigan.

15   Q.   So you didn't have your job?

16   A.   No, I didn't have a job.

17   Q.   All right.  And when did you go back to Michigan?

18   A.   It would have been March of '85.

19   Q.   What did you do when you went back to Michigan?

20   A.   Collected unemployment for a while.

21   Q.   Okay.  And then what?

22   A.   I was hired at the Juvenile Detention Center --

23        Berrien County Juvenile Detention Center.

24   Q.   What county?

25   A.   Berrien County.
```

```
 1   BY MR. SUTHERLIN:

 2   Q.  Go ahead and answer.

 3           Did you ever find out -- because you went back

 4       there, eventually, did you ever find out why you

 5       weren't hired?

 6   A.  No.

 7   Q.  And that was some -- at some point right after you

 8       were relieved by the US -- terminated by US Border

 9       Patrol?

10   A.  Correct.

11   Q.  Any other law enforcement agencies?

12   A.  Not that I recall.

13   Q.  So you stayed on until 1987 --

14   A.  Correct.

15   Q.  -- at the juvenile center?

16           Then where did you go?

17   A.  Came down here to Elkhart County to the -- work for

18       the Elkhart County Juvenile Detention Center.

19   Q.  And why did you come down to Elkhart County?

20   A.  It was higher pay than what I was making in Michigan.

21   Q.  What was the difference?  What were you paid up

22       there?

23   A.  Up there I think it was, I believe, $6 an hour.

24   Q.  What were you paid when you came down here?

25   A.  7.17.
```

1    Q.  Did you have a vitae, by any chance, or a resume,

2        by any chance?

3    A.  I don't recall.

4    Q.  You don't know whether you ever prepared one?

5    A.  For?

6    Q.  For any purpose.

7    A.  No.  Well, in the past for other jobs.  I don't

8        remember doing one for County down here.

9    Q.  Okay.  What was your position when you went to work

10       for the Elkhart Juvenile Detention Center?

11   A.  I was a youth specialist.

12   Q.  I'm sorry?

13   A.  Youth specialist.

14   Q.  That was your title.  What was your job?  What did

15       you do?

16   A.  We ran a -- at that time -- I don't think they still

17       do, a positive peer culture.  So it was kind of a

18       program for juveniles to try to get them back on

19       track to get back in society.

20   Q.  Did you have any training in that?

21   A.  I had some when I was in Berrien County.

22   Q.  Tell me what kind of training you had.

23   A.  In Berrien County there was positive peer culture

24       side, which was kind of an open area.  And I was on

25       the locked-up side, too, but I worked on both sides.

1   Q.  Did you have any title or rank other than youth

2       specialist?

3   A.  At that time it was supervisor.

4   Q.  So supervisor?

5   A.  Right.

6   Q.  Okay.  And you said that lasted till 1993?

7   A.  Uh-huh.

8   Q.  Was there any other promotions?

9   A.  Yes.

10  Q.  Okay.  Go ahead.

11  A.  No.  I was saying, "Yes" to --

12  Q.  Okay.  So were there any other promotions?

13  A.  No.

14  Q.  All right.  Then you left the 1993.  Where did you

15      go?

16  A.  Sheriff's department.

17  Q.  Okay.  And so you were hired in 1993.  Tell me

18      about the hiring process.

19  A.  I believe there was a written test for that.

20      Polygraph.  And I think -- I believe they hired some

21      firm for -- interview at that time.

22  Q.  All right.  And who, to your knowledge, had the

23      hiring responsibility, made the hiring decision?

24  A.  I don't know who did.  I wasn't in charge of that.

25  Q.  I didn't say you were in charge of it.  They didn't

1          So you had an interview with this outside

2      group and it was more of a psychological fitness?

3   A.  I believe so.

4   Q.  Then you had an interview with a captain.  Who was

5      the captain?

6   A.  I believe it was Captain Bobby Williams.

7   Q.  Bobby Williams.

8          Had you hired -- I'm sorry.

9          Had you applied to any other law enforcement

10     positions when you were the youth specialist before

11     you left in 1993?

12  A.  I don't believe so.

13  Q.  So this was the only position you applied for while

14     you were working there at the Elkhart Juvenile

15     Detention Center?

16  A.  Yes.

17  Q.  And when did you start working for the Elkhart

18     Sheriff's Department?

19  A.  November of '93.

20  Q.  What was your position when you were hired?

21  A.  I was hired as a patrolman.

22  Q.  Okay.  And were you on probation for a period of

23     time?

24  A.  Yes.

25  Q.  How long were you on probation?

1      reports, how to -- radio traffic, those kinds of

2      things, basic things, which I wasn't in uniform, so I

3      couldn't do a lot of things.

4  Q.  So you didn't have any police powers?  You just

5      sort of -- ride-along tour --

6  A.  Right.

7  Q.  -- and then learn the procedures, learn the basics?

8  A.  Learn the procedures, right.

9  Q.  You think that lasted a couple months?

10  A.  Well, it was.  I started the academy in January.

11  Q.  Okay.  And how long was the academy program?

12  A.  What is it?

13  Q.  How long was it?

14  A.  Oh.  That was three months, I believe; 12 weeks.

15  Q.  And we're talking about the academy in Plainfield,

16      Indiana?

17  A.  Correct.

18  Q.  Did you have any problems with that?

19  A.  No.

20  Q.  How old were you at that time when you started?

21      What was your age?

22  A.  In?

23  Q.  January of '94.

24  A.  '94, I was 40.

25  Q.  Just barely got in there, didn't you?  Don't they

