**EXHIBIT D**

Certified Criminal Trial Transcript of *State of Indiana v. Lana R. Canen*,
Elkhart Circuit Court, Cause No. 20C01-0309-MR-155

1

```
 1    STATE OF INDIANA    )     IN THE ELKHART CIRCUIT COURT
                          ) SS:
 2    COUNTY OF ELKHART   )     CAUSE NO:  20C01-0309-MR-00155
                                   )
 3    STATE OF INDIANA,            )
                                   )
 4        v.                       )
                                   )
 5                                 )
                                   )
 6    LANA R. CANEN,               )
                                   )
 7        Defendant.               )

 8

 9                        VOLUME I

10

11            Reporter's transcript of the proceedings in the

12    above-entitled matter commenced on Monday, August 8,

13    2005; Tuesday, August 9, 2005; and Wednesday, August 10,

14    2005, before the HONORABLE TERRY C. SHEWMAKER, Judge of

15    the Elkhart Circuit Court, Goshen, Indiana.

16

17

18

19

20

21    APPEARANCES:

22    FOR THE STATE OF INDIANA:  Vicki Elaine Becker and Denise

23    A. Robinson

24    FOR THE DEFENDANT CANEN: R. Brent Zook

25    FOR THE DEFENDANT ROYER: Christopher C. Crawford
```

```
 1                     MONDAY, AUGUST 8, 2005

 2                  (The Court convened with all the

 3                  parties present.)

 4          THE COURT:  State of Indiana versus Andrew

 5    Royer, State of Indiana versus Lana Canen.  03-MR-155 is

 6    Mr. Royer's case.  04-MR-118 is Ms. Canen's case.  The

 7    record should reflect, each defendant appears with their

 8    respective counsel.  Mr. Zook is here with Ms. Canen.

 9    Mr. Crawford is here with Mr. Royer.  State appears by

10    Chief Deputy Prosecuting Attorney Vicki Elaine Becker and

11    Deputy Prosecuting Attorney Joel Williams.  They'll be

12    assisted by Detective Daggy of the Elkhart Police

13    Department.

14            The record in this action reflects this cause

15    was set for trial as a joint trial.  Parties, by their

16    counsel, have informed me there are no Bruton Rule

17    issues.  We have had a filing today of a supplement to

18    the state's witness list in Mr. Royer's case.  You have

19    copy of that, Mr. Crawford?

20          MR. CRAWFORD:  Yes, your Honor.

21          THE COURT:  All right.  We have also a motion

22    in limine filed by Ms. Canen's counsel.  Arguments of

23    counsel have been heard with respect to that.  Motion in

24    limine has been granted without objection by the state.

25    The event we touch on such area or it becomes an issue in
```

```
 1    the trial, Mr. Williams Mr. Becker, would you approach

 2    the bench, and we'll make arrangements to remove the jury

 3    from the courtroom to address whatever issue we need to

 4    address.  Ms. Canen, would you raise your right hand.

 5                   (The defendant was sworn.)

 6              MS. CANEN:  So help me God.

 7              THE COURT:  Tell me your name.

 8              MS. CANEN:  Lana Rae Canen.

 9              THE COURT:  Mr. Royer, raise your right hand,

10    please.

11                   (The defendant was sworn.)

12              MR. ROYER:  So help me God.

13              THE COURT:  Tell me your name, sir.

14              MR. ROYER:  Andy Royer.

15              THE COURT:  The record also reflects a

16    conference call was conducted amongst all counsel and the

17    Court last week.  An amended charge was filed joining

18    both defendants in the charge of felony murder.  It was

19    agreed amongst counsel that we would proceed to trial on

20    felony murder against both defendants.  Is that correct,

21    Mr. Crawford?

22              MR. CRAWFORD:  Yes, your Honor.

23              THE COURT:  And, Mr. Zook.

24              MR. ZOOK:  Yes, sir.

25              THE COURT:  And we also talked about an initial
```

1    hearing, and it was my understanding that we were going

2    to waive the initial hearing.  Is that correct,

3    Mr. Crawford?

4              MR. CRAWFORD:  Yes, your Honor.

5              THE COURT:  And, Mr. Zook?

6              MR. ZOOK:  Yes, sir.

7              THE COURT:  All right.  A not guilty plea has

8    been entered for each defendant.  We are here for trial.

9    Has all discovery been completed, Ms. Becker?

10             MS. BECKER:  Yes, your Honor, to my knowledge

11   it has.

12             THE COURT:  And, Mr. Crawford?

13             MR. CRAWFORD:  Yes, your Honor.

14             THE COURT:  And, Mr. Zook?

15             MR. ZOOK:  As far as I know.

16             THE COURT:  The defendants have each disclosed

17   to the Court they're going to employ the defense of they

18   did not do this particular offense.  Put the state to its

19   burden of proof.  Are we ready to proceed to trial, Mr.

20   Zook?

21             MR. ZOOK:  Yes.

22             THE COURT:  And, Mr. Crawford?

23             MR. CRAWFORD:  Yes, your Honor.

24             THE COURT:  Ms. Becker?

25             MS. BECKER:  Yes, your Honor.

1      THE COURT:  If you want to be sure something is

2  in the record, you'll need to let us know so we can make

3  arrangements with the court reporter.  Bench conferences

4  is what I'm talking about.

5              (The prospective jury entered the

6              courtroom, and the following

7              proceedings were had.)

8      THE COURT:  Be seated, please.  Good morning,

9  ladies and gentlemen.  I'm Judge Shewmaker of the Elkhart

10  Circuit Court.  I'll be presiding during this trial.  For

11  trial this morning, is a criminal case in which the

12  defendants, there are two of them, are seated at the

13  table to my left.  Mr. Andrew M. Royer is one of the

14  defendants.  Ms. Lana Canen is the other defendant

15  Mr. Royer is represented by Mr. Christopher Crawford.

16      MR. CRAWFORD:  Good morning, ladies and

17  gentlemen.

18      THE COURT:  And Ms. Canen is represented by Mr.

19  Brent Zook.  In this case, the State of Indiana has

20  brought this charge of murder.  These charges have been

21  brought by a representative of the State of Indiana and

22  that is Chief Deputy Prosecuting Attorney Vicki Elaine

23  Becker.  She's seated at counsel table to my right.

24  She'll be assisted by Deputy Prosecuting Attorney Joel

25  Williams.  They will be assisted by Detective Daggy of

1    the Elkhart Police Department.

2            In a criminal case, any defendant is presumed

3    to be innocent of the charges brought against him or her.

4    State of Indiana has the burden of overcoming this

5    presumption of innocence and proving each defendant

6    guilty of the crime beyond a reasonable.  I will discuss

7    these concepts with you at greater length later in these

8    proceedings.

9            You have been chosen randomly according to law

10   to serve as a juror from certain lists of county

11   residents.

12           This call for jury service may require some

13   sacrifice of a personal or business nature; however, it

14   does not come to you frequently.  Jury service represents

15   one of the most important duties that citizens are asked

16   to perform.  The jury system could not function without

17   the assistance of capable citizens who are willing to

18   accept this responsibility.  Your service as a juror is

19   an assurance to every citizen of his right to make a

20   defense to a criminal charge or to contest a civil

21   dispute in open court or to have the facts regarding such

22   matters considered and determined by a jury of his or her

23   peers.

24           While some of you may have had previous

25   experience as a juror, I know that jury service may seem

1    strange to most of you.  As a consequence, I would like

2    to make a few preliminary remarks, which may be helpful

3    to you.  A short explanation of the procedure used in

4    selecting a jury is in order since the first step in any

5    trial by jury in either a criminal or civil case is the

6    selection of an impartial jury.  All of those who

7    participate in a trial must do so according to

8    established rules.  This is equally true of jurors.

9           All of the parties are entitled to a jury made

10   up of people who will approach this case with open minds

11   and who will agree to keep their minds open until a

12   verdict is reached.

13          Jurors must be as free as humanly possible from

14   bias, prejudice, or sympathy and must not be influenced

15   by preconceived ideas either as to the facts or the law.

16          During the first step of selecting the jury,

17   the Court and counsel will ask you questions concerning

18   your competency and qualifications to serve as a juror in

19   this case.  This is called voir dire examination of

20   prospective jurors.  Voir dire is a French phrase which

21   means "to speak the truth."  These questions must be

22   answered fully, frankly and accurately.  If a prospective

23   juror thinks that he or she may be disqualified for any

24   reason not brought out by our questions, he or she should

25   tell us about it.

1       Under the law, lawyers are within their rights

2   in asking questions to test a juror's state of mind and

3   qualifications.  The questions asked each of you are not

4   intended to satisfy idle curiosity or to embarrass you in

5   any way.

6       In the process of jury selection, some jurors

7   may be excused for cause.  Such challenges will be made

8   individually as we proceed.  There is no numeric limit to

9   the number of challenges for cause which a lawyer may

10  make.  I will rule on each challenge for cause

11  individually.

12      In addition, the law permits counsel to excuse

13  a certain number of jurors without giving any reason.  In

14  this case, that number is ten.  No juror who is excused

15  should feel that counsel or the Court is in any way

16  critical of that juror.  The selection of the jury is an

17  art rather than a science.  Lawyers often accept or

18  reject potential jurors purely on instinct.

19      Occasionally, during the course of a trial, a

20  juror or prospective juror may have some concerns or

21  questions which he or she wishes to raise with me without

22  stating them aloud in open court.  These questions or

23  concerns may be brought to my attention in a note which

24  should be given to the bailiff at the earliest

25  opportunity.  The bailiff will convey that note to me.

1    Please understand that I must share this note with the

2    lawyers and the parties.

3            After this is accomplished, I will address the

4    issue raised by the juror.  In doing so, I will attempt

5    to accommodate both the juror's desire for privacy and

6    the rights of the parties.

7            The jury, when selected, will consist of

8    regular members and one or more alternate jurors who will

9    serve in the event that a regular member is excused for

10   illness or for some other reason during the trial.

11           After a jury is selected and sworn, the Court

12   will read preliminary instructions on the law as it

13   applies to this case.  The prosecutor will then give an

14   outline of the state's case in what is called an opening

15   statement.  The defendant will then have an opportunity

16   to give an opening statement, but is not required do so.

17           The opening statements are not evidence.  They

18   are merely a preview of the case and are designed to help

19   you follow the case as it is presented.

20           After this phase of the trial, the State of

21   Indiana will present evidence.  The defendant follows

22   with the presentation of such evidence as he or she

23   desires.  The defendants are under no obligation to

24   present any evidence whatsoever.  The lawyers are

25   required to present evidence according to rules of law.

1   I enforce these rules and determine what evidence may be

2   admitted.

3          There may be objections to an exhibit offered

4   into evidence or to a question asked.  Under the rules, a

5   lawyer has the duty and is within his or her rights to

6   object to the attempted introduction of any evidence

7   which he or she believes is not proper.  If I agree, the

8   objection will be sustained.  This keeps the evidence out

9   of the case.  If I think that the lawyer is mistaken, I

10  will overrule the objection and this ruling permits that

11  evidence to become part of the case.

12         Objections by the lawyers and rulings by the

13  Court with regard to those objections should not cause

14  the jurors to take sides.

15         There may be times during the trial when the

16  jury is excused and retires to the jury room so that the

17  Court may hear the arguments of the lawyers on a point of

18  law.  The lawyers may also approach the bench and have a

19  conference with the Court.  The purpose of those

20  procedures is to secure a ruling from the Court as to

21  some matter relating to the trial, which under the rules,

22  may not be discussed in the presence of the jury.

23         The trial concludes with arguments of counsel

24  and final instructions of law by the Court.  The

25  arguments of counsel are not evidence.  Those arguments

1    often summarize the evidence from the perspective of the

2    party making the argument and urge jurors to adopt a

3    particular point of view.  The jury may accept or reject

4    those arguments as it sees fit.

5            After the lawyers have concluded their final

6    arguments, I will give you further instructions on the

7    law of Indiana as it applies to this case.

8            The jury will then retire to the jury room to

9    deliberate upon its verdict which must be unanimous.  The

10   jury shall not be permitted to separate during

11   deliberation in a criminal case unless the parties

12   consent to the separation.

13           You are all prospective jurors in this case.

14   You are prohibited from discussing this case with anyone

15   prior to the commencement of the evidentiary portion of

16   the trial.  To do so may result in a mistrial.  After the

17   presentation of evidence has begun, juror may discuss the

18   evidence presented amongst themselves in the jury room

19   during recesses.  All regular jurors and alternates must

20   be present during such discussion and you must reserve

21   judgement concerning the outcome of the case until jury

22   deliberations begin.

23           You may not discuss the facts of this case with

24   me or with the lawyers or with any of the witnesses.

25           You may not investigate yourself or attempt to

1    obtain information outside the courtroom.  It is highly

2    improper for you to do so.  You are also prohibited from

3    reading and newspaper accounts of this case and from

4    listening to or watching and radio or television reports

5    relating to this trial.  You are to consider and decide

6    this case only upon the evidence received during the

7    course of the trial her in the courtroom.

8            Our schedule for trial is generally as follows:

9    We'll try to begin by 8:30 a.m, which means you need to

10   be here by 8:15 a.m.  We'll try to break for lunch at

11   approximately 12 o'clock noon and resume the trial at

12   approximately 1:30 p.m.  We try to break for the evening

13   at approximately 5:00 p.m.

14           Those of you who are called as jurors but do

15   not serve will be paid a per diem and mileage for travel

16   expenses.  For those of you who are called as jurors and

17   do serve, you'll receive a hire per diem and also receive

18   a mileage allowance.  At the conclusion of the trial, a

19   list will be prepared and submitted to the County

20   Auditor.  You will receive a check from the auditor

21   thereafter.

22           If you need statements verifying your service

23   as a juror for your employer, you should make that fact

24   known to the bailiff or to me.  Such a statement will be

25   provided to you.

1         When we have a recess or adjourn for lunch or

2    overnight, those of you who are in the jury box, please

3    remember your seating arrangements in the box and take

4    the same chair each time you return.

5         Once the jury has been selected, during

6    recesses or retiring for lunch, please go to the jury

7    room at the start of the recess and remain in that room

8    unless you leave for lunch or are excused by the Court.

9    The bailiff will conduct you into the courtroom at the

10   appropriate time.

11        The law requires that prospective jurors be

12   sworn before any questions are asked.  Would all of you

13   please rise, hold up your right hand, and face me.  I

14   will administer the oath to you.

15             (The prospective jury venire was

16              sworn.)

17        THE COURT:  Be seated.  Certain persons are not

18   eligible for jury service.  To serve as a juror, a person

19   must be a citizen of the United States; at least 18 years

20   of age; a resident of this county; able to read, speak,

21   and understand the English language; not be suffering

22   from a physical or mental disability that prevents him or

23   her from rendering satisfactory jury service; not under a

24   guardianship appointment because of mental incapacity;

25   not a person who has had rights to vote revoked by reason

1    of a felony conviction and whose rights to vote have not

2    been restored; an not a law enforcement officer if the

3    trial is for a criminal case.

4            A person may claim exemption from jury service

5    if they've completed a term of jury service in the

6    preceding two years.  Do any of you state that you are

7    disqualified?  I see no such indications.

8            In the jury box, let's see if we can identify

9    persons present in seat number No. 1 we have Ms. Tullis.

10           A JUROR:  Yes.

11           THE COURT:  In seat No. 2 we have Judith Clark.

12           A JUROR:  Yes.

13           THE COURT:  In seat No. 3, we have Mr. Ball.

14           A JUROR:  Yes.

15           THE COURT:  In seat No. 4, we have Ms. Cramer.

16           A JUROR:  Yes.

17           THE COURT:  In seat No. 5, Mr. Emerson.

18           A JUROR:  Yes.

19           THE COURT:  In seat No. 6, Mr. Yoder.

20           A JUROR:  Yes.

21           THE COURT:  In seat No. 7, Ms. Brown.

22           A JUROR:  Yes.

23           THE COURT:  In seat No. 8, Mr. Hoffman.

24           A JUROR:  That's correct.

25           THE COURT:  In seat No. 9, Ms. Peachey.

1          A JUROR:  Yes.

2          THE COURT:  In seat No. 10, Mr. Miller.

3          A JUROR:  Yes.

4          THE COURT:  In seat No. 11, Ms. Oakley.

5          A JUROR:  Yes.

6          THE COURT:  And in seat No. 12, Mr. Enos.

7          A JUROR:  Yes.

8          THE COURT:  All right.  Those of you seated in

9    the audience section, those of you seated in the jury

10   box.  I have introduced the participants.  I've

11   introduced myself.  Are any of you acquainted with any of

12   the persons I have introduced to you today?  Yes,

13   Ms. Oakley.

14         A JUROR:  I believe I know Lana, but I don't

15   know her by that last name.

16         THE COURT:  Okay.  You believe you know Ms.

17   Canen, one of the defendants.  All right.  Anyone else?

18   Yes, sir.  Tell me your name, please.

19         A JUROR:  Daniel Bontrager.  My parents are

20   best friends with Lana's brother, so I've known her all

21   my life.

22         THE COURT:  All right.  Anyone else?  Yes.

23         A JUROR:  The lady on the end, I think I know

24   her.  I've seen her.

25         THE COURT:  That would be Ms. Canen.

1           A JUROR:  Yes.

2           THE COURT:  In the black sport coat.

3           A JUROR:  Yes.

4           THE COURT:  Anyone else?  If not, we're going

5    to commence the formal jury selection process at this

6    time.  State of Indiana has the burden of proof.  It's

7    for that reason the State of Indiana will address you

8    both first and last.

9           MS. BECKER:  May we approach, your Honor.

10                  (An off-the-record discussion was held

11                   at the bench.)

12          THE COURT:  Ladies and gentlemen, in an effort

13   to expedite these proceedings, we're going to permit

14   counsel to make a three minute preliminary opening

15   statement to tell you about the facts of this case.  That

16   hopefully will eliminate the need to talk about the facts

17   of the case during the formal jury selection process.

18   Ms. Becker.

19          MS. BECKER:  Thank you, your Honor.  Thank you,

20   ladies and gentlemen.  This case is a little bit

21   different due to the fact we have several individuals

22   involved as witnesses in this case that are individuals

23   who may have a little bit of a diminished mental

24   capability.  Nothing that rises to the level of a legal

25   defense; however, it is something that you will notice

1    using your common sense.  It is not a legal issue in this

2    case.  It is not a defense in this case.

3         We will be asking you questions during voir

4    dire for the purpose of making sure you don't have any

5    sympathies towards that.  Specifically, I'm talking about

6    individuals who lived at the Waterfall Highrise.  This is

7    a government housing facility in Elkhart that basically

8    to live there you have to qualify as having some kind of

9    a mental or physical disability.  This is going to be

10   evidence in this case.  And while is doesn't really

11   control the evidence, it is something we need to get out

12   there.  In addition to that, you're going to have to hear

13   testimony from individuals who's perceptions and whose

14   memory have also faded just a little bit due to the time

15   of this case.  These are issues we'll be talking about

16   during voir dire.

17        Ladies and gentlemen, this occurred on

18   Thanksgiving day of 2002.  It is a murder.  A 94-year-old

19   woman was brutally strangled in her apartment and was

20   left there to die.  The defendant Andy Royer is the

21   individual that strangled her physically.  Lana Canen was

22   to brains behind the operation.  Once you see the

23   evidence, you will understand why all this is coming in;

24   but you can't see evidence until after you're selected as

25   a juror.  Therefore, for purposes of voir dire, we want

1    to make sure you a have a thumb nail sketch of what this

2    is all about because, folks, what it comes down to is

3    money, and that what's it's about.

4         It's called felony murder when someone kills

5    another human being in the commission of a felony.  Lana

6    Canen and Andy Royer went to Helen's apartment for the

7    purpose of getting money from her, for robbing her.  And

8    at the same time, they took some pills from her.  This is

9    where the robbery comes in; and because someone died

10   during the commission of this, it's charged felony

11   murder.  All of these things we'll be discussing during

12   voir dire.  But, once again, we wanted to make sure that

13   you understood a little bit more about the evidence.

14   Thank you.

15         THE COURT:  Thank you, Ms. Becker.

16         MR. ZOOK:  I'll waive the argument.

17         MR. CRAWFORD:  I'll waive is as well.

18         THE COURT:  Each defendant has waived their

19   preliminary three minute opening.  Now we will commence

20   the formal process.  Ms. Becker.

21         MS. BECKER:  Thank you, Your Honor.

22                    VOIR DIRE EXAMINATION

23   BY MS. BECKER:

24   Q    Hello again.  Okay.  First thing I want you to

25        know, we want you to know, is that this process of

1       voir dire is the only opportunity that you will

2       have to talk one on one with any of us as far as

3       the lawyers are concerned.  This process is what we

4       go through in order to ensure that we have a fair

5       and impartial jury in this case.  Nobody wants to

6       have a situation where you guys might have some

7       sympathies toward one side or against the other.

8       You have got to be honest with us.  Some of these

9       questions may seem like they're prying.  We are not

10      trying to.  We have to do this business as

11      efficiently as we can so you've got to be honest.

12          So if I don't ask the right question or

13      Mr. Williams or Mr. Crawford or Mr. Zook but yet it

14      comes close to something that's bothering you, let

15      us know.  We don't always ask the right questions.

16      So volunteer that information so we know that we're

17      all trying get the most out here.  Everybody agree

18      you can do that?  Yes.  No.  Okay.

19          You're also going to have to speak audibly.

20      All right.  That double word there.  The reason

21      being is she is taking down everything that is

22      being said.  And while I will try to mention your

23      names as I'm asking individuals questions, you'll

24      understand why we're doing some of the things we're

25      doing because she's recording everything.  So make

```
 1          sure you answer me audibly instead of uh-huh or
 2          uh-uh or something along those lines.  Everybody
 3          understand that?
 4                  (The jurors answered in the
 5                  affirmative.)
 6     Q    Perfect.  Okay.  Now we're through housekeeping.  I
 7          want to identify individuals who may be witnesses
 8          in this case that way if you recognize any names
 9          you can let us know, and then we can inquire
10          further need be.  These are in no particular order.
11          They would cover both sides James Cassity, Brett
12          Canen, Martha Haff, Louis Burnett, Detective Todd
13          Thayer from Elkhart Police Department, Larry Haack
14          Martin Supermarket, Walter also known as "Skip"
15          Miller from Elkhart County Sheriff's Department
16          Caroline Hoffer, Carol Converse, Larry Converse,
17          Erica Roarhig, Jerome Matthew Johnson, Christopher
18          Kinsey, Judy Johnson, Mary Jane Dejong, Detective
19          Dennis Chapman.  Dr. Joseph Prahlow, Dr. Jeff
20          Landrum county coroner, Detective Lieutenant Peggy
21          Snider, Detective Mark Daggy, who is the detective
22          seated here with us, Detective Joel Bourdon, Larry
23          Wood, Florence Macioce, Nina Porter, Mike Berger,
24          Detective Carl Conway, Charlie Lambert, Geneva
25          West, or Betty Cross from EPD.
```

1        Any of these names sound familiar?  Yes, sir.

2    A   Yes.  Detective Thayer.  I used to work out with

3        him in the gym.

4    Q   Detective Thayer you used to work out with.  How

5        long ago?

6    A   Probably eight years.

7    Q   Eight years ago.  Since then have you spent any

8        significant time with Detective Thayer?

9    A   No.

10   Q   All right.  This crime occurred in 2002.  It was

11       after you had been working out together.  Based

12       upon your relationship or your acquaintance with

13       Detective Thayer, if he were a witness in this

14       case, would you give him any more or less

15       credibility than you would anybody else?

16   A   No.

17   Q   Okay.  Thank you very much.  Any of those names

18       sound familiar to anyone else?  Okay.  I probably

19       won't read the list of names of again, but those

20       who are in the audience right now when you come to,

21       the box the first thing I need you to let us know

22       is if you recognized any of these people.  Thank

23       you.

24           Okay.  Let's move on.  Spent five minutes.

25       I'm going to go as quick as we can but, folks, this

1          is the most boring and long process that you're

2          going to go through.  Incredibly important, but it

3          does take a lot of time.  So we have 12

4          individuals, and I need to ask quite a few generic

5          questions to begin with.

6               First of all, how many of you know what the

7          crime of felony murder is defined at in the State

8          of Indiana; or based upon what I said a little

9          while ago, think you can tell me again what I said?

10          Anybody?  Mrs. Brown, you're shaking your head.

11          Okay.  What -- what can you tell me about felony

12          murder?

13     A    You said it was in -- the murder was committed, and

14          it started out as a robbery, turned into a murder,

15          and that's why it's a felony murder.

16     Q    Okay.  Now, let me ask you folks this.  You know,

17          you got this plan in your head, you're going to go

18          in, and you're going to commit a crime.  Let's -- I

19          hate to use a bank robbery because it just

20          happened, but, you know, that's something that all

21          of us are familiar.  Let's use robbery of a

22          7-Eleven.  Okay.  Mrs. Brown, you're a clerk at the

23          7-Eleven.  All right.  And Ms. Clark and I decide

24          we're going to go in, and we're going to rob that

25          7-Eleven.  All right.

1          I'm carrying a gun, but I'm staying in the

2          car.  I'm going to be the get-away driver.  Mrs.

3          Clark is also carrying a pipe.  Okay.  Now, you're

4          the clerk, Mrs. Clark scopes things out, goes into

5          the 7-Eleven, she threatens you to give you the

6          money out of the cash register, and then she beats

7          you in the head with a pipe.  Okay.  Make sense so

8          far.  Okay.

9          Now, she grabs the money out of the register,

10         take off, and I'm out in the car and then we zoom

11         away and we committed the robbery.  Now, you got

12         hit pretty hard with that lead pipe, and it

13         actually fractured your skull and caused all kinds

14         of hemorrhaging in your brain and you die.  That's

15         felony murder, folks.

16         Does that make sense?  Does anybody think

17         that's not fair that it's still murder because you

18         didn't mean to go in there and kill her.

19         Mrs. Clark, what do you think?  Is it fair?

20     A   Yes, I believe it is.

21     Q   Okay.  Does anybody feel uncomfortable with that

22         concept?  Let me know now so we can talk about it a

23         little bit more or no.  Ms. Tullis, what about you?

24     A   I agree.

25     Q   You agree.  Okay.  Mr. Ball?

```
1     A    Yes, I agree.

2     Q    Ms. Cramer?

3     A    Yes.

4     Q    Mr. Emerson?

5     A    Yes.

6     Q    Mr. Yoder, what about you?

7     A    Yes.

8     Q    Anybody in the back got any problems with that?  Do

9          you think it's the right thing to do to hold people

10         accountable for the consequences of their actions

11         even if they're more severe than what they a

12         intended?

13              (The jurors answered in the

14               affirmative.)

15    Q    All right.  Very good.  Then let's go on and move

16         to second legal principle that's going to be

17         present in this case.  All right.  And that is

18         called accessory liability.  What do you think

19         accessory liability is?  Ms. Oakley, I'll pick on

20         you for a minute.

21    A    The person that's in the get-away car.

22    Q    Okay.  That's exactly right.  Okay.  Anybody else

23         want to add anything to that or think of any other

24         hypothetical?  Mr. Yoder, what do you think?

25    A    I just agreed with what you're saying.  If you're
```

```
 1          an accomplice, you're right in with them.
 2    Q     All right.  Legally the definition is exactly what
 3          you're talking about.  A person who aids, induces,
 4          or causes another person to commit an offense,
 5          still commits that offense, and they're held liable
 6          under the law.  Mr. Emerson, do you think that's
 7          appropriate?
 8    A     Yes.
 9    Q     All right.  Mrs. Cramer?
10    A     Yes.
11    Q     Anybody feel uncomfortable about that concept?
12          Think it's not right.  No.  Everybody is okay with
13          that.  Mr. Ball?
14    A     Yes.
15    Q     Mr. Hoffman?
16    A     Yes.  Within the realm from what I can do with my
17          religion, yes.
18    Q     Okay.  And we'll talk about that a little bit more
19          here in a little bit.  I noticed that on your
20          questionnaire that you made some comments about
21          that.  We'll talk a little more in length as well.
22          Okay.  So I'm out driving the car, and Mrs. Clark
23          goes in and robs that, and I drive her away.  Am I
24          just as guilty of the felony murder?
25                   (The jurors answered in the
```

```
 1              affirmative.)

 2    Q    Does anybody have any questions about that?  No.

 3         If you do, now is the time to let me know.  Okay.

 4         Thank you very much.  All right.  Let's move on

 5         then and talk about you guys a little bit.  How

 6         many of you have served on a jury panel before?

 7         Actually served.  Ms. Brown, what kind of case was

 8         it?

 9    A    One was a bank robbery, another one was a case

10         against Elkhart General.  Those are the two that I

11         recall.

12    Q    Boy, you'll a professional, aren't you?  Well, we

13         don't want you on this jury then.  No, I'm kidding.

14         That's great because this enables us to probably

15         pick on you a whole lot as far as using you for

16         hypotheticals.  But then also can you tell

17         everybody how hard it is?

18    A    It's just very, very important to listen.  You

19         know, don't daydream.  You know, get in a daze

20         because you're going to miss important information.

21         So it's very important to pay close attention.

22    Q    Okay.  Is it something you wanted to do before you

23         were selected as a juror?

24    A    I'm fine with doing it.  It wasn't any of my

25         aspirations in life.
```

1    Q    Okay.  Let me guess.  How many of you really want

2         to be here?  Absolutely nobody.  I'm glad you're

3         honest with me about that.  Thank you.  You know,

4         individuals when they get in -- especially when

5         they're in the box, out here it's even worse

6         because you're not even being asked questions; but

7         once you get in the box, you're thinking about a

8         1,000 other things that you need to be doing, and I

9         mean need to be doing.

10             But what we also have to balance that with is

11        how important the safety of our community is.

12        That's where you come in.  Does anybody have

13        anything going on in their life that they think is

14        more important than paying attention here?  Let us

15        know now because if you do we got to talk about it.

16        We cannot have people day dreaming.

17             This is going to be honestly what we have

18        called a sophisticated trial.  While there's some

19        evidence that's real obvious in this trial, there's

20        a lot of stuff that's going to take some

21        intelligence to put together.  You can't be day

22        dreaming here.  You can't be thinking about what's

23        happening at work.  Okay.  How many of you have any

24        trouble thinking you're going to be able to give us

25        what you need to as far as member of the community?

1          Ms. Cramer, what's going on?

2     A    I am the sole provider in my family and single

3          mother of two, plus I'm going to school full time

4          and working full time.  There's a lot on my plate.

5     Q    Sure.  I understand that.  Believe me.  I've got a

6          little one at home right now too.  Here's -- here's

7          my question to you.  These were neighbors, would

8          you want somebody to be doing something about it?

9     A    Yes.

10    Q    Why do you think that you can't do something about

11         it for the next few days?

12    A    Financially I can't afford it.

13    Q    Okay.  All right.  Now, I will tell you that we

14         don't expect evidence to go anymore than through

15         Wednesday.  We should wrap this case up on

16         Wednesday.  It might be Thursday.  I will let you

17         know that now.  Worst case scenario is we have to

18         do half days Thursday and Friday, and it would be

19         Friday afternoon.  But none of believe it would be

20         anymore than that.  I want to let you know that

21         now.

22             In addition, the judge indicated you do get a

23         little stipend.  Obviously, it's not enough to

24         replace your income.  So, Ms. Cramer, really the

25         bottom line question: If we were to keep you on

1       this jury, would you be -- understanding your

2       financial issue because we do.  Believe me there

3       are many many people that are like you.  Would you

4       be able to give us your attention and do the job of

5       a juror, or would you be so focussed on not being

6       able to pay the bills that you wouldn't be able to

7       pay attention?

8    A  It would be hard.

9    Q  I know it would.

10   A  I would try and do my best.

11   Q  Okay.  Well, that's all we can ask.  That's all we

12      can ask.  You know, we only have certain amount of

13      jurors, and unfortunately we got to be careful.

14      But we need to know if it's something that's going

15      to take you away from it.  Okay.  Thank you.  I

16      appreciate that information.  Ms. Oakley, you also

17      indicated you got a conflict?

18   A  I'm a stay-at-home mom.  My kids are out on summer

19      break right now.  Obviously, once I sit in here,

20      it's important.  It's an important thing to do, and

21      I would love to do my duty.  I'd rather do it when

22      the kids are back in school.  I'm sure everybody

23      feels that way and, you know, it's just going to be

24      extra concentration not to be thinking about

25      keeping them on schedule.

```
 1     Q    Are you comfortable with where your children are

 2          today?

 3     A    Yes.

 4     Q    And as I --

 5     A    And all week.  I can all week.

 6     Q    Okay.  I told you what the schedule is, and we're

 7          pretty sure we're going to stick to that as the

 8          worst case scenario.  Do you think that knowing you

 9          as you know you best that you would be able to give

10          us 100 percent even though it would be hard?

11     A    Yes.

12     Q    Okay.  Thank you.  I appreciate your honesty.

13          Somebody else over here raised their hand too?

14     A    I would like to be here also.  The only problem I

15          have I was car in a car accident a few weeks ago,

16          and I hurt my tailbone and spine, and it would be

17          very hard for me to sit for hours at a time.

18     Q    Okay.  Mrs. Tullis, you've indicated that you've

19          got a lower back injury.  Are you uncomfortable

20          right now?

21     A    A little, but not to the point that I have to leave

22          or anything.

23     Q    Okay.  Usually we take a break about every hour and

24          a half to two hours.  In addition to that, you're

25          welcome to stand up and stretch if you need to.
```

1    And anytime you need a break, waive the judge down.

2    He'll accommodate that with any problem.  Do you

3    believe that that would assist you in making you

4    comfortable enough to at least try?

5  A   Well, of course I do.  There is one other thing.  I

6    babysit for my daughter, and she has no other

7    babysitter.  I've been there six years, and this

8    would be a hardship on her also.

9  Q   All right.  Does she have any other person that

10    could possibly fill in for next couple days?

11 A   No, she doesn't, but she would have to take off.

12 Q   Okay.  Let me ask you something.  You indicated

13    from your car accident and you do have a back

14    injury.  Are you on any medications that effect

15    your abilities to perceive or to stay awake?

16 A   No.

17 Q   No.  All right.  Very good.  Thank you for that

18    information.  While we're talking, let's go ahead

19    and talk about your acquaintance with Ms. Canen.

20    Do -- are you sure that it's the same person that

21    you're thinking about, or help me understand.

22 A   She looks very familiar.  I've seen her before, but

23    couldn't tell you when or where, but I known I've

24    seen her.

25 Q   Okay.  That actually helps because that tells me

1              you're not friends, you don't hang out together,

2              that kind of thing.  Is there anything about the

3              occasions where you have seen her or any time where

4              you may have come into contact with her if it was

5              her that might effect your abilities to be fair and

6              impartial in this case?

7        A    I don't believe so.

8        Q    Thank you very much.  I appreciate that

9              information.  Ms. Oakley also indicated that she

10             recognized Lana.  Same question to you.  What kind

11             of a capacity?

12       A    I believe she babysat for me.

13       Q    Okay.  And anything about that relationship with

14             her, that acquaintance or anything about that that

15             might effect your abilities to be fair and

16             impartial in this case?

17       A    I never had an issue with her, but always had

18             questions.

19       Q    That's -- you don't need to elaborate on that any

20             further.  I appreciate that information.  And then

21             somebody else.  It was Mr. Hoffman.

22       A    I have a very mild case of narcolepsy and also ADD.

23       Q    Okay.  I appreciate that information.  Why don't we

24             go ahead and talk a little bit about the comments

25             you made on your questionnaire about your

1        conscientious beliefs, your religious belief.  And

2        this goes for everybody whether it be religious,

3        conscientious or otherwise.  Does it make -- I'm

4        going to say two different -- or I'm going to say a

5        phrase, and I want you to tell me whether it makes

6        sense to you or not.  There's God law, and then

7        there's man's law.  We have nothing to do no power

8        with God's law; however, man's law we have the duty

9        to enforce.  Does that make sense to you?

10   A   For you to enforce, yes.

11   Q   Okay.  You just characterized that in a way that I

12       think I understand where you're coming from.  It

13       is -- this it something that you personally don't

14       believe that you are capable of doing.

15   A   I don't believe that I'm allowed to do that.

16   Q   Okay.  Could you elaborate just a little bit for

17       the record, Mr. Hoffman?

18   A   Well, the Bible says that I'm not to be in a place

19       of judgment.  I wouldn't be able to render any type

20       of decision I believe.

21   Q   Okay.  I appreciate that information.  How many of

22       you see this as judging a person?  Raise your hands

23       if you do or even slightly as judging a person.

24       Mr. Hoffman you do, Ms. Oakley you do.  Sometimes

25       I'll make this statement.  You are judging facts

1          not a person.  How many of you know very very good

2          people, very good people, who do stupid and even

3          criminal things?  Raise your hands if you do.  Even

4          you yourself.  Okay.  What you will be asked --

5          actually, Ms. Brown, I'm going to pick on you.

6          Since you were a juror before, what is a juror's

7          responsibility during a trial?

8     A    To listen to the facts.

9     Q    Okay.  Does it matter whether you like the person

10         on trial?

11    A    You're not supposed to allow that to enter into

12         your decision.

13    Q    Okay.  The way you phrased that, though, makes me

14         think twice.  Tell me why you phrased it that way.

15    A    I think it's hard -- I think it's difficult, you

16         know, to not be compassionate.

17    Q    Okay.  Anybody who on this panel right now afraid

18         you might be compassionate in a case, especially a

19         murder case?  And I'm not asking to find out

20         whether you're a cold hearted people.  That's not

21         what this is about, folks.  You know, you heard me

22         talk about the victim in this case.  You heard me

23         talk about the individuals that are likely to

24         witnesses in this case including the defendants

25         just the way that they are.  We've got to talk

```
 1           about sympathies compassions --

 2    A    I have two things that I need to bring up.  Will

 3           the death penalty be on the table?

 4    Q    No, it is.

 5    A    Okay.  I'm fine with that then.  And I used to work

 6           with a gentlemen named Larry Woods that I think

 7           lived at the Waterfall Highrise.  Is he present so

 8           I can look and see if I know him?

 9    Q    He is not present.  Was he associated with Seifert

10           Drugs?

11    A    Yes.

12    Q    Okay.  How well do you know him?

13    A    Not well at all.  You know, I just know his name,

14           and I knew where he lived.  I gave him a ride home.

15    Q    Okay.  Anything about your acquaintance with him

16           that might effect your ability to be fair and

17           impartial if he is a witness?

18    A    No, I don't believe so.

19    Q    All right.  Thank you.  Mr. Brown brought up a very

20           important point about compassion, and it applies to

21           both sides.  Not only because of the state, you

22           know, the victim is what she was, and that really

23           really hits home with some people.  You got to put

24           that out of your minds, folks.  You have to because

25           who the victim is makes absolutely no difference to
```

```
 1          the laws of the State of Indiana.  None.  And you

 2          have to be honest with yourselves on that.

 3              In addition, the defendants or any of

 4          witnesses, compassion cannot come into this

 5          courtroom.  Common sense has got to come in.

 6          That's the one thing you bring in, but your

 7          sympathies and your compassions have to stay

 8          outside the door.  You can grab them on the way out

 9          because you're going to need them; but when you

10          come through that door, they have to stay out.

11              Does anyone feel like you have some trouble

12          with that concept?  You know you best.  There's no

13          way Mr. Williams or any of us can get to know you

14          that fast and that thoroughly.  So please let us

15          know now if anybody is worried about your

16          compassions kicking in.  Okay.  Thank you very

17          much.

18              All right.  Then we'll be go back to does

19          anyone have any religious conscientious scruples,

20          any issues whatsoever about doing this job of a

21          juror; namely, looking at facts, and figuring out

22          do they fall into behavior that is illegal under

23          the laws of the State of Indiana?  Let me know now.

24          Mr. Tullis?

25     A    No.
```

1    Q    No problems?

2    A    No.

3    Q    Mrs. Clark?

4    A    No.

5    Q    Mr. Ball.

6    A    No.

7    Q    Ms. Cramer?

8    A    No.

9    Q    Mr. Emerson?

10   A    No.

11   Q    Mr. Yoder?

12   A    No.

13   Q    Mr. Enos?

14   A    No.

15   Q    Mr. Oakley?

16   A    No.

17   Q    Mr. Miller?

18   A    No.

19   Q    Mr. Peachey?

20   A    No.

21   Q    Mr. Hauffman, you've already indicated your

22        opinion.  Thank you.  Very much for your honesty.

23        Mrs. Brown?

24   A    No.

25   Q    Okay.  Thank you.  Move on a little bit to the next

```
 1          topic.  How many of you have heard of the concept

 2          beyond a reasonable doubt?  Raise your hands if you

 3          have.  Pretty much everybody.  All right.  Mr.

 4          Miller, let's pick on you a little bit.  What is

 5          beyond a reasonable doubt?

 6    A     Beyond a reasonable doubt would be a fraction of a

 7          doubt that's in your mind.

 8    Q     Okay.  Does it mean all doubt?

 9    A     No, just a fraction.

10    Q     Okay.  Does anybody disagree with that?  Say no

11          Mr. Emerson?

12    A     I don't disagree with that.

13    Q     Don't disagree with that all.  Does anybody feel

14          uncomfortable about that because here, folks, we're

15          talking about a criminal case?  We're talking about

16          a criminal case here.  Don't you think it ought to

17          be beyond all doubt.  Okay.  You're shaking your

18          head, Mrs. Peachey?

19    A     I think that the evidence should be beyond all

20          doubt 100 percent sure.

21    Q     Okay.  All right.

22    A     That there's no evidence that they couldn't be

23          guilty.

24    Q     Okay.  You just said two different things.  You may

25          not know it, but you did.  The defense has to put
```

1      on no evidence whatsoever.  They can sit over there

2      all day and play crossword puzzles.  They don't

3      have to cross-exam any witness.  They don't have to

4      do anything, and you may not hold that against them

5      in any way, shape, or form.  It is entirely upon

6      the State of Indiana to prove this case.

7      Now, everybody understand that?  Okay.

8      Anybody think that's fair? unfair?  Anybody have

9      any problems with it?  Let me ask it that way.  No.

10      All right.  Now, here's the next part and this is

11      the kicker.  Individuals who perceive things, who

12      saw things, are going to come in, sit in this

13      witness chair, and tell you what they perceived.

14      None of you were there.  Can any of you honestly

15      say that you can find beyond all doubt if your

16      weren't there seeing it yourself?  Anybody think

17      they can?  Okay.  Then every criminal has to go

18      free.  See what I'm saying.

19      You have to be able to open your minds and

20      rely upon other persons perceptions because that's

21      the best it can possibly get.  The best it can get.

22      And then on top of that, you have to deal with you

23      have what you have.  Unfortunately, it's not a

24      situation where persons with perfect hearing,

25      perfect eyesight, perfect memory, and perfect

1    morals are going to be coming in here as witnesses

2    to you.  You don't find swans in a sewer, folks.

3    So you're going to have to rely on people that you

4    may not even want in your house to be the witnesses

5    in this case.

6        Now, how many of you think you're not going to

7    be able to give them the same credibility that you

8    would, maybe not yourself, but at least some other

9    person that you might know?  Anybody think you're

10   going to have problems that?  Do you see where I'm

11   coming from?  So does that mean that everybody

12   walks?  See, you got to open your mind a little

13   bit, and as a juror you have the power to believe

14   what you wish, disbelieve what you wish, and make

15   inferences from what you do hear because a lot of

16   times the truth is often found in the answering of

17   falsity or it's found somewhere between, or you can

18   fill in the picture.

19       That's why I was telling you earlier.  This is

20   a sophisticated case.  You are not going to have a

21   situation where you have any eyewitnesses.  It's

22   this person saw a little bit.  This person saw a

23   little bit.  It's a puzzle.  It's a puzzle, and you

24   got to put this puzzle together.  You're never

25   going to have all the pieces, never, because there

```
 1            was no videotape, with audio, tracking everything

 2            that happened here.  You can't do it.  It's just

 3            life.  How many of you thought about that before?

 4            I mean, Mrs. Brown, you probably have because

 5            you've been in these shoes before.  But when you

 6            woke up this morning knowing you were coming here

 7            to go to a jury trial, how many of you thought

 8            about the fact this is going to be tough?  Nobody.

 9                So how are you feeling about that now?

10            Ms. Peachey, let's just continue with you.  Do you

11            see why this is going to be a problem?  Let me ask

12            you this.  Knowing you as you know you best, do you

13            think you can do this job since you got to open

14            your mind a little bit more than what you had

15            previously thought?

16    A    Yes.

17    Q    You think you can?

18    A    Yes.

19    Q    You think you're going to have any problems with

20            it?

21    A    No.

22    Q    Okay.  Fantastic.  Mr. Miller, what about you?

23    A    I'm fine with it.

24    Q    You're fine with it.  Ms. Oakley, hesitantly

25            nodding your head.
```

```
 1    A   Hesitantly nodding my head.

 2    Q   It's tough, and you're not going to know for sure

 3        until you're sitting here for the trial.  Mr. Enos?

 4    A   Yes.

 5    Q   Mr. Yoder?

 6    A   No problem?

 7    Q   Mr. Emerson?

 8    A   Fine with that.

 9    Q   Ms. Cramer?

10    A   It would be hard?

11    Q   Mr. Ball.

12    A   I won't have any problem.

13    Q   Mrs. Clark?

14    A   I'll be okay.

15    Q   Ms. Tullis.  You're fine with that.  Okay.  Great.

16        Now, let's go on to another thing.  How many of you

17        watch CSI?  I pull up both hands because I love

18        them.  I love these shows.  They just -- they're so

19        entertaining to me.  Only a few of you.  That

20        really surprises me cause it's kind of the, you

21        know, the Law and Order the CSI stuff anymore is

22        really it.  How many of you think CSI has a shred

23        of credibility to it in really life?  Okay.  C'mon

24        somebody.  Mrs. Brown, you do?

25    A   They have a shred of evidence.
```

1     Q     Okay.  Let me phrase it a different way.  You're

2           probably right.  A shred of credibility.  How many

3           of you think that what you see on CSI or any of

4           these forensic file type shows is how it is in real

5           life?

6     A     No.

7     Q     No.  Okay.  Good.  That makes me feel much better.

8           You can't get a fingerprint off of a puddle, folks.

9           You just can't do it.  You're going to hear

10          testimony in this case that's going to educate you.

11          How many of you know anything, and when I ask this

12          I know you're probably thinking formal education.

13          I'm not.  If any of you have any ideas in your head

14          about what you can get fingerprints off of or DNA

15          or anything, any kind of scientific forensic

16          evidence whether you've read it in a newspaper, in

17          a journal, or you actually have training in this

18          topic, let me know now.  Anybody.  You've read

19          stuff in the newspaper.  Nobody?

20    A     Are you saying do we understand what you can get

21          evidence from?

22    Q     What I'm trying to find out --

23    A     You can get DNA from a hair, you know.

24    Q     Right.  In some circumstances, sure.  What I'm

25          trying to find out is what kind of ideas do you

1          guys have, or what kinds of expectations do you

2          have about evidence, and are they reasonable?

3          Because we've had so many jurors come in here and

4          say, well, you didn't fingerprint the dope bag, so

5          how can we say that they touched it.  Well, because

6          you don't get fingerprints unless you've got

7          certain surfaces, certain conditions.

8               Jurors want to impose what they've learned

9          either from talking to their neighbor on the

10         street, reading in the newspaper, what they see on

11         T.V.  And we got to know if that's what you're, you

12         know, what your mind is automatically going to do,

13         or are you going to clear your mind of that, listen

14         to the evidence as it comes in, and base your

15         decision exclusively upon what you are learning

16         through this trial?  Okay.  Does that make sense to

17         everybody?

18              How many of you are going to clear your minds

19         and forget what you think you may know already, and

20         be educated here?  Let me know if your are.  Raise

21         your hand.  Everybody is raising your hand.  Mr.

22         Hoffman, we've already talked so we're fine.  Okay.

23         Thank you very much.  I just want to make sure you

24         all understand while we wish this was CSI cause it

25         would be great to get a DNA result in about an

1        hour, you know, realistically it's a year and a

2        half.  These are things you just, you know, you're

3        going to learn, but you may not know now, and I

4        don't want it to cloud your ability to serve.

5              Next thing I want you to tell me about is how

6        much you know -- actually, let's just skip that.

7        Let's move on to you.  Some of these questions are

8        going to be a little bit tougher.  We've talked a

9        little bit now, but some of these things are going

10        to ask you to pry into some of the darkens of your

11        personality, and please be honest with us not

12        matter what.  Ms. Tullis, I'm just going to start

13        with you because you're No. 1 in the one chair.

14              Do you have any strong feelings, and I phrase

15        it that way because it's not something that rises

16        to the level of a bias or a prejudice or anything

17        like that, do you have any strong feelings about

18        law enforcement, individuals with physical or

19        mental conditions, lawyers in general, people from

20        different socioeconomic levels, different

21        lifestyles than you, anything that you think might

22        effect your ability to be fair or impartial in this

23        case?  And if you want to ask me about something,

24        you're welcome to.  This is a good time for us to

25        talk.

```
 1    A    No, I don't believe so.

 2    Q    You can't think of anything.  What areas of the

 3         newspaper do you read first if you read the

 4         newspaper?

 5    A    I don't read it often but first page one.  I read

 6         the front section and the religion section and

 7         that's about.

 8    Q    And that's about it.  Okay.  Do you have any

 9         questions of me so far?

10    A    No.

11    Q    What do you think about serving as juror other than

12         what we've already talked about?

13    A    I think it's fine.

14    Q    All right.  Thank you.  Mrs. Clark, what about you

15         any strong feelings about anything?

16    A    Only extremely strong feeling I have is people who

17         live in our country illegally.

18    Q    Okay.  Not going to come up here.  I can tell you

19         that right now.  Not going to come up here.

20         Anything that you have observed so far, anything

21         that you're uncomfortable about the possibility of

22         serving as a juror in this case?

23    A    The only thing I can say is when I came in and we

24         were introducing people the name registered nothing

25         with me; however, when you started talking about
```

```
 1            the case I do remember reading it in the paper when

 2            it happened.  But, you know, I don't remember

 3            anything about since then.

 4      Q    All right.  Very good.  The fact that you just

 5            indicated you don't remember anything about it

 6            answers the next group of questions so I'm just

 7            going to skip over that.  When you read it in the

 8            paper, though, is there anything about the fact

 9            that you read it you probably had some kind of an

10            emotional reaction at that time.  Is it something

11            that you're able to set aside now and get down to

12            business?

13      A    Yes.

14      Q    Any questions of me?

15      A    As a trial is going on, are we allowed to take

16            notes?

17      Q    You will be allowed to take notes.  The judge will

18            instruct you that while you're allowed to take

19            notes, and you will be furnished with paper and

20            pens to do so, do not allow the process of taking

21            notes to distract.  Sometimes when people are

22            writing, they're not listening to what's going on

23            so be aware of what your capabilities are in that

24            area.  But you are certainly welcome to take notes.

25                  There are approximately 25 witnesses that we
```

```
 1           would expect.  Many of them are very short.  But
 2           then in the end, we do a closing summary which
 3           kinds of brings everything together because it will
 4           seem very disjointed during the trial, but then in
 5           the end we'll bring it all together.  Any other
 6           questions?  No.  Mr. Ball, what about you any
 7           strong feelings about anything?
 8      A    I had concerns and fears because my mother lived on
 9           the Riverside Highrise at that time.
10      Q    Okay.  So do you remember reading about this in the
11           paper?
12      A    Yeah.
13      Q    All right.  Anything about the way that you just --
14           what you just talked about as well as your
15           emotional reaction at the time that you think might
16           effect your abilities to be fair today?
17      A    No, I don't think so.
18      Q    You don't think so.  Okay.  All right.  Have I
19           failed to ask you any specific question or any
20           group of questions that might have brought out
21           information that you think would be important for
22           us to know?
23      A    No.
24      Q    Would you be a good juror for this case?
25      A    I'll try.
```

49

```
 1    Q    I'll try.  What do you think your strongest

 2         characteristic is that would be helpful in this

 3         case?

 4    A    Good judgment probably.

 5    Q    Okay.  Let me ask you this.  What would your wife

 6         say?

 7    A    She's babysitting in South Bend.

 8    Q    All right.  Does she think that you have common

 9         sense, or does she bug you about that?

10    A    Most of the time.

11    Q    Most of the time.  Honest answer.  I appreciate

12         that.  All right.  Common sense is going to be very

13         important here.  There's no two ways about it

14         simply because you're gonna have to put two and two

15         together.  Do you think that's something that

16         you're capable of doing or interested in doing in

17         this case?

18    A    Sure.

19    Q    Ms. Cramer, we've already talked, but I want to ask

20         you any further.  Is there anything that you can

21         think of as far as strong feelings about anything

22         that we've not asked you about been --

23    A    I have strong feelings, but I don't think it will

24         effect the case.

25    Q    Okay.  Let me ask you this because I don't want to
```

```
 1            pry obviously, but unfortunately you don't know all
 2            the details of the case yet, and is it something
 3            that if it comes up it's going kick you?  I mean,
 4            is it going to be like here we go?  Is it that
 5            strong of a feeling?
 6     A      No.  It has to do with dead beat dads and different
 7            lifestyles.
 8     Q      Then, yeah.  That doesn't have anything to do with
 9            this.  Thank you.  It's hard to be generic, and you
10            tell me, and then I tell you it's safe.  You know
11            how it is.  Can you think of anything that I
12            haven't ask you yet that we should have asked you
13            in order to get better information?
14     A      I can't think of anything.
15     Q      Do you have any questions of me so far?
16     A      No.
17     Q      Anything about this process thus far that you're
18            uncomfortable, with anything like that?
19     A      It's just knew to me, and I'll have to learn as I
20            go along.
21     Q      That's okay.  We like it that way.  The last thing
22            we want is somebody's who's comfortable in that
23            seat quite frankly.  Yes, ma'am.
24     A      I do know several people that have lived there.
25     Q      At Waterfall?
```

1   A   Yes.

2   Q   Do you think that fact you know several people that

3       have lived at Waterfall will effect your abilities

4       to be fair here?

5   A   I don't think so.  I don't think so.  I just wanted

6       you to know that.

7   Q   Have you visited the Waterfall before?

8   A   I've been there once.

9   Q   Been there once.  Okay.  Based upon your

10      acquaintances with individuals who have lived

11      there, I guess what I need to know with is will you

12      set aside anything that they may have told you

13      about living there because we can't have you

14      bringing in facts that are not evidence.  Does that

15      make sense?

16  A   Right.  I haven't heard any facts about anybody

17      living there.

18  Q   What about anything going on there, anything about

19      what the place is like?

20  A   No.  Other than the fact that I knew some people

21      who lived there, but they weren't really close

22      acquaintances with me.

23  Q   I just have to make sure that you're not going to

24      be, you know, hey, I know what looks like, and it's

25      like this, and it's like this, and they're two

1       apartments down from the elevator.  You know what I

2       mean?

3    A  Right.

4    Q  Anything that you can think of that might be

5       problem there?

6    A  I don't think so.

7    Q  All right.  Very good.  Mr. Emerson, can you think

8       of any issues, you know, same questions I've been

9       asking everybody else that might effect your

10      ability to be fair and impartial in this case?

11   A  I don't think so.

12   Q  You don't think so.  What do you think about this

13      concept that you're really in a vacuum, you know.

14      You've got to rely upon what other people have

15      seen, perceived, and rely upon their perceptive

16      abilities in order to make a decision here?

17   A  I think you just got to make it on the facts of

18      what your gut feeling.

19   Q  And do the best you can.  Okay.  Fair enough.  Mr.

20      Yoder, we haven't talked at all.  What do you think

21      about this process so far?

22   A  It's very interesting.  I'm willing to, you know,

23      do my part.

24   Q  Do you have any questions thus far?

25   A  No.  You were asking if I had any problem with --

```
 1            with -- with the case or the situation.

 2      Q    Yes.

 3      A    I just want to say that I am really really

 4            proprosecution on almost everything, and I'm not

 5            sure if I can keep an open mind primarily because

 6            when I read about this case when it first came

 7            out --

 8            THE COURT:  Hold on for just a minute.  Anybody

 9     who has read anything about this case, do not repeat in

10     open court what you read.  Do not repeat what you read.

11     Go ahead, Ms. Becker.

12      Q    Fair enough.  Thank you.  Go ahead.

13      A    What I was going to say was that I got a flashback

14            to the murder of AJ Williams, and I was close with

15            him, and it effected me really badly.  And I don't,

16            I'm just so proprosecution on things I don't know

17            that if I could claim to be fair and open about

18            this.

19      Q    Okay.  I appreciate you bringing that out.  Let's

20            talk about that a little bit.  When you say you're

21            proprosecution, many people are.  In fact, many

22            people are just down right boom, boom, boom.  Yet

23            when they sit in this chair, it becomes really

24            clear that they're serious about this business, and

25            they're going to make us do our job.  And you know
```

1              why?  Because they want to know that the people

2              representing them are doing everything that they

3              can.  Does that make sense to you?

4         A    Yes, I understand.

5         Q    Have you or has there been times when you have been

6              disappointed in either a police investigation or a

7              prosecution or something that you've seen so far?

8         A    No.

9         Q    No.  Okay.  Do you believe that you can try --

10             actually, let's not even ask that because this is

11             really the bottom line.  Knowing you as you know

12             you best, do you feel like it would be so difficult

13             for you to set aside your memories of AJ as well as

14             your proprosecution personality and exclusively

15             base this case and your decision on what you learn

16             in this courtroom?

17        A    I am very willing to try to do that, but I just

18             wanted to let you know.

19        Q    And I appreciate that very much because, you know,

20             otherwise if I would have skipped over you because,

21             you know, whatever, we would have missed that, and

22             we can't have that.  But what I've got to know, and

23             trying is good, but really what we've got to find

24             out, and I'll come back to you on this.  I'll let

25             you think about it a few minutes more.  Trying

```
 1           isn't good enough at this stage.  I've got to know
 2           that you aren't going to give us the benefit of the
 3           doubt because you got to give them the benefit of
 4           the doubt.
 5      A    Sure, I understand.
 6      Q    Okay.  I'll come back in a little bit.  Ms. Brown,
 7           anything that I failed to ask you that we should
 8           have asked you so we get to know you better as far
 9           as qualities for this case?
10      A    No.
11      Q    Do you think you'd be a good juror?
12      A    Yes.
13      Q    Okay.
14      A    I would like to say something.  I wear hearings
15           aids, and I've been able to hear you very clearly.
16           I was able to hear your Honor very clearly.  This
17           lady I couldn't hear anything that she said.  So if
18           I were to raise my hand if I missed something, is
19           that okay or not?
20      Q    Absolutely.  We would hope you would do that.
21           Well, good.  Then maybe she got away with the
22           robbery.  And, you know, I try and make fun during
23           this time because we got to get to know each other
24           and feel comfortable with each other.  I don't want
25           to depreciate the seriousness of this case or what
```

```
 1          we're doing here so please don't be offended by

 2          this.  But sometimes when you get to talk, it

 3          enables us to make better judgment at this point,

 4          so I hope I'm not offending anyone, and we've

 5          already talked, Mr. Hoffman, so I'm going to move

 6          on to Ms. Peachey.

 7               Anything about what we've talked about so far,

 8          the little thumb nail I gave you earlier about this

 9          case, anything you think is going to bite up and

10          say, hey, I can't quite be fair because of this

11          experience or because of this principle that I

12          stand for?

13     A    No.

14     Q    You're okay with that?

15     A    Yes.

16     Q    Anything that I failed to ask you?

17     A    No.

18     Q    You want to be a juror?

19     A    Yes.

20     Q    Why?

21     A    You know, the only thing that I think about how

22          work is going to be.  They're going to be short,

23          but they will pay me for being here.  I'll get my

24          wage.  So, you know.

25     Q    That's huge?
```

```
 1    A    That's huge.  They're real into doing their civic

 2         duty so I'm very fortunate of that, and I think

 3         it's a little scary.  It's so awesome to think

 4         someone's fate could be in my decision or

 5         collective decision of a group of people.  That's

 6         pretty awesome.

 7    Q    It is awesome.

 8    A    And a little scary, but I would -- one of my strong

 9         points is I do listen to both sides, and I feel

10         that I can be, you know, listen to both sides and

11         understand both sides.

12    Q    Okay.  That's great.  Any problem with the fact

13         that like I indicated earlier, and I think you and

14         I were talking that it's entirely the state's

15         burden to prove this case?

16    A    I understand that.

17    Q    Okay.  Very good.  There's going to be holes.

18         There are no two ways about simply because we

19         can't -- we can't go out and hand pick.  You get

20         what you get, and unfortunately it's not always as

21         easy as it looks.  The fact that you're going to be

22         in a vacuum, you know.  You're only going to get to

23         hear what's there.  You think you're still going to

24         be able to make a decision?

25    A    Yes.
```

```
 1    Q   Okay.  Very good.  Mr. Miller, anything about your

 2        life experiences, your background, your personal

 3        feelings about anything that you think might nibble

 4        at you and effect your ability to be fair and

 5        impartial?

 6    A   No, I don't think so.

 7    Q   What do you think your strongest characteristic is

 8        that might be beneficial or detrimental to this

 9        jury?

10    A   Probably to listen to both sides.  It's a very

11        important case obviously, and listen to the

12        details.

13    Q   Okay.  Mr. Miller, you're the third person that's

14        brought up sentencing issues.  Sentencing is not

15        something that you are going to be thinking about

16        at all during this trial, during this part of the

17        trial.  Why do you think that is?

18    A   Because that would be the Court's decision to

19        sentence.

20    Q   Exactly.

21    A   Ours is guilty or not guilty.

22    Q   All right.  Let me ask you this.  Does a sentence

23        or any punishment or any consequence whatsoever

24        happening now or in a few days effect what happened

25        back in November of 2002?  Does it change facts
```

1              that may have occurred?

2      A      No.

3      Q      Do you think that if someone was worried about

4              imposing a consequence that it would effect their

5              perception of how those facts occurred because they

6              were worried?

7      A      I don't think so.

8      Q      Is anybody worried about that that worrying what

9              your consequences you think might color your

10             ability to keep an open mind and listen to the

11             facts that occurred?  Anybody worried about that?

12             Do you see where I'm coming from?  Okay.  Does

13             anybody have any concerns about that?  We've had a

14             lot of jurors who said, well, I was so worried

15             about what might happen, or I saw the defendant's

16             mom sitting in the courtroom and I couldn't, you

17             know, come back and say that with her there.  You

18             see what I'm saying.

19                 It doesn't change the facts that happened in

20             November of '02, but are you strong enough

21             individuals that you can set that aside?  Does

22             anybody think you're going to have problems with

23             that?  Let me know now if you do.  Okay.  All

24             right.  Have I failed to ask you any questions that

25             I should have asked in order to get some more

1           information?

2      A    No.

3      Q    Okay.  Very good.  Ms. Oakley, anything about this

4           case so far, any of the things you've observed,

5           what's been going on, that might effect your

6           abilities to be fair and impartial?

7      A    No, in don't think so.

8      Q    And we haven't talked at all yet other than just a

9           couple Uh-huh or uh-huh.  Mr. Enos, what do you

10          think about this whole process so far?

11     A    It's a lot more involved than I expected.

12     Q    Is it?

13     A    Oh, yeah.

14     Q    And I don't know if this is going to sound weird or

15          not, but when you got here and we told you it was a

16          murder case, what was your knee jerk reaction?

17     A    Surprised you.  I never been here before.  I didn't

18          know what to expect, but I didn't expect a murder

19          case.

20     Q    Yeah.  How do you feel about it now now that we've

21          gone through almost an hour of chatting --

22     A    It's interesting.

23     Q    It's interesting.  Do you have any hesitations

24          whatsoever about your ability to be fair and

25          impartial in this case?

```
 1    A    No.

 2    Q    Any hesitations about your ability to serve and

 3         actually, you know, with all the limitations make a

 4         decision on this case?

 5    A    No.

 6    Q    Any questions of me?

 7    A    No.

 8    Q    What have I failed to ask you that I should have

 9         asked you?

10    A    Nothing that I can think of.

11    Q    Not that good.  You can't think of anything.

12    A    Quiet little life.  Do my job, I go home, read a

13         book.

14    Q    What kind of books do you like to read?

15    A    I read all kinds of books.  History mostly.

16    Q    History mostly.

17    A    History novels.

18    Q    What kind of mystery novels do you like?

19    A    History.

20    Q    History novels.  I'm sorry.  All right.  What did

21         you think about my conversations, I can't even

22         remember who it was with, I don't remember, about

23         being in a vacuum the fact that you're not going to

24         here everything you want to hear.

25    A    That's the way I am.  Keep to myself.  I don't
```

1        watch T.V.  You talk about CSI.  I've never seen

2        it.  I don't watch network TV.  It bores me to

3        death.

4    Q   Very good.  That's okay.  Believe me.  I don't have

5        a problem with that.  We have one TV in our house.

6        It's downstairs in the basement and you know --

7    A   I watch the history channel and National

8        Geographic, speed channel 2.

9    Q   The truth comes out.  All right.  Last chance

10       folks.  Does anybody have any questions of me,

11       anything that is kind of nibbling at you we need to

12       talk again?  Can you think of anything that I

13       should have asked you?  No.

14   A   Does it matter if you said it involved some

15       mentally challenged people psychiatrically

16       challenged or whatever.  I was a psychiatric nurse

17       for five years at Oaklawn, but I don't know -- I

18       don't know if they were even involved.  But does

19       that, I mean, is that something that you want to

20       know?

21   Q   It is exactly.  That's exactly the things that we

22       want to know.  My question to you, and it's, I

23       mean, it's very flat out.  That is not defense in

24       this case.  It's not a situation where there's

25       going to be evidence, medical evidence or

1          psychiatric evidence in any way, shape, or form.

2          It's what you're going pick up on your common

3          sense.

4               Now, now that you've told me you're a skilled

5          person, I know your common sense is sharper in that

6          area because you've been trained to do this kind of

7          thing.  What we have to say is that can you set

8          aside your special training and not share that with

9          the remainder of the jury because, see, I don't

10         know what your training is.  None of us do.  And we

11         can't run a risk that you would back in the jury

12         room say, hey, I know about this, and I know about

13         this.  You absolutely cannot do that.  Do you

14         understand that?

15    A    Yes.

16    Q    Okay.  The fact that you do have some special

17         training in that while it may effect, you know, how

18         you're perceiving things, do you think it would

19         effect your abilities to be fair?

20    A    No.

21    Q    Okay.  Very good.  Thank you.  I appreciate you're

22         sharing that.  See, that's one of those things

23         where I don't ask the right question.  Okay.  Does

24         anybody else have anything that you're thinking

25         about do we want to know?  No.  Okay.  Mr. Yoder,

1    I'm going to come back to you.  If you were -- now

2    I know you've already indicated you're pretty

3    proprosecution.  If you were sitting over at

4    defense counsel table, would you want a juror of

5    your mindset in this case?

6  A   Probably not.

7  Q   Okay.  That's what I needed to know.  Thank you.  I

8    appreciate that very much.  Anybody else have any

9    questions?  Thank you so much for your time.

10   THE COURT:  Ladies and gentlemen, we're going

11  to give you recess at the time.  During this recess, I

12  need to remind you.  You are all prospective jurors in

13  this case.  You are prohibited from discussing this case

14  with anyone prior to the commencement of the evidentiary

15  portion of the trial.  To do so may result in a mistrial.

16   After the presentation of evidence has begun,

17  jurors may discuss the evidence presented amongst

18  themselves in the jury room during recesses.  All regular

19  jurors and alternates must be present during such

20  discussion.  You must reserve judgement concerning the

21  outcome of the case until jury deliberations begin.

22   You may not discuss the facts of this case with

23  me or with the lawyers or with any of the witnesses.

24   You may not investigate the case yourselves or

25  attempt to obtain information outside the courtroom.  It

1    is highly improper for you to do so.  You are also

2    prohibited from reading any newspaper accounts of this

3    case and from listening to or watching any radio or

4    television reports relating to this trial.

5         You are to consider and decide this case only

6    upon the evidence received during the course of the trial

7    here in the courtroom.

8         I'm going ask that you remain in the jury room

9    until we call for your return into the courtroom.  You'll

10   be in care of the bailiff.

11              (A short recess was taken.)

12        THE COURT:  The record should reflect that the

13   defendants plural are present, their counsel are present,

14   counsel for the state is present, Mr. Joel Williams.

15   Juror 1730 RaShonda King has been excused by agreement.

16   She's indicated to the bailiff she is no longer a

17   resident of this county.  For that reason, everyone has

18   agreed she will be excused because she will not qualify

19   as a juror.

20              (The prospective jury entered the

21               courtroom, and the following

22               proceedings were had.)

23        THE COURT:  Be seated, please.  Mr. Zook.

24        MR. ZOOK:  Thank you, Judge.

25   ////

```
 1                    VOIR DIRE EXAMINATION

 2    BY MR. ZOOK:

 3    Q    Good morning.  After I go, Chris over here goes,

 4         and then we repeat the process over and over and

 5         over and over, and it will be a nice long day, and

 6         you'll get a lot of sleep tonight.

 7              I just need to go some things concerning the

 8         trial process to see if you can follow it, and then

 9         I need to find out a bit about you because this is

10         the only opportunity I'll have to do that.  But

11         first of all, we have an estimate here of perhaps

12         through Thursday, maybe Wednesday, at the most

13         Friday, and no one really things it's going to go

14         that far.  Does anyone have a real problem with the

15         way -- with the timetable?  If you do, raise your

16         hand.  You know, you've already spoken your

17         problems here.  Okay.

18              Now, that could change because it isn't just

19         up to us, and it isn't just up to the evidence

20         here, it's up to you.  You are the people that meet

21         and make a decision and talk things over before

22         making the decision.  So you're the ones that are

23         going to determine in part how long the trial

24         takes, and it could be that you're released into

25         the jury room at, say, ten o'clock at night under
```

```
 1          the worst circumstances, and you're asked to make a

 2          decision.

 3               Are there any of you who feel that you might

 4          not be able to think well enough or not be able to

 5          give your full attention to the case even though

 6          it's late, you've struggled with the case for

 7          hours, and it's Friday, say, or Thursday, and you

 8          want to go home?  Are there any of you who feel

 9          that the case isn't important enough, this murder

10          case, that you really couldn't work on it, and

11          you've give your vote up in order to prevent a

12          disagreement?  That's what I'm really asking.  If

13          so, raise your hand.  I have had it happen before.

14          Just a little bit.  Okay.

15               I've seen it happen where people did that.

16          They said, well, it was late.  Okay.  How about you

17          say, Sarah, you said that that would be a problem

18          for you a little bit?

19    A     It would just be hard because I have a one and a

20          three year old at home, and being a single mother I

21          would want to be there for them.

22    Q     Okay.  It is sounds like you're getting a little

23          emotional about that.  Is it just the fear of being

24          in the courtroom?

25    A     No.  It's just that I'm their only parent at home,
```

1        and I want to be there at ten o'clock to put them

2        in bed.  Sorry.

3   Q    Okay.  Juries might often run late on the night of

4        the decision.  Would that be a real problem for you

5        to do?

6             (The juror indicated.)

7   Q    Do you think you could keep your mind on what's

8        going on in the in the courtroom instead of

9        thinking about your children?

10  A    No.

11  Q    Oh, no.  Okay.  Mr. Yoder, did you ever think that

12       you might be arrested for crime you didn't commit?

13  A    Yeah.

14  Q    You did?

15  A    Oh, yeah, sure.

16  Q    Well, did it ever happen to you?

17  A    No.

18  Q    Okay.

19            THE COURT:  You need to remember all of you

20  we're trying record what is stated so you need to answer

21  audibly.

22  A    Okay.

23  Q    Okay.  Now, you understand when someone is arrested

24       that doesn't mean the person's guilty.  Is that

25       right?

```
 1    A    Yes, I understand that.

 2    Q    Okay.  I guess I don't understand then why you're

 3         prosecution oriented?

 4    A    I just felt like I had to say that because that's

 5         the way I feel.  In this case here, I think I could

 6         be fair, listen the facts, and make a determination

 7         like anyone else, but that's something I felt

 8         needed to be said.

 9    Q    Okay.  When, say, Michael Jackson was an trial, did

10         you get an opinion right away about how that should

11         go?

12    A    I would say not right away, and I -- still I

13         watched a little bit of that trial, and although I

14         feel like most people that he probably was guilty,

15         they didn't really prove it.

16    Q    Okay.

17    A    So he's got his own problems.

18    Q    I was in interested to see Rush Limbaugh say he

19         even got a fair trial.  All right.  Tell me, are

20         you a member of any organizations?

21    A    No, sir.

22    Q    Okay.  Any churches things like that?

23    A    No.

24    Q    What kind of things do you like to read?

25    A    Well, like the gentleman behind me, I'm into
```

```
 1          history books quite a bit.  And it varies mainly

 2          history.

 3    Q    Okay.  Any particular history you're interested in?

 4    A    Word War II.

 5    Q    Okay.  Thanks.  Mr. Emerson, I'd like to go through

 6          the same questions with you.  Are you a member of

 7          any organizations?

 8    A    We belong to Winding Waters Brethren Church,

 9          Bowling Association, and that's about it.

10    Q    Okay.  What do you like to do?

11    A    Play golf.

12    Q    All right.  And, Ms. Cramer, what do you like to

13          do?

14    A    I like to play volleyball.

15    Q    Okay.  Do you do that in a team?

16    A    I was about four years ago, but since I've had my

17          kids I've not.

18    Q    Are you members of organizations?

19    A    I'm a member of Living Faith Fellowship in Elkhart.

20    Q    Okay.  Thank you.  And Mr. Ball?

21    A    Yes.

22    Q    Member of any organizations?

23    A    I'm a retired marine 24 years.

24    Q    Do you go to reunions things like that?

25    A    No, I'm too busy at home.
```

1    Q    Okay.  What do you like to do?

2    A    Just work around the home, maintain the house, and

3         babysit the granddaughters.

4    Q    Okay.  And, Ms. Clark, same questions?

5    A    I am a member of the Church of the Brethren in

6         another part of Indiana where I group up.  As far

7         as hobbies, in the summer I love the mow the grass

8         and work in the lawn, and we were motorcyclist.  We

9         have Goldwing motorcycle, and so we do that in

10        weekends, and I read a lot.

11   Q    Okay.  What do you like to read?

12   A    I read a lot of biographies even some like Danielle

13        Steel books which everybody refers to as

14        sophisticated trash.  I read those.  You know,

15        sometimes you just have to read no-brainer books

16        just to make you not think.  I like to read

17        self-help books.

18   Q    Okay.  Anything we can help you with?

19   A    Probably a lot.

20   Q    Okay.  Ms. Tullis, how about you?

21   A    I like to go horseback riding; however, I haven't

22        for a while.  I like reading.  I like walking.  I

23        like gardening.  I don't belong to any

24        organizations at this time.

25   Q    You have a horse?

```
1    A    I've had a couple, yes.

2    Q    Okay.  Is that how the injury happened.

3    A    No.  It was a car accident.

4    Q    Okay.  Okay.  Well, I can see why you wouldn't want

5         to horseback ride.

6    A    Yeah.

7    Q    Marilyn Brown?

8    A    Yes.

9    Q    How about you.  Tell us about you?

10   A    I belong to the Solid Rock Church of God, very

11        active in that.  I love to do trivia.  I like to

12        read murder mysteries.  I like to guess who's the

13        guilty one.  I don't come up out heads up.  I

14        usually -- they'll throw in a fact too late in the

15        book it just ruins the whole scenario.  But I do

16        crossword puzzles thinks like that.

17   Q    Okay.  Yes, it does.  I never understood people who

18        would do that, or -- or -- or who would cheat at

19        solitaire.  Same thing.  And, Mr. Hoffman, I'm

20        going to kind of skip over you here not that I'm

21        not interested, but basically you've removed

22        yourself from the panel so I'm not going to worry

23        about it.  Interested in not taking up so much

24        time.  Ms. Peachey, how about yourself any

25        organizations?
```

```
 1    A    I belong to Beulah Missionary Church.  I like
 2         gardening, and I like boating.  Read -- my husband
 3         and I have a little cottage that we're remodeling
 4         so we spend a lot of time doing that, spending time
 5         with our three boys.  I love to read, love to cook,
 6         look to bake, invent new recipes.
 7    Q    Would your husband tell me that you're a leader or
 8         a follower?
 9    A    He would tell you I'm a leader, and I would tell
10         you I'm a follower.
11    Q    All right.  Mr. Miller?
12    A    Yes.
13    Q    Tell us tell us about yourself?
14    A    I belong to Nappannee Missionary Church.  I enjoy
15         photography, working outside in the yard, anything
16         to do with outside.  I have a real love of cars.
17    Q    Okay.  A real love.  Tell us about that.
18    A    Appreciation for show cars, antique cars.  I love
19         to watch racing.  Just anything to do with cars.
20    Q    What were you doing yesterday?
21    A    I was in front of my television watching the Nascar
22         race.
23    Q    And, Ms. Oakley, tell us about yourself.
24    A    I belong to Saint Mary's Church in Bristol.  I do a
25         lot of volunteer work at the school.  I'm very
```

```
 1          involved in the school.  I like to do just about

 2          any sport.

 3     Q    Water skiing?

 4     A    Water skiing, snow skiing.

 5     Q    Bike riding.

 6     A    Yes.

 7     Q    Okay.  What do you like to read?

 8     A    I do books for the kids, self-help books that will

 9          help me with the kids.

10     Q    I -- I was not able to hear when you were talking

11          about my client.  Assume that she is the person who

12          babysat for you, do you believe in that case that

13          you would be biased either for or against the case?

14     A    Well, I think that I would listen to the facts, and

15          as I sit here I've played a lot of things out in my

16          mind, but I think I would sit and listen to the

17          facts and use that to make a determination.

18     Q    Okay.  We hope that everyone does.  What I'm

19          wondering about is where you're starting from?

20     A    Well, I'm starting from that I believe Lana babysat

21          for me 11 years ago and with my children, and now

22          she's being tried for murder.  That's a lot to

23          weigh out.

24     Q    Do you feel that you have any initial biassed is

25          what I'm asking?
```

```
 1    A   I can't say that I don't.

 2    Q   You can't say you don't; can't say you do?

 3    A   I would will hope that I would sit here and listen

 4        to the case and weigh the evidence.  I hope that

 5        that's what I would do.

 6    Q   Okay.  And, Mr. Enos, tell us about yourself.

 7    A   Stay at home, take care of my yard and garden,

 8        experimenting with growing flowers, stay outside

 9        while I can.  I live on the St. Joseph River so

10        process of working on my house.  That's it.  Keep

11        to myself and stay at home.

12    Q   Do you get any magazines?

13    A   Play Station.  I've discovered video games.

14    Q   Play Station magazines.  I know you didn't want to

15        tell us that.  Okay.  So who lives with you?

16    A   Nobody.  My wife lives out of state.

17    Q   Okay.  Thank you all.  Mr. Enos, I want to ask you

18        if you have thought about some of these things

19        before.  There was one thing that Ms. Becker didn't

20        bring up concerning the way a trial is conducted.

21        She talked about beyond a reasonable doubt being

22        the standard of proof.  Do you think anyone so far

23        has determined that these people were guilty?

24    A   I've not heard evidence yet.

25    Q   Okay.  That's going to be your job.  No one has
```

```
 1            done that yet, and that's being put to you.  Now,

 2            how do you think you determine if a witness is

 3            telling the truth?

 4       A    Got to watch them, how they act, how they react,

 5            pay attention.

 6       Q    Do you think that different people would have

 7            different actions in the courtroom when they

 8            testify?

 9       A    I'm sure they will.  Everybody's different.

10       Q    How would a person who's more accustomed to being

11            in the courtroom testify as compared to the person

12            who has never done it before?

13       A    I would think they'd be more relaxed because they

14            know what's going to happen.

15       Q    Okay.  What do you see as the difference between

16            police testimony and testimony of other people?

17       A    Police officers are professionals.  They're trained

18            better.

19       Q    Do you expect a policeman would to testify better?

20       A    I would hope so.  It's their job.

21       Q    How do you feel about policeman necessarily telling

22            the truth as opposed to lay people?

23       A    They like everybody else.  They're human.  You

24            would hope they tell the truth.

25       Q    Thank you.  Mr. Yoder, how do you feel about that?
```

1    A    About what, sir?

2    Q    About the difference in testimony between police

3          and lay witnesses.

4    A    Well, I would think that the more experience one

5          had, the more effective of a witness they would we

6          be.  That pretty well sums that up.  If somebody

7          hasn't been in court, how can they -- be slower and

8          more apprehensive perhaps about testimony.  Maybe

9          even (inaudible).

10   Q    Okay.  Mr. Miller, was it you who said would watch

11         all the testimony come in from both sides?  I think

12         you did.  You realize that both sides don't have to

13         put on any testimony.  Only one side does.  How do

14         you feel about that system of -- we're just able to

15         do crosswords.  Now that I know that, I'm going to

16         go get some.  How do you feel about that?

17   A    Innocent until proven guilty.

18   Q    Okay.  Now you get the drift.  That's what I was

19         going for that hadn't been said so far.

20         Ms. Peachey, do you understand that as well?

21   A    Yes.

22   Q    It's not a contest.  It's not a liars contest where

23         we have people swearing against each other.  The

24         state has to prove guilt, and there's innocence

25         beforehand.  So you have to assume that these two

1   people are innocent unless the state proves them

2   guilty beyond a reasonable doubt.  Does that make

3   sense?

4 A Yes.

5 Q Okay.  And, Ms. Tullis, how do you feel about that?

6   Do you have any anything to add?

7 A I believe what you said is exactly true.  Innocent

8   until proven guilty.

9 Q So as they sit here today, let's say that we don't

10   put any evidence on, and the state doesn't put any

11   evidence on, and you're asked to bring in a

12   verdict, what would your verdict be?

13 A Could you turn that question a different way?

14 Q Sure.  And it's kind of a trick question, but I'm

15   trying to just make a point with you here.  Let's

16   say the State of Indiana who has the burden of

17   proof of proving guilt beyond a reasonable doubt

18   doesn't put any proof on, doesn't put any evidence

19   on, what would your verdict be?

20 A I'm not sure.  I would have to go by what I heard

21   and seen and believe inside.

22 Q Okay.  I shouldn't try to trick you that way I

23   guess.  What I'm -- what I'm really saying is if

24   the state doesn't prove its case, the verdict is

25   not guilty.

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | You got that. |
| 3 | A | Yes. |
| 4 | Q | So if the state doesn't prove anything, what's the |
| 5 | | verdict? |
| 6 | A | Guilty. |
| 7 | Q | Are you sure? |
| 8 | A | No.  I'm not sure about that question. |
| 9 | Q | Okay.  Ms. Clark, do you see what I'm going for |
| 10 | | here? |
| 11 | A | Yes, I do. |
| 12 | Q | Can you say the word not guilty? |
| 13 | A | I can say the word not guilty, yes. |
| 14 | Q | And, Mr. Ball, would you tell us a little bit about |
| 15 | | your service? |
| 16 | A | I went in back in 1968, and I missed Vietnam.  I |
| 17 | | served at Desert Storm, and then I retired in '92. |
| 18 | Q | So you put in your time for sure. |
| 19 | A | Yes. |
| 20 | Q | How do you feel about being in the courtroom today? |
| 21 | A | It doesn't bother me. |
| 22 | Q | Okay.  You can still take orders? |
| 23 | A | Yes.  Pretty used to that. |
| 24 | Q | The judge is going to give you a bunch of orders. |
| 25 | | They're called jury instruction.  And some of what |

1         we're doing now is going over those instructions

2         that we expect to be given to you to see if you'll

3         be able to obey those.  One of the instructions

4         will be that because the state has the burden of

5         proof, the defendant doesn't have to testify in his

6         or her own behalf.  And if the defendant chooses

7         not to testify, you can't hold that against him or

8         her.  You think that you can follow that

9         instruction?

10    A    Yes.

11    Q    Does anyone have a problem?  I'll tell you there

12        usually are problems here so raise your hand if

13        that doesn't make sense to you.  Okay.  It all goes

14        in line with the fact that the state has to put on

15        the proof and the defense doesn't have to rebut

16        that if the state didn't prove it not guilty.

17            How many of you have read or heard things

18        about the case that haven't been talked about

19        before?  I know some of you admitted hearing about

20        the case.  Any of the rest of you?

21    A    I heard about it on the news and in the paper when

22        it happened, but after that I forgot about it.

23    A    The same thing.  You know, I read it and heard

24        about it, but after that I didn't really pay --

25    Q    It's like news every day, and probably if you

81

```
 1        didn't make a great note of it it's not going to

 2        effect your decision here.  I know, Mr. Yoder, you

 3        said that that effected you at the time.

 4    A   Yeah.  When I read the first account way back in

 5        2002 whenever it was.

 6    Q   And was it you, Mr. Hoffman, that said you had a

 7        relative -- Okay.  Mr. Ball, you have a relative in

 8        the Waterfall Apartments?

 9    A   No.  I think it was the Riverside.

10    Q   Okay.  You think there's anything about that

11        situation that would -- that might kick in when

12        you're looking at this one?

13    A   No.  Because it's not a situation anymore.  She's

14        not living there.

15    Q   Okay.  All right.  There are a number of the things

16        I'd like to ask.  I'm not prepared to do so because

17        Mr. Chris Crawford is going to come up, and he has

18        a big list.  So do any of you on the panel know

19        each other?  All right in this group of 12, in this

20        group of 12 people.  And I'll probably ask that

21        each time.  And do any of you have a question for

22        me?  Thank you.

23            THE COURT:  Thank you, Mr. Zook.  Mr. Crawford.

24            MR. CRAWFORD:  Thank you, your Honor.

25    ////
```

```
1                    VOIR DIRE EXAMINATION

2    BY MR. CRAWFORD:

3       Q   I think this is first time in this process I've

4           actually gone this far last, so hopefully I'll be a

5           lot shorter because most of the questions will have

6           already been asked.  If there are any additional

7           questions or anything for me, I will probably

8           address that towards the end of our conversation

9           like Mr. Zook did.

10              First left me ask you, I know that we had

11          discussed setting aside our views of things based

12          upon where we come into this particular case, but I

13          want to know if there's anyone that has any special

14          connection with an elderly person or a mom or a dad

15          or another family member that may make it difficult

16          to sit in judgement in this case because the victim

17          in this case at the time of her death was 94 years

18          of age.  Is there anything specifically about that

19          that would make it difficult or harder to hear this

20          particular case in light of those circumstances?

21          Anyone on our panel?  You'll be able to set that

22          aside and simply decide the facts of this

23          particular case.

24              (The jurors indicated.)

25      Q   Anyone on our current panel up here right now have
```

1          any friends or family members or acquaintances that

2          suffer from emotional or mental difficulties?  Yes,

3          sir.

4     A    I have sister who's mentally retarded, lives in a

5          group home here in Goshen.

6     Q    Okay.  Anything about that that would make it

7          difficult for you to decide the facts in this case?

8                    (The juror indicated.)

9     Q    Anyone else?  Ms. Peachey, anything about your

10         involvement in Oaklawn make it difficult for you to

11         sit in judgment in this particular case?

12    A    I don't believe so.

13    Q    Had no contact with Mr. Royer at all, did you?

14    A    Never.

15    Q    Okay.  Ms. Peachey, when making a difficult

16         decision in your life, how do you go about doing

17         that?  What kinds of things do you consider when

18         doing such a process?

19    A    I probably weigh out the consequences of if I make

20         this decision what will the repercussions be long

21         term versus going the other route, and would try to

22         make the decision that would benefit me or my

23         family the most.  Is that what you mean?

24    Q    Sure.  And how do you go about making -- I mean, I

25         understand the complexity of getting to that place,

```
 1            but what kinds of things do you consider when
 2            making those decisions?  What kind of evidence or
 3            what kind of things do you take into account before
 4            making a major decision?
 5      A     What the cost would be financially, emotionally,
 6            and with my family, what would benefit my family
 7            the most and me the most, would I be happy in it,
 8            or does it just look good in the beginning but then
 9            later would not be so attractive.  I'm not sure you
10            want.
11      Q     No.  That's perfectly fine.  I understand that
12            completely.  Of our panel here, how many of you
13            have children?
14                 (The jurors indicated.)
15      Q     Ms. Clark, have your children ever been in a
16            situation where they kind of didn't tell you the
17            truth?
18      A     Of course.
19      Q     And how would you go about resolving whether or not
20            your kids were telling you the truth or what the
21            actual -- truth actually was?  How would you go
22            about finding that out?
23      A     I pretty much would just quiz them until they tell
24            me the truth.  I -- I don't know.  You just
25            sometimes can read that they are not telling you
```

```
 1              the truth, and you just -- you don't let up.

 2       Q    Okay.  What reason might they have had for their

 3              decision not to be honest with you?  What might be

 4              a reason for that?

 5       A    Well, one was when my daughter went to an R rated

 6              movie that she wasn't supposed to do.  She did

 7              something that she was not supposed to do so it was

 8              the fear of punishment of being grounded after

 9              telling the truth.

10       Q    Okay.  So she was just afraid so she made the

11              decision obviously not to be truthful with you.

12       A    Yes.

13       Q    Mr. Ball, did you raise your hand as well too

14              having children?

15       A    Yes.

16       Q    Were there ever occasions when your children didn't

17              tell you the truth?

18       A    Lots.

19       Q    What would be some of the reasons behind why they

20              didn't tell you the truth?

21       A    Fear of punishment.

22       Q    Okay.  Were there other reasons?

23       A    Taking away their freedom or things like that,

24              mostly punishment.

25       Q    Has any of our panel ever been in a situation where
```

1       we had what we thought to be a friend or an

2       acquaintance or something tell us that wasn't

3       truthful?  Anyone ever have that?  I can go first.

4       When I was in middle school, I had a friend that --

5       or I thought was a friend at the time that would

6       constantly tell me that his father could get the

7       Kenner Star Wars figures so I could have any of the

8       Star Wars figures I want; however, he was never

9       able to come up with those Star Wars figures, ever

10      could ever come up with.

11          But we would go, we'd have lunch everyday in

12      school, and he would constantly tell me that he

13      could come up with these Star Wars figures, but he

14      was unsuccessful.  I learned later on and towards

15      the end of the year that is father never worked for

16      Kenner, was never a part of that company, and there

17      was now way he could ever get any of those Star

18      Wars figures.  But at least in my mind as a

19      youngster what I later looking back on realized

20      that he was simply trying to find a way to get

21      along or fit into a part of a group or something,

22      and that was the way he thought he could do that to

23      make himself seem more interesting perhaps.

24          Anybody ever have a situation like that in

25      their own life have any friends or family members

1        or acquaintance of our panel?  Anybody?  Okay.  Ms.

2        Peachey, you -- or not.  I saw you nodding your

3        head, but if you weren't --

4  A   Yes.  I've been lied to by children and other

5        people.

6  Q   And adults?

7  A   And adults.

8  Q   All right.  What would be the reason behind why

9        they might have done that?

10  A   Most recently a friend who lied to us lied because

11        they were afraid of what we would think of them if

12        we knew the truth.

13  Q   Okay.  So there's some kind of ulterior motive

14        there where they wanted you to still think of them

15        in a certain way --

16  A   He wanted us to still like him and accept him, but

17        he didn't want us to know what he had really done

18        was true.

19  Q   Okay.  All right.  Mr. Miller, were you shaking

20        your head?

21  A   Yeah.  Probably along the same lines.  I've been

22        lied to both by children and by adults.

23  Q   Similarly, to try to get a higher position or have

24        you think of them a certain way?

25  A   Right.  To fit in, try and accept them or be

1        friends.

2    Q   Much like the situation myself in middle school

3        with that particular gentleman.

4    A   Yes.

5    Q   And people -- and so that was a similar situation

6        for you.

7    A   Yes.

8    Q   Anyone else from our panel have that happen to

9        them?  Okay.  One of issues and topics that Mr.

10       Zook brought up and I don't believe had been

11       broughten up or addressed before was the issue of

12       presumption of innocence.  We talked to -- as

13       Mr. Zook mentioned, we talked a lot about

14       reasonable doubt initially, but nothing was

15       really -- it wasn't specifically dealt with on the

16       issue of presumption of innocence, and that's as

17       Ms. Canen and Mr. Royer sit here they're are

18       presumed innocent.

19          Anybody have a problem with that particular

20       protection?  Any problem using it or keeping it in

21       your mind as you're listening to the testimony over

22       the course of the next couple of days with the

23       issue of presumption of innocence?  Anybody have

24       any thoughts about what it means to them?  Okay.

25       Has anybody ever had a friend, family member, or

1          themselves been a victim of a crime of our panel?

2          Ms. Cramer.

3     A    I had an aunt and cousin murdered by my uncle.

4     Q    Anything about that particular situation that would

5          make it difficult for you to sit in this case?

6     A    No.

7     Q    Okay.  Anyone else?  Yes, ma'am.

8     A    I had car stolen once.  I had one of my cars was

9          broke into once, and my apartment was also broken

10         into twice over a period of 15 years.

11    Q    Okay.  Anything -- did anything come up of that

12         event?  Did the police investigate?  Did they find

13         a suspect?  How far did that go?

14    A    It didn't go very far that what was stolen wasn't

15         worth very much, and the person that we thought did

16         it had moved out of town left someplace.  The one

17         time that the car was stolen it was returned within

18         a couple of hours.  It was found and returned.

19    Q    Anything about that process that would make it

20         difficult for you to separate that particular issue

21         and sit in here and make a decision in this

22         particular case?

23    A    No, I don't think so.

24    Q    Anyone else been the victim of crime of our panel?

25         And friends or family members anything like that?

1            Anyone have any close -- close relationships with

2            anyone from any police department or prosecutor's

3            office anyone of our panel?  I believe, Mr. Ball,

4            you mentioned you worked out with is it Detective

5            Thayer?  Any other friends that might be police

6            officers that you've come into contact with?

7       A    Mike Bogart.  I think he's a corporal.  He ran the

8            gym, and Steve Travis.  He owned the gym so --

9       Q    Any thought or any feeling that it's -- give

10           special deference to the testimony of police

11           officers over anyone else because of your

12           involvement with these particular individuals?

13      A    No.

14      Q    Okay.  You'd be able to separate that and just

15           simply decide the facts of this case?

16      A    Right.

17      Q    Okay.  Anyone else have any friends, family

18           members?  Yes, ma'am.

19      A    I know a couple police officers.

20      Q    Who do you know?

21      A    Pardon me.

22      Q    Who do you know.

23      A    Roland Tuttle from Wakarusa.  I don't know if he's

24           still alive anymore.  I worked for him when he

25           owned a restaurant.  I'm friends with policeman in

1           Indianapolis, and my ex-brother-in-law was a

2           policeman here in Elkhart -- or Goshen.  I'm sorry.

3      Q    Anything because of your knowledge or your

4           familiarity with these people that would cause you

5           to give special deference to the testimony of a

6           police officer that you wouldn't otherwise?

7      A    I don't believe so.

8      Q    Anyone else.  Yes, Mr. Miller.

9      A    I know a Goshen City Police Robert Wartsler.

10     Q    Anything because of that experience that you would

11          give more deferential treatment to the testimony of

12          a police officer as opposed to any other witness?

13     A    No.

14     Q    How about, Mr. Enos?

15     A    I have uncle that's a retired sheriff.

16     Q    Okay.  Same question of you that I asked everybody

17          else.  Makes no difference.

18     A    No.

19     Q    You understand, all of you understand that you're

20          simply deciding the case based solely upon the

21          facts and the evidence that you hear comes by the

22          way of that chair over there?

23              Anything else about what you've heard so far

24          specifically about this case that would make it a

25          difficult case for you to sit in here and to judge

```
 1          over the next several days for any our panel?

 2               Any questions concerning the differences or

 3          what guilt beyond a reasonable doubt means?  That

 4          was only briefly, I believe, addressed during the

 5          course of Mr. Zook and Ms. Becker's time with you?

 6          Anybody have any questions about that?

 7               Ms. Brown, I believe you mentioned that you

 8          sat on a criminal jury trial.  Is that correct?

 9     A    Yes.

10     Q    And I think if I remember correctly you also sat on

11          a civil case.  Is that right?

12     A    Yes.

13     Q    Okay.  And there were two different standards of

14          proofs, isn't that fair to say?

15     A    Pardon.

16     Q    There were two different proofs.  One was guilt

17          beyond a reasonable doubt and one was by

18          preponderance of the evidence.  Did you hear that

19          phrase?

20     A    Right.

21     Q    And there was a different standard.  Correct?

22     A    Yes.

23     Q    One was more like 50 percent, more likely than not

24          on the preponderance of the evidence, and one was

25          reasonable doubt which was a higher standard.
```

1       Correct?

2   A  Correct.

3   Q  Everyone understand that that's what we're dealing

4       with over the course of the next several days here

5       a higher standard of proof and not the

6       preponderance of the evidence.  Okay.

7          Has any of our panel, I know that several of

8       you mentioned that you had read things in the paper

9       shortly after this incident took place, but of what

10      you read in the paper, is there anything that would

11      bias your opinion as you come in today one way or

12      the other about making a decision without having

13      heard all the evidence?

14         I guess a better way to say it has the paper

15      swayed you one way or the other news accounts that

16      you've heard swayed you one way or the other as

17      opposed to taking time out and just separating that

18      and listen to the evidence in this case?  Shouldn't

19      have any problem with that then.  Correct?

20         (The jurors indicated.)

21   Q  Ms. Clark, how -- I don't know if I asked you this

22      or not.  I think I started at the end.  How do you

23      make a major decision in your life?  What process

24      do you go through in doing that?

25   A  I weigh the pros and cons, all the reasons why a

```
 1            decision should be made and the reasons why it

 2            should not be made, and I pray.

 3    Q    When faced with making a critical decision, do you

 4            remain firm in your convictions or do you sway?

 5    A    If I truly believe that what I have decided is

 6            right, I stay firm.  If there's any doubt in my

 7            mind that I have not thought through everything, I

 8            can't be swayed by someone else but I can be swayed

 9            by my own thinking.

10    Q    Okay.  Thank you.  Mr. Ball, how about you?  How do

11            you make a decision in your life?

12    A    I just weigh, like she said, pros and cons and make

13            the decision.

14    Q    Are you a firm person when you make your decision?

15    A    The situation could change and your decision can

16            change.

17    Q    Okay.  How about you, Ms. Cramer?

18    A    I weigh the pros and cons and how it's going to

19            effect my family and my beliefs and what I believe

20            in.

21    Q    Are you more of a leader or a follower?

22    A    I'm more of a leader.

23    Q    And will you be firm in your decision when you get

24            there or you keep weighing or how long a process

25            does it take you?
```

| 1 | A | Once I get there, I'm firm in it. |
|---|---|---|

1    A    Once I get there, I'm firm in it.

2    Q    Is it a lengthy process to get there --

3    A    It depends on what decision I'm making.  If it's a

4         major lifetime then, yeah, it might take some time.

5         If it's small, you know, like where I'm going to go

6         eat.

7    Q    So the larger the decision the longer period of

8         time you're involved in it.  Okay.  Mr. Emerson,

9         how about you?

10   A    It's hard for me to make decisions.  I mean, firm

11       clear in my mind sometimes, you know, it's hard to

12       decide.  You have a little doubt here and there,

13       and then you don't go through it.

14   Q    Are you easily swayed by people, or do you make

15       your own mind up?

16   A    Both ways I guess.  Sometimes easy; sometimes not.

17   Q    Kind of depends on the situation.

18   A    Situation, yes.

19   Q    Okay.  Are you quick to rush to judgments or again

20       just depend upon the circumstances?

21   A    It depends on the circumstances.

22   Q    Thank you, sir.  How about you, Mr. Yoder?

23   A    Listen to all the facts pros and cons and make a

24       educated decision not on -- not based on emotions

25       but on the facts.

```
1     Q    Are you --
2     A    I think I would be able to stick to my decisions,
3          although I don't consider myself a leader, not
4          everybody can be a leader.  But I have -- once a
5          make a decision, it would be because I was pretty
6          sure.
7     Q    Based on everything you heard?
8     A    Yes.
9     Q    How about you, Mr. Enos?
10    A    Simply look at the situation, figure out what do
11         to.  I just look at situation, and make a decision
12         whether it's right or wrong.
13    Q    Okay.  Do you rush to a decision, or do you have to
14         spend time to come up with the decision?
15    A    How it's going to effect my life.
16    Q    Are you a leader or a follower?
17    A    I'm leader.
18    Q    Okay.  Thank you, sir.  Ms. Oakley, how about you?
19    A    Same as everybody else.  Weigh the pros and cons,
20         talk to the people that are involved in the
21         situation, and try to come up with what's going to
22         work for everybody.
23    Q    Okay.  Mr. Miller, how about you?
24    A    Pretty much the same thing.  Pros and cons, kind of
25         weigh.  If I go one way, what's it going to be
```

```
 1          like.  If I go the other, what's it going to be

 2          like.  See which way is best.

 3     Q    And I think I asked you that, Mrs. Peachey.  How

 4          about you, Mr. Hoffman?

 5     A    I prefer to pray about it, and then seek counsel

 6          from people around me that I value.

 7     Q    Okay.  Are you pretty firm when you finally reach a

 8          decision?

 9     A    Yes.

10     Q    Ms. Brown, how about you?

11     A    Once I reached a decision, I'm pretty firm about

12          it.

13     Q    Hard to get you to come off of that once you reach

14          it.

15     A    Right.

16     Q    Is it a long or slow process?

17     A    Once I have all the facts, it's not hard for me to

18          make a decision, but I have to make everything

19          that's going to effect it.  I need to see the whole

20          picture.

21     Q    Okay.  Thank you.  I think that's all I have other

22          than simply to say that if there's something that

23          we haven't mentioned already that would make a

24          difficult for any of our 12 people to be here over

25          the next couple days, please say it now because
```

1      this is your last opportunity.  So I guess I have

2      the privilege of being the last one that's going to

3      get to ask you that question of this particular

4      panel, and I thank you for your time.

5              (Counsel approached the bench.)

6          THE COURT:  Ms. Cramer, if you were to sit

7   here, listen the evidence, do you think you can make a

8   decision in this case keeping your mind upon the business

9   here in the courtroom?

10          A JUROR:  Yes.

11          THE COURT:  Without regard to your children,

12  can you pay attention here and make a decision based upon

13  all the evidence?

14          A JUROR:  Yes.

15          THE COURT:  Okay.  See, we need to know.  This

16  is an important case as is every case that goes to trial.

17  We need to know that we have someone sitting in the jury

18  box who can pay attention, listen to the evidence, not

19  miss anything, and not be worrying about what's going on

20  at home.  Are you that person?

21          A JUROR:  I would be fine not worrying what's

22  going on at home, but I would be worrying about -- I'm

23  also in college, and I would be worrying about my

24  assignments that are due too as well.

25          THE COURT:  As a result of your worrying about

```
1    college, would your mind be elsewhere while this trial is

2    going on?

3              A JUROR:  Partly, yeah.

4              THE COURT:  All right.  The following jurors

5    will remain the rest of you will be excused.  The ones

6    remaining will be Judith Clark, Steve Emerson, Michael

7    Miller, Karen Oakley, Randall Enos.  The rest of you will

8    be excused.  Mrs. Jackson, would you seat additional

9    jurors.  All right.  Seat No. 1 we now have JoAnn Adams.

10             A JUROR:  Yes.

11             THE COURT:  In seat No. 3 we have Kirk Beer.

12             A JUROR:  Yes.

13             THE COURT:  In Seat No. 4 we have Benjamin

14   Dickey.

15             A JUROR:  Yes.

16             THE COURT:  In seat No. 6 we have Mary Combs.

17             A JUROR:  Correct.

18             THE COURT:  In seat No. 7 we have Daniel

19   Bontrager.

20             A JUROR:  Yes.

21             THE COURT:  In seat No. 8 we have Maryann Keil.

22             A JUROR:  Yes.

23             THE COURT:  And in seat No. 9 we have Linda

24   Bowser.

25             A JUROR:  Yes.
```

```
 1              THE COURT:  Ms. Becker or Mr. Williams.

 2                    VOIR DIRE EXAMINATION

 3    BY MR. WILLIAMS:

 4    Q   My name is Joel Williams, and if you didn't hear

 5        everything that was said is anybody here on the

 6        panel that's been seated, and my questions are

 7        going to be directed towards those that have just

 8        been seated.  Is there anybody here that while the

 9        questioning was going on by Ms. Becker, Mr. Zook,

10        or Mr. Crawford that something came up that they

11        said I just have to tell the next person that comes

12        up when I get into the jury box I just have to tell

13        them about something.  Is there anybody that had

14        that that come about when they were listening to

15        the questions that were asked previously?

16    A   I had one.  She asked if we knew anybody, and my

17        daughter went to high school with Peggy her name

18        was Gilson I think it's Snider.  I forget.  But

19        that was like in the late 70s, and I haven't seen

20        her in umpteen years, but I thought, well, I better

21        tell you.

22    Q   Is there anything about knowing that that will --

23    A   No, I haven't seen Peggy in ions.

24    Q   Is that Peggy Snider, Posthuma possibly?

25    A   Posthuma.  Her maiden name was Gilson.
```

```
 1    Q   Well.  She's had many names.  Well, now that you've

 2        said that about knowing people, is there anybody

 3        that you -- anybody else that has that that come

 4        up, a name that was registered?  It's

 5        Mr. Bontrager.  Correct?

 6    A   I knew Brett Canen, so I've known the family.

 7    Q   And so how did you know Brett just a friend?

 8    A   I've grown up around the Canen's so Brett has been

 9        around.

10    Q   What type of relationship did you have?

11    A   Just see him every once in a while, not really

12        close or anything.

13    Q   I think that when the question came up and you

14        raised your hand, do you -- do you know the

15        defendant lana Canen?

16    A   Yes.

17    Q   Did you have any type of -- what type of

18        relationship did you have?

19    A   No.  It was just a -- kind of see her if I was at

20        her brother's house.

21    Q   How good of a friend was Brett?

22    A   Brett was just a --

23    Q   I'm sorry.

24    A   I just saw Brett every once in a while if he was

25        over at the weld shop.
```

```
 1    Q   Is there anything about knowing the Canen family
 2        that you think would effect your ability here to be
 3        fair and impartial?
 4    A   No.
 5    Q   Anybody else knowing anyone?  We read a list of
 6        names at the beginning of -- Ms. Becker did.  She
 7        went through a laundry list of people, 20 or 25
 8        names.  Is there anybody here that would want me to
 9        reread those names, or do you think that you all
10        heard the names that were asked?  Without any hands
11        being raised, I will assume that the answer is no.
12            This case, as Ms. Becker indicated, has been
13        charged as felony murder.  And did anybody have any
14        particular questions when that concept was talked
15        about that -- that wants to ask me a question about
16        it?
17                (The jurors indicated.)
18    Q   Ms. Bowser, when you think and you hear that term
19        felony murder, what do you think of?
20    A   I think of a person that who has committed a murder
21        while committing a felony.  It happens kind of like
22        after the fact, but it happened.
23    Q   Okay.  If we use a scenario such as a bank robbery
24        and you have different people that are involved in
25        that robbery, let's say you have four people.  One
```

1           plans the robbery, tells the others maybe the

2           combinations to the safe in the bank, another

3           person drives them to the location, another stands

4           by the door and watches for the police, and one

5           goes in and actually holds up the bank, gives the

6           note, uses the gun, gets into the vault, and in the

7           commission of that robbery while the one individual

8           is in the bank, he shoots the teller.  Who's

9           responsible for that murder?  Let's assume that the

10          teller dies.  Who's responsible?

11     A    I think they're all equally responsible if they

12          know that the man went in with a gun and it could

13          happen that was their decision, and I believe

14          they're all equally guilty.

15     Q    So in the commission of that felony, robbery would

16          be the felony, a death has occurred.  That's the

17          murder.  Does anybody disagree with that?  The

18          person who's planned it, the person who's driven

19          them there, the person who's standing in watch,

20          anybody disagree the they're all equally

21          responsible if the state can prove beyond a

22          reasonable doubt all the elements of the offense,

23          of course?  Anybody disagree with that?  Mrs. Keil,

24          what do you think about that?

25     A    I agree.  If they're all part of the planning of

1        the robbery, they would all be guilty.

2    Q   One of other concepts that was brought up by

3        Ms. Becker was something called accomplice

4        liability, and it's kind of interwoven.  In that

5        situation with felony murder, you've got accomplice

6        liability.  And the definition of accomplice

7        liability in the State of Indiana is if you aid,

8        induce, or cause a person to commit an offense,

9        then you're just as responsible.

10            Now, in the scenario that I had for the bank

11        robbery there was only one person that actually

12        physically killed the teller.  Do you have any

13        questions about the accomplice liability the fact

14        that the person that planned it, gave the

15        combinations aided or induced cause they were all

16        in the agreement, and then the person in the car

17        was the get-away driver and the person that was at

18        the door watching, they're aiding in that robbery?

19        Do you have any questions about that, that concept

20        of being responsible even though maybe not there?

21        Ms. Gill.

22    A   No, I do not.

23    Q   Ms. Adams, what do you think?

24    A   Well, I feel that the person that went in with the

25        gun and shot the person, that person should be

```
 1            charged for the murder, and the other accomplice

 2            with them would be charged too, but he would get a

 3            higher penalty because he did the murder.

 4       Q    So the person who actually is the trigger man or

 5            woman you think that person should be punished more

 6            severely.

 7       A    Right.

 8       Q    Now, that brings up something about punishment, and

 9            do you understand that the judge is the one that

10            determines punishment in the case?  If it should be

11            that the defendants are found guilty, ultimately

12            they'll be sentenced but it's his decision and not

13            your decision.  How does that make you feel as far

14            as knowing that there may be a punishment and

15            you're rendering such a decision in a case?

16       A    It depends.  I really don't go for the person to be

17            murdered.  It's against my belief on that part, but

18            what the judge decides that's his decision.  That

19            won't be mine.

20       Q    Do you think that knowing that there might be a

21            penalty for a person that you decide is guilty of

22            an offense, do you think that would weigh on you as

23            far as how you listen to the evidence that comes

24            in, the testimony that's presented?

25       A    I will go strictly on what the facts are, and I
```

1    don't know.  It's kind of pretty difficult to lay

2    aside what you believe in for that person that

3    commit the crime.

4  Q What we want to try to have you do is take all that

5    clutter, that -- that stuff that you have, your

6    experiences, you have life experience, you have

7    common sense, you have things that you experience

8    on the outside; and when you come in here, we are

9    asking you to kind of set those things aside and

10    listen to what is the evidence that's presented and

11    not take those potential preconceived notions or

12    your life experience so to speak and have that

13    somehow effect what the testimony is.  Do you have

14    any questions about that?

15  A No.

16  Q Mr. Beer, the concepts of felony murder and

17    accomplice liability any questions?

18  A No.

19  Q Mr. Dickey, any questions?

20  A Nope.

21  Q Mr. Combs, do you have any questions?

22  A No.

23  Q The concept that all the attorneys have already

24    talked about this term beyond a reasonable doubt.

25    For the -- for the people who have now been sat,

1      who here has heard of that -- that concept beyond a

2      reasonable doubt?

3           (The jurors indicated.)

4   Q   Mrs. Combs, I'm going to pick on you.  When you

5      hear that concept or you hear that term beyond a

6      reasonable doubt, what do you think about?  What

7      does it mean to you?

8   A   It means to me that if I were to be on the jury and

9      I go in to deliberate, I would have to say I have

10      to be absolutely positive in my mind that this

11      person is either guilty or not guilty.  I can't --

12      I couldn't sway, oh, gee, maybe he's not.  I think

13      I just would have to know for sure in my mind that

14      he is or isn't or they are or not guilty.

15   Q   Would you require the state to prove beyond all

16      doubt that the person is guilty?

17   A   Define all doubt, I mean, totally --

18   Q   Totally 100 percent.

19   A   You mean there's gray area that there may not be in

20      my mind I'm not sure of.  Is that what you're

21      asking me?

22   Q   What I'm asking you is: When -- when -- you had

23      said that you had to be absolutely sure in your

24      mind.  When it comes to beyond all doubt, would the

25      state have to prove to you -- maybe I can phrase it

```
 1           like this -- all doubt includes both reasonable

 2           doubt, things that are based upon reason and common

 3           sense, and it all also includes things that are

 4           unreasonable doubts.  Because if you're talking

 5           about all doubt, you have reasonable and

 6           unreasonable doubt.

 7     A     There's always got to be a little shadow of doubt.

 8           My, gosh, you're not God.  You're don't know for

 9           sure if it's true.  You have to just use your

10           common sense and hope and pray to God that you're

11           making the right decision, but there's always going

12           to be, you know, nobody knows for sure.  They don't

13           know if they're lying on the stand.  I don't know.

14     Q     Sure.  I mean, there's really nothing in life

15           that's certain.  Correct?

16     A     Absolutely.

17     Q     I mean, maybe death and taxes, but -- but no -- so

18           you're not going to hold the state to a -- to a

19           standard that it cannot obtain?

20     A     Nobody could obtain a standard that's 100 percent

21           positive that this person is or isn't guilty.  I

22           mean, it's --

23     Q     Sure.  And that's because --

24               THE COURT:  Mr. Williams, excuse me.  We need

25     to keep in mind that we're recording this.  You can't
```

```
 1    both talk at the same time.  If you both talk at the same
 2    time, we're going to end with up with nothing.  Go ahead,
 3    Mr. Williams.
 4            MR. WILLIAMS:  Thank you.
 5    BY MR. WILLIAMS:
 6    Q   Mr. Beer -- thank you very much -- beyond a
 7        reasonable doubt, that concept, what does it mean
 8        to you?
 9    A   There needs to be proof, evidence.  The vast
10        majority of that evidence needs to lean a certain
11        way to -- to prove to me that -- that they would be
12        guilty or not guilty.  I mean, there's gray areas
13        in everything.  And, like I said, the common sense
14        you got to decipher out and use your common sense
15        in doing that.
16    Q   Sure.  Have you ever purchased a home?
17    A   Yes.
18    Q   When were purchased your home, it's a big decision.
19    A   Correct.
20    Q   Did you just take a dart and throw it at a map and
21        go to that location and say that's the house I'm
22        buying?
23    A   No.
24    Q   What did you do to -- to buy that house, a big
25        decision in your life?
```

1   A   We built a home.  We did the research on it.  We

2       had plans drawn up, we had, you know, all the

3       things that go along with it.  Researched out

4       financing, you know, all that stuff that goes with.

5       Took a lot of time to do that before we even

6       started construction.

7   Q   Had to find the property.

8   A   Correct.

9   Q   So there's property, financing, builders,

10      subcontractors, decisions all to be made inside the

11      house as far as what you're going to put in.

12  A   Yes.

13  Q   Took some time.

14  A   Yes.

15  Q   When you collected all that information, you had to

16      make a decision.  Were you firmly convinced that

17      you were doing the right thing?

18  A   Yeah.  At the time I was, yes.

19  Q   So based on everything that you knew all the -- al

20      the things that had been presented to you when you

21      had to finally make that large decision, you were

22      firmly convinced.

23  A   I was able to make the decision, yes.

24  Q   And you'll get a jury instruction with regard to

25      reasonable doubt and that jury instruction will

```
1              tell you that proof beyond a reasonable doubt is
2              such that it's proof that leaves you firmly
3              convinced in the defendant's guilt, firmly
4              convinced.
5                   So when you think about those big decisions
6              that you've made and you have to come to those
7              conclusions of making a decision or not, are you
8              firmly convinced?  Mrs. Bowser, beyond a reasonable
9              doubt, what -- what does it mean to you?
10     A     I agree with what they've said.  I think that the
11             majority, the vast majority of all the evidence
12             that's what's going to tell (inaudible).
13             There will always be a shred of what if
14             circumstance but --
15     Q     But when you have those what ifs, the decision that
16             you have to make is, is that what if based on
17             reason?  Is it reasonable doubt, or is it something
18             that's based on unreasonable doubt?  If it's
19             something, well, I wonder what -- you know,
20             something that has nothing to do with it; but if
21             it's in your mind if it's unreasonable, then you
22             can't -- you can't base your decision on it.
23     A     I agree with that.
24     Q     Is there anybody here that's ever put a puzzle
25             together?  Okay.  Mrs. Keil, do you put a puzzle
```

1       together?

2   A   Yeah.  I'm not a puzzle person.

3   Q   Not a puzzle person.  Anybody a puzzle person?

4       Well, I think, Mr. Bontrager, you raised your hand.

5       You've put a puzzle together.

6   A   I have put a puzzle together.

7   Q   Are we talking the big puzzles in the box?

8   A   Something like 1,000 puzzle.

9   Q   1000 piece puzzle.  How do you know what you're

10      going to get at the end?

11  A   Just if you work from the sides in, then you kind

12      of -- it's -- it's there, put the final pieces

13      there.

14  Q   Well, when you -- when you put this puzzle

15      together, did you have -- was it in a box?

16  A   Yes.

17  Q   Was the picture of what it should be on the box?

18  A   Yeah.

19  Q   So when you bought that puzzle you said, well,

20      after I'm done, I should get the picture that I

21      have if I have all the pieces.  Right?  What if you

22      wouldn't have had the box top, but you just had all

23      the pieces, and you knew all the pieces were there?

24      I think you said that you could put that puzzle

25      together.  Right?

1    A    Yeah.  You just have to work out from the edges and

2         find the -- work from the edges out.  Finally

3         develop what the picture would be.  It would come

4         to you as the time was coming and as you were

5         building the pieces together it would come to you

6         what the product looked like.

7    Q    So you'd start with your border and your corners,

8         kind of work you way in from the edges.  At some

9         point, do you find pieces that go together that you

10        kind of clump, but you're not quite sure where they

11        fit, but over time you begin to see what develops

12        as the picture?  At some point you've put the

13        majority of the pieces of the puzzle together, but

14        let's say there's a few pieces missing.  Do you

15        think that you can say beyond a reasonable doubt

16        that you know what the picture is if there's just a

17        few pieces missing?

18             (The juror indicated.)

19   Q    So if let's say this picture was of a -- of a farm

20        with a pasture and some clouds and you've got your

21        trees and you got maybe some horses in the pasture,

22        that was the nice scene that you had, but you're

23        missing a piece in a tree or a piece in the sky or

24        piece on the house, it doesn't really effect if

25        somebody says to you, Mr. Bontrager, do you know

1    beyond a reasonable doubt what that picture is?

2  A   No.  It wouldn't effect it at all.

3  Q   Does anybody disagree with that when you're putting

4    the puzzle together that you can actually put it

5    together without having the actual picture that's

6    presented, and that's really what you have in a

7    trial.  You have evidence that will come in, and

8    the pieces of the puzzle will have to be put

9    together.  That's -- we will present the evidence

10    as we believe it should be presented, but you

11    ultimately have to make the decision as to who to

12    believe, as to what parts of evidence you believe,

13    the credibility of witnesses; and ultimately you'll

14    have to have the puzzle put together and make that

15    decision.  Does anybody else have any questions

16    about reasonable doubt.  Mr. Dickey?

17  A   No.

18  Q   No questions.  Mrs. Adams, any questions?

19  A   No.

20  Q   Mr. Beer?

21  A   No.

22  Q   Mrs. Keil, any questions?

23  A   No.

24  Q   Has anybody here ever served as a juror again just

25    asking the persons that are no just in the panel?

```
 1            Anybody serve as a juror in either a criminal or

 2            civil case?  All right.  Since no one's raised

 3            their hand, I'll assume the answer is no.  I want

 4            to talk about memory.  Mrs. Combs, do you think you

 5            have a good memory?

 6      A     I hope so, yes.

 7      Q     And why do you -- why do you think that?

 8      A     I can remember things in the past.  I mean, I can

 9            remember 25 years ago, but, you know, I can

10            remember recent things I'd like to think.

11      Q     Are there things that you think, and I think you've

12            touched on those, but are there things that you

13            think actually effect your memory?

14      A     Probably, lack of sleep.  I don't know.

15      Q     The amount of time that passes?

16      A     Yeah.  That's right.  25 years ago, when you get to

17            be my age.

18      Q     Do you think that your memory is better the closer

19            in time you are to an event?

20      A     Probably.

21      Q     So if something happened yesterday and I asked you

22            about what you did for dinner, your memory would be

23            better than if I asked you three years from now?

24      A     Yeah.

25      Q     It's possible you wouldn't even remember.
```

1    A    Oh, I'm sure I wouldn't.

2    Q    What about persons that may have mental

3         difficulties do you think that might effect

4         somebody's memory?

5    A    You mean the person that has the mental defect?

6    Q    Yes.

7    A    I would say it could, yes.

8    Q    Depends on what it is?

9    A    Yeah, I mean, minor things no but maybe major

10        things.

11   Q    When it comes to events that are important in your

12        life, do you think that you have better memories

13        than those that are just the mundane everyday of

14        your life?

15   A    I would say, yes.

16   Q    You've been married?

17   A    Correct.

18   Q    That memory is a big event in your life, you have

19        memories of that, but then again, what you ate

20        three years ago not so much.

21   A    Not so much.

22   Q    Mr. Beer, what do you think about memory?

23   A    I can remember the major things.  I remember

24        finding a gentleman on County Road Seven when Ben

25        Oak was being built that had been shot to death in

```
 1              the road, and I remember -- I can tell you exactly

 2              where everything was right to this day, and how it

 3              all and what I did.

 4        Q    That was an event that was certainly out of the

 5              ordinary.

 6        A    Correct.

 7        Q    And is it kind of a memory that was burned into

 8              your brain?

 9        A    Absolutely.

10        Q    And when you were -- when that memory was being

11              created, was it something that you thought you were

12              going to have to remember because of the event

13              itself?

14        A    Yes.

15        Q    Did you call the police?

16        A    Absolutely.

17        Q    So something that you -- you -- you can consciously

18              say I need to remember this is going to be -- is

19              going to effect your memory rather than I'm not

20              sure if it really fits or if I really need to

21              remember it so why do have I have to really burn it

22              into my memory?

23        A    I think that's correct.

24        Q    Do you think that a person's lack of memory if they

25              can't remember the exact details, does that mean
```

1       that they're not telling the truth.

2    A  No.

3    Q  Mrs. Keil?

4    A  Yes.

5    Q  What do you think about memory?  I had asked

6       Mr. Beer about whether if someone who -- who

7       doesn't necessarily can't remember all the details

8       of something does that necessarily mean that

9       they're not telling the truth?  What do you think

10      about that?

11   A  No.  But if it's a traumatic event, I think you

12      would remember most all of it.

13   Q  And if it's not a dramatic event, do you expect

14      somebody to remember all of the details?

15   A  Not necessarily.

16   Q  Do you think our memory is burned that one that you

17      remember; for example, the person on the side of

18      the road that had been shot to death or something

19      in your mind that if you know that it's significant

20      at the time it will be easier to remember that if,

21      let's say, you find out later on it was

22      significant?

23   A  Oh, I think it's burned immediately.  We were

24      robbed once, and I will never forget that evening.

25   Q  The details of that you don't --

1    A    Details, right.

2    Q    If someone had -- let's say it had been something

3         less dramatic or serious such as somebody telling

4         you a story about something that was significant,

5         but you really had no context for it.  Somebody

6         just tells you some story about something that

7         happened to them on the roadway about seeing, let's

8         say, they thought they saw a body on the roadway,

9         or they thought they saw a animal die on the

10        roadway.  Let me tell you that story.

11            At the time you may not have any reason to

12        think that that's significant, but then later on

13        you find that is because let's say somebody

14        committed a crime in shooting the animal.  We'll

15        use an animal for example.  Do you think that

16        there's going to be a difference in whether you

17        felt it was significant at the time that is was

18        told to you rather than you find out later on that

19        is was significant?  Do you think that really

20        matters?

21   A    Yeah.  I think you would probably reflect back on

22        it and remember that.  It wouldn't be quite as

23        dramatic if it happened to you directly, but I

24        think it would be start putting the pieces

25        together.

1    Q    Mrs. Bowser, memory.

2    A    Are you referring to the event that you just

3         described?

4    Q    Well, did you understand what I meant by that as

5         far as, you know, a lot of our memories they come.

6         We don't really think of it during the day of how

7         maybe important it is, but then all of a sudden you

8         find out later down the road that it was important,

9         and now you got to go back and say what was it

10        about it.  What -- what do I have need to remember

11        about that?  And you're trying now to relay that to

12        somebody and say, well, this is what I remember.

13        You may not have all the details, but again do you

14        believe that if they don't have the detail that

15        they're not telling the truth?

16   A    No.

17             THE COURT:  Counsel, approach the bench,

18   please.

19                  (An off-the-record discussion was held

20                  at the bench.)

21             THE COURT:  Ladies and gentlemen, we're going

22   to give you a recess for noon at this time.  I need to

23   remind you that you are all prospective jurors in this

24   case.  You are prohibited from discussing this case with

25   anyone prior to the commencement of the evidentiary

1    portion of the trial.  To do so may result in a mistrial.

2            After the presentation of evidence has begun,

3    jurors may discuss the evidence presented amongst

4    themselves in the jury room during recesses.  All regular

5    jurors and alternates must be present during such

6    discussion.  You must reserve judgement concerning the

7    outcome of the case until jury deliberations begin.

8            You may not discuss the facts of this case with

9    me or with the lawyers or any of the witnesses.

10           You may not investigate the case yourselves or

11   attempt to obtain information outside the courtroom.  It

12   is highly improper for you to do so.  You are also

13   prohibited from reading any newspaper accounts of this

14   case and from listening to or watching any radio or

15   television reports relating to this trial.

16           You are to consider and decide this case only

17   upon the evidence received during the course of the trial

18   here in the courtroom.

19           It is six minutes after 12.  I'd like to have

20   you back in the jury room by 1:15.  We'll try to get back

21   in the courtroom at 1:30.  Have a good lunch.

22                   (A recess was taken for lunch.)

23                   (The Court convened with all the

24                    parties present.  The prospective jury

25                    entered the courtroom and the

```
 1                    following proceedings were had.)

 2              THE COURT:  Be seated, please.  Mr. Williams.

 3                 VOIR DIRE EXAMINATION CONTINUED

 4    BY MR. WILLIAMS:

 5    Q    Good afternoon.  Hope you had a good lunch.  Is

 6         anyone that's -- again, we're again talking just

 7         with the persons put into the panel after the first

 8         round -- has anyone been subject or participated or

 9         been a witness in a lawsuit whether that be small

10         claims, civil case?  Has anybody been involved in

11         a -- in a case where they've actually sued somebody

12         or actually had to be involved in a lawsuit?  I

13         take it from -- I'm sorry.  Go ahead.

14    A    I had bankruptcy filed with my business.  I don't

15         know if that would qualify.

16    Q    Was there anything about that being involved in the

17         legal system that you think would effect you in

18         this case?

19    A    I didn't think it was fair.

20    Q    You didn't think it was fair.  But that was a civil

21         case.  Right?

22    A    Yes.

23    Q    Dealt with money.

24    A    Uh-huh.

25    Q    Anyone else that was involved in anything, a
```

```
 1          lawsuit of any kind?  Right.  I take it from no

 2          hands being raised that the answer is no to

 3          everyone else.  Does anyone have any religious

 4          convictions that may prevent them from being able

 5          to sit in judgment of another person that would

 6          effect them being able to render a decision in this

 7          case?

 8              We get your jury questionnaires provided to us

 9          before court, and one of the questions that was on

10          that jury questionnaire dealt with that issue, and

11          I bring it up.  I saw that, Ms. Adams, you had

12          checked the box regarding the religious convictions

13          maybe not being able to serve as a juror.  Did

14          you -- do you remember checking that box?

15      A   Yes.

16      Q   Okay.  And as you sit here today, do you -- do you

17          feel that way?

18      A   Maybe, yes.

19      Q   Is it something that you believe would prevent you

20          from being able to sit and -- and render a verdict

21          in -- in this case?

22      A   We going by, like, judging, and what I agree with

23          the other party if this causes them to be sentences

24          for death or something that's what we basically

25          goes on.
```

1    Q    So if this is not a death penalty case, there's no

2         allegation there.

3    A    Right.

4    Q    If that's not -- we're not going to be dealing with

5         that, could you make a decision in this case?

6    A    Yes.

7    Q    Mr. Beer, I saw on your questionnaire the same box

8         is checked.  Can you --

9    A    Similar type thing.  I can -- if it's not

10        concerning death then --

11   Q    All right.  All right.  So if the death penalty is

12        not involved, then you wouldn't have any problem at

13        least being able to listen to the evidence and make

14        a decision.

15   A    Correct.

16   Q    Is there anyone else?  I want to talk a bit about

17        types of evidence.  There are two types of

18        evidence.  There's what we call direct evidence and

19        circumstantial evidence.  Now, direct evidence is

20        eyewitness testimony, somebody sees something, and

21        they tell you what they saw.

22             Circumstantial evidence is kind of like

23        putting the pieces of the puzzle together to come

24        up with a conclusion, to look at things and make

25        inferences and make a decision.  Many of you have

1      children.  Is that right?  Mrs. Bowser, you have

2      some children.

3    A  Yes.

4    Q  Was there ever a time when your kids were growing

5      up that you told them that you didn't want them

6      to -- to have something to eat before dinner?

7    A  Yeah.

8    Q  Did they ever defy you and do it?

9    A  Of course.

10   Q  How did you know that they did it?

11   A  They usually told me.

12   Q  Was there ever a time when you actually told them

13     not to eat something and then saw them eating it?

14   A  Yes.

15   Q  And was there ever a time where you told them not

16     to eat, you didn't see them eating it, but you knew

17     based on some things at you saw that they did?

18   A  Yes.

19   Q  Give me an example.

20   A  I would find candy wrappers.  They were very

21     discrete.

22   Q  So you would say to them no candy before dinner.

23   A  Yes.

24   Q  And then what, find candy wrappers somewhere?

25   A  I believe that happened once or twice then.

```
 1    Q    Well, how did you know that they actually ate the

 2         candy?

 3    A    I didn't know that for a fact; I just assumed that.

 4    Q    Was it when just one of the children in particular

 5         that was doing it, or were they -- I see that you

 6         have three children.  Was there an instance where

 7         it was just a single child that you were dealing

 8         with in the house, time for dinner, I don't want to

 9         eat anything and --

10    A    Yes.  I had one problem child.  The other two were

11         pretty good.

12    Q    Well, how did you come to the conclusion if you

13         think back to that to say, well, I know you had

14         this candy before dinner?

15    A    They just didn't get any desert.

16    Q    They didn't get any desert.  Was there anything

17         though that -- did they get in trouble for not --

18         for having the candy before dinner?

19    A    It caused a lack of trust between us.  I think

20         that's the main problem it created.  I did not

21         punish them though.

22    Q    So if we use a situation like that where you

23         actually see your child after you've told them

24         don't have any candy and you see them actually

25         eating the candy, you have eyewitness testimony.
```

1       You would say that's direct evidence.  But when you

2       don't see it but you're able to determine that they

3       did it eat it; for example, you were -- that was

4       the only child home.  You didn't eat the candy.  No

5       animals or pets in the house.  Candy was there,

6       candy's gone, candy wrapper.  Based on all that,

7       you -- your life experience, your common sense, you

8       come to a conclusion, and that's circumstantial

9       evidence.

10   A   Yes.

11   Q   Does anybody have any questions about that the

12       differences between the two?  Ms. Combs, any

13       questions about that?

14   A   No no.

15   Q   Mr. Dickey?

16   A   No.

17   Q   Mr. Beers?

18   A   No.

19   Q   Mr. Adams?

20   A   No.

21   Q   Mr. Bontrager.

22              (The juror indicated.)

23   Q   Mrs. Keil?

24   A   No.

25   Q   Under the law direct evidence and circumstantial

128

1   evidence are equal.  There's no difference between

2   the two.  Mr. Dickey, you have a child.

3 A Yes.

4 Q How old?

5 A Three.

6 Q Three.  Is he or she of the age that she would know

7   or be able to -- to, I guess, tell you the truth or

8   not tell you the truth, or is she still too young?

9 A He is a too young still.

10 Q A little too young.  Mr. Beer, you have a child?

11 A Yes.

12 Q Six years old?

13 A Seven.

14 Q Same question to you.  Does he or she -- is it a

15   he?

16 A He.

17 Q He.  Does he know the difference between, I guess,

18   the truth and a lie?

19 A Yes.

20 Q And -- and how do you go about determining

21   potentially your child not telling you the truth?

22 A Questions.

23 Q Questioning you?

24 A Questioning, yes.

25 Q And trying to get the answers.

```
 1    A    Yes.

 2    Q    Is there something about those answers that lead

 3         you to believe that he is not telling you the

 4         truth?

 5    A    Yeah.  The stories don't match up.

 6    Q    The stories don't match up.  Mrs. Combs, you have

 7         some children?

 8    A    I have three adult children.

 9    Q    Three adult children.  Any time when they were

10         growing up that they didn't tell you the truth?

11    A    Yes.

12    Q    How did -- how did you determine that they didn't

13         tell you the truth?

14    A    Well, when you have three, they'll tattle for one

15         thing.

16    Q    Somebody always opens their mouth and says

17         something about it.

18    A    Right.

19    Q    So you were able to go to somebody else, one of

20         your other children, get information, and lead you

21         to believe that they weren't telling you the truth.

22    A    Correct.

23    Q    Any other way?

24    A    Sometimes you can get their body language and

25         just -- you just know they're lying.  You know, you
```

```
 1         know you're children.  You know they're not telling

 2         you the truth.

 3    Q    So you know it when you see it?

 4    A    Sometimes basically.

 5    Q    Not all the time, but that's a factor that you

 6         might look at.

 7    A    That's right.

 8    Q    Mrs. Bowser, how about you, when your kids maybe

 9         didn't tell you the truth, how did you make that

10         determination?

11    A    It was hard with the girls.  They were a little

12         devious.  My son I could always tell when something

13         came out of his mouth I knew it was the truth.  If

14         I confronted him, I knew.  I just knew the

15         children.  You know your kids, and you can tell the

16         way they shift their eyes around, and they aren't

17         looking you straight and telling you the truth.  I

18         could tell.

19    Q    You look to see if things make sense.

20    A    Yes.

21    Q    You use your common sense.

22    A    Yes.

23    Q    Life experience.

24    A    Yes.

25    Q    Things don't add up, it may not be a truth.
```

1    A    Correct.

2    Q    Does anybody think that the fact that they have to

3         determine the credibility of witnesses in this

4         case, they have to listen to testimony and

5         determine if someone is telling the truth or not,

6         does anybody think that they'd have difficulty with

7         that?  Mr. Beer, do you think you'd had any problem

8         with that?

9    A    No.

10   Q    Mr. Dickey?

11   A    No.

12   Q    Ms. Adams?

13   A    No.

14   Q    Ms. Bowser, any problem with that?

15   A    I don't think so --

16   Q    All right.  Well, when you say I don't think so

17        what --

18   A    I mean, you have to trust them that they're telling

19        the truth under oath.  That's all you can do.  If

20        it doesn't add up, then you begin to suspect.

21   Q    All right.  And you think you can do that listen to

22        the testimony and make those decisions?

23   A    Yes.

24   Q    Mrs. Keil any problem with that?

25   A    Keil.

1    Q   Mrs. Keil, any problem with that?

2    A   No.  They usually have a guilty look on their face.

3    Q   I'm sorry.

4    A   They would usually have a guilty look on their

5        face, and you could pick it up if someone else

6        didn't tell on them.

7    Q   And you're talking about your children.

8    A   Right, yeah.

9    Q   Mr. Bontrager, any reason to believe that that

10       would be difficult?

11   A   No.

12   Q   Mrs. Combs.

13   A   No.

14   Q   One of the things that you'll eventually get

15       instructed on, a jury instruction that you'll get

16       in this case is dealing with sympathy; and the

17       Court will instruct you that neither sympathy nor

18       prejudice is to effect your decision in this case

19       for either the victim or the defendants.  Does

20       everybody understand that sympathy is not to be

21       part of your decision making process?  Does anybody

22       have any problem with that that you have to just

23       look at the evidence and the facts presented and

24       the testimony and make that decision?  Ms. Adams,

25       do you have any problem with that?

1   A   I might have.

2   Q   Why do you say that?

3   A   It all depends on the situation of that person.

4       What their ability are.

5   Q   What their ability is.  And that may effect you

6       depending on -- when you say ability, what type of

7       ability?

8   A   They mind, if they know exactly what they was

9       doing, they really had a good understanding of what

10      was going on at that time.

11  Q   And so if you made those determinations, that

12      may -- even though it's not a legal defense that

13      they're insane or that you're instructed regarding

14      that, do you think that might have some effect on

15      your ability to decide?

16  A   Yes.

17  Q   I appreciate your answer.  Mr. Beer, any problem

18      with that facts?

19  A   No.

20  Q   Mr. Dickey?

21  A   No.

22  Q   Mrs. Keil, any problem with that.

23  A   No.  I still say, you know, at least with my own

24      I've known even my two and a half year old

25      granddaughter, I can tell when they're guilty or

134

1          something.

2     Q    So you think you're a pretty good judge of that.

3          All right.  Mrs. Bowser?

4     A    Given the age of the victim I think I would be

5          sympathetic just because of the age and the

6          vulnerability of that.  I can't help that.

7     Q    So that's something that would weigh on you.  That

8          a fact.  I mean, so that's one of the facts that's

9          involved.  The question is can you set aside that

10         preconceived sympathy and say I'm not going to let

11         that creep in and make my decision on what the

12         evidence is.  That's going to be so overwhelming

13         and that's why I'm making this decision and not

14         listen to anything else that's going on?

15    A    I don't think that would effect that ability.

16    Q    Because we all come here with -- from different

17         environments and life experiences, and we have

18         potential parents and grandparents, and that's --

19         that's each and everyone of us.  So knowing that

20         you may have that in your mind right now, do you

21         believe you could be fair and impartial to the

22         defendants without having ever heard any of the

23         evidence?

24    A    At this point I think I could, yes.

25    Q    Mr. Combs?

1    A    I believe I can.

2    Q    Do any of you have any strong feelings about law

3         enforcement, lawyers, persons with mental

4         deficiencies, or people that are of lower

5         socioeconomic means than yourself?  Does anyone

6         have any strong feelings about those?  I take it

7         from no hands being raised that the answer is no to

8         that question.

9             Mrs. Keil, on your jury questionnaire you had

10        written down that you have a father, I believe,

11        that's in a nursing home right now.

12   A    Seven years.

13   Q    How long?

14   A    Seven years.  He's had hospice since November.

15   Q    All right.  Do you have some concerns about being

16        here?

17   A    I sure do.

18   Q    And what are the concerns?

19   A    First of all, we had a scare we thought he was gone

20        three weeks ago.  They've had him on oxygen for a

21        long time.  They had to change it to liquid oxygen.

22        And he's in southern Indiana, and I told him that I

23        would have to be there.  He's the only parent I

24        have left.  My mother was killed in a car accident

25        in '82, and so I definitely would -- am concerned

1           about him.  We go done there as often as we can.

2     Q     Sure.  Is his condition as of today something that

3           young think -- is -- is potentially something going

4           to happen?

5     A     Yes.  It's worsened because they had to put him on

6           liquid oxygen last week.

7     Q     Knowing that your father is in this nursing home

8           and it's in southern Indiana and you're going to be

9           here if picked for the jury until potentially

10          Thursday, do you think that that -- having that, I

11          guess, over your head is going to effect your

12          ability to be able to sit and listen to what goes

13          on in the courtroom?

14    A     I think that, along with the fact that we are

15          moving to Grand Rapids because my husband has no

16          job.  He told me a little bit ago he sold the house

17          for less than we expected to, but we got to move

18          on.  So we need get up and there find something

19          before they tell us that they want us out in 30

20          days.  With no job, we couldn't go find something

21          until we're sure (inaudible) so I do have a lot on

22          my minds.  We just had a wedding last weekend so I

23          got --

24    Q     Much on your mind.

25    A     My suitcases are packed.  They stayed packed

```
 1          because of my dad.

 2     Q    Are you planning on moving this week or going up

 3          there this week --

 4     A    We will be going to Grand Rapids this week as soon

 5          as I am released.

 6     Q    I guess what it boils down to is knowing all this

 7          stuff on your mind and trying to be as honest as

 8          possible, and I know you will be, but do you think

 9          that you could sit here for three days and give

10          100 percent attention to the testimony and to this

11          case with all those things on your mind?

12     A    No, I do not.

13     Q    Thank you.  Mrs. Bowser, what do you like to do in

14          you free to time?

15     A    I don't have much of it; but when I do gardening,

16          bike riding, spend time with my grandchildren.

17     Q    How many grandchildren?

18     A    Two granddaughters.

19     Q    Do you watch any particular TV shows.

20     A    Very little.

21     Q    Not much time for TV?

22     A    No.

23     Q    Mr. Bontrager, what do you like to do in your free

24          time?

25     A    I coach wrestling.
```

1    Q    Coach wrestling.  Where do you coach wrestling?

2    A    I just got an assistance coach job at Central.

3    Q    That's here in Elkhart?

4    A    Yeah.

5    Q    So when does the season start?

6    A    The season doesn't start until September.  We just

7         stopped our workouts until September.

8    Q    So it's not going to effect you ability to be here

9         or anything like that?

10   A    No.

11   Q    Do you watch much TV?

12   A    Not really.

13   Q    Play any video games?

14   A    Yeah.  Play a lot of the video games.

15   Q    What kinds of video games?

16   A    Mostly sports.

17   Q    Mostly ports.  Any anything in particular?

18   A    Football.

19   Q    Football.  Ms. Adams, what do you like to do in

20        your free time?

21   A    Gardening church.

22   Q    Church.  Any time for TV?

23   A    Yes, some.

24   Q    What's your favorite TV show?

25   A    Law and Order.

1    Q    Law and Order.  Well, I guarantee you that the

2         process doesn't go as quick as it does in

3         Law and Order.  It takes much longer, and it's

4         probably not as exciting.  Is there anything about

5         the Law and Order or anything that comes to mind

6         that you think would be problematic in this case?

7    A    No.

8    Q    Mr. Beer, what do you like to do in your free time?

9    A    Camping, sporting events.

10   Q    Any particular sporting events?

11   A    Basketball, football, Nascar.

12   Q    And when you say camping, is that actual going out

13        in a tent?

14   A    No.

15   Q    What kind --

16   A    Travel trailer.

17   Q    Travel trailer.

18   A    Yes.

19   Q    All right.  Any time for TV?

20   A    In the evenings.

21   Q    And anything in particular that you like to watch?

22   A    Baseball.

23   Q    Do you have a favorite team?

24   A    Red Sox.

25   Q    Red Sox.  How about -- how about you, Mr. Dickey,

```
 1            anything in particular that you like to do in your

 2            free time?

 3       A    Camping and work on cars.

 4       Q    What kind of cars?

 5       A    Classic.

 6       Q    Classic.  And do you have much time for TV?

 7       A    Nope.

 8       Q    When you do or if you have any time, do you watch

 9            anything in particular?

10       A    Just whatever is on.

11       Q    And finally, Ms. Combs?

12       A    Well, I like to walk, and I volunteer at the

13            hospital, you know.  Elkhart General Hospital I

14            volunteer at.

15       Q    And what did you do for them as a volunteer?

16       A    I am in the gift slop.  Do all the gift shop

17            purchases and stuff like that, and I go to shows

18            and that type of thing.

19       Q    Do you have a lot of time for TV?

20       A    In the evening, I do watch some T.V.

21       Q    Anything in particular?

22       A    I watch 24.

23       Q    24.

24       A    And House.  Two of my favorite shows.

25       Q    Do you think there's anything in particular that
```

1          would make you a good juror in this case?

2      A   I good juror.

3      Q   A good juror, or on the flip side a bad juror.

4      A   I'd like to think I'd be a good juror.  I'd like to

5          think I have an open mind, wait until the end and

6          then make a decision.  I don't know.  I just really

7          think -- I have never been on a jury before, but I

8          would give it my best.

9      Q   All right.  And that's all we would ask.  That's

10         all we would ask.  And, Mr. Beer, anything that

11         would make you a particularly good juror, or I

12         guess, a poor juror?  I won't say bad juror.  It

13         sounds bad.

14     A   I have to make decisions everyday in the business

15         I'm in so, and I have to decipher out the

16         information there that I'm given so.

17     Q   What type of business are you in?

18     A   Sales.

19     Q   Sales.  What kind of decisions do you have to make?

20         Give me an example of your decision making process.

21     A   Well, I'm in charge of people within the dealership

22         and besides selling.  So I've got -- I've got to

23         not only, you know, be able to sell to people.

24         I've got to coordinate how their vehicles get taken

25         care of and done and serviced an so forth.

1    Q    Customer service?

2    A    Yeah.

3    Q    So you sell cars?

4    A    Yes.

5    Q    Mr. Dickey, anything that you believe would make

6         you a particularly great juror?

7    A    My decision making.  That's about it.

8    Q    And decision making in what areas?

9    A    Of what people say and try to explain.

10   Q    And do you -- do much decision making in your job

11        or --

12   A    At work I do it almost everyday.

13   Q    And what's your work?

14   A    Automotive technician.

15   Q    Diagnose problems with cars and then make decisions

16        on how you fix them and what you have to do.

17   A    Yes.

18   Q    Mr. Bontrager, anything in particular that would

19        make you a good juror or the opposite?

20   A    I'm open minded.  I listen to both sides before I

21        even to come to a reality what I think happened.  I

22        just want to make sure I have all the facts and

23        just open-minded.

24   Q    All right.  Mrs. Bowser?

25   A    I'd like to think I would be fair to all the

```
 1          parties involved and be as fair as I can and try to

 2          make the right decision and pray about it.

 3      Q   Is there anything that any of you want to tell me

 4          something that I didn't ask because again as

 5          Ms. Becking said we don't know every question to

 6          ask or what it is that maybe you want to tell us

 7          that I just haven't asked; and is there anything

 8          that you think would be pertinent where you want me

 9          to know, want us to know, this is the time to tell

10          us?  Ms. Combs, anything?

11      A   Nothing comes to mind.

12      Q   Mr. Dickey?

13      A   No.

14      Q   Mr. Beer?

15      A   No.

16      Q   Ms. Adams?

17      A   No.

18      Q   Mr. Bontrager?

19              (The juror indicated.)

20      Q   Ms. Keil?

21      A   No.

22      Q   Mrs. Bowser?

23      A   No.

24      Q   Thank you very much.

25              THE COURT:  Mr. Zook.
```

1                    VOIR DIRE EXAMINATION

2      BY MR. ZOOK:

3      Q    Well, it's nice getting back from lunch.  Everybody

4           is energized and ready to go.  And this is an

5           interesting process, isn't it?  In the new panel of

6           people, you're still new by the way, who in the new

7           panel has known somebody or been a person who has

8           been associated as a victim in a violent crime?

9           Nobody.  No violent crimes.  You already talked

10          about it a little bit.

11     A    I know somebody, yeah.

12     Q    I couldn't hear a thing you said when I was back

13          there.  Can you tell me what that was?  The crime.

14     A    The crime of someone I know?

15     Q    Yeah.

16     A    My first cousin.  She accidentally murdered her

17          husband.

18     Q    Okay.  Okay.  Was she convicted of that?

19     A    Yes.

20     Q    Did she go to a trial?

21     A    Yes.

22     Q    Okay.  Did you feel that was right?

23     A    Yes.

24     Q    Okay.  The two words accident and murder don't

25          really go together.

```
1    A    They accused her for murder.  They put her for

2         murder.

3    Q    And the jury found that she really did?

4    A    Yes.

5    Q    Okay.  Was that in this state?

6    A    No Illinois.

7    Q    Okay.  Their laws might be a little different over

8         there.  I don't know what they're like.  Over here

9         you might be wondering about second degree, first

10        degree, things like that.  We don't have that

11        anymore.  Since '77 we just had one kind of murder,

12        and that's just murder.  Try to speed it up for

13        Ms. Combs.  Okay.

14             To explain a little bit about what we're

15        doing, I'd like to put it in these terms.

16        Everything has checks and balances.  There's been

17        an arrest, now we're going to be the balance to

18        balance out the prosecution, but you're going to be

19        the check.  The idea is you check and see what's

20        been done, check and see whether the evidence

21        proves proved beyond a reasonable doubt.  So it's

22        important that even if you start out thinking

23        police are always right you need to check on that.

24        You must have had a lot of to eat?

25   A    Why?
```

```
 1    Q   Because you're kind of drifting off here.

 2    A   No, I'm not.  I listened to every word you said,

 3        and I listened to every word Mr. Williams said.

 4    Q   Okay.  What did you do in the community schools?

 5    A   I didn't work for the schools.

 6    Q   Excuse me.  I'm thinking of woman down there.  I'm

 7        sorry.  You passed that test.

 8    A   I knew I wasn't in school.

 9    Q   But I did mean to ask.  You are retired, and your

10        husband is retired.  What did you do?

11    A   I worked for a data processing company the last ten

12        years of my employment, then I worked at a bank.

13    Q   Okay.  Where did you work?

14    A   I worked -- Ameritrust it was called at that time.

15        Then I worked at ISI.

16    Q   I didn't know that?

17    A   It is a company that does payroll checks for other,

18        you know, for different companies.

19    Q   Okay.  If you had it to do over and you could

20        choose anything you wanted and you could be

21        retrained not that you really want to work now I

22        understand, but let's say you could do it over.

23        Free education and go into whatever you want.  What

24        would that be?

25    A   I think I like the computer a lot, but I also like
```

1        the medical field.  It would be -- I really enjoy

2        working at the hospital and that type of thing.

3        Anything that I would like to do would be probably

4        associated with people.  One on one commorodity.  I

5        wouldn't want to be by myself.

6     Q  You seem a little bit social.

7     A  Correct.

8     Q  Okay.  How would your husband describe you?

9     A  Wonderful.  No.  My husband is not real well, so

10       I'm kind of caregiver.  Not a caregiver, but he's

11       well enough to get around, but he depends on me a

12       lot.

13    Q  Okay.  Is everything going the way you hoped it

14       would?

15    A  Yes, it is.

16    Q  Good.  There's something that was said the last

17       time through that made me wondering and got my ears

18       to listening again and that was that you should

19       leave everything at the courtroom door and when you

20       come in here listen to us, look at the

21       instructions, and just pay attention to that.  You

22       don't have to leave your common sense at the

23       courtroom door.  As a matter of fact, that will

24       serve you well here.  You need to keep your common

25       sense about you.  That's why there are 12 of you

| | | |
|---|---|---|
| 1 | | here with different experiences.  And, JoAnn, I |
| 2 | | understand that you work at Elkhart Community |
| 3 | | Schools. |
| 4 | A | Yes. |
| 5 | Q | What is it that you do? |
| 6 | A | I'm a paraprofessional. |
| 7 | Q | Doing what? |
| 8 | A | Working with the teachers and the students.  I work |
| 9 | | with special ed. |
| 10 | Q | Okay.  That's pretty special.  And are you doing |
| 11 | | that now or during the school year? |
| 12 | A | I'm doing it during the school year.  So I start in |
| 13 | | two weeks. |
| 14 | Q | All right.  Are you working at Elder Beerman now? |
| 15 | A | Yes. |
| 16 | Q | What do you like about this job in the school? |
| 17 | A | I like working with the students, the teacher.  I |
| 18 | | assisted the children that need help in classes. |
| 19 | | If they, you know, slow I work with emotional |
| 20 | | mildly, LD.  I work with all of them. |
| 21 | Q | Okay.  Do you believe that this incident that |
| 22 | | happened to a relative of yours would color how you |
| 23 | | view this case?  Do you think that would effect it |
| 24 | | at all? |
| 25 | A | No. |

149

| 1 | Q | And you could judge this case impartially? |
|---|---|---|

1    Q    And you could judge this case impartially?

2    A    Yes.

3    Q    Do you think you could give our clients a

4         presumption of innocence all through the trial and

5         then look at the evidence at the end to see what

6         happened?

7    A    Yes.

8    Q    You think you can obey all the judge's

9         instructions?

10   A    Yes.

11   Q    How about the instruction concerning the fact that

12        the defense doesn't have to present a defense, the

13        defendant does not have to testify, and you can't

14        hold that against the defendant?  How does that

15        strike you?

16   A    Okay.  I mean, they're not able, and they don't

17        want them to testify, if they go on the facts that

18        they are not able to get on the stand.

19   Q    Okay.  And you wouldn't hold that against the

20        person or make an inference that the person is

21        guilty simply because the person didn't testify?

22   A    Right.

23   Q    Okay.  Lets' see here, Mr. Bontrager.  How do you

24        feel about that idea?

25   A    That if they don't testify, I think it's fine.  I

1       mean, if they don't feel they have to testify, then

2       I'm not going to judge them to be guilty

3       automatically.

4    Q  All right.  Do you think that you can keep from

5       using that presumption or that thought against them

6       entirely?

7    A  Yes.

8    Q  Just go with the stuff that's been presented to you

9       not the stuff that hasn't.

10   A  Yes.

11   Q  And, Mr. Beer, how about yourself?

12   A  Same thing.

13   Q  You'd had a -- you'd had a pretty traumatic event

14      happen to you.  Do you think that's colored your

15      view of anything?

16   A  No.  It's been many, many years ago.

17   Q  How old were you?

18   A  I would have been 20 at the time.

19   Q  Wow.  So you must have gotten a medal from your

20      parents.

21   A  I don't know about that.

22   Q  That's great.  Okay.  Now, there are going to be

23      some photographs I anticipate.  I assume the state

24      is going to introduce some photographs that are

25      kind of gory, and those are introduced to show you

1           what happened.   Does anyone -- I think you probably

2           would be used to such a thing by this time.

3     A     Right.

4     Q     Our fear as defense attorneys is that the fact that

5           photos are gory may lead you to think somebody's

6           got to be held accountable and these two are the

7           ones here, but there may be people that are so

8           effected by those photographs that they actually

9           can get physically sick.   Do any of you feel that

10          you are that type of person?   Wouldn't be able to

11          look at the photographs.   Okay.

12    A     I might be.

13    Q     Okay.   Thank you.   I expect that it would show the

14          decedent, who is a 94-year-old person, on the floor

15          with ligature marks on her neck and some other --

16    A     My dad is 91.

17    Q     Okay.   You think that might be a little too

18          personal for you?

19    A     Probably.

20    Q     If you were a defendant being tried here in court

21          and you were on trial for murder, would you want

22          someone in your frame of mind on your jury?

23    A     Not if they were biassed.

24    Q     Not if they were biassed.   Do you feel you're

25          biassed, or are you just running on a short time?

```
 1     A    No.  I've cut myself with a razor blade and had

 2          problems so.  I'm not a nurse.  That sort of might

 3          bother me.  Just basically the fact.

 4     Q    Okay.  Thanks, Ms. Keil.  Mr. Bontrager, are you a

 5          memBer of any organizations?

 6     A    No.

 7     Q    Boy Scouts?

 8     A    No.

 9     Q    Okay.  And, Mrs. Bowser, how about yourself?

10     A    I belong to our church that's all.

11     Q    Ms. Adams?

12     A    Church co-pastor.

13     Q    Co-pastor?

14     A    Yes.

15     Q    You sing in the choir?

16     A    No.

17     Q    Don't have that talent.  And, Mr. Beer?

18     A    I'm a member of First Baptist Church in Elkhart.

19     Q    Are you member of anything else?

20     A    Involved in a lot of different organizations, but

21          not a member of them.

22     Q    Do you get any magazines?

23     A    Uh-huh.

24     Q    What are those?

25     A    Sports magazines, and a couple of different car
```

1       magazines.

2   Q   Okay.  Cars seem to be running through the jury

3       here, like custom cars and old cars.  And, Mr.

4       Dickey, tell us about your car you're working on

5       now?

6   A   '78 Celica GT.  It's got a blown motor.

7   Q   You had a blown motor.  Can you put a new motor

8       into cars yourself?

9   A   Yes.

10  Q   You got the stuff to do it?

11  A   At work I do.

12  Q   So this is after work type things?

13  A   Yes.

14  Q   What is it that attracts you to do that?

15  A   It's always been my passion since I was four years

16      old.

17  Q   If there was anything else you could train to go

18      into, what would it be free?

19  A   Framing houses.

20  Q   Okay.  Have you ever worked in that area?

21  A   Two years.

22  Q   Okay.  Now, it was also said that there's no

23      difference between direct and circumstantial

24      evidence.  Do you understand what the prosecutor

25      was talking about with that?

1    A    Yes.

2    Q    Did that make sense?

3    A    Yes.

4    Q    If you find a dog with pie on its face, you might

5         conclude that the dog ate the pie.

6    A    Yes.

7    Q    There -- in some cases there can be a difference

8         between those two things, not in general; but if

9         there's going to be a difference in the direct and

10        circumstantial evidence, you'll probably get an

11        instruction on that.  All of you would receive

12        that.  Okay.  Now, I think you're probably the life

13        of this party?

14   A    Thank you.

15   Q    Have any of you new panel members been on a jury

16        before?  Do any of you have any relatives who are

17        law enforcement officers?  Yes, Mr. Dickey.

18   A    My grandfather works in the personnel at the

19        Elkhart Police Department.

20   Q    What's his name?

21   A    Tom Cal.

22   Q    Okay.  Do you think that that would make any

23        difference as far as the way you view the police

24        that testify here?

25   A    No.

```
 1    Q   How do you think police testimony and lay testimony

 2        compares?

 3    A   Better with the truth.

 4    Q   You think police are better with the truth?

 5    A   They should be.

 6    Q   Do you think they are with the exception of your

 7        grandfather?

 8    A   Yes.

 9    Q   Okay.  We're here to test that and to see if the

10        police case that's coming to you is a legitimate

11        case or not.  Understand that?  So do you think you

12        could discern if there was someone lying to you

13        whether that person is a policeman or not or

14        whether that person is fabricating or adding a

15        little to the evidence?

16    A   Yes.

17    Q   You need to be able to look into that.  And,

18        Mr. Bontrager, how about yourself?  Were you

19        raising your hand?

20    A   Yeah.  My uncle was a DNR office in Lagrange

21        County.

22    Q   Those guys are rough?

23    A   Yeah, a little bit.

24    Q   Have you discussed his cases with him?

25    A   No, we don't talk -- only thing that's ever came up
```

```
 1          is one time he had to rope a boat in the middle of

 2          a lake because nobody was on it so he roped, and

 3          brought it back in.

 4    Q     Somebody's got to do it.  Okay.  Any questions with

 5          the five of you or any thoughts about the fact that

 6          you might end up being the one juror holding out

 7          when 11 other people say either guilty or not

 8          guilty and you say the opposite?  Mr. Dickey, how

 9          do you think you would respond in a situation like

10          that?

11    A     Well, it all depends on the facts.

12    Q     Well, let's say that you still believe that you're

13          right and they're wrong, but you're only by

14          yourself, and they have 11 supporters.  One thing

15          we need here is a unanimous verdict not -- not 12

16          or not 11 to one and not seven to five.  You know

17          how you would handle that?

18    A     No.

19    Q     Okay.  Mr. Beers?

20    A     Again, I would go based upon the facts and make my

21          decision.

22    Q     Okay.  And one thing that we sometimes say is each

23          one of you makes your own verdict, and you talk

24          among yourselves and perhaps try to sway each other

25          by giving facts to show that you're right; but in
```

1        the end if you still feel that you are right, would

2        you hold that verdict for yourself?

3    A   Yeah.

4    Q   And you wouldn't give in simply to prevent a

5        disagreement between the jurors.

6    A   Correct.

7    Q   Do any of the new members feel that if the other 11

8        are against you that that means that therefore

9        you're wrong?  Okay.  Do any of you know each other

10       on the current panel?

11   A   We know each other from church.

12   Q   Same church.  Do either of you feel -- well, I know

13       how churches are, and sometimes there's this -- not

14       between you two.

15   A   No.

16   A   No.

17   Q   So if one of you decides one way, the other one

18       isn't going to follow suit, or the other one isn't

19       going to simply decide the other way to give you

20       spite?

21   A   No.

22   A   No.

23   Q   Do any of you have a question for me?

24   A   Mr. Beer and I know each other as well.  He was my

25       daughter's little league coach this summer?

1   A   I know Mrs. Oakley?

2   A   And I know Mr. Beer.

3   Q   Are you all like in the same church or something?

4   A   Mrs. Oakley's brother is married to my youngest

5       daughter, and they live in Indianapolis?

6   Q   This might be the fastest verdict ever.

7   A   She worked with my wife for many years.

8   Q   Do any of you feel a little constrained as to what

9       you can do back in the jury room because you know

10      each other?

11  A   No.

12  A   No.

13  A   No.

14  Q   And can you keep that out of your deliberation,

15      keep an independent verdict for yourselves?

16  A   Yes.

17  Q   Now, have any questions of me.  Thank you.

18          THE COURT:  Mr. Crawford.

19                  VOIR DIRE EXAMINATION

20  BY MR. CRAWFORD:

21  Q   Mrs. Adams, you mentioned you work with Elkhart

22      Community Schools.  Is that correct?

23  A   Yes.

24  Q   And you were worked as a paraprofessional.

25      Correct?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | As a paraprofessional with the special education |
| 3 | | students, what are your responsibilities? |
| 4 | A | I work with each student to make sure they get all |
| 5 | | their assignments.  If the students need help in |
| 6 | | the class, I assist them.  I read the tests to |
| 7 | | them.  If they need help, we take them to another |
| 8 | | room so they can make sure they have plenty of time |
| 9 | | to work on they test.  It all depends on the IEP. |
| 10 | | That's what we do requirement on.  All the students |
| 11 | | have that. |
| 12 | Q | What kind of special needs have these children had |
| 13 | | that you've had to work with? |
| 14 | A | Learning disability, might be LD, (inaudible) score |
| 15 | | on their test.  They might have problems with the |
| 16 | | test whether it have to be modified for them to do |
| 17 | | well on the test.  Some of them are really slow. |
| 18 | | They might not be able to read well, they might be |
| 19 | | slow reading, writing, math.  That's most of the |
| 20 | | problems they have. |
| 21 | Q | Did you -- did you have to have special training to |
| 22 | | deal with these kids? |
| 23 | A | Yes.  I had to have some education.  I go to |
| 24 | | seminars, learn how to work with them.  Some of |
| 25 | | them emotional that means they have behavioral |

1           problems.  You have to learn out how to deal with

2           those.

3      Q    Okay.  So they're special needs that these children

4           would have, and you had to specifically learn how

5           to deal with.  Is that correct?

6      A    Yes.

7      Q    And how long have you been involved in that

8           process?

9      A    Almost six years.

10     Q    And have you constantly been learning throughout

11          the period of time that you've been involved with

12          special ed students?

13     A    Yes.

14     Q    Okay.  Thank you, ma'am.  Mr. Beer, it's been a

15          while since you were up here, and I think I heard

16          this, but you had mentioned dealing with a

17          traumatic event, was that correct, of seeing a

18          person wo was deceased and having to call the

19          police.  Is that correct?

20     A    Yes.

21     Q    And I believe you had mentioned that remembered an

22          awful lot about that.  Is that right?

23     A    Yes.

24     Q    Because of the event itself.  Is that correct?

25     A    Correct.

1    Q    You mentioned that your memory was pretty good

2         about that because of that reason.  Right?

3    A    Yes.

4    Q    And that happened some time ago, didn't it?

5    A    Yes.

6    Q    Do you find that in your own life more traumatic

7         events are easier for you to remember, or are there

8         special things about certain things that's easier

9         for you to remember?

10   A    More traumatic events are easier to remember.  I'm

11        sure there are some certain things that I forget,

12        you know, from 1987; but I can tell you exactly

13        still on the road where that truck was and so

14        forth.

15   Q    How did you react when you saw that?  Were you

16        pretty tense or were you pretty anxious or did it

17        change your emotions in anyway?

18   A    Obviously, yes.  I mean, when you see a gun laying

19        on the road and you see a person's chest wide open,

20        why you get a little bit racy.

21   Q    Okay.  So you were anxious.

22   A    Yeah.

23   Q    And that happened how many years ago?

24   A    Well, it was the first murder in Elkhart County of

25        1987.

1    Q    I believe in reviewing your questionnaire as well

2         too you had indicated that there were some, I

3         guess, some issues in the past with this system

4         involving your brother-in-law.  Is that correct?

5    A    Yes.

6    Q    Okay.  And I believe there -- was that issue

7         resolved by way of a court hearing or --

8    A    Yes.  He was -- he was sent to prison for about two

9         years.

10   Q    Were you actively involved in that?

11   A    No.

12   Q    Anything as a result of that situation that would

13        make it difficult for you to sit as a juror in this

14        particular case?

15   A    No.

16   Q    You mention you were not actively involved so you

17        weren't at the Court proceedings and stuff of that

18        nature, or were you?

19   A    No, I was not.

20   Q    Have any of our panel ever been on the jury before?

21        I don't know if anybody asked that.  I couldn't

22        remember if that's come up along the way?  Any

23        other experience with a jury duty other than today

24        of our four or five new people?

25   A    I've been called twice never into the box.

| | | |
|---|---|---|
| 1 | Q | First time into the box.  Okay.  Or have you |
| 2 | | actually been in the box? |
| 3 | A | No.  I have never been in the box. |
| 4 | Q | Is it as exciting to sit up here as it was to sit |
| 5 | | back there? |
| 6 | A | Yeah. |
| 7 | Q | Do you want to be in the box? |
| 8 | A | I'm here. |
| 9 | Q | Anything that you can think that perhaps would make |
| 10 | | you believe a good juror in a case such as this or |
| 11 | | not a good juror in a case such as this? |
| 12 | A | I think I would be open minded and listen to all |
| 13 | | the facts. |
| 14 | Q | Okay.  Anything going on at home right now that |
| 15 | | would make it difficult for you to give your |
| 16 | | undivided attention? |
| 17 | A | The only thing I've going right now is I'm in |
| 18 | | sales; and if I'm not there, I don't make a living. |
| 19 | Q | I understand that.  Is that going to be too much |
| 20 | | weighing on your mind because you heard Ms. Becker |
| 21 | | say this is a pretty complicated case? |
| 22 | A | I don't think so.  I think I got good enough people |
| 23 | | around me to help me. |
| 24 | Q | Well, do you benefit by not being there, or is it |
| 25 | | only exclusively based upon your performance while |

1          being there at your job?

2    A     We help each other out a lot.  We're pretty unique.

3    Q     Okay.  So if there's -- you mention you're in

4          sales.  Correct?

5    A     Yes.

6    Q     Are you -- will you still make a part of whatever

7          profit's generated, or is that only when you're

8          there you get a profit?

9    A     No.  I would -- if I was here, I would still

10         continue to get --

11   Q     Because I can assure you what you get here will not

12         be anywhere near probably what you get there.

13   A     I understand.

14   Q     Okay.  So that won't be really an issue.  You're

15         not worried about losing sales yourself.  You have

16         an active amount of other people there that can

17         keep it up.

18   A     Correct.

19   Q     Now, I believe you mention also too that your

20         religious convictions would not be something that

21         would make it difficult for you to finally have to

22         make a decision.  Correct?

23   A     Correct.

24   Q     Okay.  Thank you, sir.  I appreciate it.  Ms. Keil,

25         I believe you mentioned the issues concerning your

1    father being in southern Indiana, and I do note

2    that I checked on that when I looked at your

3    questionnaire with some concern over that

4    particular issue.  Is that going to be something

5    again that's going to weigh pretty heavy on your

6    mind in making a decision in this case?

7  A  Yes.  I think probably the worst time in my life

8    for me to have to be here especially since we have

9    to move and everything else on top of it.

10  Q  Okay.  I appreciate that, ma'am.  Thank you.

11    Mrs. Bowser, in reviewing your questionnaire as

12    well too I noted some things concerning some

13    potentially being a victim of a certain action in a

14    the past with somebody out of is it Grand Rapids,

15    Michigan or a family member that was --

16  A  Yes.

17  Q  Is the fact that you or others were involved in

18    that situation going to make it difficult for you

19    to sit in a -- in a criminal case?

20  A  No.

21  Q  Is that something that you can completely separate

22    from what you have to resolve over the next couple

23    of days in this case?

24  A  Yes.

25  Q  I had spoken with Mrs. Keil about her father, but

1           is there anyone else that has a very close

2           connection to a friend or family member that's -- a

3           little more like Ms. Sailor's age in this case, 94

4           years of age, that would make it difficult for you

5           to sit in a case like this and separate emotions

6           you might have because of that situation of our new

7           panel members?  Okay.  I will assume since no one

8           has raised their hand or said something that that's

9           not going to be an issue, that you'll be able to

10          separate those two particular matters.

11              Other than the being a victim of a violent

12          crime or what I've spoken about with other people,

13          has anyone else had a friend or family member that

14          has been the victim of any kind of crime whatsoever

15          of our new panel?  Okay.  I will assume no one else

16          has, or we've already talked about that.

17              Has anyone ever been a witness in a case

18          before of our new panel?  Of what we have mentioned

19          so far, is there anyone else that has anything

20          going on at home or work now of our new panel that

21          would make it difficult for you to consider the

22          facts of this case over the next couple of days?

23          Anything at home, work.  Okay.  Thank you.

24              I believe some of you mentioned that you did

25          know some police officers and had had some contact

1      with police officers in the past of our new panel.

2      Does anyone believe that officers have any special

3      senses or abilities that normal citizens like

4      yourself or myself might not have?  Of our new

5      panel, anybody have any thoughts on that?  Ms.

6      Adams, do you have any thoughts about that?  Do you

7      believe they have any special abilities that you or

8      I don't have?

9   A  No.

10  Q  I would suggest that perhaps maybe if there was

11     some training on certain areas they may have some

12     special abilities in that area.  You mention that

13     you were a paraprofessional and received training

14     for dealing with certain people dealing with

15     special ed needs so you would have the experience.

16     So I would -- I would suggest even for that matter

17     there may be certain matters areas that they may

18     have more experience in than you or myself.  But

19     special abilities sight, hearing, things of that

20     nature, would it be fair to say that they may have

21     it just like the rest of us, Ms. Adams?

22  A  Would they be -- you saying they have the same --

23  Q  Similar to you or I.  Obviously, if they have

24     better eyesight they do; but normal people.

25  A  In some cases, could be.

1    Q    Okay.

2    A    All depends on the individual all on different

3         levels.  They score different.  They have different

4         learning ability where one might be higher than the

5         other one on common sense.  Some don't have that.

6         Some don't have motor skills.

7    Q    You're talking about the people you work with.

8    A    Right.  So it all depends.

9    Q    But if it was an officer or some other person that

10        may testify in the police capacity, do you believe

11        they have special abilities that may be different

12        than you or I?

13   A    No.  I would -- well, they would both be

14        professionals so that would weigh a little bit

15        more.

16   Q    Okay.  But within certain ranges.

17   A    In certain ranges.  You are to consider who's

18        testifying and if they're supposed to be telling

19        the truth so.

20   Q    Okay.  Thank you.  Mr. Beer, how about you?  What

21        do you think about that?

22   A    They're senses are the same as ours in the normal

23        world.  Granted, like you said, if they've had

24        special training in areas, absolutely they should

25        be better.

```
 1    Q    But I will assume that you will listen to that in
 2         order to be able to formulate that decision.  You
 3         won't give them that special preference until they
 4         show you that.
 5    A    No.
 6    Q    How about you, Mr. Dickey, what do you think?
 7    A    The training they have with their senses is the
 8         same.
 9    Q    Okay.  But you would look at training like Mr.
10         Beers said as well too of certain areas.
11    A    Yes.
12    Q    Ms. Combs, how about you?
13    A    I believe that I can, you know, they're just men.
14         They're just people.  Although they have some
15         expertise, I don't believe I'd believe them more
16         than anyone else.
17    Q    Right.  You would want to -- as we talked a little
18         bit about before if you had some special
19         training --
20    A    Yes, I mean, you know, like, he was, like a DNA
21         officer or something, you know, like coroner or
22         something, but as far as just a lay cop.
23    Q    Like if he went to special CSI school or something
24         really be a good forensic guy or something.
25    A    Yes.
```

1   Q   So there would be some avenues that perhaps they

2       could be better at if they had the training.

3   A   Correct.

4   Q   Much like you or I could if we had the training and

5       knowledge.

6   A   Right.

7   Q   Mr. Bontrager, how about you?

8   A   I think they're people just like us.  I believe

9       we're all equal so.

10  Q   How about you, Ms. Keil?

11  A   The same.

12  Q   The same abilities that are perceived, nothing far

13      greater, no super human abilities to perceive?

14  A   No.  But they would have more training on what to

15      look for than we ordinary people would.  We just

16      have to listen the facts.

17  Q   Okay.  Thank you.  Mr. Bowser, how about you?

18  A   I think that a police officer would see a lot more

19      than I would see if they came onto a crime scene.

20      I mean, they're trained to do that.  I certainly

21      hope.  As far as their natural abilities, no, I

22      think they would be average.

23  Q   So only what they have been taught to learn would

24      they have picked up any special skill but hearing

25      or eyesight or -- or breaking something down maybe

1           common sense wise too they share like the rest of

2           us.  Is that fair to say?

3      A    Yes.

4      Q    But they would pick some things up with seminars

5           and other classes they might have gone to.

6      A    I think the perception of something would be

7           totally different than mine would be.

8      Q    Because of training?

9      A    Because of their training, yes.

10     Q    Okay.  But in order for them to make that jump or

11          make that conclusion, do you want to hear how they

12          got that or had that ability to learn how to do

13          that?

14     A    I didn't understand your question.

15     Q    If you say that someone's perception or abilities

16          based on their training is superior to ours, they

17          might have that ability more so than yourself in

18          perceiving something, would you want to learn how

19          they got to that point?

20     A    Would I want to know how they achieved that skill?

21     Q    Yes.

22     A    Not necessarily.  I would assume it would be their

23          training.

24     Q    Okay.  We had mentioned this earlier and without

25          asking what you heard, but have any of our new

1      panel members heard anything about this particular

2      case?

3  A  Just seen a blurb in the newspaper.

4  A  I did to too.  Over the weekend, there was small

5      article, well, not small, but an article.

6  Q  Okay.  Anything abut that article or anything else

7      that you've seen make it you come in with

8      preconceived notion?

9  A  No, no.

10  Q  I think that's all I have.  Thank you for your

11      time.

12        THE COURT:  Thank you, Mr. Crawford.

13          (Counsel approached the bench.)

14        THE COURT:  Ladies and gentlemen, we're going

15  to give you a recess at this time.  We're going to

16  address a legal issue here in court.  You are all

17  prospective jurors in this case.  You are prohibited from

18  discussing this case with anyone prior to the

19  commencement of the evidentiary portion of the trial.  To

20  do so may result in a mistrial.  After the presentation

21  of evidence has begun, jurors may discuss the evidence

22  presented amongst themselves in the jury room during

23  recesses.  All regular jurors and alternates must be

24  present during such discussion.  You must reserve

25  judgement concerning the outcome of the case until jury

1    deliberations begin.

2            You may not discuss the facts of this case with

3    me or with the lawyers or with any of the witnesses.

4            You may not investigate the case yourselves or

5    attempt to obtain information outside the courtroom.  It

6    is highly improper for you to do so.  You are also

7    prohibited from reading any newspaper accounts of this

8    case and from listening to or watching any radio or

9    television reports relating to this trial.  You are to

10   consider and decide this case only upon the evidence

11   received during the course of the trial here in the

12   courtroom.  You'll be in care of the bailiff.

13                (The jury left the courtroom, and the

14                following proceedings were had.)

15           THE COURT:  All right.  The record reflects at

16   this point, all defendants are present, counsel for the

17   parties are present.  Mr. Beer has been selected in this

18   round, Ms. Combs has been selected in this round.  The

19   defendant has exercised peremptory strikes with respect

20   to Bowser and Dickey.  Likewise for the state peremptory

21   challenges Dickey and Bontrager.  Court did grant

22   Ms. Keil the challenge for cause.  She has a lot on her

23   plate right now.  Both sides agreed.  She's excused.  The

24   state is wanting me to excuse Ms. Adams also.  It is my

25   understanding the defendants do not agree.  Is that

1  correct, Mr. Zook?

2          MR. ZOOK:  That's correct.

3          THE COURT:  And Mr. Crawford.

4          MR. CRAWFORD:  Correct, your Honor?

5          THE COURT:  All right.  Now, Ms. Becker, why

6  should I excuse for cause Ms. Adams.

7          MS. BECKER:  On Ms. Adams' questionnaire, she

8  indicated that she has never been a party to a lawsuit

9  either a member of her immediate family or herself.

10  After we received the questionnaires, we, of course, ran

11  JTS to check on them, which is the county system as far

12  as the data base of cases, and a JoAnn Adams with many of

13  the same characteristics came up in eight different --

14  I've misspoken.  It's not ten it's eight different civil

15  cases: in 2003 a mortgage foreclosure, 2003 three small

16  claims, 2004 small claim, in '96 another small claim, in

17  '99 a civil plenary, in '91 a small claim.

18          I did not want to have her called out in front

19  of the presence of the other jurors as lying on her

20  questionnaire; and therefore, we did not go into that

21  topic while the jury is present.  If the Court would

22  entertain that maybe we bring her back in alone and

23  inquire as to why she did not identify this information

24  on her questionnaire, we would think that that would be a

25  proper procedure.

1          THE COURT:  Well, that sounds like the right

2    thing to do for to me also, and there's another issue.

3    The record does not reflect that Ms. Adams appears to be

4    an African American individual.  The rules do not permit

5    her being excused but for a race neutral reason.  Now,

6    Mr. Zook and Mr. Crawford, do you agree if Ms. Becker is

7    right, that's a race neutral reason?  She gave false

8    information on her questionnaire.

9          MR. ZOOK:  Right.

10          THE COURT:  Seems that way to me too?  Seem

11   that way to you, Ms. Crawford.

12          MR. CRAWFORD:  If she knew it to be false, yes.

13          THE COURT:  The record should reflect we're

14   outside that the jury except for Ms. Adams.  We're going

15   to ask questions of her.  You may be may be seated.

16   Ms. Adams just take any seat here.  You don't have to go

17   back all the way to the end of the row.  Right there is

18   fine.  We're going to ask you some questions that were

19   not asked at the time you were first here in the

20   courtroom.  Mr. Williams.

21                    VOIR DIRE EXAMINATION

22   BY MR. WILLIAMS:

23    Q   Ms. Adams, do you remember when we started after

24        the lunch break I had asked the question whether

25        you had ever been a party to a lawsuit?

```
 1    A    Right.

 2    Q    Or had ever been involved in a civil or a small

 3         claims case?  Have you ever been involved in any of

 4         those?

 5    A    Not personally, you mean, like a judgment on me?

 6    Q    Not a judgment, but where you would have had like a

 7         small claims case where you sued somebody, you had

 8         to appear in small claims, or you were sued or you

 9         had to actually answer to a small claims case, a

10         mortgage foreclosure?

11    A    Yes.  Here back, been about 10, 12 years I think.

12    Q    So it's been a longer period of time.

13    A    Uh-huh.

14    Q    We have the ability to run through our computer

15         system people's names to figure out if they've ever

16         been involved in lawsuits or criminal aspects, and

17         your name came up in eight separate times.  A

18         number of times, I think it was six times for small

19         claims cases, one time for mortgage foreclosure,

20         and one time for just a civil lawsuit; and these

21         dates range from 2002, 2001, 1996, 1999, and then

22         all the way back to 1991.  Have you ever been

23         involved in more than just the one case involving

24         small claims?

25    A    What is the civil law?  I don't remember the civil
```

```
 1          law.
 2      Q   Well, I mean, you can tell me you said you were
 3          involved in at least one of these?
 4      A   The mortgage thing, but it did not go through.
 5          They were saying that we didn't make a payment.
 6          Our payment got lost, and so they was trying to
 7          foreclose, and we did make the payment, and we
 8          showed that we had the money.  They just never
 9          pulled out the bank.
10      Q   Did they file a lawsuit against you to try to get
11          you to pay?
12      A   No.  Because we had got an attorney.  They was
13          trying to foreclose, but it didn't happen.
14      Q   You did get an attorney?
15      A   Yeah.  We had an attorney, but it didn't go through
16          cause, I don't know, we showed proof that we had
17          the money.
18      Q   They didn't actually foreclose on your house.
19      A   No.
20      Q   But it was a lawsuit actually filed against you
21          where you had to get an attorney obviously to
22          answer to what they were saying.  Is that correct?
23      A   To their attorney, yeah.
24      Q   Did you ever have to appear in court?
25      A   No.
```

```
 1      Q    Did your attorney ever have to appear in court?

 2      A    No.

 3      Q    What about any small claims cases where you're

 4           either suing somebody for some amount of money, or

 5           you're being sued for some amount of money?

 6      A    No.  I have never been in court for nothing like

 7           that.

 8      Q    And your date of birth is August 9 of 1954?

 9      A    Yes.

10      Q    Your address 58390 Westcot Lane in Goshen?

11      A    Yes.

12      Q    And how long have you lived in Elkhart?

13      A    Twenty-eight years.

14      Q    So half your life?

15      A    Uh-huh.

16      Q    Regardless of whether you had to appear in court

17           for the mortgage foreclosure, did it actually get

18           settled?

19      A    Yes.

20      Q    And again with respect to the small claims cases,

21           has there ever been a time where somebody said that

22           you owed money and you were told that you owed

23           money and then you ultimately paid it back before

24           having to go to court?

25      A    Might have been.
```

179

1    Q   When that might that have been?

2    A   I don't remember.  I didn't really go to court or

3        anything like that.

4    Q   But did you ever get notice in the mail of

5        anything?

6    A   I don't remember actually for no claim or anything.

7        I don't remember recently.

8    Q   Anything dealing with like a credit card or a

9        payment that you had to make on something where you

10       potentially didn't pay and they just wanted to like

11       in the mortgage foreclosure make you pay?

12   A   As far as I know, just the mortgage and credit

13       card.  They never did try to sue me.  I don't

14       remember anything like that.

15   Q   When did you say that the mortgage foreclosure was?

16   A   That's back when we were living 820 Fillhouse.  I

17       don't remember what we're year that was.

18   Q   Could it have been 2002?

19   A   As far as the mortgage.  No.  We didn't have

20       mortgage foreclosure not at 2002.

21   Q   When was it, do you know?

22   A   It was way back.  I don't know what year it was?

23   Q   Longer than a few years ago.

24   A   Right.  But not recently, not 2002.  My husband

25       might have one on the church maybe, but not on the

180

```
 1          house.

 2     Q    What was on the church?

 3     A    Abundant Life.

 4     Q    But you said there's something on the church?

 5     A    Maybe it been on the church of my husband name.

 6     Q    But they may have done something civilly.

 7     A    But it was wrong.

 8     Q    Did you fill out your questionnaire?

 9     A    Yes, I did.

10     Q    And do you recall checking the box as to whether a

11          member of your immediate family or whether you had

12          ever been a party to a lawsuit?  Do you remember

13          checking the boxes to that?

14     A    No.  Did I check that?

15     Q    Well, you would have actually filled this out it

16          appears back in November 22, 2004, so it's been a

17          while.  You don't remember checking the boxes.

18     A    I remember checking the boxes, but I don't know.

19          Might have had.  I don't know.  I did fill it out.

20     Q    You did fill it out.  All right.

21               THE COURT:  Any other questions.

22               MR. WILLIAMS:  No, other questions.

23               THE COURT:  Mr. Zook, any questions?

24     ////

25     ////
```

```
 1                    VOIR DIRE EXAMINATION

 2    BY MR. ZOOK:

 3      Q    So, Ms. Adams, you and your husband have a church?

 4      A    Right.

 5      Q    And does he get sued sometimes?

 6      A    He got -- they tried to sue him for that, for the

 7           church.

 8      Q    Okay.  No more questions.

 9               THE COURT:  Mr.  Crawford any questions.

10                    VOIR DIRE EXAMINATION

11    BY MR. CRAWFORD:

12      Q    Ms. Adams, when the prosecutor asked if you've been

13           a party in a lawsuit before or a party in a suit,

14           what did you think that that meant when he asked

15           you that question?

16      A    I didn't know he meant like on foreclosure on a

17           house or -- 'cause they just had my husband name on

18           the church.  My name is not on that, so that's why

19           I didn't answer.  We was trying get it cleared up

20           with our attorney about that with my husband name

21           on it, but my name is not on there, so that's why I

22           didn't answer that.

23      Q    So when he asked you that question, you didn't

24           believe in your own mind based upon on the question

25           he asked that you were a party in a lawsuit?
```

1    A    Right.

2    Q    So to your knowledge, you answered that truthfully

3         from what you understood the question to be.

4    A    Yes.

5         MR. CRAWFORD:  I have no further questions,

6    your Honor.

7         THE COURT:  Anybody have any other questions?

8    Take her back to the jury room for the moment.

9              (Juror left the courtroom.)

10        THE COURT:  What do you have to say, Mr.

11   Williams, in a few short words?  Yes/no.

12        MR. WILLIAMS:  Yes/no cause.

13        THE COURT:  Yes.  That's correct.

14        MR. WILLIAMS:  I believe my questions, Judge,

15   to the panel were, were you a party or involved in a

16   lawsuit; and I believe from her answers that she was

17   involved in the mortgage foreclosure.  So I would ask

18   that it be for cause still; and if not, we'd ask for the

19   peremptory.

20        THE COURT:  What is -- defense, what do you

21   say?

22        MR. ZOOK:  Judge, I think that she wasn't --

23   she wasn't thinking of the same thing that the prosecutor

24   was thinking of about being involved in a lawsuit.  I

25   don't know.  I haven't seen what there was on the Court

1   dockets.

2          THE COURT:  Would you like for Ms. Jackson to

3   print that out?

4          MR. ZOOK:  I -- I think maybe it would be

5   helpful for you.  As far as I'm concerned, it appeared to

6   me that she wasn't deliberately trying to mislead

7   anybody.

8          THE COURT:  Well, deliberately being the

9   operative word.  Whether she was confused or whether she

10  gave the wrong answer, of course, that is the issue.

11  Mr. Williams says if I don't grant cause he'll use a

12  peremptory.  What do you have to say, Mr. Crawford?

13         MR. CRAWFORD:  I don't think cause is here,

14  your Honor.  I think she was confused over the line of

15  questioning.  They did mention party, but whether or not

16  she understood exactly what that meant whether it had

17  gone to court or she was in court, maybe that was her

18  understanding of it, and I think on that alone, I don't

19  think that's cause.

20         THE COURT:  All right.  Well, we're going to a

21  look, and we're going to see what the record does, in

22  fact, show.  I'll let you know when she gets it printed.

23              (A recess was taken.)

24         THE COURT:  All right.  The defendants are

25  present, counsel for the defendants are present, counsel

1    for the state is present.  Court has had the bailiff

2    print chronological case summary.  The Court will deliver

3    these chronological case summaries to the court reporter

4    and ask that she make them a part of the record.  One

5    cause No. 20E01-9310-FC-4332 appears to be a case where

6    an agreed judgment was entered.  JoAnn Adams was one of

7    the defendants sued with Kevin Adams.  There are a number

8    of others here present also.  It appears that the state's

9    request that Ms. Adams be excused for cause is well

10   taken.  The Court will find that cause is granted, and

11   the Court will also note that race neutral reasons have

12   been presented by the state with respect to this issue.

13           It is clear that she gave different information

14   on these collection cases than what the actual record

15   show.  For that reason, she'll be excused.  Ladies and

16   gentlemen, as you look at your list of jurors Mr. Wenzel,

17   Ms. Risser, Mr. Martin, Mr. Pippenger, and Mr. Lundy will

18   appear in the box when they return.  We're going to

19   shorten matters up.  15 minutes per side from this point

20   forward.

21               (The jury entered the courtroom, and

22                the following proceedings were had.)

23           THE COURT:  Be seated, please.  Mr. Beer and

24   Ms. Combs, welcome to the jury.  In seat No. 1 we now

25   have Mr. Wenzel.  Correct?

```
1              A JUROR:  Yes.

2              THE COURT:  And in seat No. 4 we Ms. Risser.

3              A JUROR:  Yes.

4              THE COURT:  In seat No. 7 Mr. Martin.

5              A JUROR:  Yes.

6              THE COURT:  In seat No. 8 Mr. Pippenger.

7              A JUROR:  Yes.

8              THE COURT:  And in seat No. 9, Mr. Lundy.

9              A JUROR:  Yes, sir.

10             THE COURT:  Ms. Becker.

11                    VOIR DIRE EXAMINATION

12     BY MS. BECKER:

13     Q   Thank you, Judge.  Good afternoon.  Ms. Risser,

14         you're the only female on this panel, so not that

15         that means anything -- excuse me for just a second.

16         The nice thing is that now that we're down to five

17         individuals this is going to start going a lot

18         faster.  Plus, I trust that you've been able to

19         hear most of everything that the attorneys have

20         been asking.  Is that accurate for our five new

21         individuals?

22             (The jurors indicated.)

23     Q   Yes.  Okay.  Great.  So things will move a lot

24         faster.  So let's first of all about these legal

25         concepts that are going to be present in this case;
```

1          namely, felony murder and accessory liability.  Mr.

2          Martin, why don't you tell me if you remember what

3          felony murder is?

4     A    Felony murder to me would mean somebody to commit a

5          felony such as robbery or a burglary in which a

6          murder happens as a result of that.

7     Q    Okay.  Or in the process of that?

8     A    In the process of.

9     Q    Okay.  Mr. Pippenger, that make sense to you?

10    A    Makes sense.

11    Q    Makes sense.  Do you think it's fair?

12    A    Yes.

13    Q    For all five of you same question.  Do you all you

14         think that this law is fair?

15    A    Yes.

16    Q    That even though you don't mean to commit the

17         murder, it still happens?

18    A    Yes.

19    Q    Now, Mr. Lundy, do you remember what accessory

20         liability is or aiding and inducing?

21    A    Yes.  Someone who is driving a car get away or who

22         plots it but doesn't actually commit the murder.

23    A    Yes.

24    Q    Do you think that's fair that we still hold

25         somebody accountable for the ultimate crime?

1    A    Yes, I do.

2    Q    All right.  What about you, Mr. Pippenger?

3    A    Yes.

4    Q    Mr. Martin?

5    A    Yes.

6    Q    Ms. Risser.

7    A    Yes.

8    Q    Mr. Wenzel?

9    A    Yes.

10   Q    Okay.  All right.  Anybody have any trouble with

11        enforcing those two laws?

12             (The juror indicated.)

13   Q    No.  All right.  Great.  Move on then.  I want to

14        talk to each one of you individually about your

15        upbringing, your moral principles, your beliefs.  I

16        characterize it as strong feelings with the

17        individuals I spoke to the first round.  Mr.

18        Wenzel, let's start with you.  Can you think of

19        anything just the things that make you who you are

20        and after hearing what you've heard about this case

21        and the types of evidence that we expect, the types

22        of things that you're going to be observing, do you

23        think there's anything about your background, your

24        beliefs, that might effect your ability to be fair

25        and impartial in this case?

```
 1   A   No.

 2   Q   No problem?

 3   A   No.

 4   Q   Do you have any questions or any hesitations so

 5       far?

 6   A   No.

 7   Q   All right.  Any questions of me?

 8   A   No.

 9   Q   Mrs. Risser, same question.  Anything about what

10       you've heard so far that maybe kind of giving you

11       knee jerk reaction or think, oh, boy, I hope I did

12       don't get up there so I don't have to deal with

13       this.

14   A   Well, I come in kind of nervous right now; but, no,

15       I think I can be fair.

16   Q   Okay.  Believe me everybody is nervous, even me.

17       All of us are.  You know, this is not someplace

18       where you should feel comfortable.  I mean, it's a

19       different environment than what you're used to so

20       expect that.  Have you noticed though that some

21       people deal with nervousness differently.  For

22       example, if I picked you out right now and rather

23       than having you sit next to everybody and put you

24       on that chair up there and started asking you all

25       these personal questions, would you be maybe more
```

1        nervous?

2    A   Yes.

3    Q   All right.  Somebody asked earlier about perceiving

4        witnesses and credibility of witnesses.  Do you

5        think that you have a good ability to perceive

6        credibility of witnesses?

7    A   I think probably.

8    Q   All right.  Will you keep an open mind and consider

9        maybe their ability to perceive things as well as

10       their nervousness when they're testifying too?

11   A   Yes.

12   Q   And, of course, police officers, the coroner, the

13       forensic pathologist, they're professional

14       witnesses, a little bit different situation; but

15       obviously these are the things that you're going to

16       have to keep in your mind is that filter.  Does

17       that make sense to you?

18   A   Yes.

19   Q   Do you think you're going to be able to do that?

20   A   I think so.

21   Q   All right.  So, Mr. Lundy, same question.  If

22       somebody looks a little bit nervous or maybe won't

23       make eye contact with you all the time, will you

24       keep an open mind before flat out thinking they're

25       just lying to you?

1 A Yeah, I'll keep an open mind.

2 Q Keep an open mind.  Sometimes it can be hard

3   though, can't it?

4 A Very hard.

5 Q Very hard.  All right.  What kinds of experiences

6   have you had having to judge credibility of

7   individuals you don't know?

8 A I used to be landlord.  I had a bunch of rental

9   properties so we run across all kinds of people.

10 Q All kinds of people.  And did you ever have to

11   resolve disputes; for example, the check is in the

12   mail that kind of thing?

13 A And shotguns, hand grenades.

14 Q Hand grenades?

15 A Oh, yes.

16 Q Well, that's an interesting one.

17 A Meth lab.

18 Q Meth lab.  That seems to be more common anymore.

19 A Yes, it is.

20 Q Okay.  Do you think that you are a person who has

21   enough common sense that you can kind of sort

22   through the BS and the regular information?

23 A Very much.

24 Q Do you think you're the kind of person that can

25   appreciate perceptions that may be different than

```
 1        your own?

 2   A    Yes, to a point.

 3   Q    To a point.  Okay.  Do you understand what I'm

 4        asking?

 5   A    Kind of.

 6   Q    Okay.  You heard during that minnie opening that

 7        thumbnail sketch that some of the people that may

 8        be witnesses in this case may not possess the same

 9        mental faculties that everybody else does.  Can you

10        keep that in mind, or are you more of the type of

11        person that you hold everybody to the same

12        standard?

13   A    I hold a lot of people to the same standard, but

14        there are exceptions to every rule.

15   Q    Okay.  Fair enough.  Anything abut your upbringing,

16        your moral principles, just your character, you as

17        a person that you think might nibble at you and

18        keep you from being completely fair and impartial

19        in this case?

20   A    Oh, yeah.  I feel that if someone takes a life they

21        should take theirs.

22             MR. ZOOK:  I couldn't hear the juror.

23   Q    Could you repeat that?

24   A    I said I believe if someone takes a life they

25        forfeit theirs.
```

1    Q    That -- probably most people in here may share that

2         with you.  It talks about more consequences though.

3         What does it take, though, for you to -- well, let

4         me just put it this way.  The standard in the State

5         of Indiana is beyond a reasonable doubt.  In other

6         words, the State of Indiana must prove to you that

7         we got the right people.

8              Obviously, you probably want to be sure you

9         got the right people before that principle would

10        apply.  Do you believe that on that, because that's

11        what your job is, do we have the right people, and

12        how this occurred.  Do you believe that you can be

13        fair and impartial for that part?

14   A    I'm kind of like straddling the fence right now on

15        that one.

16   Q    Okay.  I'll come back to you in a couple minutes

17        then.  Think about that long and hard because we

18        got to have a clean plate.  It's just -- you know

19        what it is.

20   A    I understand.

21   Q    Mr. Pippenger, real quick, anything about your

22        upbringing, your personal belief, the things you

23        that you've observed here in this courtroom so far

24        that you think might nibble at you and maybe --

25   A    No.

| | | |
|---|---|---|
| 1 | Q | You're fine? |
| 2 | A | Yes, ma'am. |
| 3 | Q | Mr. Martin, what about you? |
| 4 | A | Me, I'm fine. |
| 5 | Q | You're fine.  All right.  Any questions so far |
| 6 | | Mr. Martin? |
| 7 | A | No. |
| 8 | Q | Anything that you've observed so far that gives you |
| 9 | | any hesitations about you ability to serve as a |
| 10 | | juror? |
| 11 | A | No. |
| 12 | Q | No.  Mr. Pippenger? |
| 13 | A | No, ma'am. |
| 14 | Q | No problem.  Okay.  One thing that had not been |
| 15 | | gone over yet, the differences between inferences |
| 16 | | and speculation.  Mr. Martin, can you give me your |
| 17 | | words as to the difference between an inference and |
| 18 | | a speculation? |
| 19 | A | I couldn't tell you the difference. |
| 20 | Q | Okay.  Anybody want to volunteer?  I won't be hard |
| 21 | | on you.  I promise.  Mr. Pippenger, you want to |
| 22 | | volunteer? |
| 23 | A | No. |
| 24 | Q | All right.  I'll help you out.  When we talk about |
| 25 | | this concept of beyond a reasonable doubt, first of |

1          all, how many of you five have heard of this

2          before?

3                    (The jurors indicated.)

4      Q   Okay.  Everybody has heard of beyond a reasonable

5          doubt, and you've heard people talk about the fact

6          that it's not beyond all doubt because there's

7          always some gray area.  Do you all agree with that?

8                    (The jurors answered in the

9                    affirmative.)

10     Q   Okay.  You're fine with that.  Some people have

11         issues about, well, what is reasonable doubt.  And

12         while we can tell you what it says, you know, as

13         far as the courts have given definitions of it,

14         more often than not, we just confusion you more

15         than we actually educate you.

16             Reasonable doubt is not something that can be

17         based on speculation.  In other words, I think it

18         was the lady that sat in your seat, Mr. Lundy,

19         talked about the what ifs.  What ifs are

20         speculation.  There has to be evidence.  In other

21         words, something you can wrap your hands around,

22         something you can wrap your hands around that

23         causes doubt.  Okay.  Does that make sense?  All

24         right.  You can't speculate or think, well, what if

25         it is was this, or what if it was that.  That is

1       impermissible in a court of law.  Why do you think

2       that is?  Mr. Lundy.

3    A  There's to many gray areas.

4    Q  Too many what ifs.  Too many what ifs.  And if

5       there is evidence of something out there, then

6       you're going to see it.  Does that make sense?

7       Mrs. Risser, what do you think?

8    A  Yeah.  I think that makes sense.

9    Q  Okay.  So you may not, you may not speculate about

10      all these what ifs out here unless there's some

11      evidence, something you can put your hands on

12      explaining that.

13          Now, an inference on the other hand, is a

14      common sense deduction that you make from seeing

15      certain facts.  In other words, I walk in this

16      room, you hear some boom boom outside, and I have

17      an umbrella in one hand, but I'm still soaking wet.

18      What's the inference you can make, Mr. Wenzel?

19   A  Thunder and lightening.  It's raining.

20   Q  Thunder, lightening.  It's raining outside.  That's

21      an inference.  You've not been outside to

22      experience it.  The cherry pie, you know, or

23      chocolate cake on child's face when you don't see

24      him eating it.  All these things have been talked

25      about previously, but that's the difference between

1   speculation and inference.  How many of you feel

2   confident that you can keep those things separate?

3   All five of you.  Everybody is saying yes.

4   Everyone understand the difference between

5   speculation and inference?

6   A   Yes.

7   Q   Any questions?

8   A   No.

9   Q   Okay.  Very good.  Do all of you feel like this

10   concept of beyond a reasonable doubt you think you

11   can handle it?  You think you're going to know it

12   when you see Mr. Wenzel?

13   A   Yes.

14   Q   Ms. Risser?

15   A   Yes.

16   Q   Mr. Lundy?

17   A   Yes.

18   Q   Mrs. Pippenger?

19   A   Yes.

20   Q   Mr. Miller?

21   A   Yes.

22   Q   How many of you have ever been in this position

23   before actually called to the box or serve as a

24   juror?  Anybody?  No.  Okay.  Last thing I want to

25   ask you about are any -- we've called them

1          sympathies.  I refer to it as special knowledge or

2          knowledge that maybe somebody else, your neighbor

3          may not have about a mental disabilities or mental

4          issues, crime scene CSI type stuff, forensic

5          evidence, the rules of evidence, anything like

6          that.

7               Do any of you have any special knowledge about

8          any of the topics that we have talked about so far

9          or that have come up so far based upon either your

10         own personal experience, something you've read in

11         the newspaper, something you've read a journal on,

12         or even have received formal training on?  Anybody

13         in any of those situations?

14              (The jurors answered in the negative.)

15    Q    Okay.  Do any of you feel like you are persons

16         whose sympathies or emotions might nibble at you a

17         little too much in this case to the extent that it

18         may make you a little less fair than you should be?

19         Anything have any hesitations on that?  Ms. Risser,

20         maybe?

21    A    Maybe, I'm not sure.

22    Q    All right.  I'll come back to you on that too.

23         Don't let me forget you guys.  Mr. Pippenger?

24    A    No.

25    Q    No problem.  Mr. Martin?

198

| 1 | A | No. |
|---|---|---|
| 2 | Q | Mr. Wenzel? |
| 3 | A | No. |

4   Q   Mr. Wenzel, you're young compared to everybody else

5       on this panel, and it could come down to a

6       situation where you're back in that jury room and

7       literally everybody is screaming at you.  How do

8       you think that's going to effect you?

9   A   I really don't know.

10  Q   It has been my experience that sometimes

11      individuals who have not had as much life

12      experience tend to not quite understand the gravity

13      of what this is all about.  Do you think you're one

14      of those persons, or do you think you're well

15      qualified for this job?

16  A   Well qualified.

17  Q   Why?

18  A   Because I'm an optimist, and I'll get all the

19      evidence, and nobody else can sway me.

20  Q   Okay.  Now, if you guys are having logical

21      discussions back there and you're still number one

22      and they're 11 eleven against you but yet you feel

23      very confident in why you feel the way you do, will

24      you continue to engage in discussions until either

25      the 11 change their mind or you change your mind?

1    A    Yes.

2    Q    Okay.  Has to be a unanimous verdict.  Okay.  Does

3         that make sense?

4    A    Yes.

5    Q    Any hesitations whatsoever?

6    A    No.

7    Q    Okay.  Let's come back to you two then.  Mr. Lundy,

8         really the bottom line question is: Are you a

9         person that we want on this jury?  Because while

10        you may be great on any other jury, the question is

11        here we are here for this case and we've got to

12        have a clean plate fair and impartial all the way

13        across.  Do you think someone with your current

14        state of mind, the experiences that you've had, and

15        the things that you believe, that you are a good

16        person for this jury?

17   A    No.

18   Q    No.  Why not?

19   A    Cause at an early age, I took care of some elderly

20        people.

21   Q    All right.  Do you have special sympathies then for

22        that?

23   A    Yes, I do.

24   Q    All right.  Thank you very much for your honesty.

25        I appreciate that.  Ms. Risser, you indicated that

1          you're a little concerned about you sympathies as

2          well.  Can you articulate that for me?

3      A   Well, I don't know that I really know anybody that

4          has some special needs, but I know when I see

5          people in that situation I kind of feel for them.

6      Q   Okay.  To the extent that maybe you don't hold them

7          as responsible for what they do?

8      A   No, I don't think so.

9      Q   You don't think that.  Okay.  Do you have any

10         concerns that these feelings that you're

11         experiencing or that you have as part of you might

12         effect your ability to be fair and impartial when

13         you're trying to decide whether the defendants did

14         what we accused them of doing?

15     A   No, I think I could still be fair.

16     Q   Could still be fair on that.  Do you want to be a

17         juror in this case?

18     A   Not really.

19     Q   Why not?  That's okay.  I'm glad you said that.

20         Why not?

21     A   I have other things going on in my life this week,

22         and I don't know.  I just don't feel like I want to

23         be.

24     Q   That's okay.  You know, quite frankly, the things

25         that we don't want to do are sometime the things we

```
 1         do best.  In other situations, they're not.  What
 2         I'm trying to do is figure out if this is something
 3         where it may not be the best thing or the
 4         otherwise, and I'm not quite sure where we're on
 5         that.  Do you have any questions of me?
 6    A    I don't think so.
 7    Q    All right.  Last chance for all of you five.  Does
 8         anyone have any questions of me, anything I haven't
 9         asked you that I should have asked you to get to
10         know you a little bit before we make this decision?
11    A    No.
12    A    No.
13    A    No.
14    A    No.
15    A    I do have a question.  I'm not sure.  It was
16         brought up by one of other attorneys about photos
17         that may be very graphic, and I have a very queasy
18         stomach.  I get physically ill, and I even
19         sometimes pass out.
20    Q    With the Court's permission, should I explain
21         the -- I mean -- how -- what they may be that way
22         they may know what to expect?
23                 (An off-the-record discussion was held
24                 at the bench.)
25             THE COURT:  Any other question, Ms. Becker?
```

1    MS. BECKER:  No, your Honor.  Thank you.  Thank

2 you, ladies and gentlemen.

3    THE COURT:  Mr. Zook.

4    MR. ZOOK:  Thank you, Judge.

5      VOIR DIRE EXAMINATION

6 BY MR. ZOOK:

7  Q Moving right along.  We're trying.  Now, Mr.

8   Wenzel, age 26?

9  A Actually, 27.  My birthday is today.

10  Q Today?

11  A Yes.

12  Q Congratulations.  You'll remember your 27th

13   birthday.  Okay.  You still have your life ahead of

14   you.  What do you want to do?

15  A Be a dentist.

16  Q Okay.  You have a school picked out?

17  A Yeah.

18  Q Okay.  Where are you going?

19  A IUSB.

20  Q Good for you.  And, Mr. Pippenger, you're second to

21   youngest, and you tie with the guy next to you.  No

22   birthdays there.  Right?

23  A My wife's is tomorrow.

24  Q Well, maybe she'll be happy if you're here then.

25  A She might be.

1    Q    Mr. Pippenger, I see you're a computer programmer

2         at First Source Bank.  How long have you done that?

3    A    Going on six years.

4    Q    Okay.  What would you do other than a computer

5         programmer if you had your choice?

6    A    Golf course management.

7    Q    Okay.  And let's see here, Mr. Martin.

8    A    Yes, sir.

9    Q    How about yourself?  I see you work at Kreuter what

10        do you do there?

11   A    I'm the marketing manager.  I have been for about

12        seven years.

13   Q    Well, that's back to about 23, age 23?

14   A    Yes, sir.

15   Q    What would you do if you could be trained and do

16        anything at all?

17   A    I really enjoy my job at my current capacity.

18   Q    All right.  Okay.  Now, you understand that with

19        respect to reasonable doubt -- the prosecutor

20        talked about that a little bit, but what we're

21        really looking for and your job in examining the

22        evidence is to see if there is a reasonable doubt

23        as to guilt so you're looking for a hole in the

24        state's evidence.  It might not be anything

25        tangible because it's a just a hole.  You think you

```
1          can do that?

2     A    Absolutely.

3     Q    We might have -- you might be said to be

4          speculating if you're wondering about whether

5          somebody came down on a flying saucer and did the

6          crime, but I expect that the prosecutor and the

7          defense counsel may have a bit of an argument in

8          front of you later in the case concerning what is

9          speculation and what is inference.  And there are

10         some gray areas there too, aren't there?  You

11         understand what we're talking about here?

12    A    Yes.

13    Q    Okay.  Now, do any of you have any questions about

14         the right of a person not to take a witness stand

15         in a case that's against that person?

16    A    Yes.

17    Q    Do you?

18    A    Yeah.

19    Q    Tell me about that?

20    A    Well, for example, if they got up there, and

21         they're really nervous, it might blow the case open

22         because a juror might think that they're guilty

23         because --

24    Q    Okay.  You agree then that it's okay for a person

25         not to take the witness stand?
```

```
 1      A    Yes.

 2      Q    And you wouldn't hold it against that person?

 3      A    Yes.

 4      Q    We in accord back here?

 5                     (The jurors indicated in the

 6                     affirmative.)

 7      Q    How do you feel about a policeman being a witness,

 8           Mr. Wenzel?

 9      A    Ask the question again.

10      Q    How did you expect a policeman's testimony would be

11           in comparison to that of a lay person?

12      A    Hopefully, they would be telling the truth.  It's

13           their job, and --

14      Q    So you're not hoping that for a lay person.

15      A    A lay person.

16      Q    A person who's not a policeman.  I'm not really --

17           I'm not really speaking -- I guess a pastor could

18           be lay person.

19      A    Yes.

20      Q    How -- how do you think -- do you think the

21           policemen or more likely to tell the truth than

22           other people?

23      A    I would hope so.

24      Q    See, we're here to judge whether the case that the

25           police put together is a good one.  Can you be a
```

1          good check in that kind of case?

2     A    I think so.

3     Q    Okay.  And you'll make it be proven and not just

4          trust people in general?

5     A    Yes.

6     Q    Okay.  And how about Mr. Pippenger?

7     A    You know, I would expect them to maybe handle the

8          situation a little bit better than, say, a

9          defendant would who's not been on trial before, but

10         that's just from experience rather than --

11    Q    Okay.  Mr. Martin, how would you expect a policeman

12         to behave on the witness stand?

13    A    The same as witness would as any other lay witness.

14    Q    Okay.  Can you judge the police action and the

15         action of the prosecution in this case just like

16         you would anyone else?

17    A    Absolutely.

18    Q    Okay.  I guess I'm trying to get to bias.  Do any

19         of the three of you feel that there is little bit

20         of a problem since we are here in court and there's

21         a case against my client and Mr. Crawford's client,

22         do any of you feel that that means that they're

23         probably guilty?

24              (The jurors indicated in the

25               negative.)

```
 1    Q    No.  You might be thinking about this for the first

 2         time.  Have any of the three of you thought in the

 3         past that one of you could be arrested and not have

 4         done anything wrong?

 5                   (The jurors indicated in the

 6                   affirmative.)

 7    Q    Okay.  Thank you.  Any questions of me?

 8                   (The juror indicated in the negative.)

 9    Q    Who knows each other now?  At least you don't know

10         each other.  Right?  Okay.  Pass.

11              THE COURT:  Mr. Crawford.

12              MR. CRAWFORD:  Thank you, your Honor.

13                        VOIR DIRE EXAMINATION

14    BY MR. CRAWFORD:

15    Q    Just have a few questions of our new panel.  Have

16         any of you served on a jury before of our new

17         panel.

18                   (The jurors answered in the negative.)

19    Q    Has anybody of our new panel been the victim of a

20         crime or had a family member that was a victim of a

21         crime?

22    A    A friend.

23    Q    What kind of situation was that, Mr. Wenzel?

24    A    He was stabbed with a beer bottle in the neck.

25    Q    When was that?
```

```
 1    A    I think this last Christmas.

 2    Q    And where did that happen?

 3    A    In Mishawaka/South Bend.

 4    Q    What happened with the case?

 5    A    I'm not really sure.

 6    Q    Were you present when it happened, or you just

 7         heard about it?

 8    A    No.  I heard about it.

 9    Q    Anything because of that, the nature of that

10         situation of being a violent crime and all, that

11         would make it difficult for you to consider the

12         facts of this case?

13    A    No.

14    Q    Any of our panel members have anything going on at

15         home or work, our new panel members, that would

16         make it hard for you to focus on the evidence the

17         next couple of days?

18    A    I have golf outing on Friday.

19    Q    Are you going to be thinking about that over the

20         next three or four days?  Will this impact your

21         ability to practice before the golf outing or --

22         okay.  Just want make sure.  We could arrange for

23         some the range balls perhaps.  Okay.  I'll give it

24         a rest.  So, obviously, that's the only thing going

25         on that with would be an issue if we were to get
```

```
 1            into Friday necessarily.

 2       A    That wouldn't be an issue.

 3       Q    I hope we're not going that far.  Anyone else have

 4            any things going on at home or family members that

 5            would make it difficult to be here the next couple

 6            of days.

 7                 (The juror indicated in the negative.)

 8       Q    Did our new panel members understand when I believe

 9            the three or four of us spoke about the presumption

10            of innocence?  Any problem with that concept that

11            as Mr. Royer sits here today and Ms. Canen sits her

12            today they're presumed innocent, and the burden of

13            proof rests solely on the State of Indiana, but the

14            presumption of the innocence is something that

15            stays with a person throughout the course of the

16            trial.  It's up to the state to whether they attack

17            that particular thing.  Any problem with that?

18                So if you were to hear -- get a question right

19            now, how would you vote?  Not guilty probably.

20            Right?  You haven't heard anything.  So no problem

21            with keeping that protection in mind as you listen

22            the evidence of our new panel members?

23                 (The juror indicated in the negative.)

24       Q    Mr. Wenzel, how do you make a major decision in

25            your life?
```

1    A    You weigh the pros and a cons.

2    Q    Base upon that then you make a decision?

3    A    Based upon where your goals, where you want to go.

4    Q    Okay.  Mr. Martin, how about you?

5    A    In my job, I'm in charge of a lot of product

6         development type stuff for our products, and asking

7         questions, listening to all sides.  You don't just

8         listen to one person.  You listen to everyone,

9         gather the information, and determine what you

10        believe is credible.

11   Q    So it's a process?

12   A    Absolutely.

13   Q    How about you, Mr. Pippenger?

14   A    I think the first thing I would do is consult with

15        my wife and see what her opinion is on it.  Then

16        depending on how big of a decision it is, probably

17        consult other people and weigh out the pros and

18        cons and decide from there.

19   Q    So it's kind of a fact gathering process.

20   A    Absolutely.

21   Q    Has any of our new panel ever been involved in a

22        lawsuit where they've brought the action or they've

23        been a part of it whether that be criminal or civil

24        or been witness in the case?

25              (The juror indicated in the negative.)

```
 1    Q    Any of our new panel have any friends or associates

 2         or family members who might be police officers?

 3    A    I do.  My ex-girlfriend, her dad was the assistant

 4         chief; and her sister's husband works in Indy as a

 5         cop.

 6    Q    Okay.  Because you have that special affiliation or

 7         you previously had it, would that in any way impact

 8         your ability to fairly listen to what you hear

 9         presented in the witness chairs over the next

10         couple of days?

11    A    No.

12    Q    I know Mr. Zook explored a little bit with you

13         about whether or not you would believe an officer

14         over and above any other witnesses.  Would that

15         come into play into your -- that way you would

16         value the testimony of officers?

17    A    No.  I think that's all I have.  Thank you all.

18              (Counsel approached the bench.)

19         THE COURT:  Mr. Wenzel, Mr. Risser, Ms. Lundy,

20    you'll be excused.  Mr. Pippenger, Mr. Martin, welcome to

21    the jury.

22                   VOIR DIRE EXAMINATION

23    BY MR. WILLIAMS:

24    Q    Good afternoon, Mr. Myers, Ms. Truex, and

25         Mrs. Mark.  The -- one of first -- we'll start with
```

1    Ms. Truex, do you know who I am?

2  A  You know, I didn't when I first walked in, but I do

3    now.

4  Q  You work at South Bend Medical Foundation?

5  A  Yeah.  I work at Elkhart Hospital for South Bend

6    Medical in the lab.

7  Q  And I believe you've either been a witness or are a

8    witness in one of my cases?

9  A  You -- you -- it was settled out of court, but I

10    did interview with you as a witness -- possible

11    witness.

12  Q  Is anything about me talking to you and you being a

13    witness in that case that you think is going to

14    effect your ability to sit on this panel and listen

15    to the evidence that's presented on the fact that

16    you know who I am?

17  A  No, I don't believe so.

18  Q  Do you -- you work for South Bend Medical

19    Foundation.  Is that right?

20  A  That's correct.

21  Q  But you work at Elkhart General Hospital.

22  A  Yes.

23  Q  Do you know Dr. Joseph Prahlow?

24  A  No.  I know of him.  I know the coroner.  I mean, I

25    see the coroner on a regular basis.  He brings

```
 1          samples in because the coroner -- the morgue is

 2          right down the hall from the lab.

 3     Q    So Dr. Prahlow works in --

 4     A    -- in South Bend.

 5     Q    And you said the coroner.  Who is that?

 6     A    Dr. Jeffrey Landrum.

 7     Q    So you know Dr. Landrum and Dr. Prahlow?

 8     A    I know of Dr. Prahlow.  I've not even met him.  We

 9          have pathologists that come to Elkhart, but I've

10          not had the pleasure of meeting him.

11     Q    That fact that he works for South Bend Medical

12          Foundation do you think that would have any impact

13          on your ability to be fair and impartial in this

14          case?

15     A    I don't believe so.

16     Q    What about the fact that you know Dr. Landrum?  Any

17          belief that that would have any effect on your

18          ability to listen to the evidence and render a

19          decision?

20     A    Not at all.

21     Q    Mr. Myers, it said in your questionnaire that

22          you're self-employed.

23     A    Yes.

24     Q    What do you do?

25     A    I own a fence company.
```

```
 1    Q    Is that here in Elkhart.

 2    A    It's in Elkhart County, yes.

 3    Q    Listening to all the questions that you've heard

 4         over the past several hours, is there anything that

 5         comes to mind as you sit there that you wanted to

 6         talk about?

 7    A    What I could hear, not really.

 8    Q    Were there things that you couldn't hear?

 9    A    Yeah.  You couldn't hear everything that what said

10         back there; but from what I heard, I have no real

11         questions about.

12    Q    Same question for you, Mrs. Mark.  Anything that --

13         what you've heard that's come up you said I really

14         need to talk about that when I get up there?

15    A    No.

16    Q    No.  We've talked about the concepts of felony

17         murder and accomplice liability.  Did you hear us

18         discuss those?

19    A    Yes.

20    Q    With regard to felony murder, can you tell me what

21         in your mind that is, Mr. Martin -- I'm sorry.  Mr.

22         Myers?

23    A    From what I understand, it's in the commission of a

24         felony crime there's a murder where accidentally or

25         there was a murder involved.
```

```
 1    Q    And does anybody else have any differing opinion or

 2         thought about that concept of felony murder?  Ms.

 3         Truex.

 4    A    I pretty much agree with that.

 5    Q    Mrs. Mark.

 6    A    I agree.

 7    Q    You agree.  Okay.  Accomplice liability, Mrs. Mark,

 8         what does that -- what does that mean to you when

 9         you hear that?

10    A    Well, anybody that was involved in the crime is

11         held as responsible as the person who actually

12         pulled the trigger or whatever.

13    Q    Do you believe that's fair?

14    A    Yes.

15    Q    And do you understand that -- that concept?

16    A    Yes.

17    Q    Ms. Truex, do you think that's fair?

18    A    I do.  I believe anyone involved should be held

19         accountable.

20    Q    How about you, Mr. Myers?

21    A    Yes.

22    Q    Any strong feelings moral, religious anything in

23         your upbringing, personal beliefs, that stands out

24         that you think would make you a particularly good

25         juror or possibly, and we'll use the term poor
```

```
 1            juror, Mr. Truex?
 2    A    I make -- I think I would be a good juror.  I have
 3         to make decisions every night at work.
 4    Q    What types of decisions?
 5    A    I'm the assistant supervisor on second shift.  So
 6         if there's an incident problem or there's a problem
 7         with a patient or something like that, I think I
 8         could be fair minded and keep it open.
 9    Q    You're job at the hospital, are things always black
10         and white in your work?
11    A    Not at all.  Medicine is not?
12    Q    Go ahead.
13    A    I'm sorry.  No it's not black and white.
14    Q    Did you say medicine is not an exact science?
15    A    Right.  That's what I was going to say.
16    Q    So you have to make judgment decisions and evaluate
17         what's going on in your job to come up with certain
18         decisions.
19    A    Based on my experiences and, yes.
20    Q    Mr. Myers, anything that particularly in your
21         upbringing or beliefs that you think would be --
22         make you a particularly good juror or -- or -- or
23         not?
24    A    The fact that I deal with people everyday.  I have
25         for 28 years.  All kinds of people, all ethnic
```

1      backgrounds.  So I form my opinions pretty much

2      based on my experiences.

3   Q   And do you sell fences?

4   A   Yes, I do.

5   Q   So you have to make evaluations about the people

6      that come into your business if they're paying or

7      whatever.

8   A   That's right.

9   Q   Mrs. Mark, what about you?

10  A   I think I would be very bad juror because one, I

11     tend to believe what people tell me; and two, I

12     probably would be the juror that held out on some

13     technicality, you know, that everybody agreed.  But

14     I would be the one that, you know, found something

15     wrong and couldn't --

16  Q   Couldn't put it to rest.

17  A   Yeah.

18  Q   Well, that kind of brings up the concept of beyond

19     a reasonable doubt that we talked about.  In your

20     mind, what do you think beyond a reasonable doubt

21     is?

22  A   Well, it's been stated before.  I think that

23     there's always going to be some doubt; but if it

24     can be proved that -- oh, I don't know how to say

25     it -- that reasonably the fact (inaudible) then

1          that's the way it is.  Does that make sense?

2    Q    Okay.  When you -- do you think that -- that to

3          hold somebody accountable and if you had to render

4          a verdict in this case and it has to be unanimous

5          and to make your decision, would the state have to

6          prove the defendant's guilt beyond all doubt in

7          your mind?

8    A    No.

9    Q    But there's someone that you -- in your upbringing

10         or whatever that you look to the benefit of

11         everybody or that you look and see -- try to find

12         the thing that might trip you up?

13   A    Right.

14   Q    All right.  Well, that's an honest answer.  Has

15         anybody had any experience with persons who have --

16         that aren't -- I don't know what the word would be.

17         There's different ones.  I guess the mental

18         sophistication or have some mental deficiencies not

19         that rise to the level of insanity or that

20         they're -- that they're necessarily hospitalized?

21   A    My mother is suffering from dementia right now.

22         I'm her caregiver.

23   Q    All right.  And is she on medication for that?

24   A    Not at the moment, but she's being evaluated.

25   Q    I mean, is there really anything that they'll be

```
 1         able to do as far as treating that?
 2    A    That's a good question.
 3    Q    It's up in the air.  Is there anything about
 4         that -- is that the only contact that you've had
 5         with somebody?
 6    A    Well, I see people in my line of work too.
 7    Q    And specifically is your line of work?
 8    A    I work in the lab.  Now, the phlebotomist may have
 9         more contact, but I see all kind of people they
10         bring in for drug testing for instance and stuff
11         so --
12    Q    Anything about dealing with this dementia that your
13         mother may or may not have or she's being diagnosed
14         that you think would effect your ability to -- to
15         be fair and impartial in this case?
16    A    No.
17    Q    Do you think that a person that -- that isn't maybe
18         as smart as some other people should be held
19         accountable for their actions?
20    A    Based on -- I'm not quite sure what you're getting
21         at.
22    Q    Well, it doesn't rise, let's say, to the level of a
23         mental illness.  But somebody just isn't as smart
24         as another person or might be slow or might have
25         some mental deficiencies.  Do you think they should
```

1      be held accountable for what their actions are?

2   A  I don't believe no more than anyone else.

3   Q  So everybody should be treated equal.  That doesn't

4      give them a free pass.

5   A  That's right.

6   Q  Does anybody here have any what they believe would

7      be special knowledge with regard to law

8      enforcement, have any family members that are

9      involved in law enforcement, or have been

10     themselves involved in law enforcement.  Mrs. Mark?

11  A  I have a lot of members of my family that are

12     attorneys, a judge, police officers.

13  Q  And are those local?

14  A  A couple of local, yes.

15  Q  So having -- and you said family members, how

16     close?

17  A  Sister, brother, uncle cousin.

18  Q  And having that in your background with hearing,

19     I'm sure, them talk about their job potentially, is

20     there anything about that, that you think would

21     have any effect on you in sitting as a juror?

22  A  No.

23  Q  Ms. Truex, anybody law enforcement?

24  A  Not that I'm aware.

25  Q  Mr. Myers?

```
 1    A    No.

 2    Q    Has anybody served on a jury before?  New panel.

 3         No.  Mr. Myers, what do you like to do in your free

 4         time?

 5    A    As little as possible.

 6    Q    Okay.  All right.

 7    A    I play a little golf.  That's about all I have time

 8         for.

 9    Q    So being self-employed you don't have a lot of

10         time.

11    A    No.

12    Q    The fact you're self-employed and this is going to

13         be a trial that you're going to have to -- if

14         you're selected be here at least through Wednesday,

15         is that going to be hardship on you not being at

16         the business?

17    A    No, I'll make do.

18    Q    Do you have other employees that can help out?

19    A    Not really, but my situation is such that I can --

20         I can handle it.

21    Q    Okay.  All right.  There's not going to be anything

22         out there that you're going to be worried about

23         that you won't be able to give 100 percent of your

24         attention over here?

25    A    Not particularly, no.
```

```
 1    Q    Ms. Truex, anything that you think is out in the

 2         outside world that you're dealing with right now

 3         that will effect you to be able to give 100 percent

 4         of your attention?

 5    A    Well, my mother's condition probably, but I have

 6         caretakers arranged for her for the next couple

 7         days.

 8    Q    And going through Wednesday?

 9    A    That should not be a problem.

10    Q    Anything you like to do in your free time?

11    A    I like, what free time I have, is I like sports and

12         reading.

13    Q    Okay.

14              MR. WILLIAMS:  I have no other questions,

15    Judge?

16              THE COURT:  Mr. Zook.

17              MR. ZOOK:  Thank you, Judge.

18                   VOIR DIRE EXAMINATION

19    BY MR. ZOOK:

20    Q    We get a little bit shorter each time, and now you

21         folks are in the hot seats.  Mr. Myers, you've

22         never been on a jury before?

23    A    No, I haven't.

24    Q    Have you ever been called?

25    A    No.
```

```
 1     Q    I see that your wife used to work for the Disabled

 2          American Veterans.  What did she do?

 3     A    She's a bartender.

 4     Q    Is that here in Goshen, or where was that?

 5     A    Yes.

 6     Q    So she's out of a job.

 7     A    She works for me now.

 8     Q    Ms. Truex, you said you're down the hall from the

 9          coroner.

10     A    Yes, well, the morgue.  The morgue is down the hall

11          from the lab.

12     Q    Yeah.  I didn't even know you had an office.

13     A    Oh, yeah.

14     Q    All right.  Now, you're pretty familiar with a lot

15          of medical terminology and things like that.

16     A    I would think that working 30 years in the lab,

17          yes, I am actually.

18     Q    What exactly do you do?

19     A    I'm the assistant supervisor, and I help -- you

20          know, I run the shift.  You know, I can work in a

21          department.  If an instrument breaks down, I have

22          to help trouble shoot.  I help with check out new

23          instruments.  I help a little bit of this, a little

24          bit of that.  I have various jobs.  You know, it

25          varies from night to night.
```

224

1    Q    Would it be fair to say that you run the office

2         despite that there -- there might be somebody else

3         that actually is supposed to?

4    A    The office?

5    Q    Yeah.

6    A    We have -- we have people that run the office.  I'm

7         more the technical part.

8    Q    But you keep it going.

9    A    Absolutely, second shift.

10   Q    What is that?

11   A    3:30 to midnight I work.

12   Q    All right.  And I understood that you -- I can't

13        hear very well back there.  I understood that you

14        had done something with one of the prosecutors

15        here.

16   A    Well, actually, I've been witness in a couple cases

17        because we do, do chain of custody alcohols.

18   Q    Okay.  These were DUI cases?

19   A    Pardon.  Yes.

20   Q    Driving while intoxicated?

21   A    Yes, I don't remember the one; but the one was,

22        yes.  And then there was one that was from a few

23        years ago that Mr. Williams -- I got subpoenaed,

24        and I met with him, but it got settled out of court

25        so I didn't go on that one.

```
 1    Q    Okay.  Do you feel -- how do you feel about being

 2         fair to the defendant in a case where the defendant

 3         is brought into court for a trial?

 4    A    I believe I can be fair minded.

 5    Q    Okay.  Do you think you normally are?

 6    A    I believe so, yes.

 7    Q    Should our clients be concerned because of a person

 8         being in your frame of mind on a jury?

 9    A    I hope not.

10    Q    Well, I'm asking you.

11    A    I -- I'm a pretty fair minded person I believe.

12         That's how I was raised.

13    Q    I think most of us think we are.  I'm wondering if

14         you can look in yourself and see if you had any

15         biassed.  Most of us don't know if we do.  And

16         since you've been working in this field and working

17         basically not just with medical things but in

18         prosecution of cases, do you think that would --

19    A    I've had limited -- I've only witnessed in three

20         cases so I don't know that's extensive practice

21         but --

22    Q    Okay.  Okay.  And, Ms. Mark, tell me about your

23         brother and sister I think you said.

24    A    My sister has a law practice out in Arizona, and my

25         brother is -- actually, he's studying law.  He
```

1          lives out of the country.  He's studying

2          international law.

3     Q    Who is the police officer in your family?

4     A    I have two nephews by marriage: Chris Snyder and

5          James Snyder.

6     Q    Do you have any other relatives that are serving as

7          police officers?

8     A    No.

9     Q    Do you have any of the attorney relatives of yours

10         that are involved with criminal law either

11         prosecution or defense?

12    A    No.

13    Q    And you're a single parent now.  Right?

14    A    Yes, I am.

15    Q    You just opened a new business.

16    A    When I filled out that paperwork, yes.  No.

17    Q    Are you still doing that?

18    A    No, I'm not.

19    Q    What are you doing now?

20    A    I'm running an office for an artist, and she

21         designs products, and then she has it manufactured

22         overseas.

23    Q    Are these clothing articles?

24    A    No.

25    Q    How do you like that?

```
 1    A   I love it.
 2    Q   If I'd ask -- if I ask you why wouldn't I want you
 3        on the jury, don't tell me I would, just answer the
 4        question, okay.  Why wouldn't I want you on the
 5        jury?
 6    A   That's a good question.  I'm not sure unless it
 7        would just be my medical background.
 8    Q   Okay.  Mrs. Mark?
 9    A   Well, I would certainly weigh both sides of it.
10        But like I said, I'm more apt to get hung up on
11        some obscure fact.
12    Q   But you know that about yourself.
13    A   Yes, I do.
14    Q   You think when it's 11 to 1 that you at least would
15        keep listening to what the others say not lock
16        yourself in the bathroom?
17    A   No.  I would keep listening to what they had to
18        say.
19    Q   Okay.  And, Mr. Myers, same question.  Why
20        shouldn't I have you on the jury?
21    A   I wouldn't know why you wouldn't want me on the
22        jury.  I really wouldn't.  I'm an open-minded
23        person, weigh the evidence.
24            MR. ZOOK:  Thank you.
25            THE COURT:  Mr. Crawford.
```

<pre>
 1                    VOIR DIRE EXAMINATION

 2    BY MR. CRAWFORD:

 3    Q   Ms. Truex, I believe you mentioned that your mother

 4        was potentially suffering from dementia, and you're

 5        still trying to figure out how to deal with it.  Is

 6        that correct?

 7    A   That's correct.

 8    Q   Is the fact that we are dealing with a case

 9        involving a death of a lady that was 94 years of

10        age, would that make it difficult for you to sit in

11        this?

12    A   Not at all.

13    Q   Separate situation?

14    A   Separate.

15    Q   Anyone else of our new panel have any reservations

16        concerning that particular issue; the fact, that

17        the victim was 94 years of age?

18              (The juror indicated in the negative.)

19    Q   Anything going on at home right now for our new

20        panel that would make it difficult over the next

21        couple of days to sit here and listen to the case?

22        Any questions from our new panel about reasonable

23        doubt, comments concerning that?  Everyone

24        understand that.  Mr. Myers, any problem with the

25        concept of reasonable?
</pre>

229

```
 1    A    I don't think so.  I think it's been pretty much
 2         covered.
 3    Q    State's burden of proof.  They got to show beyond a
 4         reasonable doubt?
 5    A    In my mind, yes.
 6    Q    Ms. Truex?
 7    A    I don't have questions on that.
 8    Q    Any concerns with the issue of presumption of
 9         innocence?  Ms. Truex, any problem with that?
10    A    No.
11    Q    As Ms. Canen and Mr. Royer sit here they're
12         presumed innocent.
13    A    That's correct.
14    Q    Okay.  Mr. Myers, how do you go about making an
15         important decision in your life?
16    A    I guess I research a situation, pluses and minuses,
17         and base my decisions on experience from those
18         pluses and minuses.  In business, you make
19         decisions everyday; and they don't always work out,
20         but you have to figure the pluses and minuses.
21         What I mean there is the positive side of what the
22         good side can happen if you make the right decision
23         and the negative side if you make the wrong
24         decision.  So you have to kind of go in the middle
25         there and figure it out.
```

1    Q    Is it a long-term process for you, or is it

2         something you quickly do?

3    A    That would depend upon the situation.   Sometimes

4         it's just like that; sometimes it's not.

5    Q    More complicated it is the longer of period of time

6         it might take.

7    A    Depends on the gravity of the situation.

8    Q    Are you a leader or a follower?

9    A    That that depends on the situation.   If I know what

10        I'm doing, I'd rather be a leader.   I'm not quite

11        sure.

12   Q    Does that switch based upon the amount of

13        information you think you gathered?

14   A    Sure.   You gather information you become a leader.

15   Q    Thank you, sir.   Ms. Truex, how about you?

16   A    I would probably characterize myself more of a

17        leader.

18   Q    Okay.   How do you go about making a decision?

19   A    I like to get all the -- you know, what facts you

20        can, and then, you know, use your experience and

21        common sense and come to a decision.   And, again,

22        like he said too, it would depend on, you know,

23        what -- situations are different.   Sometimes it's

24        easy to come to a decision; sometimes it's not.

25   Q    Okay.   You mention that in your line of business or

1      you practice that you had come across all kinds of

2      people.  And you didn't go much into detail about

3      that because I don't think you were what.  What

4      specifically do you mean by that?

5   A  I do have to go up and help draw patients in

6      emergency room and out patients at the hospital, so

7      you come across a wide swath of people in that --

8   Q  Comprehension abilities, or what do you mean by

9      that?

10  A  You name it cause the ER gets a little bit of

11     everything.

12  Q  So some people are a little bit more astute than

13     other people.

14  A  Absolutely.

15  Q  So you do recognize differences of people.

16  A  Absolutely.

17  Q  Ms. Mark, how do you make a major decision in your

18     life?  What do you do to come up with something?

19  A  Well, I don't make them very easily, but I try to

20     gather as much information as I can.  If I still

21     don't feel confident, I ask people who know more

22     than I do for their input, and then I end up doing

23     what I feel is right.  I can have all the facts

24     but, you know, I go with whatever my feeling is.

25  Q  Okay.  Are you a leader or a follower?

1     A     Well, I would say I'm a follower, but somehow I

2           always get moved up.  Maybe no one else wants the

3           job.

4     Q     Like, Mr. Myers, in terms of starting out one way

5           but the more information you gather you're more of

6           a leader.

7     A     Yes.

8     Q     Thank you.  Anyone of our new panel have a friend

9           or been the victim of a crime or acquaintance, any

10          insight into that or been involved in anything like

11          that?  I'll take that as a no for everybody.  Okay.

12          Any of our new panel been on a jury before?  Let me

13          step back.  I know Mr. Zook asked that, and I do

14          apologize.

15              Ms. Mark, nothing about family members being

16          police officers is in any way would impact your

17          ability to separate and just consider the facts in

18          this case.  Am I fair in my assumption of that?

19    A     You're fair in your assumption that I would not,

20          yes.  That's a tricky question.

21    Q     I know I asked that incorrectly.  Caught myself in

22          the middle of that.  Nothing -- because you have

23          friends or family members that are police officers,

24          are you more likely to believe the testimony of an

25          officer the comes in here and testifies here over

1   the next couple of days?

2 A No.

3 Q And you will give them whatever deference in

4   looking at your common sense and your ability to

5   deduct and reason things you'll look at it all the

6   same way.

7 A Yes.  I would think that their powers of

8   observation are going to be more than mine, but to

9   automatically believe whatever they had to say, no.

10 Q When you say "their powers of observation are

11   better than yours," what do you mean by that?

12 A Well, I just mean that they're more trained to

13   notice things that I wouldn't, you know,

14   necessarily.

15 Q But their eyesight may not be better.

16 A Their eyesight isn't better but --

17 Q Abilities to perceive and pick up on certain

18   things.

19 A Right.  They may notice things I wouldn't.

20 Q Okay.  I think that is all I have.  Thank you all.

21     (Counsel approached the bench.)

22    THE COURT:  Mr. Myers, Ms. Mark you'll be

23 excused.  Ms. Truex, welcome to the jury.  Ms. Jackson

24 would you seat additional jurors.  Seat No. 1 we now have

25 Christine Cupp, and in seat No. 9 we have Linda Lawson.

1    Ladies and gentlemen, we're going to take a recess.

2              You are all prospective jurors in this case.

3    You are prohibited from discussing this case with anyone

4    prior to the commencement of the evidentiary portion of

5    the trial.  To do so may result in a mistrial.  After the

6    presentation of evidence has begun, jurors may discuss

7    the evidence presented amongst themselves in the jury

8    room during recesses.  All regular jurors and alternates

9    must be present during such discussion.  You must reserve

10   judgement concerning the outcome of the case until jury

11   deliberations begin.

12             You may not discuss the facts of this case with

13   me or with the lawyers or with any of the witnesses.

14             You may not investigate the case yourselves or

15   attempt to obtain information outside the courtroom.  It

16   is highly improper for you to do so.  You are also

17   prohibited from reading any newspaper accounts of this

18   case and from listening to or watching any radio or

19   television reports relating to this trial.  You are to

20   consider and decide this case only upon the evidence

21   received during the course of the trial here in the

22   courtroom.  Once again, you'll be in care of the bailiff.

23             (A short recess was had at this time.)

24             (The Court convened with all the

25                parties present.  The prospective jury

```
1              entered the courtroom and the

2              following proceedings were had.)

3          THE COURT:  Be seated, please.  Ms. Becker.

4                 VOIR DIRE EXAMINATION

5  BY MS. BECKER:

6   Q   Good afternoon.  Almost evening, but the end is in

7       sight.  That's the good news.  First of all, Ms.

8       Cupp, you and I are acquaintance with each other.

9       Is that exclusively from our business in the courts

10      in Superior Court 1 and 2.

11  A   Did you ever rent space from Graber Law Firm?

12  Q   Yes.

13  A   Yes.

14  Q   Okay.  Then, yes, then we've come into contact with

15      each other then as well.  Anything about the fact

16      that you and I are acquaintances that you might

17      find to be -- make you a little uncomfortable being

18      fair an impartial in this case?

19  A   No.

20  Q   All right.  Do you have any questions so far?

21  A   No.

22  Q   No.  All right.  Ms. Lawson, what about you?

23      Anything thus far that you've heard or seen,

24      observed in some way in the courtroom that you

25      think might effect your ability to be fair and
```

| | | |
|---|---|---|
| 1 | | impartial? |
| 2 | A | No. |
| 3 | Q | All right.  Let's talk real quick about the |
| 4 | | principles, the legal principles you'll be dealing |
| 5 | | with, felony murder as well as accessory liability |
| 6 | | or accomplice liability.  Do both of those concepts |
| 7 | | make sense to both of you, Mrs. Cupp? |
| 8 | A | Yes. |
| 9 | Q | And, Ms. Lawson? |
| 10 | A | Yes. |
| 11 | Q | Do you think that you can enforce both of those |
| 12 | | laws? |
| 13 | A | Yes. |
| 14 | A | Yes. |
| 15 | Q | Do either one of you think they're unfair in any |
| 16 | | way, shape, or form? |
| 17 | A | Nope. |
| 18 | A | No. |
| 19 | Q | Fantastic.  The concept of inferences versus |
| 20 | | speculation.  Do you understand the differences |
| 21 | | between the two, Mrs. Lawson? |
| 22 | A | Yes. |
| 23 | Q | All right.  Describe them for me? |
| 24 | A | A speculation is unknown maybe what if, and an |
| 25 | | inference is taking information and what comes |

1           common sense to draw a conclusion from.

2    Q      Does that makes sense to you, Mrs. Cupp?

3    A      Yes.

4    Q      Do you want to add anything to that?

5    A      No.

6    Q      Okay.  The next thing we need to discuss are

7           whether you have anything in your personal beliefs,

8           your upbringing, your moral background, that kind

9           thing that might effect your ability to be fair and

10          impartial.  Ms. Cupp?

11   A      No.

12   Q      Ms. Lawson, nothing.

13   A      No.

14   Q      All right.  Anything about the fact that this case

15          involves witnesses who may have a little more of a

16          diminished mental perception then other people or

17          the fact that the victim is an elderly woman,

18          either of those things have any impact on you?

19   A      No.

20   Q      Will you keep and open mind and listen to all of

21          the evidence before you make any decisions in this

22          case.  Ms. Cupp?

23   A      Yes.

24   Q      Ms. Lawson?

25   A      Yes.

1    Q   The concept of reasonable doubt.  What does that

2         mean to you, Mrs. Cupp?

3    A   That concept of it?

4    Q   Yes.  What does it mean to you if I say tell me

5         what reasonable doubt is.  How would you put it

6         into your own words?

7    A   Anything that's out of reason.

8    Q   Okay.  When Mr. Williams was up here the first

9         round, he made a comment about there's reasonable

10        doubt there's unreasonable doubt.  What's the

11        difference between the two?

12    A  Reasonable is more fair.  Unreasonable would be

13        unfair.  Like, it's further away from reason.

14    Q  Okay.  That makes sense.  Does it make sense to you

15        also that unreasonable doubt is more like

16        speculation?  It's grasping, trying to come up with

17        something.  Understand how that is not permissible

18        as far as speculating is concerned?

19    A  Yes.

20    Q  Make sense to you?

21    A  Yes.

22    Q  Mrs. Lawson, do you agree with that?

23    A  Yes.

24    Q  Okay.  Any questions on that topic?

25    A  No.

1    Q    Okay.  Do either one of you, Ms. Lawson, you first,

2         have any special knowledge or skilled information

3         about forensic evidence, about the rules of

4         evidence, rules of trial procedure, or mental -- or

5         mental illnesses?

6    A    No.

7    Q    Mrs. Cupp?

8    A    I work for the Elkhart County Courthouse in

9         Elkhart, but, I mean, I just process paperwork.  I

10        don't really get into all that technical stuff.

11   Q    Don't get into the details.

12   A    Right.

13   Q    Do either one of you have anything that I failed to

14        ask you that you think we ought to know about in

15        order to make an educated decision?  Ms. Lawson.

16   A    I was a victim of a crime this summer, a robbery.

17   Q    Okay.  How -- let me ask you this.  The fact that

18        you were a victim of a crime this summer, do you

19        believe that that will impact you in such a way in

20        this trial that it might effect your abilities to

21        be fair or impartial to either side?

22   A    I don't think it will.

23   Q    You don't think it will.  Was it a traumatic enough

24        experience for you that it's going to be difficult

25        for you now to sit in this chair?

240

1    A    No.

2    Q    No.  Mrs. Cupp, anything about you?

3    A    No.

4    Q    All right.  Questions from either one of you?

5    A    No.  But I want to mention another thing.  I

6         work -- where I work, I work for child protective

7         services, and right now I serve as a clerk.  I have

8         been a case manager in the past, and I just wanted

9         to let you know about that.

10   Q    Sure.  Fortunately, it's not child victim type

11        case.  There are no child witnesses in this

12        situation.  So as far as those special skills that

13        you have probably won't come into play in this

14        case.  On the other hand, you've had some exposure

15        to the system.  Did you ever have to testify

16        because of any of your dealings with CPS?

17   A    Yes.

18   Q    All right.  Anything about your preparation, your

19        testifying, or your being a witness in a specific

20        case because of your association with CPS, do you

21        think any of that might effect your ability to be

22        fair and impartial?

23   A    I don't think so, no.

24   Q    Okay.  All right.  Can you think of anything else

25        because that's a couple of big things that I didn't

```
 1         ask you the right questions for.  So can you think
 2         of anything else that you think might effect you or
 3         nibble at you a little bit as you're trying to
 4         listen to evidence a make a decision in this case?
 5    A    No.  I've been listening all day, and the one thing
 6         was the case management that I wanted you all to be
 7         aware of.
 8    Q    Okay.  Very good.  Thank you.  Appreciate that.
 9         Anything else?
10    A    No.
11    A    No.
12    Q    Thank you both very much.  Mr. Zook.
13             THE COURT:  Mr. Zook.
14                   VOIR DIRE EXAMINATION
15  BY MR. ZOOK:
16    Q    Hi.  I take it, Mrs. Lawson, that the State of
17         Indiana work you do is for child protective
18         services?
19    A    That's correct.
20    Q    How long have you done that?
21    A    I have been there -- this is the second time in
22         working for them.  I'm coming up on two years the
23         majority of that as a unit clerk.  16 years ago, I
24         worked in the capacity as a case manager for four
25         years.
```

```
 1    Q   Okay.  What did you do in the meantime?

 2    A   I raised my children, I did substitute teaching, I

 3        did some contract home studies for adoptions, that

 4        kind of thing.

 5    Q   Largely concerned with children then.

 6    A   Yes.

 7    Q   Gee, I see you're almost as old as I am.  What did

 8        you do before that?

 9    A   Well, I was nontraditional student when I went to

10        get me preparation for doing social work.  So I've

11        been a stay-at-home mom for that previous marriage.

12    Q   Okay.  Thank you.  Do you understand the concept

13        that the state has to prove the crimes beyond a

14        reasonable doubt?

15    A   Yes, I believe I do.

16    Q   What does beyond a reasonable doubt mean to you?

17    A   It means with a strong assurance and that the

18        reasonable doubt has to be something that

19        plausible.  In other words not --

20    Q   Okay.  Something that comes from the evidence or a

21        hole in the evidence perhaps.

22    A   Yes.

23    Q   And it wouldn't be, for example, that someone came

24        down from a flying saucer and committed the crime,

25        and that's why our clients are not guilty.  But if
```

```
 1           you find that hole in the evidence or if you find
 2           that the case just doesn't seem plausible, would
 3           you be able to vote not guilty?
 4      A    Absolutely.
 5      Q    And now, Ms. Cupp, I don't know that we've met I
 6           think maybe once; but I don't know people on a
 7           first name basis in Elkhart.  Try not to go there
 8           as often as I can.  So you worked also for the
 9           Theora Graber I see.
10      A    Correct.
11      Q    You've had contact with criminal cases before?
12      A    When I worked for Theora, it was mostly family law
13           so not really.  I just started working at the
14           Elkhart Courthouse in October, and I haven't dealt
15           with the criminal cases yet.
16      Q    And you hadn't really dealt with them with Theora
17           either.
18      A    No.
19      Q    Did you have any criminal -- accused criminals
20           coming into your office?
21      A    No.  They did mostly family law.  They did no
22           criminal.
23      Q    That's even worse, isn't it?  Are you accustomed to
24           thinking that if somebody's arrested he or she
25           probably committed the crime or he wouldn't have
```

1       been arrested in the first place?

2   A   No.

3   Q   There was some talk about assisting in a crime or

4       being -- being a person who aids, assists, or

5       causes a crime being as guilty as the person who

6       does the crime.  What would happen if the crime

7       were committed and then another person gave aid to

8       the person that committed the crime, do you know?

9   A   They're still -- they still took part in it.

10  Q   Took part in the crime itself.

11  A   Can you -- can you repeat the question?

12  Q   Sure.  What would happen if a person commits a

13      crime and after the crime another person gets

14      involved in that crime, is that the same thing?

15  A   How are you saying involved in the crime?

16  Q   By helping the person who had originally committed

17      the crime.

18  A   Well, then they're taking part in that in helping

19      that person commit that crime.

20  Q   Could I change your mind?  How do you feel,

21      Mrs. Lawson?

22  A   I don't know the answer to that.

23  Q   It's something that the Judge would have to tell

24      you I think.  I'm not going to try to tell you

25      about that.  But, basically, if you're aiding or

1    assisting a person committing a crime would be

2    different than aiding or assisting a person after

3    the crime's committed.  When I put it that way,

4    does it make more sense?

5    A    You're still aiding but in a different

6    circumstance.

7    Q    Yeah.  What if you commit a crime and I help you

8    ten years later?

9    A    With the crime or how?  What do you mean by --

10   Q    With anything.

11   A    With anything.

12   Q    Or maybe to conceal a crime or something like that.

13   I know I've got you into unexplored areas here, but

14   basically can you understand that aiding or

15   assisting in committing the crime is -- is

16   different than aiding or assisting after the crime

17   has been committed?

18   A    After the fact is what you're saying?

19   Q    Yeah.  Do you have any question of me?

20   A    No.

21   Q    Okay.  Now, do either of you two know anybody else?

22   A    Our daughters this summer they're playing --

23   they're hoping today to make the volleyball team at

24   the same school.

25   Q    Thank you.

```
1                THE COURT:  Mr. Crawford.

2                    VOIR DIRE EXAMINATION

3   BY MR. CRAWFORD:

4      Q    Good evening, I should say.

5                THE COURT:  If anyone has a cell phone or a

6   pager or whatever, you need to shut it off?

7   BY MR. CRAWFORD:

8      Q    Ms. Cupp, in your time at the clerk's office in

9           Superior Court 2, have you and the other clerks

10          talked about criminal cases or things of that

11          nature?

12     A    Yes.

13     Q    Okay.  Do you think that given those conversations

14          they may in any way influence your ability to

15          carefully listen to facts in this case or make a

16          determination in this case?

17     A    No.

18     Q    When you talked about the cases, did you talk about

19          them in a negative way?

20     A    No.  It was more in a learning way so that I could

21          learn what paperwork went with what cases.

22     Q    So more of a process kind of thing, not about

23          specific people or the case itself, but more about

24          how this got processed and why it got processed a

25          certain way.
```

1    A    Right.

2    Q    Okay.  And it was my understanding you never at the

3         Graber Law Firm came into contact with criminal

4         type of cases.

5    A    No.

6    Q    Ms. Lawson, in your experience, probably want to

7         back to about 16 years or so ago when you were a

8         case manager.  I believe you mentioned that you had

9         to testify in criminal cases.  Is that correct, or

10        in cases --

11   A    In cases.

12   Q    Not necessarily criminal.  During the period of

13        time that you were involved as a case manager or

14        today, have you had contact with police officers?

15   A    Yes.

16   Q    And in what capacity have you had contact with

17        police officers?

18   A    Well, 16 years ago there were officers that were

19        things were done a little differently than they are

20        now.  When you were on call, you had frequent

21        contact with whatever officers were working cause

22        officers are the ones that take protective custody

23        of children even though a caseworker is there from

24        the Department of Child Services so there were

25        officers that you'd get to know.

1    Q    Are you more likely to believe the testimony of an

2         officer because of your involvement with them in

3         the past then with Child Protective Services?

4    A    No.  I don't believe they're different people than

5         you and I.

6    Q    They just take the information that they've

7         gathered, but there's no special ability that they

8         have.

9    A    I believe they can be more experienced at

10        testifying and more comfortable in that, but not

11        that they have some special way of knowing that

12        than you or I do.

13   Q    In your capacity with Child Protective Services,

14        what kind of children have you dealt with?

15   A    All ages of children from infants to teenagers, all

16        kinds of children, all kinds of parents.

17   Q    So different levels of emotional growth, would that

18        be something that you would have come into contact

19        with?

20   A    Absolutely.

21   Q    People with more of a -- some with more mental

22        deficiencies than others?

23   A    Yes.

24   Q    Have you been able to observe the differences in

25        those kind of individuals?

249

```
 1    A   Yes.

 2    Q   And how they handle or respond to situation.

 3    A   Yes.

 4    Q   And you gathered that during the period of time

 5        that you were the child protective services.

 6    A   Yes.

 7    Q   Is that something that you continue to experience,

 8        or are you just more of a processor now than you

 9        were?

10    A   I'm in the office now.

11    Q   Okay.  So you're not really coming into contact

12        with people necessarily.

13    A   That's correct.

14    Q   Anything going on in either one of your lives right

15        now that would make it difficult to hear this case

16        over the next two days, two or three days?

17    A   No.

18    A   No.

19    Q   Elkhart Superior Court No. 1 will be able to

20        survive?

21    A   They'll survive.

22    Q   Any of the two of you have any friends or families

23        members that are police officers?

24    A   I have an acquaintance Frank Thomas from the

25        Elkhart PD.  His daughter and my daughter are
```

```
 1            friends and have been for years.
 2     Q    Is -- is the fact -- I believe you mentioned when
 3            Mr. Zook was up here or Ms. Becker that you had
 4            been a victim of a crime, is that correct, this
 5            summer?
 6     A    This summer.
 7     Q    This summer.  What has happened with that case?
 8     A    It's a juvenile matter.  It was my neighbor.  And
 9            the young man is in boy's school.  All of our
10            belongings were recovered.
11     Q    So you were able to see the effects of that and
12            actually -- how did you -- you were able to see the
13            process working there.  Is that correct?
14     A    Yes.  As much as you see a juvenile process.  It's
15            closed, of course, juvenile; but the young man
16            admitted to the crime, and we had gotten everything
17            back even before that because they weren't very
18            clever.
19     Q    So they were other pieces of information that led
20            it to believe it was that young man.
21     A    It was that young man and some friends.
22     Q    Okay.  So there were pieces of information that
23            were gathered that could get you to that point.
24     A    Yes.
25     Q    Okay.  Anything about that incident that would make
```

1           it difficult for you to sit and judge -- in

2           judgment over the next couple days in this case?

3       A   No.

4       Q   Will you be able to separate that particular

5           incident and only consider the facts of this case?

6       A   Yes.

7       Q   For either one of you, is there anything about this

8           particular case that if you were Mr. Royer or

9           Ms. Canen that you would not want yourself on the

10          jury because of certain things that we've already

11          talked about?

12      A   No.

13      A   No.

14      Q   Any problems with the issues or the doctrine of

15          presumption of innocence?

16      A   No.

17      A   No.

18      Q   Thank you very much.

19                  (The counsel approached the bench.)

20              THE COURT:  Ms. Cupp, you'll be excused.  Ms.

21      Lawson, welcome to the jury.  In seat No. 1 we now have

22      Ms. Kelly, correct?

23              A JUROR:  Yes.

24              THE COURT:  Mr. Williams.

25              MR. WILLIAMS:  Thank you, your Honor.

252

1    STATE OF INDIANA    )      IN THE ELKHART CIRCUIT COURT

2                        )  SS:
     COUNTY OF ELKHART   )     CAUSE NO:  20C01-0309-MR-00155
3                                  )
     STATE OF INDIANA,             )
4                                  )
                                   )
5        v.                        )
                                   )
6                                  )
     ANDREW M. ROYER,              )
7                                  )
         Defendant.                )
8

9                        VOLUME II

10

11            Reporter's transcript of the proceedings in the

12    above-entitled matter commenced on Monday, August 8,

13    2005; Tuesday, August 9, 2005; and Wednesday, August 10,

14    2005, before the HONORABLE TERRY C. SHEWMAKER, Judge of

15    the Elkhart Circuit Court, Goshen, Indiana.

16

17

18

19

20

21    APPEARANCES:

22    FOR THE STATE OF INDIANA:  Vicki Elaine Becker and Denise

23    A. Robinson

24    FOR THE DEFENDANT CANEN: R. Brent Zook

25    FOR THE DEFENDANT ROYER: Christopher C. Crawford

253

```
1                    VOIR DIRE EXAMINATION

2    BY MR. WILLIAMS:

3      Q   It's just you and I.  Ms. Kelly, is there anything

4          you've heard sitting outside the jury panel that

5          you want to talk about?

6      A   No.

7      Q   Is there anything that came up that is in your mind

8          that would lead you to believe that you couldn't be

9          fair and impartial in this case?

10     A   No.

11     Q   You've heard the concepts of felony murder and

12         accomplice liability numerous times.

13     A   Yes.

14     Q   Any -- any questions about those concepts?

15     A   No.

16     Q   Do you believe that you could enforce felony murder

17         and accomplice liability if it's before you?

18     A   Yes.

19     Q   Do you believe they're fair?

20     A   Yes.

21     Q   The concepts of inference and speculation that

22         we've talked about, did you hear that?

23     A   Yes.

24     Q   Why don't you tell me what you believe that the

25         differences between the two?
```

```
1     A    Well, inference is more -- I'm trying to think how

2          I explain it.  Iffy, more what if type of things,

3          and the other one would be that it's more possible.

4     Q    Okay.  So let's start with cause I'm not sure which

5          one you were talking about.  Talk about speculation

6          first.  What does speculation mean to you?  Say

7          somebody is speculating about something.

8     A    Okay.  Then they're -- I'm not even sure how I'd

9          put this.  You're speculating that there's a

10         possibility that this could be the fact.

11    Q    And when you talk about inference, did you

12         understand -- I mean, what -- what -- what comes to

13         mind when you hear about inference?

14    A    If this should happen.

15    Q    The words and you've been -- you were back there

16         when we were talking about these things.  It's

17         actually switched.  I mean, when you look at

18         definitions and we think about those things,

19         speculation is really the what ifs.  You're

20         speculating.  It's a guess potentially.

21              Inference is more you take your common sense,

22         your life experience, you kind of put the pieces

23         together, and then you come to a conclusion.

24         Regardless of the terminology, do you -- do you

25         understand the difference between I guess something
```

```
 1            that's a guess and something that actually is more

 2            concrete?

 3     A      Yes.

 4     Q      And that you can't have decisions based on

 5            speculation.  And you're going to hear evidence

 6            from the witness stand and that's what you're to

 7            base your decision on, things that go on in the

 8            courtroom.  Not that you can't bring your common

 9            sense and your life experiences in.  Any questions

10            about that?

11     A      No.

12     Q      Any difficulty with that?

13     A      No.

14     Q      Anything in your personal beliefs that you believe

15            would make you not be fair and impartial in this

16            case?

17     A      No.

18     Q      Have you ever been a victim of a crime?

19     A      No.

20     Q      Do you -- have you ever had any family members be

21            victims of crime?

22     A      Yes.

23     Q      Give me a -- who?

24     A      Well, I had are sister that was robbed.

25     Q      How long ago was that?
```

1    A    Goodness.  It's been six or seven years ago.

2    Q    Anything about that incident with your sister that

3         would have some effect on you as you sit in the

4         courtroom if you had to sit in the courtroom and

5         listen to this case?

6    A    No.

7    Q    Okay.  Anything about the fact that you may hear

8         testimony from witnesses or that the victim in this

9         case is an older individual, elderly, she was 94

10        years old, any problem hearing that type of

11        evidence or anything in your background that would

12        lead you to not be fair and impartial?

13   A    No.

14   Q    The concept of beyond a reasonable doubt.  You've

15        heard us talk about that.  Tell me what that means

16        to you beyond a reasonable doubt?

17   A    That means that the puzzle pieces fit for the most

18        part.  There might be some gaps here or there but

19        that you can still see the whole picture.

20   Q    And so that you don't have to have everything

21        there, but you need to be able to see the picture.

22   A    Yes.

23   Q    Do you have any special knowledge, skill, medical

24        field, law enforcement, in your background?

25   A    Medical.

| | | |
|---|---|---|
| 1 | Q | What is that? |
| 2 | A | I'm an RN. |
| 3 | Q | And where are you an RN at? |
| 4 | A | Elkhart General Hospital. |
| 5 | Q | As an RN, do you deal with all sorts of different |
| 6 | | types of people? |
| 7 | A | Yes. |
| 8 | Q | And how do you feel about that? |
| 9 | A | They're individuals.  Everybody is different. |
| 10 | Q | Do you treat people the same when they come in? |
| 11 | A | No.  You have to treat them according to their own |
| 12 | | special qualities and their own intellect. |
| 13 | Q | So somebody who may not be as intelligent as |
| 14 | | somebody else you have to deal with differently. |
| 15 | A | Right.  We explain a little bit more, maybe give a |
| 16 | | little more detail; but they have to understand why |
| 17 | | they're there and what they're facing and any risks |
| 18 | | involved. |
| 19 | Q | Is there anything about the fact that you deal with |
| 20 | | different types of people, do you think that would |
| 21 | | make you a particularly good or bad juror? |
| 22 | A | Probably better. |
| 23 | Q | Why do you think that? |
| 24 | A | Because you're used to dealing with different |
| 25 | | personalities and different people in different |

1       levels, and you can understand the differences and

2       how they perceive things.

3   Q   You get an idea of how to understand what -- how

4       people understand things I guess.  Not eloquently

5       said but.  Is there anything that I haven't asked

6       you that you want to tell me about yourself that

7       you think that I should know?

8   A   I have an acquaintance that works in Elkhart on the

9       police force.

10   Q   And who is that?

11   A   His name is Mike Sigsbee.  He's a detective.

12   Q   Is there anything about your relationship with Mike

13       Sigsbee that would effect you ability to be fair

14       and impartial in this case?

15   A   No.

16   Q   What do you do in your free time?

17   A   I read, garden, motorcycle.

18   Q   Have much time for TV?

19   A   Not much.  I like TV that you don't have to think a

20       lot about: Comedies, old movies.  I like the old

21       movies.

22   Q   You said you like to read.  What do you read?

23   A   A variety, I mean, I'll read just about anything.

24       But I think my favorite would be some of the older

25       novels like Gone With the Wind, those type of

1           things.

2      Q    Romances.  Have you or has anyone in you family

3           ever been a party to or been involved in a lawsuit?

4      A    No.

5      Q    Have you ever been juror in a case?

6      A    Yes.

7      Q    Do you want to be a juror?

8      A    Yeah.

9      Q    And why?

10     A    I just think the whole concept is interesting.

11     Q    Anything in particular that's interesting, I mean,

12          when you say that --

13     A    I just mean the whole magnetism of the whole thing.

14          I mean, you know, it's interesting to see how a

15          judge reacts to certain things and how each

16          individual does their job.

17     Q    No more questions.

18              THE COURT:  Mr. Zook.

19                    VOIR DIRE EXAMINATION

20     BY MR. ZOOK:

21     Q    Ms. Kelly, where do you work again?

22     A    Elkhart General Hospital.

23     Q    Okay.  And you worked at some other hospital or

24          some other place before as a nurse?

25     A    Yes.

1    Q   Where was that?

2    A   In Columbus, Ohio.

3    Q   And was that in a hospital?

4    A   Yes.

5    Q   Okay.  Have you always worked in a hospital?

6    A   No, I haven't.  I've worked in nursing homes, I've

7        worked in home care.

8    Q   You read Danielle Steel?

9    A   Yes.  Not much, but I have read his books, yes.

10       Her books I should say.

11   Q   You know anyone else on the panel?

12   A   No, I don't.

13   Q   All right.  Something you said concerned me a

14       little bit concerning how sure you have to be to

15       find somebody guilty beyond a reasonable doubt, and

16       you said there could be some gaps in the evidence.

17       You understand those would have to be unreasonable

18       gaps in order to -- maybe you're saying something

19       good, and maybe you're not.  I'm just not quite

20       understanding exactly what you meant by that.

21           When you're looking for reasonable doubts

22       you're looking for holes in the evidence, things

23       that haven't been proven beyond a reasonable doubt.

24       The elements of the case being that there was a

25       robbery, not another kind of a crime, but a

1        robbery, and that someone was killed in the course

2        of it other than one of the perpetrators.

3             So when you're looking at those two things,

4        you need to see that those things have been proven

5        beyond a reasonable doubt.  And you'll hear an

6        instruction from the judge that has to do with you

7        being fully convinced that the people that are on

8        trial are guilty of the crime before you say

9        guilty.  You think you can do that?

10   A   Yes.

11   Q   Okay.  What does that mean to you?  It's just

12       another couple of words like beyond a reasonable

13       doubt or fully convinced as being equivalent or

14       still other words?  What does it mean to you?

15   A   That they brought forth enough facts that paints

16       the picture that, yes, this is what has happened.

17   Q   Okay.  Okay.  And the speculation would be even

18       though they did that, something else might have

19       happened to make it look that way perhaps that way.

20       You understand what I'm talking about?

21   A   Yes.

22   Q   You can use inferences which come from the facts

23       that have been shown.  It's Like you can deduce

24       things like any normal person from the facts that

25       are shown to you, but you can't just go out and

1          grab ahold of maybes.  Okay.  You've never been on

2          a jury.

3     A    No.  I've been part of the jury selection, but then

4          at the last minute they plea bargained, and we were

5          all dismissed.  So I never was actually part of the

6          jury to say that I heard any of the evidence.

7     Q    Okay.  Thank you.  You have any questions of me?

8     A    No.

9              THE COURT:  Mr. Crawford.

10             MR. CRAWFORD:  Thank you, your Honor.

11                  VOIR DIRE EXAMINATION

12   BY MR. CRAWFORD:

13    Q    Ms. Kelly, anything going on at work or at home

14         right now that would make it difficult for you to

15         sit as a juror over the next couple of days?

16    A    No.

17    Q    Anything about the doctrine of presumption of

18         innocence that you had questions about or you were

19         concerned about or it was difficult for you to

20         understand?

21    A    No.

22    Q    You understand that as Ms. Canen and Mr. Royer sit

23         here they're presumed innocent?

24    A    Yes.

25    Q    And is that something that you can practice

1        throughout the course of this trial if you're

2        selected?

3    A   Yes.

4    Q   Are you leader a or a follower?

5    A   I tend to be both depending on what the

6        circumstances are.

7    Q   And when you say that, what do you mean

8        circumstances?

9    A   If its something I'm knowledgeable about, I feel

10       comfortable in leading; but there's time that if

11       I'm not knowledgeable about a subject, that

12       sometimes I can follow until I develop more

13       knowledge.

14   Q   Okay.  You mention I believe also that in your

15       capacity as a registered nurse you have worked with

16       nursing homes or in nursing homes.  Is that

17       correct?

18   A   Yes, I have.

19   Q   Is the fact that the victim in this case was 94

20       years of age cause some concern or should have

21       caused some concern for my client and Mr. Zook's

22       client given your involvement with individuals in

23       nursing homes?

24   A   I don't think so.

25   Q   You'll be able to separate that experience solely

1          only upon facts that you hear over the next couple

2          of days?

3     A    Yes.

4     Q    I think that's all I have, thank you.

5          THE COURT:  Ms. Kelly, welcome to the jury.

6    Ms. Becker.

7                   VOIR DIRE EXAMINATION

8    BY MS. BECKER:

9     Q    Good evening, ladies.  Okay.  First of all, I want

10         to let you know what the alternate does.  Have

11         either of you served on a jury before?

12    A    No.

13    A    No.

14    Q    No.  All right.  The alternate juror has the

15         responsibility of paying 100 percent attention just

16         like all the other jurors do.  You have to pay

17         attention to virtually every fact of evidence that

18         comes in.  Reason being is that if one of the

19         regular members of the panel something happens,

20         then you have to jump in and hit the ground running

21         in the discussion.  The hard part of this is you

22         absolutely may not participate in any deliberation

23         prior to your taking the seat in a regular area.

24         For some people, it's no problem.  They like being

25         in the background, you know, it's no problem.  For

```
 1          other people, they have the hard time keeping quiet

 2          when everybody else is going one way and you're

 3          stuck on something else.  Do both of you think you

 4          can do this job?

 5     A    If it's something I feel passionately about,

 6          sometimes I have to keep my mouth in check because

 7          I want to add my two cents.

 8     Q    I'm the say way.  I know.  I am not capable of

 9          being an alternate.  I can't keep my mouth shut.  I

10          know myself that well.  Question is: Can you keep

11          your mouth shut even though, even if it's

12          passionate, even if it's all you can do to maintain

13          yourself, can you keep yourself under control?

14     A    I'd like to think that I could in something this

15          serious; but at that the same time, in my opinion

16          if it sounds like someone isn't making sense of

17          what was presented, I'd feel like I need to correct

18          that.

19     Q    Okay.  Here's what would happen.  If you jump in,

20          you got to start the process all over again.  Okay.

21          Knowing that would be the consequence, do you think

22          that you would be able to at least stay out, turn

23          your head?

24     A    Yes.

25     Q    And, ma'am, what about you?
```

1    A    Knowing the consequence, yes, I could keep my mouth

2         shut.

3    Q    Okay.  Very good.  And whomever the foreman is on

4         the jury will also keep you in check as well

5         because they'll tell us if you start talking; but,

6         you know, that's the hardest part really of being

7         an alternate juror.  Now, aside from that, if you

8         do get called in to serve on the panel, these legal

9         concepts we've discussed, felony murder and

10        accomplice liability, do they make sense to both of

11        you?

12   A    Yes.  But I don't agree with it.

13   Q    Okay.  Tell me what part you don't agree with.

14   A    Earlier this morning the example you gave was

15        someone is in the get-away car another person was

16        in the convenience store, hit someone with the

17        pipe, that person happened to die.  I do not think

18        that the driver of the car should be held

19        accountable for murder, although they are guilty of

20        taking part in a crime, they're not guilty cause

21        they did not wield that weapon.

22   Q    Okay.  Thank you for your candidness on this.  I

23        truly appreciate it because there are many people

24        who feel the same way you do.  That's not what the

25        say in the State of Indiana.  The law -- as

1           Mr. Zook indicated earlier, there's only one kind

2           of murder.  And while there's only one kind of

3           murder, it's true, we don't have different degrees

4           of murder.  There are two different types.  You've

5           have flat out murder where somebody kills somebody.

6           I mean, it's one person killing another human

7           being.

8                You've also got felony murder where you intend

9           to commit the felony and during that felony a

10          person gets killed, and that's the way it is in the

11          State of Indiana.  So my question to you knowing

12          you as you know you best, can you follow the law of

13          the State of Indiana which says go against what you

14          believe because if you find that they aided induced

15          or caused this offense in any way, shape, or form

16          you have to find them guilty.  Can you ignore your

17          own moral standing and follow the law?  You want me

18          to come back to you on that?

19    A    I'd like to answer.

20    Q    Feel free, yeah.

21    A    I'm the one who has to live with whatever decision

22          I make, and it would be hard if I was only given --

23          if that's it, that's hard.  I need not a way out,

24          but I need there to be another type.

25    Q    All right.  Let me ask you this then.  If the State

1        of Indiana did prove to you beyond a reasonable

2        doubt the situation that I just -- the hypothetical

3        we talked about earlier, the driver of the car knew

4        that the person had a pipe.  Didn't necessarily

5        know they were going to use it, but knew they had a

6        pipe, knew it was possible, and it happened.  In

7        that situation, and say it was all proven, all the

8        facts were proven to you, in that situation, would

9        you come back guilty on the driver?

10   A   For murder.

11   Q   For murder, felony murder.

12   A   They have no control over what that person did with

13       that pipe.  They only had control over the fact

14       that they helped get them there, drove the car, and

15       took part in the robbery.

16   Q   Then let me ask this question again.  Obviously,

17       this is a very strong principle in your belief, and

18       you're right.  You got to sleep at night.  Knowing

19       the way that you feel about this but yet knowing

20       that the law of the State of Indiana is different

21       than that, would you enforce the law or would you

22       as you indicated find a way around it?

23   A   The law is there for a reason.  That's the state I

24       live in.  It's what I have to uphold.

25   Q   Okay.  So you believe you could do it?

```
 1    A    I'd have to.

 2    Q    Okay.  That's what I needed to know.  Thank you

 3         very much.  Ma'am, do you feel the same way?

 4    A    No.  You explained about the pipe and the driver,

 5         and driver knew that the person committing the

 6         robbery had the pipe.  It's possible then that

 7         something could happen to harm somebody.  The

 8         driver knows, the driver made the choice to still

 9         go ahead with whatever was planned and done it.  So

10         basically they have made their choice, and they

11         have to be responsible.

12    Q    Okay.  Thank you.  I appreciate you information as

13         well.  Let's go ahead and talk about any sympathies

14         that either one of you may have.  Do either one of

15         you feel like you would allow yourself to be

16         swayed, or you would allow your perception of the

17         evidence to be swayed because either there's an

18         elderly victim, or their may be individuals that

19         have not as much mental sophistication as other

20         people do?  Do you think either one of those things

21         might effect your abilities here?

22    A    No.

23    A    I worked in a nursing home, and I now work for a

24         medical office that deals mainly with the elderly,

25         and I would do my best.  I can't say that I would
```

270

1            be swayed either way, but I do (inaudible).

2    Q    Thank you.  We all appreciate that information

3            because while it indicates you work in the medical

4            field it doesn't indicates that you work

5            specifically or have with elderly people.  And,

6            once again, it's a situation where you got to make

7            sure you've got the right people.  So while that

8            may an issue, do you think that you would still

9            hold true to being fair an impartial to making sure

10           we did our job?

11   A    Yes.

12   Q    Okay.  Very good.  Very good.  Any strong feelings

13           about law enforcement, lawyers in general, the

14           court system, the justice system, that either one

15           of you think we ought to know about in order to

16           make an educated decision?

17   A    No.

18   A    No.

19   Q    Any questions of me?

20   A    No.

21   A    No.

22   Q    Okay.  Concept of beyond a reasonable doubt make

23           sense to both of you?

24   A    Yes.

25   Q    Do you think you're going to know it when you see

| | | |
|---|---|---|
| 1 | | it, Mrs. Copen? |
| 2 | A | Yes. |
| 3 | Q | And what about you, Ms. Breetzke? |
| 4 | A | Yes. |
| 5 | Q | You indicated you do have a -- do you have a |
| 6 | | masters degree? |
| 7 | A | Yes. |
| 8 | Q | What is your degree? |
| 9 | A | Environmental science. |
| 10 | Q | What made you select that? |
| 11 | A | I like science, and I -- there's just the |
| 12 | | environment is more broad than something specific, |
| 13 | | and there's so many topics within it that you don't |
| 14 | | have to -- you don't have to be stuck with just |
| 15 | | chemistry or geology.  You can -- it's a more of a |
| 16 | | broad range. |
| 17 | Q | And, Ms. Copen, is your child old enough now that |
| 18 | | you're comfortable with your child care?  You're |
| 19 | | working now.  Correct? |
| 20 | A | Yes. |
| 21 | Q | Not a problem.  All right.  And I'm assuming that |
| 22 | | your further education was in the nursing field? |
| 23 | A | No.  Actually, it was medical billing. |
| 24 | Q | In medical billing.  Okay.  All right.  Thank you |
| 25 | | both very much. |

```
 1              THE COURT:  Mr. Zook.
 2                   VOIR DIRE EXAMINATION
 3     BY MR. ZOOK:
 4     Q    I only have one question for the two of you.  You
 5          understand that a person doesn't have to take the
 6          stand in his or her own defense.  Right?
 7     A    Yes.
 8     Q    And does that bother you at all?
 9     A    A little bit.
10     Q    I thought it might bother you.  Would you take the
11          stand in your defense?
12     A    I would like to.  I don't think it's natural to not
13          want to defend yourself against either a verbal or
14          physical assault.
15     Q    Okay.  And when people are charging you with a
16          crime you want to get up there.  Right?
17     A    Yes.
18     Q    Can you understand that there may be reasons a
19          person doesn't take the witness stand?
20     A    Yes.
21     Q    And you wouldn't hold it against a person if the
22          person didn't take the stand.  Right?
23     A    I would question why they didn't, but I wouldn't
24          hold it against them.  Like, they have an ulterior
25          motive.
```

```
 1    Q    Okay.  I guess -- the instruction you're going to

 2         be given will tell you not to speculate on what

 3         reason it may be that the person doesn't take the

 4         witness stand, but to simply go with the evidence

 5         that's presented to you.  Can you do it?

 6    A    I think so.

 7    Q    And you won't let a person's failure to take the

 8         witness stand weigh against that person?

 9    A    I would try not let it.

10    Q    You think you can?  When you say you try, you're

11         pretty good at that?

12    A    Yeah.  I would think it wouldn't effect too much.

13    Q    Thank you.  Heather, how about you?

14    A    Well, I like her, I think it's natural for any

15         human being to want to protect themself against an

16         allegation whether it be physical or verbal;

17         however, I do understand that there are reasons

18         that people may not want to take the witness stand.

19         I don't think that I would be swayed either way.

20    Q    Okay.  We're talking about it now.  Once you

21         actually receive the case, you probably won't be

22         wondering those things as, much but I do need to

23         know how you stand now.  Is that the new Harry

24         Potter?

25    A    Yes.
```

```
 1    Q    I don't know if I'd be able to get through this
 2         part of the day if I were reading that.  Have you
 3         heard everything that we've been talking about?
 4    A    Yes.
 5    Q    Do you have any questions about it at all?
 6    A    No.
 7    Q    The prosecutors and the defense people all kind of
 8         agree on what the law is and on what your job is.
 9         Have you pretty much figured that out by now?
10    A    Uh-huh.
11    Q    Do you have any questions?
12    A    No.
13              THE COURT:  Mr. Crawford.
14              MR. CRAWFORD:  Thank you, your Honor.
15                    VOIR DIRE EXAMINATION
16   BY MR. CRAWFORD:
17    Q    The prosecutor talked about the concepts of felony
18         murder last time she was up here, also talked about
19         the concepts of accessory liability.  I believe
20         Mr. Zook mentioned the concept of when he was up at
21         one point in time during the panel selection aiding
22         after the fact.  Any problem with understanding
23         that to be a different principle, or do you all
24         think the same that that's as much a guilty as an
25         accessory or felony murder?  Any questions about
```

1           that concept?

2      A    Could you redefine it?

3      Q    Okay.  He mentioned, Mr. Zook mentioned essentially

4           that what if you knew something ten years after the

5           fact and then you attempted with someone else to

6           help cover it up, I believe that's what he

7           mentioned when he was up here previously, and I

8           think he was trying get at with the other panel

9           members that he was talking to the differences in

10          the concept between being an accessory at the time

11          versus one say ten years later after the action has

12          already happened.  Any problem with the concept

13          that those are two different concepts?

14     A    I don't think so.  There's a difference, but I

15          understand the difference.

16     Q    You understand the difference.  One happens a

17          little bit later obviously not at the time the

18          first incident took place the separate action.

19     A    Yes.

20     Q    How about you?

21     A    They -- so if I get this straight, they helped

22          commit the crime --

23     Q    No.

24     A    No, they didn't.  They found out about it later --

25     Q    And helped to hide evidence or something like that.

```
 1      A    Yeah.  They're still assisting in that crime.

 2      Q    The original crime.

 3                 THE COURT:  Counsel, approach the bench,

 4    please.

 5                     (An off-the-record discussion was held

 6                      at the bench.)

 7                 THE COURT:  Proceed.

 8    BY MR. CRAWFORD:

 9      Q    Now, Ms. Copen, you mentioned that you are working

10           with -- as an assistant you work with the elderly

11           from time to time or you're doing that now.  Is

12           that correct?

13      A    Yes.

14      Q    And is -- I believe you kind of mentioned or

15           brought up the fact that -- that may cause some

16           difficulties for you if you were called upon to be

17           a juror in this case.  Could you knowing the nature

18           and the facts of this case involved a 94-year-old

19           woman, could you separate your current involvement

20           with people in the nursing home and just simply

21           listen to the facts of this case and make a

22           decision solely based upon the whether or not the

23           action itself was committed and it was committed,

24           in fact, by our clients?

25      A    Yes.
```

1    Q    You can separate that out and not have any feelings

2         or sympathy because of the nature of the situation

3         and because of your line of work?

4    A    I would have sympathy for the elderly that this

5         happened to; but, no, that would have no bias on

6         how I felt towards that.

7    Q    Okay.  You're just going to listen to the evidence

8         that you hear.

9    A    Correct.

10   Q    Ms. Breetzke, how do you make major decision in

11        your life?

12   A    The ones I've had to make I basically look at it

13        it's a do it or don't do it type of decision.  It's

14        not an either or.  I just figure what's the worst

15        that could happen.  If I'm willing to deal with it,

16        then okay.

17   Q    How about you, Ms. Copen?

18   A    I weigh the pros and cons, decide which -- if I

19        really want it or if I did something that I can do

20        without, and base my decision on that.

21   Q    Is it a long decision process or a short decision

22        process?

23   A    Depends on how bad I want it.

24   Q    Okay.  So it varies in length depending upon the

25        circumstance of the situation?

```
 1      A    Yes.

 2      Q    I have no additional questions thank you.

 3      A    Am I allowed to add something based on questions

 4           I've heard earlier today?

 5                THE COURT:  Let's hear what you have to say?

 6      A    My father works for the county sheriff's department

 7           over at work release.  My sister's apartment was

 8           broken into a couple of weeks ago, and he's asked

 9           several questions about innocent until proven

10           guilty, and I have a little problem with that.

11                THE COURT:  You don't believe that is the law

12      of this state?

13                A JUROR:  I know it is the law.

14                THE COURT:  You have a problem following that

15      law.

16                A JUROR:  Yes.  I believe if it's come to this

17      point and there are people that -- they're fingers being

18      pointed at then they must have done something.

19                THE COURT:  All right.  Thank you very much.

20      Counsel, we need your strikes.

21                     (Counsel approached the bench.)

22                THE COURT:  Ms. Breetzke, you'll be excused.

23      Ms. Copen will you move forward one seat.  And we now

24      have Mr. Stull.

25                A JUROR:  Yes.
```

1          THE COURT:  Mr. Stull, we're going to take a

2     recess before we question you.  It's been about an hour

3     and a half since the jury's had a recess.

4          Ladies and gentlemen, you are all prospective

5     jurors in this case.  You are prohibited from discussing

6     this case with anyone prior to the commencement of the

7     evidentiary portion of the trial.  To do so may result in

8     a mistrial.  After the presentation of evidence has

9     begun, jurors may discuss the evidence presented amongst

10    themselves in the jury room during recesses.  All regular

11    jurors and alternates must be present during such

12    discussion.  You must reserve judgement concerning the

13    outcome of the case until jury deliberations begin.

14          You may not discuss the facts of this case with

15    me or with the lawyers or with any of the witnesses.

16          You may not investigate the case yourselves or

17    attempt to obtain information outside the courtroom.  It

18    is highly improper for you to do so.  You are also

19    prohibited from reading any newspaper accounts of this

20    case and from listening to or watching any radio or

21    television reports relating to this trial.  You are to

22    consider and decide this case only upon the evidence

23    received during the course of the trial here in the

24    courtroom.  You'll be in care of the bailiff.

25          (A short recess was had at this time.)

```
 1                    (The Court convened with all the

 2                    parties present.  The prospective jury

 3                    entered the courtroom and the

 4                    following proceedings were had.)

 5              THE COURT:  Be seated, please.  Mr. Williams.

 6    BY MR. WILLIAMS:

 7       Q    Good evening.  Mr. Stull, is that right?

 8       A    Yes.

 9       Q    Mr. Stull, is there anything in particular that you

10            wanted to talk to me about after hearing many

11            rounds of jury selection, has anything struck you

12            that you wanted to talk about?

13       A    No.

14       Q    Is there anything that we talked about or anything

15            in your background, personal beliefs, that you

16            believe would prevent you from being fair and

17            impartial in this case?

18       A    No.

19       Q    The concepts of felony murder and accomplice

20            liability we've gone over.

21       A    Yes.

22       Q    Did you understand those?

23       A    Yes.

24       Q    Do you think that they're fair?

25       A    Yes, I do.
```

1    Q    Would you be able to enforce those them?

2    A    Yes.

3    Q    If the state met its burden?

4    A    Yes.

5    Q    The concept of beyond a reasonable doubt which is

6         the state's burden, any questions about that?

7    A    No.

8    Q    What does beyond a reasonable doubt mean to you?

9    A    To me that means presenting evidence that shows

10        that they are guilty but have no reason that you

11        can say that they didn't do it because a rock fell

12        off the roof, you know.  That has nothing to do

13        with the case so there's no reason to say it.

14        They're not guilty because of that.  It has to be

15        pertinent to the case and to the evidence.

16    Q    That is the doubt that you may have has to be

17        pertinent proven to the case?

18    A    Yes.

19    Q    And if it's based on reason, then you can find them

20        not guilty.

21    A    Yes.

22    Q    But if it's unreasonable, you'd be able to set that

23        aside.

24    A    Yes.

25    Q    All right.  Do you have anything in your background

```
 1           or know anybody that's in law enforcement?

 2      A    Just some friends.

 3      Q    Anything about your friends, friendship with these

 4           individuals that you believe would cause you to

 5           have any biassed towards for law enforcement or

 6           against law enforcement?

 7      A    No.

 8      Q    Anything that would effect your ability to be fair

 9           and impartial?

10      A    No.

11      Q    Have you ever been the victim of a crime?

12      A    No.

13      Q    Anybody in your family?

14      A    My mother.

15      Q    Your mother.

16      A    Yeah.

17      Q    Anything particularly about that fact that she's

18           been a victim of a crime that you think would

19           effect you in this case?

20      A    No.

21      Q    Anything that you think in your background would

22           make you a particularly good juror?

23      A    Just my ability to sort out facts because in my

24           work I have to sort out facts, and I don't go with

25           just one fact.  I go for at least two or three or
```

283

```
 1          more to back up the first fact.  I try not to base

 2          it on just one single thing.

 3     Q    And you're a truck mechanic?

 4     A    Yes.

 5     Q    What kinds of trucks do you work?

 6     A    Big trucks, semis, and school busses.

 7     Q    So somebody brings you a broken truck, and you have

 8          to basically diagnose the problem.

 9     A    Yes.

10     Q    Do you ever find that the -- your first thought

11          maybe isn't the reason why it broke down?

12     A    Yes.

13     Q    Describe and explain that to me; give me an

14          example.

15     A    One example is truck comes in, has a misfire, okay,

16          you think you got a bad injector.  You replace the

17          injector, but the problem is that the injector

18          broke the hole in the piston but if you don't keep

19          looking through, you just put the one ejector on

20          and you still (inaudible) because you have a hole

21          in the piston.  You continue your diagnosis and go

22          to the end to find out the whole problem.

23     Q    So you have to collect facts and then ultimately

24          come to a conclusion based on those facts.

25     A    Yes.
```

```
 1      Q    Do you think you could do that in this case?

 2      A    Yes.

 3      Q    Anything you think I need to know about your

 4           background, your experience, life experience that

 5           comes to mind that you think I should know about?

 6      A    No.

 7                MR. WILLIAMS:  No further questions, Judge.

 8                THE COURT:  Mr. Zook.

 9                      VOIR DIRE EXAMINATION

10  BY MR. ZOOK:

11      Q    So, Mr. Stull, if this case were about truck

12           problems and the state showed that there was

13           misfire and tried to prove to you beyond a

14           reasonable doubt that it was the injector, you

15           would insist that for you to find beyond a

16           reasonable doubt that it was the injector you'd

17           have to know something about the condition of the

18           piston.

19      A    Yes.

20      Q    Okay.  I need to ask you this because I forgot to

21           ask the last person.  Can you give the defendants

22           the presumption of being innocent at this time and

23           through the trial?

24      A    Yes.

25      Q    Okay.  Thanks.
```

```
 1              THE COURT:  Mr. Crawford.
 2                    VOIR DIRE EXAMINATION
 3    BY MR. CRAWFORD:
 4    Q   Mr. Stull, anything going on at home right now that
 5        would make it difficult for you to give this case
 6        your undivided attention for the next couple of
 7        days?
 8    A   There is one thing.  My dad had a liver transplant,
 9        my mom had cornea transplant rejection, there's a
10        family reunion coming up this weekend that they
11        planned on going to for months so I would like to
12        get them there.  And if I didn't go past Friday, it
13        wouldn't be a problem; but if it did, it would be a
14        big problem.
15              THE COURT:  This is not going to go past Friday
16    because we have another case Monday.  So we're going to
17    stay if we stay all night.  We're going to finish it.
18    Does that simplify things?
19    A   No.  Because I'm leaving for Wisconsin at one
20        o'clock Saturday morning.
21    Q   You'll be fine.  Hopefully.  The -- you mention
22        that there was some -- was it your mother that was
23        victim of a crime?
24    A   Yes.
25    Q   Did that case get dealt with, or what specifically
```

1         happened with that?

2    A    It hasn't been dealt with yet.  It's still going

3         through the process whether they're going to

4         prosecute the person or not.

5    Q    Okay.  Does the fact that this case involves an

6         elderly lady, 94 years of age, would that cause you

7         some trouble in this case specifically dealing with

8         the facts in this because of the situation with

9         your mother?

10   A    No.

11   Q    You can separate that and just decide the facts

12        based solely upon what you hear over the next

13        couple of days?

14   A    Yes.

15   Q    Thank you.  No further questions.

16                   (Counsel approached the bench.)

17              THE COURT:  Ms. Becker, does the state accept

18   the jury and two alternates?

19              MS. BECKER:  Yes, your Honor, we do.

20              THE COURT:  Mr. Zook, does the defendant

21   Ms. Canen accept the jury and two alternates?

22              MR. ZOOK:  We do.

23              THE COURT:  And, Mr. Crawford, does the

24   defendant Mr. Royer accept the jury and two alternates?

25              MR. CRAWFORD:  We do, your Honor.

1          THE COURT:  Those of you seated in the jury

2     box, at this time I want you to stand up, please, face

3     me, and raise your right hand.

4               (The jury was sworn an impaneled.)

5          THE COURT:  Be seated.  Those of you seated in

6     the audience section, I want to thank you for your

7     patience here today.  It appears we have selected a jury

8     and two alternates to try this case.  We will count this

9     as your jury service.  You will not have to serve for a

10    period of two years unless you choose to serve.  If for

11    some reason you want to come back, we will accommodate

12    you.  We have lots of jury trials in this court, and we

13    will do our best to accommodate you.  You're free to go.

14    I thank you for your patience.

15          Those of you remaining in the jury box I wanted

16    to give you kind of a road map on what you may expect

17    here.  We're going to let you go for the day.  It's been

18    a long day.  I appreciate very much your patience.  First

19    thing we'll do is admonish you just as we have every

20    other time when you left the courtroom.  We're going

21    rearrange your seating as I told you.  Those of you

22    seated on the left end will be on the right end in the

23    same row you're in right now.  Everyone else will move

24    back to your original seat.

25          In the morning, I want you here at 8:15.  At

1    8:30 we're going to bring you into the courtroom.  The

2    Court is going to give each of you a set of preliminary

3    instructions on the law.  I will read those preliminary

4    instructions.  We'll then hear the formal opening

5    statements of counsel which will be kind of roadmap what

6    they expect the evidence to show.  That will be followed

7    by the commencement of the presentation of evidence.

8            We should expect a day tomorrow probably ending

9    in the neighborhood of 5:00 o'clock, 4:30, something like

10   that.  Wednesday we anticipate, perhaps, the possibility

11   of a longer day.  So you should make whatever

12   arrangements you need to make.  Anybody have any

13   questions?  All right.  We're going let you go.

14           Before I let you go, I need to remind you one

15   more time, you are all prospective jurors in this case.

16   You are prohibited from discussing this case with anyone

17   prior to the commencement of the evidentiary portion of

18   the trial.  To do so may result in a mistrial.  After the

19   presentation of evidence has begun, jurors may discuss

20   the evidence presented amongst themselves in the jury

21   room during recesses.  All regular juror and alternates

22   must be present during such discussion.  You must reserve

23   judgement concerning the outcome of the case until jury

24   deliberations begin.

25           You may not discuss the facts of this case with

1    me or with the lawyers or with any of the witnesses.

2            You may not investigate the case yourselves or

3    attempt to obtain any information outside the courtroom.

4    It is highly improper for you to do so.  You are also

5    prohibited from reading any newspaper accounts of this

6    case and from listening to or watching any radio or

7    television reports relating to this trial.  You are to

8    consider and decide this case only upon the evidence

9    received during the course of the trial here in the

10   courtroom.  We'll see you in the morning.  Have a good

11   evening.

12            (No further proceedings were had in

13            this matter on this date.)

14

15

16

17

18

19

20

21

22

23

24

25

1          TUESDAY, AUGUST 9, 2005

2          (The Court convened with all the

3          parties present.)

4          THE COURT:  State of Indiana versus Andrew

5    Royer, State of Indiana versus Lana Canen 03-MR-155,

6    04-MR-118.  Each defendant appears with their respective

7    counsel, counsel for the State of Indiana appears.  Jury

8    has been selected.  We've made one adjustment in

9    preliminary instruction No. 2.  It was at the suggestion

10   of counsel.  Are you satisfied with that Mr. Zook and

11   Mr. Crawford, and Ms. Becker?

12          MR. ZOOK:  Yes, Your Honor.

13          MR. CRAWFORD:  Yes, your Honor.

14          MS. BECKER:  Yes, your Honor.

15          THE COURT:  All right.  We're ready to bring

16   the jury in.  We'll give them a copy of the preliminary

17   instructions.  The Court will read the preliminary

18   instructions.  We'll go to you, Ms. Becker, then for

19   commencement of opening statement.

20          MR. ZOOK:  Your Honor, I would like to take up

21   this matter of 404(B) notice that state provided.  I was

22   not here Thursday when apparently the Court was going to

23   consider that.

24          THE COURT:  We reset it because you weren't

25   here.  Is it something that we can do at the next recess?

1         MS. BECKER:  No evidence involving 404(B) is

2    going to come in until after the next recess.

3         MR. ZOOK:  That's fine.

4         THE COURT:  Take it up then.

5              (The jury entered the courtroom, and

6              the following proceedings were had.)

7         THE COURT:  Be seated, please.  Good morning

8    ladies and gentlemen, as I indicated to you yesterday,

9    we're going to commence the trial today with preliminary

10   instructions.  The bailiff will furnish each of you with

11   a copy of preliminary instructions.  She'll also furnish

12   you with a pen and a pad of paper.  We'll address the

13   note taking later when we read the instructions to you.

14   The short version would be pay attention to the evidence

15   as it is presented and do not let the act of taking notes

16   distract you from evidence as it is being presented.

17   Your notes will also become a part of the record.  We're

18   also going to furnish you with a with a jury question

19   form.  That will be addressed in the instructions also.

20        Ladies and gentlemen, you are to consider all

21   the instructions that are given to you as a whole and you

22   are to regard each with the others given to you.

23        Do not single out any certain instruction,

24   sentence, or any individual point and ignore the others.

25        For trial today is a criminal case brought by

1    the state of Indiana against Andrew M. Royer and Lana R.

2    Canen.  The case was commenced when an information was

3    filed charging the defendants with murder, a felony.

4    That information, omitting formal parts, reads as

5    follows:

6              "The undersigned affiant swears that on or

7         about the 28 day of November, 2002, at the county

8         of Elkhart, state of Indiana, one Andrew M. Royer

9         and one Lana R. Canen, and they and each of them,

10        did knowingly kill one Helen Sailor, another human

11        being, by strangling the said Helen Sailor, while

12        committing robbery, and as a direct and proximate

13        result of the strangling as aforesaid, the said

14        Helen Sailor was fatally wounded, and the said

15        Helen Sailor did languish and die in said County

16        and state on the 28th day of November, 2002; all of

17        which is contrary to the form of Indiana Code

18        section 35-42-1-1; contrary to the form of the

19        statute in such cases made and provided; and,

20        against the peace and dignity of the State of

21        Indiana.

22            To this information the defendants have entered

23   pleas of not guilty.

24            Upon the issues thus joined, the burden rests

25   upon the State of Indiana to prove to each of you, beyond

1    a reasonable doubt, every essential element of the

2    charges contained in the information or of any offense

3    included therein.

4         The information which has been filed against

5    the defendants is merely the formal method of charging

6    the, and the charges must be proven by the evidence

7    introduced during this trial.

8         The statute defining the offense of murder

9    which was in force in Indiana at the time of the offense

10   charged reads (in pertinent part) as follows:

11         "A person who kills another human being, while

12         knowingly committing or attempting to commit

13         robbery, commits felony murder, a felony."

14         The statute defining the offense of robbery

15   which was in force in Indiana at the time of the offense

16   officer charged reads (in pertinent part) as follows:

17         "A person who knowingly or intentionally takes

18         property from another person or from the presence

19         of another person;

20             (1) by using or threatening the use of force

21         on any person; or,

22             (2) by putting any person in fear; commits

23         robbery, a class C felony.  However, the offense is

24         a class B felony if it is committed while armed

25         with a deadly weapon."

1    You should give separate consideration to each

2    defendant.  Each is entitled to have his or her case

3    decided on the evidence and the law which is applicable

4    to him or her.

5    Any evidence which is limited to one defendant

6    should not be considered by you as to any other

7    defendant.

8    You are entitled to draw all reasonable

9    inferences that naturally and legitimately flow from the

10   facts proven, and you are entitled to consider such

11   inferences in reaching your verdict.

12   Knowingly is defined as: A person engages in

13   conduct knowingly if, when he or she engages in the

14   conduct, he or she is aware of high probability that he

15   or she is doing so.

16   One or more of your members have asked if

17   jurors are permitted to take notes during the course of

18   the trial.  You are, but having said that I must caution

19   you that you should attend to all the evidence as it is

20   presented and should not permit the act of taking notes

21   to distract you.  You should also understand that your

22   notes must remain in the jury room when we separate, and

23   that when the case is concluded, those notes will become

24   a part of the court record.

25   Under the law, you must presume that both

1    defendants are innocent and you must continue to believe

2    that they are innocent throughout the trial, unless the

3    state proves that either defendant is guilty, beyond a

4    reasonable doubt, of every essential element of the crime

5    charged.

6         Since each defendant is presumed to be

7    innocent, he or she is not required to present any

8    evidence to prove his or her innocence, or to prove or

9    explain anything.  If, at the conclusion of the trial,

10   there remains in your mind a reasonable doubt concerning

11   the defendant's guilt, you must find him not guilty.

12        It is your responsibility as jurors to reach

13   your verdict based solely upon the evidence presented in

14   the trial.  You are instructed that the filing of charges

15   against the defendant, his or her arrest pursuant to such

16   charges, and the fact that a defendant is here being

17   tried in a court of law, is not evidence, and may not be

18   considered, even in the slightest degree, as indicating

19   his or her guilt.

20        The burden is upon the state to prove beyond a

21   reasonable doubt that each defendant is guilty of the

22   crime charged.  It is a strict and heavy burden.  The

23   evidence must overcome any reasonable doubt concerning

24   each defendant's guilt, but it does not mean that a

25   defendant's guilt must be proved beyond all possible

1     doubt.

2           A reasonable doubt is a fair, actual, and

3     logical doubt based upon reason and common sense.  A

4     reasonable doubt may arise either from the evidence or

5     from a lack of evidence.  Reasonable doubt exists when

6     you are not firmly convinced of a defendant's guilt,

7     after you've weighed and considered all of the evidence.

8           A defendant must not be convicted on suspicion

9     or speculation.  It is not enough for the state to show

10     that the defendant is probably guilty.  On the other

11     hand, there are very few things in this world that we

12     know with absolute certainty.  The state does not have to

13     overcome every possible doubt.

14           The state must prove each element of the crime

15     by evidence that firmly convinces each of you and leaves

16     no reasonable doubt.  The proof must be so convincing

17     that you can rely and act upon it in this matter of the

18     highest importance.

19           If you find that there is a reasonable doubt

20     that a defendant is guilty of the crime, you must give

21     that defendant the benefit of that doubt and find that

22     defendant not guilty of the crime under consideration.

23           While it is necessary that every essential

24     element of the crime charged against the accused should

25     be proven by the evidence beyond a reasonable doubt, this

1    does not mean that all incidental facts must be proven

2    beyond a reasonable doubt.

3         You must consider all of the evidence as a

4    whole and must not single out any particular fact or

5    circumstance.

6         A fact or circumstance considered apart from

7    other evidence may be weak, if not improbable, but when

8    viewed in connection with surrounding facts and

9    circumstances, it may be so well supported as to remove

10   all doubt as to its existence.

11        You are the exclusive judges of the evidence,

12   the credibility of the witnesses, and of the weight to be

13   given to the testimony of each of them.  In considering

14   the testimony of any witness, you may take into account

15   their ability and opportunity to observe; their memory,

16   manner, and conduct, while testifying; any interest,

17   bias, or prejudice they may have; any relationship with

18   other witnesses or interested parties; and the

19   reasonableness of their testimony considered in the light

20   of all the evidence in the case.

21        You should attempt to fit the evidence to the

22   presumption that each defendant is innocent and to the

23   theory that every witness is telling the truth.  You

24   should not disregard the testimony of any witness without

25   a reason and without careful consideration.  However, if

1    you find that the testimony of a witness is so

2    unreasonable as to be unworthy of belief, or if you find

3    so much conflict between the testimony of witnesses that

4    you cannot believe all of them, then you must determine

5    which of them you will believe and which of them you will

6    disbelieve.

7           In weighing the testimony to determine what or

8    whom you will believe, you should use your own knowledge,

9    experience, and common sense gained from day-to-day

10   living.  You may find that the number of witnesses who

11   testify to a particular fact or on one side or the other

12   or the quantity of evidence on a particular point, does

13   not control your determination of the truth.  You should

14   give the greatest weight to that evidence which convinces

15   you most strongly of its truthfulness.

16          The trial of this case will proceed as follows:

17          First, the attorneys will have an opportunity

18   to make opening statements.  These statements are not

19   evidence and should be considered by you as a preview of

20   what the attorneys expect the evidence will be.

21          Following the opening statements, witnesses

22   will be called to testify.  They will be placed under

23   oath and questioned by the attorneys.  Documents and

24   other tangible exhibits may also be received as evidence.

25          When the evidence is completed, the attorneys

 1   will make their final statements.  These final statements

 2   are not evidence but are given to assist you in

 3   evaluating the evidence.  The attorneys are also

 4   permitted to argue; to characterize the evidence and to

 5   attempt to persuade you to a particular verdict.  You may

 6   accept of reject those arguments as you see fit.

 7          Finally, just before you retire to consider

 8   your verdict, I will give you further instructions on the

 9   law which applies to this case.

10          During the trial certain exhibits may be

11   offered in evidence.  When admitted into evidence, each

12   of you should carefully examine those exhibits, without

13   discussion, at the time they are submitted to you.

14          Counsel will be given an opportunity to

15   question all witnesses.  When counsel have finished

16   questioning the witnesses, if you feel there are

17   substantial questions that should be asked, you will be

18   given an opportunity to do so prior to that witness being

19   excused.  The way we handle juror questions is to require

20   you to write out the question on the question form and

21   sign legibly at the bottom.  The bailiff or a member of

22   the court staff will retrieve the question and provide it

23   to counsel to review and give it to me.  This method

24   gives counsel for both sides and me the opportunity to

25   review the questions before they are asked since your

1    questions, like questions of counsel, are subject to

2    objection.  I will ask the questions on your behalf if

3    deemed appropriate.  There are a couple of matters for

4    you to consider concerning questions.  First, you cannot

5    attempt to help either side.

6            Second, counsel are trained attorneys and have

7    spent much time preparing for this case.  They know more

8    about the case and the witnesses than we do.  Very often

9    they do not ask what may appear to us to be an obvious

10   question because they are aware that a particular witness

11   has no knowledge on that subject or the question may be

12   objectionable and they already know that.

13           Third, Rules of Evidence control what can and

14   cannot be received into evidence.  As I indicated,

15   questions of witnesses are subject to objection, so an

16   objection may be made to your question and the Court may

17   sustain that objection.  Therefore, your question, while

18   submitted, may not be answered.  During the course of the

19   trial when I sustain an objection, disregard the question

20   and answer.  If I overrule an objection, you may consider

21   both the question and the answer.

22           During the course of the trial, if any of you

23   realize that you have personal knowledge on any fact

24   material to this case, you should inform the bailiff of

25   this fact at the first recess or adjournment after you

1    become aware of such fact.

2           You are all jurors in this case, and I must

3    tell you now and I will repeat this again each time you

4    are permitted to separate.

5           Generally, you should not express any opinion

6    about the case before it is submitted to you for

7    deliberation; however, you are permitted to discuss the

8    evidence presented in this case amongst yourselves in the

9    jury room during recesses from trial.  All jurors and

10   alternates must be present during these discussions, and

11   you must reserve judgment about the outcome of the case

12   until your deliberations begin.

13          You are admonished that you may not discuss the

14   facts of the case with anyone other than your fellow

15   jurors.

16          You may not discuss this case with me or with

17   the lawyers, parties or with any of the witnesses.

18          You should not listen to or read any outside or

19   media accounts of the trial.  You may not investigate the

20   case or attempt to obtain information outside the

21   courtroom.  It is highly improper for you to do so.  You

22   are to consider and decide this case only upon the

23   evidence received during the course of the trial in the

24   courtroom.

25          The Court has read these preliminary

1    instructions to you prior to the opening statements of

2    the attorneys and prior to the introduction of the

3    evidence so that you may understand the issues presented

4    and the rules regarding the burden of proof, the

5    credibility of witnesses, and the weighing of evidence.

6            You will receive further instructions after you

7    have heard all the evidence and final arguments.

8            Let's review one more time jury questions.  If

9    you have a question that you believe you want answered,

10   you need to take your question form, write out the

11   question, sign it at the bottom, get the attention of

12   Ms. Jackson, the bailiff; Ann, the Court reporter or

13   myself or one of the lawyers give us your question.  It

14   is important that you remember this.  We must have your

15   question before the witness leaves the courtroom.  Once

16   they've left the courtroom, we may not have any ability

17   to get them back.  Anybody have any questions about that

18   procedure?  Okay.  If you have a question, you'll need to

19   write your question out, get our attention, and then

20   we'll address the issue raised in your question.

21           We're going to move into the opening statements

22   now.  As I told you in the instructions, these are not

23   evidence.  They're given to assist you in kind of a

24   roadmap of how the attorneys expect the case will

25   proceed.  State has the burden of proof.  For that

1   reason, the state will address you first.  Mr. Williams

2   will address you on behalf of the state.

3                         OPENING STATEMENT

4            MR. WILLIAMS:  May it please the Court,

5   Mr. Crawford, Mr. Zook.  Ladies and gentlemen, this is a

6   case about the senseless killing of a 94-year-old woman

7   for money.  On Thanksgiving day of 2002, the defendants,

8   Andrew Royer and Lana Canen, demanded money from 94 year

9   old Helen Sailor; and when she refused to give the

10  defendants money, she was killed, strangled to death by

11  Andrew Royer.

12           On Thanksgiving day of 2002, which was

13  November 28, Helen Sailor was 94 years old.  She was in

14  relatively good health for a 94-year-old woman.  She had

15  a few aliments.  She had extremely poor eyesight, she was

16  hard of hearing, she had some trouble with her mobility,

17  and she used a walker to assist her.  She was organized

18  and tidy.  She had to be because of her poor eyesight so

19  the things in her apartment had to be in the proper

20  place.

21           She was a religious woman.  She shared her

22  religion with others, and she lived in apartment 1002 on

23  the tenth floor of the Waterfall Highrise Apartment

24  complex in the city of Elkhart here in Elkhart County.

25           Now, on Thanksgiving day of 2002, Helen had

1   Thanksgiving dinner with some of her relatives Larry and

2   Carol Converse.  Now, after dinner at about 5:30, the

3   Converse's took Helen back to her apartment.  When they

4   arrived at around 5:30, Carol Converse walked Helen to

5   the front door.  Helen had with her, her walker and a bag

6   of leftovers from Thanksgiving.  Carol Converse gave

7   Helen a kiss goodbye, watched her enter the door and walk

8   towards the elevator of the apartment building.  It was

9   the last time anybody would see Helen Sailor alive other

10  than the defendants.

11          Now, at about 8:45 that evening, Caroline

12  Hoffer, who was Helen's home care aide, attempted to call

13  Helen on the telephone.  She wanted to tell Helen that

14  she was going to be over early the next morning on Friday

15  about 7:00 a.m. and because she was coming so early she

16  wanted to make sure Helen knew that.  Caroline Hoffer

17  called approximately eight to ten times between 8:45 and

18  9:15.  She didn't receive an answer.  If Helen was home,

19  she usually answered the phone when the rang.  This

20  caused some concern in Caroline Hoffer.  Ultimately, she

21  decided, well, maybe Helen was out with relatives for

22  Thanksgiving.

23          So on Friday November 29, 7:00 a.m. Caroline

24  Hoffer was at Helen's door knocking, and she continued to

25  knock for a number of minutes.  No answer.  Now, Caroline

1   Hoffer didn't have a key to the door, and the door was

2   locked, a door that you will learn only locks when you

3   leave, and you lock the door from the outside.  Now,

4   Caroline Hoffer knew that the Converse's had a key to the

5   apartment so she contacted them.  Larry and Carol

6   Converse came to the apartment building.  They all went

7   to up to Helen Sailor's apartment, and they unlocked the

8   door.  And when they entered the apartment, they saw that

9   things were not as they normally were.  A rug was out of

10  place.  A Bible that Helen kept in a box by her chair was

11  laying on a hospital bed that was in the living room.

12  There were two cranberry juice bottles that were empty

13  that were in the sink not where they were supposed to be.

14          Helen's medication that she took, which was in

15  a Tupperware box, pill box, it was not in its normal

16  place.  It was on the stove instead of being on the

17  counter where it always was.  Eventually, the Converses

18  and Ms. Hoffer went into the bedroom, and it's there they

19  found Helen laying on her back, her arm outstretched, her

20  dentures out of her mouth and on the floor.  She was

21  dead.

22          911 was called, the police arrived.  Helen's

23  body was take to the Elkhart General Hospital where an

24  autopsy was performed by Doctor Joseph Prahlow of the

25  South Bend Medical Foundation.  He determined that the

 1    cause of death was asphyxiation by strangulation.  The

 2    manner of death was homicide.

 3            The Elkhart Police Department began an

 4    investigation into this murder.  The detectives that were

 5    assigned interviewed people that lived at the apartment

 6    complex, they tracked down leads, but they didn't have

 7    any viable suspects, and so the case went cold, became a

 8    cold case.  It wasn't until August of 2003 when Elkhart

 9    Police Department established its homicide unit that the

10    investigation began again.

11            It was there when the homicide unit took over

12    and looked over the evidence that two suspects emerged,

13    Andrew Royer and Lana Canen.  Now, Andrew Royer and Lana

14    Canen both lived at the Waterfall Highrise Apartments.

15    Andrew Royer lived on the fifth floor.  Lana Canen lived

16    on the eight floor.  Royer and Canen were friends.  They

17    were seen together all the time.  You will learn that

18    Andrew Royer isn't that mentally sophisticated; and with

19    respect to his relationship with Lana Canen, she had the

20    ability to manipulate Andrew Royer.

21            In early September of 2003, Andrew Royer gave a

22    statement to Detective Carl Conway of the Elkhart Police

23    Department.  In that statement, he admitted that he

24    strangled Helen Sailor to death.  He gave intimate

25    details about the crime scene and the killing.  It was

1    backed up by evidence collected by the Elkhart Police

2    Department.  When asked by Detective Conway why he killed

3    Helen Sailor, he said, "It was a money thing, and she

4    just happened to be the victim."  A senseless killing for

5    money.

6            With respect to the Lana Canen, she was

7    interviewed by the police early in the investigation

8    after the murder and also in September of 2003.  She gave

9    statements not only to the police, but to witnesses.

10   Those statements were inconsistent.  She told the police

11   and witnesses things that could not possibly be true.

12   She implicated herself in this felony murder.

13           With regard to this crime, the planning and

14   execution of the robbery and the subsequent attempts to

15   cover up the killing, it was a mentally intellectually

16   sophisticated event.  You will learn that Andrew Royer

17   did not have the mental sophistication to plan and

18   execute this robbery alone, nor did he have the mental

19   sophistication to do the things that were done to try to

20   cover up the killing.  You will learn that Lana Canen did

21   have that mental sophistication.  With respect to the

22   planning and execution of the robbery and the attempts to

23   cover up the killing, it was Lana Canen that was the

24   brains, the mastermind.  Andrew Royer was the brawn.

25           Now, you have heard and you know that the

1    defendants have been charged with felony murder.  With

2    respect to Andrew Royer, he physically killed Helen

3    Sailor during the commission of the robbery.  With

4    respect to Lane Canen, she was his accomplice in the

5    felony murder.  She aided, induced, or caused Andrew

6    Royer to commit this felony murder, that it was Lana

7    Canen with respect to the planning of this crime who is

8    responsible.  She was there for the execution of the

9    robbery, and ultimately assisted in the cleaning up of

10   attempts to cover up this homicide.

11          Now, at the close of evidence after you've seen

12   all the exhibits you've heard from all the witnesses,

13   myself and Ms. Becker will have an opportunity to come

14   back and speak with you again.  At that time you will

15   know that this was a senseless killing of a 94-year-old

16   year woman for money, and we will ask that you find the

17   defendants, Andrew Royer and Lana Canen, guilty of felony

18   murder.

19          THE COURT:  Counsel for the defendant, Mr. Zook

20   for Ms. Canen.

21                    OPENING STATEMENT

22          MR. ZOOK:  Good morning.  I represent Lana

23   Canen.  I don't represent Mr. Royer.  He's in capable

24   hands.  I'll have to tell you Indiana's system is a

25   little odd.  I can't make an opening statement when it's

1    my turn to open my case.  I have to do it now.  It's

2    supposed to be a preview of coming attractions.  What I

3    anticipate seeing is a lot of proof coming out of the

4    state's hands.  They have kind of outlined that proof for

5    you.

6            And what -- I'm going to tease you a little bit

7    here.  What I want you to do is please watch that proof

8    very carefully with an eye toward the timing of the

9    events as they come in because later on when it comes

10   time to sum up the case, the state will talk to you, and

11   I will have a chance, and the other defense attorney will

12   have a chance, and that may play a critical role for you.

13   And if you don't remember it or if it doesn't seem

14   important when you watch it come in, you may not

15   understand what we're talking about.  But it is

16   important.  It's so important, ladies and gentlemen, that

17   when you go back and deliberate you'll find Lana Canen

18   not guilty.  Thank you.

19           THE COURT:  Mr. Crawford, for the defendant

20   Mr. Royer.

21           MR. CRAWFORD:  Thank you, your Honor.

22                   OPENING STATEMENT

23           MR. CRAWFORD:  May it please the Court, ladies

24   and gentlemen of the jury, prosecution.  On November 28,

25   2002 Helen Sailor died.  It was at that point in time and

1   thereafter that the police investigation commenced.  You

2   will learn from the testimony from the State of Indiana

3   that a number of officers were involved in this case, and

4   a number of officers talked to individuals at the

5   Waterfall Highrise thereafter.

6           It was an extensive period of time when these

7   officers spoke with all the residents and the residents

8   at the Highrise began to speak about the events that

9   occurred on November 28, 2002.  You will later learn as

10  you have already heard from the State of Indiana that my

11  client, Mr. Royer, was, in fact, questioned by Detective

12  Carl Conway from the Elkhart Police Department on

13  September 3 of 2003, almost ten months or so after this

14  incident had taken place.

15          You will also learn that my client, like

16  Ms. Canen, was also a resident of the Waterfall Highrise

17  and also was privy to the conversations that had

18  transpired in the highrise after the events had taken

19  place in this case.  Again, I caution you when you listen

20  to the testimony and to the information concerning the

21  confession that you keep in mind the issues concerning

22  the mentality of Mr. Royer.  I ask you to keep those in

23  mind and carefully consider those when you listen to the

24  events that transpire later during the course of this

25  trial.

1           Again, this was an event that occurred on

2    November 28, 2002.  The conversations with Detective Carl

3    Conway occurred on September 3 of 2003.  And I would ask

4    you to keep in mind too the time sequence.  Mr. Zook made

5    representations of the issues concerning time sequences.

6    But importantly in regard to that, I ask you to take into

7    account and to keep in mind that Mr. Royer went into the

8    police station at approximately 9:30 that morning and the

9    statement occurred later in the afternoon.  I ask you to

10   keep that in mind when you carefully consider what you

11   hear and specifically what you hear in that statement as

12   well too.

13          And, finally, like everyone has asked you to

14   do, I ask you to carefully listen the testimony and the

15   statements of the individuals as they come up before you

16   in the witness stand over the next couple of days.  While

17   all of them may not have everything critical to this

18   case, there are pieces of information that you can gather

19   and you can discern from that, and you can carefully look

20   at when you assess the overall scope of a case.

21          I believe that once you listen to all the

22   testimony in this case and carefully consider every piece

23   of testimony including the things that you may hear

24   concerning Mr. Royer, you take that back, and I believe

25   that after that you will find Mr. Royer not guilty.

312

1    Thank you.

2              THE COURT:  Call your first witness.

3              MS. BECKER:  Thank you, Judge.

4              MR. WILLIAMS:  State would call Caroline

5    Hoffer.

6              THE COURT:  Would you raise your right hand,

7    please?

8                   (The witness was sworn.)

9              THE WITNESS:  I do.

10             THE COURT:  Take the witness stand, please.

11                      CAROLINE HOFFER

12   called on behalf of the State, having been first duly

13   sworn, testified as follows:

14                    DIRECT EXAMINATION

15   BY MR. WILLIAMS:

16     Q    Would you please introduce yourself to the jury?

17     A    My name is Caroline Hoffer.

18             MR. ZOOK:  Your Honor, excuse me.  We ask that

19   the witnesses be separated.

20             THE COURT:  State's position on that?

21             MS. BECKER:  No objection, your Honor.

22   Detective Daggy would be our representative.

23             THE COURT:  All right.  Detective Daggy will be

24   the state's representative.  Ladies and gentlemen in the

25   audience section, if any of you are witnesses or know

```
 1    yourself to be witnesses, you'll have to leave the

 2    courtroom at this time.  Motion for separation is granted

 3    without objection.

 4    BY MR. WILLIAMS:

 5      Q    Would you spell your last name for the court

 6           reporter?

 7      A    H-o-f-f-e-r.

 8      Q    And where do you reside?

 9      A    Elkhart, Indiana.

10      Q    What's your occupation?

11      A    I'm a certified nursing assistant/home health aide.

12      Q    And where are do you work?

13      A    Currently I'm working in Cass County Medical Care

14           Facility in Cassopolis, Michigan.

15      Q    Now, where did you work in November of 2002?

16      A    I worked here in Elkhart up in Elkhart at Regional

17           Home Health Care.

18      Q    And what is Regional Home Health Care?

19      A    Regional is a company that provides home health

20           aides to go to client's homes to provide activities

21           of daily living, which would be bathing, washing,

22           laundry, some shopping, cooking, cleaning.

23      Q    And how long did you work for them?

24      A    And started September of that year.

25      Q    So as of November 28, 2003 --
```

1    A    Three months.

2    Q    Three months?

3    A    Yes.

4    Q    As of November 28, 2002, you were working for --

5    A    -- Regional Home Health Care.

6    Q    What's your educational background to be a home

7         health nurse?

8    A    Regional required the certified nurse's assistant

9         license which means you have 40 hours of classroom

10        and then 72 to 75 hours of clinical.

11   Q    Do you receive any training when you start a job?

12   A    Really the only kind of training you get is what

13        they would like you to do and it's like per client,

14        you know, for this client you have to do this, and

15        for this one you have to do maybe, you know,

16        something, you know, laundry in one place and, you

17        know, cooking for another.  But training, they make

18        sure you know the CPR and basic first aide things

19        but training per say, no.

20   Q    So you touched on this a little bit but the job

21        responsibilities that you would have, could you

22        describe those for the jury?

23   A    Well, the typical client I would go in and if they

24        were not out of bed, I would get them out of be.

25        I would bath them if they wanted a shower.  If they

1          didn't, if they just had one the day before, you

2          know, we wouldn't shower them or bathe them, would

3          get them dressed.  Some of them I would cook them

4          breakfast.

5               If I was there -- depending how long you were

6          there, sometimes we were there for two hours, four

7          hours, eight.  If it was a two-hour gig, you would

8          do the getting them up in the morning, wash them,

9          bathe them, feed them.  You may vacuum, you may

10         dust, straighten up the place.  And some places we

11         would then -- we would do all that, and then maybe

12         go to the laundry mat.  Take their laundry to the

13         laundry mat and do that for them.

14    Q    Now, did you have a patient by the name of Helen

15         Sailor?

16    A    Yes, I did.

17    Q    How long did you have her as a patient?

18    A    I started out, I believe, caring for her in

19         September, and I had her the whole three months I

20         was there.

21    Q    Through November 28.

22    A    Through November 28, yes.

23    Q    Do you know how old she was?

24    A    Yes, she was 94.

25    Q    Why did you have that reaction about her being 94?

```
 1    A    My first or second visit there we were just sitting

 2         and visiting.  We'd done everything that I needed

 3         to do with her.  She'd had her shower; she was

 4         dressed.  And she says, "How old do you think, I

 5         am?"  I said, "Oh, I hate that question, Helen."

 6         You know you don't ask a woman hold they are, and I

 7         just didn't want to guess, and I said 82 is my

 8         pretty pat answer, and she says, "I'm 94."  I said,

 9         "Wow, you look pretty good for 94."

10    Q    Did you have a specific schedule for Helen?

11    A    I was there generally three days a week.

12    Q    And how much time during the day did you spend with

13         her?

14    A    Two of those days would be two hours, and one of

15         those days it would be four years.  That was when

16         we would go down into the basement of the highrise

17         and do her laundry.

18    Q    Now, you said something about the highrise.  Where

19         did she live?

20    A    The highrise on Waterfall Drive in Elkhart.

21    Q    And was that located obviously in Elkhart, but was

22         that in Elkhart County, State of Indiana?

23    A    Yes.

24    Q    Now, how many times had you -- had you been in her

25         apartment from the time you started your care with
```

1        her from the time you ended your care?

2    A   How many times from September to November?

3    Q   Yes.

4    A   Oh, gosh.  I'd need a calculator for that.

5    Q   An estimation would be fine.

6    A   Estimation.  Three times a week for three months,

7        12 times a month, times three, 36.

8    Q   So approximately 36 times, somewhere in that area?

9    A   Somewhere in that ball park, yes.

10   Q   Were you Helen's only home care nurse?

11   A   No.  Angel -- I had coworker named Angel.  You want

12       her last name?

13   Q   I don't know.  If you know it, yeah.

14   A   Angel Noe N-o-e.

15   Q   Did she do the same type of thing that you did?

16   A   Yes, yes.

17   Q   Where respect to Helen, you talked about your

18       general duties for a patient.  What did you do for

19       Helen, specifically for her?  Specifically,

20       showered her, helped her get dressed, pour her --

21       her cranberry juice.  She had a specific amount of

22       cranberry juice she wanted to drink everyday.  If I

23       didn't do her laundry, I would vacuum the carpet

24       that's in one room, wet mop the bathroom, clean the

25       bathroom when we were was done in the shower, mop

1       the bathroom floor, make sure the kitchen was tidy.

2       There was really very little to do in the kitchen

3       other than, you know, I would rinse out the glass

4       that she used if she was done with it, and we'd sit

5       and visit.

6            MR. WILLIAMS:  Judge, may I approach?

7            THE COURT:  You may.

8    Q   I'm handing you what's been marked as State's

9        Exhibit 1 for identification.  Do you recognize

10       that.

11   A   Yes, I do.

12   Q   And what is it a photo of?

13   A   This is photo of Helen Sailor when she was alive.

14   Q   Does it fairly and accurately depict what Helen

15       looked like on November 28 or as of November 28 of

16       2002?

17   A   Yes, it does.

18            MR. WILLIAMS:  Judge, the state moves to admit

19   State's Exhibit 1.

20            THE COURT:  Mr. Crawford.

21            MR. CRAWFORD:  No objection, your Honor.

22            THE COURT:  Mr. Zook.

23            MR. ZOOK:  No objection.

24            MR. WILLIAMS:  At this time the state would

25   move to publish State's Exhibit 1 to the jury.

```
 1              THE COURT:  Well, let's see if we get it
 2   admitted first.  State's Exhibit 1 will be admitted
 3   without object.  The request for publication.
 4              MR. ZOOK:  No objection.
 5              MR. CRAWFORD:  No objection.
 6              THE COURT:  And Exhibit 1 will be published
 7   without objection.  You're going to publish by passing
 8   it?
 9              MR. WILLIAMS:  Yes, your Honor.
10              THE COURT:  You may do so.
11                   (State's Exhibit 1 was published to
12                   the jury.)
13   BY MR. WILLIAMS:
14      Q   Let's talk a little bit about Helen Sailor.  What
15          was her personality?
16      A   She was very warm, friendly, open.
17      Q   Was she religious?
18      A   Oh, mercy yes.
19      Q   Why do you say that?
20      A   I knew -- we -- she asked me if I was a Christian,
21          and I said, yes, I am.  And she said, well, I go to
22          church every Sunday, and we would just talk about
23          how we felt -- how our faith was, how strong our
24          faith was.  We would pray, or she would pray for
25          me.
```

1    Q   She would share her religion with you then.

2    A   Yes, she did.

3    Q   Did she have any ailments, or what was her medical

4        condition?

5    A   She had diabetes and a heart condition.  That was

6        all I knew.  As aids, we only did the care, and we

7        kind of just knew the basics.

8    Q   What about her sight?

9    A   She couldn't see very well.

10   Q   And why do you say that?

11   A   You can -- you can tell when someone's eyes, you

12       know, when you've been doing it for a while, you

13       can just see; and she -- the way she walked.  She

14       knew where everything was in her apartment so she

15       didn't have to, you know, try to grab for things as

16       she was walking, but -- and she said, you know, I

17       don't see very well.

18   Q   You said that you -- she had -- she knew where

19       everything was in her apartment.  Was she

20       organized?

21   A   Extremely organized.

22   Q   Was that because of the sight problem?

23   A   Yes.

24   Q   What about hearing?  Do you remember her having an

25       hearing problems?

```
 1    A    She did have a hard time hearing, and she was

 2         supposed to wear hearing aides and didn't like the.

 3         They hurt her ears.

 4    Q    What about her mobility?

 5    A    She was slow, but she could walk.

 6    Q    Did she have anything that assisted her?

 7    A    She used a walker when she left the apartment.

 8    Q    When she was in the apartment, where would the

 9         walker be?

10    A    The walker was in -- there's a bedroom area and it

11         had a dresser and then the bathroom was back in the

12         corner of the closet.  The walker always sat in

13         that room near her closet.

14    Q    Well, let's talk about apartment.  You come to the

15         door of her apartment.  Describe for the jury what

16         you see when you go into her apartment.  Give them

17         a layout.

18    A    When you first walk in, you have a pantry closet on

19         your left, and right there right inside the door

20         and the kitchen -- there was a refrigerator, sink,

21         stove and a little hunk of counter on the right

22         cabinet or just a few cabinets, and then in that

23         same room but a bigger -- little bit bigger section

24         because it would angle off to the left, she had a

25         table.  There was a hospital bed along the wall all
```

1          the way up to the window.  The windows were

2          straight ahead.  Doorway into a bedroom.  Just past

3          that doorway in that same room was her little table

4          where she had her stuff, where she would put things

5          and her recliner, and the TV was right next to her

6          recliner.  She could -- she liked to have to see

7          the TV out of this one eye.  If she got really

8          close, she could see some images on the TV; and it

9          was loud if she had it on, and another little table

10         just with things.  She would keep things.

11              The other room that you would go into had a

12         double bed along the left wall, a little aisle way,

13         and then a dresser across from that bed, then back

14         this way empty space, the walker, a clothes closet

15         and then the bathroom.

16    Q    Is it a small apartment?

17    A    Yes.

18    Q    One bedroom?

19    A    Technically, I suppose you could call it one

20         bedroom.

21    Q    Because she kept this hospital bed in the living

22         room.

23    A    Right.

24    Q    Now, did Helen take any medication?

25              THE COURT:  Excuse me, Counsel, approach,

1    please.

2                    (An off-the-record discussion was held

3                    at the bench.)

4              THE COURT:  Proceed, please.

5    BY MR. WILLIAMS:

6    Q    I was talking about medications.  Did she take

7         medications?

8    A    Yes, she did.

9    Q    Were you responsible for her medication?

10   A    No.

11   Q    Who dispensed the medication?

12   A    The nurses from home health care would come in and

13        fill her pill bottles like once a week or once

14        every two weeks.  I don't know.  I had nothing to

15        do with her pills, so I don't know.

16   Q    Did you know where her medication was located?

17   A    It was kept in a container on a little piece of

18        countertop next to her stove.

19   Q    What was the container made out of?

20   A    It was a clear plastic like a rubber made box.

21   Q    And you said on the countertop.  Where was the

22        counter top in the kitchen?

23   A    Just to the left of the stove.

24   Q    Did you ever touch the medication?

25   A    No.  I may have touched it if a wiped the

 1          countertop, you know, to lift it up and wipe

 2          underneath it.  That was all.

 3      Q   I want to talk to you about the week of

 4          Thanksgiving of 2002.  Do you recall when you

 5          saw -- when the last time was that you saw Helen

 6          before Thanksgiving?

 7      A   I was there on Wednesday before Thanksgiving and

 8          did her care.

 9      Q   Do you remember what you did for her?

10      A   Showered her, dressed her.  I don't remember if I

11          did her laundry.

12      Q   Did you see her on Thanksgiving?

13      A   No.

14      Q   Why is that?

15      A   She denied care for Thanksgiving.  She wanted the

16          aides to be able to be home with their families.

17          So she told Regional don't send anyone over.  I

18          want them home.

19      Q   Did you attempt to contact her on Thanksgiving?

20      A   Yes.  Our policy was the night before we go to any

21          client, we would call them to remind them that we

22          were coming and what time we were coming.

23      Q   What time were you going the next day?

24      A   I was to be there at seven in the morning.

25      Q   Describe what you did in your attempts to contact

1          Helen?

2     A    I started calling her about 8:45, got no response.

3          I called I don't know how many times, eight to ten

4          times at least between 8:45 and 9:15.  And in

5          getting no response our -- what we're supposed to

6          do is call the nurse on call.  I did that, and she

7          said she's probably still out with her family, and

8          I said I don't think so.  It's just unusual for her

9          to be out this late.  I don't feel right.  What

10         should I do?  Do you want me to go over there?  And

11         she said, no.  Just give her a call in the morning

12         before you go.

13    Q    Let's go to the next day, which is Friday, November

14         29.  Describe what you did?

15    A    Woke up and got ready for work, and I made the

16         phone call in the morning probably around 6:30, and

17         no response again.  So I drove over there, and in

18         order to get into the building you have to buzz a

19         buzzer in the foyer and then the resident opens the

20         lock from there apartment.  And buzzed it a couple

21         times, two times, and got no response, and there

22         was a man in the -- I don't know what you call

23         it -- inside the door that I knew from being in

24         there all the times I was in there, and I said,

25         could you open the door and let me in, and he knew

1        me so he let me in, and I went right up to her

2        apartment and started ringing the doorbell and got

3        no response.  This was five till seven when I got

4        up to her apartment door.

5    Q   Now, did she have a buzzer or did you knock?

6    A   I would knock.

7    Q   How long did you knock?

8    A   I knocked for eight minutes; eight to ten minutes I

9        stood knocking.

10   Q   Was the door open?

11   A   And I also called with my cell phone.  I could hear

12       the phone ringing, and the door was not -- the door

13       was locked.

14   Q   How -- describe the lock on the door?

15   A   It was deadbolt lock.

16   Q   How would -- how would you lock the door?

17   A   Twist -- twist lock from the inside.

18   Q   If you were leaving, would you have to lock it from

19       the outside, do you know?

20   A   You could lock it from the outside if you had a

21       key.

22   Q   All right.  Now, you were knocking for eight to ten

23       minutes, got no answer, called on your cell phone.

24       What did you do next?

25   A   I knew the lady that lived across the hall, so I

```
 1          went to her door, and she came to the door, and I

 2          asked her if she would happened to have Helen's

 3          cousin's phone number because I needed to get into

 4          the apartment and she did.

 5     Q    Did you know her cousin?

 6     A    I had seen them a couple of times.

 7     Q    Do you know who they were, their names?

 8     A    Larry and Carol Converse.

 9     Q    Did they come to the apartment?

10     A    They came immediately.  They were there within ten,

11          15 minutes.

12     Q    Describe what happened after the Converses arrived?

13     A    Larry opened up the door and went in the apartment,

14          and he says, "I found her.  She's in here," and I

15          immediately stepped around him cause he kind of

16          backed off and saw where she was.

17     Q    Describe what you saw?

18     A    With her?

19     Q    Yes.

20     A    She was laying on her back, her right arm was

21          extended out flat palm up, her teeth were on the

22          floor, a little -- maybe a foot from her fingertips

23          her lower plate, and her face was really dark

24          modeled purplish reddish.  She was swollen.  Her

25          body seemed swollen.  She was a bigger woman, but
```

1          she swollen.

2              Her pants were -- her slacks were down around

3          her knees.  She had a brief and her underwear on.

4          Her blouse was pulled up to her breasts, and I

5          just -- I knew she was gone, and I just -- I just

6          only had taken one step into the room and saw the

7          condition of the room and stepped back, and I

8          called 911.

9     Q    You mentioned Helen's teeth.  Did she wear

10         dentures?

11    A    She wore dentures, yes.

12    Q    Both upper and lower?

13    A    Yes.

14    Q    Did Helen ever wear anything around the beck?

15    A    She wore what is called a lifeline.  It's a black

16         cloth cord with a little cream colored -- I think

17         cream colored box that if they fell they could just

18         grab that, and it wouldn't take much to push, and

19         they would then get a call from a company asking

20         them if they were all right, and did they need

21         assistance.

22    Q    You said there was a call button on this black

23         cord.

24    A    Yes.

25    Q    Was anything else on this lanyard?  Was it just the

1           lifeline?

2      A    There was something else hanging there.  I can't

3           recall what it was.

4      Q    Now, did you notice anything out of place in the

5           apartment?

6      A    Yes.  When I first walked, I noticed she had a

7           carpet that went from the counter -- may I have a

8           glass of water, please.

9      Q    Absolutely.

10     A    She had a carpet that spanned the area between her

11          counter and her pantry.  And when I first walked

12          in, I noticed that it was just a -- cockeyed, which

13          would not be how she would have it because if it

14          was not straight she could trip over it.  That was

15          not right.  There were two jugs of empty cranberry

16          juice in the sink which was not right as well.  If

17          she were to empty one, it would be put in the

18          trash.  Things were just put away.

19               On her chair -- she did not sleep in either of

20          the beds.  She slept in her recliner, and she

21          always kept a black Hefty bag on the chair because

22          she would have accidents and a towel over that.

23          That was not there.  So there were things on top of

24          the hospital bed, and there was never anything on

25          there except like stuffed animals, a few stuffed

```
 1          animals along the wall.

 2              Her Bible was on that bed, which was always in

 3          the wooden shelf by her chair.  When I stepped into

 4          the room where she was, I just took one step; and I

 5          looked to the left, and I saw drawers on the -- the

 6          place had definitely been gone through.  There were

 7          two drawers out of her dresser, and they were on

 8          bed and the contents were out.  There was a box

 9          kind of half out from under the bed that was a red

10          box that had a lock that was off to the side.  And

11          I looked to the right not knowing if whoever had

12          done this was still there and didn't see anything

13          in the bathroom.

14    Q     Did you notice anything about her walker?

15    A     Her walker was in the living room, and it was

16          always in that other room.

17    Q     Did Helen have a key chain?

18    A     Yes.

19    Q     Can you describe the key chain?

20    A     It had a heart on it, and her apartment key and a

21          few other keys.  I'm not sure what the keys went

22          to.

23    Q     Do you recall seeing that key chain when you were

24          in there --

25    A     That was on her kitchen table.  That was always
```

1          where she left it.

2     Q    Were there any keys on the key ring?

3     A    I don't remember.

4     Q    After you found the body, you called 911.

5     A    Yes.

6     Q    And were you eventually interviewed by the police?

7     A    Yes.

8          MR. WILLIAMS:  One moment, your Honor.  No

9     further questions, Judge.

10         THE COURT:  Mr. Zook.

11         MR. ZOOK:  No questions.

12         THE COURT:  And Mr. Crawford.

13         MR. CRAWFORD:  Just briefly, your Honor.  Thank

14    you.

15                    CROSS-EXAMINATION

16    BY MR. CRAWFORD:

17    Q    Ms. Hoffer, you mentioned that you called between

18         8:45 and 9:15.  Is that correct?

19    A    Yes.

20    Q    And you mentioned that this was a common practice

21         for you.  Is that correct?

22    A    Yes.

23    Q    All the other times that you had called during the

24         period of your assistance with Helen did she

25         answer?

```
 1    A    Yes.

 2    Q    Was it relatively -- was that something that you

 3         normally did call about 8:45?

 4    A    No.  I called later because we had just gotten home

 5         from our Thanksgiving dinner.

 6    Q    Had you ever called that late before in the past,

 7         to your knowledge?

 8    A    I usually tried to call between seven and

 9         eight o'clock at night.

10    Q    And Helen would always answer those calls.

11    A    Yes.

12    Q    When you would go over and take care of her, how

13         often -- you mentioned that you went three days a

14         week.  Is that correct?

15    A    Yes.

16    Q    And how often -- how long would you stay when you

17         visited with Helen?

18    A    For normal care, two hours.  One day a week we

19         would spend four hours there.

20    Q    At about what time would you get over there?

21    A    Generally at eight, eight to ten or eight to noon.

22    Q    Okay.  You mentioned that you knew the lady across

23         the street.  Is that correct?

24    A    Yes.

25    Q    Do you know if she was a friend of Helen's?
```

```
 1    A   Yes, she was.

 2    Q   Were there other people that came like the lady

 3        across the way that were friends of Helen's while

 4        you were taking care of her?

 5    A   No.

 6    Q   Your only connection was the lady across the way?

 7    A   That I knew her well enough.  I knew she knew

 8        people that were down in the lobby because they

 9        would all say Hi to her so they all knew her.  But

10        as far as right there at her room, Mary Jane was

11        the only one that I knew that had come because she

12        had come in when I would be giving care sometimes.

13    Q   To your knowledge, how many people are on the floor

14        on the tenth floor?

15    A   I would not know that.

16    Q   Okay.  More than, obviously, Ms. Sailor.  Is that

17        correct?

18    A   Oh, certainly.

19    Q   More than five?

20    A   Oh, certainly.

21    Q   And the lady across the street, what was her name?

22    A   Marry Jane.  I don't know her last name.

23    Q   And she's the only one you encountered on that

24        floor.

25    A   Yes.
```

```
 1              MR. CRAWFORD:  No further questions, your

 2   Honor.

 3              THE COURT:  Mr. Williams, any additional

 4   questions?

 5              MR. WILLIAMS:  No, your Honor.

 6              THE COURT:  Mr. Zook, any additional questions?

 7              MR. ZOOK:  No, sir.

 8              THE COURT:  You may step down.  Watch your

 9   step.  Call your next witness.

10              MS. BECKER:  Can this witness be released from

11   her subpoena?

12              THE COURT:  Any reason she cannot be released?

13              MR. ZOOK:  No.

14              MR. CRAWFORD:  No.

15              THE COURT:  She'll be released from her

16   subpoena.

17              MS. BECKER:  Thank you, your Honor.

18              THE COURT:  Would you raise your right hand,

19   please.

20                   (The witness was sworn.)

21              THE WITNESS:  I do.

22              THE COURT:  Take the witness stand, please.

23   ////

24   ////

25   ////
```

```
 1                        CAROL CONVERSE
 2   called on behalf of the State, having been first duly
 3   sworn, testified as follows:
 4                      DIRECT EXAMINATION
 5   BY MR. WILLIAMS:
 6      Q    Would you please introduce yourself to the jury?
 7      A    I'm Carol Converse.  I was Helen Sailor's second
 8           cousin.
 9      Q    And where do you live?
10      A    In Elkhart.
11      Q    Are you married?
12      A    Yes.
13      Q    Who are you married to?
14      A    Larry Converse.
15      Q    Now, did you know Helen Sailor when she was alive?
16      A    Yes.
17      Q    You said your relationship was you were second
18           cousins.
19      A    Actually, she was my husband's second cousin.
20      Q    So it was Larry's second cousin.
21      A    Yes.
22      Q    Did you ever see Helen?
23      A    Constantly.
24      Q    Describe your contact with her?
25      A    We were like caregivers for her.  We would go over
```

```
 1              once a weak, take food.  I'd go to the grocery

 2              store for her.  She'd come over and visit with our

 3              family.  She loved our kids and our grandchildren.

 4              So she was over at least once a month.  We would go

 5              camping during the summer.  We'd take her down

 6              there for a day so that she could enjoy the

 7              outdoors.  We were just with her quite a bit.

 8     Q    Where did she live?

 9     A    In the highrise on Waterfall.

10     Q    Had she always lived in that apartment?

11     A    No.  She moved back from Georgia, and she'd lived

12          in Georgia for about three years, and she lived in

13          the highrise when it the first opened.

14     Q    So she lived in the highrise, and then she moved to

15          Georgia.

16     A    Moved to Georgia, then moved back.

17     Q    Do you know when she moved back from Georgia?

18     A    About 1997.

19     Q    Now, you said you would see Helen weekly.

20     A    At least once a week, yes.

21     Q    Buy groceries for her.

22     A    I would by her groceries; I would put things in the

23          refrigerator; I'd fix her sandwiches.  Things like

24          that.

25     Q    What was her physical condition?
```

```
 1   A   For her age, she was in very good physical

 2       condition.  She was -- she had to use a walker; but

 3       other than that, I think she was in good physical

 4       condition.

 5   Q   What about mental condition?

 6   A   Good.  She had a wonderful will to live, and she

 7       was just a great gal.

 8   Q   Was she organized?

 9   A   Yes, very.

10   Q   Why was she organized?

11   A   Partially because she was -- her sight was bad, and

12       so she had to keep her apartment really neat and

13       clean so that she wouldn't trip on things.

14   Q   Was she a religious woman?

15   A   Very.

16   Q   Did she share her religion with others?

17   A   She shared it with us.  I would assume she shared

18       it with others.

19   Q   Now, did she take medications?

20   A   Yes.

21   Q   Do you know specifically what she was taking?

22   A   No.

23   Q   Did you dispense the medication?

24   A   No.

25   Q   Do you know how it was dispensed?
```

```
 1      A    There was a daily/weekly pill box.

 2              MR. CRAWFORD:  Objection, your Honor.

 3    Speculation.

 4              THE COURT:  Speculation.

 5              MR. CRAWFORD:  As to how it was dispersed.  She

 6    said she didn't know how the pills were taken care of and

 7    how they were dealt with.

 8              THE COURT:  Why don't you lay additional

 9    foundation.  I'll sustain the objection at this point.

10    BY MR. WILLIAMS:

11      Q    Did you know who dispensed the medication?

12      A    No.

13      Q    Had you ever seen medication in her apartment?

14      A    Yes.

15      Q    Where was it located?

16      A    It was on the kitchen sink on the left side by the

17           stove.

18      Q    How was it kept?

19      A    There was a daily/weekly pill container, and then

20           behind that there was a plastic container that had

21           pill bottles in it.

22      Q    This plastic container, do you know when Helen got

23           this pill container?

24      A    No.  It was -- as far as I know, she had it ever

25           since she moved up here.
```

1    Q   You're talking when she moved from --

2    A   -- Georgia.

3    Q   So, since you had -- she had moved back up from

4        Georgia, she had had that pill container.

5    A   As far as I know, yes.

6    Q   You said that this -- the pill container and this

7        pill box were on the counter.  Were they always on

8        the counter?

9    A   Yes.

10   Q   Did she wear any type of necklace or anything

11       around her neck?

12   A   She had an alarm.  It was just a chain -- not a

13       chain, but it was a -- like a shoestring thing that

14       she wore around her neck.  If she got in trouble,

15       if she fell or something, couldn't get up, she

16       could ring that; and they would usually call me,

17       and I would got help her up or go get somebody else

18       to help her up.

19   Q   Did you see Helen on November 28, 2002 which would

20       have been Thanksgiving Day?

21   A   Yes.

22   Q   Describe your contact with her that day.

23   A   Thanksgiving day we picked her up early afternoon,

24       brought her over to our house.  We had Thanksgiving

25       dinner with our children and grandchildren, sat and

1          watched TV for a little while, and then we took her

2          home.

3     Q    Do you recall what time you took her home?

4     A    It was sometime 5, 5:30, somewhere in there.

5     Q    How far is it from your home to the apartment

6          complex?

7     A    Ten minutes.

8     Q    Do you recall what time approximately you arrived

9          at the apartment complex?

10    A    It was -- that would make it probably about quarter

11         after five because we were watching some TV program

12         that would have been over by five.

13    Q    So somewhere, I guess, between 5:15 and 5:45 you

14         took her --

15    A    Yes.

16    Q    Could you describe what happened when you dropped

17         Helen off?

18    A    My husband parked out in the front area, I got out,

19         got her walker, got the food that we packaged up

20         for her, helped her out of the car, and I walked

21         her up, and there was somebody sitting inside that

22         opened the door for her, and I kissed her, and she

23         walked in.

24    Q    Did she have anything with her?

25    A    We'd packaged up some food from Thanksgiving.

```
1     Q    Was she using her walker?

2     A    Yes.

3     Q    As she entered the building, what did she do?

4     A    I think she just thanked the gal that let her in,

5          walked off towards the elevators.

6     Q    And was that the last time you saw Helen alive?

7     A    Yes.

8     Q    Let's move onto February -- I'm sorry -- November

9          29, which would be the next day, Friday.  Describe

10         what happened in the morning?

11    A    I heard the telephone ring.  My husband was up.  He

12         answered the telephone.  He came in, and I was

13         awake, and he said, "Helen's nurse called, and they

14         couldn't get into the apartment."  And I said,

15         "Well, I'll go with you," because we have keys to

16         get in, and so I got dressed.  We grabbed a cup of

17         coffee, and we went over to the apartment, walked

18         in.  We can get in -- we could get in the building

19         and into her apartment, and so we unlocked the door

20         and walked into her apartment.

21    Q    Describe the lock on the door?

22    A    It's similar to a deadbolt.  It's -- you have to

23         have a key -- if it's locked, you have to have a

24         key to open it.  You cannot lock the door and shut

25         the door.
```

1    Q    So when you leave, you have to lock it from outside

2         so you don't lock yourself out.

3    A    Yes.

4    Q    And you the key.

5    A    Yes.

6    Q    And used it to open the door.

7    A    Yes.

8    Q    Describe what you saw when entered the apartment.

9    A    We walked in and, of course, we were looking for

10        Helen, and we didn't see her in the main room so we

11        walked a little farther, looked in the bedroom.  We

12        saw her laying on the floor in the bedroom, and I

13        don't, you know, exactly what happened after that.

14        We were all in shock.  But Carol called 911.  They

15        told Carol to have somebody go touch the body,

16        which my husband did, and then we just waited for

17        them to get there.  In the meantime, we went

18        through -- I saw -- her Bible was on the bed.

19   Q    Let's talk about her Bible.  Where did she normally

20        keep it?

21   A    There was a -- like a coffee table, and it was in a

22        box.  It was in a Bible box under the coffee table.

23   Q    Is this where she normally kept it?

24   A    Yes.

25   Q    Where was that table in relation to her chair?

```
 1    A    It was right next to the chair.

 2    Q    When you entered the apartment, where was the

 3         Bible?

 4    A    It was on the bed open.

 5    Q    Now, did Helen ever put anything in the Bible?

 6    A    Yes.  She put money in it or had us put money in

 7         it.

 8    Q    So you put money in the Bible.

 9    A    Yes.

10    Q    How much did she typically keep in the Bible?

11    A    Several hundred dollars.  Anywhere between one and

12         probably five.  She always kept money so if her

13         daughter came up she could help them out to get up

14         here and get home.

15    Q    So she set some money aside if she needed it.

16    A    Right.

17    Q    And you would put that money in the Bible.

18    A    Yes.

19    Q    Did she ask you to do this periodically?

20    A    When she saved up.  It was usually in $100

21         increments.

22    Q    Did you check the Bible that day?

23    A    Yes.

24    Q    What did you fine?

25    A    It was empty.
```

1    Q    No money.

2    A    No money.

3    Q    Did you find anything else that was out of place

4         other than the Bible?

5    A    I think that's the main thing that struck me.

6    Q    Do you recall seeing her walker?

7    A    I -- I don't remember it, no.

8    Q    What about curtains?

9    A    I don't remember anything about the curtains.

10   Q    Did she have a key chain?

11   A    Yes.

12   Q    Did you recall seeing that?

13   A    No.  She always -- she almost always when she

14        walked in, she'd put it on the -- as you walked in

15        there's a kitchenette over here, and then there's a

16        little table over here.  She'd put it on that

17        table.

18   Q    After 911 was called, did the police arrive?

19   A    I don't know if it was the police or the paramedics

20        or exactly what.

21   Q    Were you ultimately interviewed by the police?

22   A    Yes.

23        MR. WILLIAMS:  One moment, Judge.  No further

24   questions, your Honor.

25        THE COURT:  Mr. Zook, any questions?

STATE'S WITNESS - CAROL CONVERSE - (CROSS)

1    MR. ZOOK:  Thank you, yes.

2              CROSS-EXAMINATION

3    BY MR. ZOOK:

4    Q    Carol, I guess it's fair to say then that you

5         didn't pay a lot of attention to the drugs.  Is

6         that right?

7    A    As far as what was there, no.  I mean, we knew that

8         she took a lot of medication, and the only time it

9         would be necessary for us to know what it was is if

10        we had to take her to the hospital, in which case,

11        we would grab them and go.

12   Q    Grab them and go.  Now, the things that the drugs

13        were in there was a -- a rather flat -- or a couple

14        of flat plastic pieces, right, with day -- it was

15        divided up and into day and weeks, and there also

16        was a tub where she kept some medicine that was

17        still in the box.

18   A    Yeah.  There was medicine.  It was so, I don't

19        know, about like this.  It was like a Tupperware or

20        plastic or something.

21   Q    Okay.  Now, that's, when you say Tupperware, I

22        think you said Rubbermaid before.  Right?

23   A    You know, I don't know what it's made of.  It's

24        just a plastic container.

25   Q    Right.  Sort of a generic item.

STATE'S WITNESS - CAROL CONVERSE - (CROSS)

1    A    I guess.

2    Q    Are you positive that that particular container is

3         the same container that was there when she came

4         back in '97?

5    A    I'm not positive.  As far as I can remember, it was

6         the same one that she brought back.

7    Q    It's at least similar?

8    A    It'd be similar, yes.

9              THE COURT:  Mr. Crawford, any questions.

10             MR. CRAWFORD:  Thank you, your Honor.

11                        CROSS-EXAMINATION

12   BY MR. CRAWFORD:

13   Q    Ms. Converse, I believe you mentioned you went to

14        Ms. Sailor's apartment several times a week.  Is

15        that correct?

16   A    At least once a week, yes.

17   Q    And when you were at the apartment, how much time

18        did you spend?

19   A    Oh, usually half hour to an hour.

20   Q    Okay.  During that period of time, did you get to

21        know her neighbors across the way at all?

22   A    We knew one neighbor across the way, yes.

23   Q    Did Helen ever visit with that neighbor while you

24        were there?

25   A    The neighbor would come visit with her.

STATE'S WITNESS - CAROL CONVERSE - (REDIRECT)

1    Q    And how often did that frequently occur?

2    A    Not -- not all that often.  Not when we were there.

3    Q    Do you remember what that lady's name was?

4    A    Mary Jane.

5         MR. CRAWFORD:  That's all I have.  Thank you.

6         THE COURT:  Mr. Williams, any other questions?

7         MR. WILLIAMS:  Briefly.

8                    REDIRECT EXAMINATION

9    BY MR. WILLIAMS:

10   Q    With respect to this medication tub with pills that

11        were in it, the Tupperware container, after Helen

12        returned in 1997, do you ever remember seeing more

13        than one Tupperware container?

14   A    The big container, no.

15        MR. WILLIAMS:  Nothing else, your Honor.

16        THE COURT:  Anybody have any additional

17   questions?

18        MR. ZOOK:  No.

19        MR. CRAWFORD:  No.

20        THE COURT:  You may step down.  Watch your

21   step.  Is she released from her subpoena?

22        MR. CRAWFORD:  Yes.

23        MR. ZOOK:  Yes.

24        THE COURT:  She'll be released from her

25   subpoena.  Call your next witness.

1        MS. BECKER:  May we approach.

2              (An off-the-record discussion was held

3              at the bench.)

4        MS. BECKER:  Dr. Joseph Prahlow.

5        THE COURT:  Raise your right hand, sir.

6              (The witness was sworn.)

7        THE WITNESS:  I do.

8        THE COURT:  Take the witness stand, sir.

9                    DR. JOSEPH PRAHLOW

10   called on behalf of the State, having been first duly

11   sworn, testified as follows:

12                    DIRECT EXAMINATION

13   BY MS. BECKER:

14   Q    Doctor, would you please introduce yourself to our

15        jury?

16   A    Yes.  My name Dr. Joseph Prahlow P-r-a-h-l-o-w.

17   Q    What do you do for a living?

18   A    I'm a forensic pathologist.

19   Q    What is forensic pathologist?

20   A    A forensic pathologist is a physician who first of

21        all becomes a pathologist, who is a physician who

22        specializes in the study of disease.  And then a

23        forensic pathologist goes on to receive further

24        training in forensic pathology, which specifically

25        deals with the investigation of sudden unexpected

1   or violent death.

2 Q Okay.  Are there special -- or are there specialty

3   areas in the science of pathology?

4 A Yes.

5 Q What types?

6 A There are -- there are two major groups -- or

7   divisions within the world of pathology.  Again,

8   pathology is the study of disease.  There is

9   anatomic pathology and clinical pathology.

10   Clinical pathology has to do with the laboratory,

11   laboratory aspect of medicine.  So if you do have

12   blood work done, if you have a throat culture done,

13   the blood bank, all the laboratories, that's

14   clinical pathology; and the pathologist kind of

15   runs that.  And each one of those areas can be a

16   subspecialty within the world of pathology.

17     Anatomic pathology has to do with microscopic

18   work, looking at tissues that are removed at

19   surgery or biopsied, making diagnosis.  Is this

20   cancer?  Is it not cancer?  What type of cancer is

21   it?  Are the lymph nodes involved?  That's what we

22   call surgical pathology doing the microscopic work.

23     Another part of anatomic pathology is autopsy

24   pathology.  Doing a surgical procedure after death

25   on a body, and that's an autopsy.  And a

1          subdivision of autopsy pathology is forensic

2          pathology where we specifically investigate by

3          performing autopsies, sudden unexpected or violent

4          deaths.

5     Q    In what type of pathology are you trained?

6     A    I did a five-year residency in pathology which

7          included anatomic and clinical pathology, and then

8          I did a one year fellowship, one more additional

9          year of training, in forensic pathology.  I'm board

10         certified in anatomic pathology, clinical

11         pathology, and forensic pathology.

12    Q    Well, presuming you had to probably getting an

13         undergraduate degree before going through with the

14         pathology further studies.  Correct?

15    A    Yes.

16    Q    Where is your undergraduate degree from?

17    A    I received a bachelor of science degree from

18         Valparaiso University in chemistry and biology.  I

19         then got my medical degree, my M.D. degree from

20         Indiana University.  And then I did my five year

21         residency in pathology at Wake Forest University,

22         which is in Winston Salem, North Carolina.  And

23         then I did my one year fellowship in forensic

24         pathology at the University of Texas Southwestern

25         in Dallas, Texas?

| 1 | Q | After you finished your one year clinical in |
|---|---|---|
| 2 | | Dallas, Texas, did you stay in Texas? |
| 3 | A | Yes, I did. |
| 4 | Q | How long did you stay in Texas and, what did you do |
| 5 | | there? |
| 6 | A | I stayed in Texas for three additional years |
| 7 | | following my formal training, and I stayed on |
| 8 | | faculty, or staff, at the University of Texas |
| 9 | | Southwestern at the Institute of Forensic Sciences |
| 10 | | there. |
| 11 | Q | After you left Texas, where did you go? |
| 12 | A | In the middle of 1999, I moved back home to |
| 13 | | Indiana, to this area, where I took a job at the |
| 14 | | South Bend Medical Foundation as a forensic |
| 15 | | pathologist.  And my duties include performing a |
| 16 | | bulk of the autopsies, whether they are coroner's |
| 17 | | cases, forensic cases or hospital autopsies.  And I |
| 18 | | also teach the pathology course at the Indiana |
| 19 | | University School of Medicine south Bend campus at |
| 20 | | Notre Dame. |
| 21 | Q | Any idea how many forensic autopsies you have |
| 22 | | performed in your career? |
| 23 | A | I have performed over 2000 autopsies. |
| 24 | Q | All right.  I would like to draw your attention to |
| 25 | | November of 2002.  Do you recall performing an |

1          autopsy on the body of Helen Sailor?

2     A    Yes.

3     Q    Can you please explain to us, first of all how you

4          came into contact with this responsibility?

5     A    Well, as -- as -- in my role as a forensic

6          pathologist at the South Bend Medical Foundation, I

7          perform autopsies for various coroners around the

8          area, including Elkhart County.  So I was contacted

9          by the Elkhart County coroner about this case and

10         was, you know, given some background information

11         about the case.

12              When that happens, the typical situation is we

13         set up a time where the police can be there, the

14         coroner can be there, and I can be there, meaning

15         Elkhart General Hospital's morgue, and I can

16         perform an autopsy.  So that's what we did.  We set

17         it up, and I started the autopsy at Elkhart General

18         Hospital on November 29th at 3:30 in the afternoon.

19    Q    When you began the autopsy on November 29 on the --

20         on the body of Helen Sailor, what did you do first?

21    A    The first thing that is done is to do what's

22         referred to as an external examination where I look

23         at the body.  Depending on the case, we may collect

24         trace evidence at that time or any other evidence

25         that might need to be collected.

1          In this particular case after viewing the body

2      initially, I did collect trace evidence.  We took

3      fingernail clippings, we performed a sexual

4      activity kit, took hair standards, and then I

5      proceeded with the external examination which

6      involves taking note of the clothing the individual

7      was wearing, jewelry then.

8          The clothing is removed, and we do a very

9      complete external examine looking at the outside of

10     the body and looking for any injuries that may be

11     present, documenting those injuries by diagram as

12     well as photography.

13   Q  Do you recall whether Helen Sailor's fingerprints

14     were also taken at that time by the crime scene

15     technician that was with you?

16   A  Typically, the fingerprints are taken after the

17     case is complete.  Taking fingerprints requires

18     getting black ink on the fingers so -- in certain

19     cases we'll take them -- the -- the -- the crime

20     scene folks, the police officers will take them

21     earlier on in the case.  But the typical scenario

22     is once I've completed the entire autopsy, then

23     they do that.

24   Q  When you indicated that you collected trace

25     evidence, do you do that with the crime scene tech

1          is present so that you can transfer possession

2          directly to that detective?

3     A    Yes.  Any evidence that I collect during the

4          autopsy will take place in the presence of the

5          police officers that are -- that are there.  And I

6          will collect the evidence either by myself or with

7          the officer and then turn it over to the officer.

8     Q    All right.  Let's go ahead and talk about the

9          observations that you made about Helen Sailor.

10         First of all, let's talk about her clothing.  What

11         did you note about Helen Sailor's clothing before

12         your began any further investigation?

13    A    Well, the -- the best way to describe it would be

14         that the clothing was somewhat disheveled.  She was

15         wearing a short-sleeved sweater, and it was at the

16         mid chest level.  She also had a pair of panties on

17         with a disposable undergarment.  She had a pair of

18         pants and the waist of the pants were at her lower

19         thigh level.  She had a pair of stockings on, a

20         pair of shoes, and a bra.

21             She also had two long-sleeves sweaters that

22         were partially on her right arm.  Through up and

23         around the clothing she had some tissues like

24         Kleenex that seemed to be soaked in some type of

25         fluid.  There was also a pink fluid like substance

1          on portions of the clothing and on her skin.

2                If you include jewelry as clothing, she also

3          wore a white metal ring with a turquoise stone on

4          the right ring finger, and she had a digital watch

5          on her right wrist.

6     Q    Do you remember this liquid substance that was on

7          her body?

8     A    Yes.

9     Q    How would you describe that for the jury?

10    A    It was pink.  It was -- it didn't look like it was

11         a -- a body fluid per say.  Sometimes we'll see

12         vomit that looks that color, but it didn't appear

13         to be vomit per say.  It was kind of a greasy --

14         almost greasy look to the pink.  I wasn't sure what

15         it was.

16    Q    Do you know whether samples were taken of that by

17         the crime scene detective?

18    A    I believe so, yes.

19    Q    Okay.  Let's go ahead and move on.  After Helen's

20         clothing was removed, did you have an opportunity

21         to observe her body.

22    A    Yes.

23    Q    Did you look for any signs of trauma to her body?

24    A    Yes.

25    Q    Starting with -- actually, let's start with the

```
 1          torso and the legs and then go up.
 2     A    She had what -- what I would call minor or
 3          superficial very relatively smaller insignificant
 4          looking, at least initially, injuries including
 5          some abrasions, which are scrapes or scratches, as
 6          well as contusions, which are bruises, in various
 7          parts of the body below the level of the head and
 8          neck.
 9               Specifically, she had -- I need to refer to me
10          notes so that I get it exactly correct -- on the
11          left buttocks she had some blue contusions,
12          bruises.  She had some suttle contusions or bruises
13          on the midportion of the left side of her back.
14          She had a subtle blue contusion of her upper left
15          back.
16     Q    What about her neck?
17     A    Her neck had some significant injuries.
18     Q    We'll talk about it in detail though in just a few
19          minutes.  Also, in general, were there any other
20          signs of trauma about her head and face area?
21     A    Yes.
22     Q    What were they?
23     A    She had abrasions, or scrapes and scratches, as
24          well as bruises or contusions on her face.
25          Specifically again, she had a scrape/bruise on her
```

1      left forehead, she had an abrasion or a scrape on

2      her nose, she had what most people would call black

3      eyes on both sides.  We call that bilateral,

4      meaning both sides; periorbital, that means around

5      the eyes; ecchymosis, which is another fancy way to

6      call a bruise.  So she had bilateral, both eyes;

7      periorbital, around the eyes; ecchymosis, or

8      bruising, so black eyes.  She had some blood that

9      came out of her right ear.  She had a laceration of

10     the tip of her tongue.

11  Q  Doctor, do you prepare notes so that you can keep

12     all these injuries straight in light of all the

13     autopsies that you do?

14  A  Yes.

15  Q  Do you also do diagrams so that you can document

16     where injuries are on certain bodies?

17  A  Yes.

18  Q  I'd like to show you what's been marked for

19     identification purposes as State's Exhibit 2 and

20     ask if you recognize this?

21  A  Yes, I do.

22  Q  What is it?

23  A  State's Exhibit 2 is photocopy of the body diagram

24     that I prepared for Helen Sailor.  It shows the

25     front and back of a female's body nude, and then it

1       has on her the markings that I wrote on describing

2       some of the -- the injuries that I've already

3       described to you, but also some injuries that we

4       haven't talked about yet.

5   Q   Okay.  Does this diagram accurately depict what you

6       personally prepared during the autopsy or shortly

7       thereafter of Helen Sailor in November of 2002?

8   A   Yes.

9   Q   Do you believe that this will assist the jury by

10       illustrating your testimony?

11   A   Yes.

12   Q   Thank you.

13           MS. BECKER:  State would now move to admit

14   what's been marked for identification purposes as State's

15   Exhibit 2.

16           THE COURT:  Mr. Crawford, any objection?

17           MR. CRAWFORD:  No, your Honor.

18           THE COURT:  And, Mr. Zook, any objection?

19           MR. ZOOK:  No, sir.

20           THE COURT:  You're offering 2.

21           MS. BECKER:  Yes.

22           THE COURT:  State's Exhibit 2 will be admitted

23   without objection.

24           MS. BECKER:  State would move to publish

25   State's Exhibit 2 by electronic publication.

1        THE COURT:  Any objection, counsel?

2        MR. ZOOK:  No, sir.

3        MR. CRAWFORD:  No, your Honor.

4        THE COURT:  Exhibit 2 will be published in the

5   manner of choosing by the state.

6              (State's Exhibit 2 was published to

7              the jury.)

8   BY MS. BECKER:

9   Q    Doctor, I'm going to hand you a remote control that

10        has a red laser pointer on it.  If you would be so

11        kind, could please point out the are of bruising on

12        the buttocks that you were describing?

13   A    The left buttocks.  I'm circling it with the laser

14        pointer.

15   Q    Now, you also indicated there was a contusion in

16        the midback.  Where is that?

17   A    Right there.

18   Q    You also indicated there was another contusion on

19        the left upper shoulder back area.

20   A    Yes, right there.

21   Q    All right.  Would you also describe any trauma that

22        you found on the hands of Helen Sailor or lower

23        arms?

24   A    Yes.  She had extensive -- I mentioned earlier that

25        the ones on the buttocks and the back were

1       relatively small.  She also had a small contusion

2       on the back of her left arm, the triceps area as

3       I'm indicated here, but she had extensive

4       contusions or bruising on the backs of both hands

5       and the one on the back of the left hand extended

6       up onto her forearm.

7    Q   Now, if you look to left of this diagram it shows a

8       frontal view.  Do you also have some notes

9       documenting the trauma area to the neck and head

10       region?

11   A   Yes.

12   Q   Could you please point out what those are for the

13       jury to illustrate the exact areas you were

14       discussing?

15   A   Yes.  She has abrasions, again, of the forehead, on

16       the nose.  She also has -- here I have B/L

17       periorbital that's bilateral periorbital ecchymosis

18       around the eyes more extensive on the right.  She

19       also had the neck injuries.  I didn't get into

20       detail about those when I was talking earlier, but

21       she has abrasions as well as contusions around the

22       neck, and she has other injuries as well there.

23   Q   Okay.  Once again, we will get into more detail

24       about the neck area, but let's go ahead and discuss

25       these trauma areas on the remainder of her body and

```
 1          extremities.  First of all, I'd association like to

 2          show you what's been marked for identification

 3          purposes as State's Exhibit 2, do you recognize

 4          this?  I'm sorry, 3.

 5     A    Yes, I do.

 6     Q    What is it?

 7     A    State's Exhibit 3 is a photograph of Helen Sailor's

 8          left hand and forearm at autopsy showing that

 9          extensive contusion or bruising that I just talked

10          about.

11     Q    Thank you.  Next I'd like to show you what's been

12          marked for identification purposes as State's

13          Exhibit 4.  Do you recognize this?

14     A    Yes, I do.

15     Q    What is it?

16     A    State's Exhibit 4 is a photograph of Helen Sailor's

17          right hand, the back of her right hand showing the

18          contusion or bruising that I just talked about.

19     Q    Thank you.  Next I'd like to show you what's been

20          marked for identification purposes as State's

21          Exhibit 5.  Do you recognize this?

22     A    Yes, I do.

23     Q    What is it?

24     A    State's Exhibit 5 is a photograph showing the front

25          of Helen Sailor's face at autopsy.  Specifically in
```

1        this photograph, you can see the abrasion of the

2        left side of the forehead.  You can see the

3        extensive abrasion or scrape or scratch on her

4        nose.  There is a ruler that covers over the left

5        eye, but the right eye is visualized, and you can

6        see the ecchymosis, or bruising, around the right

7        eye.

8    Q   Next, I'd like to show you what's been marked for

9        identification purposes as State's Exhibit 6.  Do

10       you recognize this?

11   A   Yes, I do?

12   Q   What is it?

13   A   State's Exhibit 6 is another frontal photograph

14       showing Helen Sailor's front of her face and neck

15       and upper chest at autopsy.  Again, on this one,

16       you can see the abrasions that I just talked about.

17       You can also see the bruising around both eyes.

18       You can see some abrasions and bruises on her neck.

19           You can also see very well some of the other

20       injuries that we haven't talked about which --

21       which are referred to as petechial hemorrhages.  A

22       petechial hemorrhage is a pinpoint hemorrhage, and

23       she has extensive petechial hemorrhages from about

24       midneck upwards involving her neck and face and

25       head, and you can see these petechia all over her

```
 1              face.

 2      Q    Thank you.  Next I'd like to show you what's been

 3              marked for identification purposes as State's

 4              Exhibit 7.  Do you recognize this?

 5      A    Yes, I do.

 6      Q    What is it?

 7      A    State's Exhibit 7 is a closer-up photograph of her

 8              face showing in more detail the petechial

 9              hemorrhages.

10      Q    Thank you.  Next I'd like to show you what's been

11              marked for identification purposes as State's

12              Exhibit 8.  Do you recognize this?

13      A    Yes, I do.

14      Q    What is it?

15      A    State's Exhibit 8 is a photograph where I have

16              placed a retractor, an eyelid retractor on the

17              eyelid of Helen's Sailor's right eye to pull those

18              open so that we can see the white part of her eye,

19              which we refer to as the sclera.  And I put this

20              retractor for photography purposes so that we can

21              document the injuries of her eyes.  We can see some

22              petechial hemorrhages, pinpoint hemorrhages of the

23              whites of the eye, but also what refer to as

24              ecchymosis, again, bruising that are bigger than

25              petechia on the white parts of her eye.
```

```
 1    Q   Now, you indicated that you have used something to

 2        hold the eyelids open.  Has there been any

 3        instrument used other than that or any cutting or

 4        anything like that done on this photograph?

 5    A   No.  This was just during external examine.  It's

 6        is just to visualize the eyes.  There's no surgical

 7        manipulation at all.  It's just a retraction.

 8    Q   Okay.  Thank you.  Next I'm showing you what's been

 9        marked for identification purposes as State's

10        Exhibit 9.  Do you recognize this?

11    A   Yes, I do.

12    Q   What is it?

13    A   State's Exhibit 9 is a photograph showing the --

14        the mouth area of Helen Sailor at autopsy.  Again

15        in this photograph, there is an instrument there.

16        It's a plastic lip retractor holding the mouth open

17        so that we can see on the tongue the presence of

18        contusions or bruises as well as petechial

19        hemorrhages, the pinpoint hemorrhages.

20    Q   Have any surgical manipulations been performed

21        prior to this photograph?

22    A   No.

23    Q   And does this show an accurate representation of

24        what you observed during autopsy?

25    A   Yes.
```

1    Q    Now, in reference to what has been marked for

2         identification purposes as state's Exhibit 3 all

3         the way through State's Exhibit 9.  Do all of these

4         photographs appear to be photographs that were

5         taken during autopsy on November 29, 2002?

6    A    Yes.

7    Q    Do you believe that they are fair and accurate

8         representations of what you personally observed on

9         that day?

10   A    Yes.

11   Q    Do you believe that they will assist the jury in

12        illustrating your testimony as well as showing is

13        the actual trauma to Helen Sailor's body.

14   A    Yes.

15   Q    Thank you.

16            MS. BECKER:  State would now move to admit

17   what's been marked for identification purposes as State's

18   Exhibit 3, 4, 5, 6, 7, 8, and 9.

19            MR. ZOOK:  No objection, your Honor.

20            THE COURT:  Mr. Crawford?

21            MR. CRAWFORD:  No objection, your Honor.

22            THE COURT:  State's Exhibits 3, 4, 5, 6, 7, 8,

23   and 9 will each be admitted without objection.

24            MS. BECKER:  State would move to publish

25   State's Exhibits 3 through 9 inclusive by using

```
 1    electronic publication.

 2              THE COURT:  Counsel.

 3              MR. ZOOK:  No objection.

 4              MR. CRAWFORD:  No objection, your Honor.

 5              THE COURT:  State's Exhibits 3, 4, 5, 6, 7, 8,

 6    and 9 will be published without objection in the manner

 7    of choosing of the state.

 8              MR. CRAWFORD:  Thank you, your Honor.

 9    BY MS. BECKER:

10    Q    State's Exhibit 3, you indicated this was the left

11         arm of Helen Sailor.  Can you identify why this is

12         significant, this bruising is significant?

13    A    Yes.  Essentially, with the exception of this area

14         right up here on the edge of the forearm and here

15         and then the fingers, the remainder of the area

16         that we are looking at is all bruised or contusion,

17         which is very extensive; and you can see the

18         swelling that occurs here.  It's somewhat

19         disfiguring of the back of the left hand and wrist.

20         This would be the normal color of skin.  So this is

21         very extensive contusion of that area.

22    Q    Does this appear to be significant to you in your

23         examination and your diagnosis?

24    A    Significant in that it's a relatively major injury,

25         yes.  As far as, you know, would an injury like
```

1      this cause death?  Probably not.  But it's

2      significant in light of the other injuries that are

3      present.

4    Q   Now, you indicated that the discoloration and the

5      swelling.  When you have done examinations and

6      based upon your training and experience in the

7      medical field, how fast can something like this set

8      in an elderly person?

9    A   Very quickly.

10   Q   What do you mean by very quickly?

11   A   Within seconds of trauma being inflicted.  Elderly

12      individuals in particular can have very fragile

13      blood vessels underneath their skin, and it's not

14      infrequent in elderly individuals to see what they

15      refer to as senile ecchymosis, meaning bruising

16      related to that fragility of that older person's

17      skin.  And they can hit their hand on something and

18      cause a little bruise there within seconds to

19      minutes.

20   Q   You also indicated that the right hand of Helen

21      Sailor also had bruising on it.  What was

22      significant about this?

23   A   This is similar to what we just saw except the

24      bruising is not as extensive.  It's in this area

25      that I'm outlining -- outlining with the lazer

1       pointer on the back of her right hand.

2    Q  Is there any way that you can determine to any

3       degree of medical certainty how long this bruise

4       has been there or when it was created?

5    A  No.

6    Q  You also indicated that there were several

7       abrasions to Helen's face.  Would you please

8       describe so we know what you're talking about the

9       areas of trauma that we're looking at right now?

10   A  Yes.  In this case -- or in this photograph, first

11      of all just for explanation, the white that you see

12      is a reflection from the flash, the white areas,but

13      the injuries as far as abrasions go are this dark

14      area on the nose.  Essentially, the entire surface

15      of the nose has a scrape or scratch or abrasion on

16      it, and then there's another abrasion on the left

17      forehead.  You can also see that there's

18      discoloration of that right eye or the tissues

19      around that right eye which we'd call a black eye

20      or a periorbital ecchymosis.

21   Q  Now, moving on, I believe this would be State's

22      Exhibit 6.  Does this photograph also show

23      additional injuries under the chin?

24   A  Yes.  Again, kind of in the shadows up here you can

25      see the abrasions we just looked at, the eye

1    contusions.  There are abrasions on the chin and

2    the area here.  And this one we also start to get

3    an idea of those petechial hemorrhages that I

4    discussed, the pinpoint hemorrhages.

5        You can see there's a line right here at the

6    neck below which we don't see any of those, but

7    above which on the entire neck and head and face

8    region we see abundant petechial hemorrhages, and

9    there's pink purple discoloration of the remainder

10    of the skin suggesting that very congested skin

11    there.

12    Q   Doctor, let's actually talk about that at this

13        point in time.  What causes petechial hemorrhaging?

14    A   Petechial hemorrhages occur for a variety of

15        reasons all of which have to do with the blood

16        pressure that is behind the blood vessels supplying

17        the skin with blood.  When there is a local

18        increased blood pressure in those very small blood

19        vessels that supply the skin, those little blood

20        vessels can burst, and that results in a petechial

21        hemorrhage.

22    Q   How would blood pressure increase in just a small

23        area such as a head?

24    A   Well, one of the most common things that we see

25        facial, neck, eye petechia in, is when there is

1  compression of the neck.  What happens when there

2  is compression of the neck is first of all the --

3  the veins which are blood vessels that are thin

4  walled, the blood returns towards the heart and the

5  vein, they are compressed first with less force

6  than the arteries.

7   Arteries are thicker walled, takes more

8  pressure to compress them.  But what first happens

9  is those veins get compressed when there's

10  compression of the neck.  So the arterial pressure

11  is still forcing blood up into the head and the

12  face, but then the blood can't get back out of the

13  head and face because the veins are being

14  compressed by the compression of the neck.  And

15  that arterial pressure continues to build, and then

16  you get these petechial hemorrhages in the small

17  blood vessels.

18 Q Now, we're looking again at State's Exhibit 7, and

19  you indicated this is a closer up of the petechial

20  hemorrhaging.  Does this actually occur in the

21  little cells that are next to the skin?

22 A Yes.  They actually occur in the skin, and this is

23  just to show what they look like closer up.  These

24  are pinpoint hemorrhages.  Now, some are really

25  tiny pinpoint, others get more like the size of the

1       head of the pin.

2    Q   Okay.  And what area of Helen's face are we looking

3       at right now?

4    A   I believe this is the cheek, although without

5       comparing with other photos, this is one of those

6       retractors that is in another photo, so I believe

7       this is the cheek here.

8    Q   Number 8, you indicated that her eye also had

9       petechial hemorrhaging.  What is the significance

10      of the amount of this?

11   A   Yes.  There are petechia here.  You can see smaller

12      one, but there's also ecchymosis, big -- bigger

13      hemorrhages in the sclera.  Again, the significance

14      here would be as far as the petechia go that there

15      is likely compression of the neck causing these,

16      especially in light of some of the other injuries

17      we haven't talk about yet.

18         It is my opinion that these result from the

19      compression of the neck.  The bigger hemorrhages

20      can result from that as well with the blood

21      building up; or they could be related to blunt

22      injury, being struck in the face.

23   Q   Normally, does there appear to be hemorrhaging in

24      the sclera like this when there's absence of

25      injury?

1    A    No.

2    Q    Okay.  So what we're seeing here does indicate

3         injury to you?

4    A    Absolutely.

5    Q    Thank you.  And then 9 shows her mouth.  You

6         indicated that there was a laceration on her

7         tongue.  Can you show us where that is in the

8         photograph?

9    A    Yes.  There's a contusion with a tear.  I believe I

10        mentioned the laceration when I was referring to my

11        notes, but when I looked at the picture I -- I

12        didn't say that I said there was a contusion, which

13        there is, but there's also a tear, or a laceration,

14        right there.  This is the retractor, the plastic

15        retractor holding the lips open.  You can again see

16        petechial hemorrhages of the lips and the cheeks.

17        There are also petechial hemorrhages on the

18        undersurface of the tongue.

19   Q    Was there anything else about the mouth or even

20        this injury in and of itself that you have seen

21        before in certain types of situations?

22   A    Just the fact that -- as far as the petechia, there

23        were petechia throughout the gums in the floor of

24        her mouth, again, indicating probable compression

25        of the neck.  The fact that there are the injuries

1        to the tongue, again, suggest possible -- a blunt

2        force type of injuries impact, but also possible --

3            When I talk about compression of the neck,

4        that's the category of asphyxial injury.  Asphyxia

5        means without a pulse, but we use it more commonly

6        to refer to a lack of oxygen, and there are all

7        sorts of asphyxial injuries one of which is

8        compression of the neck.  Another of which is

9        compression of the mouth and nose and we call that

10       smothering.  You can sometimes see injuries such as

11       the laceration and the contusion with tearing of

12       the tongue, the bruise of the tongue, when there's

13       a smothering type of mechanism occurring.

14   Q   Now, Doctor, let's go ahead and move along to the

15       area of the neck.  You indicated that there was

16       also some trauma around Helen's neck.  Can you

17       please describe that in detail?

18   A   Yes.  And we've seen a little of it in the

19       photographs we've seen already.  There was a

20       circumferential, meaning all the way around the

21       neck.  What I refer to as a furrow mark, it's an

22       abrasion, contusion -- abrasion and contusion

23       caused by a ligature, something that can be readily

24       wrapped around something, a ligature.

25            And when a ligature is wrapped around a neck

1  or wrists or body, they can leave marks; and we

2  refer to that mark as furrow mark f-u-r-r-o-w,

3  furrow, so that's the term that pathologists will

4  use.  She had a circumferential all the way around

5  the neck furrow mark that measured 16 and a half

6  inches all the way around the neck.  It had a

7  variable width ranging from less than one quarter

8  inch to about one inch in width.

9   In areas there was a pattern to this abraded

10  contused furrow mark consisting of small parallel

11  lines.  There were also areas that had a

12  paradisecity of repetitive type of parallel lines

13  in it.  There were also other abrasions and

14  contusions consistent with a ligature or other

15  means of causing scrapes or scratches and bruises

16  on the neck impact with other objections whether

17  it's the ligature or fingers or an object of some

18  sort.  There are other abrasions and contusions,

19  some of which we've seen already.

20   This ligature was about midway on the neck

21  specifically measured from the top of Mrs. Sailor's

22  head to where it was on the front of her body.  The

23  anterior part of her body was ten inches.  On the

24  back of her neck, it was seven inches.  So it was

25  roughly horizontal, somewhat upward as it went

1              back.

2                    The petechia and the congestion of the neck

3              and face that I discussed earlier was confined to

4              the area above where that ligature was.  Below that

5              there were no petechia.

6      Q      Now, I'd like to show you what's been marked for

7              identification purposes as State's Exhibit 10.  Do

8              you recognize this?

9      A      Yes, I do.

10     Q      What is it?

11     A      This is a body diagram that I prepared in this

12             autopsy on Helen Sailor.  This body diagram shows

13             four views of an adult face.  The left side, the

14             front, the right side, and the back.  It also

15             includes the neck.  On this diagram with this

16             particular case, I have indicated the injuries that

17             I have just discussed with you and have notation

18             about those injuries on this diagram.

19     Q      Does this appear to be a true and accurate

20             photocopy of the notes that you personally prepared

21             on November 29, 2002 regarding the autopsy of Helen

22             Sailor?

23     A      Yes.

24     Q      Do you believe that this will assist the jury in

25             illustrating your testimony and being specific

1        about the location and the appearance of these

2        injuries?

3    A    Yes.

4    Q    Thank you.

5              MS. BECKER:  State would move to admit what's

6    been marked for identification purposes as State's

7    Exhibit 10?

8              THE COURT:  Mr. Crawford.

9              MR. CRAWFORD:  No objection.

10             THE COURT:  And, Mr. Zook.

11             MR. ZOOK:  No objection.

12             THE COURT:  State's Exhibit 10 will be admitted

13   without objection.

14             MS. BECKER:  State would move to publish

15   State's Exhibit 10 by electronic display.

16             MR. ZOOK:  No objection.

17             MR. CRAWFORD:  No objection.

18             THE COURT:  State's Exhibit 10 will be

19   published without objection in any manner of the state's

20   choosing.

21                  (State's Exhibit 10 was published to

22                  the jury.)

23   BY MS. BECKER:

24   Q    Doctor, you indicated -- first of all, let's just

25        start with the top left of this diagram.  What view

1          does that show?

2     A    Top left shows the left side of the face and neck.

3     Q    And what at the bottom can you tell us about the

4          way you have drawn these lines?

5     A    You can see that I've drawn the furrow mark as it

6          was evident at autopsy along the left side of the

7          neck here.

8     Q    Is there anything significant about the number of

9          furrow marks or the width or appearance of this

10         furrow mark that you found to be important?

11    A    Yes.  The fact that it ranges, you know, up to a

12         inch or so, but down to a quarter of an inch

13         suggests first of all that the ligature perhaps

14         measured approximately one quarter inch in width.

15         The fact that we have areas where it measures wider

16         than that suggests that there was sliding of that

17         ligature on the neck or perhaps loosening and then

18         retightening so that there areas that appear wider.

19             It's relatively frequent that we see this even

20         if we know the exact ligature that is involved in a

21         case.  We see marks on the -- the neck that are

22         wider than that because that ligature has moved

23         around or had multiple periods of tightening or

24         loosening.  Whether there's a struggle involved or

25         not, that can result.

1          So -- and then there are areas that I've

2      indicated here.  There's and area of central

3      blanching where we have abrasion or scratch mark on

4      either side of an area where there is nothing, and

5      that suggests that it was a pretty significant area

6      of tightening of the ligature when that injury was

7      formed such that the sides of the neck that bent

8      around the ligature as it was tightening had the

9      abrasions or scratches from being up against that

10     ligature whereas the part that was immediately

11     under it was blanched, meaning the blood was pushed

12     out of it as that injury occurred.

13  Q  When you tighten a ligature at such an extreme that

14     is causes the skin to fold like that, does that

15     take a significant amount of force?

16  A  Relatively speaking, when we're talking about neck,

17     neck trauma, yes.

18  Q  All right.  Now, in the bottom left side, you have

19     the opposite side of the head; and if you look at

20     right margin and the right margin of those two, you

21     have some numbers written.  Is that characteristic

22     of the measurements that you took?

23  A  Yes.  Are you talking about the seven and ten?

24  Q  Exactly.

25  A  Yes.  On this lower left portion of the diagram,

1    it's the right side of the face and neck; and again

2    you can see a ligature mark.  This one doesn't have

3    nearly as much overlapping, and it doesn't get as

4    wide, but what I've indicated on the upper diagram

5    is at the back of the neck, this ligature measures

6    seven inches from the top of the head.  In the

7    front, if measures ten inches from the top of the

8    head as I -- as I explained earlier.

9  Q  Let's move now to the bottom right which would show

10    the back of the head.  Can you explain what these

11    drawings that you've made here represent?

12  A  Yes.  The bottom right is the back of the head, and

13    you can see a continuation of that furrow mark

14    across the back of the head, and this is where it

15    would be seven inches from the top of the head

16    here.

17  Q  And now let's go ahead and move up to the top

18    right.  What is significant about that mark, if

19    anything?

20  A  This -- this furrow mark shows the -- that it

21    crosses the -- about midlevel across the neck.

22    Again, there is some -- some degree of

23    criss-crossing here, and there's some contusions

24    and abrasions there.

25  Q  This degree of criss-cross, is your diagram

1     accurate to show that maybe there's some area that

2     was not effected by the ligature?

3  A  Yes.  And -- and I tried to draw these diagrams as

4     accurately as possible again for my notation

5     purposes keeping in mind that there are photographs

6     taken also for absolute documentation.  But this is

7     drawn to show that as for coming from her right

8     side of her neck this way across the very middle of

9     the neck, it comes downward a bit, and then there's

10    an area of blanching, and then it starts again.

11        This suggests that whatever ligature was

12    there, that might be where a ligature is perhaps

13    twisted; or we see this frequently in hanging

14    deaths where the knot occurred in the noose.  It's

15    typically in the back of the neck, but you see this

16    criss-cross type of configuration here where the

17    furrow marks don't go right end to end

18    continuously.

19        There appears to be a portion that kind of

20    veers off to the side and another one coming in and

21    an area of blanching.  You could imagine in a

22    hanging victim the knot in the back of the neck

23    could have an appearance like that.  So it -- so it

24    suggests some twisting of a ligature,

25    criss-crossing of the ligature, or a knot.

1    Q    All right.  Now, I'd like to show you what's been

2         marked for identification purposes as State's

3         Exhibit 11.  Do you recognize this?

4    A    Yes.

5    Q    What is it?

6    A    State's Exhibit 11 is a photograph of Mrs. Sailor

7         as autopsy showing that front portion of the neck

8         that we've just described a little off to the side,

9         the left side, showing in much greater detail than

10        my diagram what I -- what I just tried to explain

11        to you.

12   Q    Thank you.  Next I'd like you to show you what's

13        been marked for identification purposes as State's

14        Exhibit 12.  Do you recognize this?

15   A    Yes.

16   Q    What is it?

17   A    State's Exhibit 12 is a photograph of Mrs. Sailor

18        at autopsy showing the left side of her neck again

19        showing the furrow mark and showing some of the

20        very subtle parallel lines that we refer to as a

21        patterned abrasion that I described earlier.

22   Q    Thank you.  Next I'd like to show you what's been

23        marked for identification purposes as State's

24        Exhibit 13.  Do you recognize this?

25   A    Yes.

1    Q   What is this?

2    A   State's Exhibit 13 is a closer-up view of the left

3          side of Mrs. Sailor's neck at autopsy showing this

4          pattern of four parallel lines, very small lines

5          running together at the lower end this entire

6          furrow mark that was on the neck.

7    Q   Finally, I'd like to show you what's been marked

8          for identification purposes as State's Exhibit 14.

9          Do you recognize this?

10   A   Yes.

11   Q   What is it?

12   A   State's Exhibit 14 is photograph showing the -- the

13         back of Mrs. Sailor's neck.  Again, you can see --

14         the furrow mark on the back, and there are areas

15         that have that pattern to them again.

16   Q   Do all of these exhibits, namely, State's Exhibits

17         11, 12, 13, and 14 accurately represent what you

18         personally observed on November 29, 2002 during the

19         autopsy of Helen Sailor's body?

20   A   Yes, they do.

21   Q   Do you believe that they will assist the jury in

22         illustrating you testimony and also provide

23         evidence of the actual injuries you observed?

24   A   Yes.

25   Q   And are -- were they all taken on November 29,

1        2002?

2     A    Yes.

3             MS. BECKER:   Thank you.   State now moves to

4     admit what's been marked for identification purposes as

5     State's Exhibit 11 through 14 inclusive.

6             THE COURT:   Mr. Crawford.

7             MR. CRAWFORD:   No objection.

8             THE COURT:   Mr. Zook.

9             MR. ZOOK:   No objection.

10            THE COURT:   Exhibits 11, 12, 13 and 14 will be

11    admitted without objection.

12            MS. BECKER:   State moves for publication by

13    electronic means.

14            THE COURT:   Counsel.

15            MR. CRAWFORD:   No objection.

16            MR. ZOOK:   No objection.

17            THE COURT:   Exhibits 11, 12, 13 and 14 will be

18    published without objection in any manner of choosing by

19    the state.

20            MS. BECKER:   Thank you, your Honor.

21    BY MS. BECKER:

22    Q    Okay.   State's Exhibit 11 you indicated was showing

23         the ligature mark around the front of the neck.

24         Can you show us where you're talking about a

25         criss-cross pattern?

```
1    A    Yes.  This area of the abrasion on the furrow mark
2         has an extension somewhat downward here.  Her feet
3         are down to the left of the screen, her face is up
4         here.  So that abrasion continues this way.
5         There's one that continues this way, but there's
6         another that stops right here and does not
7         intersect with this downward abrasion.  That's
8         where I'm talking about the crisscross pattern.
9    Q    Next is 12.  Which side of the face of this is
10        Helen's?
11   A    This is the left side of the neck.  You can see her
12        chin here.  This is the bottom of the left portion
13        of the ear.  There's a lot of glare on this
14        picture, the white; but the furrow mark is right
15        here, and the area that is in the next photograph
16        that is a close-up is an area where we can see four
17        subtle parallel lines here.  It will be much more
18        visible in the next photograph.
19   Q    Go ahead and go to 12 then.
20   A    These are the four parallel lines that I'm talking
21        about in this ligature mark.  And you can see them
22        extending all the way along the side, this left
23        side of the neck.  You can see a contusion here, a
24        bruise.  You can see more of the abrasions and
25        contusions of the furrow mark complex here.  Here
```

1          is where it's measuring about one inch, and you can

2          see that there's multiple areas where the ligature

3          caused injury here.  But this is what I refer to as

4          a patterned abrasion, very specific.  Four parallel

5          lines running along this area that I'm indicating

6          with the laser.

7     Q    And then finally, Helen -- the back of Helen's

8          neck.  What are there injuries around the neck?

9     A    Yes.  The back of the neck the furrow mark runs in

10         this location.  Again, it's relatively wide in the

11         back, and there are areas throughout this where you

12         can see some of those four parallel lines again.

13         Not nearly as well as we saw in the left picture,

14         but focally in individual areas there we can see

15         that pattern.

16    Q    Thank you, Doctor.

17              THE COURT:  Ladies and gentlemen, we're going

18    to go to give you a recess at this time.  You are all

19    jurors in this case.  I must tell you now and I will

20    repeat this again each time you are permitted to

21    separate.

22              Generally, you should not express any opinion

23    about the case before it is submitted to you for

24    deliberation; however, you are permitted to discuss the

25    evidence presented in this case amongst yourselves in the

386

1    jury room during recesses from trial.  All jurors and

2    alternates must be present during these discussions.  You

3    must reserve judgment about the outcome of the case until

4    your deliberations begin.

5           You are admonished that you may not discuss the

6    facts of the case with anyone other than your fellow

7    jurors.

8           You may not discuss this case with me or with

9    the lawyers, parties or with any of the witnesses.

10          You should not listen to or read any outside or

11   media accounts of the trial.  You may not investigate the

12   case or attempt to obtain information outside the

13   courtroom.  It is highly improper for you to do so.  You

14   are to consider and decide this case only upon the

15   evidence received during the course of the trial in the

16   courtroom.  You may leave your notebooks turned upside

17   down in your seats.  You'll be in care of the bailiff.

18                   (A short recess was had at this time.)

19                   (The Court convened with all the

20                   parties present.)

21          THE COURT:  The record should reflect the both

22   defendants are present, counsel for each defendant is

23   present, counsel for the state is present.  Mr. Zook, you

24   indicated you wanted to take up the issue of the state's

25   proposed 404(B) evidence.  State has filed notice of

1    intent to use 404(B) evidence, evidence of defendant

2    obtaining prescription drugs illegally and using the same

3    and/or delivering the same to others in exchange for

4    marijuana.  What do you have to say about that, Mr. Zook?

5         MR. ZOOK:  Your Honor, I don't think there is

6    any evidence of obtaining prescription drugs illegally.

7    No doubt Lana was getting prescription drugs.  She had

8    prescriptions for many prescription drugs.  There would

9    be evidence of her exchanging that for marijuana.

10        THE COURT:  That.  What would that be?

11        MR. ZOOK:  Those prescription drugs she had.  I

12   see no relevance to the state's case since I believe the

13   state's witnesses would establish that all of the pills

14   were accounted for.  All of the prescriptions had enough

15   pills to account for them at least that's how I read the

16   state's case that they appeared to be messed up, but

17   there were none missing.

18        THE COURT:  Ms. Becker, what evidence are you

19   seeking to introduce under the confines of your notice?

20        MS. BECKER:  Under the -- or in light of the

21   fact that the defendant, Lana Canen, fingerprint was

22   found on the medical container that contained a reservoir

23   of pills in Helen Sailor's apartment, and that medical --

24   or that container appeared to have been moved at least

25   contemporaneous with the crime.  We've believe that it

 1    shows motive.  In other words, that the defendant, Lana

 2    Canen, is the person who touched and moved that container

 3    for the purposes of stealing pills from inside that

 4    container.

 5              Now, Mr. Zook is partially right in that the

 6    state's evidence will be that there were all of her pills

 7    that she should have had were there.  However, the

 8    state's evidence actually is going one step further than

 9    that they were so messed up that it's impossible to tell

10    whether there were any missing or not because if they

11    were that messed up then they can't say what should have

12    been there to begin with.

13              THE COURT:  So you don't know what should or

14    should not have been there.

15              MS. BECKER:  Correct.  So we can't say --

16              THE COURT:  How -- how would you say then or

17    how would you prove that she took some of them?

18              MS. BECKER:  We can't prove that she took some

19    of them, but we can prove that somebody moved that

20    container during the commission of the crime, and as a

21    result a person's identical -- or a person's identity put

22    on that, namely, the fingerprint, is incredibly important

23    in this case.

24              THE COURT:  What about fingerprint evidence,

25    Mr. Zook?  Any problem with that being admitted.  It

1     would be appear to be inextricably intertwined.

2          MR. ZOOK:  The fingerprint evidence is -- is --

3     is there, and there are enough points matching it that I

4     don't doubt that they'll get that admitted.  But I don't

5     see how that opens the door to talk about marijuana, to

6     talk about somebody being a pill freak.  It seems to me

7     that that's a totally different operation.

8          THE COURT:  So what you're saying is the

9     probative value of her alleged drug use or exchange on

10    another occasion of pills for marijuana is outweighed by

11    the prejudice.

12         MR. ZOOK:  Right.

13         THE COURT:  And what do you say to that,

14    Ms. Becker?

15         MS. BECKER:  Your Honor, the State of Indiana

16    believes that it is important for us to show why the

17    defendant went for the -- went for the pill container.

18    We have three witnesses that will show that she regularly

19    obtained prescription medication.  She had variety -- one

20    witness who actually called her a walking pharmacy, and

21    that she provided these pills to persons in exchange for

22    marijuana.

23         She wanted to get pills.  There's no doubt

24    about that.  And while she may have had legal means of

25    doing, she didn't have all legal means of doing that, and

1   she was known to take pills from other persons for the

2   purpose of getting marijuana for them.  We believe that

3   it does show a motive.  We believe that it ties her to

4   this crime without any other means of explanation.

5          THE COURT:  I'll take the matter under

6   advisement.  Are ready to go back with the jury?

7          MS. BECKER:  Yes.

8                (The jury entered the courtroom, and

9                 the following proceedings were had.)

10          THE COURT:  Be seated, please.  Ladies and

11  gentlemen, the recess lasted a little longer than

12  expected.  We were working on some legal issues, and that

13  accounted for some of the period of the recess.  Ms.

14  Becker.

15          MS. BECKER:  Thank you, your Honor.

16                DIRECT EXAMINATION CONTINUED

17  BY MS. BECKER:

18  Q   Doctor Prahlow, you were indicating that based upon

19      your examination of the body of Helen Sailor during

20      autopsy that it was clear that she was strangled

21      with a ligature.  In addition to that, did you

22      notice any other diseases from which she was

23      suffering or any other problems with her physical

24      condition during the autopsy?

25  A   Yes.

1    Q   What did you notice?

2    A   On internal examination when the body is opened and

3        the organs are removed one by one, we not only take

4        note of injuries that are present we also take not

5        of natural diseases that we may find.

6            Specifically, with Mrs. Sailor's autopsy, she

7        had a heart that was somewhat enlarged, which is

8        not unusual for someone as elderly as she is.  She

9        also had atherosclerosis, or hardening of the

10       arteries, again, which is not unusual in the United

11       States population.  Specifically, she had some

12       atherosclerosis, or hardening of the arteries, of

13       the aorta, which is the large artery coming off the

14       heart, supplies blood to the rest of the body, and

15       that was from a mild degree to a severe degree

16       focally.

17           She also had some atherosclerosis, or

18       hardening of the arteries of blood vessels in the

19       brain, but just to a mild extent.  She also had

20       some changes in her kidneys which suggests some

21       atherosclerosis under the microscope.

22   Q   Were any of these internal deformities or

23       deficiencies contributory causes to her death?

24   A   No.

25   Q   All right.  Let's specifically talk about her cause

1        of death.  You've indicated that she was strangled.

2        You've indicated that she had some asphyxia.  What

3        exactly was the cause of Helen Sailor's death?

4  A   In my opinion, the cause of death was

5        strangulation.

6  Q   Okay.  There's also term called manner of death,

7        what does that mean?

8  A   The manner of death -- well, first of all the cause

9        of death.  The cause of death is either an injury

10       or a disease, sometimes the combination of both of

11       those that sets in motion the chain of events that

12       leads to death.  That's what the cause of death is.

13       It's either an injury or a disease or a combination

14       of those two.

15          The manner of death specifically refers to the

16       means by which that cause of death occurred.  In

17       Indiana we have five choices for manner of death

18       when a death certificate is filled out.  We can

19       call it a natural death.  That's when the death is

20       related to an underlying disease process.  It's a

21       natural death.  It can be an accidental death, an

22       unforeseen event.  It can be a suicide, when

23       someone takes their own life.  It can be a

24       homicide, death at the hands of another.  And then

25       we have kind of a fifth category where we don't

1              have enough information to decide between those

2              first four, and we can call it undetermined manner

3              of death.

4         Q    In Helen Sailor's death, what was the manner of

5              death?

6         A    The manner of death was homicide.

7         Q    So if you've got a death at the hands of another

8              based upon your autopsy examination of Helen

9              Sailor's body, that -- is it fair to say that that

10             has enabled you to draw some conclusions just based

11             upon what you've observed?

12        A    Yes.

13        Q    Specifically let's talk about the ligature marks

14             ranging from a quarter of an inch all the way up to

15             an inch, there being several repeated patterns the

16             crossover, that type of thing.  Because of the

17             amount of differences and the changes in those, did

18             it appear to you that death was instant when that

19             ligature was applied?

20        A    No.

21        Q    Why not?

22        A    Because, again, basing it on my experience in doing

23             other cases of strangulation, some of which there

24             was no question unconsciousness occurred within a

25             matter of seconds and then death followed shortly,

1          and then others where no question there was some

2          struggle or repeated applications of a ligature,

3          and based on my experience with those types of

4          cases where I know for a fact what happened, it is

5          my opinion based on some of the things you just

6          said, the fact that they're crossing over, they're

7          not just in one spot, the fact that there are other

8          injuries on the body suggesting a struggle.  It is

9          my opinion that unconsciousness and death was not

10          instantaneous.

11   Q    The wounds on her arms -- well, her left arm and

12          her right hand as well as some of the other

13          bruising, is that consistent with defensive wounds

14          that you've seen in the past?

15   A    Those could be, especially the extremity ones, yes.

16   Q    Thank you, Dr. Prahlow.

17          THE COURT:  Mr. Zook.

18          MR. ZOOK:  No questions.

19          THE COURT:  And Mr. Crawford.

20          MR. CRAWFORD:  No questions.

21          THE COURT:  You may step down, Doctor.  Watch

22   your step.  Is he released on his subpoena?

23          MS. BECKER:  Please, your Honor.

24          MR. CRAWFORD:  Yes, your Honor.

25          THE COURT:  Mr. Zook, is he released?

1        MR. ZOOK:  Oh, yes, sir.

2        THE COURT:  He'll be released on his subpoena.

3   Call your next witness.

4        MS. BECKER:  Thank you.  The state would call

5   Detective Mark Daggy.

6        THE COURT:  Raise your right hand, sir.

7            (The witness was sworn.)

8        THE WITNESS:  I do.

9        THE COURT:  Take the witness stand.

10                    MARK DAGGY

11  called on behalf of the State, having been first duly

12  sworn, testified as follows:

13                 DIRECT EXAMINATION

14  BY MS. BECKER:

15   Q   Mr. Daggy, would you please introduce yourself to

16       our jury?

17   A   My name is Mark Daggy.

18   Q   What do you do for a living?

19   A   I'm a detective with the Elkhart Police Department.

20   Q   Is there an area of the detective bureau at the

21       Elkhart Police Department in which your specialize?

22   A   Yes, I do.

23   Q   What area would that be?

24   A   It's the homicide unit.

25   Q   In order to become a detective and then specialize

```
 1          in the homicide unit, what kind of training and
 2          experience have gone to?
 3     A    I went to a two-week homicide school at the
 4          Southern Police Institute that was about two years
 5          ago.  That's located at the University of
 6          Louisville, and I also went to Cold Case School a
 7          year ago at an Annapolis, Maryland that was put on
 8          by NCIS Naval Criminal Investigative Service in
 9          Annapolis, Maryland.
10     Q    In addition to that and prior to you homicide
11          school as well as you cold case school, did you
12          have training and experience as a detective with
13          the police department?
14     A    Yes, I did.
15     Q    How long had you been a detective?
16     A    I'd say around -- before coming to the homicide
17          unit, about a year and a half two years as a
18          regular detective.
19     Q    How long had you been a police officer before you
20          came out?
21     A    Ten years.
22     Q    Did you also have to go to the academy, the police
23          academy in order to get training and experience to
24          become a police officer?
25     A    Yes, I did.
```

1    Q    Have you also gone through many continuing

2         education type seminars to teach you different

3         skills in being a police officer and detective?

4    A    Yes, I have.

5    Q    What kinds of schools have you gone to to become a

6         detective?

7    A    Went to Reid Interrogation Schools.  That's one

8         that really comes to mind as far as being a

9         detective.  There was a lot of on-the-job training.

10        I have been to several undercover schools.

11   Q    In fact, part of the time that you were a police

12        officer you did serve undercover.  Correct?

13   A    That's correct.

14   Q    As part of your undercover duties, was it important

15        for you to have communication with individuals that

16        may be suspects, may be criminal witnesses, and

17        that type of thing?

18   A    Yes.

19   Q    Did you find that the skills that you learned at

20        some of these training schools as well as your

21        experience enabled you to have good communication

22        and learn things that maybe somebody else wouldn't

23        be able to learn?

24   A    Yes.

25   Q    Okay.  Do you believe that these skills have

1           enabled you to be well-rounded as a homicide

2           detective?

3      A    Yes, I do.

4      Q    All right.  And based upon the training and

5           experience that you have, have you been assigned as

6           lead investigator in certain homicide cases

7           currently pending, specifically this one, at

8           Elkhart City Police Department?

9      A    Yes, I have.

10     Q    Let's go ahead and talk about Thanksgiving of 2002

11          and the murder of Helen Sailor.  First of all, were

12          you lead detective on that murder in thanksgiving

13          of 2002?

14     A    No, I wasn't.

15     Q    All right.  Are you familiar with the officers who

16          were?

17     A    Yes, I am.

18     Q    Who were the officers that were the lead

19          investigators at the time Helen Sailor was

20          murdered?

21     A    At that time, the lead officer was Detective

22          Thayer.  He's now a sergeant, uniform division, and

23          Detective D'Andre Christian.

24     Q    Okay.  Now, at the time that the murder occurred,

25          was there an investigation done by Detective Thayer

| 1 | | and Detective Christian? |
|---|---|---|
| 2 | A | Yes, there was. |
| 3 | Q | What kinds of things were done during that initial |
| 4 | | investigation? |
| 5 | A | Initially they would -- they canvassed the entire |
| 6 | | apartment complex, witnesses, neighbors.  They -- |
| 7 | | initially the scene was secured.  Detective |
| 8 | | technicians came in and processed the entire scene, |
| 9 | | performed interviews, just kind of hit the road and |
| 10 | | asking questions of people that were near or |
| 11 | | resided inside the Waterfall Highrise. |
| 12 | Q | Based upon -- well, first of all, what is a canvass |
| 13 | | of the area? |
| 14 | A | Basically, canvassing the area, you can go door to |
| 15 | | door asking if -- you've seen the residents inside |
| 16 | | the doors, if they've heard anything, something |
| 17 | | unusual.  And to me canvassing is, you know, if you |
| 18 | | seen anything in the immediate area that presents a |
| 19 | | red flag or need to be -- possibly might be |
| 20 | | evidence.  It could be in and around the building. |
| 21 | Q | Within the first three days of the investigation, |
| 22 | | were you able to gather or was the police |
| 23 | | department able to gather quite a bit of |
| 24 | | information about what had been going on? |
| 25 | A | Yes. |

1    Q   Even though they gathered a significant amount of

2        information, were there really any red flags to

3        begin with?

4    A   No, I don't believe so.  I don't -- I don't think

5        that at the very beginning a suspect rose to the

6        top.

7    Q   Did there come a time when some information

8        involving a person by the name of Lana Canen threw

9        a red flag into the investigation?

10   A   Yes.

11   Q   All right.  Now, we can't talk about specifically

12       what that is at this point.  But let's go ahead and

13       discuss what happened with this case after the

14       first three days.

15   A   I'd say -- well, in November of 2002 when this

16       occurred -- can you repeat that?

17   Q   Sure.  What happened -- after the first three days,

18       you know, those first three hot days when you

19       talked about the canvassing of the neighborhood,

20       interviewing witnesses, gathering information, were

21       there any suspects at that time?

22   A   No.

23   Q   Okay.  Did the investigation continue past that

24       time?

25   A   I would say it continued, but it wouldn't -- slowed

401

 1          down within the first two to three months.  I mean,

 2          it pretty much slowed down.

 3     Q    Why was that?

 4     A    I believe the investigators at the time ran out of

 5          leads.

 6     Q    When in an investigation you get a lead, what I

 7          would characterize as a red flag, do you send

 8          people out, do interviews, try and get to the

 9          bottom of that?

10     A    Yes, we do.

11     Q    And as a result of following up on these leads, did

12          a suspect emerge?

13     A    No suspect or suspects emerged.

14     Q    Okay.  Any idea how many detective, officers, ect.,

15          had been working on this investigation?

16     A    Well, initially there probably was a handful of

17          them, maybe four or five; but it -- ultimately at

18          the beginning I would say Detective Todd Thayer and

19          Detective Christian had the responsibility of this.

20     Q    Did they also have other detectives that would go

21          out and interview people so that they wouldn't have

22          to spread themselves so thin?

23     A    Yes, they did.

24     Q    And did they from time to time, I call it powwow,

25          confer with each other to see what each other had?

1    A    Yes, they did.

2    Q    Even with all this work, any suspects?

3    A    No.

4    Q    Did there come a time when the homicide unit was

5         formed so that you could devote more time to this

6         type of case?

7    A    Yes, we did.

8    Q    When the homicide unit was formed, was this one of

9         first cases that you took up?

10   A    I think it was the first case.

11   Q    All right.  What was special about the homicide

12        unit that enabled you to focus exclusively on this

13        case and give it intense attention?

14   A    We had the luxury -- I mean, this is -- our

15        department formed a homicide unit.  We never had

16        this before.  So we had the luxury of four or five

17        fresh cases looking at a case, not developing any

18        tunnel vision, and concentrating all their time on

19        this homicide.

20             And usually, we would work just one homicide

21        case, whether it we cold or a fresh case, we'd look

22        at that one case.  And in the past, we wouldn't

23        have that luxury.  You'd have -- you'd have a

24        detective that would get assigned a homicide case,

25        plus he'd have all these other cases, burglaries or

1   robberies so their -- their case load will build

2   up.  We had the luxury of just working on just this

3   one case.  Five heads looking into it.

4  Q When homicide took this case on, did you go

5   reinterview individuals that had been originally

6   interviewed back at the time of the murder?

7  A Yes, we did.

8  Q And when was that?

9  A I believe it was August of 2003 is when we started

10   this.

11  Q Okay.  And in August of 2003, were able to locate

12   most of the people that had provided information

13   originally?

14  A Yes.

15  Q Were all those people reinterviewed?

16  A Yes.

17  Q After they were reinterviewed, did you learn some

18   additional information that started to kind of fall

19   into a context at this point?

20  A Yes, we did.

21  Q Now, although we can't talk specifically, you

22   indicated earlier that there was a red flag that

23   surrounding Lana Canen's name.  Correct.

24  A Correct.

25  Q Now, did there come a time when Lana Canen was

```
 1           known to be with another person by the name of

 2           Nina -- Nina Porter?

 3      A    Yes.

 4      Q    Did somebody go talk to Nina Porter after she had

 5           been with Lana Canen from your Police Department?

 6      A    Yes.

 7      Q    And after that, did the leads start to develop and

 8           things fall into place?

 9      A    Yes.

10      Q    After that occurred, did one of the detectives from

11           homicide actually go interview a person?

12      A    Yes.

13      Q    Who was that person?

14      A    Nina Porter.

15      Q    After Nina Porter.

16      A    Andrew Royer, sorry.

17      Q    Okay.  Based upon what you had learned from Nina

18           and the information that you had at that time, did

19           the interview of Andrew Royer provide crucial

20           information about the murder of Helen Sailor?

21      A    Yes.

22                MR. ZOOK:  Objection, your Honor.  I believe

23      that's a multiple question.

24                THE COURT:  Rephrase your question.

25      ////
```

```
 1    BY MS. BECKER:

 2    Q    Okay.  After you had gained this information from

 3         Nina Porter and the interview with Andy Royer, did

 4         the investigation take on a new character?

 5    A    Yes, it did.

 6    Q    Were you able to identify suspects at that time?

 7    A    Yes, we were.

 8    Q    Now, did you actually conduct the interview with

 9         Andrew Royer when he was first interviewed in

10         August or September of 2003?

11    A    No, ma'am, I did not.

12    Q    Did you observe some of it?

13    A    Some of it I did.

14    Q    And were you privy to the information obtained

15         during that interview?

16    A    Yes.

17    Q    Was there a subsequent interview of Andrew Royer

18         just a day later?

19    A    Yes, there was.

20    Q    Did you conduct that interview?

21    A    No, I did.

22    Q    Were you -- did you observe that interview?

23    A    I don't believe I did.

24    Q    Were you privy to information in that interview?

25    A    Maybe from a supplement or a statement.
```

1    Q    Was it consistent with the information that he

2         provided the first day?

3    A    It varied.

4    Q    Now, after you had these things and later on, did

5         you actually interview Andrew Royer?

6    A    Yes, I did.

7    Q    When did that take place?

8    A    It's about a year ago.  It was June of 2004.

9    Q    Okay.  When you interviewed Andrew Royer, did you

10        advise him of his rights?

11   A    Yes, I did.

12   Q    How did that come about?

13   A    I read -- I read his Miranda Form right to him.

14        There were two attorneys present.  He stated

15        that -- Andy -- Andy stated that he wanted to come

16        clean.

17   Q    Did he review his rights?

18   A    Yes, he did.

19   Q    Did he acknowledge that he understood them?

20   A    Yes, he did.

21   Q    Did he waive those rights in your presence?

22   A    Yes, he did.

23   Q    All right.  Now, did you ask him questions about

24        the murder of Helen Sailor at that time?

25   A    Yes, I did.

1    Q    Now, you were aware of what he had said earlier.

2         Correct?

3    A    Correct.

4    Q    When you go into a subsequent interview knowing

5         what hasn't been said earlier, do you suggest or do

6         you remind them of what they said earlier as

7         they're giving new information?

8    A    Yes.  If they get to a point where it's -- well,

9         no, I don't.  But if it gets to a point where the

10        story is totally different, we might remind them

11        that, hey, your story is different.

12   Q    In fact, why don't you educate us a little bit on

13        how you take a statement.  What do you do in order

14        to get information from an individual that you

15        believe may be involved in a crime?

16   A    What I usually do is I would -- in this case, I

17        took Andy back to the Thanksgiving of 2002, start

18        from the morning when he woke up, and I just let

19        him talk like he did, let him answer, you know,

20        what happened next.  Okay.  What happened next.

21        Okay.  And just kind of go from there.  I don't

22        know if that answers your question.

23   Q    Uh-huh.  Even though you're aware of things that

24        such as physical evidence or what he said before,

25        do you interject that to try to get him back on

```
 1           track, or do you just let him do his thing?
 2      A    I let him do his thing.  I don't want to provide
 3           him with anything.
 4      Q    Why is that?
 5      A    Because that would appear to be leading.
 6      Q    When you spoke to Mr. Royer about a year ago and
 7           you started asking him questions abut what happened
 8           on Thanksgiving, what did Mr. Royer tell you
 9           happened on Thanksgiving of 2002?
10      A    He said that his mother came over to highrise,
11           picked him up.  He said that he left the highrise
12           with his mom at 1:00 p.m. and got back to the
13           highrise being dropped off by his mother at 4:00
14           p.m.  He said he came back to his room, he took a
15           nap --
16                MR. ZOOK:  Your Honor, may we approach.
17                     (An off-the-record discussion was held
18                      at the bench.)
19                THE COURT:  Correct, Mr. Zook, not necessary to
20      have that recorded.  Is that correct?
21                MR. ZOOK:  That's right.
22                THE COURT:  Ms. Becker, proceed.
23      BY MS. BECKER:
24      Q    Okay.  So, the defendant Andy Royer indicated that
25           he had been picked up at one dropped off at four.
```

1          What happened next?

2     A    He stated to me that he came back to the apartment,

3          took a nap, woke up, went to Martins Supermarket,

4          bought a case of beer, drank about eight years, and

5          got really drunk, and came back to his room.

6     Q    Did he say what he did when he came back to his

7          room after getting -- or came back, got really

8          drunk, and then what did he do?

9     A    Went back to bed.

10    Q    All right.  Was this consistent with the

11         information that Mr. Royer had provided before?

12    A    No.

13    Q    Okay.  Did you point that out to him?

14    A    I believe I did.

15    Q    Did he change his story at all?

16    A    He didn't change his story.

17    Q    Okay.  In fact, how many different versions from

18         the defendant were you aware of by this point?

19              THE COURT:  Excuse me.  When you say "the

20    defendant," are you referring to Mr. Royer.

21              MS. BECKER:  I'm sorry.  Andrew Royer.

22              THE WITNESS:  I believe three or four.

23    BY MS. BECKER:

24    Q    In an investigation, does that throw up some red

25         flags for you?

```
 1    A    Yes.

 2    Q    Now, the defendant Andy Royer told you during your

 3         interview he wasn't there.

 4    A    Correct.

 5    Q    Okay.  Did that alone make him a suspect just the

 6         fact that he was lying to you?

 7              MR. CRAWFORD:  Objection, your Honor.

 8              THE COURT:  Rephrase your question.

 9   BY MS. BECKER:

10    Q    The fact that it had been inconsistent from

11         previous statements?

12    A    Yes.

13    Q    Are you also familiar with the investigation as it

14         focussed around Lana Canen?

15    A    Yes, I was.

16    Q    Was Lana Canen originally interviewed by detectives

17         back when this murder occurred in 2002?

18    A    Well, they made several attempts to get ahold of

19         her, but I do not believe there was any formal

20         statement taken from her at all.

21    Q    Okay.  Do you know if they ever actually just

22         talked to her?

23    A    They did talk to her.

24    Q    Some time later, did a detective with the homicide

25         division, well, in August of 2003 have an
```

1   opportunity to interview Lana Canen?

2 A Yes.

3 Q Okay.  Did you actually conduct that interview

4   yourself?

5 A No, I did.

6 Q Did you observe that interview or parts thereof?

7 A I believe parts of it I did.

8 Q Okay.  Did Lana Canen provide a story or a version

9   of where she was on Thanksgiving of 2002?

10 A Yes, she did.

11 Q Subsequent to that, were you able to interview

12   additional witnesses to corroborate or contradict

13   that information?

14 A Yes, I was.

15 Q Did they corroborate it or contradict it?

16   MR. ZOOK:  Objection, your Honor.

17   THE COURT:  Sustained.

18   MR. ZOOK:  This is just hearsay.

19   THE COURT:  Sustained.

20 BY MS. BECKER:

21 Q Has it been your experience that when an

22   investigation does not have any suspects to begin

23   with it's difficult to put things in context?

24 A Yes.

25 Q Once you obtained the additional statements from

412

1      Andrew Royer and Lana Canen, were you able then to

2      go back and look at the original information

3      obtained and put it into context?

4  A   Yes.

5  Q   Once you have done that, do you put the entire

6      investigation together for purposes of presenting

7      it at a trial?

8  A   Yes, we do.

9      MS. BECKER:  Can I have just a moment, your

10  Honor.

11      THE COURT:  You may.

12      (An off-the-record discussion was held

13      between counsel for the state.)

14      MS. BECKER:  No further questions at this time.

15      THE COURT:  Mr. Zook, any questions?

16      MR. ZOOK:  No, sir.

17      THE COURT:  And, Mr. Crawford, any questions?

18      MR. CRAWFORD:  Thank you, your Honor.

19      CROSS-EXAMINATION

20  BY MR. ZOOK:

21  Q   Detective, when was it that you first got involved

22      in this homicide investigation?

23  A   I believe it was August of 2003.

24  Q   And you made references to the early stages of the

25      investigation.  Am I to assume that you relied upon

 1           information in making those statements earlier in

 2           your testimony?

 3      A    I don't understand the question.

 4      Q    You made statements concerning how your -- how the

 5           initial investigation began.  How were you able to

 6           come up with that information?

 7      A    I -- I read it.

 8      Q    So you read it.  You actually were not a

 9           participant in that initial investigation.  Is that

10           correct?

11      A    That's correct.

12      Q    Now, in reading those statements, did you come

13           across the various -- the various names of people

14           during the course of the investigation early on?

15      A    Yes.

16      Q    And of those individuals was an individual by the

17           name of Larry Woodridge?

18      A    Yes.

19      Q    And I believe he was resident of the Highrise.  Is

20           that correct?

21      A    That's correct.

22      Q    And also an individual by the name of Tony Thomas.

23           Is that correct?

24      A    That's correct.

25      Q    And you mentioned that the first red flags were

1        Andrew Royer and Lana Canen.  Isn't that correct?

2    A   When we -- when we took it.

3    Q   Just your portion of the investigation, not the

4        initial investigation.

5    A   That's correct.

6    Q   Okay.  So you were -- when you spoke that way, you

7        were relying upon only your portion of the

8        investigation.

9    A   Yes.  But we looked at the old -- we looked at the

10       old information.  We take that into account so that

11       when we start the new investigation, you know, we

12       form our own investigation and our -- our own

13       suspects.

14   Q   But if there were any red flags early on, those

15       might have come from either Detective Thayer or

16       Detective Christian.  Is that correct?

17   A   That's correct.

18   Q   Because they were the private investigators?

19   A   That's correct, but we still -- we still check

20       those out.

21   Q   Okay.  Now, you mentioned that you were only

22       actually involved specifically with the last

23       interview of Mr. Royer.  Is that correct?

24   A   That's correct.

25   Q   Did you have any participation whatsoever in the

```
 1            initial interviews or interrogations with Mr.

 2            Royer?

 3       A    I didn't sit in -- sit on in with Mr. Royer.  There

 4            were portions of -- of it that I witnessed on a

 5            close circuit television, but I did not participate

 6            in the room.

 7       Q    Were you there when he was driven to the Elkhart

 8            Police Department?

 9       A    Yes.

10       Q    And were you present with him when you went to

11            the -- or when he was taken to the Elkhart Police

12            Department?

13       A    Yes, I was.

14       Q    Did he comply with your request to go?

15       A    He certainly did.

16       Q    And that first time that you spoke with him, do you

17            recall the date of that?

18       A    Not off the top of my head.

19       Q    Okay.  The first time that he was spoken with, was

20            that the date of the first initial report was done

21            with Mr. Royer that same day, to your knowledge?

22       A    Yes, sir.

23       Q    And when you picked him up, do you know if he had

24            his medication before he was taken to the police

25            station?
```

1   A   I don't know for sure if he had his medication or

2       not.

3   Q   Do you know if he had it with him when he went to

4       the police station?

5   A   I don't think he did.

6   Q   That's your recollection (intelligible)?

7   A   That's my recollection.

8   Q   Do you recall what time it was that you took him to

9       the police station the first time?

10  A   It was in the morning.  I would say around close to

11      9:00 a.m.

12  Q   Now, you mentioned that you had interviewed or

13      reinterviewed a lot of witnesses in the beginning

14      of August of 2003.  Is that correct?

15  A   Yes, sir.

16  Q   Were a lot of these individuals present or located

17      at the highrise where Ms. Sailor had died?

18  A   Yes.

19          MR. CRAWFORD:  No further questions, your

20  Honor.

21          THE COURT:  Ms. Becker, any other questions?

22          MS. BECKER:  Yes, thank you.

23                  REDIRECT EXAMINATION

24  BY MS. BECKER:

25  Q   You indicated that you do refer back to the

1        original detectives and their written documentation

2        in beginning your case review.  Is that correct?

3   A   Yes.

4   Q   Is it a requirement that you go ahead and provide

5        supplements or police reports whenever you do

6        things on a case?

7   A   Yes.

8   Q   All right.  And is that something that you put in

9        as many details as you can remember?

10   A   Yes.

11   Q   And then do you rely on that when you are

12        furthering an investigation?

13   A   Yes.

14   Q   Do you take it as gospel, or do you do your own

15        investigation?

16   A   We do our own investigation.

17   Q   After reviewing what had been previously been done,

18        did you then go back out and ensure that you had

19        all of your questions answered as well?

20   A   Yes.

21   Q   All right.  Now, several names were mentioned.

22        Larry Williams, Tony Thomas.  Was further

23        investigation done with those individuals?

24   A   Yes.

25   Q   In fact, Matt Johnson, Martha Haff, many other

1      people were mentioned in this investigation.

2      Correct?

3   A  That's correct.

4   Q  Now, did the detectives in homicide focus on

5      following up on those types of leads?

6   A  Yes.

7   Q  In fact, how far did you push those kinds of leads?

8   A  We pushed them until we couldn't follow anymore.

9   Q  During this time did any evidence arrive?

10  A  No evidence.

11  Q  Well, that showed that anyone other than the

12     defendants were responsible for Helen Sailor's

13     death?

14  A  No.

15  Q  Okay.  Was there any evidence you could put your

16     finger on at all that would indicate that Tony

17     Thomas or Larry Wood or any of these other people

18     had anything to do with this?

19  A  There was no evidence.

20  Q  Mr. Crawford mentioned any other red flags.  Even

21     if it wasn't a name or a person, if there was a red

22     flag or something that didn't sit right with you in

23     the investigation, did you follow-up on it?

24  A  Yes.

25  Q  Did anything lead to any place other than the

1      defendants in this case?

2    A   Nothing else.

3    Q   And when you reinterviewed people in August of

4        2003, did you find that the information that you

5        obtained from them -- actually, strike that.  What

6        was one of the biggest challenges that you found in

7        the witnesses in this case?

8    A   The biggest challenge when reinterviewing all these

9        witnesses, a lot of them had mental -- diminished

10       mental capabilities, that was really hard.  A lot

11       of them were elderly, so a lot of them had -- they

12       had trouble communicating to you.

13           We had to, you know, we had to slow down when

14       we talked to the elderly and not be too fast just

15       so they could understand our -- our questions.  The

16       Waterfall Highrise just has a lot of tough

17       witnesses because you have the elderly, and you got

18       people with mental -- diminished mental capability.

19       That was the toughest aspect of this case.

20   Q   In light of the fact that you had these types of

21       witnesses -- well, let me ask you this.  When you

22       get a statement from somebody, even if it doesn't

23       seem to be accurate, do you still record it the way

24       that they say it?

25   A   Yes.

1    Q    Why?

2    A    Because it's their words.  It's accurate to them.

3    Q    Okay.  Can you make any firm decisions just based

4         upon looking at one statement from one person and

5         saying, boy, this is it?

6    A    No.  It's just a part of the puzzle.

7    Q    Has it been your experience that you have to wait

8         until you get everything?

9    A    Yes.

10   Q    I'm sorry.  Before you can start putting things

11        together?

12   A    That's correct.

13   Q    Is that what happened in this case?

14   A    That's what happened in this case.

15        MS. BECKER:  I don't have anything further.

16   Thanks.

17        THE COURT:  Does anybody have any other

18   questions, Mr. Crawford?

19        MR. CRAWFORD:  I do, your Honor.

20                  RECROSS-EXAMINATION

21   BY MR. CRAWFORD:

22   Q    You mentioned that several of the people that you

23        spoke to had diminished mental capacity.  Is that

24        correct?

25   A    That's correct.

```
 1      Q    During the course of your conversations with Mr.

 2           Royer and your involvement with him, would you

 3           classify him in that category?

 4      A    Yes, I would.

 5      Q    During the course of your investigation, did you

 6           come into contact with a lady by the name of Mary

 7           Jane Dejong?

 8      A    Yes, I did.

 9      Q    And did you specifically interview her?

10      A    Yes, I did.

11      Q    Was she -- do you recall during the course of your

12           investigation where she resided?

13      A    I believe it was on the tenth floor room 1001.

14      Q    About the same location area where Helen Sailor

15           resided?

16      A    Yes.

17      Q    Did you follow-up on any leads that she gave you?

18      A    Yes.  Yes, I did.

19      Q    Did those take you anywhere?

20      A    No.

21                MR. CRAWFORD:  Nothing further, your Honor.

22                THE COURT:  Mr. Zook, any questions?

23                MR. ZOOK:  No questions.

24                THE COURT:  Ms. Becker, any other questions?

25                MS. BECKER:  No questions.
```

                    STATE'S WITNESS - LARRY HAACK - (DIRECT)

1         THE COURT:  You may step down.  Counsel

2    approach, please.

3                (An off-the-record discussion was held

4                 at the bench.)

5         THE COURT:  Call your next witness.

6         MS. BECKER:  Thank you.  Larry Haack.

7         THE COURT:  Raise your right hand.

8                (The witness was sworn.)

9         THE WITNESS:  I do.

10        THE COURT:  Take the witness stand.

11                        LARRY HAACK

12   called on behalf of the State, having been first duly

13   sworn, testified as follows:

14                      DIRECT EXAMINATION

15   BY MR. WILLIAMS:

16   Q    Would you please introduce yourself to the jury?

17   A    My name is Larry John Haack.

18   Q    What's your occupation?

19   A    I'm store manager for Martins Supermarket on

20        Jackson Street, Elkhart, Indiana.

21   Q    And is that in a shopping plaza?

22   A    Yes, it is.

23   Q    What shopping plaza?

24   A    It's called Easy Shopping Center.

25   Q    You said East Jackson.  What's the specific

423

STATE'S WITNESS - LARRY HAACK - (DIRECT)

1         address?

2    A    555 East Jackson.

3    Q    How long have you been the manager for that store?

4    A    A little over ten years.

5    Q    What are your responsibilities as the manager?

6    A    Run the entire store, daily operations, scheduling.

7    Q    Are you -- I'm sorry.  Go ahead.

8    A    I could go on and on.

9    Q    Are you in charge of reviewing sales records?

10   A    Yes, I am.

11   Q    And do you document sales record each day for the

12        store?

13   A    Yes, we do.

14   Q    How does that occur?

15   A    It's actually done through a computer -- through

16        the computer.  You know, everyday we get a printout

17        of daily sales.

18   Q    Now, I want to take you back to November 28 of

19        2002.

20   A    Okay.

21   Q    Were you -- you were the manager of the store at

22        that time.

23   A    That is correct.

24   Q    What were the hours of the store on Thanksgiving

25        day of 2002?

424

1    A    We were closed that day.  We have always been

2         closed on Thanksgiving Day.  I've been with Martins

3         36 years, and we haven't been open on Thanksgiving

4         Day.

5    Q    So you have independent recollection that you

6         weren't open on November 28, 2002?

7    A    I do, and I also have sales records showing that we

8         were not open that given day.

9    Q    So there was a lack of sales records.

10   A    There was zero records.

11   Q    The next day would be Friday the 29th.

12   A    That is correct.

13   Q    Do you recall what time the store was open?

14   A    6:00 a.m.

15   Q    No further questions.

16            THE COURT:  Mr. Zook.

17            MR. ZOOK:  No questions.

18            THE COURT:  Mr. Crawford.

19            MR. CRAWFORD:  Thank you, your Honor.

20                    CROSS-EXAMINATION

21   BY MR. CRAWFORD:

22   Q    On the day before Thanksgiving, what time would you

23        have closed?

24   A    10:00 p.m.

25            MR. CRAWFORD:  No further questions.

1          THE COURT:  Mr. Williams, any other questions?

2          MR. WILLIAMS:  No, your Honor.

3          THE COURT:  You may step down, sir.  Watch your

4     step please.  Call you next witness.

5          MS. BECKER:  Can we approach?

6          THE COURT:  Certainly.

7               (An off-the-record discussion was held

8                at the bench.)

9          THE COURT:  Ladies and gentlemen, we're going

10    to let you go a couple of minutes early today for lunch.

11         During the recess, I need to tell you.  You are

12    all jurors in this case.  I must tell you now and I will

13    repeat this again each time you are permitted to

14    separate.

15         Generally, you should not express any opinion

16    about the case before it is submitted to you for

17    deliberation; however, you are permitted to discuss the

18    evidence presented in this case amongst yourselves in the

19    jury room during recesses from trial.  All jurors and

20    alternates must be present during these discussions, and

21    you must reserve judgment about the outcome of the case

22    until your deliberations begin.

23         You are admonished that you may not discuss the

24    facts of the case with anyone other than your fellow

25    jurors.

1          You may not discuss this case with me or with

2     the lawyers, parties or with any of the witnesses.

3          You should not listen to or read any outside or

4     media accounts of the trial.  You may not investigate the

5     case or attempt to obtain information outside the

6     courtroom.  It is highly improper for you to do so.  You

7     are to consider and decide this case only upon the

8     evidence received during the course of the trial in the

9     courtroom.

10          As I said, we're going to let you go a couple

11     of minutes early.  I'd like you back around 1:15.  We'll

12     try to attempt to get into the courtroom at 1:30.  This

13     is smaller town.  There are not a lot of restaurants in

14     town.  Be cautious when you're having lunch that you do

15     not overhear any conversations any of the persons in the

16     audience sections may be having if it relates to this

17     case.  Once again, you can leave your notebooks here.

18     Have a good lunch.

19               (The jury left the courtroom, and the

20               following proceedings were had.)

21          THE COURT:  The record should reflect that both

22     defendants are present, counsel for both defendants are

23     present, counsel for the state is present.  Argument has

24     just been conducted relative to the 404(B) Evidence, and

25     Court has been asked by the state to make a ruling.  The

1    Court at this time based upon the status of the record at

2    this time will not permit the introduction of any

3    evidence in front of the jury to the effect that

4    Ms. Canen traded either legally or illegally obtained

5    drugs for marijuana.

6           The reason the Court has embarked upon that

7    ruling is this.  Counsel for the state have indicated to

8    me their evidence will reflect the proposition that cash

9    money was taken being the basis of the robbery in the

10   felony murder in this case and not illegal drugs.  If no

11   illegal drugs were taken or the state is not in a

12   position to prove they were taken, it would appear to be

13   to be problematic to permit this evidence to come in that

14   the defendant traded drugs for a different type of

15   illegal drugs.

16          Now, Ms. Becker points out there is a

17   fingerprint on the drug container or a box in which the

18   drug the containers were in.  That can be tied up to Ms.

19   Canen.  That appears to me to be a horse of a completely

20   different color, and it would appear to me that evidence

21   might well be admissible.  We'll see.

22                    (A recess was taken at this time.)

23                    (The Court convened with all the

24                    parties present.  The jury entered the

25                    courtroom and the following

```
 1                    proceedings were had.)

 2             THE COURT:  Be seated, please.  Ms. Becker, Mr.

 3   Williams, call your next witness.

 4             MS. BECKER:  Thank you, Judge.

 5             MR. WILLIAMS:  State calls Matt Johnson.  Raise

 6   your right hand, sir.

 7                  (The witness was sworn.)

 8             THE WITNESS:  I do.

 9             THE COURT:  Take the witness stand.

10                  JEROME MATTHEW JOHNSON

11   called on behalf of the State, having been first duly

12   sworn, testified as follows:

13                   DIRECT EXAMINATION

14   BY MR. WILLIAMS:

15     Q   Can you tell the jury your full name?

16     A   Jerome M. Johnson.

17     Q   Do you go by Matt?

18     A   Yes.

19     Q   Matt, where do you live?

20     A   Oaklawn Apartments.

21     Q   And how long have you been at Oaklawn?

22     A   About three months I've been living there.

23     Q   Was there ever a time that you lived at the

24         Waterfall Highrise Apartments?

25     A   I lived there from October of '99 until January of
```

1           2002.

2       Q   With regard to when you lived there, were you

3           living there on Thanksgiving of 2002?

4       A   Yes.

5       Q   So when you said that you were living there as

6           of -- until January of 2002, is that correct?

7       A   Yes.

8       Q   Are you sure?

9       A   Yeah.

10      Q   I mean, phrase it this way.  Were you living at the

11          Waterfall Highrise Apartments as of November 28,

12          2002?

13      A   Yeah.  I lived there until January of 2003.

14      Q   All right.

15      A   Sorry.

16      Q   That's okay.  Do you remember what apartment you

17          were in?

18      A   1009.

19      Q   Was that on the tenth floor?

20      A   Yes.

21      Q   Did you know -- strike that.  Did you live alone?

22      A   Yes.

23      Q   And did you know a woman by the name of Helen

24          Sailor?

25      A   Yes.

```
 1      Q    How did you know her?

 2      A    She lived about four doors down from me on the

 3           tenth floor.

 4      Q    Had you ever talked with Helen?

 5      A    I opened a jar of relish for her at one time.

 6      Q    Do you remember when that was in relation to

 7           Thanksgiving of 2002?

 8      A    About -- about a year before.

 9      Q    Now, do you know a person by the name of Andrew

10           Royer?

11      A    Yes.

12      Q    Do you see Andrew Royer in the courtroom today?

13      A    Yes.

14      Q    Can you point out where he is seated and what he is

15           wearing?

16      A    He's sitting next to the gentleman in the brown

17           tweed jacket with glasses on.

18                MR. WILLIAMS:  Will the record reflect, Judge,

19      that the witness has identified the defendant Andrew

20      Royer?

21                THE COURT:  The record will so reflect.

22      BY MR. WILLIAMS:

23      Q    Matt, did you know a person by the name -- or do

24           you know a person by the name of Lana Canen?

25      A    Yes.
```

1   Q   And do you see Lana Canen in the courtroom today?

2   A   Yes.

3   Q   Can you point out where she is seated and what she

4       is wearing?

5   A   She's sitting at the end of the table in a pink

6       shirt.

7           MR. WILLIAMS:  Again, Judge, may the record

8   reflect that the witness has identified Lana Canen?

9           THE COURT:  The record will so reflect.

10  BY MR. WILLIAMS:

11  Q   Now, Matt, I want to take you back to Thanksgiving

12      day of June of 2002.  Do you recall what you did

13      that day?

14  A   I had Thanksgiving dinner with my sister.

15  Q   Who is your sister?

16  A   Martha Haff.

17  Q   What did you eat for dinner?

18  A   Ham, vegetables.

19  Q   Did you do anything else that day?

20  A   Pretty much stayed in my room, went down to the

21      lobby a couple times and got some pop.

22  Q   Now, was your sister staying with you?

23  A   Yes.

24  Q   When did she arrive at your apartment?

25  A   The night before.

432

1    Q   So the night before Thanksgiving she came over.

2    A   Yeah.  She spent the night.

3    Q   Now, on the evening of Thanksgiving, do you

4        remember having any visitors?

5    A   I think Lana and Andy stopped by.  Andy was going

6        to spend Thanksgiving with his mom.

7    Q   All right.  And in the evening hours, do you

8        remember anybody coming by other than Lana and

9        possibly Andy?

10   A   No.  I think that's it.

11   Q   Was there a time in which you went to sleep that

12       night?

13   A   I think I took a nap that afternoon.

14   Q   And in the evening hours, did you go to bed?

15   A   Yeah.  About a 11.

16   Q   Do you remember a knock at a door?

17   A   I -- at that time I didn't remember because I was

18       sleeping.  Andy knocked about midnight, and I let

19       him in and told him he could visit with my sister,

20       but I was going to go back to bed.

21   Q   So there was a knock at the door and you answered

22       it.

23   A   Yes.

24   Q   Martha was there.  Why didn't she answer the door?

25   A   She's not allowed to answer my door.

1    Q    Why is that?

2    A    Because people -- somebody's been stealing stuff

3         from people in the building and odd things had been

4         going on lately.

5    Q    Now, your sister is Martha.  Is that correct?

6    A    Yeah.

7    Q    Now, does she have any mental conditions, your

8         sister?

9    A    Yes.

10   Q    What is that?

11   A    I'm not sure of her exact diagnosis, but she's also

12        a patient at Oaklawns.

13   Q    Now, you said that you went to the door and you let

14        Mr. Royer in.

15   A    Yeah.

16   Q    Is that correct?  Did you talk with him at all?

17   A    Just besides what I told him about visiting with my

18        sister.  I went back to bed.

19   Q    Now, had Andy Royer visited your apartment before?

20   A    Yes.

21   Q    Did he normally come over that late at night?

22   A    No.

23   Q    Now, when did you -- did you find out at some point

24        that Helen Sailor had been murdered?

25   A    Emma Cox told me in the lobby Friday night.

1    Q    Is this Friday night the night of Thanksgiving?

2    A    Yes.

3    Q    Now, do you remember having a conversation about

4         the murder?

5    A    Me and my sister was discussing it that following

6         Monday I think it was.  Andy and Lana were there.

7    Q    And where were you at?

8    A    In my apartment.

9    Q    Did you say anything about the murder?

10   A    Me and my sister was talking about it, and Andy and

11        Lana didn't comment at all about it so I changed

12        the subject because I thought they felt

13        uncomfortable.

14        MR. ZOOK:  Objection, your Honor.  When he says

15   he thought they felt something.

16        THE COURT:  It would call for a conclusion or

17   speculation on the part of the witness.  The jury will

18   disregard the answer just given by the witness.  You want

19   to rephrase your question, Mr. Williams?

20        MR. WILLIAMS:  Thank you, you Honor.

21   BY MR. WILLIAMS:

22   Q    You had a conversation with your sister about Helen

23        Sailor's murder.  Is that right?

24   A    Yes.

25   Q    And Lana and Andy were present?

1    A    Yes.

2    Q    When you were talking about that, what did Lana and

3         Andy do?

4              MR. CRAWFORD:  Objection.  Asked and answered,

5    your Honor.

6              THE WITNESS:  Just more or less stared at the

7    floor --

8              THE COURT:  Wait a minute.  Hold on.  Hold on

9    just a minute.

10              MR. CRAWFORD:  I believe he's already answered

11    that portion of the question already.

12              THE COURT:  It was stricken from the record at

13    the request of Mr. Zook.

14              MR. CRAWFORD:  The latter part of it I believe.

15              THE COURT:  Well, if it has been, then it would

16    be cumulative and nonerror.  Your objection is overruled.

17              MR. WILLIAMS:  Thank your, your Honor.

18    BY MR. WILLIAMS:

19    Q    What did Andy and Lana do when you were talking

20         about this?

21    A    Just stared at the floor.  Didn't make any

22         comments.

23    Q    Now, how long have you known Andy Royer?

24    A    I met Andy at Oaklawn about a year before he moved

25         into the highrise.

436

```
 1      Q    So as of today, how long is that -- how long have

 2           you known him, do you know?

 3      A    About five years.

 4      Q    And when he lived at the Waterfall Highrise

 5           Apartments, were you friends?

 6      A    Yes.

 7      Q    Now, how long have you known Lana Canen?

 8      A    I met her about six weeks before Helen's death.

 9      Q    And did you meet her at the Waterfall Highrise

10           Apartments?

11      A    Yeah.

12      Q    Now, did Andy and Lana both live there?

13      A    Yes.

14      Q    And when I say "there," I mean the Waterfall

15           Highrise Apartments?

16      A    Yes.

17      Q    Were they friends?

18      A    Sherrie Miller brought Lana up to my apartment, and

19           that's where she met Andy at, and they became

20           friends after that.

21      Q    Did you ever see them together after that?

22      A    Lots of times.

23      Q    Did Andy ever tell you what he thought of Lana?

24      A    He felt attracted to her --

25                MR. ZOOK:  Objection.  Hearsay.
```

```
 1              THE COURT:  Hold it.  It would be hearsay,

 2   would it not?

 3              MR. WILLIAMS:  It's an admission, Judge, by a

 4   party opponent.

 5              THE COURT:  Statement of a party opponent.

 6              MR. WILLIAMS:  I'm asking what Andy --

 7              THE COURT:  It would be a statement of a party

 8   opponent.  The objection will be overruled.

 9              MR. WILLIAMS:  May I proceed, your Honor?

10              THE COURT:  You may.

11   BY MR. WILLIAMS:

12     Q   I'm going to rephrase that or ask the question

13         again.  Did Andy ever tell you what he thought of

14         Lana?

15     A   He told me one time in his own words that he'd like

16         to jump her bones.

17     Q   Now, were you contacted by the police regarding

18         Helen Sailor's murder?

19     A   Yes.

20     Q   And were you interviewed?  Were you interviewed by

21         the police?

22     A   Yes.

23     Q   And did you cooperate with their investigation?

24     A   Yes.

25              MR. WILLIAMS:  Nothing further, your Honor.
```

438

1            THE COURT:  Mr. Zook.

2            MR. ZOOK:  Thank you.

3                      CROSS-EXAMINATION

4    BY MR. ZOOK:

5    Q    Matt, when did you live there again in the

6         Waterfall Apartments?

7    A    (No response.)

8    Q    When did you live at the Waterfall apartments, from

9         when to when?

10   A    (No response.)

11   Q    When did you live in the Waterfall Apartments?

12   A    From '99 until January of last year, the year

13        before last.

14   Q    Okay.  Did you have any duties while you were

15        there?

16   A    Could you repeat that?

17   Q    Did you have any duties while you were at the

18        Waterfall Apartments?

19   A    No.  I was just a resident.

20   Q    Okay.  And this person that lived with you or was

21        staying with you, who was she again?

22   A    My sister.

23   Q    Your sister.

24   A    She would visit me.

25   Q    You need to keep in front of the microphone.

439

1    A    She would visit me from Mondays till Wednesdays.

2    Q    Okay.  Are you having problems seeing me?

3    A    No.  I have a hard time hearing.

4    Q    Okay.  So she would live with you Mondays through

5         Wednesdays.

6    A    On average, yes.

7    Q    Okay.  And she had another place to stay also.

8    A    She was living at Oaklawn Apartments at the time.

9    Q    Okay.  Back in 2002, November of 2002, were you on

10        any medication?

11   A    Was I?

12   Q    Yes.

13   A    Yes, sir.

14   Q    What would that have been?

15   A    Depakote, respridol and Paxil.

16   Q    Okay.  And what was your condition that that was

17        prescribed for?

18   A    My condition.

19   Q    Yes.

20   A    Normal/average.

21   Q    Normal/average?

22   A    About just average day, average.

23   Q    I mean, what was your medical condition that you

24        were taking the --

25   A    Bipolar disorder and anxiety.

1    Q   All right.  Thank you.

2            MR. ZOOK:  No further questions.

3            THE COURT:  Mr. Crawford, any questions?

4            MR. CRAWFORD:  Yes, your Honor.

5                    CROSS-EXAMINATION

6    BY MR. CRAWFORD:

7    Q   Just want to make sure I'm clear.  Mr. Johnson, you

8        were friends of Andy's for -- a friend of Andy's

9        for about how long, about a year and a half, two

10       years?

11   A   Between four and five years.  I didn't really

12       become his friend until after he moved into the

13       highrise.

14   Q   You spent some time together while the two of you

15       were at the highrise?

16   A   Yeah.  And drank coffee and stuff.

17   Q   Was he a frequent visitor of your place?

18   A   Yeah.

19   Q   Consider yourself to be pretty good friends?

20   A   Not real close.  Just more like acquaintance

21       because of our -- our relationship to Oaklawn.

22   Q   Okay.  So you mentioned that you were a patient at

23       Oaklawn.  Is that correct?

24   A   Yes.

25   Q   And you were receiving treatment for anxiety

1              attacks and bipolar condition.  Is that correct?

2        A    Yes.

3        Q    And you were on medication.  Is that correct?

4        A    Yes.

5        Q    Without the medication, would you ever be violent?

6              Would you ever be violent if you were not using the

7              medication?

8                   MR. WILLIAMS:  Objection, your Honor.

9                   THE WITNESS:  Could you repeat that?

10                   THE COURT:  Hold on a moment.  Counsel,

11       approach.

12                        (An off-the-record discussion was held

13                         at the bench.)

14                   THE COURT:  The Court will permit -- the

15       objection will be sustained.  The Court will permit

16       Mr. Crawford to call this witness in his own case at any

17       time of his choosing if he wishes to explore this issue.

18       Mr. Crawford, any other questions?

19                   MR. CRAWFORD:  Yes, your Honor, thank you.

20       BY MR. CRAWFORD:

21       Q    You had mentioned that you met Lana about six weeks

22            prior to this particular incident.  Is that

23            correct?

24       A    Meeting Lana?

25       Q    Yes.

1    A    Yes.

2    Q    And how often did you visit with her about --

3         during the period of time in the six weeks up to

4         the point of Ms. Sailor's death?

5    A    She'd come over to my apartment average three or

6         four times a week.  I think I went over to her

7         apartment probably four times at the most.

8    Q    Okay.  During the periods of time that you would

9         visit with Lana, was it always -- was Andy always

10        with you or were there periods of time that you

11        visited with her alone?

12   A    Most of the time.

13   Q    Most of the time he was there?

14   A    Yes.

15   Q    But there were periods of time that you visited

16        alone with her as well?

17   A    Could you repeat that?

18   Q    Were times that just you visited with her that Andy

19        was not present?

20   A    Sometimes, not too often.

21   Q    Okay.  Now, I believe you mentioned that you were

22        contacted by the police in this case.  Is that

23        correct?

24   A    Yes, sir.

25   Q    And you did cooperate with them?

STATE'S WITNESS - JEROME MATTHEW JOHNSON - (REDIRECT)

1    A    Yes.

2    Q    Were you required -- or did they ask you to give

3         fingerprints as well?

4    A    Did they ask me what?

5    Q    To take your fingerprints?

6    A    They took my picture and my fingerprints, gave me a

7         voice stress analyzer test, and took pictures of my

8         shoes.

9              MR. CRAWFORD:  Okay.  No further questions,

10   your Honor.

11             THE COURT:  Redirect.

12             MR. WILLIAMS:  Briefly, Judge.

13                      REDIRECT EXAMINATION

14   BY MR. WILLIAMS:

15   Q    Mr. Johnson, you said you were taking some

16        medication for your condition.  Is that correct?

17   A    Yes.

18   Q    And were you taking that medication in November of

19        2002?

20   A    Yes.

21             MR. WILLIAMS:  No further questions, your

22   Honor.

23             THE COURT:  Mr. Zook.

24             MR. ZOOK:  No questions.

25             THE COURT:  Mr. Crawford.

STATE'S WITNESS - JEROME MATTHEW JOHNSON - (REDIRECT)

1          MR. CRAWFORD:  No further questions, your

2     Honor.

3          THE COURT:  You may step down, sir.  Watch your

4     step, please.  Is he released from his subpoena at this

5     time from the state?

6          MS. BECKER:  Yes, your Honor.

7          THE COURT:  Mr. Crawford, yes/no.

8          MR. CRAWFORD:  At this time, no, your Honor.

9          THE COURT:  All right.  Mr. Johnson, you'll be

10    held on your subpoena.  Mr. Crawford's office will

11    contact you if you are needed.  You must remain available

12    if you're called back to testify.  Do you understand?

13         THE WITNESS:  Yes.

14         THE COURT:  Okay.  Thank you.  Call your next

15    witness.

16         MR. WILLIAMS:  Judge, the state will call

17    Martha Haff.

18         THE COURT:  Would you raise your right hand.

19              (The witness was sworn.)

20         THE WITNESS:  I do.

21         THE COURT:  Take the witness stand, please.

22    ////

23    ////

24    ////

25    ////

```
 1                           MARTHA HAFF

 2    called on behalf of the State, having been first duly

 3    sworn, testified as follows:

 4                         DIRECT EXAMINATION

 5    BY MR. WILLIAMS:

 6        Q    Can you tell the jury your name?

 7        A    (No response.)

 8        Q    Can you tell the jury your name?

 9        A    (No response.)

10        Q    Martha, could can you introduce yourself to the

11             jury?

12        A    I'm Martha Haff.

13        Q    And, Martha, where do you live?

14        A    Elkhart.

15        Q    How long have you lived in Elkhart?

16        A    How long?

17        Q    How long?

18        A    Maybe for about 30 years.

19        Q    Do you have a brother?

20        A    Matt Johnson.

21        Q    Do you visit Matt?

22        A    Huh?

23        Q    Do you visit Matt?

24        A    Yes.

25        Q    I want to take you back to November 28 of 2002,
```

```
 1          which was Thanksgiving Day.  Do you remember what

 2          you did that day?

 3     A    Huh?

 4     Q    Do you remember what you did on Thanksgiving Day of

 5          2002?

 6     A    I got up, and I went to the lobby.

 7     Q    Where were you?

 8     A    At the Waterfalls.

 9     Q    Is that the Waterfall Highrise Apartments?

10     A    Uh-huh.

11     Q    What were you doing there?

12     A    Visiting my brother.

13     Q    Did your brother live at the Waterfall Highrise?

14     A    On the tenth floor.

15     Q    Now, you said you went to the lobby.  Do you

16          remember if you did anything else that day?

17     A    I went to the lobby, and I saw Andy down there in

18          the lobby waiting for a ride from his mother I

19          think.

20     Q    Do you remember what time that was?

21     A    It was pretty early in the morning.

22     Q    At some point did you leave the lobby?

23     A    I think I did when he left.

24     Q    Did you have Thanksgiving dinner?

25     A    The people downstairs -- I think I brought in stuff
```

1              from the Faith Mission.

2        Q    So you had Thanksgiving dinner that day.

3        A    I didn't; my brother did.

4        Q    Now, you said your brother lived on the tenth floor

5              of the apartment building.  Do you remember if

6              anybody came over on Thanksgiving night?

7        A    I think Andy did.

8        Q    Now, did you know Andrew Royer back then?

9        A    Uh-huh.

10       Q    Do you see Andy in the courtroom today?  Do you see

11             Andy in the courtroom today?  Is that yes or a no?

12             Do you see him in the courtroom today?

13       A    Yes.

14       Q    Can you point out where he's seated and what he's

15             wearing?

16       A    He's wearing glasses, and it looks like he's got a

17             haircut.

18       Q    And where is he seated.

19       A    Right there between those two guys?

20             MR. WILLIAMS:  Judge, may the record reflect

21   that the witness has identified Andy Royer.

22             THE COURT:  The record will so reflect.

23   BY MR. WILLIAMS:

24       Q    Now, you said that you thought that Andy came by

25             that night.  Do you know if he came by?

1    A    It was about eleven o'clock.  Matt was already in

2         bed, and I was watching a movie on cable TV.

3    Q    And how did Andy come to the apartment?

4    A    I think he walked up in the elevator.

5    Q    Did he walk in?

6    A    Uh-huh.

7    Q    Did he have to knock on the door?

8    A    I think he knocked.

9    Q    Do you remember who answered the door?

10   A    I think I did.

11   Q    Are you sure?

12   A    It seems like it.

13   Q    Now, were you allowed to open your brother's door

14        back then?  Were you allowed to open your brother's

15        door when you lived with him?

16   A    Not really.  He got mad when I did that.

17   Q    Now, you said Andy stopped by, and you were

18        watching a movie, and this was about eleven

19        o'clock.  How long did Andy stay at the apartment?

20   A    Till about one; I think about two hours.

21   Q    And did Andy say anything to you while he was

22        there?

23   A    No.  He was awful quiet.

24   Q    Now, after Andy left around one o'clock, what did

25        you do?

                   STATE'S WITNESS - MARTHA HAFF - (CROSS)

1    A    When Matt got up to -- to lock the door, and he

2         said, "What the hell is he doing here so late?"

3    Q    And then what did you do?

4    A    I think I laid on the couch and went to sleep cause

5         it was awful late, and I was tired cause I had to

6         get up in the morning to leave.

7    Q    Were you going -- were you going back somewhere

8         after -- in the morning?

9    A    I went back home.

10            MR. WILLIAMS:  No further questions, your

11   Honor.

12            THE COURT:  Mr. Zook, any questions.

13            MR. ZOOK:  Yes.

14                     CROSS-EXAMINATION

15   BY MR. ZOOK:

16   Q    Hi.

17   A    Hi.

18   Q    Did you say that Matt had cable TV there?

19   A    Uh-huh.

20   Q    Okay.  Thank you.

21            THE COURT:  Mr. Crawford, any questions.

22            MR. CRAWFORD:  Yes, your Honor.  Just briefly.

23                     CROSS-EXAMINATION

24   BY MR. CRAWFORD:

25   Q    Ms. Haff, you mentioned that Andy had gotten there

STATE'S WITNESS - MARTHA HAFF - (CROSS)

1    about eleven o'clock.  Was that correct?

2    A   (No response.)

3    Q   And you mentioned --

4         THE COURT:  Okay.  Hold on a minute.  You have

5    to answer out loud so we can record what you're saying.

6    Could you give your answer out loud?

7    A   Yes.

8    Q   And you mentioned that he left about one o'clock.

9        Is that correct?

10   A   Yes.

11   Q   So you mentioned he stayed there for two hours.

12   A   Yes.

13   Q   And during that period of time I believe you

14       mentioned that he was awfully quiet.  Is that

15       correct?

16   A   Yes.

17   Q   Is that uncommon for Andy, or is Andy a quiet

18       person?

19   A   Seems like a quiet person.

20        MR. CRAWFORD:  No further questions, your

21   Honor.  Thank you.

22        THE COURT:  Anybody have any additional

23   questions?

24        MR. WILLIAMS:  No, your Honor.

25        THE COURT:  You may step down.  Watch your

1   step, please.  Is she released on her subpoena?

2          MR. CRAWFORD:  Yes, your Honor.

3          MR. ZOOK:  Yes, sir.

4          MR. WILLIAMS:  Yes, sir.

5          THE COURT:  She's released.  Call your next

6   witness.

7          MR. WILLIAMS:  State calls Terri Walker.

8          THE COURT:  Raise your right hand.

9              (The witness was sworn.)

10          THE WITNESS:  Yes.

11          THE COURT:  Take the witness stand, please.

12                      TERRI WALKER

13   called on behalf of the State, having been first duly

14   sworn, testified as follows:

15                  DIRECT EXAMINATION

16   BY MR. WILLIAMS:

17   Q   Could you please introduce yourself to the jury?

18   A   My name is Terri Walker.

19   Q   Ms. Walker, where do you work?

20   A   For the Elkhart Housing Authority.

21   Q   And how long have you been working for the Elkhart

22       Housing Authority?

23   A   For 20 years.

24   Q   What is your current position?

25   A   I'm a director of public housing management.

452

1    Q    And how long have you been in that position as the

2         director of public housing management?

3    A    Over eight years.

4    Q    So you were the director of the Public Housing

5         Management as of November 28, 2002.

6    A    Yes, I was.

7    Q    Now, what is the Elkhart County Housing Authority?

8    A    The Housing Authority is a government program that

9         provides housing -- subsidized housing for low to

10        moderate income families.

11   Q    And what are your duties as the director of the

12        housing portion of the organization?

13   A    I oversee the management division that leases the

14        apartment and maintains development and handle all

15        tenant issues.

16   Q    Now, you said developments.  Do you have a number

17        of developments that you manage?

18   A    Yes.  We have five different developments.

19   Q    And do you manage all five of those?

20   A    Yes, we do.

21   Q    Do you manage only those -- those developments in

22        Elkhart County?

23   A    Yes.

24   Q    Specifically, is that the city of Elkhart?

25   A    Yes.

453

```
 1    Q   Is one of the developments that you manage the

 2        Waterfall Highrise Apartments in Elkhart?

 3    A   That's correct.

 4    Q   And what's the specific address to that location?

 5    A   303 Waterfall Drive.

 6    Q   Now, can anyone live in the Waterfall Highrise

 7        Apartments?

 8    A   You must be income eligible and over the age of 18.

 9    Q   So there's some criteria you have to meet to move

10        in.

11    A   Correct.

12    Q   Anything else other than income and age?

13    A   Elderly, disabled, and handicapped is also a

14        criteria.

15    Q   So you have to be over the age of 18, income

16        dependent, and either elderly or mentally or

17        physically handicapped.

18    A   Yes.

19    Q   And that was the criteria back in November of 2002.

20    A   Correct.

21    Q   Do people that live at the Highrise receive public

22        assistance?

23    A   Yes.  They are eligible for public assistance, yes.

24    Q   Now, are you the custodian of records for the

25        organization?
```

454

1    A    Yes, I am.

2    Q    And have you reviewed some records for your

3         testimony today regarding Andrew Royer, Lana Canen,

4         and Helen Sailor?

5    A    Yes, I have.

6    Q    What records did you review?

7    A    I reviewed records for Helen Sailor.  I -- I

8         reviewed the move in and move out dates and

9         reviewed her -- the address that she resided in.

10   Q    Did you do that also for Andrew Royer and Lana

11        Canen?

12   A    Yes.

13   Q    Now, are these records that you reviewed in -- that

14        are kept in the normal course of the business of

15        the housing authority?

16   A    Yes, they are.

17   Q    I want to speak specifically about Helen Sailor

18        first.  Did she live at the Waterfall Highrise

19        Apartments as of November 28, 2002?

20   A    Yes, she did.

21   Q    Do you remember when she moved in?

22   A    Yes.  She -- our records show that her move in date

23        was October 14, 1997.

24   Q    And she stopped living there as of November 28 of

25        2002.

1    A    That's correct.

2    Q    What apartment was she in?

3    A    She was in 1002.

4    Q    And is 1002 on the tenth floor?

5    A    Yes, it is.

6    Q    With respect to Lana Canen, was she living at the

7         Waterfall Highrise Apartments as of November 28,

8         2002?

9    A    Yes, she was.

10   Q    And what was her move in date?

11   A    Here move in date was June 15, 1998.

12   Q    And her move out date?

13   A    April 1, 2003.

14   Q    What apartment was she in?

15   A    Apartment 802.

16   Q    Was she in that apartment during the entire

17        duration of while she was living at the Waterfall

18        Highrise Apartments?

19   A    Yes, I believe so.

20   Q    And again was that -- would that be on the eighth

21        floor?

22   A    Yes.

23   Q    So the numbers go 802 is on the eighth floor, 1002

24        is on the tenth floor.

25   A    That's correct.

1    Q    With respect to Andrew Royer, was he living at the

2         Waterfall Highrise Apartments as of November 28,

3         2002?

4    A    Yes.

5    Q    And, again, what was his move in date?

6    A    Andrew's move in date was December 17, 2001.

7    Q    And what was his move out date?

8    A    October 30, 2003.

9    Q    What apartment did he live in?

10   A    Apartment 507.

11   Q    And that would have been on the fifth floor.

12   A    Correct.

13        MR. WILLIAMS:  No further questions, your

14   Honor.

15        THE COURT:  Mr. Zook.

16        MR. ZOOK:  No questions.

17        THE COURT:  Mr. Crawford.

18        MR. CRAWFORD:  No questions, your Honor.

19        THE COURT:  You may step down.  Watch your

20   step, please.  Call your next witness.

21        MS. BECKER:  Thank you.  The State of Indiana

22   would call Charlie Lambert.

23        THE COURT:  Would you raise your right hand,

24   please, sir.

25             (The witness was sworn.)

1          THE WITNESS:  I do.

2          THE COURT:  Thank you.

3                   CHARLIE LAMBERT

4    called on behalf of the State, having been first duly

5    sworn, testified as follows:

6                 DIRECT EXAMINATION

7    BY MS. BECKER:

8    Q    Sir, would you please introduce yourself to our

9         jury?

10   A    I'm Charlie Lambert.

11   Q    Mr. Lambert, where do you live right now?

12   A    I live out at Overlook Apartments on 19.

13   Q    Is that here in Elkhart County?

14   A    Yes.  Just outside the city limits.

15   Q    Outside the city of Elkhart?

16   A    Yeah.  Just barely outside the city.

17   Q    Okay.  Where did you live in November of 2002?

18   A    I was living at Overlook.

19   Q    Okay.  Same place you are now?

20   A    Yeah.

21   Q    Prior to living at the Overlook, where did you

22        live?

23   A    I lived at Waterfall Highrise fifth floor.

24   Q    We're having trouble hearing you a little bit.

25   A    I'm sorry.

```
 1     Q   That's okay.  If you could just speak as loud as

 2         you can so we can all hear you.  Did you indicate

 3         you lived at the Waterfall?

 4     A   Yes, I did.

 5     Q   How long did you live at the Waterfall Highrise?

 6     A   About four and a half years.

 7     Q   Do you recall when you moved there?

 8     A   Vaguely.

 9     Q   Do you recall when you moved out?

10     A   It was September of 2001.

11     Q   Okay.  So in September of 2001, is that when you

12         moved to the Overlook?

13     A   Yes.

14     Q   Did you still maintain some friendships with

15         individuals who lived at the Waterfall?

16     A   Yeah, one or two.

17     Q   One or two.  I'd like to draw your attention to

18         November 28 of 2002, that would be Thursday,

19         Thanksgiving Day of 2002.  All right.  First of

20         all, where were you during the day that day?

21     A   I was between home and then my relatives up in

22         Michigan.

23     Q   Okay.  Whereabouts in Michigan were you relatives

24         located?

25     A   Adamsville.
```

459

```
 1    Q    What did you do at your relatives that day?

 2    A    We had a family dinner, you know, socializing.

 3    Q    Do you recall what time you left your relative's

 4         house in Michigan?

 5    A    Somewhere between probably six and quarter after.

 6    Q    On your way home that evening, did you make any

 7         stops?

 8    A    One.

 9    Q    Where?

10    A    It was at the Highrise.

11    Q    Why did you stop that Highrise Thanksgiving

12         evening?

13    A    I'm not really sure other than to see some friends.

14    Q    Okay.  Did you feel like visiting a little bit?

15    A    Yeah.  I was in no rush to get home.

16    Q    Okay.  Was it a holiday kind of making you feel

17         warm?

18    A    Yeah.

19    Q    All right.  When -- who specifically were you

20         hoping to see at the highrise?

21    A    I think it might have been Randy.

22    Q    Okay.  Do you remember Randy's last name?

23    A    Skofferland (phonetic).

24    Q    Do you recall what time it was when you got to the

25         highrise that evening?
```

[8/8/2005] 20050809CanenRoyer

1    A    Probably 25 after, 6:30.

2    Q    How long did it take to get to the highrise from

3         your relatives in Michigan?

4    A    About 15, maybe a few more minutes.

5    Q    So it was pretty close.  When you got to highrise,

6         where did you -- well, first of all, how did you

7         get there?  What kind of vehicle did you use?

8    A    I was driving a Toyota Camry at the time.

9    Q    When you arrived, where did you park your car?

10   A    In one of the visitor's spots in one of the

11        handicap areas I think.

12   Q    Well, did you have anyone with you at the time?

13   A    Nope.

14   Q    Did you see anyone outside walking around when you

15        arrived?

16   A    One person.

17   Q    Who was that?

18   A    The defendant there, Lana.

19   Q    Okay.  You just identified someone as Lana and then

20        used your finger to point.  First of all, you're

21        going to have to speak up a little bit more.

22        Sorry.  How do you know a person by the name of

23        Lana?

24   A    I met her when I was living there.

25   Q    Living where?

```
 1     A    At Waterfall.

 2     Q    Okay.  And when you refer to Lana, do you know her

 3          last name?

 4     A    I do, but I'm not sure how to pronounce it.

 5     Q    Okay.  How do you -- do your best shot?

 6     A    Canon I would assume.

 7     Q    Okay.  Do you see -- you've indicated you see her

 8          in the courtroom today.  Would you describe what

 9          she is wearing so that the record knows who you're

10          talking about it?

11     A    It looks like a pink blouse.

12     Q    Okay.  Where is she seated in the courtroom?

13     A    Over here to my left.

14          MS. BECKER:  To your left.  Would the record

15     please reflect this witness has identified the defendant

16     Lana Canen.

17          THE COURT:  The record will so reflect.

18     BY MS. BECKER:

19     Q    As you drove up, parked your car, and saw the

20          defendant Lana Canen outside the highrise, did you

21          stop and talk to her at that point?

22     A    Probably for a couple minutes.

23     Q    Okay.  What did you do next?

24     A    I went inside, signed in.

25     Q    Did you visit with anyone while you were inside?
```

1   A   Yeah.  There was some people in the TV room.

2   Q   Do you remember who you spoke to in the TV room?

3   A   Maybe one, and she has since past on.

4   Q   Okay.  Do you know someone by the name of Flo

5      Macioce?

6   A   Yes, I do.

7   Q   Do you remember if you saw her in the TV room when

8      you got there?

9   A   No, I don't.

10   Q   No you didn't see her, or no you don't remember?

11   A   I don't remember.

12   Q   Where did you go from the TV room?

13   A   I might have talked to a of couple ladies that were

14      in the laundry room.

15   Q   Did you see your friend Randy?

16   A   I don't believe he was there now that I think about

17      it.

18   Q   At some point, then, did you leave the Highrise?

19   A   Yes, I did.

20   Q   What did you do when you left the Highrise?

21   A   The more I think about it, I -- I probably took

22      somebody somewhere.

23   Q   Who did you take somewhere?

24   A   Once again, it would have been the defendant.

25   Q   I'm sorry.  I can't hear you.

```
 1    A    I'm sorry.  It would have been the defendant.

 2    Q    Okay.  Which defendant are we talking about?

 3    A    Lana.

 4    Q    Lana.  Where did you take Lana after you left the

 5         highrise?

 6    A    Over off Oslo and Bristol Road to her boyfriends.

 7    Q    Any idea what time of day it was when you drove the

 8         defendant over to Oslo?

 9    A    Probably somewhere between quarter of and seven.

10    Q    And when you say quarter of, you're referring

11         quarter till seven, seven o'clock?

12    A    Yes.

13    Q    Okay.  How was Lana behaving when you left the

14         highrise and still saw her outside?

15    A    I'd have to say probably normal like anybody else,

16         you know, just hanging out there, you know, whether

17         it's just to relax.  I don't know.

18    Q    What did you see her doing?

19    A    When I drove up?

20    Q    Yes.

21    A    Like, standing right at the main entrance, went to

22         the east end of the building like she was looking

23         around the corner, and did the same going to the

24         west.

25    Q    Okay.  How many times did you observe her do that?
```

```
 1     A   At least two each way.

 2     Q   Okay.  After you came out of the highrise from

 3         being inside visiting, was she still walking back

 4         and forth?

 5     A   No.  She was waiting to talk to me again.

 6     Q   And when you came out, did you stop and talk to

 7         her?

 8     A   Yeah.

 9     Q   Did she ask you any questions?

10     A   If I could take her somewhere.

11     Q   And did you agree to do that?

12     A   Yes.

13     Q   Did you drive your car to do that?

14     A   Yes.

15     Q   Anybody else leave with you?

16     A   No.

17     Q   Do you know if anybody saw you leave?

18     A   If there was anybody down in the -- in the -- the

19         main entrance area, it would have been somebody

20         from there if anybody; and possibly the people in

21         the TV room.

22     Q   Okay.  Did you and the defendant, Lana Canen, talk

23         at all between the time you left the highrise until

24         the time you got out to Bristol and Oslo Road?

25     A   I'm sure we did.
```

```
1     Q    Do you recall what the conversation was about?

2     A    No.  She was just trying to describe to me how to

3          get out to where I was taking her.  That's the only

4          thing I can say.

5     Q    Did you talk about anything else?

6     A    I have no recollection of that.

7     Q    Was there anything about the way she was behaving

8          while you were driving that made you uncomfortable?

9     A    No.

10         MR. ZOOK:  Objection, your Honor.  This is

11    leading.

12         THE COURT:  Well --

13         MS. BECKER:  It doesn't suggest an answer.

14         THE COURT:  I'm not sure it's leading.  His

15    answer was no.  Do you want the answer stricken or --

16         MR. ZOOK:  No.  I'm withdrawing my objection.

17         THE COURT:  You're withdrawing your objection.

18    All right.

19    BY MS. BECKER:

20    Q    Do you recall whether the defendant, Lana Canen,

21         had anything with her in her hands while you saw

22         her when you took her out to --

23    A    One large duffel bag I'd say about that long about

24         that high.

25    Q    Okay.  So the record reflects what your hands were
```

1    just doing, how wide would you say your fingers

2    were apart?

3  A  Between 18 and 20 inches.

4  Q  And how tall were you reflecting?

5  A  Maybe between four to six or maybe taller.

6  Q  Do you recall what color that bag was?

7  A  Black, white and red.

8  Q  Had you seen that bag before or a bag like it?

9  A  I had seen one like it.

10 Q  Okay.  What kind of a bag would you characterize it

11   as?

12 A  It's one of those special offer duffel bags.

13 Q  From what company?

14 A  It was from Marlboro.

15 Q  Okay.  After you took Lana out to Bristol and Oslo

16   Road somewhere around 6:45, 7:00 o'clock p.m. that

17   night, a few days later did you come back to the

18   highrise?

19 A  I might have.

20 Q  Do you recall speaking to Flo Macioce in the

21   laundry room?

22 A  Yes, I do.

23 Q  Okay.  What did you say to Flo Macioce?

24 A  We were talking about what had transpired.

25 Q  Okay.  What did you say to her, do you remember?

```
 1    A    Other than I was surprised to see what had

 2         happened.

 3    Q    What are you referring to?

 4    A    The passing of Helen.

 5    Q    What else do you remember talking to Flow about?

 6    A    I had made a statement to her saying I -- I guess I

 7         wish I hadn't got involved but yet I was.

 8    Q    What do you mean by that?

 9    A    That I had showed up there that night and took the

10         defendant out to her boyfriend's.

11    Q    Who are you referring to?

12    A    Lana.

13    Q    Did Lana say anything to you on that trip that made

14         you nervous?

15    A    I am -- I'm not sure but I -- on that.

16    Q    Okay.  A few days later you're talking to Flo, do

17         you remember what else you said to her?

18    A    No, I don't.

19    Q    Do you remember asking her about keys?

20    A    About what?

21    Q    Keys.

22    A    No.

23    Q    Okay.  Do you remember asking Flo not to say

24         anything about your taking Lana?

25              MR. ZOOK:  Objection, your Honor, this is
```

1   leading.

2            THE COURT:  It is leading.  Objection will be

3   sustained.

4   BY MS. BECKER:

5       Q   Do you remember saying anything else to Flo about

6           Lana?

7       A   No, I don't.

8       Q   Did you have any concern that someone had seen you

9           drive Lana from the Waterfall?

10      A   I don't remember having any concern about who saw

11          me.

12           MS. BECKER:  May I have just a moment, please.

13               (An off-the-record discussion was held

14                between counsel for the state.)

15           MS. BECKER:  No further questions.  Thank you.

16           THE COURT:  Mr. Zook, any questions.

17                     CROSS-EXAMINATION

18  BY MR. ZOOK:

19      Q   Charles, do you remember what the weather was that

20          evening, Thanksgiving evening when you gave Lana a

21          ride?

22      A   Probably a little bit on the cool side.

23      Q   Okay.  Was it raining or not?

24      A   No, it wasn't.

25      Q   It wasn't?

1    A    No.  I don't recall any rain.

2    Q    Okay.  Was it cloudy?

3    A    It could have been partly cloudy.

4    Q    It could have been.

5    A    Yeah.  I'm not for sure.

6    Q    Thank you.  No more questions.

7         THE COURT:  Mr. Crawford.

8         MR. CRAWFORD:  Thank you, your Honor.

9                    CROSS-EXAMINATION

10   BY MR. CRAWFORD:

11   Q    Charles, when you approached the highrise on

12        Thanksgiving, the only person you initially saw up

13        front was Lana Canen.  Is that correct?

14   A    Yes.

15   Q    And the only person that got away -- or left with

16        you in the car was Lana Canen.  Is that correct?

17   A    Yes, it is.

18   Q    And you testify that at the time she left she had

19        some items with her.  Is that correct?

20   A    Yes.

21        MR. CRAWFORD:  No further questions, your

22   Honor.

23        MS. BECKER:  No redirect.

24        THE COURT:  You may step down, sir.  Watch your

25   step.  Ladies and gentlemen, we're going to take a break.

1    Once again, I need to remind you.  You are all jurors in

2    this case.  I must tell you now and I will repeat this

3    again each time you are permitted to separate.

4              Generally, you should not express any opinion

5    about the case before it is submitted to you for

6    deliberation; however, you are permitted to discuss the

7    evidence presented in this case amongst yourselves in the

8    jury room during recesses from trial.  All jurors and

9    alternates must be present during these discussions.  You

10   must reserve judgment about the outcome of the case until

11   your deliberations begin.

12             You are admonished that you may not discuss the

13   facts of the case with anyone other than your fellow

14   jurors.

15             You may not discuss this case with me or with

16   the lawyers, parties or with any of the witnesses.

17             You should not listen to or read any outside or

18   media accounts of the trial.  You may not investigate the

19   case or attempt to obtain information outside the

20   courtroom.  It is highly improper for you to do so.  You

21   are to consider and decide this case only upon the

22   evidence received during the course of the trial in the

23   courtroom.

24             (A recess was taken at this time.)

25             (The Court convened with all the

```
 1                    parties present.  The jury entered the

 2                    courtroom and the following

 3                    proceedings were had.)

 4          THE COURT:  Be seated, please.  Call your next

 5   witness.

 6          MS. BECKER:  Thank you, your Honor.  The state

 7   would call Florence Macioce.

 8          THE COURT:  Now, would you raise your right

 9   hand, please.

10                    (The witness was sworn.)

11          THE WITNESS:  I do.

12          THE COURT:  Thank you.  Ms. Becker.

13                    FLORENCE MACIOCE

14   called on behalf of the State, having been first duly

15   sworn, testified as follows:

16                    DIRECT EXAMINATION

17   BY MS. BECKER:

18   Q    Good afternoon, ma'am.  Would you please tell the

19        jury who you are?

20   A    Florence Macioce.

21   Q    Okay.  Florence, where did you live in November of

22        2002?

23   A    303 Waterfall Drive, Apartment 812.

24   Q    Is that also known as the Waterfall Highrise?

25   A    Yes.
```

1   Q   How long had you lived at the Waterfall Highrise by

2       that time?

3   A   Seven years that time, but I lived there before.

4   Q   Did you know someone by the name of Helen Sailor?

5   A   Yes.

6   Q   Okay.  Were you friendly with Helen?

7   A   Yes, we talked.

8   Q   The reason I want to draw your attention to

9       Thanksgiving evening of 2002, I want to ask you

10      about who you saw that evening.  First of all, do

11      you remember where you were during the day?

12  A   Yes.  I was at home, then I went downstairs in the

13      lobby.

14  Q   Okay.  Do you recall seeing Charlie Lambert that

15      evening?

16  A   Twice, yes.

17  Q   How long had you known Charlie lambert?

18  A   Approximately eight years.

19  Q   Okay.  Did you recognize him by sight?

20  A   Yes.

21  Q   All right.  Where did you see Charlie Lambert that

22      night?

23  A   First in the elevator, and then when he came out

24      into the lobby to go out the front door.

25  Q   Did you talk to Charlie Lambert at all?

1    A    I said Hi, but he left.

2    Q    Okay.  So you didn't have a very long conversation.

3    A    No.

4    Q    All right.  Did there also come a time where you

5         saw a person known as Lana Canen at the highrise?

6    A    Yes.

7    Q    First of all, do you know someone by the name of

8         Lana Canen?

9    A    Yes.

10   Q    Do you see that person in the courtroom today?

11   A    Yes.

12   Q    Would you please describe what she is wearing and

13        where she is seated so we all know who you're

14        speaking of?

15   A    In this, like, pinkish orangish top, sitting right

16        over there with the long black hair.

17   Q    All right.  Is she seated off to your left?

18   A    Yes.

19        MS. BECKER:  Would the record please reflect

20   this witness has identified the defendant, Lana Canen?

21        THE COURT:  The record will so reflect.

22   BY MS. BECKER:

23   Q    Did you also know a person by the name of Andrew

24        Royer?

25   A    Yes.

1    Q    How do you know Andrew Royer?

2    A    He lived in the same building?

3    Q    Do you see Andrew Royer in the courtroom today?

4    A    Yes.  He's right there.  He has glasses on and

5         orange shirt with flowers or whatever.

6    Q    Is he also off to your left?

7    A    Yes, correct.

8              MS. BECKER:  Would the record please reflect

9    this witness has identified the defendant, Andrew Royer.

10             THE COURT:  The record will so reflect.

11   BY MS. BECKER:

12   Q    Now, when you saw the defendant Lana Canen at the

13        Waterfall Highrise, where was she?

14   A    On Thanksgiving evening you mean?

15   Q    On Thanksgiving evening.

16   A    Outside towards the left of the building.

17   Q    What did you see Lana Canen doing outside on

18        Thanksgiving evening?

19   A    Just pacing.

20   Q    Did you actually sit there and watch her?

21   A    No.  I kind of seen her just walking by back and

22        forth.

23   Q    After Charlie Lambert left that evening, did you

24        see Lana Canen any more?

25   A    No.

475

```
 1      Q   Now, Flo, I want to take you a couple weeks later.

 2          Were you still living at the highrise at that time?

 3      A   Yes.

 4      Q   Did you come into contact with Charlie Lambert

 5          again at that time?

 6      A   It's about approximately four weeks later.

 7      Q   About four weeks later.

 8      A   Yes.

 9      Q   Where were you located when that happened?

10      A   I was coming out of the elevator going towards the

11          lobby to go out.

12      Q   Okay.  Where is the laundry room located?

13      A   As soon as you get off the elevator directly ahead.

14      Q   Okay.  Was it in that general vicinity where you

15          ran into Charlie Lambert?

16      A   Yes.  They call it -- Charlie was sitting in the

17          laundry room, and there was another resident.  They

18          called me into the laundry room.  I had a

19          conversation with Charlie.

20      Q   Okay.  I'm going to ask you about the conversation

21          you had with Charlie.  Did Charlie ask you any

22          questions?

23      A   After -- after he told me --

24              MR. ZOOK:  Objection, your Honor.  This is

25      getting into hearsay at this point.
```

```
 1              THE COURT:  Well, this is a yes or no question
 2    at this point.  The question was: "Did Charlie ask her
 3    any questions.  Without saying what the questions were or
 4    were not, can you answer that question?
 5              THE WITNESS:  Yes.
 6              THE COURT:  Okay.  What is your answer to that
 7    question?
 8              THE WITNESS:  Yes.
 9      Q   What did Charlie ask you?
10              MR. ZOOK:  Hearsay.
11              MS. BECKER:  May we approach?
12              THE COURT:  Sustained.
13              MS. BECKER:  May we approach?
14              THE COURT:  You may.
15                   (An off-the-record discussion was held
16                    at the bench.)
17              THE COURT:  The objection will be sustained.
18    BY MS. BECKER:
19      Q   Ms. Macioce, you indicated that you had a
20          conversation with Charlie Lambert approximately
21          four weeks later.
22      A   Yes.
23      Q   During that conversation, did you encourage him to
24          do something?
25      A   Yes.
```

STATE'S WITNESS - FLORENCE MACIOCE - (CROSS)

1    Q    What did you encourage him to do?

2    A    I encouraged him to go down and talk to the police

3         department about what he spoke to me about.

4    Q    Okay.  I don't have any further questions.  Thank

5         you.

6              THE COURT:  Mr. Zook.

7              MR. ZOOK:  No questions.

8              THE COURT:  And Mr. Crawford.

9                    CROSS-EXAMINATION

10   BY MR. CRAWFORD:

11   Q    Ms. Macioce, you had indicated that you had seen

12        Lana Canen outside the apartment complex on

13        November 28, 2002.  Isn't that correct?

14   A    Correct.

15   Q    And she was the only person you'd seen outside the

16        apartment complex on that date in question.  Isn't

17        that correct?

18   A    Correct.

19             MS. BECKER:  No further questions, your Honor.

20             THE COURT:  Ms. Becker, any additional

21   question?

22             MS. BECKER:  No redirect?

23             THE COURT:  Anyone else have any questions for

24   this witness?

25             MR. ZOOK:  No, sir.

```
 1              THE COURT:  You may step down.  Watch your

 2     step, please.  Is she released?

 3              MS. BECKER:  Yes, your Honor.

 4              THE COURT:  Mr. Zook, Mr. Crawford.

 5              MR. ZOOK:  Yes, sir.

 6              MR. CRAWFORD:  Yes, your Honor.

 7              THE COURT:  She'll be released on her subpoena.

 8     Call your next witness.

 9              MS. BECKER:  Thank you.  State of Indiana would

10     call Detective Carl Conway.

11              THE COURT:  Raise your right hand, sir.

12                  (The witness was sworn.)

13              THE WITNESS:  Yes, sir.

14              THE COURT:  Take the witness stand, please.

15                          CARL CONWAY

16     called on behalf of the State, having been first duly

17     sworn, testified as follows:

18                       DIRECT EXAMINATION

19     BY MS. BECKER:

20      Q    Good afternoon.  Would you please introduce

21           yourself to our jury?

22      A    I'm Carlton Dean Conway.

23      Q    Mr. Conway, what do you do for a living?

24      A    I am currently employed as a Detective with the

25           Elkhart City Police Department.
```

1   Q   How long have you been at the Ekhart City Police

2       Department?

3   A   I've been with Elkhart City since 1998.  I was with

4       South Bend Police Department since 1996 before

5       that.

6   Q   Okay.  Before you became a police officer, did you

7       attend any special schooling?

8   A   Yes.

9   Q   Where did you go?

10  A   Went to the Indiana State Law Enforcement Academy.

11  Q   During the academy, did you learn different tactics

12      as far as policing is concerned and interviewing

13      tactics?

14  A   Yes, ma'am.

15  Q   Since that time, have you received additional

16      training in the areas of interviewing -- well, why

17      don't you tell us what your training is?

18  A   Since back in the detective bureau, I have gone to

19      two different interview schools.  One for basic

20      interviewing and interrogation also an advanced

21      interview and interrogation school put on by the

22      Reid Corporation.  And I've also gone down to the

23      Southern Police Institute which is a homicide

24      school.  It's put on down at the University of

25      Louisville.

```
 1      Q    A couple of years ago, were you a part of the

 2           homicide team that was formed at the Elkhart Police

 3           Department?

 4      A    Yes, ma'am, I was.

 5      Q    During that time, did you have the occasion to take

 6           over the investigation of the murder of Helen

 7           Sailor?

 8      A    Yes, ma'am, I did.

 9      Q    What did you do when you first got this case?

10      A    When I first got the case, I spent a long duration

11           of time just reviewing documentation that already

12           existed from the previous investigator.

13      Q    Okay.  Who were the previous investigators?

14      A    D'Andre Christian was the primary that originally

15           had the case.

16      Q    Was Detective Todd Thayer involved in the original

17           investigation as well?

18      A    Yes.  Detective Todd Thayer and D'Andre Christian

19           they work in -- in conjunction with each other as

20           part of a homicide investigation before the

21           homicide unit was organized.

22      Q    Now, when you got this case and started looking at

23           it, at the time that you picked it up, was it

24           considered a cold case, or was it considered just

25           one that you needed to look at?
```

481

```
 1    A   A cold case is when you go ahead and you've
 2        exhausted every avenue, every lead, and then we
 3        also have what we call unresolved cases where there
 4        still may be some work that could be looked into.
 5        At our opinion, it was more of an unresolved case.
 6    Q   Okay.  And when you looked at this case, did you
 7        then go back through with a fine tooth comb and
 8        follow up on all of these leads?
 9    A   Yes, ma'am.
10    Q   All right.  Now, after following up on all of these
11        leads, did there come a time when the attention
12        shifted to two specific individuals?
13    A   Yes, ma'am.
14    Q   Who were those people?
15    A   Lana Canen and Andrew Royer.
16    Q   Now, after -- let me ask you this.  Did there come
17        a time when you or a member of your team spoke to
18        Nina Porter?
19    A   Yes, ma'am.
20    Q   Did she provide you information that assisted in
21        this investigation?
22    A   Yes, ma'am, she did.
23    Q   After speaking to Nina and getting that
24        information, who did you directly go to?
25    A   Andrew Royer.
```

```
 1    Q   When you came into contact with Andrew Royer,

 2        explain to us how that came about?

 3    A   After obtaining the information from Nina Porter,

 4        we collectively thought about it.  We decided to go

 5        try to take -- try to interview Andy about the

 6        homicide; and we went to this apartment, introduced

 7        ourselves told him why we wanted to speak to him,

 8        invited him down to the police department.  He

 9        willingly accompanied us.

10    Q   Who is we?

11    A   I'm not quite sure who was with me at the time.  I

12        believe it might have been Lieutenant Posthuma or

13        Sergeant Bill Wargo.  I'm not quite sure.

14    Q   And at that time, did the defendant, Andy Royer,

15        come with you?

16    A   Willingly, absolutely.

17    Q   All right.  Who drove him there?

18    A   I did.

19    Q   On the way there, did you talk about anything?

20    A   No.  He was over at the Waterfall Highrise.  It's

21        only about a block and a half from the police

22        department, relatively a quick drive.

23    Q   Okay.  Once you got to the police department, what

24        happened?

25    A   We got to the police department.  Went ahead and
```

1          escorted Andy into one of the interview rooms.  At

2          that time we, like I said, once again, we

3          reiterated why we were talking to him, advised him

4          of his Miranda Rights, told him that we were

5          looking at him in reference to having possible

6          involvement in Helen Sailor homicide.  He waived

7          his right to writing, and then we proceeded to have

8          an interview.

9      Q   Okay.  Let's back up just a little bit.  Do you

10         remember specifically what you told him as far as

11         why you were talking to him?

12     A   I told him that we had obtained information saying

13         that he was involved with the murder of Helen

14         Sailor.

15     Q   When you told the defendant, Andrew Royer, that,

16         how did he respond?

17     A   He had been -- originally, he was out of denial,

18         but he was -- wasn't very confrontational about it.

19         He seemed pretty relaxed about the whole situation.

20     Q   You also indicated that you read him his Miranda

21         Warnings.  What are the Miranda Warnings?

22     A   Anytime we start an interview with any potential

23         suspect, we have a legal rights advise form which

24         we'll go ahead and advise him of the Miranda

25         Warnings kind of what you see on TV and -- and if

484

| | | |
|---|---|---|
| 1 | | they agree to talk to us, we request a signature, |
| 2 | | and then we go ahead and sign as a witness where |
| 3 | | it's time and dated. |
| 4 | Q | Did you have a conversation with Andrew Royer about |
| 5 | | his Miranda Warnings? |
| 6 | A | Yes, ma'am. |
| 7 | Q | Did he appear to understand you? |
| 8 | A | Yes, ma'am, completely. |
| 9 | Q | In fact, did you have different conversations with |
| 10 | | him. |
| 11 | | (The witness coughed.) |
| 12 | Q | I'm sorry.  Do you need some water? |
| 13 | A | No.  I'm okay.  Thank you. |
| 14 | Q | Did you have conversations with him so that you |
| 15 | | could get a feel for what his level of |
| 16 | | understanding was? |
| 17 | A | Yes, ma'am. |
| 18 | Q | Okay.  Did you believe that he understood the |
| 19 | | Miranda Warnings when you provided them to him? |
| 20 | A | 100 percent. |
| 21 | Q | And did he execute that sheet indicating he |
| 22 | | understood and was waiving his right? |
| 23 | A | Yes, ma'am.  He reviewed it.  We reviewed it |
| 24 | | together.  He signed it in agreement to speak with |
| 25 | | me. |

1    Q    Okay.  Now, how did you conduct an interview with

2         Mr. Royer?

3                    (A cell phone rang in the courtroom.)

4             THE COURT:  Anybody who has a cell phone, let's

5    get it turned off right now.  Does everybody have their

6    cell phone or pager turned off?

7    BY MS. BECKER:

8    Q    How did you conduct an interview with Andrew Royer?

9    A    Well, obviously due to the nature of the topic, we

10        originally start off what we call a preinterview at

11        that time.  But we'll sit there.  We'll just have

12        casual conversation, just trying to build a base

13        rapport with the individual, and then gradually

14        ease our way into the topic at hand.

15   Q    Okay.  Is this something that takes time to do?

16   A    It can take a long time to do.

17   Q    What time, if you recall just general, did you

18        bring Andrew Royer to the police department that

19        day?

20   A    It was -- if I can refer to the Miranda Rights

21        Form, I believe the time would be on that.

22   Q    I'm going show you what's been marked for

23        identification purposes as State's Exhibit 15.  Do

24        you recognize this?

25   A    Yes, ma'am.  This is the Miranda Rights Form filled

1       out by me and Mr. Royer.

2    Q   Okay.  Does this accurately depict the -- the

3        Miranda Rights form that you personally executed

4        with the defendant, Andrew Royer?

5    A   Yes, ma'am.  This is a carbon copy of it yes,

6        ma'am.

7    Q   What date did that interview occur?

8    A   September 3, 2003.

9    Q   All right.  And what time did that occur?

10   A   As written on here, it was 9:34 a.m.

11            MS. BECKER:  Okay.  Thank you.  State would

12   move to admit what's been marked for identification

13   purposes as State's Exhibit 15.

14            MR. ZOOK:  No objection.

15            MR. CRAWFORD:  No objection, your Honor.

16            THE COURT:  State's Exhibit No. 15 will be

17   admitted without objection.

18            MS. BECKER:  State declines publication at this

19   time.

20   BY MS. BECKER:

21   Q   So about 9:30 in the morning you go through rights

22       and then you do this preinterview process.

23   A   Yes, ma'am.

24   Q   What -- why do you do a pre-interview?

25   A   Like I said, just to go ahead and build a rapport

1    at first, and then obviously due the topic at hand

2    there is denials.  It's kind of almost like a -- I

3    mean, it's -- it's an interview where we're trying

4    to go ahead basically sift through, I guess, the

5    nonsense that's going on.  In fact, it can take

6    quite a long amount of time.

7  Q  Okay.  Is this recorded either audiotaped or some

8    other method?

9  A  At that time, no, it was not.

10  Q  Why not?

11  A  Well, that was the procedure that our police

12    department had established at the time.

13  Q  Okay.  And how long did it normally take to get

14    through a pre-interview with an individual who is a

15    suspect in a homicide?

16  A  It -- it -- it -- there's no set time.  This

17    particular one was only a matter of a couple of

18    hours, two or three hours.

19  Q  All right.  You started about 9:30.  Did you

20    provide any breaks in there?

21  A  Yes, ma'am.

22  Q  What kind of breaks.

23  A  We brought Mr. Royer food.  He was allowed to use

24    the restroom.  He basically -- we made him -- we

25    made very well aware that he was -- basically any

1        need -- any need he had he was allowed to let us

2        know and we would try to accommodate him anyway we

3        could.  He was allowed to have cigarette breaks.

4    Q   During this pre-interview, was there any

5        question that -- where he was understanding you?  I

6        mean, were you able to communicate with him?

7    A   Absolutely.

8    Q   Okay.  During the preinterview, did there come a

9        time when the defendant, Andrew Royer, began to

10       make some admissions to you about Helen Sailor's

11       murder?

12   A   Yes, ma'am.

13   Q   Before we go any further, first of all, do you see

14       person that you were speaking to that you've

15       referred to as Andrew Royer in the courtroom today?

16   A   Yes, ma'am.

17   Q   Would you please describe what he is wearing and

18       where he is seated in the courtroom?

19   A   Dark haired gentleman wearing a cream colored

20       short-sleeve shirt, glasses sitting just beside

21       Mr. Crawford.

22            MS. BECKER:  Thank you.  Would the record

23   please reflect this witness has identified the defendant,

24   Andrew Royer.

25            THE COURT:  The record will so reflect.

```
1    BY MS. BECKER:

2    Q    When you were talking to the defendant, were there

3         any techniques that you have used that you found

4         helpful in getting the defendant to open up to you?

5    A    Just basically it was what we refer to as a

6         retechnique.  It's one of the techniques we learned

7         during interview school.

8    Q    What is that?

9    A    Basically, we -- as we talk to the person, we

10        openly confront them with the situation and the

11        knowledge that we have in reference to their

12        participation in the crime, and Mr. Royer was very

13        susceptive to it, and he openly admitted that he

14        committed the homicide.

15   Q    How much information do you actually give?

16   A    Oh, we would try -- we try not to give any at all.

17   Q    Okay.  When -- help us understand what you're

18        talking about here.  For example, you confront them

19        with something, but yet what do you hold back?

20   A    We basically hold the back primary details.  When

21        we confront them with very vague generalized

22        information that we have whether we say, you know,

23        we do have witness statements.  There is evidence.

24        We are very vague and generalized.  And what it is

25        and then when it comes time when they do confess to
```

1      them that way it gives them the opportunity to give

2      us the details of the incident that we'll go ahead

3      and corroborate that they did actually commit the

4      crime.

5   Q   Okay.  Why would you hold back details?  I mean,

6      that's a way to get them to talk, isn't it?

7   A   Well, it's also a way you can also feed them

8      information that they can go ahead and either

9      one -- it can -- they can go ahead and -- they can

10     go ahead and create their own defense on, or it can

11     also -- they can also use that as saying that we

12     forced them to say these things.

13  Q   Okay.  In your experience as a detective, do you

14     give details in your interviews?

15  A   Very limited; very limited.

16  Q   Okay.  When you were interviewing the defendant,

17     Andrew Royer, for first time on September 3, did

18     you give him any details about Helen Sailor's

19     murder?

20  A   No.  As a matter of fact, in Mr. Royer's case I

21     made a point not to do it.

22  Q   Why not?

23  A   I mean, I -- we were well aware of Mr. Royer,

24     and -- and of -- we had limited knowledge about his

25     mental background.  So I definitely wanted to make

1       a point not to give to Mr. Royer just for the sheer

2       fact that he might go ahead and dispose of the

3       concept that we might have been spoon feeding him

4       information.

5   Q  Okay.  Now, during this preinterview when the

6       defendant, Andrew Royer, started giving you details

7       about the murder of Helen Sailor, what specifically

8       did he tell you he did?

9   A  He gave renditions of it; but for the most part, he

10      openly admitted that he went into Helen Sailor's

11      apartment and he strangled her, and then he was

12      able to give us details about how he committed the

13      strangulation along with what he did to dispose of

14      some of the evidence that was -- that we found

15      during the original investigation that corroborated

16      what he was saying.

17   Q  Okay.  Did he demonstrate anything for you?

18   A  Yes, ma'am, he did.

19   Q  What specifically did the defendant, Andrew Royer,

20      demonstrate for you?

21   A  During the interview when he was talking about how

22      he strangled Ms. Sailor, I -- I took my tie off,

23      and I -- and I -- and I asked him, please, show me

24      how you did it.  And without hesitation he reached

25      forward and acted like he grabbed the collar of my

1          shirt, and he twisted his hand like this.  He said

2          I grabbed her, and I twisted, and I held her like

3          this.

4     Q    Okay.  Did he continue to provide details that

5          were corroborated by other physical evidence?

6     A    Yes, ma'am.

7     Q    Anything specific?

8     A    He talked about the fact that there was a rope that

9          was used.  That was a piece of information that no

10         one was aware of.  We did find marks on

11         Ms. Sailor's neck that indicated she was strangled

12         by a rope.  He talked about areas of her apartment

13         that was cleaned up, along with items that were

14         used from her apartment that no one knew about.

15              MR. CRAWFORD:  Objection, your Honor.

16    Speculation as to what no one knew about who may or may

17    not have known it.

18              MS. BECKER:  I'll rephrase it.

19              THE COURT:  Let's, you know, let's stick to

20    question and answer and probably we won't have that

21    happen.  The objection will be sustained.  Rephrase.

22    BY MS. BECKER:

23    Q    Did the defendant refer to items of -- or cleaning

24         up things that were details not released to the

25         public?

```
 1    A    Yes, ma'am.
 2    Q    Were there other details that were not released to
 3         the public which the defendant seemed to have
 4         intimate knowledge of?
 5    A    Yes, ma'am.
 6    Q    What were those?
 7    A    Locations within the apartment that were rummaged
 8         through, where some of the evidence was disposed
 9         at.
10    Q    Where was that?
11    A    Waterfall Highrise has an internal garbage chute
12         that goes to every floor where you can drop items
13         down, and they will go down into a main hopper
14         down -- actually adjoined to the building outside
15         the parking lot.  Some of the items -- some of the
16         towels that were used to clean up the area of the
17         scene were actually thrown in the garbage chute,
18         and we found them in the hopper.  He knew this.  No
19         one else -- we did not ever disseminate that
20         information to him.
21    Q    Okay.  So there were some details that you kept
22         completely private.
23    A    Yes, ma'am.
24    Q    Yet he had intimate knowledge.
25    A    Absolutely.
```

 1    Q   Now, by this time, did you figure out you probably

 2        ought to get this on tape?

 3    A   Yes, ma'am.

 4    Q   All right.  What did you do at that point?

 5    A   After we -- after we finalized the pre-interview

 6        then I openly told Mr. Royer, pulled out a tape

 7        right in front of us, and we went ahead and

 8        conducted a audiotape confession.

 9    Q   Did the defendant Andrew Royer's demeanor change

10        when he saw that tape recorder?

11    A   Very much.

12    Q   Did you still get -- try to take a statement from

13        him?

14    A   Yes, ma'am.

15    Q   I'm going to show you what's been marked for

16        identification purposes as State's Exhibit 16.  Do

17        you recognize this?

18    A   Yes, ma'am.

19    Q   What is it?

20    A   It is a dubbed copy of the confession statement

21        taken from Mr. Royer on September 3, 2003.

22    Q   Have you had an opportunity to listen to what's

23        been identified at State's Exhibit 16?

24    A   Yes, ma'am.

25    Q   Is this an accurate recording of the interview that

```
 1          you did with Andrew Royer on September 3, 2003?

 2    A    For the most part, yes, ma'am.

 3    Q    Are there areas that have been blanked out for

 4         evidentiary purposes?

 5    A    Yes, ma'am, there has been.

 6    Q    All right.  Other than that, is it accurate in it's

 7         entirety?

 8    A    Yes, ma'am.

 9    Q    Thank you.

10            MS. BECKER:  State would move to admit what's

11    been marked for identification purposes as State's

12    Exhibit 16.

13            MR. CRAWFORD:  No objection.

14            MR. ZOOK:  No objection, your Honor.

15            THE COURT:  Without objection, Exhibit 16 will

16    be admitted, and I have a question.

17                 (An off-the-record discussion was held

18                  at the bench.)

19            THE COURT:  Proceed.  16 is admitted without

20    objection.

21            MS. BECKER:  State would move to publish

22    State's Exhibit 16 by playing it for the jury.

23            THE COURT:  Any objections?

24            MR. CRAWFORD:  No objection, your Honor.

25            MR. ZOOK:  No sir.
```

```
 1            THE COURT:  Without objection, State's Exhibit

 2   16 will be published to the jury at this time.  Ladies

 3   and gentlemen, we're going to play this tape for you.  If

 4   you cannot hear it, get your hand up, let us know, and

 5   we'll make adjustments.

 6                  (State's Exhibit 16 was published to

 7                  the jury.)

 8            MR. ZOOK:  Your Honor, there's a point

 9   objection that I want to make to the next statement that

10   the jury will hear on this.

11            THE COURT:  The next statement.

12            MR. ZOOK:  Yes.  Once it finally comes back on

13   again.

14            THE COURT:  Well, the exhibit has been

15   introduced.

16            MR. ZOOK:  I guess I was misunderstood what was

17   taken out of it.

18            MS. BECKER:  Excuse me.  May we approach.

19                  (An off-the-record discussion was held

20                  at the bench.)

21            THE COURT:  The objection will be overruled.

22            MS. BECKER:  Thank you.

23                  (State's Exhibit 16 continued to be

24                  published to the jury.)

25            MS. BECKER:  May we approach.
```

1    THE COURT:  You may.

2         (An off-the-record discussion was held

3         at the bench.)

4    THE COURT:  Ladies and gentlemen, we're going

5  to give you a recess.  We have a legal issue we're going

6  to address.

7         You are all jurors in this case.  I must tell

8  you now and I will repeat this again each time you are

9  permitted to separate.

10        Generally, you should not express any opinion

11  about the case before it is submitted to you for

12  deliberation; however, you are permitted to discuss the

13  evidence presented in this case amongst yourselves in the

14  jury room during recesses from trial.  All jurors and

15  alternates must be present during these discussions, and

16  you must reserve judgment about the outcome of the case

17  until your deliberations begin.

18        You are admonished that you may not discuss the

19  facts of the case with anyone other than your fellow

20  jurors.

21        You may not discuss this case with me or with

22  the lawyers, parties or with any of the witnesses.

23        You should not listen to or read any outside or

24  media accounts of the trial.  You may not investigate the

25  case or attempt to obtain information outside the

1    courtroom.  It is highly improper for you to do so.  You

2    are to consider and decide this case only upon the

3    evidence received during the course of the trial in the

4    courtroom.  You'll be in care of the bailiff.

5                (The jury left the courtroom, and the

6                following proceedings were had.)

7         THE COURT:  All right.  The record should

8    reflect the jury has left the courtroom.  Ms. Becker, you

9    have called the Court's attention to a portion of the

10   tape, Exhibit 16, which has a reference to Lana Canen.

11   Is it your proposal that we edit the tape at this time

12   with the jury outside of the courtroom?

13        MS. BECKER:  Well, your Honor, for the record

14   the state does not belief this is a Bruton Rule in any

15   way, shape, or form.  However, to avoid any further

16   problem, the state is willing to redact at the Court's

17   direction.

18        THE COURT:  Mr. Zook, you've raised an

19   objection, and you want this part redacted to avoid any

20   Bruton Rule problem.

21        MR. ZOOK:  Right.  That's correct, Judge, and I

22   want the say thank you for the prosecutor.  I think both

23   of us thought there was no references in the tape.

24        THE COURT:  Okay.  And, Mr. Crawford, you have

25   nothing to say about this because it doesn't involve your

1    situation.  Right?

2             MR. CRAWFORD:  Right.

3             THE COURT:  Let's error on the side of caution.

4    Let's take it out.  Would you read the words you're going

5    to edit out of the record, Ms. Becker?

6             MS. BECKER:  Mr. Zook, what do you want edited

7    out?

8             THE COURT:  Just so when the Court of Appeals

9    or anyone else picks up this record they'll know what was

10   edited out of Exhibit 16.

11            MR. ZOOK:  I would like to see, "okay, did you

12   ever speak -- yes.  Did you ever speak to Lana about

13   this.  Answer, no, I never talked to her about it.

14            THE COURT:  You want those words removed?

15            MR. ZOOK:  Right.

16            MS. BECKER:  State would agree to do that.

17            THE COURT:  All right.  Can you do that?

18            MS. BECKER:  Yep.

19            THE COURT:  All right.  Let's take a break

20   while you're doing that.  When we come back, we'll pick

21   up it up right after the edited portion.  Take a short

22   break.

23                 (A short recess was taken.)

24                 (The Court convened with all the

25                  parties present.  The jury entered the

500

```
 1                    courtroom and the following

 2                    proceedings were had.)

 3              THE COURT:  Be seated, please.  Ms. Becker.

 4              MS. BECKER:  Thank you, your Honor.

 5                    (State's Exhibit 16 continued to be

 6                    published to the jury.)

 7   BY MS. BECKER:

 8    Q   Detective Conway, why did you end the interview at

 9        that point?

10    A   It -- it was very obvious that you could tell that

11        Mr. Royer was starting to get very fatigued and

12        just go ahead and for the preservation of his right

13        (unintelligible) the case we decided to go ahead

14        and conclude the interview at that point so he

15        could go ahead and get some rest.

16    Q   Did you then allow Mr. Royer to leave?

17    A   No.  At that point, Mr. Royer was placed under

18        arrest for murder.

19    Q   Then did you allow him to go somewhere so that he

20        could sleep?

21    A   Yes, ma'am.  He was -- he was escorted back to the

22        detention area where he was, I mean, given food,

23        allowed to sleep.

24    Q   Okay.  Do you know if he did sleep?

25    A   I couldn't testify to that.  I assume he did.
```

```
1     STATE OF INDIANA      )      IN THE ELKHART CIRCUIT COURT

2                           )  SS:
      COUNTY OF ELKHART      )     CAUSE NO:  20C01-0309-MR-00155
3                                   )
      STATE OF INDIANA,             )
4                                   )
                                    )
5          v.                       )
                                    )
6                                   )
      ANDREW M. ROYER,              )
7                                   )
           Defendant.               )
8

9                       VOLUME III

10

11          Reporter's transcript of the proceedings in the

12     above-entitled matter commenced on Monday, August 8,

13     2005; Tuesday, August 9, 2005; and Wednesday, August 10,

14     2005, before the HONORABLE TERRY C. SHEWMAKER, Judge of

15     the Elkhart Circuit Court, Goshen, Indiana.

16

17

18

19

20

21     APPEARANCES:

22     FOR THE STATE OF INDIANA:  Vicki Elaine Becker and Denise

23     A. Robinson

24     FOR THE DEFENDANT CANEN: R. Brent Zook

25     FOR THE DEFENDANT ROYER: Christopher C. Crawford
```

502

```
 1    Q    The next day did you again try to continue your

 2         interview?

 3    A    Yes, ma'am, I did.

 4    Q    Did Mr. Royer appear to be refreshed?

 5    A    Yes, he did.

 6    Q    Tell us about how he appeared as far as his state

 7         of mind at that point in time?

 8    A    You could tell he was -- you could tell he was

 9         obviously concerned.  He had made comments how he

10         was afraid of talking to me because he was afraid

11         that he was gonna' -- cause he knew that he would

12         get in trouble because from what he had done.

13             We went ahead and talked and kind of rebuild

14         that rapport again.  At one point in time I even

15         made a point to tell him that, you know, he

16         would -- he would probably feel better if he would

17         just be straight with me and come out with

18         everything.

19    Q    At this point in time, did you believe he was

20         telling you everything that he knew?

21    A    No.

22    Q    Was that based upon what you already knew about the

23         scene?

24    A    Correct.

25    Q    Okay.  Even though you know they're not telling you
```

```
 1          the truth, or what you believe to be the truth, do
 2          you still do what you did by taking that audio
 3          recording so that you could produce that later?
 4     A    Yes, ma'am.
 5     Q    All right.  So the next day, namely, September 4,
 6          did you try to go at him again to try to get the
 7          truth out?
 8     A    Yes, ma'am, I did.
 9     Q    I'm going to show you what's -- oh, I'm sorry.
10          Before you began the next interview, did you
11          Mirandise him once again?
12     A    Yes, ma'am, we did.  He was -- submit another form
13          where he went ahead and signed and waived his
14          rights again.
15     Q    I'm going he show you what's been marked for
16          identification purposes as State's Exhibit 17.  Do
17          you recognize this?
18     A    Yes, ma'am.  This is a carbon copy of the Miranda
19          Form dated September 4, 2003, and the time he was
20          advised was 8:25 a.m.
21     Q    Okay.  Is this a true and accurate representation
22          of the actual Miranda form that -- or a carbon copy
23          of the Miranda form that you provided to the
24          defendant, Andy Royer, and had him sign?
25     A    Yes, ma'am.
```

```
 1     Q    Once again, you did you communicate with him his

 2          rights, and did he waive those rights?

 3     A    Yes, he did.

 4     Q    Did he appear to understand you?

 5     A    100 percent.

 6          MS. BECKER:  State would move to admit what's

 7    been marked for identification purposes as State's

 8    Exhibit 17.

 9          MR. ZOOK:  No objection.

10          MR. CRAWFORD:  No objection, your Honor.

11          THE COURT:  State's Exhibit No. 17 will be

12    admitted without objection.

13          MS. BECKER:  State declines publication at this

14    time.

15    BY MS. BECKER:

16     Q    Detective Conway, I'm now showing you what's been

17          marked for identification purposes as State's

18          Exhibit 18.  Do you recognize this?

19     A    Yes, ma'am.

20     Q    What is it?

21     A    This is a dubbed copy of the second confession

22          given by Mr. Royer on September 4, 2003.

23     Q    Okay.  Does this -- or have you had an opportunity

24          to review this audiotape?

25     A    Yes, ma'am, I have.
```

505

1    Q    Is it an accurate copy of the audiotaped interview

2         that you did with Andrew Royer on September 4?

3    A    Yes, ma'am, it is.

4              MS. BECKER:  Thank you.  State would now move

5    to admit what's been marked for identification purposes

6    as State's Exhibit 18.

7              THE COURT:  Mr. Zook.

8              MR. ZOOK:  No objection.

9              THE COURT:  Mr. Crawford.

10             MR. CRAWFORD:  No objection.

11             THE COURT:  Exhibit 18 will be admitted without

12   objection.

13             MS. BECKER:  State moves to publish State's

14   Exhibit 18 by playing the same to the jury.

15             THE COURT:  Mr. Zook.

16             MR. ZOOK:  No objection.

17             THE COURT:  And Mr. Crawford.

18             MR. CRAWFORD:  No objection, your Honor.

19             THE COURT:  State's Exhibit 18 will be

20   published without objection.

21                  (State's Exhibit 18 was published to

22                  the jury.)

23             MS. BECKER:  No further questions at this time.

24             THE COURT:  Mr. Zook, cross-examination.

25             MR. ZOOK:  Yes, sir.

```
 1                    CROSS-EXAMINATION

 2    BY MR. ZOOK:

 3     Q   Detective Conway, you made these two recordings of

 4         Andrew, and yet there's nothing leading up to the

 5         recordings.  I believe you said it's department

 6         procedure that you not record anything until the

 7         time of the actual statement.

 8     A   At the time we have what we call a pre-interview,

 9         yes, sir.

10     Q   And it was your procedure that you would not record

11         the pre-interview.

12     A   That's correct.

13     Q   Was that true for other people you talked to as

14         well, no recording the pre-interview?

15     A   At that time, that was the homicide unit's

16         procedure.  At the time that we had the Royer

17         case -- that we started the Helen Sailor case, the

18         homicide unit was kind of in it's -- in it's

19         infantile stages, and we were trying to go ahead

20         and set parameters on how we would go and conduct

21         interviews, and how we would go ahead, and the

22         procedures and policies that we would go ahead and

23         have, and at the time this is the way that they

24         went ahead and decided to go ahead and do it.

25     Q   The -- the -- the tape recorder was there
```

```
 1              obviously.  Right?

 2      A    That is correct.

 3      Q    And you had access to tapes.  Is that right?

 4      A    That is correct.

 5      Q    But because of department procedure, you

 6           deliberately did not record the pre-interview?

 7      A    That is correct.

 8              MR. ZOOK:  All right.  No more questions.

 9              THE COURT:  Mr. Crawford.

10              MR. CRAWFORD:  Thank you, your Honor.

11                      CROSS-EXAMINATION

12   BY MR. CRAWFORD:

13      Q    Detective Conway, I believe the first time you

14           mentioned that you had spoken with Andrew Royer was

15           on September 3rd of 2003.  Is that correct?

16      A    No, that was not correct.

17      Q    When was the first time you spoke with Mr. Royer?

18      A    Actually, the first time I spoke with Mr. Royer was

19           through the initial investigation during the Helen

20           Sailor case where I was assisting Detective

21           Christian in a building canvas.

22      Q    And when was that exactly?

23      A    I can't remember the exact date, sir.

24      Q    Was that early on in the investigation process?

25      A    That was within the days following the homicide.
```

1    Q    Would you have made an assessment concerning your

2         feelings of the mental abilities of Andrew Royer at

3         the time you initially had come into contact with

4         him?

5    A    At the time I initially came into contact with

6         Mr. Royer, I was assisting Detective Christian.  I

7         had just came back to the homicide unit.

8         Correction.  Back to the detective bureau, and I

9         was assisting Detective Christian.  She was the one

10        who spoke to Mr. Royer.

11   Q    So were you with Detective Christian when she spoke

12        to Mr. Royer?

13   A    Oh, yes, sir, I was.

14   Q    Were you able to observe his demeanor during the

15        course of those interviews?

16   A    We spoke for a few minutes, yes, sir.

17   Q    So were you able to get an impression of his mental

18        abilities at the time you first spoke with him when

19        you were with Detective Christian?

20   A    I knew that there were some mental issues, yes,

21        sir.

22   Q    How much involvement did you have with the case

23        initially on in its early stages after Ms. Sailor's

24        body was found?

25   A    Not much.  Just with the initial 24/48 hours worth

```
1            of the investigation.

2    Q    Do you recall how many people you assisted with in

3            speaking with or how many you spoke with directly

4            at the time of your involvement in that first

5            couple of days?

6    A    No, sir.  Like I said, I was pretty much just

7            attached to other detectives assisting them.

8    Q    No idea how many you had talked to?

9    A    No, sir.

10   Q    Did you gather a lot of information during those

11           first couple of days in your involvement with the

12           initial investigation?

13   A    Like I said, I was assisting other detectives.  I

14           was pretty much kind of, I guess what you say, a

15           gopher.  I was kind of just a person who would be

16           there to assist the other detectives while they

17           went ahead and handled the investigation.

18   Q    But did you learn things while you were being a

19           gopher?

20   A    Yes, sir.

21   Q    Okay.  And was it only the first initial couple

22           days that you were involved in this before you were

23           later involvement again?  When specifically did you

24           get reinvolved with the investigation?

25           THE COURT:  I think we got a two-part question.
```

 1    One at a time.

 2              MR. CRAWFORD:  I'm sorry.  I'll rephrase that.

 3    Thank you, your Honor.

 4    BY MR. CRAWFORD:

 5    Q    When did you stop being actively involved initially

 6         in the investigation?

 7    A    Like I said, it was probably within the first 24/48

 8         hours.  I was just extra manpower to assist other

 9         detectives.

10    Q    And it was in -- during that course of time when

11         you spoke with Detective Christian and Andrew

12         Royer.

13    A    Yes.

14    Q    When exactly did you get back involved in the

15         investigation again?

16    A    After I was assigned to the homicide unit, the case

17         was assigned to me for investigation.

18    Q    Do you recall specifically when that was?

19    A    No, I don't.  I know it was within a couple weeks

20         of us speaking to Royer.

21    Q    At the time that you got back involved in this

22         investigation again, did you thoroughly review the

23         file including case reports and supplements?

24    A    Yes, I did.

25    Q    And did you look at all of the same statements that

1       were given by these at the time that you reviewed

2       the file?

3    A  Yes, I did.

4    Q  Outside of looking at the file, did you talk with

5       other representatives of the police department and

6       gather additional information that may not have

7       been included in the file?

8    A  I did ask if there was anything I needed to know,

9       yes, sir.

10   Q  Who specifically was involved in the homicide unit

11      at the time of your initial involvement in this

12      case?

13   A  At the time it was being lead by Lieutenant Paul

14      Converse, second in command was Sergeant Bill

15      Wargo, and then there was Detective Mark Daggy,

16      Lieutenant Posthuma, and myself.

17   Q  Now, you mentioned when you -- so the second time

18      that you would have come involved -- come in

19      contact with Mr. Royer was when you picked him up

20      to bring him in the Elkhart Police Department.  Is

21      that correct?

22   A  That's correct.

23   Q  And that was on September 2 of 2003.  Is that

24      correct?

25   A  That is correct.

1    Q   And I believe that you mentioned at that time that

2        you were accompanied by -- who exactly do you

3        remember being accompanied by you went to pick up

4        Andrew Royer?

5    A   If I do recall I said I really -- I couldn't

6        recall.

7    Q   Any reason to believe it might not have been

8        Detective Mark Daggy?

9    A   Like I said, I couldn't recall.  I knew it was

10       somebody from the unit.  I couldn't tell you for

11       certain whom.

12   Q   Do you recall when you went to pick up Andrew Royer

13       and questioned him whether he took his medication

14       with him to the Elkhart Police Department?

15   A   No, sir, he did not.

16   Q   He did not not take it.

17   A   No, sir.

18   Q   Do you recall if he -- if you had asked him if he

19       had taken his medication before going to the

20       Elkhart Police Department?

21   A   No, sir.  I do not recall if I did or not.

22   Q   Now, I believe you testified that it was

23       approximately at 9:34 a.m. or somewhere around

24       there when you gave him his Miranda Warning.  Is

25       that correct?

```
 1    A    That is correct.
 2    Q    And it was after that that you conducted a
 3         interview with him.  Is that correct?
 4    A    That is correct.
 5    Q    And it wasn't until approximately 1:30 or
 6         1:00 o'clock in the afternoon that the tape
 7         recorder began to role.  Is that correct?
 8    A    That is correct.
 9    Q    And you mentioned when Mr. Zook was up here that it
10         was not a departmental policy to record the audio
11         statements of the accused or alleged accused at the
12         time of the events when you first spoke with him?
13    A    The pre-interview, sir.
14    Q    Right.  And did you have access to videotape
15         cameras at that time?
16    A    Yes, sir, we did.
17    Q    And is that something that you could have used
18         either at the pre-interview time or at the time the
19         person was making the statement?
20    A    Once again, that was not policy at that time.
21    Q    And you've indicated I believe during direct
22         examination that you did not take any specific
23         notes at the time during the pre-interview phase.
24         Is that correct?
25    A    No, I didn't state that, sir.
```

514

1    Q   Did you take specific notes at the time of the

2        pre-interview stage?

3    A   I took notes throughout the duration of our

4        interview, yes, sir.

5    Q   You mentioned, I believe, during direct examination

6        that you were careful in this particular interview

7        because you potentially had some issues or knew the

8        status of Mr. Royer concerning some mental

9        deficiency problems.  Is that correct?

10   A   I didn't say I knew the status.  I said I knew that

11       there was obviously something there.

12   Q   Potential concerns.

13   A   Yes.

14   Q   Did you seek to obtain any information concerning

15       that particular issue before questioning Mr. Royer?

16   A   Yes, we did.

17   Q   Did you seek to have a case manager or someone

18       available with him when you questioned him from

19       Oaklawn?

20   A   No, sir, we did not.

21   Q   But again, you testified that you were somewhat

22       aware of his mental status at the time you

23       questioned him.  Correct?

24   A   Yes, sir.

25   Q   To your knowledge, while he was being housed in the

```
 1            Elkhart Police Department September 3rd through

 2            September 4th prior to your second interview with

 3            him did, Mr. Royer have his medication?

 4       A   Yes, sir, he did.

 5       Q   When specifically do you recall him taking that?

 6       A   After Mr. Royer was arrested for the murder of

 7            Helen Sailor, we went back -- he gave us permission

 8            to go back to his apartment and obtain his medicine

 9            so he could have it.

10       Q   So to your knowledge this would be after the tape

11            recorded statement.  Is that correct?

12       A   The first one yes, sir.

13       Q   Okay.  I believe you mentioned during the course of

14            direct examination that there appeared at time or

15            times that Mr. Royer appeared mentally fatigued.

16       A   Yes, sir.

17       Q   Do you feel that he would appear tired

18            concentration abilities?

19       A   Yes, sir.

20       Q   Problems associated with that.

21       A   I'm sorry.  I don't understand, sir.

22       Q   Problems associated with his concentration at one

23            point in time.  Is that correct?

24       A   Yes, sir, as well as myself.

25       Q   You're not being treated at Oaklawn, are you?
```

```
 1    A    No, sir.

 2    Q    Now, I believe you also mentioned that there was

 3         some indication that a particular pawnshop might

 4         have been in place for certain items that could

 5         have been sold after the 28th.  Is that correct?

 6    A    Yes, sir.

 7    Q    And I believe you mentioned that Mr. Royer, or at

 8         least the tape recording indicated that Mr. Royer

 9         may be able to show that to you.  Is that correct?

10    A    Yes, sir.

11    Q    Did that take place after the fact?

12    A    Mr. Royer pointed out the pawnshop to us, yes, sir.

13    Q    Is it fair to say that you were unable to recover

14         anything when you went into that pawnshop?

15    A    That is correct, sir.

16    Q    And there was no indication from any representative

17         from that pawnshop that they had dealt with Mr.

18         Royer on the 29th or thereafter.  Is that correct?

19    A    That is correct, sir.

20    Q    And you had them go through the books.  Is that

21         correct?

22    A    That is correct, sir.

23    Q    Did you investigate any other leads of persons who

24         might have taken these items and taken them to the

25         pawnshop?
```

```
 1    A   Yes, sir.

 2    Q   Were you able to find anything in that

 3        investigation?

 4    A   No, sir.

 5            MR. CRAWFORD:  Just a second, your Honor, if I

 6    may have a few moments?

 7    Q   Officer, were there other police officers involved

 8        in the actual securing of the -- of Ms. Sailor's

 9        apartment?

10    A   Yes, sir.

11    Q   And were you one of those officers?

12    A   I was present, sir.  But, now, as far as the

13        original officers who secured that would have been,

14        I assume, articulated by Detective Christian.

15    Q   So in that regard, there were other officers that

16        would have a better insight as to what was

17        discovered or recovered at Ms. Sailor's apartment.

18        Is that correct?

19    A   That is correct.

20    Q   You don't have first-hand knowledge as to that

21        specific event.

22    A   No, sir.

23    Q   And prior to talking to Mr. Royer, had you talked

24        to other individuals again before speaking with him

25        in August of -- or September of 2003?
```

1   A   Yes, sir.

2   Q   Had you talked to a number of individuals before

3       speaking with Mr. Royer?

4   A   No, sir.

5   Q   Were you part of the party that went back to

6       highrise and canvassed the area and spoke to people

7       at the highrise before your spoke to Mr. Royer?

8   A   I'm sorry.  I don't really understand the question,

9       sir.

10   Q   Prior to speaking with Mr. Royer on September 3rd

11       of 2003, had you spoken with other individuals at

12       the highrise?

13   A   Spoken of other individuals, yes, but not

14       specifically about Mr. Royer.

15   Q   Right.  I understand that.  About the actual series

16       of events from November 28th of 2002.

17   A   Yes.

18   Q   And had you done that when you joined the homicide

19       force in August of 2003, I believe?

20   A   Yes.

21   Q   You recall how many individuals you spoke to at the

22       highrise concerning this incident in August of 2003

23       before speaking with Mr. Royer?

24   A   It'd be documented in the case.  I couldn't tell

25       you -- I couldn't tell you for certainty off the

1              top of my head.

2        Q    And through these individuals you gathered

3              information.  Is that correct?

4        A    Yes, sir.

5        Q    And you had all of this information before you

6              spoke to Andrew Royer on September 3, 2003.

7        A    All of what information, sir?

8        Q    The information that you gathered from reviewing

9              the file, from speaking with other witnesses?

10       A    Yes, sir.

11             MR. CRAWFORD:  No further questions, your

12   Honor.

13             THE COURT:  Ms. Becker.

14             MS. BECKER:  Just briefly.

15                    REDIRECT EXAMINATION

16   BY MS. BECKER:

17       Q    Detective Conway, you indicated that because you

18             were aware of Mr. Royer's challenges mentally that

19             you did speak to some people at Oaklawn.  Correct?

20       A    Yes, ma'am.

21       Q    After inquiring into his condition further, did you

22             find it was necessary at all to have a

23             representative or someone there on his behalf?

24       A    No.  As a mater of fact, we were told that, that

25             wasn't necessary.

```
 1    Q   Okay.  And when you were talking to Mr. Royer, did

 2        he give you any indication whatsoever he didn't

 3        understand you?

 4    A   No, ma'am.  He was -- he was very -- he seemed to

 5        be very articulate.  I mean, there was obviously

 6        you could tell he was -- I would say slow.  But I

 7        mean, by no means whatsoever did I think that he

 8        did not fully understand everything that was going

 9        on.

10    Q   In fact, you had at least three different versions

11        of what had happened by that time.  Correct?

12    A   Yes, ma'am.  He did give several renditions of what

13        happened.

14    Q   All right.  And During the preinterview or actually

15        right after the preinterview did he make some

16        comment to you about why his stories were changing?

17    A   Yes, ma'am, he did.

18    Q   What did he say?

19    A   He openly told me -- I was trying to get him -- I

20        was trying to get him at ease and basically we knew

21        it was there that he had it inside of him.  He just

22        had a hard time stating it, and he even told me he

23        said he goes, "I know if I tell you what I did I'm

24        going to get in a lot of trouble."

25    Q   Okay.  So based upon that fact he told you he was
```

```
 1            going to get into trouble, you'd already talked to

 2            Oaklawn and followed up on his mental capacity, and

 3            clearly he was giving you different renditions

 4            maybe fabricating something.  Did it appear to you

 5            that there was any problem of his mental processes

 6            other than being slow?

 7       A    No.  It was very apparent to me that he knew he had

 8            done something wrong and knew the ramifications of

 9            it.

10       Q    Okay.  Now, when you went to go check the pawnshop,

11            did you check to find out whether any false names

12            had been used on registers or books?

13       A    Yes, ma'am.  We checked the registers and the

14            computers.

15       Q    Okay.  And Andy Royer's name never came up.

16            Correct?

17       A    No, ma'am.

18       Q    Did you ask him whether he used any false names, or

19            did you find out whether maybe he had somebody help

20            him in this situation?

21       A    As far as false names, no.  He -- he indicated that

22            he was the one who took them -- or took -- that he

23            was the one who sold these items.  He even went as

24            far as to actually accompany us to the pawnshop,

25            point it out, and actually physically walked in the
```

1    pawnshop with us and this is where I sold the

2    items.

3    Q   Okay.  But the person there at that time really

4        couldn't help you confirm or contradict that?

5    A   That is correct.

6    Q   Okay.  And finally, you indicated during direct

7        that it wasn't until after you had furthered this

8        investigation, spoke to Nina Porter, that it

9        focussed on Andy Royer.  So at the time that you

10       were reviewing all of these prior statements and

11       going back to the highrise and conferring with all

12       of these people, did you know absolutely that Andy

13       Royer was a suspect at that time?

14   A   No, ma'am.

15   Q   So it wasn't until later that you were able to put

16       all this into context.  Is that true?

17   A   That is correct.

18   Q   Thank you.  I don't have anything further

19       questions.

20           THE COURT:  Mr. Zook.

21           MR. ZOOK:  No questions.

22           THE COURT:  Mr. Crawford, recross.

23           MR. CRAWFORD:  Thank you, your Honor.

24   ////

25   ////

STATE'S WITNESS - CARL CONWAY - (RECROSS)

1            RECROSS-EXAMINATION

2    BY MR. CRAWFORD:

3    Q    Detective Conway, do you remember specifically what

4         day it was that you went to Oaklawn to speak to the

5         representative about Andrew Royer?

6    A    Actually I spoke to a gentlemen on the phone.  I

7         can't recall the gentleman's name.  It would be in

8         the case book.  He was the one who told me about

9         Andy's condition.

10   Q    Do you know -- do you recall his name?

11   A    Like I said, it would be in the case book.

12   Q    And you don't recall the day.  It's in the case

13        book.  Is that correct?

14   A    No, sir, I do not.

15            MR. CRAWFORD:  Nothing further, your Honor.

16            THE COURT:  Any other questions from any

17   counsel?

18            MR. ZOOK:  No sir.

19            MS. BECKER:  No, Your Honor.

20            THE COURT:  You may step down, sir.  Watch your

21   step.  Is he released from his subpoena.  Yes, yes, yes.

22            Ladies and gentlemen we're going to recess for

23   the day.  During the recess, I need to tell you.  You are

24   all jurors in this case.  I must tell you now and I will

25   repeat this again each time you are permitted to

1    separate.

2          Generally, you should not express any opinion

3    about the case before it is submitted to you for

4    deliberation; however, you are permitted to discuss the

5    evidence presented in this case amongst yourselves in the

6    jury room during recesses from trial.  All jurors and

7    alternates must be present during these discussions, and

8    you must reserve judgment about the outcome of the case

9    until your deliberations begin.

10          You are admonished that you may not discuss the

11    facts of the case with anyone other than your fellow

12    jurors.

13          You may not discuss this case with me or with

14    the lawyers, parties or with any of the witnesses.

15          You should not listen to or read any outside or

16    media accounts of the trial.  You may not investigate the

17    case or attempt to obtain information outside the

18    courtroom.  It is highly improper for you to do so.  You

19    are to consider and decide this case only upon the

20    evidence received during the course of the trial in the

21    courtroom.  Have a good evening.  See you at 8:15.

22                    (No further proceedings were had in

23                    this matter on this date.)

24

25

```
 1                 WEDNESDAY, JULY 11, 2005

 2                 (The Court convened with all the

 3                 parties present, and the following

 4                 proceedings were had.)

 5           THE COURT:  The record reflects the defendant,

 6   Mr. Royer, is present with his counsel, Mr. Crawford.

 7   The defendant, Ms. Canen, is present with her counsel,

 8   Mr. Zook.  Counsel for the state is also present.  I'm

 9   unsure if the record is clear on what occurred earlier.

10   I think we ought to clear it up at this time.  There was,

11   I believe it was witness Matt Johnson, a question asked

12   by Mr. Crawford as to whether or not Mr. Johnson had any

13   violent tendencies.  State objected.  Court called

14   counsel to the bench, and the Court made inquiry of

15   Mr. Crawford as to whether or not he had any evidence to

16   indicate Matt Johnson was involved in this.  Mr. Crawford

17   indicated he did not have any such information, but he

18   wanted his question answered because it was a part of his

19   defense.

20           Court sustained the objection and indicated to

21   Mr. Crawford that the Court would permit Mr. Crawford to

22   call Mr. Johnson when the defense was presented on behalf

23   of Mr. Royer, that would be Mr. Crawford's client.  The

24   Court made arrangements before Mr. Johnson left the

25   courtroom for him to be held on his subpoena and informed
```

1     him of such.  He indicated to the Court he would remain

2     available, and he understood what the Court had stated.

3             Court also notes that the question was outside

4     the scope of the direct exam of Ms. Becker with respect

5     to witness Johnson.  Is that an accurate representation

6     of what occurred, Ms. Becker?

7             MS. BECKER:  Yes, your Honor.

8             THE COURT:  And, Mr. Zook?

9             MR. ZOOK:  I believe so, yes.

10            THE COURT:  And Mr. Crawford.

11            MR. CRAWFORD:  Yes, your Honor.

12            THE COURT:  Are we ready to go?

13            MS. BECKER:  Yes.

14                (The jury entered the courtroom, and

15                the following proceedings were had.)

16            THE COURT:  Be seated, please.  Good morning

17    ladies and gentlemen.  Ms. Becker, call your next

18    witness.

19            MS. BECKER:  State would call Erika Roarhig.

20            THE COURT:  Raise your right hand.

21                (The witness was sworn.)

22            THE WITNESS:  I do.

23            THE COURT:  Take the witness stand, please.

24    ////

25    ////

```
 1                       ERIKA ROARHIG

 2    called on behalf of the State, having been first duly

 3    sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5    BY MS. BECKER:

 6        Q    Good morning, ma'am.  Would you please introduce

 7             yourself to our jury?

 8        A    Hi, I'm Erika Roarhig.

 9        Q    Erika, what do you for a living?

10        A    I'm a registered nurse.

11        Q    What do you work now?

12        A    Currently I work at Mason's Health Care in Warsaw.

13        Q    What kind of a business is Mason Health Care.

14        A    It's a nursing home and it's also a restorative

15             nursing.  We do rehab for patience that had

16             surgery.

17        Q    How long have you been with Mason's Health Care?

18        A    I've only been with Mason for three months?

19        Q    Prior to that, did you work for Regional Home

20             Health Care in Elkhart?

21        A    Yes, I did.  I was their director of professional

22             services.

23        Q    What exactly is the director of professional

24             services?

25        A    I was responsible for nursing scheduling, doing
```

```
 1           nursing visits, the home health aids.

 2    Q    Okay.  Back in November of 2002, were you working

 3           with for Regional Health Care?

 4    A    Yes.  At that time I had left and came back, and I

 5           was their acting director at that time.

 6    Q    How long you been with Regional by about November

 7           of 2002?

 8    A    About two years.

 9    Q    Now, I'd like to draw your attention to

10           Thanksgiving Day of 2002, actually the day before

11           that.  Did you have a client by the name of Helen

12           Sailor?

13    A    Yes, I did.

14    Q    How long has Helen Sailor been your client?

15    A    I believe Helen Sailor had been with Regional since

16           they had opened.  So she had been a client of

17           theirs for several years.

18    Q    How long had you personally been assisting Helen?

19    A    I had been assisting Helen for about two years.

20    Q    What did you do exactly do for Helen by around

21           November of the 2002?

22    A    At that time, she required skilled nursing.  We

23           went up, and we set up her medications for a her,

24           and we did her blood pressure and her pulse, and

25           listened to her lungs.  Just made sure that
```

1        physically she was doing fine at home.

2   Q    Was it your responsibility to set out her

3        medications?

4   A    Yes.  We set out her medications every two every

5        two weeks, because she was blind she couldn't see

6        to do them herself so we set them up for her?

7   Q    How would you set up her medication?

8   A    She had two pill boxes.  We saw her once every two

9        weeks.  So we put all of her pills in there for

10       morning, noon, evening and suppertime; and we

11       stacked the two pill boxes on top of each other,

12       and we put all her other pills up in the cupboards

13       so that she wouldn't get them, she wouldn't touch

14       them.

15  Q    In your experience, had Helen ever touched the

16       other medications, the back up medications?

17  A    No.

18  Q    In the two years that you helped Helen, do you

19       recall what kind of a container the remainder of

20       the back up pill bottles were kept in?

21  A    We had one -- we had one bag that we kept some in

22       that were extra ones that we hadn't used yet.  And

23       the ones that we were currently using we kept in a

24       the clear plastic container like a little square

25       about like this.

1   Q   Okay.  Is that the same container she had all

2       along?

3   A   Yes.  As long as I had been taking care of her.

4   Q   And that was for approximately two years?

5   A   Right.

6   Q   Now, when did you last fill Helen's medication

7       prior to Thanksgiving day of 2002?

8   A   The day before, the 27th.

9   Q   The 27th.  Would that have been Wednesday?

10  A   Yes.

11  Q   Do you remember what time you got there in the

12      morning?

13  A   I don't remember.  I'm thinking it was more towards

14      the end of the day actually because I think I went

15      and saw her right before I went and picked up my

16      son.

17  Q   When you saw her and took care of her meds, explain

18      for us exactly what you did that day, if you can

19      recall?

20  A   I went in, I talked to Helen, and I went and got

21      her -- her medicines out of the cupboard and her

22      pill boxes, and then she had a little single bed

23      that was over against the one wall, she had a chair

24      here, and I also went and sat on that little single

25      bed and sat her pills out and her folder that

```
 1          listed all her meds, and then I would start filling

 2          them all.

 3     Q    Okay.  How long did it normally take for you to

 4          fill all of her medications for a two-week period.

 5     A    It takes a good half hour.

 6     Q    Were you talking to Helen during this time?

 7     A    Yes.

 8     Q    As you would fill the medications, did anybody ever

 9          come over and visit with Helen or stop by and say

10          hello, that kind of thing?

11     A    Yeah.  She'd have other people that lived in the

12          apartment that would stop by and say Hi, and

13          sometimes we had these supervisory visits and

14          sometimes our home health aides would be there

15          working with Helen supervising, make sure that they

16          were doing their job correctly.

17     Q    Now, you indicated that this medical container or

18          this rubber -- I'm sorry -- this plastic container

19          that you kept the reserve pills in, where did you

20          say you kept that?

21     A    It's kept up in the cupboard.

22     Q    Okay.  And then where were the daily pills the

23          plastic daily pills?

24     A    Those were kept on the counter right up in the

25          corner.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  I'm going to show you what's been marked for |
| 2 | | identification purposes as State's Exhibit 22.  Do |
| 3 | | you recognize this, Erika? |
| 4 | A | Yes. |
| 5 | Q | What is it? |
| 6 | A | This is Helen's little kitchenette here. |
| 7 | Q | Does this show the plastic container that you were |
| 8 | | referring to that keeps the reserve medication? |
| 9 | A | Yeah.  They're sitting here on the stove. |
| 10 | Q | Does it also show the daily medicine boxes that you |
| 11 | | were discussing? |
| 12 | A | Right.  Right here on the counter. |
| 13 | Q | Now, as they appear in this photograph, is that |
| 14 | | normally how they were? |
| 15 | A | No.  No.  This container would be up there in the |
| 16 | | cupboard.  These pills would be up there above |
| 17 | | that.  None of these would be out.  These would all |
| 18 | | be in here. |
| 19 | Q | Let me -- because we're aren't showing the |
| 20 | | photograph let me talk about -- don't show the |
| 21 | | photograph.  The plastic container that's on the |
| 22 | | stove now, where would that be? |
| 23 | A | That would be up in the cupboard. |
| 24 | Q | Okay.  The pill dividers that are set out weekly, |
| 25 | | where would those be? |

```
 1    A    Those would be all the way up in the corner next to

 2         the stove on the counter.

 3    Q    The white plastic -- or the white paper bag where

 4         would that be?

 5    A    That would also be up in the cupboard.

 6    Q    And the pill bottles that are lose sitting on the

 7         counter, where would those be?

 8    A    Those would be either in the white paper bag or

 9         they'd be in the plastic container.  They were

10         never left out.

11    Q    Okay.  Thank you.  In your experience in the time,

12         the two years that you helped Helen set out her

13         medication, did you ever find the medication boxes

14         out on the sofa like that?

15    A    No.

16    Q    When you left on the 27th, where did you put the

17         medication boxes?

18    A    Up in the cupboard.

19    Q    Now, you indicated that you were an individual that

20         sets out her pills.  Were you the only person that

21         was responsible for setting out her pills?

22    A    No.  Any of the other nurses I might have assigned

23         to do that.

24    Q    Okay.  Do you specifically recall it was you that

25         did it the day before she died?
```

1    A    Yes.

2    Q    Any idea when it was prior to that time when were

3         you there as opposed to somebody else?

4    A    I honestly don't recall.

5    Q    Okay.  Based upon your experience and granted we

6         all know, you know, there's lots of people that go

7         through a process of filling a prescription.  Is

8         there any way that you could tell with absolute

9         certainty how many pills were supposed to be there?

10   A    No.  Not unless I had been there from day one.

11   Q    Why not.

12   A    Because, I mean, once in a while we all forget to

13        take a pill so it might have been left over.

14        Unless the nurse documented that, oh, she forgot to

15        take this pill and so it was put back.  You know, I

16        mean, unless I got the pills from the pharmacy, the

17        pharmacy could have miscounted.  I mean, somebody

18        could have, dropped one and thrown it away, you

19        know, when they were filling it.  I mean, there's

20        occasion where I might have dropped one; and if I

21        dropped it on the floor, I'm not going to give it

22        Helen.  I would take it to the sink and throw it

23        away and get a new one so --

24   Q    So is it possible to tell how many pills should

25        have been present?

1    A    No.  There's no way to really tell.

2    Q    Did there come a time during the time that you

3         treated Helen or that you assisted Helen where she

4         would discuss religious topics with you?

5    A    Yes.  Helen was a very religious lady.  I mean, we

6         usually God bless each other when we left.  But

7         other than that, typically I don't discuss religion

8         with my patients.

9    Q    I don't have any further questions.  Thank you,

10        Mrs. Roarhig.

11            THE COURT:  Mr. Zook.

12            MR. ZOOK:  Thank you.

13                      CROSS-EXAMINATION

14   BY MR. ZOOK:

15   Q    Hi, Erika?

16   A    Hi.

17   Q    You're in charge of all these people that take care

18        of the pills and the nursing and the whole bit.

19        How long have you been doing this?

20   A    I've been a registered nurse for 20 years.

21   Q    Okay.  Have you been doing the home health care for

22        20 years?

23   A    No.  I was at Memorial rehab for ten years.  I did

24        nurse case management.  I did -- I've done pretty

25        much a lot of different realms.  I've been doing

1         that for two years.

2    Q    You expect to be doing this for the rest of your

3         nursing career?

4    A    Nursing, yeah.

5    Q    Certainly there's a retirement home for nurses.

6    A    Pretty much.

7    Q    Okay.  I'm interested in the pills that you set

8         out.  I understand that it's difficult to keep

9         track of the number of pills in the bottles and so

10        forth but -- but you put the pills into the daily

11        and weekly containers the night right before

12        Thursday, right, right before Thanksgiving?

13   A    Yes.

14   Q    So as far as the pills that were in the containers,

15        you surely could figure out if any of those were

16        missing, couldn't you?

17   A    That were in the daily containers?

18   Q    Right.

19   A    Yes.

20   Q    It's just the ones that you don't know about that

21        are up in the reserve box.

22   A    Right.

23   Q    Okay.  And you could probably get an estimate on

24        those, couldn't you, from -- from knowing when the

25        prescription dates were and --

```
 1    A    Not really because Helen was on Medicaid so a lot
 2         of times you had to make sure that you always had
 3         enough pills, like, when I left I would have to
 4         make sure that there was still enough pills left in
 5         her bottles for when the next nurse came to fill it
 6         for another two weeks.  If there was only going to
 7         be enough pills for 13 days, then you would have to
 8         reorder.  And you always wanted to reorder before
 9         the end of month because her spin down was met.
10         And otherwise she'd have to meet her spin down
11         again at the beginning of the next month before she
12         could get their pills.
13    Q    Okay.  So you did this two weeks at a time.  And
14         if -- if one pill would be used once a day, there
15         should be 14 of those in the -- in the boxes that
16         were for daily use.
17    A    There should be one for each day.
18    Q    One for each day minus whatever she used?
19              THE COURT:  Excuse me.  You need to answer yes.
20              THE WITNESS:  Sorry.  Okay.
21              THE COURT:  What you would answer be?
22              THE WITNESS:  Yes.
23    Q    Okay.  Now, you by any chance take medication out
24         of boxes like that yourself?
25    A    No.
```

[8/8/2005] 20050809CanenRoyer

1   Q   Okay.  After you have filled the boxes, the daily,

2       weekly pill boxes, have you ever gone back and

3       rechecked what you did?

4   A   Yes.

5   Q   Have you ever found mistakes when you did that?

6   A   Typically, no.  But occasionally you're going to

7       find mistakes.  We all make mistakes.

8   Q   Especially when there are people interrupting

9       what's going on?

10  A   Yes.

11  Q   And you said there'd been a pill container that

12      you'd seen for a couple of years that was the --

13      the Tupperware or Rubbermaid type clear bin that

14      extra pills were in.  Right?

15  A   Right.

16  Q   Now, how many times had you personally been the one

17      to fill the pill -- the daily/weekly bins.

18  A   I would say probably 20 times for Helen.

19  Q   Okay.  Over that two-year period.

20  A   Correct.

21  Q   Are you absolutely positive it was the same pill

22      bin that she had?

23  A   Yes.

24  Q   How can you be so sure?

25  A   It's the same one because we would be the ones that

```
 1          would purchase her a new one, and we never

 2          purchased her the new one.  I mean, it was always

 3          the same clear plastic container.  It never

 4          changed.  I mean, except it got more wore with

 5          time.

 6     Q    What brand name is it that you would purchase her

 7          if you were to purchase a pill bin?

 8     A    I wouldn't do it.  My CNA would go do it for her.

 9          I mean, it would be something at Venture or

10          Wal-Mart something of that, but I wouldn't

11          personally go do that.

12     Q    I noticed that there was in -- in one of the

13          pictures, which I assume you saw but I don't know

14          exactly what you saw, there's full pill bin and

15          there were some additional bottles sitting beside

16          it.  Was that normally the way things were kept?

17     A    No.

18     Q    The pill bin was not quite big enough to store all

19          of her medication.  Is that right?

20     A    That's correct.

21     Q    So wouldn't you want to purchase her a bigger bin

22          in that case?

23     A    We only used that bin for meds that she was

24          currently using that we were using from the

25          bottles.  The extra meds that we weren't using yet
```

```
 1        or that had been discontinued or on hold were kept

 2        in the paper bag.

 3    Q   Okay.  Would you describe the bin that she had?

 4    A   It's a clear plastic bin about eight by four by

 5        six.

 6    Q   What was on the bin?

 7    A   There was nothing on the bin.  I mean, it was

 8        clear.  It might have had a manufacture label; but

 9        other than that, I don't recall it having anything

10        on it.

11    Q   Do you recall any name on the bin?

12    A   No name.

13    Q   No name.

14    A   I don't recall.

15    Q   No more questions.

16            THE COURT:  Mr. Crawford, any questions?

17            MR. CRAWFORD:  No questions, your Honor.

18            THE COURT:  Ms. Becker, any redirect?

19            MS. BECKER:  No further.

20            THE COURT:  You may step down.  Watch your

21   step, please.  Is she released on her subpoena?

22            MS. BECKER:  Please, your Honor.

23            MR. ZOOK:  Yes, your Honor.

24            MR. CRAWFORD:  Yes.

25            THE COURT:  Thank you.  Call your next witness.
```

1          MS. BECKER:  Detective Joel Bourdon.

2          THE COURT:  Raise your right hand.

3               (The witness was sworn.)

4          THE WITNESS:  I do.

5          THE COURT:  Take the witness stand, please.

6                    JOEL BOURDON

7    called on behalf of the State, having been first duly

8    sworn, testified as follows:

9                    DIRECT EXAMINATION

10   BY MS. BECKER:

11   Q    Good morning, sir.  Would you please introduce

12        yourself to our jury?

13   A    My name is name Joel Bourdon.

14   Q    Mr. Bourdon, what do you do for a living?

15   A    I'm a police detective technician.

16   Q    How long have you been with the police department.

17   A    Since April of 1987, 18 -- a little over 18 years.

18   Q    When you first joined the police department were

19        you required to go through any training or gather

20        any schooling in order to become a police officer?

21   A    Yes.

22   Q    What kind of training did you receive?

23   A    I attended the Indiana Law Enforcement Academy the

24        basic training session.

25   Q    Okay.  When you first joined the police agency,

542

1      what was your capacity?

2    A   I was a uniform patrol officer.

3    Q   How long were you a uniform patrol officer?

4    A   About a year and a half.

5    Q   What did you do next for the police department?

6    A   I went to the detective bureau.

7    Q   While you were in the detective bureau did you

8        receive further training and schooling regarding

9        interview techniques, evidence techniques, things

10       like that?

11   A   Yes, I did.

12   Q   Can you explain to the jury what kind of schoolings

13       you went to and different certifications you have

14       obtained?

15   A   Initially, actually, I believe I was still in

16       uniform division when I first started attending

17       Northwestern University Traffic Institute for

18       accident reconstruction.  It was taken down at

19       Plainfield, Indiana is actually where I took my

20       initial courses; and then also through the course

21       of the years then I've attended classes on arson

22       investigation to -- over in Ohio that's both the

23       basic and advanced and then subsequently I received

24       training in a lot of different topics.

25   Q   Okay.  You received training in processing crime

1        scenes?

2   A    Yes.  Most of that was done after 1992 which is

3        when I started doing what I do now, a detective

4        technician.

5   Q    Why don't you tell us exactly what a detective

6        technician is first?

7   A    Basically, my -- my duties consist of responding --

8        upon being requested, responding out to crime

9        scenes.  Most of them are of serious nature, death

10        investigations of different types.  And when I get

11        there, my job is to document, photograph, videotape

12        collect evidence, take measurements, diagram and

13        then subsequently then we may process evidence

14        further.  We may send it to laboratories, a variety

15        of things, and then eventually prepare it and bring

16        it to court if needed.

17   Q    Since 1992 when you started as a Detective

18        technician until present day, any idea how many

19        hours of advanced schooling you've obtained?

20   A    A lot.

21   Q    Okay.  What types of courses?

22   A    I -- I initially started by taking a course from

23        the Federal Bureau of Investigation on physical

24        evidence, preservation, and collection.  That was,

25        I believe, a one -- week course.  And then since

```
 1          then I've taken classes through Northwestern

 2          Traffic Institute up in Evanston, Illinois on crime

 3          scene work.  I believe I took a photography class

 4          from them.  I also took a facial reconstruction

 5          course, and then I attended several seminars

 6          through Wayne State University up in Michigan,

 7          death investigation type courses.

 8               And then most recently this last fall I

 9          attended ten week -- the National Forensic Academy

10          down in Knoxville, Tennessee.  I attended that.

11     Q    In fact, the academy that you just attended, did

12          you rank in your graduating class?

13     A    Yes, ma'am.

14     Q    What was your rank in your graduating class?

15     A    I receive -- I -- I don't know that we would call

16          it a ranking, I -- they issue one award.  It's call

17          the Doctor Bass Award for achievements in forensic

18          investigations, and I received that out of my class

19          of 16 people.

20     Q    Okay.  So since 1992 or approximately 13 years that

21          you have been doing this detective technician

22          position, any idea how many death scenes you have

23          teched?

24     A    I think I could safely say over 100, probably

25          hundreds.  It's very difficult to say.  A lot of
```

1           them -- it may vary on our involvement.  It may be

2           something where my services are not needed, and one

3           of the other technicians would complete those

4           tasks.

5    Q      As part of all of the schools that you have been

6           to, have you been trained regarding fingerprint

7           detection and lifting or preserving?

8    A      Yes.

9    Q      What about serum or bodily fluid for purposes of

10          DNA testing?

11   A      Yes, I have.

12   Q      Are there very detailed procedures that must be

13          followed in order to preserve evidence like this?

14   A      Yes.

15   Q      In your experience in the crime scenes that you

16          have -- or in the scenes that you teched, do you

17          find that it's easy to gather forensic evidence

18          such as DNA or fingerprints or bodily fluids?

19   A      Is it easy.  There are occasions where it's a

20          relatively simple process after you've done it for

21          a while, and there's been lots of changes over the

22          years on how all of this is done and advancements

23          in technology.  It becomes more difficult with time

24          actually because of the sensitivity of testing.

25   Q      Let me ask you this, Detective Bourdon.  Is it easy

1      to find -- actually, I shouldn't say it that way.

2      What characteristics are necessary before you can

3      detect something like a fingerprint?

4   A  Well, in that case, much of it is just making it

5      become visible.  Most -- most latent impressions,

6      most fingerprint impressions left behind are

7      difficult to see with the naked eye unless you

8      process them further.  Once they're located, the

9      actually recovery process is relatively simple.

10  Q  Have you been trained on the different ways to

11     locate fingerprints?

12  A  On a large variety of them.  I'm sure not all of

13     them.

14  Q  Okay.  And could you just briefly explain a couple

15     of the ones that are ones that you typically use?

16  A  Well, probably the most common way of -- of

17     locating fingerprint impressions is dusting.  It's

18     nothing more than using a -- there's several

19     different types of brushes that you use.  They're

20     very fine, and you apply a powder.  There's a

21     multitude of powders out there that can be used,

22     and basically it's applying that dust to the

23     impression left behind it.  It makes it become

24     visible.

25  Q  Now, we'll talk about fingerprints a little bit

```
 1            more in a few minutes, but let's go ahead and move
 2            onto November 29 of 2002.  Did you receive a
 3            request to arrive at the Waterfall Highrise
 4            approximately November 29, 2002?
 5    A       Yes, I did.
 6    Q       Any idea what time of day it was?
 7    A       I believe I got there shortly after eight o'clock
 8            in the morning.
 9    Q       Okay.  When you arrived on that scene, first of
10            all, do you remember what you did when you first
11            got there?
12    A       When I first got at the scene, I met with the
13            supervisor at the time which was Lieutenant Tom
14            Lerner.  He's -- actually, I believe he's the one
15            requested that I respond to that location.  And
16            then from there, he provided me with the initial
17            information they he had at that point.
18    Q       Do you get briefed by officers on the scene as much
19            as possible so that you can start narrowing down a
20            crime scene?
21    A       Yes, yes.
22    Q       Based upon the information you had received thus
23            far, what did you believe to be the actual crime
24            scene regarding Helen Sailor's death?
25    A       Helen Sailor's apartment.
```

```
 1    Q    Did you then go to Helen Sailor's apartment?

 2    A    Yes.

 3    Q    When you begin an investigation and specifically in

 4         Helen Sailor's investigation after the briefing and

 5         after figuring out where the crime scene is, what

 6         is the first course of action that you take?

 7    A    I normally at that point in time physically look at

 8         it myself.

 9    Q    Why do you just take a look at it to begin with?

10    A    Just to see in my eyes what I see that appears to

11         be relevant to what the crime we're investigating,

12         in this case, her death.  What items might -- could

13         possibly be related.  You don't always know because

14         you've got -- it's like anybody else's home,

15         there's lot of stuff, and so you have to kind of

16         get a feel for what might be related to it because

17         it is -- so much of it is unknown at that point in

18         time.

19    Q    Now, prior to your arriving, is the scene or the

20         area that might be involved secured in any way?

21    A    Yes.

22    Q    And the normal course of practice ever since you've

23         been a police officer, how is a scene secured?

24    A    Normally what takes place, every scene is

25         different, but normally what takes place is that
```

1      there will be an officer posted, a uniform officer

2      normally, to secure the location and that can be

3      done in a variety of ways.  In this particular

4      case, it was an officer standing at the doorway to

5      the apartment.  This was on the tenth floor so

6      access was extremely limited of course naturally.

7   Q  When you arrived at the Helen Sailor's apartment,

8      was a uniform officer standing at the door guarding

9      the scene?

10  A  Yes.

11  Q  And when you went into the apartment, did you have

12     to basically log in or identify the fact that you

13     are now present?

14  A  Yes.  They logged -- that's that officer's job also

15     to maintain a log of who enters and exits the

16     scene.

17  Q  Okay.  So from the time that the scene is secured

18     by the police department whatever time that may be

19     until the time that you arrive, do you believe the

20     scene is usually secure?

21  A  Yes.

22  Q  Obviously you have no way of knowing what occurred

23     before police got involved.  Correct?

24  A  That's correct.

25  Q  Okay.  But once police get involved, do you feel

```
 1            comfortable with the security of scene?

 2       A    Yes.  Our officers are good at it.

 3       Q    Now, on November 29 in the morning hours after you

 4            got a good look at Helen Sailor's apartment, what

 5            was the next function?

 6       A    After I reviewed that, it was determined that

 7            Officer McConnell, he was the uniform technician,

 8            would assist me in the processing of the scene and

 9            then I began videotaping.

10       Q    Why do you videotape a scene first?

11       A    Just to get a -- it's -- it's difficult to show

12            everything.  Part of my job is to be able to show

13            this to everyone else whether it be investigators,

14            prosecutors, anybody including the jury later on,

15            what as best we can portray it, and one of the good

16            ways in doing that is videotaping.  We normally do

17            that first just to show the -- what we see as best

18            we can in the human eye.

19       Q    I'm going to show you what's been marked for

20            identification purposes as State's Exhibit 19.

21            Will you take a look at this and tell me if you

22            recognize it?

23       A    Yes, I recognize the label on this.

24       Q    What is it?

25       A    This is the copy of the scene videotape related to
```

1          this case.

2     Q    All right.  And this case means the Helen Sailor

3          homicide?

4     A    Yes.

5     Q    All right.  Does this videotape accurately depict

6          what personally observed in Helen Sailor's

7          apartment the morning of November 29, 2002?

8     A    Yes, it does.

9     Q    Thank you.  Do you believe that this videotape will

10         enlighten the jury and illustrate your testimony as

11         not only the layout but also the way that the scene

12         appeared on the morning you discovered it?

13    A    Yes, it would.

14              MS. BECKER:  Thank you.  State moves to admit

15    what's been marked for identification purposes as State's

16    Exhibit State's 19.

17              MR. ZOOK:  No objection.

18              MR. CRAWFORD:  No objection, your Honor.

19              THE COURT:  Without objection, State's Exhibit

20    19 will be admitted.

21              MS. BECKER:  State would move to publish

22    State's Exhibit 19 by showing it to the jury.

23              MR. ZOOK:  No objection.

24              MR. CRAWFORD:  No objection, your Honor.

25              THE COURT:  And without objection, State's

```
 1      Exhibit 19 will be published electronically.

 2                      (State's Exhibit 19 was published to

 3                      the jury.)

 4      Q    What are we looking at in this view?

 5      A    This is the hallway of the tenth floor of the

 6           Waterfall Highrise.

 7      Q    Are you the person actually behind the video camera

 8           in this?

 9      A    Yes, I am.

10      Q    Why did you take this scene?

11      A    This is just showing the overall view of what we

12           see out in the hallway, just showing the

13           surrounding area, what kind of environment it was.

14      Q    What apartment number was Helen Sailor's apartment?

15      A    1002.

16      Q    Is this the door to Helen Sailor's apartment?

17      A    Yes, ma'am, it is.

18      Q    Why are you focussing on the locking mechanism?

19      A    It was just part of the normal course of

20           investigation.  You -- you would review what access

21           ways there are.  And in this case it would be that

22           door whether there's damage to the doorway or not.

23      Q    Now, you're entering into Helen's apartment.  What

24           area are you seeing now?

25      A    You're facing towards the north -- actually, right
```

1     now you're seeing the floor area in the entry

2     hallway.

3  Q  Why do you do that?

4  A  Try to show everything that you can: up, down, show

5     all the views, show what we see.  Just like you

6     would if you walked into her room.

7  Q  To your knowledge, had anyone disturbed anything

8     prior to your getting there?

9  A  I believe from the information I received was that

10     family members had looked in the victim's person

11     purse.

12  Q  Do you wear gloves or any other kind of protective

13     material while you are even doing this process?

14  A  Yes.

15  Q  Why?

16  A  Just to protect everything so if I inadvertently

17     tripped or had to catch myself that I wouldn't

18     transfer anything.  I normally wear gloves and

19     footwear protection.

20  Q  This key ring that you're focussing on right now,

21     were there any keys on that key ring?

22  A  No, ma'am.

23  Q  Did anybody advise you that they had removed those

24     keys prior to your arriving?

25  A  No.

1    Q   The thing that you focussing on right there, the

2        little white bottle that was off on the table, was

3        that exactly where you found it?

4    A   Yes, ma'am, it was.

5    Q   Did you find any ropes or strings or anything like

6        that in that vicinity?

7    A   No.

8    Q   In fact, did you find anything like that anywhere

9        in the apartment?

10   A   No.

11   Q   This small bed right here and the Bible that is on

12       it, do you have any information that anyone had

13       manipulated or touched that Bible prior to your

14       arriving, or do you know?

15   A   Not that I'm aware of.

16   Q   What is this little package?

17   A   It was a Ziplock style bag, and it appeared to have

18       antacids in it.

19   Q   What are we looking at here?

20   A   This was believed to be the victim's purse.  The

21       black edge of it is shown in the video right now.

22   Q   Where are you standing when you're taking this

23       shot?

24   A   Right now I'm at the doorway leading from that

25       first room that we saw into the -- what I described

1              as the east bedroom.

2        Q    Why do you focus on that box so much?

3        A    Because it was damaged.  The lock mechanism

4              appeared to be pried.

5        Q    Why do you make a point to document the position --

6              the exact position of a body in a crime scene so

7              early on?

8        A    Just because you -- it might assist in determining

9              the events.

10       Q    Does the body get moved usually early on?

11       A    No.

12       Q    There's a bit of glimmery substance that we just

13             saw on the left hand of Helen?  Did you make note

14             of this and collect samples of it during your

15             processing the scene?

16       A    If I recall correctly, that was not collected --

17             the items -- what was on her hand was not collected

18             at the scene.  That would have been done later on.

19       Q    Was there other areas in this apartment or right

20             around Helen's body that also had that same

21             glimmering substance?

22       A    Yes.

23       Q    Did you collect samples of that?

24       A    It was on some of the items that were recovered.

25       Q    There's also kind of pinky substance that was

```
 1           around the body, a liquid.  Did you collect samples

 2           of that?

 3      A    Again, that was also on some of the items which we

 4           collected so, yes, they were collected.

 5      Q    And did you later find bottles of things that might

 6           be consistent with those things in the apartment?

 7      A    Could be.

 8      Q    Do you videotape those as well?

 9      A    I believe so.

10      Q    What are we seeing here?

11      A    Right now I'm showing the closet door.  This is on

12           the east wall of the -- kind of the small hallway

13           leading from the bathroom into that east bedroom,

14           and now it's showing a stain that was on the door

15           itself behind the handle.

16      Q    What are you focussing on now?

17      A    Just showing the overall condition of the bed and

18           the surrounding.  There were stains observed on the

19           wall showing the drawers and items that were kind

20           of strewn about on the bed.

21      Q    Did you also find some of this -- or what appeared

22           to be consistent with the liquid on the floor in

23           the drawers?

24      A    Yes.  That red colored -- reddish pink colored

25           substance.
```

```
 1                    (The video was turned off.)

 2    BY MS. BECKER:

 3    Q    Now, detective, after you finished taking the

 4         video, what did you do next?

 5    A    Normally, in this process we started taking

 6         35-millimeter photographs.

 7    Q    Why do you also take photographs?

 8    A    Just as another way of documenting what we

 9         observed.

10    Q    May I approach?

11              THE COURT:  You may.

12    Q    I'd like to show you what's been marked for

13         identification purposes as State Exhibit 20.  Do

14         you recognize this?

15    A    Yes, I do.

16    Q    What is it?

17    A    This is a photograph, and in the central area of

18         the photograph it's depicting a door knob and door

19         lock this being to the apartment door that we're

20         speaking of 1002.

21    Q    All right.  Next I'd like to show you what's been

22         marked for identification purpose as State's

23         Exhibit 21.  Do you recognize this?

24    A    Yes, I do.

25    Q    What is it?
```

558

1    A    This is a photograph taken standing at the front

2         doorway to the apartment facing towards the north.

3    Q    Thank you.  Next I'd like to show you what's been

4         marked for identification purpose as State's

5         Exhibit 22.  Do you recognize this?

6    A    Yes, I do.

7    Q    What is it?

8    A    This is a photograph taken showing the sink and

9         stove area of this same apartment.

10   Q    Okay.  Next I'd like to show you what's been marked

11        for identification purpose as State's Exhibit 23.

12        Do you recognize this?

13   A    Yes, I do.

14   Q    What is it?

15   A    This is photograph showing the kitchen table and

16        basically the west wall and adjoining furniture

17        items in the same apartment.

18   Q    Thank you.  Next I'm showing you what's been marked

19        for identification purpose as State's Exhibit 24.

20        Do you recognize this?

21   A    Yes, I do.

22   Q    What is it?

23   A    This is a photograph showing the kitchen table area

24        and it's content.

25   Q    Okay.  Is this photograph a little bit closer up

1          than the one prior to it?  The one prior to it

2          would be State Exhibit 23.

3     A    Yes, it is.  It's more directed towards the

4          specifically the table.

5     Q    Okay.  Thank you.  Next I'm showing you what's been

6          marked for identification purposes as State Exhibit

7          25.  Do you recognize this?

8     A    Yes, I do.

9     Q    What is it?

10    A    This is a photograph showing the bed in the west

11         room or the living room area of this apartment

12         showing the items that were laying on the bed.

13    Q    Okay.  Would that specifically be the Bible?

14    A    The Bible and the associated envelope and a small

15         paper there.

16    Q    Next I'm showing you what's been marked for

17         identification purposes as State's Exhibit 26.  Do

18         you recognize this?

19    A    Yes, I do.

20    Q    What is it?

21    A    This is photograph taken showing -- basically

22         facing towards the east showing a recliner with

23         a -- with a seat cushion inside of a bag and then a

24         purse is laying on the floor next to that, and off

25         to your left is a television.

1    Q    Thank you.  We're all these photograph; namely,

2         what's been identified as state's Exhibit 20

3         through and including State's Exhibit 26, taken the

4         morning of November 29, 2002 or thereabouts?

5    A    Or thereabouts.  It could have been the later on

6         that same day also.

7    Q    Are these true and accurate representations of what

8         you personally observed in the apartment of Helen

9         Sailor as you were teaseling it on or about

10        November 29, 2002?

11   A    Yes.

12   Q    Do you believe they will assist the jury in

13        understanding the crime scene and being able to

14        illustrate your testimony?

15   A    Most certainly.

16             MS. BECKER:  Thank you.  State would move to

17   admit what's been marked for identification purposes as

18   State's Exhibit 21 through 26 inclusively.

19             THE COURT:  Mr. Zook.

20             MR. ZOOK:  No objection.

21             THE COURT:  Mr. Crawford.

22             MR. CRAWFORD:  Your Honor, I would only object

23   to No. 21 in that it appears to be a similar shot to what

24   was already shot in the video and would be cumulative.

25   As for the other ones, I see that they're close pictures

1   and maybe not picked up in the video, but 21 I would

2   object to.  Seems to be a similar shot to what was in the

3   video.

4           THE COURT:  Well, all of these are similar to

5   what appeared in the video.

6           MR. CRAWFORD:  They're closer than that

7   particular overall view.

8           THE COURT:  Exhibits 19 -- excuse me --

9   Exhibits 20, 22, 23, 24, 25, and 26 will be admitted

10   without objection by either counsel.  Exhibit 21 will be

11   admitted over the objection of counsel for the defendant

12   Royer.

13           MS. BECKER:  State moves for publication of

14   State's Exhibits 20 to 26 inclusive.

15           THE COURT:  Mr. Zook, any problems that?

16           MR. ZOOK:  No objection.

17           MR. CRAWFORD:  Still noting my objection, your

18   Honor.  I have no objection to the others.

19           THE COURT:  Exhibits 20, 22, 23, 24, 25, and 26

20   will be published without objection.  Exhibit 21 will be

21   published over the objection of the defendant Royer.

22   They'll be published in the manner of the choosing by the

23   state.

24           MS. BECKER:  Thank you, your Honor.  State's

25   Exhibit 20, 21 22, 23, 24, 25, 26.

```
 1                    (State's Exhibits 20, 21, 22, 23, 24,

 2                    25, and 26 were published to the

 3                    jury.)

 4      BY MS. BECKER:

 5         Q    May I approach?

 6              THE COURT:  You may.

 7         Q    Detective, next I'd like to show you what's been

 8              marked for identification purposes as State's

 9              Exhibit 27.  Do you recognize this?

10         A    Yes, I do.

11         Q    What is it?

12         A    This is a photograph of the victim, Helen Sailor,

13              laying on the floor in the east bedroom area.

14         Q    Now, when you arrived on scene, had anybody come in

15              and moved the clothing or moved the body to your

16              knowledge yet?

17         A    No.

18         Q    All right.  So this is a depiction of what you

19              actually observed when you first arrived?

20         A    That is correct.

21         Q    Thank you.  Next I'd like to show you what's been

22              marked for identification purposes as State's

23              Exhibit 28.  Do you recognize this?

24         A    Yes, I do.

25         Q    What is it?
```

| | | |
|---|---|---|
| 1 | A | This is a photograph of the victim's left hand and |
| 2 | | the surrounding area. |
| 3 | Q | Thank you.  Next I'd like to show you what's been |
| 4 | | marked for identification purposes as State's |
| 5 | | Exhibit 29.  Do you recognize this? |
| 6 | A | Yes, I do. |
| 7 | Q | What is it? |
| 8 | A | This is a photograph of the victim's right hand and |
| 9 | | surrounding area. |
| 10 | Q | Next I'd like to show you what's been marked for |
| 11 | | identification as purposes as State's Exhibit 30. |
| 12 | | Do you recognize this? |
| 13 | A | Yes, I do. |
| 14 | Q | What is it? |
| 15 | A | This is a photograph of a set of dentures and the |
| 16 | | surrounding area. |
| 17 | Q | Thank you.  I'm showing you what's been marked for |
| 18 | | identification purposes as State's Exhibit 31.  Do |
| 19 | | you recognize this? |
| 20 | A | Yes. |
| 21 | Q | What is it? |
| 22 | A | This is a photograph showing the front of the |
| 23 | | clothes dresser or bureau on the east wall of the |
| 24 | | east bedroom.  It's showing that there were two |
| 25 | | drawers out of it. |

564

```
 1      Q    Did you find those two drawers somewhere in the

 2           apartment?

 3      A    Yes.

 4      Q    Where were they?

 5      A    Laying on the bed in that same room.

 6      Q    Now, I'm showing you what's been marked for

 7           identification purposes as State's Exhibit 32.  Do

 8           you recognize this?

 9      A    Yes, I do.

10      Q    What is it?

11      A    This is a photograph of one of the dresser drawers

12           laying on the bed in that same room?

13      Q    Okay.  Next is what's been identified as State's

14           Exhibit 33.  Do you recognize this?

15      A    Yes, I do.

16      Q    What is it?

17      A    This is a photograph of the red jewelry box that

18           was underneath the southeast corner of the bed in

19           that room in the east bedroom.

20      Q    Thank you.  Next I'm showing you what's been marked

21           for identification purposes as State's Exhibit 34.

22           Do you recognize this?

23      A    Yes, I do.

24      Q    What is it?

25      A    This is a photograph of partially the interior of
```

1          the closet located on the east wall of the east

2          hallway leading from the bedroom into the bathroom.

3     Q   Thank you.  And then finally, I'll show you what's

4          been marked for identification purposes as State's

5          Exhibit 35.  Do you recognize this?

6     A   Yes, I do.

7     Q   What is it?

8     A   This is a photograph of the kitchen sink or

9          actually the south end of the kitchen sink and part

10         of the refrigerator and countertop in the kitchen

11         at this apartment.

12    Q   Why did you take this photograph?

13    A   Just showing the overall condition of things,

14         showing the surrounding items that were both in the

15         sink, around the sink.

16    Q   Okay.  The bottles that are in the sink, what did

17         you observe them to be?

18    A   They're juice bottles.

19    Q   What kind of juice?

20    A   Ocean Spray.

21    Q   What kind of Ocean Spray juice?

22    A   I believe it was cranberry.

23    Q   Was it red cranberry or white cranberry, do you

24         remember?

25    A   It was a reddish color.

1    Q    And all of these photographs we've just discussed;

2         namely, what's identified as State's Exhibit 27

3         through State's Exhibits 35 inclusive, are these

4         accurate representations of what you personally

5         observed on the morning -- I'm sorry.  During the

6         day of November 29, 2002 at Helen Sailor's

7         apartment?

8    A    Yes.

9    Q    Do you believe that they accurately depict what you

10        saw and would assist the jury in understanding your

11        testimony?

12   A    Yes.

13   Q    Thank you.

14            MS. BECKER:  State moves to admit what's been

15   marked for identification purposes as State's Exhibits 27

16   through 35 inclusive.

17            THE COURT:  Mr. Zook, any objection.

18            MR. ZOOK:  No, sir.

19            THE COURT:  And, Mr. Crawford, any objection?

20            MR. CRAWFORD:  No, your Honor.

21            THE COURT:  State's Exhibits 27, through and

22   inclusive of 35 will be admitted without objection.

23            MS. BECKER:  State moves for publication of

24   State's Exhibit 27 through 35 inclusive through

25   electronic publication.

1          THE COURT:  Any objection, Mr. Zook.

2          MR. ZOOK:  No, your Honor.

3          THE COURT:  Mr. Crawford.

4          MR. CRAWFORD:  No, your Honor.

5          THE COURT:  State's Exhibit 27 through 35 will

6     be published in any manner of choosing by the state.

7          MS. BECKER:  27, 28, 29, 30, 31, 32.

8               (State's Exhibits 27, 28, 29, 30, 31,

9               and 32 were published to the jury.)

10    BY MS. BECKER:

11    Q    Now, Detective Bourdon, the box that is located in

12         32 you characterized it as a jewelry box.  Why did

13         you do that?

14    A    Because later in collecting that and that's what I

15         found as its content.

16    Q    Did you actually identify the contents and keep

17         that as evidence?

18    A    Yes.  That box and contents were recovered.

19               (State's Exhibits 33, 34, and 35 were

20               published to the jury.)

21    Q    Detective, after you had the opportunity to

22         document all of the items in the apartment either

23         by video and/or with 35-millimeter film, what did

24         you do next?

25    A    Then we begin the process of taking measurements to

1              locate furniture items, the victim' position.  I

2              did this with the assistance of Officer McConnell.

3         Q    Why do you do that?

4         A    Just another way of documenting.  Just another way

5              of as accurately as we possibly can documenting

6              locations.

7         Q    In the event that it becomes important in a case

8              later, can you then make a diagram; for example, if

9              the measurements or distances become important?

10        A    Yes.

11        Q    After you've done the measurements and done this

12             rough sketch or whatever comes next, then what do

13             you do?

14        A    Then you would begin in the process of collection

15             and recovery of items.

16        Q    Okay.  Did you collect items such as the Bible, the

17             jewelry box, ect.

18        A    Yes, later that day.

19        Q    Okay.  Now, why do you actually collect those kinds

20             of items?

21        A    With -- with many of them in this particular

22             circumstance was for the possibility of impressions

23             left by someone.

24        Q    What do you mean by impressions?

25        A    Fingerprint impressions, palm prints.

```
 1    Q    Okay.  For example, the medicine container, why did

 2         you collect that?

 3    A    Because it was -- its positioning was such that is

 4         was out on the counter with lots of other items and

 5         it just -- medications just by their nature -- it

 6         just seemed an odd positioning.  I don't -- that's

 7         the best answer I can give to that.

 8    Q    Fine.  Why did you collect the bottles from the

 9         sink?

10    A    Because of their positioning.  They were out -- the

11         red substance or pinkish red substance that was

12         left in the bottle kind of coincided with what we

13         saw in the second room, in the east room.  I don't

14         know that for sure, but that's why they were

15         collected initially.

16    Q    Okay.  And after you collected all of these items,

17         did you what we call bag them and tag them?

18    A    Yes.  They were -- they were bagged and then

19         returned to the evidence area at the Elkhart Police

20         Department.

21    Q    Okay.  Once you have bagged them and at your first

22         opportunity, do you seal them?

23    A    Yes.

24    Q    Why?

25    A    The bags are sealed after we're done processing.
```

```
 1          That can take an extended period of time.  Until

 2          that time, they're secured; and then once they're

 3          sealed, it would be important for -- when they're

 4          transported somewhere else if they went to a

 5          laboratory to protect them.

 6    Q     Okay.  Do you also ensure that -- well, by the

 7          seal, do you ensure that there's been no tampering

 8          with the item?

 9    A     Yes.

10    Q     Do you have to use different types of articles in

11          order to bag them or package them depending upon

12          the substance that you're -- or the items that

13          you're collecting?

14    A     Yes, certainly.

15    Q     Why do you have to worry about that?

16    A     If you're submitting -- if it's an item that could

17          be submitted later on for further examination for

18          serology exam sent to a laboratory for testing,

19          certain items, serology items need to be in paper

20          unless there's -- and there's qualifiers to that

21          even.  Some can be in plastic depending on what

22          they are, how they were obtained.  It's just to be

23          able to protect them so they don't degrade, the

24          samples wouldn't deteriorate, for those issues.

25    Q     Did you also try and take any kind of latent
```

```
 1          impressions whether they be footprint, fingerprint

 2          anything like that?

 3     A    Yes, I did.

 4     Q    In what areas did you try and take prints?

 5     A    I worked in the -- on the doorways to the pantry

 6          closet which was on your left in the apartment, the

 7          floor in that area, the countertops of the kitchen

 8          counter, the stove, the telephone, a lot of the

 9          items that were recovered were subsequently

10          processed later on.  But in the apartment

11          specifically the floor inside of the east bedroom

12          near where the victim was laying, that was

13          processed.  The door to the closet in the --

14          leading towards the bathroom was processed for

15          impressions, a multitude of areas.

16     Q    Okay.  Do you have to narrow down where you're

17          going to dust for impressions, or can you do the

18          entire room?

19     A    Just out of a sheer time frame involvement, you

20          kind of have to focus on what appears to be out of

21          place or related somehow, but you believe it may be

22          tied in or could be tied into this.

23     Q    Okay.  In the Helen Sailor apartment, did you do

24          just that: Focus on the areas that looked out of

25          place, looked like they could have been touched
```

1          somehow?

2     A    Yes.

3     Q    How did you attempt to identify or to see as you

4          previously talked about any type of latent print?

5     A    Basically, at the scene I dusted just using the

6          dusting powders just like we've described before

7          just making them visible.

8     Q    Okay.  And at that point in time, did you find some

9          type of latent print that you thought might be able

10         to be recovered?

11    A    Yes.

12    Q    Let's go ahead and start with the latent markings

13         that you found on -- or in the kitchen area.

14    A    Okay.

15    Q    Do you recall processing any part of the stove?

16    A    Yes.

17    Q    Why did you process the stove?

18    A    Because of it's proximity to where the victim was

19         located.  It's near to where you would have to walk

20         in that area, and it could be touched, you know,

21         it's -- it's a possibility.

22    Q    Okay.  Was there any specific area on the stove

23         that you were able to find some kind of a latent

24         impression you thought was worth collecting?

25    A    Yes.  There were two areas.

1    Q   What did you find?

2    A   On the -- as you face the stove now on the top left

3        side, I recovered one latent impression that was up

4        near the corner; and then I also located an

5        impression down on the bottom right hand drawer,

6        broiler drawer, clear at the very bottom and to the

7        right.

8    Q   The top left, what kind of an impression was that

9        if you could tell?

10   A   Well, it looked like a fingerprint impression, but

11       it had ridge lines like a finger or palm

12       impression.

13   Q   Okay.  Now, while we -- we aren't going to go into

14       detail as far as your abilities to analyze

15       fingerprints.  Is that something that you've been

16       trained to do?

17   A   Not to the extent of a true identification work,

18       no, ma'am.

19   Q   Have you been to enough training that you can at

20       least get a general feel whether it's a fingerprint

21       or whether it's something that has enough quality

22       or enough detail that it could possibly be

23       processed further?

24   A   Yes.

25   Q   Okay.  This print that you -- the latent impression

1      you found at the top left, did you believe it had

2      enough ridge detail that it might worth trying to

3      do something with later?

4   A  Yes, it could be.

5   Q  Did you go ahead and take a lifter or preserve that

6      print?

7   A  Yes.

8   Q  Let's now talk about the bottom right-hand corner.

9      What kind of a latent impression did that appear to

10     be?

11  A  That was different.  That -- it appeared as though

12     it could be like hair.  It was linear in pattern.

13     It was just an odd impression.

14  Q  Okay.  After the stove, do you remember moving into

15     the what we'll call the bedroom or the room where

16     the body lie?

17  A  (No audible response.)

18  Q  Did you find anything that you tried to lift or

19     tried to preserve in there?

20  A  Yes.

21  Q  What areas?

22  A  Basically, in that main area I focussed on the

23     floor because it was pretty much open.  It was

24     obviously near to the victim's location.

25     Obviously, you would have to cross that path to get

1          to her position.

2     Q    Okay.  What did you do to process that area?

3     A    I used dusting powders.

4     Q    Were you able to see by using the dusting powder

5          any kind of detail of an impression that you

6          thought was able to be taken or preserved?

7     A    There were several.

8     Q    What did you do?

9     A    I first after dusting it examined it further.  I

10         found several impressions, possible footwear

11         impressions on the floor on the linoleum area.

12         They were photographed, and their position was

13         documented with measurements, and then they were

14         collected.

15    Q    How do you collect a footwear impression?

16    A    In this particular case, I used adhesive lifters.

17         It's just similar to a piece of tape, a big piece

18         of tape; and then it has a backer on it to protect

19         it so once you lift it, identify it, basically peel

20         it up from whatever substance you would have placed

21         it down onto and then you close it, and it adheres

22         to itself.

23    Q    Okay.  Once it's closed, can it be reopened again?

24    A    Not unless there was something causing it not to

25         seal.  A wet liquid could cause it to possibly

1           separate.

2     Q     Okay.  Would there be obvious changes or

3           manipulations in the paper, the backing, if

4           something wet had touched it?

5     A     Well --

6     Q     Let me ask you this:  Can you visually look at it

7           and see whether it's been tampered with?

8     A     Oh, certainly, certainly.

9     Q     Okay.  All right.  Now, after you took these

10          impressions of footwear detail, where did you go

11          next?

12    A     I already had worked in that area, and then I moved

13          to the bathroom area in the hallway, that small

14          hallway.

15    Q     What did you dust, or what did you try to obtain

16          prints from in that area?

17    A     In the -- I was not able to locate any impressions

18          upon the closet doors which I processed, but I also

19          worked on the area of the bathroom floor.  In there

20          I did observe I believe it was one impression in

21          that area.  It had some detail present.

22    Q     Any areas -- or any other areas that you processed

23          at this time?

24    A     Well, prior to doing the kitchen, I had worked in

25          the pantry area, and I had processed the floor in

1      that area and then also -- excuse me -- the doors

2      leading into that pantry.

3   Q  Were you able to obtain any sample - or any samples

4      of ridge detail or any samples of detail that you

5      thought might be available for further processing?

6   A  Yes.

7   Q  What manner did you use to collect those items as

8      well?

9   A  The same which I described before with the adhesive

10     lifters on the floor.

11  Q  Next I'm going to show you what's been marked for

12     identification purposes as State's Exhibit 36.  Do

13     you recognize this?

14  A  Yes, I do.

15  Q  What is it?

16  A  This is a photograph showing the lifter in place on

17     the front of the stove the bottom right showing

18     it's location.

19  Q  Okay.  I'm now showing you what's been marked for

20     identification purposes as State's Exhibit 37.  Do

21     you recognize this?

22  A  Yes, I do.

23  Q  What is it?

24  A  This is a view showing that same area on the stove

25     only in closer -- closer proximity showing the

1           impression that I observed.

2      Q    Thank you.  Next I'm showing you what's been marked

3           for identification purposes as State's Exhibit 38.

4           Do you recognize this?

5      A    Yes, I do.

6      Q    What is it?

7      A    This is a photograph showing the area what would be

8           towards the west and slightly north from where the

9           victim was located showing the impressions -- some

10          of the impressions which I had obtained from that

11          floor area.

12     Q    Thank you.  Next I'm showing you what's been marked

13          for identification purposes as State's Exhibit 39.

14          Do you recognize this?

15     A    Yes, I do.

16     Q    What is it?

17     A    This is the pantry door leading -- this is on the

18          outside of the pantry door showing the location

19          near the handle where I made a lift.

20     Q    Okay.  And then next I'd like to show you what's

21          been marked for identification purposes as State's

22          Exhibit 40.  Do you recognize this?

23     A    Yes, I do.

24     Q    What is it?

25     A    This is a photograph of the closet door in that

```
 1        small hallway where there was that substance
 2        located leading towards the bathroom.  It's a close
 3        view of it.
 4   Q    Thank you.  And all of these photographs; namely,
 5        State's Exhibit 36 through and including what's
 6        been identified as State's Exhibit 40, are these
 7        accurate representations of what you personally
 8        observed while you were processing the Helen Sailor
 9        apartment on November 29, 2002?
10   A    These actually -- they were not taken on that date.
11   Q    When were these taken?
12   A    These were taken the following day, the 30th.
13   Q    Okay.  Had you been processing the scene pretty
14        much this entire time?
15   A    I had gone home for a -- I finished at
16        approximately midnight on the 29th and then came
17        back in, and it was about noon when I started the
18        following day.
19   Q    Had the scene been secured to your knowledge in the
20        same manner as you described before prior to your
21        coming back?
22   A    The doors were sealed and locked.  I did not have
23        an officer standing on it all night long.
24   Q    Did you check the seals before your entered again
25        on the 30th?
```

```
 1    A    Yes.

 2    Q    Were they intact?

 3    A    Yes, they were.

 4    Q    Okay.  Any reason to believe that they had been

 5         tampered with in any way?

 6    A    No.

 7    Q    All right.  Other than that, are they the same or

 8         substantially the same condition as they were when

 9         you personally observed them while you were at

10         Helen Sailor's apartment?

11    A    Yes.

12    Q    Do you believe that these will assist the jury in

13         understanding your testimony and showing the detail

14         of what you collected?

15    A    Yes, it will.

16    Q    Thank you.

17              MS. BECKER:  State moves to admit what's been

18    marked for identification purposes as State's Exhibit 36

19    through 40 inclusive?

20              THE COURT:  Mr. Zook any objections?

21              MR. ZOOK:  No, sir.

22              THE COURT:  Mr. Crawford, any objections.

23              MR. CRAWFORD:  No, your Honor.

24              THE COURT:  State's Exhibits 36, 37, 38, 39 and

25    40 will be admitted without objection.
```

1           MS. BECKER:  State moves for a publication of

2    36 through 40 inclusive.

3           THE COURT:  Any objections, counsel?

4           MR. ZOOK:  No, sir.

5           MR. CRAWFORD:  No, your Honor.

6           THE COURT:  State's Exhibit 36 through 40

7    inclusive will be published without objection in the

8    manner of choosing by the state.

9           MS. BECKER:  State's Exhibit 36, 37, 38, 39,

10   40.

11              (State's Exhibit 36, 37, 38, 39 and 40

12              were published to the jury.)

13          THE COURT:  Ladies and gentlemen, we're going

14   to give you a break at this time.  During the recess, I

15   need to tell you.  You are all jurors in this case.  I

16   must tell you now and I will repeat this again each time

17   you are permitted to separate.

18              Generally, you should not express any opinion

19   about the case before it is submitted to you for

20   deliberation; however, you are permitted to discuss the

21   evidence presented in this case amongst yourselves in the

22   jury room during recesses from trial.  All jurors and

23   alternates must be present during these discussions, and

24   you must reserve judgment about the outcome of the case

25   until your deliberations begin.

1          You are admonished that you may not discuss the

2     facts of the case with anyone other than your fellow

3     jurors.

4          You may not discuss this case with me or with

5     the lawyers, parties or with any of the witnesses.

6          You should not listen to or read any outside or

7     media accounts of the trial.  You may not investigate the

8     case or attempt to obtain information outside the

9     courtroom.  It is highly improper for you to do so.  You

10     are to consider and decide this case only upon the

11     evidence received during the course of the trial in the

12     courtroom.

13                    (A short recess was taken.)

14                    (The Court convened with all the

15                     parties present.  The jury entered the

16                     courtroom and the following

17                     proceedings were had.)

18          THE COURT:  Be seated, please.  Ms. Becker.

19     BY MS. BECKER:

20     Q    Now, detective, we just talked about those

21          photographs about the latent processing that you

22          did.  Can you explain for the jury what it takes to

23          leave a latent print whether it be fingerprint,

24          footprint, footwear impression, something like

25          that?  Help us understand.

```
 1    A   Basically, there's several different ways it could

 2        take place the actual process with regards to

 3        fingerprints, handprints.  It's basically

 4        leaving -- for the most part -- leaving something

 5        behind.  The oils from your skin, it could be a

 6        substance you have on your hand that was

 7        transferred and the residue that's left behind

 8        dries out and leaves an impression there.  If you

 9        made an impression with, say, footwear or with your

10        hand into something soft that would retain that

11        impression, that could be possible also.

12    Q   So if you have clean hands, really clean hands, not

13        even the oils on your hands are present, can you

14        leave a print on anything you touch?

15    A   Not always.  I mean, there's -- there's not 100

16        percent thing on this.  It's -- it's -- sometimes

17        it's left behind and sometimes it's not, or we're

18        not able to locate it.

19    Q   In your experience processing crime scenes, it is

20        usual that you actually do find fingerprints that

21        are of such a quality that they can actually be

22        compared to something else later?

23    A   I wouldn't say it's the norm.  It's a -- most cases

24        we don't end up with a lot of usable impressions.

25    Q   Why is that, or what is it -- why is it that it's
```

1       so difficult to get a usable impression?

2   A   Because in order to be able to identify it, I mean,

3       you've got to have specific detail present to do

4       that for the examiners.  And with normal activities

5       when you think about it, if you take you hand and

6       you lay it on the arm of your chair and you move

7       your hand just as you would to get yourself up or

8       move or shift, it smears.  So that -- in that

9       occasion, then, it's going to make that unusable.

10  Q   Okay.  So just because you touch something doesn't

11      necessarily mean that it's going to leave a

12      fingerprint or a latent print that you can use.

13  A   That's correct.

14  Q   What exactly does latent mean?

15  A   Hidden.

16  Q   Hidden?

17  A   Yes.

18  Q   Okay.  And you indicated earlier that it's a

19      process of becoming able to see it is what the

20      dusting powder or other means are used for?

21  A   Yes, that's correct.

22  Q   Have you also made attempts at the scene of Helen

23      Sailor to gather other types of prints?  We've

24      already talked about the hair, or what appeared to

25      be the hair on the stove, you talked about the

```
 1        footwear, and you talked about some fingerprint

 2        impressions.  Were there any other types of

 3        impressions that you tried to get?

 4    A   Not really as far as impressions go, no.

 5    Q   All right.  Now, talk about the footwear

 6        impressions.  In your responsibilities as a

 7        detective technician, are you responsible for part

 8        of the evidence room and knowing what evidence is

 9        submitted in a case?

10    A   Yes.

11    Q   All right.  Were there several comparison

12        footprints submitted in the case regarding Helen

13        Sailor's homicide?

14    A   There were -- actually submitted into evidence,

15        yes, there were several different shoes that had

16        been submitted.

17    Q   Okay.  Was there an attempt to make comparisons in

18        the footwear impressions, or the latent footwear

19        impressions that you found in the apartment?

20    A   Well, they were basically examined as far as the

21        footwear that was recovered whether it was even

22        remotely similar to what we observed at the scene,

23        and then if that was -- and then there were others

24        that were just sent to the laboratory for that

25        testing or other testing.
```

1    Q    Now, it's a floor.  Correct?

2    A    Yes.

3    Q    Is there any way of knowing how long a latent

4         impression that you may have been able to pick up

5         came from that floor, or has been on that floor?

6    A    In most circumstances, no.

7    Q    Now, in this circumstance; namely, the fact that

8         there was a body and then some liquid around that

9         body, were there any latent impressions that

10        appeared to be in that liquid or on top of that

11        liquid?

12   A    Yes.

13   Q    Did you collect those?

14   A    Yes.

15   Q    All right.  Did you make an attempt to identify

16        those?

17   A    Yes.  Those were sent to be identified.

18   Q    Were they identified?

19   A    Yes.

20   Q    Was it a known person?

21   A    Yes, it was.

22   Q    Okay.  Was it someone that you had record had been

23        in with the body?  Actually, let me just ask you

24        this.  Who was it?

25   A    It was Larry Converse's shoe.

```
 1    Q    Okay.  Now, were any of the other latent shoeprints

 2         in the liquid substance or clearly part of this

 3         crime scene?

 4    A    No.  Most of the others were in the surrounding

 5         areas nearby.

 6    Q    Okay.  Is there any way that you could say with

 7         certainty that they were left by someone who would

 8         have been involved in this crime?

 9    A    No.

10    Q    Do you try and collect them anyway just in case?

11    A    Make the attempt.

12    Q    All right.  And all of the latent prints --

13         footprints that you collected, did you make

14         attempts to have them identified them by sending

15         them for processing or other means?

16    A    Yes.  If they were -- appeared to be usable

17         impressions after you lifted them, yes, we did

18         attempt it.

19    Q    Okay.  And based upon the footwear impressions, was

20         an identity of a perpetrator ever found?

21    A    No, no.

22    Q    Let's now talk about the fingerprint impressions.

23         Were you able to get some fingerprint impressions

24         that had enough ridge detail that you thought could

25         be used for later processing?
```

1    A    Yes.

2    Q    Did you make lifters like you talked about before

3         of those fingerprint impressions?

4    A    Yes, I did.

5    Q    Specifically let's talk about some additional items

6         that were admitted into evidence.  Were there items

7         that had been recovered from the trash chute that

8         were admitted into evidence?

9    A    Yes.

10   Q    Now, did you retrieve some of those items at a

11        later date for purposes of further processing?

12   A    Yes, I did.

13   Q    What kind of items were they?

14   A    They were, if I recall correctly, it was juice

15        bottles and then an envelope I believe it was.

16   Q    Okay.  Were there also some towels that were

17        submitted into evidence from that same location?

18   A    Yes.

19   Q    Okay.  But can you process cloth for fingerprints?

20   A    It is possible.

21   Q    Did you do it in this case?

22   A    No, I did not.

23   Q    Are you familiar with how to do that?

24   A    Vaguely, yes.

25   Q    Okay.  Did you try and process the juice bottles?

1     A    Yes.

2     Q    What kind of juice bottles were they?

3     A    The one -- I don't remember the brand name on the

4          one.  The one was an Ocean Spray, I believe, and

5          then the other one I believe it was an Old Orchard

6          brand.

7     Q    I may I approach?

8              THE COURT:  You may.

9    BY MS. BECKER:

10    Q    I'm going to show you what's been marked for

11         identification purposes as State's Exhibit 41.  Do

12         you recognize this?

13    A    Yes, I do.

14    Q    What is it?

15    A    This is a photograph of the process of processing

16         the one Ocean Spray cranberry juice bottle.

17    Q    Next I'm going to show you what's been marked for

18         identification purpose as State's Exhibit 42.  Do

19         you recognize this?

20    A    Yes, I do.

21    Q    What is it?

22    A    This is a photograph of that same bottle with

23         different adhesive lifters attached to it.

24    Q    All right.  Does this accurately demonstrate the

25         process that you go through in trying to make these

1          lifters from the print?

2     A    Yes.

3     Q    Does it also show a decent view of how to -- or of

4          all the different prints and latent marks on these

5          bottles that make it difficult for you to get

6          lifters?

7     A    Could you rephrase that question, ma'am?

8     Q    Sure.  Let me rephrase that question.  Does this

9          also show the various other marks that are present

10         on these bottles that are also latent, in other

11         words, they're brought up with the dusting powder?

12    A    Oh, yes, certainly.

13    Q    And do those sometimes interfere with your

14         abilities to take ridge prints or fingerprints?

15    A    Yes, they can.

16    Q    All right.  Do these two photos accurately

17         represent what you personally observed when you

18         processed this bottle?

19    A    Yes.

20    Q    And do you believe that they will assist the jury

21         in understanding your testimony?

22    A    Yes.

23    Q    Thank you.

24         MS. BECKER:  State would move to admit what's

25    been marked for identification purpose as State's

1    Exhibits 41 and 42.

2              THE COURT:  Mr. Zook, any objections?

3              MR. ZOOK:  No, sir.

4              THE COURT:  Mr. Crawford, any objections?

5              MR. CRAWFORD:  No, your Honor.

6              THE COURT:  Exhibits 41 and 42 will be admitted

7    without objection.

8              MS. BECKER:  State would move to publish

9    State's Exhibit 41 and 42 in digital publication.

10             THE COURT:  Any objection, counsel?

11             MR. ZOOK:  No, sir.

12             MR. CRAWFORD:  No, your Honor.

13             THE COURT:  Exhibits 41 and 42 will be

14   published in any manner of choosing by the state without

15   objection.

16             MS. BECKER:  41, 42.

17                  (State's Exhibits 41 and 42 were

18                   published to the jury.)

19   BY MS. BECKER:

20   Q    Now, detective, you indicated that you dusted for

21        prints and -- fingerprints in numerous areas of the

22        apartment, and in some circumstances you were able

23        to take lifters.  Correct?

24   A    That's correct.

25   Q    Were those lifters submitted to laboratory or

```
 1          submitted somewhere for further analysis?

 2     A    Yes.

 3     Q    Were any of them of sufficient -- well, aside from

 4          one print on a tub, were any of them of sufficient

 5          quality to be able to identify a perpetrator?

 6     A    I can't really answer that.

 7     Q    Let me ask you this.  Did -- the results that you

 8          got from the lab, did they assist in the

 9          investigation in identifying the perpetrator?

10     A    No.

11     Q    Okay.  Let's now talk about this plastic tub.  May

12          I approach?

13              THE COURT:  You may.

14   BY MS. BECKER:

15     Q    I'm going show you what's been marked for

16          identification purposes as State's Exhibit 43.  Do

17          you recognize this?

18     A    Yes, I do.

19     Q    What is it?

20     A    This is the plastic tub and then the medication

21          bottles contained in it that was on the stove at

22          Helen Sailor's apartment.

23     Q    Is this is the same plastic container that we saw

24          in the photograph previously?

25     A    Yes.  Yes, it is.
```

1    Q    All right.  Now, other than the fact that this has

2         been repackaged and appears to have been processed,

3         does it appear to be in the same or substantially

4         the same condition as it was when you personally

5         retrieved it from the Helen Sailor's apartment?

6    A    The tub is substantially in the same condition.

7         The medications have -- appear to be shifted

8         around.

9    Q    All right.  Just in their positioning?

10   A    Yes.

11   Q    Now, were some of these -- the plastic tub itself,

12        was it processed for fingerprints?

13   A    Yes.

14   Q    Did you do that personally?

15   A    Yes, I did.

16   Q    All right.  Is that what the black coating is on

17        the tub?

18   A    Yes.  That's some of the dusting powder.

19   Q    All right.  And then I'd also liked to show you

20        what's been marked for identification purposes as

21        State's Exhibit 44.  Do you recognize this?

22   A    Yes, I do.

23   Q    What is it?

24   A    These are three bottles of prescription type

25        medication and a dosage cup that were on the

1          kitchen counter in front of the pill planners at

2          the apartment of Helen Sailor.

3     Q    All right.  Was there also a fourth bottle in front

4          of the pill planners?

5     A    Yes, there was.

6     Q    Is that packaged in a different bag?

7     A    Yes, it is.

8     Q    All right.  Did you process or attempt to process

9          all of these four bottles for latent prints?

10    A    Yes, I did.

11    Q    All right.  And are these the only bottles that

12         were separate on the counter which we saw in the

13         photograph earlier?

14    A    Yes.  The only ones sitting out, yes.

15    Q    Did the -- other than that, are they in the same or

16         substantially the condition as they were when you

17         retrieved them?

18    A    Yes.

19    Q    Thank you.

20         MS. BECKER:  State would move to admit what's

21    been marked for identification purposes as State's

22    Exhibit 43 and 44?

23         THE COURT:  Counsel, any objection?

24         MR. ZOOK:  No, sir.

25         MR. CRAWFORD:  No, your Honor.

1    THE COURT:  Exhibits 43 and 44 will be admitted

2  without objection.

3    MS. BECKER:  State would reserve publication at

4  this time.

5    THE COURT:  All right.

6  BY MS. BECKER:

7    Q   Detective, you indicated that you did process this

8        medicine tub what's been identified as 43 for

9        latent prints.  Correct?

10   A   That is correct.

11   Q   Were you able to see enough ridge detail anywhere

12       on there to try and take some lifters for further

13       processing?

14   A   Yes, I did.

15   Q   How many, do you rememberer?

16   A   I believe it was eight.

17   Q   Were one of those lifters identified as lifter M?

18   A   Yes.

19   Q   From where or what area of the medicine tub did you

20       take lifter M?

21   A   From on the back side, the opposite side of where

22       the label is located?

23   Q   All right.  So if we look at State's Exhibit 43 and

24       we see that the label is at the end of the bag

25       where the exhibit sticker is --

```
 1    A   That's correct.

 2    Q   -- what are you referring to the back side of the

 3        container?

 4    A   The opposite side from the label.  This side right

 5        here where I'm pointing now.

 6    Q   Okay.  Did you photograph your process of taking

 7        lifter M at the time you were processing the

 8        medical tub?

 9    A   Yes.

10    Q   I'm going show you what's been marked for

11        identification purposes as State's Exhibit 45.  Do

12        you recognize this?

13    A   Yes, I do.

14    Q   What is it?

15    A   This is a photograph of that tub with the lifters

16        in place, or at least two sides are shown here,

17        with the lifters in place with M, and you can see

18        the edge of H.

19    Q   Okay.  Does this photograph accurately depict what

20        you were observing as you processed the medical

21        container?

22    A   Yes, it did.

23    Q   Thank you.  Does it also show the positioning of

24        that lifter on the medical container?

25    A   Yes.
```

1    Q    Do you believe this will assist the jury in

2         understanding your testimony?

3    A    Yes, it will.

4    Q    And was that done at the same time that you

5         processed that medical container subsequent to

6         recovering it from Helen Sailor's apartment?

7    A    The photograph was taken when it was processed,

8         yes, ma'am.

9    Q    Thank you.  Next I'd like to show you what's been

10        marked for identification purposes as State's

11        Exhibit 46.  Do you recognize this?

12   A    Yes, I do.

13   Q    What is it?

14   A    This is the lifter which was depicted in the

15        previous photograph identified as M.

16   Q    Okay.  Now, there are two chunks out of the center

17        of that lifter.  What are those chunks

18        representing?

19   A    I believe those were removed from the lifter during

20        the subsequent laboratory processing.

21   Q    All right.  Did you request certainly laboratory

22        processing that would require them having a piece

23        removed?

24   A    Yes.

25   Q    What kind of processing would that have been?

| | | |
|---|---|---|
| 1 | A | Processing the -- the -- what's in between the |
| 2 | | adhesive lifter and the backer for DNA. |
| 3 | Q | Oaky.  Did -- or were there chunks taken out of |
| 4 | | areas that effected identifying this print to your |
| 5 | | knowledge? |
| 6 | A | Not to my knowledge. |
| 7 | Q | Okay.  And does what's been identified as State's |
| 8 | | Exhibit 46 appear to be in same or substantially |
| 9 | | the same condition as it was when you took it off |
| 10 | | the medical tub except for the two chunks taken |
| 11 | | out? |
| 12 | A | Except for the chunks, and there's several other |
| 13 | | markings on this that weren't there at that point |
| 14 | | in time. |
| 15 | Q | Do you recognize the markings? |
| 16 | A | They appear to be laboratory markings. |
| 17 | Q | Are they markings that you're familiar with? |
| 18 | A | Yes. |
| 19 | Q | Thank you. |
| 20 | | MS. BECKER:  State now moves to admit what's |
| 21 | been marked for identification purposes as State's |
| 22 | Exhibit 45 and 46. |
| 23 | | THE COURT:  Counsel, any objections? |
| 24 | | MR. ZOOK:  No, sir. |
| 25 | | MR. CRAWFORD:  No, your Honor. |

1          THE COURT:  Exhibits 45 and 46 will be admitted

2     without objection.

3          MS. BECKER:  State would move to publish

4     State's Exhibit 45 by digital publication and 46 by

5     passing to the jury.

6          THE COURT:  Any objection?

7          MR. ZOOK:  No, sir.

8          MR. CRAWFORD:  No, your Honor.

9          THE COURT:  State's Exhibit 45 and 46 will be

10    published in the manner of choosing by the state.

11              (State's Exhibit 45 and 46 was

12              published to the jury.)

13         THE COURT:  Ladies and gentlemen, take as long

14    as you wish to examine Exhibit No. 46.  It's being passed

15    amongst you.  These exhibits will be sent, generally

16    speaking, to the jury room with you during your

17    deliberations.  You'll have another opportunity to

18    examine them at that time.

19    BY MS. BECKER:

20    Q    Now, detective, after you were able to process the

21         medical tub and you were able to get lifter M, did

22         it appear to you to have enough ridge detail that

23         you thought it might be sufficient for comparison

24         purposes?

25    A    Yes.

600

1    Q    Were you instructed to obtain another print, or a

2         sample print, for purposes of submitting for

3         comparison?

4    A    Yes.

5    Q    Where did you go to obtain a sample print?

6    A    From -- it was a print card, and I obtained that at

7         the Elkhart Police Department Records Division.

8    Q    Okay.  Does the Elkhart Police Department keep

9         certain records in the normal course of their

10        business?

11   A    Yes, they do.

12   Q    Among those do you have fingerprint cards on

13        record?

14   A    Yes, we do.

15   Q    Next I'm going to show you what's been marked for

16        identification purposes as State's Exhibit 47.

17        Take a look at that.  Do you recognize this?

18   A    Yes, I do.

19   Q    What is it?

20   A    This is a Elkhart Police Department fingerprint

21        card with inked impressions on it.

22   Q    Okay.  Where did you obtain this?

23   A    From the records division.

24   Q    Okay.  Did you personally seal it?

25   A    Yes, I did.

601

1 Q Is this the same fingerprint card that you

2   submitted for purposes of comparison?

3 A Yes, it is.

4 Q To whom did you submit this card for purposes of

5   comparison?

6 A To Detective Chapman with the Elkhart County

7   Sheriff's Department.

8 Q Why did you submit a fingerprint to Detective

9   Chapman with the Elkhart County Sheriff's

10   Department?

11 A Because he's a latent prints examiner?

12 Q Okay.  Why didn't you just send the latent print,

13   the fingerprint, with this much detail to the

14   Indiana State Police Lab?

15 A Because it was requested we go through him because

16   he could get it done sooner so -- because he would

17   be able to start his examination sooner.

18 Q In your experience with the Indiana State Police

19   Lab, how long does it typically take to get

20   fingerprint comparisons done?

21 A It varies a great deal, depends on their -- their

22   bag lock.  Anywhere -- I've had them come back

23   within a few months, and sometime it's been several

24   years.

25 Q What about DNA testing?

```
 1    A    Pretty much more than a year is the routine.

 2    Q    Now, after you were able to gather all of the

 3         evidence that you collected from Helen Sailor's

 4         apartment whether it be the latent fingerprint or

 5         the latent ridge detail, whatever you could get,

 6         the foot impressions, samples of bodily fluids from

 7         the autopsy or what from what you got around the

 8         scene or the items at the scene, did you submit

 9         some of these items to the Indiana State Police

10         lab?

11    A    Yes.

12    Q    Why did you do that?

13    A    For further testing in an attempt to identify the

14         contributor.

15    Q    Other than lifter M, that fingerprint, was the lab

16         able to assist in identifying another perpetrator?

17    A    No.

18             MS. BECKER:  No further questions at this time.

19             THE COURT:  Mr. Zook.

20                       CROSS-EXAMINATION

21   BY MR. ZOOK:

22    Q    Good morning, Joel?

23    A    Good morning, sir.

24    Q    I understand that you got a jewelry box from

25         underneath a bed.  Is that right?
```

603

```
 1    A   Yes, sir.

 2    Q   Was that actually a jewelry box?

 3    A   It appeared to be to me.

 4    Q   It did?

 5    A   Yes, sir.

 6    Q   Okay.  It looks kind of like a tool box from the

 7        front.

 8    A   Well, it was a -- if I recall right, it was like

 9        padded like naugahyde or facsimile leather.

10    Q   What was in it?

11    A   There were Ziplock bags containing jewelry item.

12        looked like costume jewelry type items.

13    Q   Okay.  Did it appear to be relatively full or

14        empty?

15    A   There were numerous items in it.  I don't recall

16        how packed it seemed to me.

17    Q   Okay.  And did you find any pieces of rope?

18    A   Any pieces of rope, sir?

19    Q   Pieces of rope in the apartment?

20    A   No, sir.

21    Q   Did you check in the chute, the chutes going down

22        from the tenth floor where you would throw garbage?

23    A   I did not search that area, sir.

24    Q   It wasn't searched?

25    A   No.  I -- I did not search that area, no, sir.
```

```
 1    Q   You found some towels.  Those would be towels that
 2        were found in the apartment.
 3    A   No.  I did not recover any towels.
 4    Q   Oh, you didn't.
 5    A   No, sir.
 6    Q   I thought you'd said there were some things that
 7        you didn't fingerprint that were of that nature?
 8    A   There were towels recovered, but I didn't
 9        personally recover those items, sir.
10    Q   Okay.  And you don't know where they were recovered
11        from?
12    A   I would -- to the best of my knowledge, they were
13        recovered from the trash chute and dumpster area.
14    Q   Okay.  Now, were there -- did you dust all of the
15        pill bottles?
16    A   All of the pill bottles.  No.  I did not dust the
17        ones that were inside of that tub that we talked
18        about earlier.
19    Q   Why wouldn't you dust those?
20    A   Because it appeared -- from how they were
21        positioned when I recovered them, it didn't really
22        look like they had been rifled through or gone
23        through.  They were just seated in there at that
24        position.
25    Q   Okay.  Okay.  And the only -- the only matching
```

1          shoe was from a relative of the deceased.  Is that

2          right?

3     A    I believe he's a relative, sir, yes.

4     Q    And someone who is recognized to have been in the

5          apartment --

6     A    Yes, sir.

7     Q    -- since the time of the death.

8     A    That's correct, sir.

9               MR. ZOOK:  Pass the witness.

10              THE COURT:  Mr. Crawford.

11              MR. CRAWFORD:  Thank you, your Honor.

12                       CROSS-EXAMINATION

13    BY MR. CRAWFORD:

14    Q    Officer, I want to make sure I'm clear.  You tested

15         the kitchen area I believe you mentioned for latent

16         prints.  Is that correct?

17    A    Portions of it, yes, sir.

18    Q    The stove area specifically.  Right?

19    A    Yes.

20    Q    You also mentioned that you took shoe prints in the

21         bedroom, is that correct, or took prints --

22         possible prints or -- of shoe prints?

23    A    Yes.  Not in the kitchen, sir.

24    Q    Right.

25    A    Okay.

1    Q   In the bedroom.

2    A   Yes.

3    Q   Did you take any prints or attempt to take any

4        prints of the dresser drawers?

5    A   Yes.

6    Q   And were those also passed on to the state police

7        lab?

8    A   I didn't -- I didn't recall -- or recover any

9        usable impressions from those areas.

10   Q   Okay.  Did you attempt to obtain prints from the --

11       what you called the jewelry box?

12   A   Yes.

13   Q   And were any of those prints sent to the state lab?

14   A   If I recall correctly, I did not obtain any usable

15       impressions off of that box.

16   Q   Now, I believe you also mentioned during

17       cross-examination that there was some jewelry still

18       in the box.  Is that correct?

19   A   Yes, I believe there was.  It was in a Ziplock --

20       small Ziplock bags.

21   Q   And of the one person -- again, I want to make sure

22       I'm clear -- for the footprints, it was just one

23       that came back, is that correct, someone you can

24       identify?

25   A   Right.  As I -- to the best of my recollection,

STATE'S WITNESS - JOEL BOURDON - (REDIRECT)

1       there was just one impression that was identified.

2   Q   I think you also mentioned during direct

3       examination that cloth could be processed.  Is that

4       correct?

5   A   It does have the possibility as my understanding

6       for it, yes, sir.

7   Q   But that was not done with the particular cloth

8       towels that were recovered in this case.  Is that

9       correct?

10  A   That is correct, sir.

11  Q   Thank you.  No further questions.

12          THE COURT:  Ms. Becker.

13          MS. BECKER:  Just briefly, your Honor.

14                REDIRECT EXAMINATION

15  BY MS. BECKER:

16  Q   Do you know which officer searched the trash chute

17      outside of Helen Sailor's apartment?

18  A   I know one of the officers that did that.

19  Q   Who was that?

20  A   Detective D'Andre Christian.

21  Q   Did you have in your evidence room under this case

22      number submissions from the trash chute from

23      D'Andre Christian?

24  A   Yes.

25  Q   In fact, the two primary juice bottles that we

STATE'S WITNESS - JOEL BOURDON - (RECROSS)

1       talked about were those from the trash chute

2       according to the evidence log?

3   A   I don't know that the one was a cranberry juice

4       bottle, but the juice bottles, yes, there were, I

5       believe, two submitted by her along with additional

6       towels.

7   Q   Okay.  When was that trash chute searched, do you

8       know on or about?

9   A   That was -- that was searched -- that was done on

10      the 29th of November, 2002.

11  Q   Okay.  Now, as you were processing this scene for

12      prints that was just discussed, while you were

13      doing that, did you find lots of different smears?

14  A   Numerous smears, yes, ma'am.

15  Q   I don't have any further questions.  Thank you.

16          THE COURT:  Mr. Zook, any other questions?

17          MR. ZOOK:  Yes, sir.

18                  RECROSS-EXAMINATION

19  BY MR. ZOOK:

20  Q   Joel, you're the -- you are a custodian of the

21      evidence.  Is that right?

22  A   One of them, sir.

23  Q   You and at least one other person.

24  A   Yes, sir.

25  Q   To your -- best of your recollection, was any rope

STATE'S WITNESS - JOEL BOURDON - (RECROSS)

1      submitted into evidence?

2   A   Any rope.  Not to the best of my remembrance, sir.

3   Q   Okay.  Did you dust the key chain for prints?

4   A   When you say "the key chain," sir, are we

5       discussing the heart shaped key chain?

6   Q   The -- the -- the heart shaped --

7   A   Yes, I did; yes, I did.

8   Q   Was any print found on that?

9   A   No.  I did not obtain any usable impressions from

10      that.

11  Q   Thank you.  No more questions.

12          MR. CRAWFORD:  No questions, your Honor.

13          MS. BECKER:  Nothing further.

14          THE COURT:  You may step down, sir.  Watch your

15  step.  Call your next witness.

16          MS. BECKER:  Thank you.  State would call Betty

17  Cross.  Can this witness be released from his subpoena?

18          MR. ZOOK:  Yes.

19          MR. CRAWFORD:  Yes.

20          THE COURT:  He will be released.

21          MS. BECKER:  Thank you, your Honor.

22          THE COURT:  Would you raise your right hand,

23  please.

24              (The witness was sworn.)

25          THE WITNESS:  Yes.

 1              THE COURT:  Take the witness stand, please.

 2                        BETTY CROSS

 3    called on behalf of the State, having been first duly

 4    sworn, testified as follows:

 5                    DIRECT EXAMINATION

 6    BY MS. BECKER:

 7        Q    Good morning, ma'am, would you please introduce

 8             yourself to our jury?

 9        A    My name is Betty Cross.

10        Q    Betty, what do you do for a living?

11        A    I'm a records manager for the Elkhart City Police

12             Department.

13        Q    How long have you been the records manager for the

14             Elkhart City Police Department?

15        A    Three years now.

16        Q    In the course of your duties as the records

17             manager, is it your responsibility to ensure that

18             the records of the Elkhart Police Department are

19             kept safe and secure in your facility?

20        A    Yes.

21        Q    Are these records that are kept in the normal

22             course of business at the Elkhart Police

23             Department?

24        A    Yes.

25        Q    Okay.  I'd like to show you what's been marked for

1          identification purposes as State's Exhibit 47 and

2          ask you to take a look at this, please.

3     A    (This witness complied.)

4     Q    Do you recognize this?

5     A    Yes.

6     Q    What is it?

7     A    It's a palm print card.

8     Q    What is a palm print card?

9     A    It is a print of the -- of a -- a person that's

10         arrested.

11    Q    Okay.  And does -- when the fingerprints are taken,

12         are these records that's are kept in the normal

13         course of business of the Elkhart Police

14         Department?

15    A    Yes.

16    Q    Are they taken by a person with knowledge of what's

17         going on; namely, the officer that's doing the

18         print taking?

19    A    Yes.

20    Q    All right.  Is the identifying information of the

21         person that's giving the print recorded on the card

22         as well?

23    A    Yes.

24    Q    All right.  Does there name appear on that card?

25    A    Yes, it does.

612

```
 1    Q    Are these records that are kept in the normal

 2         course of business of the Elkhart Police Department

 3         from records that are made at or near the time of

 4         the observation?

 5    A    Yes.

 6    Q    Okay.  And are they kept as a regular business

 7         activity of the police department?

 8    A    Yes.

 9    Q    Okay.  Thank you.  No further questions.

10         THE COURT:  Mr. Zook.

11         MR. ZOOK:  No questions.

12         MR. CRAWFORD:  No questions, your Honor.

13         THE COURT:  You may step down.  Watch your

14    step, please.  Is she released, Mr. Zook?

15         MR. ZOOK:  Yes.

16         MR. CRAWFORD:  Yes.

17         THE COURT:  She'll be released from her

18    subpoena.  Call your next witness.

19         MS. BECKER:  State would call Detective Dennis

20    Chapman.

21         THE COURT:  Would you raise your right hand,

22    sir?

23              (The witness was sworn.)

24         MR. WILLIAMS:  I do.

25         THE COURT:  Take the witness stand, please.
```

613

```
 1                        DENNIS CHAPMAN

 2    called on behalf of the State, having been first duly

 3    sworn, testified as follows:

 4                        DIRECT EXAMINATION

 5    BY MS. BECKER:

 6        Q    Could you please tell us who you are?

 7        A    Dennis Chapman.  I'm a detective with the Elkhart

 8             County Sheriff's Department.

 9        Q    How long have you been a detective with the Elkhart

10             County Sheriff's Department, Detective Chapman?

11        A    I've been a detective six years.

12        Q    Okay.  How long have you worked at the Elkhart

13             County Sheriff's Department?

14        A    In November it will be 12 years with the sheriff's

15             department.

16        Q    Prior to that, what did you do?

17        A    I worked in a juvenile detention for six years in

18             Elkhart County.

19        Q    Prior to that?

20        A    I worked the juvenile detention in Berrien County,

21             Michigan.

22        Q    Okay.  And then prior to that?

23        A    I was in training for the U.S. border patrol.

24        Q    That's okay.  We need to keep going back.  What did

25             you do before the border patrol?
```

```
 1      A    And before that I worked as security at the Cook

 2           Nuclear plant, Bridgeman, Michigan.

 3      Q    I'm sorry, what?

 4      A    I worked security at the Cook Nuclear Plant in

 5           Bridgeman, Michigan.

 6      Q    The Cook Nuclear Plant?

 7      A    Right.

 8      Q    All right.  Prior to that, that's the important

 9           part, what did you do?

10      A    I worked for the FBI.

11      Q    What did you do for the FBI?

12      A    I was a fingerprint examiner.

13      Q    How long were you a fingerprint examiner for the

14           FBI?

15      A    Approximately two years.

16      Q    Now, not to date you, but when did you actually

17           begin your service with the FBI?

18      A    It was February of 1976.

19      Q    Okay.  In February of 1976, was the FBI using

20           computers for fingerprint classifications?

21      A    No, they were not.

22      Q    Okay.  When you began working for the FBI, what

23           kind of training did you have to obtain?

24      A    I went through 12 weeks of training how to classify

25           and examine presents.
```

```
 1    Q   Okay.  What do you mean by classify prints?

 2    A   Well, at the time, the FBI -- the whole seventh

 3        floor of the FBI headquarters in Washington was

 4        filled with file cabinets, and the fingerprint

 5        cards were all filed in there, and they were

 6        classified according to female, male, and they were

 7        broken down so you could search them easily.

 8        Each -- there was 26 units on that floor, and each

 9        unit was broke up so it would be easier to search.

10        They were not searched by name, but they were

11        searched by classification.

12    Q   All right.  So for example, somebody would submit a

13        fingerprint to you and say find me the comparison.

14        What would you do?

15    A   First thing you'd do would be classify the print

16        and find out which unit you would go to.

17    Q   And when you say "classify," do you break a print

18        down according to the types of characteristics that

19        it shows?

20    A   Right.  It would be the type of patterns that were

21        in each finger.

22    Q   And once you're able to break it down into those,

23        can you at least limit your search to a smaller

24        number?

25    A   A smaller number, yes.
```

1    Q   Even though you could classify a print and get it

2        down to a smaller number, how many print cards

3        would you have to look at in order to make a

4        comparison?

5    A   Well, the standard was -- say, the last card you

6        would search by would be a ridge count of ten.  You

7        always have to search from either five to 15, so

8        you'd have several prints, sometimes hundreds of

9        prints in one search.

10   Q   Okay.  And how would you actually compare?

11   A   You would look at each card individually.

12   Q   Okay.  What kind of an instrument did you use in

13       order to look at these cards and make comparisons?

14   A   We had little magnifying glasses that we look

15       through.

16   Q   And how many years did you spend doing this?

17   A   Two years.

18   Q   All right.  After you left the FBI, did you later

19       then have to use your fingerprint skills again?

20   A   When I worked at Cook Plant, occasionally they

21       would ask me if these prints -- for background

22       checks on certain individuals asked me if they were

23       all right to be submitted, and I would look at

24       them.

25   Q   Okay.  When you came to the Elkhart County

```
 1           Sheriff's Department and became a detective, what

 2           were part of your duties?

 3     A     As initially, I was assigned investigations, but

 4           they would also ask for me to look at prints

 5           because they knew I had the fingerprint training.

 6     Q     Okay.  Did everybody kind of come to you and say

 7           can you help?

 8     A     Yes, they did.

 9     Q     All right.  And based upon that, did you start

10           doing that on a more regular basis?

11     A     Yeah.  In the fall of 2000, I attended a Integrated

12           Indiana Law Enforcement Crime Scene Training

13           School; and after that of course, then I was

14           assigned to lab full time.

15     Q     Okay.  And in the lab as a full time detective

16           technician, is it one of your responsibilities to

17           examine as well compare fingerprints?

18     A     Yes, it is.

19     Q     Based upon your experience, have you been able to

20           make fingerprint comparisons in the past several

21           years?

22     A     Yes, I have.

23     Q     Any idea how many comparisons you've made?

24     A     Not right off the top of my head.  Several -- maybe

25           100 or so.
```

```
 1     Q    Okay.  I'd like to show you what has been --
 2          actually, before we do that.  Let's talk a little
 3          bit about fingerprints.  Do you also have training
 4          and experience in attempting to recover latent
 5          prints from a crime scene?
 6     A    Yes.
 7     Q    Is that part of your responsibilities at the
 8          sheriff's department?
 9     A    Yes, it is.
10     Q    In your experience, do you often find fingerprints
11          at a crime scene?
12     A    Not often.
13     Q    Why not?
14     A    A lot of it depends on the surface you're trying
15          fingerprint and the type of surface it is.  Glass
16          is pretty easy but most other surfaces it's
17          difficult to get prints off of.
18     Q    Okay.  Are there certain external things that
19          effect whether a fingerprint is left or not?
20     A    Yes.  Weather will effect it, and the type of
21          surface; and if someone is a secretor or not if
22          they leave prints behind.
23     Q    What does a secretor mean?
24     A    Someone sweats a lot, or if they have -- sometimes
25          people wear gloves (unintelligible) T.V. too
```

619

1          they'll wear gloves at scenes.

2     Q    Okay.  And what if your hands are really clean,

3          like you've washed them?

4     A    The more likely is difficult to leave sometimes.

5     Q    The older that you get, does that effect the

6          quality of prints?

7     A    Yes, it does.

8     Q    Why?

9     A    Depending on a person's career.  If someone -- if

10         they work in a factory or something they get --

11         their fingerprints get worn a lot, and they get

12         scatches.  Even if someone who sits in the tub --

13         we've done that for a long time, you know, your

14         fingers get wrinkly after that.

15    Q    Do all of these things effect your ability to

16         recover a print?

17    A    Yes, it does.

18    Q    When you're looking at fingerprints and when you

19         were doing your classifications not only for the

20         FBI but when you examine them now, what kinds of

21         things do you look for?

22    A    I look for types of pattern, how good the ridges

23         are.  The ridges are the little lines you see on

24         your fingers.

25    Q    In addition to the lines that you see, do those

620

1          lines have certain characteristics such as stops,

2          starts, dots, those kinds of things that are

3          important in your classifications?

4     A    Yes, all those.

5     Q    All right.  I'd like to show you what's been marked

6          for identification purposes as State's Exhibit 47.

7          Do you recognize this?

8     A    Yes, I do.

9     Q    What is it?

10    A    It's a fingerprint card from the Elkhart City

11         Police Department.

12    Q    Did you personally use this fingerprint card to

13         attempt to make a classification or -- I'm sorry --

14         a comparison?

15    A    Yes, I did.

16    Q    All right.  When did you do that?

17    A    (unintelligible) we received these prints in August

18         29th from Joel, I believe, it's 2003.

19    Q    Okay.  Thank you.  Next I would like to show you

20         what has been marked for identification purposes --

21         I'm sorry.  It's been admitted into evidence as

22         State's Exhibit 46.  Do you recognize this?

23    A    Yes, I do.

24    Q    What is it?

25    A    This is a loose card with a -- latent prints on it.

621

```
 1    Q   Where did you receive this latent print card?

 2    A   I received this from Detective Bourdon of Elkhart

 3        City Police Department at the same time I received

 4        the fingerprint card.

 5    Q   Were you asked to perform any specific examination

 6        on these two things?

 7    A   Yes.  I -- along with this, I received several

 8        other fingerprint lifts and fingerprint cards.  I

 9        was asked to see if I could make a comparison from

10        those?

11    Q   Okay.  Thank you.  And let me ask you.  Were you

12        able to make a comparison from the fingerprint card

13        in state's -- what's identified as State's Exhibit

14        47 and what is entered into evidence as State's

15        Exhibit 46?

16    A   Yes, I was.

17            MS. BECKER:  Thank you.  State would now move

18    to admit what's been marked for identification purposes

19    as State's Exhibit 47.

20            THE COURT:  Mr. Crawford, any objection?

21            MR. CRAWFORD:  No objection, your Honor.

22            THE COURT:  Mr. Zook, any objection?

23            MR. ZOOK:  No, sir.

24            THE COURT:  Exhibit 47 will be admitted without

25    objection.
```

1    BY MS. BECKER:

2       Q    Detective, I'm now showing you again State's

3            Exhibit 47.  What is the name or the signature on

4            the top left of that card?

5       A    Lana R. Canen.

6       Q    Thank you.

7            MS. BECKER:  State would move to publish

8    State's Exhibit 47 to the jury by passing?

9            THE COURT:  Any objection.

10           MR. ZOOK:  No, sir.

11           MR. CRAWFORD:  No, objection, your Honor.

12           THE COURT:  Exhibit 47 will be published in the

13   manner of choosing by the state.

14                (State's Exhibit 47 was published to

15                the jury.)

16   BY MS. BECKER:

17      Q    Detective Chapman, let's talk a little bit about

18           how you made your comparison.  First of all, did

19           you have to use something in order to examine

20           State's Exhibit 46, namely, lifter M, for the

21           purpose of even finding a print on here?

22      A    Yes.  I needed a magnifying glass to look at that.

23      Q    What kind of a magnifying glass did you use?

24      A    It's a little instrument.  We've used the same type

25           at the FBI just a little black instrument with two

```
 1          magnifying glasses in it.  You can adjust it for

 2          your eyes?

 3     Q    Okay.  After you were able to locate the print on

 4          lifter M, did you try and locate any others that

 5          might have enough ridge detail or enough detail to

 6          make some kind of a comparison as well?

 7     A    Yes.  Initially that's what I did with all the

 8          lifters.  I checked those out see if there was any

 9          prints on there that I could examine.

10     Q    Did any of the other lifters or anywhere else on

11          lifter M have anything that had enough detail for

12          you to make a comparison?

13     A    There was slight detail, but not enough to make a

14          comparison.

15     Q    Now, after you were able to enlarge with your glass

16          and look at what was on lifter M the one print that

17          had enough detail, what did you do?

18     A    I examined the cards I had.  I examined first the

19          suspect cards.

20     Q    Okay.  Were you able to notice certain

21          characteristic about the print that was on lifter M

22          that you were looking for in the suspect card?

23     A    Yes.  I knew it was a loop.  So I was looking for a

24          loop on the fingerprint cards themselves.

25     Q    What's a loop?
```

```
1    A    That would be where the ridges would all flow

2         through at one side, present a different pattern

3         whirls, loops, arches; and I was looking for a loop

4         specifically that I eliminated the ones on the card

5         that were not loops.

6    Q    All right.  What's a whirl?

7    A    A whirl would be there would be two deltas which

8         doesn't mean much.

9    Q    Try and explain it best as you can to us?

10   A    Okay.  A delta would be -- there would be two

11        doubles outside of a whirl where a loop is going to

12        have one delta, and it be the -- for a whirl would

13        be almost like little circles, like a lot of people

14        refer to them as swirls, which is termed as a

15        whirl.  An arch would be they flow on one side and

16        smoothly out the other side.

17   Q    Are there also characteristics such as stops and

18        starts of ridges that are unique for individuals?

19   A    Ridges, yes they would be, yes.

20   Q    In all your time examining fingerprints whether it

21        be for the FBI or through your career until

22        present, have there ever been any literature or

23        anything else that has found -- or that more than

24        one person has the same fingerprint?

25   A    No.
```

1    Q    So the rumor about people having unique prints, is

2         that true?

3    A    Yes.

4    Q    What about identical twins?

5    A    They have different prints as well.

6    Q    All right.  So when you're looking for these

7         characteristics such as whirls or loops or deltas

8         or ridge detail, are you able to narrow down

9         quickly based upon finding a specific pattern?

10   A    Yes.

11   Q    Were you able to look at any of the these suspects

12        cards and find something that matched the pattern

13        you found in M?

14   A    Yes.  It was on fingerprint card of Lana's.

15   Q    All right.  I'm going to give you back State's

16        Exhibit 47, which is Lana Canen fingerprint card.

17        Which finger were you able to find the -- at least

18        the characteristics that were consistent with

19        lifter M from the medical tub?

20   A    First fingerprint, that was her right index finger

21        cause that one had the same flow as a little bit

22        that was on the lift card, but that did not match

23        at all.

24   Q    So after you got past it had the characteristics,

25        further investigation showed it wasn't the same.

1    A    Right.  So I knew it couldn't come from the right

2         hand because it was gonna' have to be an ulnar

3         loop, and the ulnar loop can only be from the left

4         hand.

5    Q    Okay.  What's an ulnar loop?

6    A    Ulnar loop -- they would all flow towards the --

7         they would start in the upper hand and flow this

8         way for right a finger.  For the left finger, they

9         flow the opposite way.  And her right index finger

10        is a radial loop, which flows the opposite way.

11   Q    Okay.  So you've got an ulnar loop, and now you're

12        looking at the left card.

13   A    Right.

14   Q    What do you find on the left side?

15   A    On the left thumb's a whirl, so that eliminates

16        that right away.  The right index finger possibly

17        could be a whirl so it was eliminated as well and a

18        left ring was a whirl, possibly a loop.  This is

19        done visually cause when we used to look at a card,

20        we didn't have the time to -- actually, we were on

21        a production.  My last unit I was in I had to do 40

22        prints an hour so classify these real quick you try

23        to pick out a finger to go search by because you're

24        looking at the same pattern all fingerprints you're

25        looking at.  But you have to find one that's a

```
 1          little bit different than the others so you would
 2          (unintelligible) then you would flip through the
 3          different fingerprint cards and try to find that
 4          one which matched.  Then you would -- the last
 5          thing you would do is use your magnifying glass to
 6          verify it.
 7     Q    Were you able to use your magnifying glass and
 8          verify any of the prints from Lana's left hand?
 9     A    Yes.  The left little finger.
10     Q    The left little finger.
11     A    Yes.
12     Q    Now, so if I give you fingerprint lifter M, which
13          is State's Exhibit 46, back and ask you where did
14          the fingerprint that was found on M come from based
15          upon your examination, what would you conclude?
16     A    Well, I examined this previously.  I know it's -- I
17          made this little cut that's in here right now.
18     Q    Okay.  And based upon the examination that you did
19          comparing M to Lana's fingerprint card, what did
20          find?
21     A    That they match.  So the same points on each of
22          those prints.
23     Q    All right.  After you made the actual comparison
24          finding that that print was Lana Canen's little
25          left finger, did you make any enlargements for
```

```
 1          purposes of explaining your testimony?

 2    A     Yes, I did.

 3    Q     What did you make?

 4    A     I placed those two on the scanner and blew those

 5          up.

 6    Q     I'd like to show you what's been marked for

 7          identification purchase as State's Exhibit 48.  Do

 8          you recognize this?

 9    A     Yes, I do.

10    Q     What is it?

11    A     This is a blown up of the latent print left little

12          finger.

13    Q     Okay.  Which one are you referring to?  Where did

14          get this one?

15    A     This was off the lift card.

16    Q     Okay.  Next, I'd like to show you what's been

17          marked for identification purposes as State's

18          Exhibit 49.  What is that?

19    A     It is a blown up of the fingerprint card left

20          little finger.

21    Q     Okay.  Is that from State's Exhibit 47?

22    A     Yes.

23    Q     Okay.  The items contained in what's identified as

24          State's Exhibits 48 and 49, are these true and

25          accurate representations that you made enlarged
```

1        from what's -- or what's been entered into evidence

2        as State's Exhibits 46 and 47 for purposes of

3        illustrating your testimony?

4    A   Yes, they are.

5    Q   Are they accurate representations of what you

6        personally observed under that enlargement glass?

7    A   Yes.

8    Q   All right.  Do these show the points of what you

9        made your comparison?

10   A   Yes, they do.

11   Q   Thank you.  Did you also find some ridge on another

12       one of the lifter prints?

13   A   Yes, I did.

14   Q   Do you recall from what surface that lifter had

15       been taken?

16   A   Not right off hand.

17   Q   All right.  For illustration purposes, were you

18       able to make an enlargement of that lifter as well?

19   A   I did at the time.

20   Q   Okay.  I'd like to show you what's been marked for

21       identification purposes as State's Exhibit 50.  Do

22       you recognize this?

23   A   Yes, I do.

24   Q   What is it?

25   A   That's the enlargement of the lifter.

```
1    Q    Okay.  Which lifter would that we?

2    A    From the -- it was a different lifter.  It wasn't

3         this lifter here.  I don't recall which one it was

4         right off hand.

5    Q    Why did you make this enlargement?

6    A    To see if I could match it up a little better with

7         the fingerprint -- from the fingerprint card.

8    Q    Okay.  Were you able to actually match this to a

9         degree of certainty that you were comfortable with?

10   A    No, I was not.

11   Q    Did it show similar characteristics such that you

12        thought it would be possible?

13   A    Yes, it was possible.

14             MS. BECKER:  Thank you.  State would now move

15   like to admit what's been marked for identification

16   purposes as State's Exhibits 48, 49, and 50.

17             THE COURT:  Mr. Crawford, any objection?

18             MR. CRAWFORD:  No, your Honor.

19             THE COURT:  Mr. Zook, any objection.

20             MR. ZOOK:  Objection to State's Exhibit 50.  I

21   think by the testimony of the witness this would not be

22   admissible as -- as not showing sufficient indicia of

23   reliability.

24             THE COURT:  Counsel approach, please.

25                  (An off-the-record discussion was held
```

631

1           at the bench.)

2           THE COURT:  Exhibits 48 and 49 will be admitted

3    without objection.  Exhibit 50 will not be admitted.

4           MS. BECKER:  State would reserve publication

5    just for a few moments in those.

6           THE COURT:  All right.

7    BY MS. BECKER:

8    Q   Now, detective, when you are looking at prints you

9        indicated you look for this whirl or a loop or arch

10       that kind of thing, look for other stops and

11       starts.  Do you mark those or do you identify them

12       somehow so that you can make ready reference to

13       them to show why you did what you did?

14   A   On the enlargements I do.

15   Q   Okay.  Referring back to State's Exhibit 49 and

16       then also State's Exhibit 48, why did you put the

17       markings that you did on these two pieces of

18       evidence?

19   A   The markings correspond with the same on each print

20       so I can show for the audience to look at and

21       see -- possibly show that where they match up.

22   Q   Okay.  Now, what is in State's Exhibits 48, 49, are

23       they exactly the same angle or exactly the same

24       size on the ratio scale?

25   A   No, they are not.

632

```
 1     Q    Okay.  But do they give a reference to the jury so

 2          that they can get a better idea of what you looked

 3          at?

 4     A    Yes.

 5              MS. BECKER:  State would now move to publish

 6     State's Exhibits 48 and 49.

 7              THE COURT:  Mr. Zook.

 8              MR. ZOOK:  No objection.

 9              THE COURT:  Mr. Crawford.

10              MR. CRAWFORD:  No objection, your Honor.

11              THE COURT:  Exhibits 48 and 49 will be

12     published without objection in the manner of choosing of

13     the state.

14                  (State's Exhibit 48 was published to

15                  the jury.)

16     BY MS. BECKER:

17     Q    Okay.  48 what was that again?

18     A    This is a latent print from the print lift -- a

19          lifter.

20     Q    So lifter M, which was off the medical container.

21          Right?

22     A    Yes.

23     Q    And you've identified several points on here.  How

24          many points did you actually identify that were

25          unique?
```

| | | |
|---|---|---|
| 1 | A | Several for illustrative purposes. |
| 2 | Q | And then on the inked print or; namely, the print |
| 3 | | from the print card of Lana Canen, how many points |
| 4 | | did you identify here? |
| 5 | A | Seven.  There's a couple missing off to the side |
| 6 | | there numbers. |
| 7 | Q | And this is actually State's Exhibit 49.  And then |
| 8 | | going back to 48 are they supposed to correspond, |
| 9 | | or are they the same things that you've identified? |
| 10 | A | Yes. |
| 11 | Q | Forty-nine. |

12                     (State's Exhibit 49 was published to

13                      the jury.)

14            MS. BECKER:  I don't have any further questions

15    thank you all.

16            THE COURT:  Mr. Zook.

17            MR. ZOOK:  Thank you.

18                      CROSS-EXAMINATION

19    BY MR. ZOOK:

| | | |
|---|---|---|
| 20 | Q | Detective Chapman, I see there are seven points |
| 21 | | that you numbered as being similar between the |
| 22 | | latent print and the ink print.  Is that right? |
| 23 | A | That's correct. |
| 24 | Q | Wasn't the old FBI standard ten points of |
| 25 | | comparison? |

634

1    A   There is no standard.

2    Q   Was there a standard of comparison of ten points at

3         one point?

4    A   Not when I went to school.

5    Q   Not when you went to school.  So it doesn't matter

6         how many points you have.  It's basically an art as

7         opposed to a science?

8    A   That's correct.  It's a science -- the science has

9         been proven in the past.

10    Q   I'm sorry.

11    A   As far as the science, it has been proven in the

12         past.

13    Q   How do you prove that no print in mankind matches

14         any other print in mankind?

15    A   Through history.

16    Q   None that you're aware of?

17    A   Right.

18    Q   Okay.  But as far as the identification of the

19         prints, isn't it true that you make that

20         identification by looking at points of comparison

21         between one print and another print?

22    A   That's correct.

23    Q   And that's what you did in this case?

24    A   That's correct.

25    Q   And you found seven points of comparison?

```
 1     A    For illustrative purposes there's (unintelligible).

 2     Q    For points of comparison you try to use features of

 3          the print, don't you, such as points where, say,

 4          one ridge branches into two?

 5     A    That's correct.

 6     Q    Or other -- other things that distinguish one print

 7          from another.

 8     A    That's correct.

 9     Q    And you found seven of those.

10     A    For illustrative purposes.  There was actually

11          more, but they were more difficult to see on them

12          once there were blown up.

13     Q    More difficult than this?

14     A    When they're blown up.  Comparisons are actually

15          made with other magnification of glass.

16     Q    So the comparisons are made before they're blown

17          up.

18     A    That's correct.

19     Q    Thank you.  No more questions.

20              THE COURT:  Mr. Crawford, any questions?

21              MR. CRAWFORD:  Yes.  Thank you, your Honor.

22                      CROSS-EXAMINATION

23     BY MR. CRAWFORD:

24     Q    Detective Chapman, you've indicated that you

25          received the fingerprint card for Lana Canen on
```

```
 1            August 29, 2003.  Is that correct?

 2     A    I believe that is correct.

 3     Q    And you received that from Joel Bourdon.  Is that

 4          correct?

 5     A    Correct.

 6              MR. CRAWFORD:  No further questions.

 7              THE COURT:  Ms. Becker.

 8              MS. BECKER:  No redirect.

 9              THE COURT:  You may step down.  Watch your

10     step, please.  Call your next witness.

11              MR. WILLIAMS:  State calls Detective Todd

12     Thayer.

13              MS. BECKER:  May this witness be released from

14     his subpoena?

15              THE COURT:  Mr. Zook, is he released?

16              MR. ZOOK:  Yes.

17              THE COURT:  Mr. Crawford.

18              MR. CRAWFORD:  Yes.

19              THE COURT:  He'll be released.  Raise your

20     right hand, sir.

21                  (The witness was sworn.)

22              THE WITNESS:  I do.

23              THE COURT:  Take the witness stand.

24     ////

25     ////
```

```
 1                          TODD THAYER

 2    called on behalf of the State, having been first duly

 3    sworn, testified as follows:

 4                       DIRECT EXAMINATION

 5    BY MR. WILLIAMS:

 6       Q    Please introduce yourself to the jury?

 7       A    Todd S. Thayer.

 8       Q    And what's your occupation?

 9       A    Currently a sergeant with the Elkhart Police

10            Department.

11       Q    How long have you been a sergeant with the Elkhart

12            Police Department.

13       A    About seven months.

14       Q    Now, what's your current, I guess, job duties as a

15            sergeant?

16       A    I'm a shift-level supervisor for the midnight

17            shift, which is from 11:00 p.m. to 7:00 a.m.

18       Q    I want to take you back to November 28, 2002.  Were

19            you a sergeant -- or, I guess, what was your

20            position back then?

21       A    I was a detective at that time.

22       Q    Were you with any specific part of the police

23            department?

24       A    Yes.  At that time, I was involved in the homicide

25            investigation.
```

1    Q    Now, were you involved in the investigation of

2         Helen Sailor's murder?

3    A    Yes, I was.

4    Q    And when were you involved in this investigation?

5    A    Right at the initial onset.  I was called directly

6         to the scene once her body had been discovered.

7    Q    At some point during your investigation, did you

8         interview residents at the Waterfall Highrise

9         complex?

10   A    Yes.

11   Q    And during that time, did you have some contact

12        with a person by the name of Lana Canen?

13   A    Yes, I did.

14   Q    Do you see Lana Canen in the courtroom today?

15   A    Yes, I do.

16   Q    Would you point where she's seated and what she's

17        wearing?

18   A    She's a white female with long hair with the

19        multicolour blue and yellow top there.

20        MR. WILLIAMS:  Your Honor, may the record

21   reflect that the witness has identified the defendant

22   Lana Canen.

23        THE COURT:  The record will so reflect.

24   BY MR. WILLIAMS:

25   Q    Your contact with Ms. Canen, was that in the

1       initial investigation in the initial part of it?

2   A   Yes.

3   Q   Where did you make contact with her?

4   A   In her apartment.

5   Q   Now, describe that contact with her when you came

6       into contact with her at her apartment?

7   A   One of our normal procedures on a homicide

8       investigation what we would call a neighborhood

9       canvas.  If it was a residential area like a house,

10      we would knock on your door and talk to people if

11      maybe they had potentially seen something.  Since

12      it was apartment complex, we were going to each

13      door and each apartment to speak with the

14      residences to see if they might possibly have seen

15      anything that would help our session investigation.

16  Q   And did you do that with respect to Lana Canen's

17      apartment?

18  A   Yes.

19  Q   Describe how you came into contact with Ms. Canen?

20  A   Well, we attempted to contact her several times,

21      left a business card on her door over the past

22      couple of days during the initial part of the

23      investigation.  We had not received a call from

24      her, or I had not received a call from her or had

25      not spoke to her so we were at the Highrise when we

```
 1            were told by some other residences that she was

 2            present at the apartment in her apartment.  So at

 3            that time, Detective Christian and I proceeded up

 4            to her apartment in an attempt to contact her.

 5       Q    What did you do once you got to her apartment?

 6       A    We knocked on her door for several minutes.  We

 7            could see that there was somebody inside.  I could

 8            see light moving and shadows underneath the door as

 9            if somebody was standing on the other side of the

10            door; however, Ms. Canen wouldn't answer the door.

11       Q    What did you do?

12       A    Well, at that time since we already had one

13            homicide I felt that there might possibly be

14            something wrong with her.  Maybe she couldn't

15            speak, she couldn't answer the door.  So at that

16            time I called for maintenance, and a maintenance

17            person came with the key.  We were able to unlock

18            the door.  Once we unlocked the door, we noticed

19            that the chain was engaged.  The chain lock was

20            engaged on the door.  Once we started to open it,

21            Lana spoke up that she was coming to the door.

22       Q    Did she come to the door?

23       A    Yes, she did.

24       Q    Did she indicated where she had been?

25       A    She stated that she was asleep on the sofa which
```

```
 1            was just a couple feet from the door.
 2      Q    Now, when she came to the door, did you ask her any
 3            questions?
 4      A    Yes.
 5      Q    What did you ask her?
 6      A    Just asked her if he was aware that a homicide had
 7            taken place in the highrise.  She stated that she
 8            knew there had been a homicide.  I asked her if she
 9            was familiar with Lana -- or excuse -- Mrs. Sailor,
10            the victim.  She says she knew her and had contact
11            with her in the past.
12      Q    Did you ask her where she had been at the time of
13            the murder?
14      A    Yes, I did.
15      Q    What did she say?
16      A    She stated that she was out of town visiting
17            friends and family over the Thanksgiving holiday.
18                MR. ZOOK:  Your Honor, may we approach.
19                THE COURT:  You may.
20                    (An off-the-record discussion was held
21                     at the bench.)
22                THE COURT:  Ladies and gentlemen, we're going
23      to give you a recess.  You're all jurors in this case.  I
24      must tell you now and I will repeat this again each time
25      you are permitted to separate.
```

1          Generally, you should not express any opinion

2    about the case before it is submitted to you for

3    deliberation; however, you are permitted to discuss the

4    evidence presented in this case amongst yourselves in the

5    jury room during recesses from trial.  All jurors and

6    alternates must be present during these discussions, and

7    you must reserve judgment about the outcome of the case

8    until your deliberations begin.

9          You are admonished that you may not discuss the

10   facts of the case with anyone other than your fellow

11   jurors.

12         You may not discuss this case with me or with

13   the lawyers, parties or with any of the witnesses.

14         You should not listen to or read any outside or

15   media accounts of the trial.  You may not investigate the

16   case or attempt to obtain information outside the

17   courtroom.  It is highly improper for you to do so.  You

18   are to consider and decide this case only upon the

19   evidence received during the course of the trial in the

20   courtroom.  We're going to address a legal issue at this

21   time.

22              (The jury and the witness left the

23               courtroom, and the following

24               proceedings were had.)

25         THE COURT:  All right.  Be seated.  All right.

1    The record in this action at this time reflects the

2    witness stated that he tried to contact Ms. Canen several

3    times, left a card, learned from other persons that she

4    was at her apartment on the day in question, knocked on

5    her door, could see shadows in the light and movement

6    inside.  The witness has testified that he was concerned

7    for the well-being, essentially that's what he said.  He

8    was concerned for the well-being in light of the fact

9    there had been had a homicide at the highrise building,

10    and he didn't want to be in a situation where he was

11    facing with another one.  I assume that's what he was

12    talking about, although he didn't say it in those words.

13           He then stated that he got maintenance to open

14    the door.  When maintenance opened the door, the chain

15    was across the lock and the door jam.  Then he said

16    Ms. Canen came to the door and opened it.  He asked her

17    if she knew of the death.  She stated she did know of the

18    death.  Asked if she knew Ms. Sailor, and she said she

19    did.  At that point, Mr. Zook, I guess, formally did not

20    make an objection but raised the issue.

21           MR. ZOOK:  I objected, yes.

22           THE COURT:  Okay.  What is your objection?

23    Tell me specifically.

24           MR. ZOOK:  My objection, your Honor, is that

25    the -- the police at this point have broken into her

1  apartment.  She was not free to leave.  They've confirmed

2  that she's okay.  The questioning did not have anything

3  to do with whether Ms. Canen was all right or not.  It

4  had to do with an interrogation regarding the facts of

5  this case and regarding Ms. Sailor.

6         At that point, she should have been read her

7  rights and told that she did not need to communicate with

8  them about that.  She obviously was a suspect if they

9  were asking her about what she was doing on the night

10  that the murder happened.  I think that it's obvious what

11  happened, and perhaps they were concerned for her safety.

12  But looking at it from her subjective angle, she would

13  not feel free to leave.

14         THE COURT:  She would not feel free to leave

15  her own apartment where this occurred.

16         MR. ZOOK:  Right.  Not after they come in.

17         THE COURT:  So you're saying there was

18  custodial interrogation I guess.

19         MR. ZOOK:  Right.

20         THE COURT:  And she is in her own apartment.

21  She doesn't come to the door.  Testimony so far is that

22  she opened the door and let them in, is it not?

23         MR. ZOOK:  Well, she didn't open the door.

24         THE COURT:  She took the chain off the door.

25         MR. ZOOK:  Right.  She saw they were coming in

1   anyway.

2          THE COURT:  All right.  Anything else you want

3   to tell me about this.

4          MR. ZOOK:  No, sir.

5          THE COURT:  Ms. Becker or Mr. Williams, your

6   response to Mr. Zook's I guess what you would call it an

7   oral motion to suppress.

8          MR. ZOOK:  Right.

9          MR. WILLIAMS:  Judge, there was no custody in

10  this case in this particular circumstance.  They were

11  there to speak with Ms. Canen regarding what she may have

12  known in the normal canvassing as they did with many

13  other residents.  It was a welfare check.  As the officer

14  stated, he was concerned potentially for her safety.  She

15  came to the door.  She's the one that unlocked the chain,

16  or at least the indication from the officer was that the

17  door was open, but it was still chained shut.  She was in

18  her own apartment.  There's no evidence that she didn't

19  feel free to leave before this court.

20         THE COURT:  Ms. Jackson, would you ask Sergeant

21  Thayer to come back in.  I want to hear what he has to

22  say.  Why don't you put on the full and complete version

23  of your testimony that you're anticipating here, and

24  let's see where we go with that.  The record should

25  reflect the jury is not present in the courtroom at this

```
1    time.  Sergeant Thayer, take the witness stand again if

2    you would, please.

3               MR. WILLIAMS:  Judge, just so I'm clear the

4    full and complete testimony as far as up to what he's

5    already stated.

6               THE COURT:  You don't have to do that again.

7    Pick it up with he asked if she knew of the death of

8    Ms. Sailor.  She said she did knew -- she did know about

9    it, and Ms. Canen said she knew Ms. Sailor.  Pick it up

10   there.

11   BY MR. WILLIAMS:

12     Q    Did you ask Ms. Canen where she was on the date of

13          Helen Sailor's murder November 28, 2002?

14     A    Yes.

15     Q    What was her response?

16     A    She stated she was out of town visiting friends or

17          relatives over the Thanksgiving holiday.

18               MR. WILLIAMS:  That is the extent of testimony.

19               THE COURT:  All right.  Mr. Zook, that's the

20   extent of the testimony.  How is that a problem you?

21               MR. ZOOK:  It's -- it's simply an interrogation

22   where she wasn't given the appropriate warnings.

23               THE COURT:  Do you have any questions you'd

24   like to ask the sergeant?

25               MR. ZOOK:  Due to the limited nature of the
```

1    testimony, I have no questions.

2              THE COURT:  You have no questions.  Anybody

3    have anything else they want to submit on the matter?

4              MR. WILLIAMS:  Well, Judge, I would also

5    indicate --

6              THE COURT:  Evidence wise.

7              MR. WILLIAMS:  I'm sorry.  No.

8              THE COURT:  You have to go back out in the

9    hall.

10                  (The witness exited the courtroom.)

11             THE COURT:  All right.  So far there is no

12   evidence Canen was in custody or arrested.  There is no

13   evidence before me to indicate her side of the story with

14   respect to Ms. Canen's state of mind.  In fact, Ms. Canen

15   has offered no evidence to support her position.

16             When a defendant challenges the admissibility

17   of evidence claiming it was illegal to be obtained, he or

18   she has the burden of going forward with evidence in

19   support of that challenge.  Failure to do so should

20   result in the rejection of the challenge.  Timberlake

21   versus State 690 N.E.2d 243, a 1997 case.  Simpson versus

22   State 506 N.E.2d 473, a 1987 case.

23             If the defendant produces evidence to support

24   their challenge, the burden then shifts to the state.  At

25   this point, we have no evidence from the defendant in

```
 1    support of her position other than the assertions of her

 2    counsel.  The assertions of her counsel are not evidence.

 3    I would also note that the question was already answered

 4    by the witness precisely the same as he answered it here

 5    out of the jury's presence when the jury was present in

 6    the courtroom before the objection was made.  Your

 7    objection is overruled.  Anybody have anything else they

 8    want to say on that issue?

 9              MR. ZOOK:  No, sir.

10              MR. WILLIAMS:  No, your Honor.

11                   (The jury entered the courtroom, and

12                    the following proceedings were had.)

13              THE COURT:  Be seated.  Mr. Williams.

14                   DIRECT EXAMINATION CONTINUED

15    BY MR. WILLIAMS:

16    Q    Detective Thayer, we were talking about a

17         conversation you were having with Ms. Canen at her

18         door.

19    A    Yes.

20    Q    My question to you is did you ask Lana Canen where

21         she had been at the time of Helen Sailor's murder

22         on November 28, 2002?

23              MR. ZOOK:  Same objection, your Honor.

24              THE COURT:  The objection will be overruled for

25    the reasons previously stated by the Court.
```

649

1     BY MR. WILLIAMS:

2         Q    And what did Lana Canen say?

3         A    She stated she was out of town with friends and

4              family over the Thanksgiving holiday.

5                   MR. WILLIAMS:  No further questions, your

6     Honor.

7                   THE COURT:  Mr. Zook, any cross-examination?

8                        CROSS-EXAMINATION

9     BY MR. ZOOK:

10        Q    Detective Thayer, you were present with one other

11             person.

12        A    Yes.

13        Q    You were present with what other person?

14        A    Detective Christian.

15        Q    Okay.  And did Detective Christian go ahead and

16             search the apartment?

17        A    No, not that I recall.

18        Q    Wasn't -- wasn't permission requested and didn't

19             Detective Christian go ahead and search after --

20                  THE COURT:  Okay.  You have two questions.

21    Let's do one at the time.

22                  THE WITNESS:  Not that I recall.

23        Q    Not that you recall.  Could that have happened?

24        A    Yes.

25                  MR. ZOOK:  Okay.  No more questions.

1         THE COURT:  Mr. Crawford, any questions?

2         MR. CRAWFORD:  Yes, your Honor.  Thank you.

3                   CROSS-EXAMINATION

4  BY MR. ZOOK:

5    Q    Detective Thayer, you've indicated that you were

6         involved in the initial investigation of the

7         homicide in this case.  Is that correct?

8    A    Yes, sir.

9    Q    And that as part of your duties with that job you

10        interviewed a number of residents at the highrise.

11        Is that correct?

12   A    That is correct.

13   Q    And I believe you also testified that you went into

14        Lana Canen's apartment.  Is that correct?

15   A    Yes.

16   Q    Did you go into any other residents' apartments

17        during your investigation?

18   A    Yes.

19   Q    Were the apartment basically laid out the same, if

20        you remember?

21   A    As far as I recall, yes?

22        THE COURT:  Excuse me.  Keep in mind that

23  whatever conversation you're having at that table is

24  being amplified through the courtroom.

25        MR. ZOOK:  Yes, Judge.

```
 1              THE COURT:  Go ahead.

 2   BY MR. CRAWFORD:

 3     Q    So they were similar style apartments.  Is that

 4          correct?

 5     A    Yes.

 6     Q    Do you recall or estimate how many people you

 7          talked to at the highrise concerning the death of

 8          Helen Sailor?

 9     A    A couple dozen.

10     Q    And did you gather a lot of different information

11          from these people?

12     A    Yes.

13     Q    And over the course of how long a period of time

14          was it that you were involved in doing this

15          investigation?

16     A    Total or during my neighborhood canvas?

17     Q    Your neighborhood canvas?

18     A    Approximately five days.

19     Q    And how long total were you involved in this

20          process?

21     A    Well, it was an ongoing investigation up to the

22          point where I left working homicide, so several

23          months.

24     Q    You mention that it was initially five days is when

25          you spoke to the people at the highrise.  Is that
```

                    STATE'S WITNESS - TODD THAYER - (REDIRECT)

1        correct?

2    A   Yes.

3    Q   Did there also come periods of time after that you

4        went back and spoke to people at the highrise?

5    A   Yes.

6    Q   And that -- did that occur over the seven months?

7    A   Yes.

8            MR. CRAWFORD:  No, other questions.

9            THE COURT:  Mr. Williams, any other questions?

10                   REDIRECT EXAMINATION

11   BY MR. WILLIAMS:

12   Q   During, your initial canvas and the questioning

13       that you did with different people over those five

14       days, were you questions related to where they had

15       been, what they were doing?

16   A   Yes.

17   Q   Did you disclose to any of these people the

18       specifics or the details of the homicide --

19   A   No, sir.

20   Q   -- while you were talking to them?

21   A   No.

22   Q   Thank you.

23           MR. WILLIAMS:  No further questions, your

24   Honor.

25           MR. ZOOK:  No questions.

STATE'S WITNESS - TODD THAYER - (RECROSS)

1          MR. CRAWFORD:  Just briefly, your Honor.

2                    RECROSS-EXAMINATION

3   BY MR. CRAWFORD:

4    Q    And you did testify that you learned a various

5         amount of information from all the people you

6         talked to.  Is that correct?

7    A    Yes, sir.

8    Q    Thank you.

9          THE COURT:  Anybody else have any questions for

10  this witness?

11         MR. WILLIAMS:  No, your Honor.

12         THE COURT:  You may step down.  Is he excused,

13  counsel?

14         MR. ZOOK:  Yes.

15         MR. CRAWFORD:  Yes.

16         THE COURT:  He'll be excused.  Counsel

17  approach, please.

18              (An off-the-record discussion was held

19               at the bench.)

20         THE COURT:  Call your next witness.

21         MR. WILLIAMS:  Thank you, your Honor.  The

22  state calls Judy Johnson.

23         THE COURT:  Raise your right hand if you would,

24  please.

25              (The witness was sworn.)

654

```
 1              THE WITNESS:  I do.

 2              THE COURT:  Take the witness stand, please.

 3                        JUDY JOHNSTON

 4   called on behalf of the State, having been first duly

 5   sworn, testified as follows:

 6                     DIRECT EXAMINATION

 7   BY MR. WILLIAMS:

 8   Q    Could you introduce yourself to the jury?

 9   A    I'm Judy Johnston.  I'm from Elkhart.

10   Q    Ms. Johnston, could you spell your last name for

11        the record?

12   A    J-o-h-n-s-t-o-n.

13   Q    And what is your occupation?

14   A    I'm a teacher.

15   Q    Where are you a teacher at?

16   A    Eastwood Elementary School in Elkhart.

17   Q    What grade do you teach?

18   A    I'm a phys ed teacher so it's kindergarten through

19        sixth grade.

20   Q    All right.  How long have you been teaching there?

21   A    Seventeen years.

22   Q    Do you know a person by the name of Lana Canen?

23   A    Yes, I do.

24   Q    How do you know her?

25   A    I was at Krogers in Elkhart late one night in the
```

```
 1          summer of 2002, and she was in line.  We were both

 2          in line to check out.  And when I went out to my

 3          car I noticed that she was walking down the street

 4          carrying some bags, and it was late at night, and I

 5          just felt I should offer her a ride, and so she

 6          accepted the offer and just kind of started talking

 7          together, and asked her if she knew about the Lord,

 8          and we started talking about sharing my faith and

 9          so forth with her and kind of struck up a

10          friendship.

11     Q    Now, do you see Lana Canen in the room today?

12     A    Yes, I do.

13     Q    Can you point out where she's seated, and what

14          she's wearing?

15     A    A plaid suit it looks as if.

16     Q    And is she sitting to your left in the courtroom?

17     A    Yes, to the far left.

18          MR. WILLIAMS:  Your Honor, may the record

19   reflect the witness has identified the defendant Lana

20   Canen?

21          THE COURT:  The record will so reflect.

22          MR. WILLIAMS:  Thank you, your Honor.

23   BY MR. WILLIAMS:

24     Q    You struck up a conversation with Ms. Canen in you

25          your car as you were leaving or going home from
```

```
 1        Krogers.  Did you develop a friendship with her?
 2    A   Yes, we did.  Yes, I did.
 3    Q   Would you do things with her?
 4    A   I would -- she did not have a car -- a vehicle at
 5        the time.  So I would take her to maybe pick up
 6        prescriptions or medications or to run errands.
 7        Several times she went to church with me and to a
 8        like a Bible study class.
 9    Q   Over what period of time was this?  You said summer
10        of 2002 you met her --
11    A   Probably over the next several months.  I think
12        probably through October.
13    Q   Was -- what happened in October?
14    A   I would stop by where she was living like on Sunday
15        mornings to stop and ring the buzzer to see if
16        she'd, like, want to go to church and so forth, and
17        she just either was not there or would not answer.
18        So there really was no way to get ahold of her, and
19        she had my name and number knew she was free to
20        call if she needed something, and I just did not
21        hear from her.
22    Q   So there was a period of time which you basically
23        lost contact with Ms. Canen.  How long did that
24        last?
25    A   Probably from October of 2002 to about the next --
```

STATE'S WITNESS - JUDY JOHNSTON - (CROSS)

1       probably about the next year.

2    Q   So for about a year you didn't have any contact

3        with Ms. Canen.  When you, I guess, established

4        contact with Ms. Canen again in October of 2003,

5        did you ever have a conversation with her about

6        Helen Sailor's murder?

7    A   Yes.

8    Q   Did Lana Canen tell you where she was at the time

9        of Helen Sailor's murder?

10   A   Yes.

11   Q   What did she say?

12   A   She told me that she was out of town.

13   Q   Did Lana Canen ever tell you where -- if she'd ever

14       been in Helen Sailor's apartment?

15   A   Yes.  She denied that she had ever been in the

16       apartment.

17           MR. WILLIAMS:  No further questions, your

18   Honor.

19           THE COURT:  Mr. Zook.

20                   CROSS-EXAMINATION

21   BY MR. ZOOK:

22   Q   Did you put Lana under oath before your asked her?

23   A   Excuse me?

24   Q   Did Lana -- was Lana under oath when she told you

25       those things like you are now?

                STATE'S WITNESS - JUDY JOHNSTON - (CROSS)

1      A   No.  It was a private conversation.

2              MR. ZOOK:  Okay.  No more questions.

3              THE COURT:  Mr. Crawford, any questions?

4              MR. CRAWFORD:  No questions, your Honor.

5              THE COURT:  Mr. Williams, any additional

6   questions?

7              MR. WILLIAMS:  No further questions, your

8   Honor.

9              THE COURT:  You may step down.  Watch your

10  step, please.  Is she released from her subpoena?

11             MS. BECKER:  Yes.

12             MR. CRAWFORD:  Yes.

13             MR. ZOOK:  Yes.

14             THE COURT:  She'll be released from her

15  subpoena.  Ladies and gentlemen, we're going to break for

16  lunch at this time, and it is your lucky day because

17  we're going to give you two-hour lunch today.  I'd like

18  you back at 1:45 in the jury room.  We'll try to get back

19  in the courtroom at two o'clock.

20             Before you go to lunch, I need to remind you.

21  You are all jurors in this case.  I must tell you now and

22  I will repeat this again each time you are permitted to

23  separate.

24             Generally, you should not express any opinion

25  about the case before it is submitted to you for

1    deliberation; however, you are permitted to discuss the

2    evidence presented in this case amongst yourselves in the

3    jury room during recesses from trial.  All jurors and

4    alternates must be present during these discussions, and

5    you must reserve judgment about the outcome of the case

6    until your deliberations begin.

7         You are admonished that you may not discuss the

8    facts of the case with anyone other than your fellow

9    jurors.

10        You may not discuss this case with me or with

11   the lawyers, parties or with any of the witnesses.

12        You should not listen to or read any outside or

13   media accounts of the trial.  You may not investigate the

14   case or attempt to obtain information outside the

15   courtroom.  It is highly improper for you to do so.  You

16   are to consider and decide this case only upon the

17   evidence received during the course of the trial in the

18   courtroom.  Have a good lunch.  1:45 in the jury room.

19   See you back here at two.

20              (The jury left the courtroom, and the

21              following proceedings were had.)

22        THE COURT:  Counsel for the defendants are

23   present, counsel for the state is present, both

24   defendants are present.  In light of the testimony of the

25   last witness it would appear this has a distinct bearing

1   on the testimony of Sergeant Thayer.  The precise

2   testimony Sergeant Thayer gave with respect to Ms. Canen

3   being out of the area visiting family members is the same

4   testimony this lay witness gave.  In that sense, it would

5   appear to be cumulative of other evidence and harmless

6   error if any error at all.

7          I gave you copies of the Court' final

8   instruction a preliminary version.  Is anyone having any

9   problems with them so far?

10         MS. BECKER:  So far no, but I have not looked

11  at them yet.

12         MR. CRAWFORD:  I haven't looked at them yet

13  either.

14         THE COURT:  Juror Ms. Oakley has indicated to

15  the bailiff that she is personally acquainted with Judy

16  Johnston.  She's made that disclosure.  Is she still

17  here?  Bring her in.

18              (The juror entered the courtroom.)

19         THE COURT:  And if you would raise your right

20  hand, please.

21              (The juror was sworn.)

22         A JUROR:  I do.

23         THE COURT:  Tell me your name Karen Oakley.

24         A JUROR:  Karen Oakley.

25         THE COURT:  Ms. Oakley, you've made a

1   disclosure to the bailiff.  You indicated to the bailiff

2   you were personally acquainted with Judy Johnston the

3   last witness who has testified here today.  Is that

4   correct?

5            A JUROR:  Correct.

6            THE COURT:  All right.  The fact that you are

7   personally acquainted with this witness, will that make

8   any difference in your deliberations one way or the

9   other?

10           A JUROR:  No, sir.

11           THE COURT:  Does it have anything to do with

12  the evidence that has been presented here?

13           A JUROR:  No, sir.

14           THE COURT:  Are you telling me you'll make your

15  decision based upon the evidence that's been presented

16  and not on your acquaintance with the witness?

17           A JUROR:  Yes, sir.

18           THE COURT:  Ms. Becker or Ms. Williams, any

19  question for Ms. Oakley?

20           MR. WILLIAMS:  No, your Honor.

21           THE COURT:  Mr. Zook, any questions?

22           MR. ZOOK:  No, your Honor.

23           THE COURT:  And Mr. Crawford, any questions?

24           MR. CRAWFORD:  None, your Honor.

25           THE COURT:  Thank you very much.  You may go to

```
 1    lunch.

 2            The record should reflect that both defendants

 3    were present when Ms. Oakley was questioned.  Mr. Zook,

 4    any objections to Ms. Oakley continuing as a juror?

 5            MR. ZOOK:  No, sir.

 6            THE COURT:  And Mr. Crawford.

 7            MR. CRAWFORD:  No, your Honor.

 8            THE COURT:  And Ms. Becker.

 9            MS. BECKER:  No, your Honor.

10            THE COURT:  She'll continue as a juror, and you

11    should so inform her.

12                    (A recess was taken for lunch.)

13                    (The Court convened with all the

14                     parties present.  The jury entered the

15                     courtroom and the following

16                     proceedings were had.)

17            THE COURT:  Be seated, please.  State call your

18    next witness.

19            MR. WILLIAMS:  State calls Lieutenant Peggy

20    Snider.

21            THE COURT:  Raise your right hand, please.

22                    (The witness was sworn.)

23            THE WITNESS:  I do.

24            THE COURT:  Take the witness stand, please.

25    ////
```

```
 1                      PEGGY SNIDER

 2    called on behalf of the State, having been first duly

 3    sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5    BY MS. BECKER:

 6      Q   Would you introduce yourself to our jury?

 7      A   Peggy Snider.

 8      Q   And, Ms. Snider, what's your occupation?

 9      A   I'm a detective -- detective bureau with the

10          Elkhart Police Department.

11      Q   How long have you been a detective with the Elkhart

12          Police Department?

13      A   Approximately 17 years.

14      Q   What's your current position with the Elkhart

15          Police Department?

16      A   I'm a lieutenant in the adult division of the

17          detective bureau.

18      Q   Now, I want to take you back to November 28 of

19          2002.  What was your position with the Elkhart

20          Police Department on that day?

21      A   That was a Friday I believe.  I was a lieutenant in

22          the detective bureau.

23      Q   So as of Thanksgiving of 2002, you were a detective

24          in the bureau, the detective bureau?

25      A   Yes, I was.
```

1    Q    What were your responsibilities in detective bureau

2         at that time?

3    A    Supervise the detectives, manage cases that came in

4         and what other Detectives were investigating.

5    Q    Now, are you familiar with the intersection of Oslo

6         Road and Bristol Street?

7    A    Yes, I am.

8    Q    And what city is that in?

9    A    City of Elkhart.

10   Q    And how far away is that insection from the

11        Waterfall Highrise Apartment Complex?

12   A    I would say two to two and a half mile.

13   Q    Were you involved in the investigation of Helen

14        Sailor's murder?

15   A    Yes, I was.

16   Q    When were you involved in that investigation?

17   A    The day the -- the day the homicide occurred, which

18        was the day after Thanksgiving 2002 I believe.

19   Q    And did your involvement last throughout the

20        investigation?

21   A    Basically, yes.

22   Q    Did there come a time in August of 2003 that the

23        Elkhart Police Department developed a homicide

24        unit?

25   A    Yes, there was.

```
 1      Q    And were you a part of the homicide unit?

 2      A    Yes, I was.

 3      Q    At some point in your investigation, did you have

 4           contact with a Lana Canen?

 5      A    Yes, I did.

 6      Q    When was that?

 7      A    I believe that was September 2, 2003.

 8      Q    Do you see Lana Canen in the courtroom today?

 9      A    Yes, I do.

10      Q    Can you point out where she's seated, and what's

11           she's wearing?

12      A    She's at seated at the far end of the defense table

13           wearing a blue plaid jacket and has long dark hair.

14              MR. WILLIAMS:  May the record reflect that the

15      witness has identified the defendant Lana Canen.

16              THE COURT:  The record will so reflect.

17              MR. WILLIAMS:  Thank you, your Honor.

18      BY MR. WILLIAMS:

19      Q    Why was it that you had contact with Lana Canen on

20           September 2, 2003?

21      A    We had -- during the course of the investigation,

22           had discovered a fingerprint that belonged to her

23           that was inside the apartment of the deceased.

24      Q    When you say the deceased, that's Helen Sailor?

25      A    Yes, sir.
```

1    Q    At some point on September 2, did you pick Lana

2         Canen up?

3    A    Yes, I did.

4    Q    Where did you take her?

5    A    To the Elkhart Police Department.

6    Q    And what did you do once you got there with Lana

7         Canen?

8    A    She was taken to an interview room.

9    Q    Was anybody else working with you at that time?

10   A    Yes, there were several of us: Sergeant Wargo and I

11        believe Detective Conway and Detective Daggy.

12   Q    Specifically after you had taken her to the

13        interview what happened?

14   A    Sergeant Wargo went into the interview room and

15        began talking with her.

16   Q    Now, where did you go?

17   A    Into another room that we have video capability of

18        observing the -- in some of the interviews of the

19        police department.

20   Q    Did you observe the interview with Lana Canen?

21   A    Yes, I did.

22   Q    Now, was Lana Canen Mirandised before Sergeant

23        Wargo talked to her?

24   A    He -- he Mirandised her.

25   Q    And did Lana Canen indicate that she understood her

1           Miranda Rights?

2    A   Yes, she did.

3    Q   Did she agree to waive those rights?

4    A   Yes, she did.

5    Q   Did she agree to talk to Sergeant Wargo?

6    A   Yes, she did.

7    Q   Now, you said that this room had video capability.

8        Was this interview videotaped?

9    A   No, sir, it was not.

10   Q   And why wasn't it videotaped?

11   A   It was just a preliminary interview with Lana, and

12       it was not our policy or procedure at that time to

13       interview -- I'm sorry -- to videotape the initial

14       interviews.

15   Q   So this preinterview was not videotaped or

16       audiotaped?

17   A   No, sir.

18   Q   Can you describe the interview process that

19       Sergeant Wargo went through as far as did he

20       complete the entire interview?

21   A   I don't recall if I watched the entire interview.

22       I know I started watching it, and I may have been

23       interrupted and didn't watch the complete

24       interview, but at one point in time he ended the

25       interview with her and asked, I believe, if I would

```
 1            go in and talk with her.  Well, I think maybe I
 2            might have went in and offered her some water or
 3            something to drink, and I began talking with her at
 4            that time.
 5       Q   So you to took over the -- the interview process.
 6       A   Yes, I did.
 7       Q   Was Sergeant Wargo in the room with you when you
 8            took that interview process over?
 9       A   No, he was not.
10       Q   Can you tell the jury what you talked to Lana Canen
11            about when you started with the interview process?
12       A   I asked her -- and I had a rapport with Lana so she
13            knew me.  I'd asked her if she'd ever been into
14            Helen's room into her --
15            MR. ZOOK:  Your Honor, may I voir dire?
16            THE COURT:  You may.
17                   VOIR DIRE EXAMINATION
18   BY MR. ZOOK:
19       Q   Peggy, I believe you said that you had -- you
20            talked with Lana after Sergeant Wargo.  Is that
21            right?
22       A   Yes, sir.
23       Q   And Sergeant Wargo Mirandised her.
24       A   Yes.
25       Q   Was there a sheet of paper that Lana signed saying
```

1        that she'd received the warnings?

2    A   I believe so, but I'm not certain.

3    Q   Isn't it department procedure that you would get

4        her signature on a piece of paper?

5    A   Normally it is, but sometimes they -- they will

6        agree to talk with us, but they do not want to sign

7        anything.

8    Q   Is that what happened in her case?

9    A   I don't recall.

10    Q   And it's also procedure that you don't video or

11        audiotape these meetings.

12    A   The initial -- the initial interview with subjects,

13        no, not necessarily.  At that time, it was not.

14        MR. ZOOK:  That's all.

15        THE COURT:  Mr. Williams.

16            DIRECT EXAMINATION CONTINUED

17  BY MR. WILLIAMS:

18    Q   Detective Snider, any doubt that Lana Canen was

19        Mirandised before she was spoken to on September 2,

20        2003?

21    A   No, sir.

22    Q   Let's go back to when you began your interview

23        process with Ms. Canen.  Tell the jury what you

24        talked to Lana Canen about?

25    A   I began talking with her asking her about Helen and

670

1          if she'd ever been into Helen's apartment, and she

2          said she had not.  Obviously, I knew that she had

3          been because of the evidence that we had, and I

4          tried to get her to tell me that she had been into

5          Helen's apartment, but she was adamant that she had

6          never been inside Helen's apartment.

7      Q   After she denied being in Helen's apartment, what

8          did you talk about?

9      A   I talked to her about a fingerprint and that if the

10         possibility existed of us having a fingerprint of

11         her's inside of Helen's apartment how that could

12         be.  She still denied ever being in Helen's

13         apartment.

14     Q   So you floated it out there that if you had a print

15         how would it have gotten there.

16     A   Yes.

17     Q   And she again indicated that she'd never been in

18         the apartment.

19     A   Correct.

20     Q   What else did you talk about?

21     A   Obviously, she didn't -- I don't know if she didn't

22         think that we had a fingerprint, if I was just

23         lying to her; and then I told her specifically I

24         told her, "Lana we do have a fingerprint, it is

25         your fingerprint, and it was in Helen's apartment."

1    Q    Did she ask where the fingerprint was found?

2    A    Yes, she did.

3    Q    And what did she ask you?

4    A    I told her, I said, "I won't be specific as to

5         where the fingerprint was found, but all I will

6         tell you it had something to do with Helen's

7         medication."

8    Q    So she asked where it was, and you told her it had

9         something to do with the medication.

10   A    Correct.

11   Q    You weren't specific?

12   A    No, sir.

13   Q    What was her response after you told her that it

14        had something to do with the medication?

15   A    She said that if it had anything to do with the

16        medication that it would have to be more than one

17        because she's opened up hundreds of pill bottles in

18        her lifetime, and she knows -- and she demonstrated

19        how she would open it and that her fingerprints

20        would be on the bottle not just a fingerprint.

21   Q    So when you said that there'd have to be more than

22        one, what were you referring to?

23   A    I'm sorry.

24   Q    You said there would have -- that Lana had said

25        that there would have to be more than one if she'd

1          opened a pill bottle.  What's the one that you are

2          referring to?

3     A    I told her, I said, "I didn't tell you where the

4          fingerprint was.  I just said we had a fingerprint

5          and it had something to do with the medication.  I

6          did not indicate that it was on a pill bottle."

7     Q    And you indicated that it was a single fingerprint.

8     A    Yes, I did.

9     Q    Then she demonstrated how she would open up a pill

10         bottle.

11    A    Correct.

12    Q    And indicated that if that was the case because the

13         way she opens up pill bottles there would have to

14         be more than one fingerprint.

15    A    That is correct.

16    Q    You followed that up with saying that I never said

17         it was on a pill bottle.

18    A    Correct.

19    Q    Did Lana say that she had been in Helen's

20         apartment?

21    A    She continued denying ever being in Helen's

22         apartment.

23              MR. WILLIAMS:  Nothing further, your Honor.

24              THE COURT:  Mr. Zook.

25              MR. ZOOK:  No questions.

1     THE COURT:  Mr. Crawford.

2     MR. CRAWFORD:  No questions, your Honor.

3     THE COURT:  You may step down.  Watch your

4  step, please.  Call your next witness, or do we need a

5  recess before the next witness?  Ladies and gentlemen

6  we're going to take a recess.  We're going to address a

7  legal issue at this time outside of your presence.

8     You are all jurors in this case.  I must tell

9  you now and I will repeat this again each time you are

10 permitted to separate.

11    Generally, you should not express any opinion

12 about the case before it is submitted to you for

13 deliberation; however, you are permitted to discuss the

14 evidence presented in this case amongst yourselves in the

15 jury room during recesses from trial.  All jurors and

16 alternates must be present during these discussions, and

17 you must reserve judgment about the outcome of the case

18 until your deliberations begin.

19    You are admonished that you may not discuss the

20 facts of the case with anyone other than your fellow

21 jurors.

22    You may not discuss this case with me or with

23 the lawyers, parties or with any of the witnesses.

24    You should not listen to or read any outside or

25 media accounts of the trial.  You may not investigate the

1   case or attempt to obtain information outside the

2   courtroom.  It is highly improper for you to do so.  You

3   are to consider and decide this case only upon the

4   evidence received during the course of the trial in the

5   courtroom.  We're going to take with a recess at this

6   time.  It will be of unknown length.

7                   (The jury left the courtroom, and the

8                   following proceedings were had.)

9           THE COURT:  Mr. Williams has indicated there is

10  a need to hear some testimony outside of the jury's

11  presence to be sure that we do not create any Bruton Rule

12  issues.  Bring your witness.  Raise your right hand.

13                  (The witness was sworn.)

14          THE WITNESS:  Yes.

15          THE COURT:  Take the witness stand, please.

16  Mr. Williams, we're going to hear this testimony that

17  you're wanting to offer?

18          MR. WILLIAMS:  Yes, your Honor.

19          THE COURT:  Go ahead.

20                      NINA PORTER

21  called on behalf of the State, having been first duly

22  sworn, testified as follows:

23                  DIRECT EXAMINATION

24  BY MR. WILLIAMS:

25    Q   Ms. Porter, I want to talk to you about --

```
 1              THE COURT:  Let's start off with her name.

 2    BY MR. WILLIAMS:

 3       Q    I'm sorry.  Would you say your name for the record,

 4            please?

 5       A    Nina Porter.

 6       Q    Ms. Porter, I want to talk to you about some

 7            different areas so that the judge can make a

 8            decision on your testimony.  I want to specifically

 9            start with talking about Lana and Andy, Lana Canen

10            and Andy Royer and their relationship.  Do you

11            know -- do you know Lana Canen?

12       A    Yes, I do.

13       Q    And do you know Andy Royer?

14       A    Yes, I do.

15       Q    And when did you first meet Lana Canen?

16       A    April of 2003.

17       Q    And when did you first meet Andrew Royer?

18       A    April of 2003.

19       Q    When you met them, did you ever see them together?

20       A    Yes.

21       Q    How often?

22       A    Very often.

23       Q    Did you ever see Lana have any control over Andy?

24       A    Yes.

25       Q    And can you give us some examples of that?
```

| | | |
|---|---|---|
| 1 | A | If she told him to do something, he'd to do it for |
| 2 | | her. |
| 3 | Q | Anything specifically?  When you say her, who are |
| 4 | | you referring to? |
| 5 | A | Lana. |
| 6 | Q | So when Lana would tell Andy to do certain things, |
| 7 | | he would do them. |
| 8 | A | Yes. |
| 9 | Q | Can you give us some examples? |
| 10 | A | If he told her -- she told him to go outside he |
| 11 | | would. |
| 12 | Q | And you could speak up because it's recording, and |
| 13 | | so that the other counsel can hear.  You said that |
| 14 | | if -- if Lana had told Andy to go outside he would. |
| 15 | A | Yes. |
| 16 | Q | Do you remember any specific incidences of that? |
| 17 | A | One time it was raining outside.  She told him to |
| 18 | | go outside and wait, and he did. |
| 19 | Q | How long did he stay outside? |
| 20 | A | He was still outside when I went back upstairs |
| 21 | | probably almost a half an hour. |
| 22 | Q | And was he covered by anything? |
| 23 | A | No.  He was all the way outside. |
| 24 | Q | So he was out in the rain with no cover. |
| 25 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | For about a half hour. |
| 2 | A | Yes. |
| 3 | Q | Any other times that you saw Lana tell Andy Royer |
| 4 | | to do something and he did it? |
| 5 | A | He did -- if she asked him to turn around, he'd |
| 6 | | turn around. |
| 7 | Q | Anything else? |
| 8 | A | No. |
| 9 | Q | So Lana would just say, "Andy turn around," and |
| 10 | | he'd do it. |
| 11 | A | Yes. |
| 12 | Q | Now, did you ever see Lana Canen with any drugs? |
| 13 | A | Yes. |
| 14 | Q | What kind? |
| 15 | A | Prescription pills. |
| 16 | Q | What type of prescription pills? |
| 17 | A | Zanex, Valium. |
| 18 | Q | Now, how did you know that she had -- that these |
| 19 | | were prescriptions? |
| 20 | A | I seen prescription bottles. |
| 21 | Q | Do you know if they had her name on them? |
| 22 | A | No, I don't know. |
| 23 | Q | So she had prescription bottles, and you saw that |
| 24 | | they were Zanex and Valium. |
| 25 | A | I heard that they were Zanex and Valium. |

1    Q    From who?

2    A    Lana.

3    Q    So Lana told you that she had prescriptions for

4         Zanex and Valium.

5    A    Yes.

6    Q    How did she keep the pills?

7    A    They were in their bottles in a bag.

8    Q    What type of bag?

9    A    Drawstring bag.

10   Q    Was it a see through drawstring bag?

11   A    No.

12   Q    So she had some type of a drawstring bag, and you

13        had seen a couple bottles in this bag before.

14   A    Yes.

15   Q    How many pill bottles?

16   A    Several.

17   Q    Several.  Again, if you could just speak up so that

18        counsel can hear.  I know.  Are you nervous?

19   A    Yes.

20   Q    That's okay.  Did Lana ever tell you what she did

21        with the pills?

22   A    She traded them for pot.

23   Q    She told you this?

24   A    Yes.

25   Q    Did she say that she ever traded them for anything

1        else?

2    A    Money to my roommate.

3    Q    To your roommate.  Describe what you're talking

4        about that she traded pills to your roommate for

5        money?

6    A    Yes.

7    Q    What type of pills?

8    A    Zanex and Valium.

9            THE COURT:  You're going to have to speak up a

10   lot louder.

11   Q    Just yell into the microphone.

12           THE COURT:  What did she trade it for?

13   A    Money.

14   Q    Now, did Lana ever ask you for money.

15   A    Yes.

16   Q    How often?

17   A    Often.

18   Q    How long after meeting Lana in -- was it April of

19       2003 --

20   A    Yes.

21   Q    -- did she start asking for money?

22   A    Probably a week.

23   Q    So within a week of you meeting her, she started to

24       asking for money.

25   A    Yes.

680

1    Q    Did you give her the money?

2    A    Yes.

3    Q    Was there ever a time when she asked for money that

4         you said no?

5    A    Yes.

6    Q    And when you said no to her, what was her demeanor?

7    A    She would get upset.

8    Q    Anything else other than being upset?

9    A    Angry.

10   Q    So she'd get upset and angry if you said no?

11   A    Yes.

12   Q    Was there instances where you just didn't have the

13        money?

14   A    Yes.

15   Q    Or where you had the money and just didn't want to

16        give it to her?

17   A    I didn't have the money.

18   Q    Did Lana ever request money from you in the

19        presence of Andy Royer?

20   A    Yes.

21   Q    Did there ever come a time when that occurred when

22        you were at Lana's apartment?

23   A    Yes.

24   Q    Describe for the Judge what happened.

25   A    Lana asked me for money, and I told her I didn't

681

```
 1          have any money, and she asked me a couple times.  I
 2          told her I didn't have it, and she asked Andy was I
 3          a good candidate.
 4    Q     So Andrew Royer was present.
 5    A     Yes.
 6    Q     And after you said no a number of times, she asked
 7          Andy if you were a good candidate.
 8    A     Yes.
 9    Q     What was Andy's response?
10    A     He just put his head down, just kind of shook his
11          head.
12    Q     Did he say anything?
13    A     No.
14    Q     But he shook his head.
15    A     Yes.
16    Q     Did there ever come a time where Lana asked for
17          money when you were in your apartment?
18    A     Yes.
19    Q     Was Andrew Royer present?
20    A     He was outside of my door.
21    Q     Describe for the judge what being outside the door
22          what that means?
23    A     We have a stairway between all four apartments, and
24          Lana came in.  My door was open because it was
25          summer time.  Andy was still outside of the door.
```

682

1      She asked me for money, and I didn't have it.  We

2      were still talking, and then Andy stepped in.

3  Q   So Lana had asked you for money, you said no, and

4      then after you said no Andrew Royer walked in.

5  A   He stepped into the area we were at.

6  Q   How close did he get?

7  A   Not real close.

8  Q   How did you feel?

9  A   I was intimidated because Andy's a big guy.  He

10     doesn't talk.

11         MR. WILLIAMS:  I don't have anything else,

12 Judge.

13         THE COURT:  Mr. Zook, any questions for this

14 witness relative to this matter?

15         MR. ZOOK:  No.

16         THE COURT:  And again --

17         MS. BECKER:  May we approach.

18         THE COURT:  I'm trying to find what the legal

19 issues are here rather than your normal

20 cross-examination.  That's what I'm asking.

21         MR. ZOOK:  I understand.

22         THE COURT:  Do you have any questions you want

23 to ask about legal issues that have been presented?

24         MR. ZOOK:  Yes.

25         MS. BECKER:  I want to bring something to the

1    Court's attention.

2                THE COURT:  Before.

3                MS. BECKER:  Yes, immediately.

4                THE COURT:  Fine.  Why don't you have a seat in

5    the hall.

6                MS. BECKER:  Just as Ms. Porter finished making

7    her statement and Mr. Zook indicated that he had some

8    things to say, Ms. Canen said "bitch" right at the

9    witness.  The witness saw it, and she was visibly

10   effected by it.  I would request that Ms. Canen be

11   removed from the courtroom, sanctioned, or warned that

12   she or any of her representatives not threaten this

13   witness any further.

14               THE COURT:  All right.  Ms. Canen, you've heard

15   what Ms. Becker said.  Is that correct?

16               MS. CANEN:  I don't recall.

17               THE COURT:  I can't hear you.

18               MS. CANEN:  I don't recall.

19               THE COURT:  You don't recall.

20               MS. CANEN:  I looked at her.

21               THE COURT:  Well, I'm telling you right now

22   that's the end of that conduct if you did any such thing.

23   It's not going to happen again in this courtroom.

24               MS. CANEN:  She is lying.

25               THE COURT:  If it happens again, you'll be

1   removed from the courtroom; or you'll be put behind a

2   screen where you can hear the witness but cannot see her.

3   Do you understand me?

4           MS. CANEN:  Yes.

5           THE COURT:  I'm not going to tolerate it.

6   Understand me?

7           MS. CANEN:  Yes.

8           THE COURT:  Mr. Royer, same for you.

9   Understood?

10          MR. ROYER:  I understand.

11          THE COURT:  All right.  Now, tell me,

12  Mr. Williams, what information you're seeking from this

13  witness?  The first section appears to be the control

14  issues.

15          MR. WILLIAMS:  Correct, your Honor.

16          THE COURT:  Let's take them one at a time.

17  Mr. Zook, Mr. Crawford, it would appear the evidence

18  related to the control issue would be evidence of habit

19  or some other such matter.  Agree or disagree?  Not a

20  Bruton Rule issue.

21          MR. ZOOK:  I don't think it's a Bruton Rule

22  issue, no.

23          THE COURT:  Okay.  Do you have any problem with

24  that portion of the testimony?

25          MR. ZOOK:  Yes, I do.  I think it's offered --

```
1    I think what's being done is they're offering to show

2    that it's a habit to perform robberies simply because --

3            THE COURT:  Well, no, no.  We're not talking

4    about the same thing.  The testimony from this witness

5    was if Lana told Mr. Royer to go outside, he would go

6    outside.  If she told him to turn around, he would turn

7    around.  That's the end of that portion of the testimony.

8            MR. ZOOK:  It doesn't sound like a habit to me

9    Okay.

10           THE COURT:  Well, do you have any objection to

11   that portion of the testimony?

12           MR. ZOOK:  Not if that's what she saw; however,

13   I don't see how it relates to the case.

14           THE COURT:  Well, and I'm trying to find out if

15   you have an objection to that testimony.

16           MR. ZOOK:  I would object because it seems to

17   be prejudicial in this context.

18           THE COURT:  A confession in any case is the

19   most prejudicial piece of evidence you can have most

20   certainly, right, but sometimes those are admissible.

21   What is your specific objection other than it's

22   prejudicial?

23           MR. ZOOK:  That it outweighs the probative

24   value of that type of evidence.

25           THE COURT:  Okay.  Mr. Crawford, any objection?
```

1        MR. CRAWFORD:  Same objection, your Honor.  But

2   I would echo the habit issue as well too because we don't

3   know how often she saw these individuals together.  We

4   don't know if there were times specifically when Andy

5   didn't do what was said.  We don't know whether or not

6   just simply going outside is a control issue necessarily,

7   and I don't think it's relevant specifically in this

8   case.  And, again, it would -- the probative value of it

9   would certainly be outweighed by the prejudicial value of

10  it.

11       THE COURT:  And, Mr. Williams, I suppose your

12  position is the opposite theirs.

13       MR. WILLIAMS:  It is.

14       THE COURT:  How did I guess.  I think it has

15  some probative value, and I think you Mr. Zook and you

16  Mr. Crawford will be permitted to explore just the issues

17  that you raised.  We'll let the jury decide what weight

18  it has.  The next point from this witness relates to

19  Zanex Valium in the alleged possession of Ms. Canen, and

20  Ms. Canen allegedly saying she traded the pills for pot

21  or money.  What's your position, Mr. Zook?  This is point

22  two.

23       MR. ZOOK:  Well, obviously, Judge, my position

24  is that that's evidence of another crime.

25       THE COURT:  404(B).

1          MR. ZOOK:  Right.

2          THE COURT:  And we already had the 404(B)

3     arguments, and I sided with you on that.

4          MR. ZOOK:  Right.

5          THE COURT:  Do you have anything different on

6     that?

7          MR. ZOOK:  No.  I could go over it all, but

8     I'll spare you --

9          THE COURT:  I don't think you need to.  It's in

10    the record.  Your reason's already in the record.  Mr.

11    Crawford, how about you?

12         MR. CRAWFORD:  It doesn't effect me per say,

13    but I'll note with what Mr. Zook has said.

14         THE COURT:  So you're going to say me too.

15         MR. CRAWFORD:  Me too.

16         THE COURT:  Me too.  I thought that's what you

17    might say.  Mr. Williams, what do you have to say

18    different than what you've told me before?  Anything new?

19         MR. WILLIAMS:  I believe Ms. Becker argued that

20    so I would just add, Judge, that now the evidence is in

21    regarding the fingerprints, and that is one of the

22    questions you had with that was going to come in or not.

23    The state's belief that the fingerprint is on a

24    Rubbermaid tub that contains the prescription medication

25    that it was moved based upon the testimony of various

1    witnesses and that it is her fingerprint.

2         THE COURT:  Well, that wasn't really the point

3    that I was trying to make.  Maybe I did so in a

4    not-too-clear fashion.  My problem was the state was not

5    in a position to prove any drugs were taken at the time

6    the event on trial here occurred.  If that is the case,

7    it would appear to be offered to have more to do with her

8    character rather than the offense.  How do you link it

9    up?  That's my question.

10        MR. WILLIAMS:  It goes to conduct because she

11   moved the pills.

12        THE COURT:  Okay. what conduct.

13        MR. WILLIAMS:  The conduct of moving the pills.

14        THE COURT:  Okay.  How would I conclude that

15   Ms. Canen moved the pills from evidence that she had

16   prescription bottles in a bag six months later?  How

17   would I conclude that?

18        MR. WILLIAMS:  From the state's perspective, it

19   goes to the fact that with regard to this case by moving

20   the pill box from its location to another location which

21   is conduct --

22        THE COURT:  Well, she didn't take it.

23        MR. WILLIAMS:  Well, we don't know that.

24        THE COURT:  And that's what I'm trying get at.

25   You don't know that.  You don't have any evidence to

 1   prove that.  If you had evidence to prove that drugs were

 2   taken, my ruling would be exactly the opposite of what

 3   I'm thinking right now; and I think I would admit the

 4   evidence, but you have no evidence that drugs were taken.

 5   So if she's in possession of drugs, that appears to me to

 6   be a problem under 404(B) because (A) it's remote in

 7   time.  It's like six months later after the fact.  And

 8   (B) they were prescription drugs.  So far I don't have

 9   any testimony that it's not legal for her to have

10   these -- no testimony has been presented so far to let me

11   know if it's her prescription, someone else's

12   prescription, someone else's drugs.  I don't know.  I

13   don't have enough to support the admission of this right

14   now.  Is there anything else you have?

15           MR. WILLIAMS:  No, your Honor.

16           THE COURT:  I don't think I'm going to change

17   my prior ruling.  I think the prejudicial value in this

18   case does outweigh the probative value.  It can't be

19   connected up to drugs that were taken in the alleged

20   robbery and it's remote in time.  It's evidence of

21   another crime potentially the trading of the pills for

22   marijuana or cash, and it would appear to go more to her

23   character rather than be probative.

24           I'm going to stick with my prior ruling.  The

25   next one, "Lana would ask for money, and if she didn't

 1    get what she asked for she got angry."  What's your

 2    position, Mr. Zook?

 3              MR. ZOOK:  That's not a robbery, and if I had

 4    questioned the witness I would have questioned her more

 5    concerning whether threats had been made, but I don't

 6    think that that's relevant to this case.

 7              THE COURT:  All right.  What about Mr. Royer

 8    being present and the conversation about asking about

 9    whether or not the witness was a good candidate?

10              MR. ZOOK:  I have no idea what that means,

11    Judge.

12              THE COURT:  Well, aren't we jumping right in

13    the middle of a Bruton Rule problem with that?

14    Mr. Royer's conduct is his answer.  He shakes his head

15    and looks down.  How does he get cross-examined on that

16    if he doesn't take the witness stand?  Do you have

17    anything else to say on the anticipated testimony?

18              MR. ZOOK:  No, sir.

19              THE COURT:  Mr. Crawford.

20              MR. CRAWFORD:  I echo the Court's concerns.

21              THE COURT:  You have no evidence in this

22    particular instance when Ms. Sailor became deceased that

23    Lana Canen got angry.

24              MS. BECKER:  We do, but we can't enter it.

25              THE COURT:  Okay.  You have none that you're

1 going to be using.

2    MS. BECKER:  Correct.

3    THE COURT:  I think we're barking up the wrong

4 tree, and it's a dangerous tree.  I don't think we're

5 going to admit that evidence.  I think there's a Bruton

6 Rule problem with the conduct when both defendants are

7 present.

8    MR. WILLIAMS:  Judge, if I may just interject.

9    THE COURT:  Sure.

10    MR. WILLIAMS:  I didn't put this evidence on

11 because we don't believe there's a problem, there's a

12 statement that Lana Canen made to Nina Porter in July, 3,

13 2003.  In that statement, the testimony the state

14 believes will come will be that Lana stated that there

15 was an old lady that she could get money from, and that

16 she was going to get some money from.  But when she

17 got -- or when she went to this older woman for money,

18 she refused.  The older woman refused to give the money

19 to Lana because someone had told this older woman not to

20 give her the money, meaning not to give Lana the money.

21    And that the demeanor when these statements

22 were made will ask Ms. Porter, I believe, will be that it

23 appeared that Lana was blaming this older lady for not

24 doing these things.  I don't specifically remember if she

25 was going to say that she was angry, but that's how we

1    believe it relates to now subsequent to that now Nina

2    Porter observes these things going on when money is asked

3    for --

4              THE COURT:  Well, you're asking me to rule on

5    something I haven't heard.  Standing alone if Lana Canen

6    asked her for money and was told no and then Lana Canen

7    got angry, that concerns me because you have nothing to

8    go with it.  If you have something to go with it, I guess

9    I'd like to know that before the jury hears it.

10             MR. WILLIAMS:  Well, we can present the

11   testimony.

12             THE COURT:  Well, tell me what the testimony

13   would be.  Just what you told me here a minute ago.

14             MR. WILLIAMS:  Specifically with regard to your

15   question, yes, that's how it -- that portion relates

16   to --

17             THE COURT:  What is the time frame she asked

18   the older woman for money?

19             MR. WILLIAMS:  Thanksgiving.

20             THE COURT:  Okay.  Is there any reason you know

21   of why that wouldn't be admissible, Mr. Zook, as an

22   admission?

23             MR. ZOOK:  That's what I understood they were

24   offering it for, but I didn't recall that it happened

25   Thanksgiving.

1      MR. WILLIAMS:  It didn't happen at

2  Thanksgiving.  There are three statements that Nina

3  Porter will testify to.

4      THE COURT:  Okay.  Let me see if I understand

5  it.  Nina porter is positioned to potentially give

6  testimony that in a conversation with Lana Canen, Lana

7  Canen related an event of asking an older woman for money

8  and the older woman refused because someone had indicated

9  she shouldn't do that.

10      MR. WILLIAMS:  Correct.  And in addition to

11  that statement, there will be a statement that no one was

12  supposed to get hurt, and she states, "Thanksgiving,

13  thanks for giving death."  Those statements are not one

14  after another.  They are over a period of time.

15      THE COURT:  I understand; I understand.  Well,

16  I think that's a whole different matter.  Mr. Zook, why

17  would these not be admissions by a party opponent?

18      MR. ZOOK:  Your Honor, in all honesty I think

19  that perhaps the state should be able to use that, but I

20  don't understand how they would get into the other times

21  when they allege that Lana would get mad when she asked

22  for money, things like that.

23      THE COURT:  Yeah.  I think you're right, and I

24  think that's what my ruling will be.  But I think the

25  information that you've related outside of the witness's

694

1    present here -- presence here, Mr. Williams, I think that

2    would be admissible.  Statement against penal interest,

3    admission by a party opponent, any number of ways, shapes

4    or forms that could come in.  Does that answer your

5    question that you had raised now?

6              MR. WILLIAMS:  Yes, it does, your Honor.

7              THE COURT:  We all kind of on the same page.

8              MR. CRAWFORD:  Just want to make sure which

9    ones you ruled on to come in and which can't.

10             THE COURT:  I think this is going to come in,

11   the conversation Mr. Williams had with the witness

12   relative to Ms. Canen telling Mr. Royer to do something

13   and he did it.  She gave two examples.  Turn around; go

14   outside.  That little portion of the testimony I think is

15   admissible.

16             The other portion is the portion that the

17   witness did not actually give formal testimony to here in

18   the courtroom.  Mr. Williams told us what the testimony

19   was anticipated to be, and that was relating to the

20   conversation with the older woman and the part about

21   Thanksgiving.  Asking the older woman for money.  The

22   older woman said, no.  Someone apparently had told her

23   not to give her money.  Those parts would be admissible

24   the rest would not.

25             MR. CRAWFORD:  I would also appreciate your

1    Honor if Mr. Williams wouldn't use the word control when

2    he uses that.

3              MR. WILLIAMS:  Would you rather have

4    manipulate?

5              MR. CRAWFORD:  No.

6              THE COURT:  I'm not going to tell lawyers what

7    to ask because if I did, it would shorten trial

8    substantially.  Let's take a break before we start up

9    again.

10                   (A recess was taken.)

11                   (The Court convened with all the

12                    parties present, and the following

13                    proceedings were had in open court.)

14             THE COURT:  The defendants are present, counsel

15   for the defendants are present, counsel for the state is

16   present, the witness is present, and multiple persons are

17   present in the courtroom.  Those of you in the audience

18   section, keep your thoughts to yourself.  I don't want

19   you making any editorial comments by facial gestures or

20   otherwise with respect to the testimony.  Ms. Canen and

21   Mr. Royer, likewise for you.  Understood, Ms. Canen?

22             MS. CANEN:  Yes.

23             THE COURT:  Mr. Royer, understand.

24             MR. ROYER:  Yes, I do.

25             THE COURT:  Thank you.

```
 1                    (The jury entered the courtroom and

 2                     the following proceedings were had.)

 3              THE COURT:  Be seated please.  Mr. Williams.

 4              MR. WILLIAMS:  Thank your, your Honor.

 5                          NINA PORTER

 6     called on behalf of the State, having been first duly

 7     sworn, testified as follows:

 8                      DIRECT EXAMINATION

 9     BY MS. BECKER:

10       Q   Could you introduce yourself to the jury?

11       A   My name is Nina porter.

12       Q   And, Nina, so that everybody can hear you, could

13           you speak up a little bit?  Where do you reside?

14       A   I live in Goshen, Indiana.

15       Q   Where do you work?

16       A   Lippert Components.

17       Q   How long have you been working at Lippert

18           Components?

19       A   Almost six months.

20       Q   And what do you do for Lippert Components?

21       A   I'd head of line two's quality control.

22       Q   So you quality control for them.

23       A   Yes.

24       Q   What does Lippert -- what does Lippert Components

25           make?
```

1    A    A lot of things, but I do RV frames.

2    Q    How old are you?

3    A    Thirty.

4    Q    Now, I want to take you back to November 28, 2002,

5         it was Thanksgiving day, where were you living at

6         that time?

7    A    Indiana Women's Prison.

8              THE COURT:  Excuse me for a moment.  Ms.

9    Porter, I need to ask you one additional question.  In

10   the jury's absence, were you placed under oath?

11             THE WITNESS:  Yes, I was.

12             THE COURT:  And you understand you're still

13   under oath?

14             THE WITNESS:  Yes.

15             THE COURT:  Proceed.

16   BY MR. WILLIAMS:

17   Q    Now, you said on November 28, 2002, which was

18        Thanksgiving, you were in Indiana Women's Prison.

19        Is that right?

20   A    Yes.

21   Q    And why were you there?

22   A    Violation of probation.

23   Q    And what was the violation of probation related to

24        as far as a conviction for something?

25   A    Yes.

```
 1    Q   And what was the conviction for?

 2    A   Welfare fraud and forgery.

 3    Q   And as a result of those convictions, ultimately

 4        you had to go to prison?

 5    A   I was placed on home detention, and I violated.

 6    Q   How long were you in the Indiana Women's Prison for

 7        that probation violation?

 8    A   One year.

 9    Q   Do you remember the dates from when you went in

10        till when you got out?

11    A   I was arrested in July of 2002, and then I was

12        released February of 2003.

13    Q   So you were released from the Indiana Women's

14        Prison sometime in February of 2003.

15    A   Yes.

16    Q   Do you have any other convictions for conversion or

17        check deception or anything like that?

18    A   Yes.

19    Q   With respect to your forgery and welfare fraud, why

20        did you commit those crimes?

21            MR. ZOOK:  Objection, your Honor.

22            THE COURT:  Sustained.

23   BY MR. WILLIAMS:

24    Q   Do you know Lana Canen?

25    A   Yes, I do.
```

1   Q   How do you know her?

2   A   I lived upstairs in the same apartment building.

3   Q   What apartment building was that?

4   A   At 124 Johnson Street.

5   Q   Was that in Elkhart?

6   A   Yes.

7   Q   And when did you move into that location?

8   A   April of 2003.

9   Q   Now, did you move there after you had gotten out of

10      prison?

11  A   Yes, I did.

12  Q   And do you recall when you moved out?

13  A   September of 2003.

14  Q   Did Lana Canen live in the same apartment building?

15  A   Yes.

16  Q   Describe this apartment building for us?

17  A   There's four apartments in the same converted

18      house: two upstairs, two downstairs.

19  Q   Was it a larger house?

20  A   Not for four apartments, no.

21  Q   Which apartment did you live in?

22  A   I lived in No. 1.

23  Q   And where was No. 1?

24  A   Upstairs on the left.

25  Q   So you lived upstairs in the building.

700

```
1     A    Yes.

2     Q    Where did Lana Canen live?

3     A    Downstairs on the right.

4     Q    She was on the first floor.

5     A    Yes.

6     Q    When you moved into the apartment complex in April

7          of 2003, did you meet Lana Canen?

8     A    Yes.

9     Q    Did you become friends with her?

10    A    Yes, I did.

11    Q    Now, do you see Lana Canen in the courtroom today?

12    A    Yes, I do.

13    Q    Can you point out where she's seated and what she's

14         wearing?

15    A    She's seated at the end of the table.  She's

16         wearing a blue plaid dress.

17    Q    That's the table to your left?

18    A    Yes.

19              MR. WILLIAMS:  Your Honor, may the record

20    reflect the witness has identified the defendant Lana

21    Canen.

22              THE COURT:  The record will so reflect.

23    BY MR. WILLIAMS:

24    Q    Do you know someone named Andrew Royer?

25    A    Yes, I do.
```

1 Q And how did you meet Andrew Royer?

2 A Through Lana.

3 Q Do you see Andrew Royer in the courtroom today?

4 A Yes, I do.

5 Q Can you point out where he is seated and what he is

6   wearing?

7 A He's the second person at the table to my left in a

8   brown shirt.

9    MR. WILLIAMS:  May the record reflect that the

10 witness has identified the defendant Andrew Royer the

11 defendant.

12    THE COURT:  The record will so reflect.

13 BY MR. WILLIAMS:

14 Q Now, Lana, you knew both Andrew Royer and Lana

15   Canen as of April 2003.  Is that right?

16 A Yes.

17 Q Did you ever see them together?

18 A Yes.

19 Q Were they friends?

20 A Yes.

21 Q How often did you see them together?

22 A Often.

23 Q Did there ever come a time when you saw them

24   together that you saw Lana control Andy's behavior?

25 A I seen Lana tell Andy what to do.

702

```
 1      Q    Give me an example.

 2                MR. ZOOK:  I can't hear the witness.

 3                THE COURT:  Speak up a little bit, ma'am.

 4      Q    Can you repeat your last answer?

 5      A    Lana would tell Andy what to do.

 6      Q    Can you give some examples of that?

 7      A    She could tell him to go outside and wait or to

 8           turn around.  He would do it.

 9      Q    Was there any specific instance where she told him

10           to go outside that you remember?

11      A    Yes.

12      Q    And describe that for the jury?

13      A    She told Andy to go outside and wait, and he went

14           outside and waited.

15      Q    What was -- what was the weather conditions at that

16           time?

17      A    He was raining.

18      Q    And Andy Royer went outside when Lana told him to

19           do so.

20      A    Yes.

21      Q    Did he have anything covering him when he went

22           outside?

23      A    No.  He just went outside.

24      Q    So he would be rained on.

25      A    Yes.
```

703

1    Q    How long was he outside for?

2    A    He was still outside when I went upstairs almost a

3         half hour later.

4    Q    Lana, I want to take you to July 3rd of 2003.  Do

5         you recall that day?

6    A    Yes.

7    Q    Why do you recall July 30, 2003?

8    A    Because I'm a recovering addict, and I drank

9         alcohol on that day.

10   Q    So it stands out in your mind because you lapsed.

11   A    Yes.

12   Q    From the time that you got out of prison in

13        February of 2003 to July 3rd of 2003, had you drank

14        anything?

15   A    No.

16   Q    Did you take -- did you take any drugs at all

17        between that time?

18   A    No.

19   Q    So you remember this day because you drank some

20        alcohol?

21   A    Yes.

22   Q    Anything else about that day that -- that makes it

23        stand out?

24   A    The police came to our apartment building.

25   Q    We'll talk about the police coming to your

```
 1            apartment building in just a minute.  I want to

 2            take you now to July 3, 2003 at nine o'clock in the

 3            evening or thereabouts.  Do you remember where you

 4            were?

 5      A     Yes.

 6      Q     Tell the jury?

 7      A     I was outside on the patio in front of the

 8            apartment building drinking at a table with Lana.

 9      Q     Anybody else there?

10      A     Her friend, Dan, and my boyfriend, Robby.

11      Q     At some point did Dan and Robby leave?

12      A     Yes.

13      Q     And did that just leave you and Lana?

14      A     Yes.

15      Q     Now, you say you had been drinking.  How much did

16            you have to drink, do you remember?

17      A     We were drinking; no amount.

18      Q     At some point -- strike that.  You say we were

19            drinking, you and Lana Canen were drinking?

20      A     Yes.

21      Q     At some point while you were there with Lana alone,

22            did she make any statements?

23      A     Yes.

24      Q     What did she say?

25      A     She said no one was supposed to get hurt.
```

1   Q   Did you have any idea what that meant?

2   A   No.

3   Q   Did she say that more than once?

4   A   Yes.

5   Q   Did she say anything else?

6   A   She said she went upstairs to an old lady, and she

7       said she could come and get money.  When she got

8       there, she couldn't give her the money because

9       someone told her not to.

10  Q   Did you have any idea what she was talking about?

11  A   No, I didn't.

12  Q   Now, at the time that Lana made these statements to

13      you, were you intoxicated?

14  A   I had been drinking.

15  Q   Were you drunk?

16  A   No, I wasn't.

17  Q   Do you remember these statements vividly?

18  A   Yes.

19  Q   Now, you said something about the police coming.

20      What happened with regard to that?

21  A   The police came and told us that they were called

22      because someone had said we were drinking outside.

23  Q   Now, were they called after Ms. Canen had made

24      these two statements?

25  A   Yes.

1    Q    The statements that she made were they one after

2         another?

3    A    No.

4    Q    Do you know how much time was in between the

5         statements?

6    A    No, I don't.

7    Q    So she made the first statement about no one

8         getting hurt and then sometime later she made the

9         statement regarding an old lady that she would get

10        money from, was going to get money from, but that

11        woman refused because someone told her not to.  Is

12        that correct?

13   A    Yes.

14   Q    Well, the police come because you are drinking

15        outside.  Did you have contact with the police?

16   A    Yes, we did.

17   Q    Did they tell you why they were there?

18   A    Yes.

19   Q    Did they arrest you for public intoxication?

20   A    No.

21   Q    Did there come a time that evening that you went

22        inside?

23   A    Yes.

24   Q    Did Lana go inside?

25   A    Lana went inside first.

1    Q    So Lana left this patio area.

2    A    Yes.

3    Q    And this patio area was outside of the apartment

4         complex.

5    A    Yes.

6    Q    On the first floor.

7    A    Yes.

8    Q    So she was leaving to go back to her apartment.

9    A    Yes.

10   Q    Just after the police had been there.

11   A    Yes.

12   Q    Did she make any statements as she left?

13   A    Yes.

14   Q    What did she say?

15   A    She mumbled "Thanksgiving, thanks for giving

16        death."

17   Q    Thanksgiving, thanks for a giving death.

18   A    Yes.

19   Q    Did you have any idea what she was talking about?

20   A    No.

21   Q    When Lana Canen made these statements to you, did

22        you have any idea who Helen Sailor was?

23   A    No, I did not.

24   Q    Did you ever hear of the murder of Helen Sailor?

25   A    No, I did not.

1    Q    What was her demeanor when she said these things?

2    A    She was angry.

3    Q    Nina, how did you get involved in this case?

4    A    I got pulled over with Lana in my vehicle.

5         MR. ZOOK:  I can't hear that.

6         THE WITNESS:  I got pulled over.

7    Q    And you said Lana was in your vehicle.

8    A    Yes.

9    Q    Were the two of you separated?

10   A    Yes, we were.

11   Q    Now, were you interviewed by the police with regard

12        to this case?

13   A    Yes, I was.

14   Q    And do you remember who you talked to at the police

15        department?

16   A    No, do not.

17   Q    Was it a detective?

18   A    Yes.  It was two detectives.

19   Q    And did you tell them everything that you told the

20        jury here today?

21   A    Yes.

22   Q    Was it during this interview that you realized that

23        -- strike that -- at some point did the interview

24        end?

25   A    Yes, it did.

709

```
 1      Q    And after the interview ends, is that when you

 2           learned that Helen Sailor had been killed on

 3           Thanksgiving day of 2002?

 4      A    After I was done.

 5              MR. WILLIAMS:  No further questions, your

 6  Honor.

 7              THE COURT:  Mr. Zook.

 8                       CROSS-EXAMINATION

 9  BY MR. ZOOK:

10      Q    Ms. Porter, as I understand it you were picked up

11           by a police officers what was that for?

12      A    To come to the --

13      Q    I still can't hear you?

14      A    To come to the police department to make a

15           statement.

16      Q    You were picked up to make a statement?

17      A    Yes, I was.

18      Q    I thought they pulled you over for some other

19           reason?

20      A    They pulled me over and arrested Lana and gave me a

21           ticket.

22      Q    Okay.  What was the ticket?

23      A    Driving with no driver's license.

24      Q    Okay.  Now, were you on probation at that time?

25      A    Yes, I was.
```

1    Q   Did anything happen to your probation?

2    A   Not at that point.

3    Q   And it was later that you were violated?

4    A   Yes.

5    Q   Okay.  When you were violated, did you go back to

6        prison?

7    A   Yes, I did.

8    Q   But that time you told them that Lana had told you

9        about some woman that didn't give her money.

10       Right?

11   A   Yes.

12   Q   Okay.  Now, what was the period of time that you

13       talked with Lana while you were sitting outside

14       drinking?

15   A   We were outside for more than two hours.

16   Q   Two hours?

17   A   Yes.

18   Q   You have a soft voice, and it's just not going with

19       my ears very well.  So during that two hour period

20       Lana would say some things, and you remembered some

21       of them.

22   A   Yes.

23   Q   And the three things she said that -- that we're

24       talking about here are the one thing about the

25       woman who didn't give her money.

1    A    Yes.

2    Q    And the thing about Thanksgiving death.

3    A    Yes.

4    Q    And something else, what was that?

5    A    No one was supposed to get hurt.

6    Q    What?

7    A    No one was supposed to get hurt.

8    Q    No one was supposed to get hurt.  Okay.  Did Lana

9         ever say anything about Helen Sailor?

10   A    No, she did not.

11   Q    Did Lana have the bottle you were drinking from?

12   A    The bottle was on the table.

13   Q    Outside?

14   A    Yes.

15   Q    What kind of bottle?

16   A    Root Beer Schnapps.

17   Q    Okay.  Was it Lana's bottle?

18   A    I believe the alcohol we bought for us to drink out

19        there that night.  I'm not sure whose bottle.

20   Q    Who took the bottle inside?

21   A    I don't remember.

22   Q    You don't remember Lana picking up the bottle and

23        taking it inside as she made that comment?

24   A    I don't remember anything about the bottle.  I just

25        remember her going inside.

712

1    Q    Okay.

2            MR. ZOOK:  Pass the witness.

3            THE COURT:  Mr. Crawford.

4            MR. CRAWFORD:  Thank you, your Honor.

5                    CROSS-EXAMINATION

6    BY MR. CRAWFORD:

7    Q    Ms. Porter, I want to talk about July 3, 2003.  You

8         mentioned that present at that time were yourself.

9    A    Yes.

10   Q    Ms. Canen.

11   A    Yes.

12   Q    A friend of Ms. Canen's name Dan.  Is that correct?

13   A    Yes.

14   Q    Was he a boyfriend?

15   A    I'm not sure what their relationship was.

16   Q    And your boyfriend was also present.  Is that

17        correct?

18   A    Yes.

19   Q    And Andrew Royer was not present.  Is that correct?

20   A    That's correct.

21           MR. ZOOK:  No further questions, your Honor.

22           THE COURT:  Any other questions, sir?

23           MR. WILLIAMS:  Yes, Judge.

24   ////

25   ////

STATE'S WITNESS - NINA PORTER - (REDIRECT)

1               REDIRECT EXAMINATION

2    BY MR. WILLIAMS:

3      Q    Nina, how often or how many times did Lana Canen

4           repeat the phrase "no one was supposed to get

5           hurt"?

6      A    Several times.

7      Q    What about the statement that she made to you

8           regarding the old lady that she would get money

9           from and said she could come and get the money from

10          her, but then when she got there she refused

11          because someone told her not to give her the money.

12          What -- how many times did she say that?

13     A    One time.

14     Q    What about the comment that you said that Lana

15          stated as she was going inside "Thanksgiving,

16          thanks for giving death" how many times did she say

17          that?

18     A    One time.

19     Q    No further questions.

20               MR. ZOOK:  No questions.

21               MR. CRAWFORD:  No questions, your Honor.

22               THE COURT:  You may step down.  Watch your

23    step, please.  Is she released from her subpoena?

24               MS. BECKER:  Yes.

25               MR. ZOOK:  Yes.

```
1              MR. CRAWFORD:  Yes.

2              THE COURT:  She'll be released from her

3    subpoena.  Call your next witness.

4              MS. BECKER:  Your Honor, at this time the State

5    of Indiana rests it's case.

6              THE COURT:  The State of Indiana has rested.

7              MR. ZOOK:  Mr. Zook, may I have a minute, your

8    Honor?

9              THE COURT:  May you have a minute in the

10   courtroom or with the jury --

11             MR. ZOOK:  In the courtroom.

12             THE COURT:  In the courtroom, you may.

13             MR. ZOOK:  Your Honor, defendant Canen rests.

14             THE COURT:  The defendant Ms. Lana Canen has

15   rested.  Mr. Crawford.

16             MR. CRAWFORD:  Your Honor, Mr. Royer rests as

17   well.

18             THE COURT:  Mr. Royer has rested.  Ladies and

19   gentlemen, that concludes the evidence in this case.

20   We're going to take a recess at this time, and what we're

21   going to do is sit down with counsel, try to finalize the

22   instructions as quickly as we can.  Counsel have worked

23   over the long noon hour to facilitate this case moving

24   along.  So what we need to do is get our final

25   instructions in final form, get them copied so that each
```

1    of you will have a copy.

2              As soon as that is accomplished, we'll bring

3    you back; and we'll complete the trial, and we'll

4    complete the trial by this.  Both the state and the

5    defendant's counsel will have an opportunity to make

6    their final arguments based upon the evidence that has

7    been presented.  We'll have that.  We'll furnish each of

8    you with a set of final instructions.  I'll read the

9    final instructions to you for the record, and then you'll

10   retire to deliberate.  Before you leave the courtroom, I

11   need to remind you one more time.

12             You are all jurors in this case.  I must tell

13   you now and I will repeat this again each time you are

14   permitted to separate.

15             Generally, you should not express any opinion

16   about the case before it is submitted to you for

17   deliberation; however, you are permitted to discuss the

18   evidence presented in this case amongst yourselves in the

19   jury room during recesses from trial.  All jurors and

20   alternates must be present during these discussions.  You

21   must reserve judgment about the outcome of the case until

22   your deliberations begin.

23             You are admonished that you may not discuss the

24   facts of the case with anyone other than your fellow

25   jurors.

1           You may not discuss this case with me, with the

2      lawyers, parties or with any of the witnesses.

3           You should not listen to or read any outside or

4      media accounts of the trial.  You may not investigate the

5      case or attempt to obtain information outside the

6      courtroom.  It is highly improper for you to do so.  You

7      are to consider and decide this case only upon the

8      evidence received during the course of the trial here in

9      the courtroom.

10          Before I turn you over to the bailiff, I'm

11     going to tell you that it is the policy of this court to

12     take your cell phones from you during deliberations.

13     This would be a golden opportunity for you to use your

14     cell phones to make whatever arrangements you need to

15     make to let people know that you're going to be here with

16     us in the Elkhart Circuit Court for a while.  We'll not

17     take the phones until the deliberations begin.  You'll be

18     in care of the bailiff.

19                    (A short recess was taken.)

20          THE COURT:  The record should reflect that each

21     defendant is present, counsel for each defendant is

22     present, counsel for the state is present.  Court has

23     with the assistance of counsel prepared final

24     instructions and two verdict forms.  Mr. Zook, with

25     respect to the verdict form for if each defendant, are

1    agreeable to you.

2            MR. ZOOK:  Yes.  Sir.

3            THE COURT:  And, Mr. Crawford, are they

4    agreeable to you.

5            MR. CRAWFORD:  Yes, your Honor.

6            THE COURT:  And, Ms. Becker, are the verdict

7    forms agreeable to you?

8            MS. BECKER:  Yes, your Honor.

9            THE COURT:  With respect to the final

10   instructions, Mr. Zook, do you have any objections?

11           MR. ZOOK:  No, your Honor.

12           THE COURT:  And, Mr. Crawford.

13           MR. CRAWFORD:  No, your Honor.

14           THE COURT:  And, Ms. Becker.

15           MS. BECKER:  No, your Honor.

16           THE COURT:  We've discussed final arguments.

17   We've agreed there will not be a limit, although at a

18   certain point in time the Court will urge counsel to wind

19   up their arguments.  Are we ready to proceed?

20           MS. BECKER:  Yes.

21           MR. ZOOK:  Yes.

22           THE COURT:  Mr. Crawford.

23           MR. CRAWFORD:  Yes.

24           THE COURT:  Those of you seated in the audience

25   section, I would appreciate your assistance.  Out of

1    respect for the jury, I ask that you keep your thoughts

2    to yourself, that you not make any facial gestures, or

3    other movement that would detract the jury from their

4    duties.

5                    (The jury entered the courtroom, and

6                    the following proceedings were had.)

7            THE COURT:  Be seated, please.  Ladies and

8    gentlemen, as you know the evidence has now been

9    concluded in this case.  What we're going to do now is

10   hear the final arguments of counsel.  These statements of

11   counsel are not evidence.  They are statements by counsel

12   intended to persuade you to their particular way of

13   thinking with respect to the evidence.

14           State of Indiana of Indiana has the burden of

15   proof in this matter.  It's for that reason the state of

16   Indiana will be permitted to address you both first and

17   last.  Ms. Becker.

18           MS. BECKER:  Thank you, your Honor.

19                      CLOSING STATEMENT

20           MS. BECKER:  Thanksgiving day, Thanksgiving eve

21   of 2002 was profound for many people.  Don't know what

22   you were doing, but Helen Sailor was getting strangled in

23   her own home.  Helen Sailor's personal belongings were

24   was being rifled through by two intruders.  Helen Sailor,

25   her body was being offended even further by pouring juice

1    or oil or some kind of substance on it as she lay there

2    cold on that tile floor.  It wasn't enough just to kill

3    her.  It wasn't enough just to wrap something around her

4    neck whether it be hands and then later a cord,

5    ironically enough her lifeline.  It wasn't enough.

6              Instead, they had to just to keep doing things,

7    and then they had to take her things.  Take her money out

8    of her Bible, the large print Bible.  We can go on and on

9    about all the offensive things that surrounded this

10   murder, but you're going to have plenty of time to think

11   about those in a little bit.

12             What we want to do at this point is wrap this

13   case together because as you heard and as we talked to

14   you about during opening statements, it's kind of

15   disjointed.  There's lots of little pieces, little pieces

16   here, little pieces there.  And as Mr. Williams talked

17   about, you know, when you're putting a puzzle together

18   the gentleman that sat right back there in that seat

19   said, yeah, sometimes I clump some things, and then it

20   starts to fill in the rest of way.  And we talked

21   constantly about the fact that, you know, you don't have

22   to have every piece of the puzzle.  You don't have to

23   have the picture box in order to see what it is.

24             And, folks, as these last couple of days have

25   gone, every single one of you can see that picture.  You

 1    can see that writing on the wall.  What was the writing

 2    on the wall.  There you go.  Let's start with that one.

 3    Thanksgiving.  Thanks for giving death.  Out of the mouth

 4    of Lana Canen.  The day before Independence Day, the day

 5    before fourth of July 2003, as she sat on the patio with

 6    Nina Porter drinking some Root Beer Schnapps just hanging

 7    out.  And what does she keep saying?  No one was supposed

 8    to get hurt.  That statement, folks, no one was supposed

 9    to get hurt is incredibly profound for what reason?

10    There was a plan.  No one was supposed to get hurt.  What

11    does that do?  Corroborate virtually every piece of

12    evidence that came from that stand.  No one was supposed

13    to get hurt and yet Helen did.  It wasn't their intent to

14    kill her when they went to her home.  It was their intent

15    to get money from her, money.

16            Once again, out of the mouth of Lana Canen, you

17    got her talking about the fact that she would go up to

18    the old lady's apartment, the old lady that she'd get

19    money from, the old lady.  A lot of respect as she'd go

20    up there and mooch money from Helen Sailor.  But then the

21    day that she refused to give money, Thanksgiving, was the

22    day that she was given death.

23            Now, what do you think was in her mind?  How

24    profound do you think this was to her where eight months

25    later as she's drinking she keeps repeating over and over

1    again no one was supposed to get hurt.  She just was

2    supposed to give us the money, give me the money.

3            And then you got Andrew Royer.  We could go

4    through -- I could play that tape over again for you.

5    You can listen to it over again if you want to in the

6    jury room when you're deliberating.  But there were a few

7    things on that tape that are so important because it

8    pulls it all together again.  Andrew Royer talked about

9    the fact that he strangled her for a long time, five, ten

10   minutes.  Look at the clock right now.  It is 3:42ish.

11   And in another five or ten minutes, let's look at that

12   clock and see how long it is.  If I stood here silent for

13   five or ten minutes, it would seem like an eternity.  How

14   do you think it felt to Helen Sailor as he continued to

15   strangle her?  And Dr. Prahlow, this is why it's

16   important, explained to you this didn't happen fast -- or

17   didn't happen fast at all.  It was repeated movement of

18   the ligature.  You saw up on the screen, and these are

19   going to go back with you so you can look at them closer,

20   the different placements of the ligature.

21           In State's Exhibit 13 you can see the little

22   texture lines.  How much pressure do you think had to be

23   exerted against this in order to make those pressure

24   lines?  Pressure lines on the back of her neck.  Also,

25   profoundly important from his statement you saw on the

1    slide the criss cross.  Comes down like this and ends

2    here.  They don't meet up.  How did Andrew Royer

3    demonstrate that he strangled Helen?  I'm quite sure that

4    Andrew Royer had not had an opportunity to meet with

5    Dr. Prahlow to find out about that little detail before

6    he give his statement.

7         He had such intimate knowledge about this crime

8    that there's no other way to explain it, folks.  But what

9    did he say?  It was a money thing, and she just happened

10   to be the victim.  Even when he gave his statement,

11   although he said he was sorry, the underlying current,

12   she just happened to be there.

13        The defendant Lana Canen statements.  She

14   wouldn't give me the money.  Her death is her own fault.

15   The callousness that these two exhibited during the crime

16   by pouring these things on her body, after the crime by

17   making these statements.  We can never ever understand

18   what each individual one was thinking.  Our minds don't

19   work that way.  We should be happy our minds don't work

20   that way because then when you talk about this woman in

21   the condition that she was, she just happened to be a

22   victim.  That's a problem.

23        Let's talk about the evidence, ladies and

24   gentlemen.  Over the last two days you have heard from

25   numerous witnesses from the State of Indiana.  Some of

1    them very very quick.  Some of them took a little more

2    time.  Caroline Hoffer, first witness, she was able to

3    explain to you what she saw and how things occurred.

4    Remember, the door was locked when she got there.  Had to

5    have Larry and Carol Converse come and unlock the door.

6    That door had to be locked from the outside.  Why is that

7    important?  Because the perpetrators couldn't have locked

8    it from the inside and left.  They would have had to have

9    thought, we want to lock this door from the outside.

10   What did it take?  It took a key.  It took a key.  Low

11   and behold, Helen's key ring was empty, the key ring that

12   held her apartment key.  They didn't take the whole key

13   ring.  They just took her key.  Think of the detail of

14   that because we're going to talk about that in a little

15   bit.

16          The Bible, giant print addition of the Holy

17   Bible in which Helen would keep several hundred dollars

18   anywhere from 100 to several hundred.  She kept it there

19   for extra money.  After this crime was over, the money

20   was gone.  It had been taken.  There's the robbery,

21   folks.

22          Now, you can look at this from several

23   different perspectives.  You can also see that jewelry

24   had been taken.  Andrew Royer talked about the fact that

25   jewelry had been taken from the jewelry box, the red

1   jewelry box that was underneath the bed.  Broken clasp

2   still under the bed.  Remember how he talked about the

3   fact that he cleaned things up, organized things, put

4   things back so that it didn't look like they'd been

5   tampered with.  Except for the fact that it was broken,

6   it was right back under the corner of the bed.  Things

7   were wiped down.  Lots of smears Detective Bourdon

8   testified to.  Lots of smears, had a hard time getting

9   fingerprints.

10          The medical tub, incredibly important because

11  that was one piece of forensics evidence that we were

12  able to have.  And what did Caroline Hoffer add about the

13  medical tub?  That's been with since she came back from

14  Georgia in 1997.  Same medical tub.

15          Carol Converse -- I'm sorry, that was Carol

16  Converse talked about the same since 1997.  Caroline

17  talked about all the different items that had been

18  disturbed as well.  Her walker was still in the living.

19  What could that tell us?  That when she got home, she got

20  home, maybe put her food away, hadn't put her walker away

21  yet, and she had company because by 8:45 this was done.

22  She didn't answer her phone anymore.  Thanksgiving

23  evening was the time of the crime.

24          Dr. Prahlow established that the cause of death

25  was the strangulation.  He established for you she didn't

```
 1    die quickly.  The ligature had moved.  The injuries were

 2    anywhere from a quarter of an inch to a full inch, and

 3    that she had defensive wounds on her hands.  Look at

 4    these.  And granted, elderly skin is frail.  But a bruise

 5    that goes from your hand all the way up to your elbow.

 6    She was fighting him.  Another bruise on the right hand,

 7    smaller bruises on her back side, two black eyes,

 8    abrasion on the chin, the abraded nose, the contusion on

 9    her forehead.  All of these things.  She was fighting

10    him.

11            Detective Daggy testified about the

12    investigation.  Enlightened you a little bit about how

13    difficult some investigations can be.  Granted, you've

14    got a situation where the individuals who may have been

15    witnesses to the crime have perceptions that may be

16    diminished a little bit, not as good as ours might be.

17    That was a problem.  That was a problem.  Yet they kept

18    working on this.  And even though over the first few days

19    and even into the first few months, they weren't able to

20    get a resolution to this case, there were a couple red

21    flags; but nothing that jumped out and said, here you go.

22    Here's your suspect.

23            It took a break in the case, namely, Nina

24    Porter to start giving some intimate details so that they

25    could then go back and start doing some interviews.  And
```

1    then things started falling into place.  The context was

2    there.  Then the fact that Lana Canen was pacing out in

3    front of the highrise Thanksgiving evening was important.

4    When they got that information a couple days after the

5    crime, it just wasn't all that important.  Was it a red

6    flag?  Sure, it was.  Was it enough?  No.

7            The fact that Flo Macioce sees Charlie and sees

8    Lana that night doesn't fit into the context until you

9    start pulling things together, and then it all fits

10   together.  After the crime, she wants to get out of

11   there.  So what does she do?  She packs a bag and high

12   tails it downstairs, and then Charlie takes her to her

13   boyfriend's house over at Bristol and Oslo.  That's still

14   within the city of Elkhart, folks.  It's only a couple

15   miles away.  Sure as heck isn't out of town visiting

16   friends and relatives.

17           Now, Detective Daggy probably the most

18   important thing he could add to this case was his

19   interview with Andrew Royer later on, 2004.  By that

20   time, he'd already given his statement.  He'd already

21   expressed his concern about the fact that if he tells us

22   what he really did, he's going to get into a lot of

23   trouble.  What has he done by now?  Now his story, now

24   his story is that he comes home from mom's for

25   Thanksgiving dinner about 4:00 p.m. takes a nap, wakes

1    up, goes to Martins and gets beer.  Gets really drunk and

2    then goes back to bed.

3            And then the three witnesses right after that

4    Larry Haack from Martins Supermarket, folks, he didn't

5    get beer that night cause Martins was closed.  It's

6    always closed on Thanksgiving.  And he didn't go to bed

7    because he was at Martha Haff and Matt Johnson's

8    apartment.  Do any of those people have any reason to

9    fabricate?  You saw Martha.  Not only did she not want to

10   be here, there was absolutely no reason for her to

11   fabricate, none whatsoever.  And the fact that Andy was

12   up and awake and wanting to hang out and watch movies,

13   completely contradicts what he told Detective Daggy.

14           Then Charlie Lambert and Flo Macioce testified.

15   Both of them individually put Lana Canen at the Waterfall

16   Highrise the evening that Helen was murdered, and Charlie

17   says he didn't leave there until I think it was 6:30,

18   6:45, somewhere in there.  6:30, 6:45 maybe that's when

19   he got there, but it was still plenty of time to commit

20   this murder because Carol and Larry dropped Helen off at

21   the latest it would have been 5:45, 6ish, but it was

22   somewhere between right after five until right before

23   six, somewhere in there.

24           And we're quite sure Lana packed her bag and

25   got out of there as fast as she could.  Why?  She's got a

```
 1    little more ability for self-preservation.
 2    Self-preservation kicked in as you saw with Detective
 3    Thayer, Judy Johnston, because Lana told each one of them
 4    I was out of town visiting friends two days after the
 5    murder.  She already had her story down pat.  And when
 6    Detective Thayer tried to rouse her, at first she
 7    wouldn't talk to him at all, and then she comes I was out
 8    of town visiting friends and family.  She tells Judy
 9    Johnston I'm out of town visiting friends and family
10    directly in contradiction with what Flo Macioce and
11    Charlie Lambert had to say.
12            Who had motive to fabricate?  Charlie didn't
13    want to be a part of this at all.  Lana made him a part
14    of this.  Flo didn't want to be a part of this at all.
15    Lana made her a part of this.  Nobody chooses witnesses
16    in this case except for these two right here, and that's
17    what we've got.
18            And by the time that this started to come
19    together when Detective Conway went out to interview
20    Andrew Royer, then things really started to make sense
21    because an Andrew -- Andrew was in a position where he
22    knew he had been had.  And after the preinterview which
23    defense wanted you to believe was so unreasonable, boy,
24    they just pounded it into him.  They put all those words
25    in his mouth, and then he just recited everything that
```

1    the detectives wanted him to say.

2           Now, if that were the case, maybe we might

3    actually have the real story about what happened because

4    we'd all really like to know why Helen died that night.

5    Is it pretty clear it had something to do with money?

6    Yeah.  But the closure of knowing how and why is not

7    there because even when he started to think he came

8    clean, he's still feeding us a line.  And while he's got

9    intimate details many many intimate details, he never

10   tells us the whole story.

11          Intimate details such as I slapped her open

12   handed on the cheek.  I knocked her down in the kitchen.

13   You saw the photograph of what appeared to be possibly a

14   hair drag on the front of the stove.  Do we know it's

15   connected?  No, absolutely not.  Does it make sense?

16   Yeah, the bruising on her nose, the major contusion on

17   her head, any of those could have come from those areas.

18   We don't know how those happened yet.  But the only ones

19   that can tell us that are the defendants, and Andrew

20   Royer gave just enough intimate details to get the police

21   off his back, at least he thought.

22          Now, during this preinterview, all the intimate

23   details that came out started really making sense, and

24   Detective Conway then wants to get this all on record.

25   He knows he's got it now.  So what's he do?  He brings

1    out that tape recorder, turns it on, Andrew Royer's

2    demeanor changes pretty kick, so did his story.  Granted,

3    still gave a lot of intimate details of the crime but

4    then tries to blame it on Helen.  Just give me the money.

5    What did he say?  "I hit her hard enough that she got the

6    point."  How hard do you have to hit a woman like Helen

7    to give her the point?

8              Then we start to come to the evidence against

9    Lana Canen.  All of Tuesday was pretty much spent

10   focussing on what was against Andrew Royer.  Today we

11   learned why Lana Canen is also guilty of this crime.  We

12   started with Erika Roarhig, the home health nurse, who

13   has been taking care of Helen's meds for the last two

14   years.  And she testified that that tub, this rubber tub,

15   I'm sorry, this plastic tub right here, the one that's

16   the most important piece of evidence in this case has

17   been with Helen ever since she's been there, two years,

18   and that their company would have bought another one for

19   her if they needed to replace it, but there was no need

20   to replace it.  The tub that then Joel Bourdon testified

21   about had a usable print right back here.

22             Now, I don't know what your expectations were

23   about fingerprints, I don't know what your training and

24   experience is about fingerprints; but when you look at

25   lifter M, this is what it's like trying to take

1    fingerprints, folks.  You don't know when they were

2    there, they get smudged, they get moved over, things go

3    over them, and it's stuff to find a fingerprint.  Between

4    Detective Chapman and Detective Bourdon, individuals

5    whose profession it is to tech crime scenes, hundreds of

6    crime scenes, and in their experience fingerprints are

7    not easy.  Out of all the lifters that Detective Bourdon

8    was able to get out of Helen's apartment, only one had

9    enough identifiable ridge detail to make a comparison.

10          Now, he testified that there was lots of ridge

11   detail.  He found some things.  He took several lifters.

12   They did several -- or attempted several comparisons.

13   They tried.  How hard do you think they tried knowing

14   that this case was going and going and going with no

15   suspects, and forensic science still couldn't give them

16   anything until this print.  And by this time, things were

17   starting to fall into place, August of 2003.

18          And immediately when interviewed, as Detective

19   Lieutenant Snider indicated to you when confronted, what

20   did Lana Canen say?  I've never been in her apartment.

21   You don't have a print.  You don't have anything.  But if

22   you do, it couldn't be just one on a pill bottle because

23   this is how I open a pill bottle.  Nobody said anything

24   about a pill bottle.  And in light of the fact that Helen

25   was blind, she wouldn't be having pill bottles out laying

1    around anyway like you heard from Caroline and Carol and

2    Erika.

3            When they tried the pill bottle, no

4    identifiable or no usable print as Detective Bourdon

5    would testify.  Nothing was usable.  We got lucky.  We

6    got luck lucky, and she was counting on the fact that we

7    wouldn't.

8            Now, Detective Chapman with the experience that

9    he has explained how he then took the fingerprint card of

10   Lana Canen, and he compared it to the print from the tub,

11   and he said, yep, that print is Lana Canen's.  Her left

12   pinky -- left little finger.  Lana's never been in that

13   apartment before except when Helen Sailor was being

14   murdered.  Except when that pill container was being

15   moved from the cupboard to the stove because as Erika

16   testified, that pill container is always up in that

17   cupboard.

18           Now, the little daily ones are stacked on top

19   of each and pushed back right here between the stove and

20   the sink, and the paper bag is up in the cupboard, but

21   that little box is up on the cupboard.  It wasn't up in

22   the cupboard after the murder.  It was up there before.

23   So what's the only conclusion?  The only reasonable

24   conclusion, folks, is that the pill container was moved

25   contemporaneous or near the same time of Helen's murder

1    and Lana's print was on it.  Why would somebody move

2    that?  Get pills, look for valuables.  Pills are liquid.

3    Pills can be sold on the street.  They're a commodity,

4    folks.  They're valuable not just to the person who needs

5    them for medical reasons.

6              So it wasn't even enough to steal the money

7    from her Bible.  Had to rifle through her jewelry box

8    too.  Had to pour this liquid on her clothes and her

9    dresser and the bed.  You can almost just look at her and

10   see her taking that bottle, shaking it all over the bed,

11   look what I did, cause she was sure proud of it at the

12   time.

13             What was Andrew Royer doing at this time?

14   Depending on which statement you want to think about,

15   whether it's -- it was a money thing, and she just

16   happened to be the victim, or the fact that she strangled

17   her for five to ten minutes.  It was a long long time.

18   While he was cleaning up?  Or think about this.  Do you

19   remember how he talked about the fact that he dumped what

20   he thought were lotions on Helen's body to make her

21   decompose faster he thought, and you listen to his

22   statement and the way that he talked, you see his thought

23   processes, you hear Nina Porter's statement.  He doesn't

24   talk much.  Lana controls him.  Andy, go stand in the

25   rain.  And what did he do?  He did it.  Turn around,

1   leave, and he did it.

2          Why?  Matt Johnson said it.  He cared about

3   Lana.  He had an interest in Lana.  As Matt Johnston

4   stated, "He wanted to jump her bones," which at the time

5   there was quite a reaction to that.  As we sit here now

6   and think about how disgusting that is.  It's really

7   tough, but it's easy to understand that he did whatever

8   Lana told him to do.

9          So when you think about the fact that he was

10  saying, poured lotion on her, make her decompose faster,

11  have to wonder where he was.  Was he freaking out because

12  of what he had just done because he still had a little

13  bit of a conscience and not paying attention to what Nina

14  was doing -- or what Lana was doing?  He thought they

15  lotions.  They weren't anything close to lotions.  And

16  while he had tons of details about the crime, you have to

17  wonder.  Is he just covering for somebody trying to take

18  the blame himself and filling in gaps for the things he

19  didn't do personally?

20         Because, boy, he remembered cleaning up, wiping

21  things down with a towel and then throwing them down with

22  a chute including the bottles.  He remembered and those

23  towels were in the chute, the bottle was in the chute.

24  Think about that long and hard.  Not that it's crucial,

25  folks, it's not.  Because to find them guilty, all you

1    have to do is look at the statement and see her

2    fingerprint.  That's enough evidence to find them guilty

3    because the State of Indiana has to prove that they

4    committed a robbery or attempted to commit a robbery.

5    You got that from her statements.  Nobody was supposed to

6    get hurt.  She just was supposed to give me money.  Money

7    is gone from Helen's apartment.  There's the robbery,

8    folks, and Helen is sure dead.  That's all you have to

9    find beyond a reasonable doubt.

10          But we know you're going to want to put this in

11   perspective.  You're going to want to put this in

12   context.  And all of these little things add up, and the

13   only thing they add up to just as you heard the

14   detectives that were involved in this case, Detective

15   Thayer, Detective Snider, Detective Daggy most

16   importantly because he went through all this, detective

17   Conway, Detective Bourdon.  All of them went through and

18   talked about how they had through all this evidence they

19   submitted to the lab.  They tried so hard in order to

20   find some way to vindicate Helen Sailor's death.  And

21   where did every road lead?  Right here.

22          And this is the end of the road because now it

23   is your opportunity to hold them accountable.  Nobody

24   else can do it but you.  You have the power now to say

25   you are guilty, and we know you are guilty, and now you

```
 1    have to take responsibility for it cause you have to
 2    wonder then will Lana say once again Thanksgiving, thanks
 3    for a giving death.  Thank you.
 4              THE COURT:  Thank you, Ms. Becker.  Mr. Zook.
 5              MR. ZOOK:  Thank you.
 6                      CLOSING STATEMENT
 7              MR. ZOOK:  Well, that was certainly
 8    enlightening.  I'm going to get to talk to you once.  The
 9    prosecution will get to go twice.  Mr. Crawford will talk
10    to you after I talk.  But I won't get to come up and
11    refute anything that comes afterward, so I hope you'll
12    pay attention.  The psychologists generally tell us what
13    you hear first and last is what you remember most.  I'm
14    in the middle.  I hope you remember what I have to say.
15              First of all, I want to thank you all for
16    paying attention.  I can tell by your faces that it's --
17    that it's wearing on you.  I can't imagine what people go
18    through in California where they have such long trials.
19    I don't they think meet for as long in the daytime, and
20    it will be a longer period of time because I know you're
21    going to talk about this among yourselves, and you're
22    going to do the right thing, and you're going to look at
23    the evidence that's been presented.
24              What we just heard was we heard about some
25    evidence, and we heard about a lot of things that were
```

1  said and a lot of things that were mentioned such as my

2  client throwing various substances on a body and so

3  forth.  This is speculation, and this is exactly what you

4  were told about in the beginning by that prosecutor that

5  you shouldn't be paying attention to.

6       What exactly is there in the way of evidence

7  that ties Lana Canen to the crime?  Nothing.  There is a

8  fingerprint, but there's no evidence that ties Lana Canen

9  to this crime.  You have some definite evidence that ties

10  Mr. Royer to the crime, namely, that he admitted it.

11  Mr. Royer's statements don't tie Lana to the crime.  They

12  certainly tie himself to the crime.  When you think about

13  the things that are used to try to tie Lana to this

14  crime, you have to say, well, there's a fingerprint.

15  There's some statements that she made allegedly to a

16  person that testified against her, and there's some

17  statements she made herself that were inconsistent with

18  those.  And when the police are talking to Lana, she says

19  "I wasn't there."  Gee, maybe I would have said that too.

20       The evidence of control.  I guess -- remember

21  in the first place in opening statements Ms. Becker said

22  she was going to show that Lana was the mastermind.

23  Well, that word kind of sticks in your head, and then

24  later on she tries to show that there is control by

25  calling a witness that says she could tell Andrew to go

```
1    out in the rain, and Andrew would go out in the rain, and

2    I got to thinking about that.  And I thought if my wife

3    told me to go wait for her, I'd probably go wait.  If my

4    wife told me to turn around, I'd probably turn around.

5    I'd probably follow her from one room to the next like

6    some guys do.  But that doesn't mean that she has control

7    when it comes to important things.  It doesn't mean I go

8    commit a robbery for her.  And we don't really have any

9    evidence that Lana Canen told Andy Royer to go commit a

10   robbery.  We got a bunch of things that look like it

11   might have been, could have been, and we want to put it

12   together so that we have this thing solved, and so that

13   Andy Royer doesn't take the wrap by himself because the

14   theory is he's too stupid to have done it by himself.

15           We have a fingerprint that was not on a wall,

16   it was not on a piece of furniture, heavy piece, it was

17   not on anything that is immovable in the room.  It's on a

18   bin that's easily carried, and that is similar to many

19   bins.  I guess we'll call it a bin.  And, you know, one

20   woman that is Helen's relative said that's the same thing

21   she's had all along since she came from Georgia.  Another

22   woman said, well, we -- we'd get her another one if she

23   needed it.  Neither one of them would say, yes, this is

24   the one that's been there all the time.  We can't really

25   say that.  One woman said like when I asked her what's on
```

```
 1    it.  Nothing is on it.  That would be the nurse.  Or

 2    there might be some manufacture's label.  Well, there is

 3    a manufacture's label.  Is there any writing on it?  No.

 4    But there is.  Helen Sailor written twice on it.  I don't

 5    know why people can't simply give the testimony that they

 6    know to be true instead of trying embellish to make an

 7    impression.

 8            If you're called up to the witness stand and

 9    you know there's something that she keeps her drugs in,

10    how can you conclude that it's the same thing she always

11    has kept her drugs in?  It may seem like a small point to

12    you, but think about it.  It's the bias that we get when

13    we try to do a good thing.  We know Helen.  We try to do

14    a good thing for her.  I wouldn't be able to say if it's

15    the same bin.  Would any of you be able to say, yes, this

16    is the one?  How certain is that?  Where did that bin

17    come from to begin with?  Was that actually always in

18    Helen's room?  Neither witness says it.  Is there a

19    alternative explanation for the fingerprint?  The state

20    has to prove that my client was involved somehow in this

21    case, and a mere fingerprint on a bin with drugs in it

22    just doesn't do it.

23            It's true that Andy and Lana were good friends.

24    So, even if -- even if Andy had done this murder and

25    gotten that bin and taken it to Lana, even if Lana had
```

1    come downstairs -- or upstairs, excuse me -- and gone

2    into the room to help him clean up, she wouldn't be a

3    part of the crime itself.  Here's the instruction you're

4    going to get on aiding, inducing or causing an offense.

5            A person knew who knowingly aids, induces, or

6    causes another person to commit an offense, commits that

7    offense even if the other person has not been prosecuted

8    for the offense, has not been convicted of the offense,

9    or has been acquitted of the offense.

10           In other words, it doesn't matter what happened

11   to the other person.  If you aid, induce, or cause to

12   commit the offense, and that's the key here, because if

13   the murder happened before the action of Lana Canen, then

14   she didn't help to murder Helen Sailor, and we don't

15   know.  If we assume that that fingerprint on that bin was

16   something that occurred in the apartment of Helen Sailor,

17   we don't know when it got there.  We don't know if it was

18   before or after.  I guess I explained to you before that

19   proving something beyond a reasonable doubt means looking

20   for holes in the evidence.  And while it might be a nice

21   thing to say, yeah, she's the mastermind, and he's the

22   muscle, do you really think that's what happened here,

23   and even if you do are you sure?

24           You're going to get another instruction and it

25   concerns direct and circumstantial evidence.  Direct

1    evidence means evidence that directly proves a fact

2    without an inference and which in itself is true -- if

3    true conclusively established that fact.

4          When Andy Royer says I did it, if that in

5    itself is true that conclusively established the fact,

6    that's direct evidence.  Somebody says I saw Lana Canen

7    go in the apartment and do the crime.  That's evidence

8    that if true conclusively establishes the fact.  That's

9    direct evidence.

10          Circumstantial evidence means evidence that

11   proves a fact from which an inference of the existence of

12   another fact may be drawn.  So in this case we have the

13   fingerprint, which is basically the evidence against Lana

14   Canen, and we've got some statements.  Those statements

15   are not I did it.  Those statements are not to a person

16   here that testified Andy Royer killed Helen Sailor, and I

17   told him to do that.  Those statements are little bits a

18   pieces which may lead to an inference from which another

19   fact may be drawn.  So those are known as circumstantial

20   evidence.  And it appears that the case against Lana

21   Canen is totally circumstantial evidence because the

22   person that said he was involved in the crime didn't

23   mention her at all.

24          Now, here's the thing about circumstantial

25   evidence.  The prosecutor -- one of the prosecutors said

1    in the beginning that's just the same as direct evidence.

2    Well, it's different in this respect.  Both direct and

3    circumstantial evidence are acceptable means of proof.

4    Where proof of guilt is by circumstantial evidence only,

5    it must be so conclusive and point so surely and

6    unerringly to the guilt of the accused as to exclude

7    every reasonable theory of innocence.

8            We heard in the beginning of the case that Lana

9    knew Helen Sailor, and she admitted knowing Helen Sailor.

10   Had she been in her apartment before?  We don't know.

11   But from the evidence, it may be an inference you can

12   draw.

13           Did Andy, knowing Helen Sailor, take that drug

14   tub down and show it to Lana?  We don't know.  But I

15   believe from the evidence that they knew each other so

16   well it may be, and it may be just as likely that that

17   happened then that Lana was involved in the murder.  What

18   is as likely as what?  And, remember, we're not weighing

19   to see what's more likely because that only proves the

20   case by more than 50 percent.  We're talking what proves

21   the case beyond a reasonable doubt, and that's what you

22   have to keep in mind here.

23           You're going to be given an instruction on

24   reasonable doubt.  A defendant must not be convicted on

25   suspicion or speculation.  It's not enough to show that

1    the defendant is probably guilty.  On the other hand,

2    there are few things in the world that we know with

3    absolute certainly.  The state doesn't have to overcome

4    every possible doubt, but the state must prove each

5    element of the crime by evidence that firmly convinces

6    you and leaves no reasonable doubt.  The proof must be so

7    convincing that you can rely and act upon it in the

8    matter of the highest concern and importance to you.

9         Think of your life savings.  How much of that

10   would you be willing to bet on this?  How much do you

11   know about what really happened here?  Can you say that

12   Lana Canen beyond a reasonable doubt prompted that man to

13   go up and rob Helen Sailor during which he killed her

14   beyond a reasonable doubt?  Then you're seeing a lot

15   fewer of them than I am.  I hope that you will find Lana

16   not guilty.  Thank you.

17        THE COURT:  Thank you, Mr. Zook.  Ladies and

18   gentlemen, we have two more lawyers to hear from, and we

19   have final instructions.  For that reason, we're going to

20   give you a short recess at this time.

21        You are all jurors in this case.  I must tell

22   you now.  I'll repeat this again each time you are

23   permitted to separate.

24        Generally, you should not express any opinion

25   about the case before it is submitted to you for

1    deliberation; however, you are permitted to discuss the

2    evidence presented in this case amongst yourselves in the

3    jury room during recesses from trial.  All jurors and

4    alternates must be present during these discussions, and

5    you must reserve judgment about the outcome of the case

6    until your deliberations begin.

7            You are admonished that you may not discuss the

8    facts of the case with anyone other than your fellow

9    jurors.

10           You may not discuss this case with me or with

11   the lawyers, parties or with any of the witnesses.

12           You should not listen to or read any outside or

13   media accounts of the trial.  You may not investigate the

14   case or attempt to obtain information outside the

15   courtroom.  It is highly improper for you to do so.  You

16   are to consider and decide this case only upon the

17   evidence received during the course of the trial in the

18   courtroom.  You'll be in the care of the bailiff.

19               (A short recess was taken.)

20           THE COURT:  Mr. Crawford, Mr. Zook, Ms. Becker

21   Mr. Williams we have a situation here where we have some

22   oversized exhibits, some items that probably should not

23   be here in storage.  Does anyone object to the conclusion

24   of trial photographing these exhibits, substituting a

25   photograph in the record?  Anyone object?

1          MS. BECKER:  No.

2          MR. CRAWFORD:  No, your Honor.

3          MR. ZOOK:  Your Honor, only to the drug tub.

4          THE COURT:  Yes.  The rest of the items are

5    okay.  They're not oversized.  This is only thing that

6    I'm thinking is oversized.

7          MR. ZOOK:  I don't mind the drugs going back --

8          THE COURT:  No, no.  They're all going back.

9    That's not what I'm saying.  At the conclusion of the

10   trial.

11         MR. ZOOK:  I understand what you're saying.

12   I'm saying the drug tub itself should be preserved here

13   as evidence.

14         THE COURT:  All right.  But the contents you're

15   all right with photographing those?

16         MR. ZOOK:  Yes.

17         MS. BECKER:  Judge, if we break the seal then

18   it ruins the chain of custody --

19         THE COURT:  Well, he's giving up any chain of

20   custody argument by his suggestion.  Right?

21         MR. ZOOK:  Right.

22         THE COURT:  That solve your problem.

23         MS. BECKER:  Fine with me.

24              (The Court convened with all the

25                parties present.  The jury entered the

1          courtroom and the following

2          proceedings were had.)

3          THE COURT:  Be seated, please.  Mr. Crawford

4     will now address you on behalf of the defendant

5     Mr. Royer.  Mr. Crawford.

6          MR. CRAWFORD:  Thank you, your Honor.

7                    CLOSING STATEMENT

8          MR. CRAWFORD:  Ladies and gentlemen of the

9     jury, I appreciate you taking the time over the last two

10    days to carefully listen to the evidence.  That's what we

11    spoke about when we spoke about earlier in this case when

12    we were picking the jury about how important it was going

13    to be to carefully listen all of the evidence.  While

14    this case certainly involves the tragic death of a very

15    nice -- or what seemed to be a very nice lady, Ms. Helen

16    Sailor, it also involves issues concerning a young man

17    with a diminished mental capacity, Andrew Royer.

18         MS. BECKER:  Objection, may we approach.

19         THE COURT:  You may.

20              (An off-the-record discussion was held

21              at the bench.)

22         THE COURT:  To the extent there was an

23    objection, it is overruled.

24         MR. CRAWFORD:  What do we know about Andrew

25    Royer?  We know that he was a gentleman that lived in the

```
 1   highrise, and we know that he was a gentlemen that was

 2   initially questioned by police officers in this case.  I

 3   believe officer -- or Detective Conway who said he spoke

 4   with him initially in this case when I believe Detective

 5   Christian was involved.  You'll have to review your notes

 6   to make a determination as to specifically who was

 7   involved in that initial questioning in the case.  At

 8   that point in time, nothing was learned from Mr Royer.

 9          We know from the detectives that Mr. Royer was

10   an individual that was a little slow, and I believe you

11   all heard that on the tape.  You certainly had an

12   opportunity to listen to that during the course of the

13   statements that were given yesterday that was played out

14   before you by the State of Indiana.  We certainly know

15   that information.  And again, you have an opportunity to

16   consider that when you consider the nature and the scope

17   of the testimony by way of the tape in this particular

18   case.

19          Now, at this point in time, I'd like to take

20   you back to November 28, 2002, and figure out

21   specifically what we saw in the way of evidence

22   concerning the death of Helen Sailor.  What do we first

23   know?  We know from the course of the several statements

24   from Mr. Royer that he got home at approximately

25   four o'clock.  We know that he had been at his mother's
```

1    house that day for thanksgiving dinner, and it was

2    approximately four o'clock or so when he got home on that

3    evening in question.

4          We also know from the testimony of Carol

5    Converse that Helen Sailor arrived home somewhere between

6    5, 5:15, 5:30 somewhere along that nature and that time.

7    I believe that she mentioned specifically that they had

8    watched a show that she believed went to five o'clock,

9    and after that they left and it took about 10, 15 minutes

10   to get to the highrise from their location.

11         Well, what's the next relevant information that

12   perhaps was presented through the State of Indiana's case

13   and also during cross-examination in my case, and that's

14   through Charles Lambert?  We learned that somewhere

15   between 7, 7:15 he saw co-defendant in this case Lana

16   Canen out in front of the highrise, and she was the one

17   that was walking up back and forth around the front of

18   the highrise there.  That's a specific piece of

19   information that we learned at that point in time, and

20   Charles Lambert was very clear during cross-examination

21   that he under no circumstances saw Andrew Royer at that

22   point in time.  Carefully, he -- it was clear that that

23   was the only person that he had seen out at that point in

24   time.

25         And what also did he see her with as well too?

1    I believe he mentioned a duffle bag, and he mentioned

2    another bag as well too.  She had some items with her

3    when she was leaving the particular location at the

4    highrise.  Did you see Andrew Royer with anything at that

5    point in time?  No, he didn't.  It was only Lana Canen.

6            What next did we learn in the scope of events

7    that transpired?  Somewhere between 8:45 and 9:15

8    Caroline Hoffer called Helen Sailor's apartment I believe

9    somewhere between eight and ten times, or six and eight.

10   There were a relative number of periods of times that she

11   called 8:45 to 9:15 to let her know that she was going to

12   be coming the next morning and to follow-up with her

13   since she hadn't seen her Thanksgiving.  We also learned

14   at that point in time that Helen Sailor never answered

15   the telephone during that period of time.  It is at that

16   point in time that thereafter Caroline Hoffer came the

17   next day and tried to get into the apartment of Helen

18   Sailor or to get her to let her in but was unsuccessful.

19   She had to call Helen's friends, family members, Larry

20   Converse, and Carol Converse to come and open the door;

21   and that point in time is was when Carol and everyone

22   else discovered that Helen Sailor was dead.

23           Now, what happened with the Elkhart Police

24   Department at that point in time.  Well, we heard

25   Detective Joel Bourdon come in and testify that he went

1   around with others and canvassed the apartment, and I

2   believe you all had an opportunity to see both video and

3   photos about what it looked like in that apartment at

4   that point in time.  And you heard Detective Joel Bourdon

5   talk about the procedures he went about and carefully

6   going over all of the items that he felt were relevant in

7   Helen Sailor's apartment to attempt to pull out latent

8   prints.  You heard him testify that he did that in

9   several areas both in the kitchen area and in the bedroom

10  area and all around where he thought that you might

11  find -- perhaps find a latent print.  And I believe he

12  testified, and this is very important, testified that

13  there were no prints that were found from the defendant

14  Andrew Royer, none whatsoever.

15          We learned later that the only print they found

16  was a print of Lana Canen, the co-defendant in this case,

17  certainly not Andrew Royer, and that's critical when you

18  go back and look at this information in this case and

19  make a determination.  Think carefully about what they

20  didn't find in this apartment at this point in time.

21          Now, we also learned that kind of the case that

22  during that first five days of the investigation, the

23  officers blanketed the highrise, and they wanted to get

24  some information.  So they talked to all of the residents

25  or as many of residents as they could talk to about did

1 they know anything about this.  Did anybody know anything

2 about what had happened to Helen Sailor, and they talked

3 to a number of individuals.  I believe Detective Conway

4 had indicated it was at that point in time, the original

5 canvas time, that they had come into contact with Andrew

6 Royer, and also I believe Detective Thayer testified it

7 was during that point in time that they came into contact

8 with Lana Canen.

9   Well, and we also heard they had spoken with

10 Charlie Lambert, and they talking with Flo Macioce as

11 well too, a resident of highrise.  Jerome Matt Johnson,

12 who was up there on the tenth floor, also came in and

13 testified.  He was talked to as well by the police.  So

14 everyone was being talked to by the police to the extent

15 that they could.  The police had some red flags, but they

16 weren't certain about things, and things kind of sat on

17 hiatus for a little while.  I'm sure they didn't give it

18 up completely, but the case didn't kind of come to any

19 kind of conclusion at that point in time.

20   It wasn't until August or so of 2003

21 interestingly enough when we got the new homicide unit at

22 the Elkhart Police Department, a unit devoted exclusively

23 to resolving homicides.  And as I believe Detective Daggy

24 mentioned, this was the first case they got.  So you can

25 imagine, common sense would tell you, how much they were

 1    pursuing this, what they were looking at, and what they

 2    wanted to prove by this.  So they took all of the

 3    information that they gathered in this case, and they all

 4    had opportunity, all of them I'm sure, to carefully

 5    review this file, and consider all of the facts and all

 6    of the statements and everything that had transpired

 7    during the course of the investigation in this case and

 8    were fully equipped with information in all of their

 9    heads as to what they knew and what they knew

10    specifically.

11            Now, in addition too, we can't forget the fact

12    that in November and December of 2003, obviously, we had

13    the highrise.  There were a lot of people at the

14    highrise.  And, again, while it wasn't testified to, no

15    one asked you to leave your common sense at home when you

16    came here today, you can carefully think about what may

17    have been discussed amongst the residents at the

18    highrise, and I ask you to take that with you when you go

19    back and deliberate in this case.

20            So we have the information that the police have

21    gathered.  We have the information that may have been

22    seminated throughout the highrise that was going on at

23    all this point in time.  Next, what do we know?  We know

24    specifically that Detective Daggy and Detective Carl

25    Conway of the Elkhart Police Department came to pick up

1    Andrew Royer at his home on September 3rd of 2003.  Now,

2    I specifically asked them if they knew if he'd taken him

3    his medication beforehand.  They said they weren't

4    certain, but he certainly didn't take it with him

5    initially to the police department.  That was very clear.

6    On September 3, 2003, Andrew Royer of Oaklawn --

7    receiving Oaklawn treatment did not take his medication

8    with him at that point in time.  So it's with that in

9    mind you carefully listen to the statements that you

10   heard on the tape.

11          But I want to go back a little bit further in

12   this case.  And I want to talk about State's Exhibit 17.

13   Sorry, State's Exhibit 15.  September 3, 2003 apparently

14   contains the signature of Andrew Royer, and it's an

15   advisement of rights section.  And it's listed here at

16   9:35 a.m. specifically when Andrew Royer signed the

17   advisement of rights section.  Now, I believe Detective

18   Conway, according to his testimony, had indicated that

19   because of the nature and the situation of the individual

20   he was dealing with here, he mentions Andrew Royer.

21          He took great pains to explain to discuss

22   things with him because he knew the concerns associated

23   with that situation and wanted to make very certain that

24   there was nothing wrong with the course of this

25   communication that the two of them were having.  I

754

1    believe he also indicated that he called representatives

2    from Oaklawn by phone, and they said they didn't need

3    anybody there.  He could feel free to go ahead and talk

4    to Andrew Royer on his own.  That's what he testified to

5    so.

6              Okay.  So over the course of the next couple of

7    hours, approximately until 1:10, 1:20, 1:30 something of

8    that nature, Carlton Conway of the Elkhart Police

9    Department had an opportunity to speak with Andrew Royer

10   himself.  Now, you heard during course of the questioning

11   of both Mr. Zook and myself we discussed specifically

12   with Carlton Conway whether or not the state or whether

13   or not the Elkhart Police Department had access to video

14   cameras, had access to audiotapes.  He was very clear at

15   that time that they did.  And, in fact, today we heard

16   from Detective Posthuma that she watched Lana Canen's

17   initially or through a videotape that was provided by

18   another office in the Elkhart Police Department.

19             Again, we know for certain that the Elkhart

20   Police Department had at their disposal at that time

21   videotape cameras and audiotapes because we certainly

22   heard an audiotape in this case that were at their

23   disposal that they could have used throughout the entire

24   scope of the process in this case, the whole scope of the

25   interrogation when they took Andrew Royer into the

 1    station at about 9:15, 9:20, 9:30 on September 3 of 2003.

 2    That wasn't used.  We don't have any specific knowledge

 3    or recorded knowledge which we could have had as to what

 4    transpired during the period of time in which Carl Conway

 5    spoke with Andrew Royer.  That you will have to consider

 6    when you go back and deliberate in this case.

 7         And one of the other things that I would ask

 8    you to do when you go back and deliberate in this case is

 9    to listen to the tapes, or is to listen to your memory to

10    what you thought you heard and what you heard the other

11    day specifically concerning the transaction of what took

12    place in this particular case.  Listen to the way in

13    which Andrew Royer talks.  Listen to the questioning of

14    Carl Conway, Detective Carl Conway, listen very

15    carefully, there are different stories, there are

16    different things specifically about this particular

17    situation.

18         Obviously, on the first date we have

19    conversations concerning issues of money.  The second day

20    we have issues of religion.  The whole thing over

21    religion.  Doesn't make any sense if you listen to all

22    that, and you all had an opportunity yesterday and today

23    to carefully think about that, and you'll have an

24    opportunity to carefully think about that when you go

25    back and deliberate.  See what does and doesn't make

 1    sense when you go back and deliberate because it isn't

 2    all there.  And that's exactly what the State of Indiana

 3    has suggested as well too is you have to piece it

 4    together, but I'd say don't do that.  Take and listen to

 5    the whole scope and the statement of what you

 6    specifically hear here under these circumstances.

 7           And you have to ask yourself when you go back

 8    what you heard from the tape is this is the kind

 9    gentleman that is thinking that quickly to go pull a

10    towel out to clean up an area, to go through that whole

11    apartment, to take all those precautions so there's

12    nothing left?  Because we heard on the stand at least

13    there were no confirmable prints or nothing that they

14    could tie specifically to Mr. Royer.  Both the shoe

15    print, both the fingerprint, and any other sort of

16    evidence whatsoever.  The other only thing we heard that

17    came from was that medicine cabinet, or that medicine jug

18    over there because it had Lana Canen's fingerprint on it

19    and not Andrew Royer's.  That's what you heard.  Nothing

20    else.

21           Now, does that gentleman strike you as one --

22    from what you heard on the tape, what you were able to

23    perceive based upon all the evidence that was presented,

24    as a gentleman that could think quickly, could move and

25    react like that to clean up a scene, to do all these

1    things, to take all these necessary steps, to do it on

2    his own, in such what would appear to be a pretty short

3    period of time.

4           We know that between 8:45 and 9:15 Caroline

5    Hoffer was under -- was not being able to reach Helen

6    Sailor, and we know that she returned somewhere between

7    5:15, 5:30 or so.  Within that period of time, that

8    gentlemen was going to think about all of these things

9    and all of a sudden just decide, oh, I might as well just

10   go kill Helen Sailor?  No.  It just isn't there.  It just

11   doesn't make any sense from what you heard.  It just

12   simply is not there.  So go back and carefully analyse

13   and look at those statements in tune with also looking at

14   what you see in the apartment itself too.

15          One of the other things I caught as well too

16   when he said -- when the detective said, well, yeah, he

17   talked about taking her jewelry, getting that out of her

18   jewelry box.  Well, that didn't look like jewelry box to

19   me.  No, it didn't.  And then he also said, or it was

20   discussed I believe by Detective Bourdon, that there were

21   items that were found in there in Ziplock bags.  Well, if

22   you're going to take some of it, why are you not taking

23   all of this stuff?  There's still stuff apparently in

24   there.  It just doesn't make any sense for him to talk

25   like that and to have taken those particular items when

1    you still have stuff that's still in the jewelry box.

2    It's those things that you got to wrestle with when you

3    go back and deliberate.

4           He also I believe mentions the C and L Pawnshop

5    that he said he took Andrew Royer to the store because

6    this is where Andy said apparently he took the items to

7    pawn to get money.  There was no record from Mr. Royer.

8    No record whatsoever of Mr. Royer ever taking anything to

9    the pawnshop to sell, nothing whatsoever.  It just isn't

10   there.  It just doesn't make any sense.

11          When you consider all of this information

12   together and when you carefully look at it and when you

13   tear it apart, and that's what I'm asking you to do

14   because we told you this wasn't going to be an easy case.

15   When you tear it apart and when you look at it, it simply

16   doesn't make any sense.  Yes.  I know there's going to

17   take time for you to go back an deliberate and look at

18   what's was said because, yeah, that's a difficult burden.

19   I can imagine, and I know that's an insurmountable thing

20   for everybody to look at when you have a confession.  I

21   understand that completely.  I'm just asking you to pull

22   it apart and take a look at it when the rest of it just

23   doesn't make any sense because it isn't always as clear

24   as the state would have you believe about little the

25   little things that only Mr. Royer could have known.  It

1    just isn't there.  Think about it, and go back and look

2    at it and carefully weigh it.

3          The other thing that I thought interesting too

4    was in the other statement, the second statement, Andrew

5    said that he would conversate with Helen Sailor, talk

6    about religion.  Well, that would explain how he might

7    have some knowledge about where things might have been in

8    the apartment.  He'd conversate with her.  They'd talk.

9    About religion.  He could know where certain items were,

10   where they were located, because he would have seen them

11   if he had been in there.  That you can consider when you

12   go back and deliberate and look at all the facts in this

13   case.  Those are important pieces of information that you

14   have to take a look at and make a decision about when you

15   go back and wrestle with these issues.

16         Remember, importantly, that within the course

17   and the period of time that Elkhart Police Department had

18   their new homicide unit, within a month they had solved

19   this case, and you can imagine it was important for them

20   to do this.  This was a pretty lingering case.  Remember

21   also that there was a ten month window of opportunity

22   that people could have been talking about the facts of

23   this particular case.  The highrise has a lot of people

24   in it.  There are a lot people that live there, could

25   have known certain facts and certain information about

1    this case.

2         Additionally too, take a careful look at the

3    fact that throughout the entire apartment area there were

4    no prints, no hair, no feet prints or marks for Andrew

5    Royer; and obviously he's a pretty big gentleman, had

6    some pretty big size shoes.  I think they would have seen

7    that if those items -- if he shoe prints in there.

8    Weren't there.  Nothing physically to tie Andrew Royer to

9    that particular apartment.  It just doesn't make sense

10   when you pull it all apart and look at it, and that's

11   what I'm asking you to do when you go back and

12   deliberate.  And I again thank all of you for your time

13   in this, and I ask that you find you find Andrew Royer

14   not guilty.  Thank you.

15        THE COURT:  Counsel approach, please.

16             (An off-the-record discussion was held

17             at the bench.)

18        THE COURT:  Mr Crawford.

19        MR. CRAWFORD:  Thank you, your Honor.  While it

20   is true, ladies and gentleman, that diminished capacity

21   itself is not a defense to murder, and I do understand

22   that.  I only ask, and again, it is not a defense, I only

23   ask that you carefully consider the factors of the things

24   that you heard up here in this stand about Mr. Royer when

25   you make determinations concerning the nature of the

1    statement itself and whether it adds up.  Thank you very

2    much.

3            THE COURT:  Thank you, Mr. Crawford.

4    Mr. Williams.

5                    CLOSING STATEMENT

6            MR. WILLIAMS:  Well, at the beginning of this

7    case we talked about this being a senseless killing of a

8    94-year-old woman for money.  I think we have to add

9    something to that after you've heard the evidence.  This

10   was a brutal senseless killing of a 94-year-old woman for

11   money.  Mr. Zook talked about -- he said there was no

12   evidence -- no evidence tying Lana Canen to the crime in

13   this case.  The state has shown nothing.  Just a

14   fingerprint.  Just a fingerprint.  Lana Canen said she

15   was out of town when this murder occurred.  She told that

16   to numerous people.  She told it to Judy Johnston, she

17   told it to Detective Snider, and we know that's not true

18   because Flo Macioce and Charlie Lambert saw her there.

19            She said, "I was never in the apartment."  Not

20   only was I out of town.  I was never in the apartment.

21   Oops.  There's a fingerprint, a fingerprint that puts her

22   in the apartment.  No evidence.  She's not telling the

23   truth about being in town.  She's seen outside the

24   apartment complex at 6:45 on the evening of Thanksgiving

25   pacing back and forth.  She sees a person come in.  Hey,

1    can you give me a ride.  I need to get out of here.

2    That's what she's saying.  She's got her Marlboro bag,

3    and she's off to her boyfriend's.

4            Fingerprint.  Even when confronted with it, she

5    says, well, where was it.  It was on the medication.

6    Well, if it was on a pill bottle, I open up pill bottles

7    a certain way.  I never said it was an pill bottle.  Lana

8    Canen didn't think that that print would be found because

9    they wiped down the evidence after Helen was killed.

10   Andrew Royer told you, "We got the towels, I have them,

11   I'm wiping down the area."  That's what they did.  They

12   covered up their tracks.  We told you that this was a

13   mentally sophisticated event.  Planning, execution of a

14   robbery, the killing.  Took brute force.  It was Andrew

15   Royer, and then the cover up occurs.  Taking the keys out

16   off the key ring to lock the door as you leave, wiping

17   down prints, taking her body into a different room,

18   throwing things in the trash.  You'll go back and you'll

19   know from the evidence that Andrew Royer didn't have the

20   mental sophistication to come up with those things.  It

21   was Lana Canen.

22           Lana Canen also gives you the statement from

23   Nina Porter.  Nina Porter doesn't come up with, you know,

24   a statement like some vendetta against her saying, oh,

25   she told me that she robbed and she murdered the woman.

1    She tells you these things that she really didn't

2    understand at the time.  She didn't know -- Nina Porter

3    didn't know about Helen Sailor's murder until after she

4    was interviewed, and she told the detectives at the

5    police department what the statements were, and then they

6    filled her in on the significance.

7          What did she say -- she gave, with regard to

8    Lana Canen, they when, the who, the what, the result and

9    the plan.  On Thanksgiving there's an old lady going to

10   get money from her.  I can get money from her.  She has

11   the audacity to refuse.  They gave death.  Andrew Royer

12   was there.  He did things Lana Canen wanted him to do.

13   Go stand out in the rain for 30 minutes.  Okay.  Andrew,

14   I'm not getting the money.  He's there.  What does he do?

15   Come off some of that money.  Bam.  Smacks Helen.  Down

16   she goes.  She says -- she shares religion with people.

17   She's a religious person.  You do not know what you do as

18   she's talking to Andrew, and that sets him off.  He's

19   angry.

20          Mr. Crawford said, well -- well, the two

21   statements don't make sense.  If they don't make sense,

22   the first one is about money and then the second one is

23   about religion.  They do make sense.  It's just that he

24   didn't give it all in one statement.  Helen was in there

25   fighting for her life and preaching to him, and it made

1    him angry.  Mr. Crawford said something.  There's no --

2    nothing -- no physical evidence that links my client to

3    the apartment.  What about Helen Sailor's neck as he took

4    the lanyard and he twisted it five to ten minutes as

5    Dr. Prahlow said.  There's a space where you would twist.

6    Andy, how did you do that as Detective Conway says,

7    grabbed it, twisted it.  I think that's some physical

8    evidence that he left her neck as he cut off the oxygen

9    supply as the blood pressure rose in her head, and she

10   had no ability to breathe, and it took time five to ten

11   minutes.

12          Lana Canen, Mr. Zook said is not the brains.

13   There's no evidence of the brains or being the

14   mastermind.  You heard Andrew Royer.  He was not the

15   brains, wasn't the mastermind.  He was the brawn.  Lana's

16   plan is in her statement.  No one was supposed to get

17   hurt.  We went there to get money, things went wrong.

18   But what we ultimately do?  We got our money out of the

19   Bible, we got some jewelry as Andrew said, and off we go.

20   Not the brains.  She had the ability to control Andrew

21   Royer as Nina Porter told you, and she did that.

22          Mr. Zook talks about the plastic bin.  I wish

23   the witnesses would tell the truth.  I wish they could

24   just do that.  Well, Caroline Hoffer said that since 1997

25   when Helen moved back, she had never seen another

1    container.  As far as she could remember, she had never

2    seen another container.  Erika Roarhig, more

3    specifically, said I treated -- or was with her for two

4    years from Thanksgiving of 2002, go back two years.

5    Thanksgiving of 2000, two years she cared for her.

6    Filled the bin many times.  Was not mistaken about the

7    bin.  That's the bin.  It was the same the entire time

8    that she cared for her, cared for Helen.

9            Mr. Zook said something about, well, the -- the

10   things that were sprinkled on -- the juice that was

11   sprinkled on Helen.  We don't know who did that.  Not my

12   client.  Speculation.  Talk about speculation.  That

13   somehow there's -- there's no evidence that this bin left

14   the apartment went down, somehow found it's way to his

15   client, and then found it's way back up.  Talk about

16   speculation.  That's pure speculation.

17           Andrew Royer didn't move into the apartment

18   complex until 2001.  So it wasn't as like, you know, he

19   had a bin that he gave -- got from Lana and they gave to

20   Helen or something like that.  He wasn't even living

21   there at the time that Erika Roarhig began care.

22           Now, with respect to Mr. Royer, you have his

23   statements.  His statements, "I strangled Helen to

24   death."  There's your physical evidence.  "It was a money

25   thing.  She just happened to be the victim."  And he gave

1    intimate details.  Mr. Crawford said, well, there's no

2    fingerprints.  Andrew Royer tells you.  Got the towels,

3    and I wiped down everything I could.  Detective Bourdon

4    said the way that you can not have fingerprints is when

5    you put your hand down it moves.  Not necessarily you can

6    be somewhere and not leave fingerprints, especially when

7    you wipe them up.

8              Mr. Crawford also talked about the information

9    disseminated throughout the highrise that these -- the

10   people that lived there the elderly and the -- the

11   mentally physically challenged must have received and

12   came up with and then disseminated all that information

13   and said, Andy, this is what happened, then Royer goes in

14   and then talks to Conway and gives this version that he

15   heard from the highrise.  The officers in this case told

16   you that they don't disseminate the information for that

17   exact reason.  Detective Conway said I didn't give any

18   information because I knew he wasn't mentally

19   sophisticated.  I called and checked with Oaklawn to see

20   if I should go forward.  They said fine, but he got on

21   the stand and told you specifically, I didn't do those

22   things because I didn't want to plant things in Andrew

23   Royer's head.  If you listen to the statement, he gives

24   intimate details that would not have been disclosed to

25   the public.  Certainly would have been disclosed to him.

1      What intimate details?  Bible that he went

2  through took the money, it's where they got the money,

3  they towels that he used to clean up, the way that

4  strangulation occurred.  No one would ever have known how

5  the strangulation in detail occurred other than the

6  examination by Dr. Prahlow, the twisting of a lanyard,

7  and the result asphyxiation and death.

8      The jewelry box that Andrew Royer talked about,

9  there it is, that he struck Helen in the face and the

10  bruises, that he transferred the body to the bedroom.

11  Detective Conway, what did you do with the body after you

12  strangled Helen?  I drug her into the bedroom with the

13  lanyard around her neck making the marks back and forth

14  where he deposits her.  That information wasn't

15  disseminated.

16      Medication, Mr. Crawford talked about

17  medication.  Well, he wasn't on his meds.  In his

18  statement, in Andy Royer's statement, he says, "I'm on

19  Paxil."  Conway talks to him about.  Yeah.  I'm taking my

20  medication.  First statement, taking my medication.

21  Starts the preinterview at 9:30 goes to 1:30, it's four

22  hours, then he takes a 23 minute statement with Andrew

23  Royer.  And what does Conway do.  He sees that he's

24  getting mentally fatigued, so he doesn't push on to try

25  to get more.  He takes that into consideration and he

1   stops.  Gives him the time to rest, and they go get his

2   medication so that he has it on two day.

3        So what happened on day two?  Don't talk about

4   day two, Mr. Crawford doesn't talk about day two as far

5   as the medication.  He comes back and tells you again

6   that he strangled her and gives intimate detail in day

7   two.

8        The first statement and the second statement

9   when taken together do make sense.  They do make sense.

10  As the plan was to go get the money, according to Lana

11  Canen, from the old lady Helen, Helen Sailor.  And when

12  she refused and she had the audacity, is when Andrew

13  Royer was unleased.  They got their money, they took

14  their things, they did what they needed to do they

15  thought to cover up the scene, and they got out of there.

16       One of the things that you have when you go

17  back into the jury room is your life experience and

18  common sense.  If you count up all your years of your

19  common sense and life experience, it's about 550 years.

20       This we said at the beginning was going to be a

21  puzzle, and you didn't know what the puzzle was at the

22  beginning because you didn't have any evidence so you

23  didn't have the box top.  Based on the evidence, now you

24  have the box top to this murderer's puzzle, and it's a

25  collage not just a single picture.  It has Helen Sailor

1   sitting there alive.  It has the events that you heard

2   about on the 28th of November 2002, and the events of the

3   29th of November, 2002, and it has two faces on it.

4   Those faces are Andrew Royer and Lana Canen who are

5   responsible for the brutal senseless killing of a

6   94-year-old woman for money.  And we ask that you find

7   Andrew Royer and Lana Canen guilty of felony murder.

8   Thank you.

9          THE COURT:  Thank you, Mr. Williams.  Ladies

10   and gentlemen, the bailiff is going to furnish each of

11   you with a copy of the Court's final instructions.  The

12   court will then read the final instructions.

13          You are to consider all the instructions that

14   are given to you as a whole and you are to regard each

15   with the others given to you.

16          Do not single out any certain instruction,

17   sentence, or any individual point and ignore the others.

18          The Court has previously given you your

19   preliminary instructions on certain matters of law which

20   were to be considered during the trial, and now gives you

21   your final instructions on the law which are to be

22   considered along with the preliminary instructions in

23   arriving at your verdict.

24          For trial today is a criminal case bought by

25   the State of Indiana against Andrew M. Royer and Lana R.

770

1    Canen.  The case was commenced when an information was

2    filed charging the defendants with Murder, a felony.

3    That information, omitting formal parts, reads as

4    follows:

5            "The undersigned affiant swears that on or

6        about the 28th day of November, 2002, at the county

7        of Elkhart, State of Indiana, one Andrew M. Royer

8        and one Lana R. Canen, and they and each of them,

9        did knowingly kill one Helen Sailor, another human

10       being, by strangling the said Helen Sailor, while

11       committing robbery, and as a direct and proximate

12       result of the strangling as aforesaid, the said

13       Helen Sailor was fatally wounded, and the said

14       Helen Sailor did languish and die in said county

15       and state on the 28th day of November 2002; all of

16       which is contrary to Indiana Code section

17       35-42-1-1; contrary to the form of the statute in

18       such cases made and provided; and, against the

19       peace and dignity of the State of Indiana."

20           To this information the defendants have entered

21   pleas of not guilty.

22           Upon the issues thus joined the burden rests

23   upon the State of Indiana to prove to each of you, beyond

24   a reasonable doubt, every essential elements of the

25   charges contained in the information or of any offense

1    included therein.

2            The information which has been filed against

3    the defendants is merely the formal method of charging

4    them, and the charges must be proven by the evidence

5    introduced during this trial.

6            The statute defining the offense of murder

7    which was in force in Indiana at the time of offense

8    charged reads (in pertinent part) as follows:

9            "A person who (1) kills another human being,

10           (2) while knowingly committing or attempting to

11           commit robbery, commits felony murder, a felony."

12           The statute defining the offense of robbery

13    which was in force in Indiana at the time of the offense

14    charged reads (in pertinent part) as follows:

15           "A person who knowingly or intentionally takes

16           property from another person or from the presence

17           of another person:

18               (1) by using or threatening the use of force

19           on any person; or

20               (2) by putting any person in fear;

21           Commits robbery, a class C felony.  However,

22    the offense is class B felony if it is committed while

23    armed with a deadly weapon."

24           You should give separate consideration to each

25    defendant.  Each is entitled to have his or her case

1    decided on the evidence and the law which is applicable

2    to him or her.

3         Any evidence which is limited to one defendant

4    should not be considered by you as to any other

5    defendant.

6         The crime of felony murder is defined by

7    statute as follows:

8         A person who kills another human being while

9    committing or attempting to commit robbery, commits

10   felony murder, a felony.

11        To convict a defendant, the State must have

12   proved each of the following elements:

13        The defendant killed Helen Sailor while

14   knowingly committing or attempting to commit robbery.

15        If the state failed to prove each of these

16   elements beyond a reasonable doubt, you should find that

17   defendant not guilty.

18        If the state did prove each of these elements

19   beyond a reasonable doubt, you should find that defendant

20   guilty of felony murder, a felony.

21        A person who knowingly aids, induces, or causes

22   another person to commit an offense, commits that

23   offense, even if the other person:

24        1. has not been prosecuted for the offense

25        2. has not been convicted of the offense; or

1          3. has been acquitted of the offense.

2          A person is responsible for the acts of his or

3 her accomplice as well as his or her own.  The acts of

4 one person are attributable to all who are knowingly

5 acting together during the commission of the crime.

6 Accordingly, the state need not prove, beyond a

7 reasonable doubt, that the defendant personally and

8 acting by himself or herself, committed all of the

9 elements of the crime or crimes with which he or she is

10 charged.  However, the state must prove, beyond a

11 reasonable doubt, that the defendant and another person

12 or persons, acting together, committed all of the

13 elements of the crime with which he or she is charged.

14          It is not necessary for the state to show that

15 a defendant was a party to a preconceived scheme; it must

16 merely show concerted action or participation in an

17 illegal act by the defendant.

18          You are instructed that although it is true

19 that mere presence is not enough to show a person's

20 participation in a crime, such presence may be considered

21 with all other evidence to determine guilt.  A trier of

22 fact my infer participation from a defendant's failure to

23 oppose the crime, companionship with one engaged therein,

24 and a course of conduct before, during, and after the

25 offense which tends to show complicity.

1         Knowingly is defined as: A person engages in

2    conduct knowingly if, when he or she engages in the

3    conduct, he or she is aware of a high probability that he

4    or she is doing so.

5         Under the law, you must presume that each

6    defendant is innocent and you must continue to believe

7    that they are is innocent throughout the trial, unless

8    the state proves that any defendant is guilty, beyond a

9    reasonable doubt, of every essential element of the crime

10   charged.

11        Since each defendant is presumed to be

12   innocent, he or she is not required to present any

13   evidence to prove his or her innocence, or to prove or

14   explain anything.  If, at the conclusion of the trial,

15   there remains in your mind a reasonable doubt concerning

16   a defendant's guilt, you must find him or her not guilty.

17        It is your responsibility as jurors to reach

18   your verdict based solely upon the evidence presented in

19   the trial.  You are instructed that the filing of charges

20   against the defendant, his or her arrest pursuant to such

21   charges, and the fact that a defendant is here being

22   tried in a court of law, is not evidence, and may not be

23   considered, even in the slightest degree, as indicating

24   his or her guilt.

25        You are entitled to draw all reasonable

1    inferences that naturally and legitimately flow from the

2    facts proven, and you are entitled to consider such

3    inferences in reaching your verdict.

4            You are the exclusive judges of the evidence,

5    the credibility of the witness, and of the weight to be

6    given to the testimony of each of them.  In considering

7    the testimony of any witness, you may take into account

8    their ability and opportunity to observe; their memory,

9    manner, and conduct, while testifying; any interest,

10   bias, or prejudice they may have; any relationship with

11   the other witnesses or interested parties; and the

12   reasonableness of their testimony considered in the light

13   of all the evidence in the case.

14           You should attempt to fit the evidence to the

15   presumption that each defendant is innocent and to the

16   theory that every witness is telling the truth.  You

17   should not disregard the testimony of any witness without

18   a reason and without careful consideration.  However, if

19   you find that the testimony of a witness is so

20   unreasonable as to be unworthy of belief, or if you find

21   so much conflict between the testimony of witnesses that

22   you cannot believe all of them, then you must determine

23   which of them you will believe and which of them you will

24   disbelieve.

25           In weighing the testimony to determine what or

 1   whom you will believe, you should use your own knowledge,

 2   experience, and common sense gained from day-to-day

 3   living.  You may find that the number of witnesses who

 4   testify to a particular fact or on one side or the other

 5   or the quantity of evidence on a particular point, does

 6   not control your determination of the truth.  You should

 7   give the greatest weight to that evidence which convinces

 8   you most strongly of its truthfulness.

 9         The burden is upon the state to prove beyond a

10   reasonable doubt that each defendant is guilty of the

11   crime charged.  It is a strict and heavy burden.  The

12   evidence must overcome any reasonable doubt concerning

13   each defendant's guilt, but it does not mean that a

14   defendant's guilt must be proved beyond all possible

15   doubt.

16         A reasonable doubt is a fair, actual, and

17   logical doubt based upon reason and common sense.  A

18   reasonable doubt may arise either from the evidence or

19   from a lack of evidence.  Reasonable doubt exists when

20   you are not firmly convinced of a defendant's guilt,

21   after you have weighed and considered all of the

22   evidence.

23         A defendant must not be convicted on suspicion

24   or speculation.  It is not enough for the state to show

25   that a defendant is probably guilty.  On the other hand,

1    there are very few things in this world that we know with

2    absolute certainty.  The state does not have to overcome

3    every possible doubt.

4          The State must prove each element of the crime

5    by evidence that firmly convinces each of you and leaves

6    no reasonable doubt.  The proof must be so convincing

7    that you can rely and act upon it in this matter of the

8    highest importance.

9          If you find that there is a reasonable doubt

10   that a defendant is guilty of the crime, you must give

11   the defendant the benefit of that doubt and find that

12   defendant not guilty of the crime under consideration.

13         While it is necessary that every essential

14   element of the crime charged against the accused should

15   be proven by the evidence beyond a reasonable doubt, this

16   does not mean that all incidental facts must be proven

17   beyond a reasonable doubt.

18         You must consider all of the evidence as a

19   whole and must not single out any particular fact or

20   circumstance.

21         A fact or circumstance considered apart from

22   other evidence may be weak, if not improbable, but when

23   viewed in connection with surrounding facts and

24   circumstances, it may be so well supported as to remove

25   all doubt as to its existence.

1        No defendant may be compelled to testify.  A

2    defendant has no obligation to testify.

3        The defendants did not testify.  You must not

4    consider this in any way.

5        Failure to oppose a crime is not alone

6    sufficient to sustain a conviction under the theory of

7    aiding, inducing, or causing an offense.

8        Direct evidence means evidence that directly

9    proves a fact, without an inference, and which, in

10   itself, if true, conclusively establishes that fact.

11       Circumstantial evidence means evidence that

12   proves a fact from which an inference of the existence of

13   another fact may be drawn.

14       An inference is a deduction of fact that may

15   logically and reasonably be drawn from another fact or

16   group of facts.

17       It is not necessary that facts be proved by

18   direct evidence.  Both direct evidence and circumstantial

19   evidence are acceptable as a means of proof.  Where proof

20   of guilt is by circumstantial evidence only, it must be

21   so conclusive in character and point so surely and

22   unerringly to the guilt of the accused as to exclude

23   every reasonable theory of innocence.

24       I submit this case to you with the confidence

25   that you will faithfully discharge the grave duty resting

```
 1   upon you, bearing in mind that the liberty of the accused

 2   is not to be trifled away nor taken by careless or

 3   inconsiderate judgment; but if after a careful

 4   consideration of the law and the evidence in the case you

 5   are satisfied beyond a reasonable doubt that the

 6   defendant is guilty, you should return your verdict

 7   accordingly.  Duty demands it and the law requires it.

 8   You must be just to a defendant and equally just to the

 9   state.  As upright men and women charged with the

10   responsible duty of assisting the Court in the

11   administration of justice, you will put aside all

12   sympathy and sentiment and look steadfastly and alone to

13   the law and the evidence in the case and return into

14   court such a verdict as is warranted thereby.

15           During the progress of the trial, certain

16   questions may be asked, certain exhibits may be offered

17   which the Court may rule are not admissible into

18   evidence.  You must not concern yourselves with the

19   reasons for the rulings since the production of evidence

20   is strictly controlled buy rules of law.

21           You must not consider an exhibit or testimony

22   which the Court does not admit or orders stricken from

23   the record.  In fact, such matter is to be treated as

24   though you had never heard of it.

25           Nothing that I say during the trial is intended
```

1    as any suggestion of what facts or what verdict you

2    should find.  Each of you, as jurors, must determine the

3    facts and the verdict.

4          The Court is sometimes asked by the jury to

5    answer questions which arise during jury deliberations.

6    However, this Court's experience has been that the

7    answers to most questions can be found in the evidence

8    presented during the trial and the jury instructions

9    given to you by the Court.

10          If questions arise during your deliberations

11   that you wish to have answered by the Court, then the

12   questions are to be in written form and given to the

13   bailiff who will bring them to me.  I will then consult

14   with the attorneys in this case and determine if the

15   question can be answered under the law.

16          Questions can be answered:

17          (1)  only if the Court and the attorneys agree

18       that they would be answered, and;

19          (2)  only if the attorneys and the Court agree

20       on the answer to be given.

21          Under the law, seldom can jury questions be

22   answered.  If questions are submitted, we will answer the

23   questions or we will advise you that the questions cannot

24   be answered under the law.

25          In criminal cases the Constitution of Indiana

1    gives the jury the right to determine the law as well as

2    the facts, and it is my duty to instruct you concerning

3    the law.  You should pay respectful attention to the law

4    contained in these instructions.  You should give the law

5    a fair and honest interpretation and should not ignore or

6    disregard the law without a substantial reason.  However,

7    in reaching your final decision, you have the right to

8    determine the law and the facts which will govern your

9    verdict.

10          Your verdict must represent the considered

11   opinion of each juror.  In order to return a verdict, you

12   must all agree, your verdict must be unanimous.

13          It is your duty, as jurors, to consult with one

14   other and to deliberate with a view to reaching an

15   agreement if you can do so without violence to individual

16   judgment.  Each of you must decide the case for

17   yourselves but do so only after an impartial

18   consideration of the evidence with your fellow jurors.

19   In the course of your deliberations, do not hesitate to

20   re-examine your own views and change your opinion if

21   convinced it is wrong, but do not surrender your honest

22   conviction as to the weight or effect of evidence based

23   solely upon the opinion of your fellow jurors or for the

24   mere purpose of returning a verdict.

25          If you should fail to reach a decision, this

1    case will be left open and undecided.  Like all cases it

2    must be disposed of at some time.  Another trial would be

3    a heavy burden on both sides.

4              There is no reason to believe that the case can

5    ever be tried again any better or more exhaustively than

6    it already has been.  There's no reason to believe that

7    more evidence or clearer evidence would be produced on

8    behalf of either side.

9              There is no reason to believe that the case

10   would ever be submitted to twelve people more

11   intelligent, more impartial, or more reasonable than you.

12   Any future jury must be selected in the same manner that

13   you were.

14             This does not mean that those favoring any

15   particular position should surrender their honest

16   convictions as to the weight or effect of any evidence

17   solely because of the opinion of the other jurors or

18   because of the importance of arriving at a decision.

19             This means that you should give respectful

20   consideration to each other's view and talk over any

21   differences of opinion in a spirit of fairness and

22   candor.  If at all possible, you should resolve any

23   differences and come to a common conclusion so that this

24   case may be completed.

25             From time to time during the trial, it became

1    necessary for me to talk with the lawyers out of the

2    hearing of the jury, either by having a conference at the

3    bench when the jury was present in the courtroom, or by

4    calling a recess and hearing arguments on the law as it

5    applies to this case.  I apologize to you for having to

6    keep you waiting during those times, but I'm sure you can

7    understand the necessity to do so.  The purpose of those

8    conferences was not to keep relevant information from

9    you, but to decide how certain evidence was to be treated

10   under the rules of evidence and to avoid confusion and

11   error in the trial of this cause.

12            It is both the duty and obligation of the

13   attorney for each side to object when the other side

14   offers testimony or other evidence which the attorney

15   believes is not properly admissible.  Counsel also have

16   the right and duty to ask the Court to make rulings of

17   law and to request conferences at the bench out of the

18   hearing of the jury when necessary.  All of those

19   questions of law must be decided by the Court.  You

20   should not show any prejudice against either party

21   because the attorney objected to the admissibility of

22   evidence or asked for a conference out of the hearing of

23   the jury or asked the Court for a ruling on the law

24   because it is their duty to do so.

25            As I have already indicated, my rulings on the

784

1    admissibility of evidence do not, unless expressly stated

2    by me, indicate any opinion as to the weight or effect of

3    such evidence.  You are the sole judges of the

4    credibility of all witnesses and of the weight and effect

5    of all evidence.

6         It will be necessary that all of you remain

7    together until you are discharged by the Court.  The

8    bailiff will be in charge of you until you are discharged

9    by the Court.  During your deliberations, you must not

10   communicate with anyone, except to answer such questions

11   as may be asked of you by the bailiff under the direction

12   of the Court.  If, at any time, you desire to communicate

13   with me, you should notify the bailiff.

14        When you retire to the jury room, you will

15   first select a foreperson, who will then preside over

16   your deliberations.  When you have agreed upon your

17   verdict, you will have it dated and signed by the

18   foreperson.  You will then notify the bailiff, and she

19   will arrange for your return into the courtroom.

20        I will send the final instructions and exhibits

21   to the jury room with you.  They are to be returned by

22   the foreperson to the Court when you have reached your

23   verdict.  When you are returned to the courtroom, you

24   will give the instructions, the exhibits, and verdict to

25   the bailiff.  The foreperson will not read the verdict in

1    open court.

2           I'm also sending the alternate jurors to the

3    jury room during deliberations.  The alternate jurors are

4    specifically admonished and advised at this time that

5    they are only entitled to listen to the deliberations of

6    the jury and are specifically prohibited from

7    participating in any of the deliberations by the jury and

8    are also specifically prohibited from voting with the

9    jury.  Any alternate juror is permitted to take part in

10   the discussions and voting only in the event one of the

11   regular members of the jury should be discharged for some

12   reason and an alternate juror be needed to comprise a

13   total of twelve.  The foreperson of the jury is

14   specifically admonished that in presiding over the

15   deliberations, that it is his or her responsibility to

16   see that the alternate juror does not participate in any

17   of the deliberations or voting.  The alternate juror

18   shall only be permitted to listen to the deliberations by

19   the regular members of the jury.

20          You will now be in charge of the bailiff.

21   Mrs. Jackson, would you come forward, and raise your

22   right hand.

23                  (The bailiff was sworn.)

24          THE BAILIFF:  Yes.

25          THE COURT:  Mrs. Jackson, I'm going give you a

1    folder.  In this folder you will find the final

2    instructions, the original set, the original set of

3    preliminary instructions, and two verdict forms.  We will

4    assemble the exhibit make them available to you.  Ladies

5    and gentlemen, at this time you may take your notebooks

6    with you, and you will at this time retire to deliberate.

7    You'll be in care of the bailiff.

8              (The jury exited the courtroom at

9              5:36 p.m.)

10             THE COURT:  All right.  This is State of

11   Indiana versus Andrew Royer, State of Indiana versus Lana

12   Canen.  In Mr. Royer's case 03-MR-155, Ms. Canen's case

13   04-MR-118.  Each defendant appears with their respective

14   counsel.  Mr. Williams appears on behalf of the State of

15   Indiana.  Ms. Canen, would you raise your right hand.

16             (The defendant Lana Canen was sworn.)

17             MS. CANEN:  So help me God.

18             THE COURT:  Tell me your name.

19             MS. CANEN:  Lane R. Canen.

20             THE COURT:  Mr. Royer, raise your right hand.

21             (The defendant Andrew Royer was

22             sworn.)

23             MR. ROYER:  Yes, I do.

24             THE COURT:  Tell me your name, sir.

25             MR. ROYER:  Andy Royer.

1          THE COURT:  All right.  We have the jury

2     deliberating at this time.  They have been deliberating

3     for approximately one half an hour.  This case is

4     scheduled for a bifurcation; that is, there will be a

5     second part with respect to the aggravators.  It is my

6     understanding from discussions with counsel that all

7     counsel and all defendants have agreed to dispense with

8     the Smylie Procedure in this case.  It is also my

9     understanding that each defendant is going to admit the

10    existence of certain aggravators which the Court may

11    consider at the time of sentencing.

12          The Court will also consider any mitigators at

13    the time of sentencing, and the Court will then weigh the

14    aggravators admitted against the mitigators together with

15    any criminal history, if any, each defendant has.  The

16    Court will then impose a sentence that is appropriate in

17    the Court's opinion.  Now, this is all, of course,

18    predicated and conditioned upon a defendant being

19    convicted.  If the defendant Royer or the defendant Canen

20    is found not guilty, of course, these proceedings will be

21    meaningless in that event.  So far is that correct, Mr.

22    Zook?

23          MR. ZOOK:  Yes sir.

24          THE COURT:  And, Mr. Crawford?

25          MR. CRAWFORD:  Yes, your Honor.

1      THE COURT:  And, Mr. Williams?

2      MR. WILLIAMS:  Yes, your Honor.

3      THE COURT:  And, Ms. Canen, is that your

4  understanding?

5      MS. CANEN:  Yes.

6      THE COURT:  And, Mr. Royer, is that your

7  understanding.

8      MR. ROYER:  Yes, sir.

9      THE COURT:  Ms. Canen, under the Constitutions

10  of the State of Indiana and the United States of America,

11  you may have the right to require proof beyond a

12  reasonable doubt of the existence of certain aggravators.

13      Now, in your case, the state has alleged the

14  existence of some aggravators.  Those aggravators are the

15  risk that you will commit another crime, nature and

16  circumstances of the crime, defendant's character and

17  condition, prior criminal history not reduced to

18  conviction, the fact that you may be in need of

19  rehabilitation or correctional treatment best provided in

20  a penal facility, the fact that an imposition of a

21  reduced or suspended sentence would depreciate the

22  seriousness of crime, the fact that the victim of the

23  crime was less than 12 years of age or at least 65 years

24  of age, the fact that the victim of the crime was

25  mentally or physically infirmed.

1     There are additional nonstatutory aggravators:

2  The defendant shows a lack of remorse, the offense

3  involved a violation of a position of trust and

4  confidence, additional uncharged acts not brought by the

5  state, defendant shows a lack of remorse, defendant shows

6  contempt for the laws of the state and the United States

7  of America.  Those are the ones that alleged.  There may

8  be others.  Now, you may have the right to require proof

9  of these aggravators I've just told you about other than

10  criminal convictions which you may which the Court may

11  consider in enhancing your sentence over and above the

12  presumptive sentence for this offense if you're

13  convicted.  Do you understand that?

14     MS. CANEN:  Yes, sir.

15     THE COURT:  If the Court accepts this

16  stipulation that you're making here today, you won't have

17  a trial on the aggravators, and the Court will consider

18  the aggravators agreed to, mitigators found in the

19  presentence report, any additional written material

20  submitted by the parties, and evidence presented at your

21  sentencing hearing held in this case.  Consequently, if

22  the Court accepts this stipulation, you'll be giving up

23  the right you may have to require that aggravators

24  considered by the Court in sentencing you be found to

25  exist by this jury.  Do you understand that?

1    MS. CANEN:  Not really but --

2    THE COURT:  All right.  Do you understand you

3    can have this jury determine whether or not any of these

4    alleged aggravators exist?

5    MS. CANEN:  Yes.

6    THE COURT:  Okay.  And what I'm asking you is

7    do some of these aggravators exist in your case?

8    MS. CANEN:  Two, seven and eight.

9    THE COURT:  Two, seven and eighth of the

10   statutory aggravators.

11   MS. CANEN:  Yes, sir.

12   THE COURT:  So, two, the nature and

13   circumstances of the crime.  You want me to consider that

14   in deciding whether I should impose an aggravated

15   sentence?

16   MS. CANEN:  Yes, sir.

17   THE COURT:  And you're admitting that the

18   victim was 94 years of age.  Is that correct?

19   MS. CANEN:  Yes, sir.

20   THE COURT:  And you're also admitting that the

21   victim utilized a walker and had some vision problems and

22   was physically infirmed.  Is that correct?

23   MS. CANEN:  Yes, sir.

24   THE COURT:  I don't believe there's any

25   evidence she was mentally infirmed, is there?

1      MR. WILLIAMS:  No, your Honor.

2      THE COURT:  No.  All right.  And you're

3  admitting those statutory aggravating circumstances,

4  Ms. Canen?

5      MS. CANEN:  Yes, your Honor.

6      THE COURT:  All right.  Do you understand we

7  can have the jury determine whether they exist, or you

8  can admit the.  Do you understand that?

9      MS. CANEN:  Yes, sir.

10      THE COURT:  And do you want to admit them

11  rather than have the jury determine them?

12      MS. CANEN:  Yes, I do.

13      THE COURT:  And are you willing to waive any

14  right you may have to require that the existence of

15  aggravators considered by the Court in sentencing you be

16  proved beyond a reasonable doubt to this jury?

17      MS. CANEN:  Yes, your Honor.

18      THE COURT:  All right.  And, Mr. Zook, two

19  seven and eight are the statutory aggravators you and

20  Mr. Williams and Ms. Becker have agreed upon?

21      MR. ZOOK:  Yes, sir.

22      THE COURT:  And, Mr. Williams, is that correct?

23      MR. WILLIAMS:  That's correct, your Honor.

24      THE COURT:  And you want me to accept this

25  stipulation, Ms. Canen?

1          MS. CANEN:  Yes, your Honor.

2          THE COURT:  And Mr. Zook.

3          MR. ZOOK:  Yes, sir.

4          THE COURT:  And Mr. Williams.

5          MR. WILLIAMS:  Yes, your Honor.

6          THE COURT:  I will do so.  And in your case,

7   Ms. Canen, we will vacate the Smylie Procedure, and we

8   will sit here, and we will wait until the jury comes back

9   with a verdict.  If they find you not guilty, of course

10  you'll be released, and that will end these proceedings.

11  If they find you guilty, at the time of sentencing the,

12  Court will consider those aggravators that you have told

13  me about, two, seven and eight, statutory aggravators.

14  Understood?

15         MS. CANEN:  Yes, your Honor.

16         THE COURT:  Do you have any questions about

17  this procedure?

18         MS. CANEN:  No, sir.

19         THE COURT:  All right.  Mr. Royer, you

20  understand you're also under oath here today?

21         MR. ROYER:  Yes.

22         THE COURT:  And you also understand that you

23  can have a trial here with this jury on the existence of

24  aggravators.

25         MR. ROYER:  Yes.

1       THE COURT:  All right.  The state has alleged

2   statutory aggravators in your case, there's a risk you'll

3   commit another crime, the nature and circumstances of the

4   crime committed, your character and condition, fact that

5   you're in need of correctional or rehabilitative

6   treatment that can best be provided by commitment to a

7   penal facility, the imposition of a reduced or suspended

8   sentence would depreciate the seriousness of the crime,

9   the victim of the crime was less than 12 years of age or

10  at least 65 years of age, in this case, 94 years of age,

11  and the victim of the crime was mentally or physically

12  infirmed.  You understand that?

13      MR. ROYER:  Yes.

14      THE COURT:  There are nonstatutory aggravators.

15  One, it is alleged you show a lack of remorse; and two,

16  the offense involved violation of a position of trust and

17  confidence in the community with respect to the victim.

18  Did you understand that?

19      MR. ROYER:  Yes, I do.

20      THE COURT:  Mr. Royer, you have the right to

21  have the jury determine whether or not these aggravators

22  exist other than criminal convictions or criminal history

23  which you may have which the Court would consider to

24  enhance your sentence if you're convicted in this

25  offense.  The Court cannot impose the sentence above the

1    presumptive sentence unless these aggravators or admitted

2    or found by a jury.  Do you understand that?

3              MR. ROYER:  Yes.

4              THE COURT:  All right.  Are you admitting the

5    existence of any of these aggravators?

6              MR. CRAWFORD:  Two, six and seven, your Honor.

7              THE COURT:  Your counsel tells me two, six and

8    seven you are admitting, Mr. Royer, is that correct?

9              MR. ROYER:  Yes, that is correct.

10             THE COURT:  You're admitting the nature and

11   circumstances of the crime may be considered by me in

12   determining whether or not I should impose an aggravated

13   sentence.  Is that correct?

14             MS. CANEN:  Yes.

15             THE COURT:  And you're telling me I can also

16   consider the fact that the victim was 94 years of age as

17   an aggravator and the fact that the victim used a walker

18   and had some eyesight problems.  Is that correct?

19             MR. ROYER:  Yes.

20             THE COURT:  All right.  We can have a jury

21   determine whether these aggravator exist, or you can

22   admit them here today.  Is it your desire to admit them

23   here today?

24             MR. ROYER:  Yes.

25             THE COURT:  And the Court will consider the

```
1    existence of these aggravators in the event you are

2    convicted.  If you're not convicted of this offense, you

3    will be released from custody and that will end the

4    matter.  Understood?

5            MR. ROYER:  Yes.

6            THE COURT:  All right.  If you admit these

7    aggravators here today, you'll be giving up the right to

8    have the jury determine the existence of the aggravators.

9    Do you understand this?

10           MR. ROYER:  Yes.

11           THE COURT:  Do you want to admit these

12   aggravators and give up your right to have the jury

13   determine whether they exist?

14           MR. ROYER:  Yes.

15           THE COURT:  Are you willing to waive any right

16   you have to require the existence of aggravators

17   considered by the Court in sentencing you be proved to

18   this jury beyond a reasonable doubt?

19           MR. ROYER:  Yes.

20           THE COURT:  And same question for you,

21   Ms. Canen, are you willing to waive any right you have to

22   require that the existence of aggravators considered by

23   this Court in sentencing you proved beyond a reasonable

24   doubt to this jury?

25           MS. CANEN:  Yes, your Honor.
```

1      THE COURT:  All right.  Mr. Zook, are you

2   satisfied with the record and admission?

3      MR. ZOOK:  Yes, sir.

4      THE COURT:  Mr. Crawford, are you satisfied

5   with the record and admission?

6      MR. CRAWFORD:  Yes, your Honor.

7      THE COURT:  And, Mr. Williams, are you

8   satisfied with the record and the admission?

9      MR. WILLIAMS:  Yes, your Honor.

10      THE COURT:  Court will vacate the bifurcation

11   in each of these two case as a result of the defendants'

12   admission of aggravators.  There will not be a bifurcated

13   trial.  We will sit, we will wait, we will see what the

14   jury does.  If the jury convicts either defendant or both

15   defendants, the Court will consider only the aggravators

16   admitted by them except for the existence of any prior

17   criminal history.  Anybody have any questions?

18      MR. WILLIAMS:  No, your Honor.

19      MR. ZOOK:  No, sir.

20      MR. CRAWFORD:  No, your Honor.

21      THE COURT:  All right.  That will be all.

22         (The Court convened with all the

23          parties present.)

24      THE COURT:  State of Indiana verses Andrew

25   Royer, 03-MR-155; State of Indiana versus Lana Canen,

797

```
 1    04-MR-118.  Each defendant appears, counsel for each

 2    defendant appears, counsel for the state appears, other

 3    persons appear in the audience section.  Ladies and

 4    gentlemen, I'm going address my comments to all of you

 5    including those of you in the audience section, the jury

 6    as indicated they've reached a verdict.  What we're going

 7    to do is bring the jury into the courtroom.  I will make

 8    inquiry of the jury as to whether or not they have

 9    reached a verdict.  If they do, by the foreperson,

10    indicate they've reached a verdict, we'll have the

11    verdict given to the bailiff.  She'll give it to me.  If

12    it is in appropriate form, I will read the verdict at

13    that time.  Counsel will address any motions at that

14    time.  Out of respect for the jury, I do not want any

15    emotional outbursts from anyone in the courtroom.

16   Everyone understand?  Defendants.

17              MS. CANEN:  Yes.

18              MR. ROYER:  Yes.

19              THE COURT:  Those of you in the audience

20   section everyone understand.  Counsel, are you ready?

21              MS. BECKER:  Yes.

22              MR. CRAWFORD:  Yes, your Honor.

23              MR. ZOOK:  Yes, sir.

24                   (The jury entered the courtroom, and

25                    the following proceedings were had.)
```

1        THE COURT:  Be seated, please.  I will address

2   my comments to the foreperson of the jury and ask that he

3   speak on behalf of other jurors.  Mr. Foreman, has the

4   jury reached a verdict?

5        A JUROR:  Yes, we have, your Honor.

6        THE COURT:  With respect to each case?

7        A JUROR:  Yes, we have, your Honor.

8        THE COURT:  All right.  Would you deliver the

9   verdict form to the bailiff.  She will deliver it to me.

10   Court notes the evidence has been returned.  The Court

11   has examined each verdict form, finds each verdict form

12   to be in proper form.  Court will read the verdict.

13        State of Indiana versus Andrew M. Royer

14        Verdict:  We, the jury, find the defendant

15   Andrew M. Royer guilty of felony murder, a felony.  Dated

16   this tenth day of August 2005 signed by the foremen.  Any

17   motions?

18        MS. BECKER:  State moves for judgment on the

19   verdict.

20        THE COURT:  State has moved for entry of

21   judgment on the verdict.  Judgment will be entered

22   accordingly finding the defendant guilty of Felony

23   Murder, a felony.

24        State of Indiana versus Lana R. Canen

25        Verdict:  We, the jury, find independent Lana

1    R. Canen guilty of felony murder, a felony.  Dated this

2    tenth day of the August, 2005.  Are there any motions?

3              MS. BECKER:  Thank you, your Honor.  The state

4    moves for judgment on the verdict.

5              THE COURT:  Judgment of finding of guilty

6    felony murder will be made with respect to Ms. Canen.

7    Court will order a presentence report.  With respect to

8    each defendant, sentencing will be scheduled September 8

9    if that is agreeable with all counsel.

10              MS. BECKER:  Your Honor, a representative of

11    the victim's family is unavailable September 8.  Could we

12    do it either the week before or the week after?

13              THE COURT:  September 1 we can do it then.

14              MS. BECKER:  Thank you.

15              THE COURT:  Mr. Crawford Mr. Zook, September 1

16    work for you?

17              MR. ZOOK:  That's fine.

18              THE COURT:  September 1, 8:30.  A presentence

19    report will be ordered.  Bond will be revoked.  Each

20    defendant will be remanded to the custody of the sheriff.

21              Ladies and gentlemen, I want to thank you for

22    three long days here in the Elkhart Circuit Court.  I

23    very much appreciate your service.  This is a very

24    important case as is every case that goes to trial.  I

25    appreciate your attentiveness.  I appreciate your

1    willingness to work long days.  This system that we have,

2    criminal justice system in this county and this state

3    simply does not work without people such as yourselves

4    willing to give up a little bit of their own time.

5            I want to personally thank you for your service

6    here.  As I told other jurors, I'll tell you the same,

7    you may not serve for two years.  You may claim exemption

8    if you wish.  If you feel the need to serve again, we

9    will accommodate you here between now and the year end.

10   I'm going to come back to the jury.  I'll try to answer

11   any question that you may have.  Thank you very much.

12   Once again, you'll be in care of the bailiff.

13                 (No further proceedings were had in

14                  this matter on this date.)

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF INDIANA      )      IN THE ELKHART CIRCUIT COURT
                           ) SS:
 2   COUNTY OF ELKHART     )      CAUSE NO:  20C01-0409-MR-00118

 3

 4

 5

 6                             CERTIFICATE

 7

 8           I, Ann S. Hunsberger, do hereby certify that I

 9   am the Official Court Reporter of the Elkhart Circuit

10   Court in the above matter, and the foregoing pages

11   constitute a true and accurate transcript of the

12   testimony given at said time and place.

13           I certify that the same was reduced to

14   typewritten form from my original stenograph notes and/or

15   electronically recorded equipment by Computer-Aided

16   Transcription.

17           IN WITNESS WHEREOF, I have hereunto set my hand

18   and seal this 12th day of December, 2005.

19

20

21                                  Ann S. Hunsberger
                                    Official Court Reporter
22                                  Circuit Court
                                    101 North Main Street
23                                  Goshen, Indiana  46526

24

25
```