# EXHIBIT E

Cited portions of Certified Post-Conviction Relief Transcript of
*Lana R. Canen v. State of Indiana*, Elkhart Circuit Court,
Cause No. 20C01-0908-PC-00018

COPY

```
STATE OF INDIANA      )        IN THE ELKHART CIRCUIT COURT
                      )
COUNTY OF ELKHART     )        CAUSE NO. 20C01-0908-PC-00018
                                         20C01-0409-MR-00118


LANA R. CANEN               )
                            )
        VS                  )
                            )
STATE OF INDIANA            )
```

ELKHART CIRCUIT COURT
ELKHART COUNTY, INDIANA

THE HONORABLE TERRY C. SHEWMAKER

REPORTER'S TRANSCRIPT

Hearing held August 16, 2012

APPEARANCES:

```
    For the Petitioner:     MS. CARA S. WIENEKE
                            WIENEKE LAW OFFICE LLC
                            P.O. Box 188
                            Plainfield, IN 46168
                            (317)331-8293


    For the State:          MR. DAVID FRANCISCO
                            Deputy Prosecuting Attorney
                            301 S. Main Street
                            Suite 100
                            Elkhart, IN 46516
                            (574)296-1888



Prepared by:                Christine Macon
                            Official Reporter
                            101 N. Main Street
                            Goshen, IN 46526
                            (574)535-6419
```

```
 1            AUGUST 16, 2012, GOSHEN, INDIANA

 2                         -0-

 3            THE COURT:  This is 04-MR-118, there is a

 4   corresponding PC number.  State of Indiana vs Lana Canen.

 5   You are Ms. Canen, correct?

 6            MS. CANEN:  Yes, sir.

 7            THE COURT:  Raise your right hand.

 8                      LANA CANEN

 9   After first being duly sworn upon her oath, testifies as

10   follows:

11            MS. CANEN:  So help me God, I do.

12            THE COURT:  Tell me your name.

13            MS. CANEN:  Lana Canen.

14            THE COURT:  Be seated.

15            We have Mr. Francisco.  We have Ms. Lana Canen.

16   We have Ms. Cara Wieneke, who's at this instance, outside

17   the courtroom.

18            All right, Ms. Wieneke, we have opened the

19   record.

20            MS. WIENEKE:  I don't think we've done that yet,

21   your Honor.

22            THE COURT:  No, I have done that.

23            MS. WIENEKE:  Oh, sorry.  Thank you, your Honor.

24            THE COURT:  I thought you were coming right in.

25            MS. WIENEKE:  Sorry.
```

1

```
 1              I've taken numerous seminars and symposiums

 2         dealing with — with prints, testimony of prints,

 3         issues of dealing with ACE-V on print comparisons.

 4         I've taken classes and workshops through the

 5         International Association for Identification, there's

 6         seminars at their conferences.

 7    Q    And what is the International Associations of

 8         Identification?

 9    A    They are essentially the largest organization,

10         worldwide, sort of the mother organization of

11         representing forensic fields of which latent prints is

12         one of the entities under the International

13         Association for Identification.

14    Q    Do you belong to any — either the IAI, or to any other

15         professional associations, related to fingerprints?

16    A    I am a member of the IAI and I'm a certified latent

17         examiner through the International Association for

18         Identification.

19    Q    And when you say you're certified, what — what is

20         required to get and maintain a certification?

21    A    To be able to take the latent print certification test

22         one needs to have a minimum of a four-year college

23         degree, two years of having worked full-time in latent

24         prints, have taken at least 80 hours minimum of

25         training to be able to take the test.
```

7

1          The test consists of written questions.  The test

2      consists of shape analysis and comparisons of – of

3      actual latent's.  The test is an eight-hour exam given

4      through the International Association for

5      Identification.

6  Q   And, so, you've taken that exam?

7  A   I have taken the exam.  I've maintained my

8      certification since taking that test, I took the test

9      in 1995 and have maintained my certification ever

10     since.  To continue maintaining that certification you

11     are required to have continuing education to show that

12     you are involved still in prints, whether you're

13     teaching, whether you're attending classes, that

14     you're doing publication of articles, but there is a

15     requirement to show continuing education, continuing

16     involvement with latent prints.