```
 1    A.  Correct.

 2    Q.  -- a deputy?

 3            Now, you started being a deputy about April of

 4        2000- -- I'm sorry -- 1994.  And how -- tell me

 5        when -- at what point did you start checking for

 6        fingerprints?

 7    A.  Actually, in '93 Corporal Books was -- showed me how

 8        to dust for prints.

 9    Q.  Corporal showed you how to dust?

10    A.  Correct.

11    Q.  All right.  And was that normal for a patrolman and

12        their deputies to dust for fingerprints?

13    A.  All patrolmen were issued a fingerprint kit and a

14        camera.

15    Q.  So you didn't have a crime scene group that came

16        in?

17    A.  No, we did not.

18    Q.  All right.  So let's say the first year, how often

19        did you, in fact -- were you required to -- or did

20        you take it upon yourself to dust for fingerprints

21        in 1994, 12 months?

22    A.  I don't recall.

23    Q.  I'm trying to get an idea as to how often this

24        would occur, because you listed about ten different

25        activities, and burglary --
```

1    Q.  Which is from what?

2    A.  2:00 to 10:00.

3    Q.  2:00 to 10:00.  And you rotated to different zones,

4        and there were four of them to start with?

5    A.  Correct.

6    Q.  All right.  Did your job assignment change after

7        that, after a period of time?

8    A.  No.  I stayed patrolman until I left.

9    Q.  Till you left the department?

10   A.  No.  Until I left to become a detective.

11   Q.  And when was that?

12   A.  January of '99 was -- became a detective.

13   Q.  And was that a position that was based upon merit?

14   A.  Test.

15   Q.  A test?

16   A.  A test.

17   Q.  Okay.  And tell me about the test.  Is it

18       administered to people who apply for the position?

19   A.  Correct.

20   Q.  Is there any eligibility requirements?

21   A.  Yeah, there was.  But they've changed so much over

22       the years, I don't know what they were at that time.

23       You had to be, like, patrolman so many years

24       before -- I don't recall.

25   Q.  Okay.  And it was a written test?

1    A.  Yes.

2    Q.  All right.  Have you ever been disciplined when you

3        were a patrolman?

4    A.  No.

5    Q.  Any reprimand of any kind?

6    A.  Not that I recall.

7    Q.  Okay.  But you haven't looked through your

8        personnel file?

9    A.  No.

10   Q.  You had access to it, didn't you?

11   A.  I always had access to it.

12   Q.  All right.  You became a detective, then, in

13       January of 1999?

14   A.  Correct.

15   Q.  What were your duties and responsibilities?

16   A.  I was assigned to property crimes, investigate those.

17   Q.  And what does that mean?

18   A.  Well, I would be given cases that had either

19       follow-ups or some of them that weren't -- didn't

20       have anything to follow up on.  And then I'd

21       investigate those, interview the -- first of all, I'd

22       interview the complainant.  I'd always do that first.

23   Q.  Okay.

24   A.  See what I could find from them.

25   Q.  Property crimes would be like --

```
 1    A.  Burglaries, thefts.

 2    Q.  Break-in to cars, things like that?

 3    A.  Exactly.

 4    Q.  Okay.  If the theft involves use of a weapon or

 5        violence, is that also an area you would

 6        investigate, or is that assigned to somebody --

 7        some other type of detective?