17 Q   If you – if it's found in your career that you've made

18     and erroneous identification, would that in any effect

19     your certification?

20 A   Through the IAI, they would remove your certification.

21     It is, generally, removed for at least a year.  In my

22     case, me losing my certification would also lose my

23     job with the Pima County Sheriff's Department.  That

24     is a mandate for employment there in my capacity, that

8

1   many, many years ago.  That would have been still in

2   the 1990's.

3  Q   Can you describe for us, getting into fingerprints a

4   little bit, what a known or an inked fingerprint is?

5  A   An inked print is when you take a very fine layer of

6   printer's ink and apply it to the bottoms of your

7   fingers, palms of your hand, and then place your hand

8   down upon a card designed for that purpose.  The

9   recording left behind is a deliberate recording of

10   those ridges.  It's meant to show the detail.  That's

11   what referred to as an inked print, or a known print.

12   Sometimes they're referred to as exemplars.

13  Q   And what is a latent print?

14  A   A latent print is an accidental print, that when you

15   touch something, you may or may not leave behind a

16   print.  What happens is those ridges have very tiny

17   pores on them, which is where your sweat comes from,

18   so that when you touch something, you may leave behind

19   some of that sweat.  The term *latent* itself, means

20   hidden or unseen, so, it usually requires chemicals or

21   powders to make them visible.  And once they're made

22   visible, they're either lifted and placed on a card

23   for such a purpose, or - or they're - they're

24   photographed.  But they are an accidental impression

25   versus the inked print being a deliberate impression.

10

```
1   Q   And why are fingerprints a good source of

2       identification?

3   A   Well, there's two factors in why we use fingerprint or

4       - or prints in general.  Palm prints are just as

5       identifiable and just as unique.  The two factors are

6       that they are unique and they're permanent.  They're

7       unique in that no two people in the entire history of

8       fingerprint science have ever been found to have the

9       same fingerprints, not even identical twins will have

10      the same fingerprints.  And they are permanent in that

11      they begin forming during the third month of fetal

12      formation and they remain until after death and

13      decomposition sets in.

14  Q   And, so, is it fair to say most of your work involves

15      comparing a latent print to a known print, or an inked

16      print?

17  A   Yes.

18  Q   Is that most of what you do?

19          So, how do you conduct your comparisons?  If you

20      had a typical comparison how - how would you sit down

21      and first conduct it?

22  A   Your Honor, it's - if I could demonstrate on the

23      board, it's easier to kind of -

24          THE COURT:  Is that a problem?

25          MR. FRANCISCO:  No, your Honor.
```

11

```
 1              THE COURT:  You may step down.  The only thing
 2     you'll have to do is you'll have to speak up.  There's a
 3     microphone on the front of the bench.  We're going to be
 4     able to hear what you're saying.
 5     A    My voice usually carries.
 6              THE COURT:  All right.
 7              MR. FRANCISCO:  Your Honor, may I reposition
 8     myself, if you don't mind.
 9              THE COURT:  That's fine.
10              What do you need, ma'am?
11     A    Just a marker or something.
12         When I'm doing a latent print comparison, the first
13         thing I do, there's actually three levels of detail —
14              THE COURT:  You're hitting the microphone, it's
15     right behind you; your elbow's hitting it.
16     A    Okay, your Honor.
17              There's actually three levels of detail that
18         we're looking at.  If the latent print, for example —
19         in Level 1 detail, is what we refer to as patterns.
20         There's three basic types of patterns.  The first
21         pattern is what we refer to as an arch pattern and
22         that's where the ridges rise up and gradually flow to
23         the opposite side of the finger.
```

```
 1   Q   You are part of the International Association of
 2       Identification?
 3   A   The International Association for Identification.
 4   Q   And that's commonly referred to by its initials IAI?
 5   A   Correct.
 6   Q   And you are IAI certified?
 7   A   I am a certified latent print examiner to the IAI.
 8   Q   And you're familiar with the IAI code of ethics –
 9   A   Yes.
10   Q   – and standards of professional conduct, correct?
11   A   Yes.
12   Q   Now, no jurisdiction in the United States requires
13       that a latent print examiners be IAI certified, is
14       that correct?
15   A   I believe it would be up to the agencies and the
16       direction that they're encouraging, but it's not a
17       requirement that I'm aware of.
18   Q   Okay.  So, in other words, you don't have to
19       necessarily be IAI certified to testify in a court
20       concerning latent prints?
21   A   Correct.
22   Q   You're familiar with the Scientific Working Group on
23       Friction Ridge Analysis, Study in Technology?
24   A   Yes, SWGFAST.
```