 8    A.  Back then I think we had -- I still probably would

 9        have got that.  Never had any case with a

10        violence/theft, though.

11    Q.  I'm thinking of a mugging.  That kind of thing

12        would be a theft.

13    A.  Mugging, no.  That would be a -- we have some people

14        work people -- people crimes.

15    Q.  Even though it involved a theft, if there was

16        injury to the person or a threat to the person, it

17        would be assigned to a different type of detective?

18    A.  Yeah.

19    Q.  That's what I was trying to clarify.  Thank you.

20            So how long did you work, then, property?

21    A.  Two years.

22    Q.  And did your job involve any fingerprint work?

23    A.  Some.

24    Q.  And what was that?

25    A.  A lot of times -- because we were right next door to
```

```
 1        records, records would be bring me fingerprint cards

 2        once in a while to see if they were the same person.

 3        Two different cards.

 4   Q.   Okay.  So this wasn't part of your job.  This was

 5        simply something you volunteered to do --

 6   A.   Correct.

 7   Q.   -- from time to time?

 8   A.   I didn't volunteer.  They asked me, so --

 9   Q.   Okay.  And --

10   A.   Occasionally if they had a question on a print,

11        they'd have me look at it, the crime lab people at

12        that time.

13   Q.   Okay.  When was that?

14   A.   That would have been when I started as detective

15        because they knew I had that training at the FBI.

16   Q.   When you did this comparison, did you issue any

17        reports?

18   A.   For those, a lot of times I did not.

19   Q.   Okay.  So it was kind of an informal opinion that

20        you would offer?

21   A.   Correct.

22   Q.   Is that a fair characterization?

23   A.   Correct.

24   Q.   Did you actually write up your opinion on any of

25        those cases that you reviewed from time to time?
```

```
 1   A.  It be for -- sometimes they'd have another agency --
 2       someone would be down here in Indiana arrested and
 3       then another State would want them back, and they
 4       were saying it wasn't them.  I would do a report for
 5       those.
 6   Q.  I'm not sure I understand.  Could you explain that
 7       a little further.
 8   A.  Well, someone was arrested in Indiana, and Michigan
 9       had a warrant for them.
10   Q.  Okay.
11   A.  And they would say it wasn't them.
12   Q.  So how would you help them out in making that
13       decision?
14   A.  Compare the prints.
15   Q.  So they would send you a print down from Michigan,
16       say?
17   A.  Correct.
18   Q.  And you would have a ten-point fingerprint?
19   A.  From the records.
20   Q.  Yeah.
21   A.  Yeah.
22   Q.  And then you would compare that ten-point
23       fingerprint with what?
24   A.  The one that was sent from Michigan.
25   Q.  Okay.  And would that also be a ten-point
```

1      fingerprint?

2  A.  Yes.

3  Q.  Okay.  And that's what we're talking about when you

4      said that you would offer an opinion?  Those are

5      the times that you would offer a written opinion?

6  A.  On those, yes.

7  Q.  And how often did that happen?

8  A.  I never kept track of it.

9  Q.  Well, just give me some idea how often it happens.

10  A.  It happened?

11  Q.  How often that happened.

12  A.  Which ones are you talking about now?

13  Q.  The examples that you just gave me where --

14  A.  Two different ones:  Ones from records where they

15      would ask if they're the same person and the one from

16      a different State, those are different altogether.

17  Q.  Well, I think you asked me -- or you told me that

18      you never wrote up a report when you were just

19      asked informally for an opinion.

20  A.  From records, yeah.

21  Q.  From records, yes.  Then I said, "Have you ever

22      written a report?"

23          And you said, "Yes, when I'm asking to compare

24      a warrant from another State," so that's the

25      subject we're on right now, Mr. Chapman?

1    Q.  And that would be either with Elkhart or some other

2        agency?

3    A.  Correct.

4    Q.  Okay.  And your opinion would be either that the

5        ten-point prints match or don't match?

6    A.  Correct.

7    Q.  And that's it?

8    A.  Right.

9    Q.  Up or down.  All right.

10          So you continue to work as a detective in

11       property.  How long did that continue?

12   A.  Fall of 2000.

13   Q.  Then where did you work?  What was your assignment?

14   A.  Then I went to -- attended -- was it -- I believe it

15       was Integrated Indiana Crime Scene School.  That was

16       August, I believe.  End of August.  I don't remember

17       the dates exactly.  It was about a 12-week school.

18       Oh, wait, a 4-week school.

19   Q.  Where was this held?

20   A.  Plainfield.

21   Q.  And who were the instructors?

22   A.  Indiana State Police.

23   Q.  And did anybody from Elkhart go with you?

24   A.  No.  I was the only one.

25   Q.  Okay.  And what was the curriculum?  What did it

1   cover?

2   A.  Processing crime scenes, all sorts of different

3       topics.  I can't recall all of them.  How to collect

4       fingerprints, shoe impressions, tire impressions,

5       reconstructing a crime scene by drawings -- by

6       drawings.

7   Q.  Okay.  Was that a tested course?

8   A.  Yes.

9   Q.  All right.  So you had a written test?

10  A.  Yes.

11  Q.  Did you have any problems with that?

12  A.  No.

13  Q.  When you completed that and you came back to

14      Elkhart Sheriff's Department, were you given any

15      additional assignments or responsibilities?

16  A.  I was assigned to a crime lab then.

17  Q.  So, then, you were assigned to the crime lab.  What

18      were your duties and responsibilities in the crime

19      lab?

20  A.  Our main duties, processing major crime scenes, major

21      burglaries, $10,000 or more; same with thefts.

22  Q.  That's the important change.

23  A.  Yeah.

24  Q.  All right.

25  A.  And then we were also in charge at that time with