39

```
 1   Q    In the last several weeks were you contacted by the
 2        Prosecutor in this case?
 3   A    Yes.
 4   Q    Were you provided with a - a report, or a presentation
 5        from them?
 6   A    Yes.
 7   Q    And, uh, was that what we - I don't know if you've
 8        seen today, was it a PowerPoint presentation?
 9             MR. FRANCISCO:  Judge, the record should reflect
10   Mr. Chapman was not in the courtroom at the time.
11             THE COURT:  I - I can't hear you.
12             MR. FRANCISCO:  The record should reflect that
13   Mr. Chapman was not in the courtroom at the time of the
14   presentation by Ms. Bright-Birnbaum.
15             MS. WIENEKE:  I'll withdraw and re-ask.
16             THE COURT:  All right.
17   BY MS. WIENEKE:
18   Q    Were you - what were you provided with by the
19        Prosecutor?
20   A    Copies from the PowerPoint.
21   Q    And do you know who - who offered the PowerPoint?
22   A    I don't recall the name on it right off hand.
23   Q    Did - do you know what it consisted of?
24   A    Yes.
25   Q    And did you look through the presentation?
```

79

```
 1   A   Yes, I did.

 2   Q   And after looking through it, what did you do?

 3   A   What did I do?

 4   Q   Yeah, did it – did it raise any concerns, did it make

 5       you –

 6   A   Yes, it did.

 7   Q   And what – what concerns did you have?

 8   A   That I made a mistake nine years ago.

 9   Q   And, so, as a result, of that concern, did you do

10       anything?  Did you – what – what was the next step you

11       took?

12   A   I met with the Prosecutor.

13   Q   And then what did you do?

14   A   This past Monday looked at the actual lift that was

15       used in the comparison.

16   Q   And where did you do this?

17   A   Here at the courthouse.

18   Q   Did you bring equipment with you?

19   A   A magnifying glass.

20   Q   And did you have sufficient lighting to do the exam?

21   A   Yes.

22   Q   And did you relook at everything, or did you just

23       relook at the – the print that was admitted at trial?

24   A   I had the latent in front of me and I looked at that

25       and compared it with the – it was the fingerprint
```

                                    80

```
 1          card, or the …(indiscernible to reporter)… of the

 2          fingerprint first.

 3   Q    And after you did this re-examination, what was your

 4          conclusion?

 5   A    That it wasn't her print.

 6   Q    So, you agreed with – with the presentation that you

 7          had seen?

 8   A    Yes.

 9   Q    So, is it fair to say your original testimony to the

10          jury was – was wrong?

11   A    Yes, that would be correct?

12          MS. WIENEKE:  Nothing further.

13          THE COURT:  Mr. Francisco.

14          MR. FRANCISCO:  Thank you, your Honor.

15                      CROSS EXAMINATION

16   BY DPA FRANCISCO:

17   Q    Detective Chapman, you testified in this court, being

18          the State of Indiana vs Lana Canen?

19   A    (No audible response.)

20   Q    Yes?

21   A    Yes.

22   Q    That was a joint trial with the State vs. Andrew

23          Royer, correct?

24   A    I believe so.

25   Q    That was in August of 2005?
```