```
 1                    back to him, please?

 2                        (Record read.)

 3                    THE WITNESS:  Yes.

 4    BY MR. SUTHERLIN:

 5    Q.  And you took an oath to uphold the constitution,

 6        did you not?

 7    A.  Yes.

 8    Q.  What do you understand the Fourth Amendment of the

 9        Constitution to be, if you know?

10    A.  Fourth?  I don't remember off hand.

11    Q.  Okay.  So when I see your evaluations, and they

12        refer to your knowledge of the law, are they

13        referring to Constitutional law?  What?

14    A.  It would be State law.

15    Q.  Sorry?

16    A.  State law.

17    Q.  State law?

18    A.  (Witness nods head.)

19    Q.  All right.  State Constitutional law?

20    A.  Criminal Code.

21    Q.  Criminal Code.  Okay.

22            Besides the fingerprint of Lana Canen, have

23        you ever misidentified a latent fingerprint?

24    A.  No.

25    Q.  Are you sure of that?
```

73

1   A.  Yes.

2   Q.  Would you look on page 99 of Plaintiff's Exhibit --

3       29, is it? -- 29.

4   A.  Page 99?

5   Q.  Yes.  What are you reading?

6   A.  It's a job problem documentation.

7   Q.  What's the date?

8   A.  9/17/2012.

9   Q.  Okay.  Do you remember seeing that?

10  A.  Yes.

11  Q.  And what is it?  What does it refer to?

12  A.  Refers to the latent print in the Lana Canen case.

13  Q.  Okay.  And were you disciplined for that?

14  A.  Yes.  I received a write-up.

15  Q.  Okay.  And were you also told that you could no

16      longer represent any other agencies after that

17      date?

18  A.  Represent any other agencies?

19  Q.  Be -- assist any other agencies with regard to

20      print identification.

21  A.  Correct.

22  Q.  You can just flip that over.

23          Okay.  Would you read the letter, the second

24      page, please.  Read it into the record.

25          Is it addressed to you?  Start with the

1   Q.  Right, but they were ten-points?

2   A.  Right.

3   Q.  Okay.  So you compared ten-points of known

4       prints to ten points of unknown prints?

5   A.  Correct.

6   Q.  That's your experience?

7   A.  Yes.  At the trial, that's what she was asking.

8   Q.  Pardon me?

9   A.  She was asking me at the trial, correct.

10  Q.  Right.  During the PCR you were asked about that,

11      and you clarified that you had not done latent

12      fingerprint examinations as a general rule.  Isn't

13      that correct?

14  A.  What time frame are you talking about?

15  Q.  At the PCR.

16  A.  No.  When doing fingerprints.

17  Q.  Prior to the Lana Canen trial.

18  A.  I had done latent prints prior to that.

19  Q.  Had you ever testified at a trial regarding latent

20      fingerprints?

21             MR. DE BONI:  For clarification,

22          during what time period?

23             MR. SUTHERLIN:  Before Lana Canen.

24             THE WITNESS:  No.  I was scheduled

25          for one, but I didn't actually testify at

```
 1    Q.  Did you ever tell Mr. Daggy or anyone else at the

 2        City Police Department that you were an expert in

 3        latent fingerprints?