81

```
 1   A   (No audible response.)

 2   Q   Yes?

 3   A   I believe so.

 4   Q   So, almost seven years ago to the day, correct?

 5   A   I believe you're correct.

 6   Q   And you told us, the State, everyone, under oath, that

 7       the fingerprint matched Lana Canen, right?

 8   A   Yes.

 9   Q   Her left little finger?

10   A   Yes.

11   Q   Today, seven years later, you're telling us it did

12       not, right?

13   A   Correct.

14   Q   So, Detective Chapman, the State, Courts, the public,

15       and most importantly, Ms. Canen, want to know, what

16       has changed in the last seven years?

17   A   Well, since then I've had more training.

18   Q   More training?

19   A   Pardon me?

20   Q   More training?

21   A   Yes.

22   Q   Anything else?

23   A   No.

24   Q   All right, so, you went to a training in 2006?

25   A   Right.
```

```
 1   Q    What training was that?

 2   A    Complex Latent Printing Examinations.

 3   Q    Who hosted that?

 4   A    Michigan State Police.

 5   Q    When did you go to that in 2006?

 6   A    I believe it was in the fall of 2006.

 7   Q    Now, do you think that the area of fingerprint

 8        examination has changed significantly since your time

 9        in the FBI, sir?

10   A    No.

11   Q    Is there anything that you can recall about the

12        training in 2006 that was particularly, I guess, stuck

13        out in your mind?

14   A    Those were more with latent prints.

15   Q    I'm sorry?

16   A    Those were latent print.

17   Q    What was?

18   A    The examinations difficult prints.

19   Q    I'm sorry.  Hold on.  What was more latent prints?

20   A    Latent print is not readily visible to the eye.

21   Q    Okay, well, prior to 2005, what sort of prints were

22        you looking at?

23   A    Mostly ten-prints.

24          THE COURT:  Excuse me, Mr. Francisco.  If you're

25   in the audience section and you want to have a conversation
```

```
 1   about something that's going on, would you please take it

 2   outside.  We're trying to focus on what the witness is

 3   saying, not what's going on in the audience section.

 4         Go ahead.

 5   Q   Okay.  So, your training in 2006 dealt with looking at

 6       latent prints, right?

 7   A   Correct.

 8   Q   Are you telling us that prior to your testimony in

 9       2005, you did not do latent print comparison?

10   A   Not complex ones, no.

11   Q   What is a complex latent print?

12   A   Where you overlays, or one that's not really visible,

13       a lot of details not present.

14   Q   Well, the print in this case was not overlaying, was

15       it?

16   A   No.

17   Q   It was dusted, right?

18   A   I didn't - I believe they dusted it.

19   Q   Well, I mean, you were able to look at ridge detail,

20       correct?

21   A   Correct.

22   Q   And you prepared the report for this case, did you

23       not?

24   A   Correct.
```

```
 1   A    I believe so at that time.

 2   Q    Did you have all the tools that you needed?

 3   A    Yes.

 4   Q    And you had sufficient lighting to do your analysis?

 5   A    Yes.

 6   Q    All right.  You don't recall how long it took,

 7        correct?

 8   A    No.

 9   Q    Just this week, Monday, you came to the courthouse,

10        did you not?

11   A    Correct.

12   Q    And I was here?

13   A    Correct.

14   Q    And we arranged to look at the actual lifter, did we

15        not?

16   A    Correct.

17   Q    You brought all the tools that you needed?

18   A    Yes.

19   Q    You brought a light?

20   A    Yes.

21   Q    Were you comfortable that you had everything that you

22        needed to form an analysis?

23   A    Yes.
```

96

1    Q    How long did it take you, Detective Chapman, to look

2         at that fingerprint and come to the conclusion that

3         you have today that it is not Ms. Canen's print?

4    A    Well, it had been over several days, because I was

5         looking over the copies of the evidence, Items 48 and

6         49.  The print just made it a little clearer.

7    Q    I'm sorry, I don't understand.  You were looking at -

8         at what?  Forty-eight and 49?