 4    A.  No.  I never spoke to Mark Daggy.

 5    Q.  Well, the question is:  Did you ever tell

 6        anybody --

 7    A.  No.

 8    Q.  -- that you were an expert in latent fingerprints?

 9    A.  That is up to the judge to decide if you're an

10        expert.

11    Q.  Please just answer the question.

12    A.  I said, "No."

13    Q.  Okay.  Did you ever tell the deputy prosecutor,

14        Ms. Becker, that you were an expert in latent

15        fingerprints?

16    A.  No.

17                    MR. SUTHERLIN:  Let's go off the

18             record.  I think I'm just about done.

19             Off the record.

20             (Off the record.)

21    BY MR. SUTHERLIN:

22    Q.  I'm going to hand you what has been identified as

23        Plaintiff's Deposition Exhibit 29, pages ESCD101

24        through 103.

25             Do you recognize what that is?
```

1    A.   It's from a conversation I had with my captain,

2         Jeff Seigle (phonetic).

3                    THE REPORTER:  Who was the first

4              person?  Mike?

5                    THE WITNESS:  Captain.

6    BY MR. SUTHERLIN:

7    Q.   And this conversation had to do with what?

8    A.   The Lana Canen misidentification --

9         misidentification.

10   Q.   And do you agree with his assessment?

11   A.   Oh, he's got a few errors in here.

12   Q.   Like what?

13                   MR. DE BONI:  Read it carefully;

14             okay?  Then answer.

15                   THE WITNESS:  He said in here,

16             "Dennis was required to examine 30 to

17             40 print cards per day."

18                   It was actually 30 to 40 print cards

19             an hour.

20   BY MR. SUTHERLIN:

21   Q.   Those are the ten-point cards compared to ten-point

22        cards?

23   A.   Yes.

24   Q.   Okay.

25   A.   Okay.  He's got -- in here it says, "Dennis stated he

```
 1         felt pressure because EPD told him" --

 2   Q.  Slow down a little bit because she's got to record

 3         this.

 4   A.  Sorry.

 5              "Dennis stated he felt pressure because EPD told

 6         him they suspected Canen."  That's not correct.

 7   Q.  You didn't tell your captain that?

 8   A.  No.

 9   Q.  What did you tell him?

10   A.  I felt pressure because I didn't have the time to do

11         the print.  It was a -- time constraints.

12   Q.  You didn't have time to do the prints?

13   A.  Correct.  Because of county business we had to do.

14   Q.  So it was not because of the trial date, but

15         because of other business; is that what you're

16         saying?

17   A.  Trial date?  I didn't say anything about a trial

18         date.

19   Q.  Let me finish my question.

20              When you said you didn't have time, it was not

21         the trial date that you were concerned about, but

22         other responsibilities and tasks that were given to

23         you?

24   A.  Was getting the prints done on time for Elkhart.

25   Q.  When did you start to look at the prints?
```

```
 1    A.  I got them in 2003.

 2    Q.  Do you know when it went to trial?

 3    A.  Yes.  But I didn't look at them for at least 12 weeks

 4        when Randy was gone to Crime -- Crime Scene School in

 5        Tennessee.

 6    Q.  Do you know when the trial occurred?

 7    A.  2005.

 8    Q.  And you didn't have time to look at it carefully?

 9    A.  That's not what I said.  I said it was -- felt

10        pressure to get the time -- the prints done so they

11        could have them back in time.

12    Q.  Who was the one that said that you had to get them

13        back right away?  Who did you speak to?

14    A.  Well, they sent them to me in the first place because

15        State Police don't have an examiner in Fort Wayne.

16    Q.  Who is the that told you to get them back right

17        away?

18    A.  No one told me to get them back.  They just gave them

19        to me so I could get them done quicker.

20    Q.  Well, so you got them done quicker.  Is that what

21        you're telling me?

22    A.  I don't know if I did or not.  No, I didn't get them

23        done quicker because I had them for a while.

24    Q.  Who did you deal with at the sheriff's -- at the

25        City Police Department regarding this case?
```

```
 1                    MR. KUS:  Just a few follow-ups.