9    A    Yeah, Exhibit 48 and 49.

10   Q    Which would be the big charts you presented?

11   A    Correct.

12   Q    One from the lifter?

13   A    Correct.

14   Q    And one from Ms. Canen?

15   A    Correct.

16   Q    When's the first time that you told me that you no

17        longer believed this was Ms. Canen's print?

18   A    Monday.

19   Q    Would you agree that we were at the courthouse for no

20        more than ten or 15 minutes?

21   A    Yes.

22   Q    So, Detective, how can you explain taking six months

23        looking at prints, saying it belonged to her, and 15

24        minutes this week, telling me it didn't?  How do you

25        explain that?

                              97

1   A   I made a mistake nine years ago.

2   Q   Your explanation is that the difference would be a

3       training course that you attended in 2006?

4   A   That's part of it.

5   Q   Well, what's the rest of it, we need to know.

6   A   Looking at a lot of prints since then.

7   Q   You have more experience?

8   A   Correct.

9   Q   Sir, you were deposed in this case, were you not?

10  A   Correct.

11  Q   On September 7, 2011?  Do you remember the date?

12  A   No, I don't remember the date.

13  Q   Ms. Wieneke was there.

14  A   Correct.

15  Q   I was there.  There was a court reporter, right?

16  A   Correct.

17  Q   You took the same oath you took today.  Here's a copy

18      of your deposition marked State's C.  Detective,

19      please refer to page 11, the question at the bottom of

20      ten, page 11.  Do you recall Ms. Wieneke asking you

21      how many latent prints you compared to known prints?

22      Do you see that question on page 10, line 23?

23  A   Yes.

24  Q   What's your response?

25  A   Quite a few.

98

```
 1              THE COURT:  Twenty, okay.  I haven't seen him in
 2   20 years.
 3              MR. FRANCISCO:  That does not make a difference,
 4   your Honor, in the State's eyes.
 5              THE COURT:  Does it make any difference to you?
 6              MS. WIENEKE:  No, your Honor.
 7              THE COURT:  No.  All right, go ahead.
 8                       DIRECT EXAMINATION
 9   BY DPA FRANCISCO:
10   Q    Sir, please introduce yourself, well, you don't have
11        to.  Please state your name for the record.
12   A    Charles L. Lambdin.
13   Q    Would you spell that, please?
14   A    L-a-m-b-d-i-n.
15   Q    Are you retired, sir?
16   A    Yes, sir.
17   Q    What did you do prior to retirement?
18   A    I was a crime scene investigator for the Elkhart
19        Police Department.
20   Q    How long were you with them?
21   A    Twenty years.
22   Q    What did you do for the Elkhart City Police
23        Department?
24   A    Investigated crime scenes.
```

1  Q   Did you do that throughout the duration of your 20-
2      plus years on the force?

3  A   No, we all started at the bottom, out on patrol, in
4      the juvenile.

5  Q   Is crime scene investigation at the top, sir?

6  A   Yeah, I spent probably 12 years in the crime scene
7      investigation.

8  Q   As part of working in crime scene investigation, did
9      you have experience working with fingerprints?

10  A   Yes, sir.

11  Q   Can you tell us real briefly about your training and
12     experience as it relates to fingerprints?

13  A   Well, I took multiple courses on – on fingerprints
14     with Indiana University, Michigan State, any other
15     training classes that came along over a period-of-
16     time.  Usually every year we got reviewed on – on it.

17  Q   You said you worked in crime scene investigation for
18     12 years.  During that time, did you work with
19     fingerprints?

20  A   Most definitely.

21  Q   Did you do fingerprint comparisons?

22  A   Most definitely.

23  Q   Do you compare latent fingerprints, that is
24     fingerprints lifted from a crime scene to known
25     fingerprint cards?