 2                    CROSS-EXAMINATION

 3    BY MR. KUS:

 4    Q.  I think, Mr. Chapman, you said you never spoke with

 5        Mark Daggy in the Lana Canen case.  Is that

 6        correct?

 7    A.  Correct.

 8    Q.  Did you ever have contact with him, any run-up or

 9        preparation of the trial in the Lana Canen case?

10    A.  No.

11    Q.  Didn't -- Detective Daggy ever request you to do

12        the latent fingerprint analysis regarding the

13        Lana Canen case?

14    A.  No.

15    Q.  Did you ever discuss with Detective Daggy your

16        qualifications in any way?

17    A.  No.

18    Q.  The report that you've identified today that you

19        said you prepared, did you ever send that to

20        Detective Daggy?

21    A.  No.

22    Q.  Did Detective Daggy have anything to do with your

23        fingerprint analysis?

24    A.  No.

25    Q.  Are you aware whether or not -- let me rephrase
```

1                          CERTIFICATE

2          I, Charolette A. Martinez, a Notary Public, in and

3      for the County of St. Joseph and State of Indiana, do

4      hereby certify there appeared before me, DENNIS E.

5      CHAPMAN, on Tuesday, November 18, 2014, who was duly

6      sworn to testify the truth, the whole truth, and

7      nothing but the truth to questions propounded at the

8      taking of the foregoing deposition in a cause now

9      pending and undetermined in said court;

10         I further certify that I then and there reported

11     stenographically the proceedings at the said time and

12     place; that the proceedings were then transcribed from

13     my original shorthand notes; and that the foregoing

14     transcript is a true and correct record thereof;

15         IN WITNESS WHEREOF, I have hereunto set my hand

16     and affixed my notarial seal this 24th day of November,

17     2014.

18

19

20

21                                    ____
                        Charolette A. Martinez, CSR
22                      Notary Public, State of Indiana
                        Residence:  St. Joseph County
23                      Commission Expires:  12-18-2022

24

25

Lana Canen –vs–
Dennis Chapman and Mark Daggy

Dennis Chapman
November 18, 2014

Page 94

```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF INDIANA
 2                         SOUTH BEND DIVISION

 3    LANA CANEN,                     )
                                      )
 4                  Plaintiff,        )
                                      )
 5        vs                          ) Case No.
                                      ) 3:14-cv-315-RL-CAN
 6    DENNIS CHAPMAN and MARK DAGGY,  )
                                      )
 7                  Defendants.       )
                                      )
 8

 9                    DENNIS E. CHAPMAN

10        I hereby acknowledge that I have read the foregoing

11    deposition transcript regarding the case of Canen Vs.

12    Daggy, taken on November 18, 2014, and that the same is a

13    true and correct transcription of the answers given by me

14    to the questions propounded, except for the additions or

15    changes, if any, as noted on the attached errata sheet.

16

17

18        _____
                  DENNIS E. CHAPMAN
19
          Subscribed and sworn to me
20        this _____19th_____ day of __December__
          2014, A.D.
21

22
          Notary Public or Witness _____
23        State of
          County of                CYNTHIA SUSAN BENNETT
24        My commission expires    Notary Public, State of Indiana
                                    St. Joseph County
25                                  My Commission Expires
                                    July 7, 2022
```

NOTARY PUBLIC
SEAL
INDIANA

Midwest Reporting, Inc.
574-288-4242

**ORIGINAL**

ERRATA SHEET

Deposition of: **Dennis E. Chapman**

**November 18, 2014**

| Page | Line | Change | To | Reason For Change |
|------|------|--------|-----|-------------------|
| 8 | 21 | BENTON HARBOR H.S. | BENTON HARBOR | HARBOR WAS OMITTED |
| 13 | 25 | THEY -- BUDGET CUTS | BECAUSE OF | |
| 13 | 25 | , THEY DIDN'T | , THEY DIDN'T | ONE SENTENCE |
| 20 | 13 | GYNCO | GLYNCO | SPELLING |
| 34 | 23 | AUTO | OMIT AUTO | GRAMMAR |
| 54 | 16 | TO A CRIME | TO THE CRIME | GRAMMAR |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

MIDWEST REPORTING, INC.
1448 Lincolnway East
South Bend, Indiana  46613
(574) 288-4242

Signature: _Dennis E. Chapman_

Date: _12-15-14_