                    105

```
 1    A    Yes, sir.

 2    Q    When did you retire?

 3    A    September 1990.

 4    Q    Did you hold any sort of certifications in fingerprint

 5         examination?

 6    A    Yes.

 7    Q    You did?

 8    A    Yeah.

 9    Q    Which - what were you certified in?

10    A    Well, these class - each class that I attended with

11         the Universities, you got a certificate.

12    Q    Okay.  But there was no professional organization that

13         you certified with?

14    A    No.

15    Q    Because that's the question I'm asking.

16    A    No.

17    Q    Okay.  Would you - could you be able to recall how

18         many cases you worked involving fingerprints?

19    A    Hundreds.

20    Q    During the time you were working with the Elkhart

21         Police Department, did you work with an individual

22         named Bill Clark?

23    A    Well, Bill was on the Police Department with me, but I

24         did not work with him, no, he was in uniform.

25    Q    Okay. You knew Bill Clark?
```

```
 1   A    It was someone else's.

 2   Q    Were you comfortable with using that magnifying glass?

 3   A    Not entirely, no.

 4   Q    Now, you had some concerns, you said, about the

 5        fingerprints, or not?

 6   A    Sir?

 7   Q    Well, -

 8   A    I'm a little hard of hearing.

 9   Q    I'm sorry.  Let me ask you this.  What did you do,

10        sir, when you were done with your analysis?

11   A    When I was done with my analysis?

12   Q    Correct.

13   A    I went home.

14   Q    Okay.  Did you talk to the Detective at all?

15   A    Yes, we - we talked.  He asked me what I thought about

16        it.

17   Q    What did you say?

18   A    I said there was a - I - I found two similarities.

19   Q    Okay, you said you found two.

20   A    Yes, I believe so.  It's been some time.

21   Q    Did you express any reservations that there were any

22        differences?

23   A    Well, the rest of the print was probably indifferent

24        because it was not a good print it was smeared.

25   Q    Okay.  Well, did you tell him to do anything?
```

| | | |
|---|---|---|
| 1 | A | No, I don't think so. |
| 2 | Q | Did you tell Bill Clark to do anything? |
| 3 | A | No. |
| 4 | Q | Did you tell Brent Zook – do you know who Brent Zook |
| 5 | | is? |
| 6 | A | I know the man, yes. |
| 7 | Q | Had you ever met him before? |
| 8 | A | I've met him many times, he worked several criminal |
| 9 | | cases with him. |
| 10 | Q | Okay, although he was usually cross-examining you? |
| 11 | A | Yes. |
| 12 | Q | Do you recall if you ever had any cases with Mr. Zook |
| 13 | | that involved fingerprints? |
| 14 | A | No, I don't believe so. |
| 15 | Q | Did you ever contact Mr. Zook and say anything about |
| 16 | | the fingerprints? |
| 17 | A | No. |
| 18 | Q | Okay.  Did you get paid for your services? |
| 19 | A | A little bit. |
| 20 | Q | Okay, now, this was several years ago, correct? |
| 21 | A | Yes. |
| 22 | Q | You don't remember all of the details very well, but |
| 23 | | you testified to the best of your memory, correct. |
| 24 | A | That's correct. |
| 25 | Q | Mr. Lambdin, thank you very much, sir. |

112

```
STATE OF INDIANA        )      IN THE ELKHART CIRCUIT COURT
                        )
COUNTY OF ELKHART       )      CAUSE NO.  20C01-0908-PC-00018
                                          20C01-0409-MR-00118


STATE OF INDIANA              )
                              )
      Vs                      )
                              )
LANA R. CANEN                 )
```

## REPORTER'S CERTIFICATE

I, H. Christine Macon, court reporter for the Elkhart County Court, do hereby certify that I am an official reporter of said Court, duly appointed and sworn to report the evidence in causes tried therein.  That as such reporter I did personally transcribe the proceedings herein and certify that the foregoing is a true and correct transcript thereof.

WITNESS my hand this 29th day of October, 2012.


```
                              /s/H. Christine Macon
                              H. Christine Macon
                              Official Court Reporter
                              Elkhart Circuit Court
                              101 North Main Street
                              Goshen, IN 46526
```