# EXHIBIT J

Cited portions of Deposition of Vicki Becker dated 10/29/2014
taken in *Lana Canen v. Dennis Chapman, et al.*,
U.S. District Court, Northern District of Indiana,
South Bend Division, Case No. 3:14-CV-00315

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF INDIANA

3                      SOUTH BEND DIVISION

4        LANA CANEN,                        )
                                            )
5                      Plaintiff,           )
                                            )
6            vs                             ) Case No.
                                            ) 3:14-cv-315-RL-CAN
7        DENNIS CHAPMAN and MARK DAGGY,     )
                                            )
8                      Defendants.          )
                                            )
9

10

11              The Deposition of VICKI ELAINE BECKER

12              Date:   Wednesday, October 29, 2014

13              Time:   9:26 a.m.

14              Place:  Elkhart Prosecutor's Office
                        301 South Main Street
15                      Elkhart, Indiana

16

17          Called as a witness by the Plaintiff

18          in accordance with the Federal Rules of Civil

19          Procedure for the United States District

20          Court, Northern District of Indiana, South Bend

21          Division, pursuant to Notice.

22

23        Before Charolette A. Martinez, CSR 11983
          Notary Public, St. Joseph County, Indiana

24                MIDWEST REPORTING, INC.
                   1448 Lincolnway East
25                South Bend, Indiana  46613

```
 1    APPEARANCES:

 2


 3    MR. MICHAEL K. SUTHERLIN
            MICHAEL K. SUTHERLIN & ASSOCIATES
 4          334 North Senate Avenue
            Indianapolis, Indiana 46204
 5          msutherlin@gmail.com
            317.634.6313
 6
      For the Plaintiff;
 7


 8    MR. MARTIN W. KUS
            Newby, Lewis, Kaminski, Jones, LLP
 9          916 Lincolnway
            La Porte, Indiana 46350
10          219.362.1577
            mwkus@nlkj.com
11
      For the Defendant, Mark Daggy;
12


13    MR. MICHAEL F. DE BONI
               -- and --
14    MR. NATHANIEL M. JORDAN
            Yoder, Ainlay, Ulmer & Buckingham, LLP
15          130 North Main Street
            P.O. Box 575
16          Goshen, Indiana 46527-0575
            574.533.1171
17          mdeboni@yaub.com

18    For Defendant, Dennis Chapman.

19
      ALSO PRESENT:   Cindy Bennett
20                    Nathasha Felton

21
                         *      *      *
22


23


24


25
```

1   Q.  I would like you to tell me what your relationship

2       was, then, with Joel Williams in the trial of Lana

3       Canen.

4   A.  Joel Williams is an associate of mine here at the

5       prosecutor's office.  He joined our team in early

6       2003.  I do not remember the specific date, but I

7       know it was early of 2003.  And he and I worked

8       closely together on a variety of cases.  He's quite

9       an experienced attorney.

10          And so when we began the prosecution of the

11      Lana Canen case and Andrew Royer case, he worked on

12      the case with me in the original evaluation stage.

13          I'm not sure how much he participated in the

14      actual charging.  That was primarily myself preparing

15      the paperwork and Mr. Hill approving it.  And then he

16      assisted me as we went forward in the pretrial

17      proceedings, as well as the trial.

18  Q.  Okay.  So you're -- you were lead counsel and he

19      did some of the pretrial evaluation, things like

20      that?

21  A.  I wouldn't say "lead."  We really don't designate a

22      lead all the time.  Perhaps it was interpreted that I

23      am the lead, which is a fair assessment.  But I never

24      sat there and said, "You're second."  "I'd lead," and

25      then go from there.

1        about something, I'll either call one of the

2        supervisors, or if it's a case that I'm working

3        involving a specific investigator, I contact them

4        directly.  But I have an open line of communication,

5        basically, from the chief, down.  So if I need

6        something from the chief, I can contact the chief.

7            But we don't have like a designated liaison that

8        takes care of all of those types of communications.

9        Chief Investigator Winbigler is what you would

10       probably consider a liaison, but that's more in

11       general type things, not necessarily specific

12       casework.

13   Q.  So you don't delegate this to somebody else when

14       it's a murder case; you do all the contacting with

15       the Elkhart City Police yourself?

16   A.  I do.

17   Q.  Okay.

18   A.  I do.

19   Q.  And is that true as well with the Elkhart Sheriff's

20       Department?

21   A.  Yes.

22   Q.  Okay.  Tell me, if you can, when you first became

23       involved in the homicide of Helen Sailor.

24   A.  I honestly don't know.  I do not know when I first

25       started looking into it.  I remember that I had it

1   under review for a decent period of time before we

2   elected to charge, so I'm sure that it was a period

3   of months between the time that I initially got it

4   and started reviewing it and the time that charges

5   were filed against Mr. Royer and then thereafter

6   followed with Mrs. Canen.

7 Q. There was a considerable amount of time.  She died

8   November 28, 2002.

9 A. Okay.

10 Q. And the trial commenced August the 8th, 2005.  She

11   was charged September 2nd, 2004.

12 A. Okay.

13 Q. 22 months.  I'd say that's more than just a few

14   months.

15 A. Well, I don't know when the case actually came over

16   for our review.  That's what I was referring to,

17   because that was the question you asked.

18 Q. Yes.

19 A. I don't know when the case was submitted to the

20   prosecutor's office for review.

21 Q. Okay.

22 A. It had to be after January of 2003 because Mr. Hill

23   was not even in office until then, and I wasn't the

24   chief deputy before then.

25 Q. Okay.  So in reviewing the case, that's not

```
 1        something you've found -- or familiarized yourself

 2        with when you got involved?

 3   A.   No.  I -- I can't sit here and tell you when we

 4        received the case for review.  I'm sorry.

 5   Q.   Okay.  Had you ever worked with Mr. Dennis Chapman

 6        before this case?

 7   A.   Yes.

 8   Q.   And had you ever worked with him in a murder case?

 9   A.   I don't know.

10   Q.   Did you attend the PCR hearing?

11   A.   No.

12   Q.   Do you know who did?

13   A.   David Francisco.

14   Q.   Okay.

15   A.   Are you talking about on our behalf as the

16        prosecutor?

17   Q.   Yes.

18   A.   Yes.  David Francisco.

19   Q.   And was he somebody that you designated?

20   A.   Yes.

21   Q.   Okay.  Was he familiar with the case?

22   A.   Hold on.  I did attend some of the PCR hearing.  I

23        did not play a role.  But I remember going into the

24        courtroom and watching part of it, but I couldn't

25        even tell you who the witness was.  I apologize.
```

1   Q.  Yeah, "Royer."

2        -- separately?

3   A.  Yes.

4   Q.  Okay.  And then you waited on charging Lana Canen?

5   A.  Yes.

6   Q.  And what was -- was it based on Mr. Chapman's

7      analysis of the fingerprint?

8   A.  That was absolutely part of it, yes.

9   Q.  And you'd used him before?

10  A.  Yes.

11  Q.  Did you later learn from any source, reviewing his

12     testimony, what his credentials were?

13  A.  Actually, I was aware of his credentials before

14     utilizing his services.

15  Q.  Well, what were those credentials?

16  A.  To the best of my recollection, he worked for the FBI

17     for a period of time doing classification of

18     fingerprints.  He also had been working for the

19     Elkhart County Sheriffs Department in their crime

20     laboratory doing a variety of forensic services,

21     photographing.  I know he had done quite a bit of

22     fingerprint amplification, for lack of a better term.

23     I know there's a better word for it.  But basically

24     collecting latent prints, collecting patent prints,

25     documenting those, preserving them as evidence,

1    et cetera, et cetera.

2        I had worked with him on previous occasions of

3    identifying patent compared to latent prints on print

4    cards versus inked finger prints that he had taken in

5    what habitual phases of cases.  And I believe --

6    well, I know that I had talked to him on a couple of

7    different occasions regarding his assessment of

8    fingerprint evidence in other cases.

9    Q.  Okay.  Were you aware that he'd only testified in

10    one murder trial before?

11   A.  I don't know.

12   Q.  Were you aware that he had done no cases involving

13    complex latent fingerprints?

14   A.  That depends on what you mean by complex latent

15    fingerprint.

16   Q.  That's a term of art that I understand, as opposed

17    to just looking at a latent fingerprint.  In other

18    words, I understand he went to some training after

19    this murder case, but beforehand he had no training

20    or experience in examining complex latent

21    fingerprints and making those comparisons.

22            MR. DE BONI:  I'm just going to

23        object to the form of the question; lacks

24        foundation.

25            MR. KUS:  There's no question yet.

1               It is very clear to me that you and I

2               have different definitions of things.

3               And until I'm comfortable with what you

4               mean by "complex," that's not a question

5               I can answer for you.

6    BY MR. SUTHERLIN:

7    Q.  What is a ten-print examination?

8    A.  Ten-print examination, to my understanding, is when

9        you have an inked fingerprint card involving the ten

10       fingers of most human's hands, right and left.  And

11       you can look at that inked fingerprint card, which is

12       a patent print, and draw conclusions or make

13       observations about that ten-print card.

14   Q.  Did you make the decision to hire Mr. Chapman?

15   A.  Mr. Chapman was not hired.

16   Q.  Brought into the case?

17   A.  I think so, yes.

18   Q.  But you're not sure?

19   A.  I'm not sure.

20   Q.  Why didn't you use the Indiana State Police Crime

21       lab?

22   A.  Because they were backlogged so bad that we had to

23       ask them to give the fingerprints back because we

24       asked them to do it and they couldn't get it done in

25       a timely fashion.

1    Q.  So first you sent them there?

2    A.  Yes.

3    Q.  And they couldn't get them back in two and a half

4        years?

5    A.  That's correct.  Well, I don't know when they sent

6        them.

7    Q.  Two years.

8    A.  I can't answer that question.  But I didn't know that

9        they did not have them done and they told us they

10       could not get them done.

11            And when I say "us," it was Joel Borden, I

12       believe, that had the direct communication with the

13       Indiana State Police Laboratory.  I could be wrong

14       about that, but Joel was the crime scene investigator

15       for Elkhart Police Department at the time, and that

16       would, generally, be how it occurred.

17            I was under the impression that Indiana State

18       Police could not finish the evaluation in time for

19       Andrew Royer's trial.  And, therefore, we wanted to

20       be able to have those questions answered before

21       Mr. Royer's trial, the first trial.  And so we

22       started brainstorming about other individuals that

23       may have expertise in this area to determine whether

24       or not they could help.

25   Q.  Were you involved in the preparation of Mr. Chapman

48

```
 1    Q.  Do you recall that in the Lana Canen criminal case

 2         tried in Elkhart Circuit Court that Ms. Canen was

 3         represented by Brent Zook?

 4    A.  Yes.

 5    Q.  And is it your understanding that Brent Zook was

 6         appointed by the Elkhart County Public Defender's

 7         Office?

 8    A.  Yes.

 9    Q.  To represent Ms. Canen?

10    A.  Yes.

11    Q.  Had you had other cases with Mr. Zook prior to

12         Mrs. Cane's criminal case?

13    A.  Many.

14    Q.  So was Mr. Zook a fairly experienced criminal

15         defense attorney?

16              MR. SUTHERLIN:  Objection; present

17              tense no longer applies.

18    BY MR. DE BONI:

19    Q.  Did you hear my question?

20    A.  Yes.  He was very experienced at the time that this

21         case was tried.  He'd been around longer than I had.

22              MR. KUS:  We've all been around at

23              this table longer than you have.

24              THE WITNESS:  I don't know about

25              everybody.
```

[10/29/2014] becker vicki

1   Q.  And Mr. Royer was represented by Chris Crawford.

2       Is that correct?

3   A.  Yes.

4   Q.  I wonder if you could turn to the date 7/29/2005.

5   A.  I have it.

6   Q.  Part of the Court's entry states that, "Court

7       confirms trial date of August 8, 2005, at 8:30 a.m.

8       with joint trial to be conducted of each

9       defendant."

10          Do you see where I'm at?

11  A.  I do.

12  Q.  "Court also confirms that each defendant will

13      employ the defense that they did not commit this

14      offense.  And the Court also notes from counsel

15      that discovery has been completed."

16          Do you see that entry?

17  A.  I do.

18  Q.  So my question is:  Do you recall specifically --

19      I'm sorry.

20                  (Off the record.)

21  BY MR. DE BONI:

22  Q.  Do you recall in this specific case what discovery

23      was conducted?

24  A.  No.  I do not recall specifically what discovery was

25      conducted.  During this period of time we had more of

1    an open-file type of discovery process where we would

2    allow the defense to review our entire file,

3    including notes, anything that wasn't really

4    confidential.

5        We also were at a practice of making photocopies

6    of police reports as well as, you know, summaries,

7    narratives, et cetera, et cetera, and providing

8    physical evidence such as audio, video, anything that

9    was physically documented.  We tried to be as open as

10   we could.

11  Q.  This open-file process you just described, that

12      would have been in place at the time of the

13      Lana Canen case?

14  A.  I believe so.  I believe so.  At least at the

15      beginning of it, because we -- it wasn't -- I don't

16      remember when we went more to the "We'll provide

17      everything for you," as opposed to "Come over and

18      take a look."  It was kind of a combination, a

19      carry-over from the previous administration.

20          But Mr. Zook and Mr. Crawford and I, all of us,

21      had a very open relationship such that, you know,

22      "Whatever I have, you're welcome to" type of thing.

23  Q.  Did you have that you recall now -- I know it's

24      been a few years -- any discovery disputes with

25      Mr. Zook such that he wanted something and the

1    prosecuting -- the prosecutors refused to turn it

2    over?

3    A.  No.  Nothing.

4    Q.  Do you recall in this case whether the police

5    reports involving the murder of Helen Sailor would

6    have been available to Mr. Zook and Mr. Crawford?

7    A.  Yes, I am positive they were.

8    Q.  Okay.

9    A.  In fact, we may have burned photocopies for them.

10    (Plaintiff's Exhibit No. 22 marked.)

11   BY MR. SUTHERLIN:

12   Q.  Exhibit 22, do you see that in front of you, ma'am?

13   A.  Yes, I do.

14   Q.  Is the report authored by Dennis Chapman?  Correct?

15   A.  It appears to be, yes.

16   Q.  Would this report have been turned over to Mr. Zook

17    and Mr. Crawford prior to the trial?

18   A.  Yes.  I am sure it was.

19   Q.  That would be your normal procedure?

20   A.  Yes.

21   Q.  Would this be considered part of what criminal

22    attorneys call Brady material the prosecutor turns

23    over?

24   A.  No.  This would not really be Brady material.  Brady

25    material is more along the lines of material that

1      would be shown to exonerate someone as opposed to

2      incriminate someone.

3  Q.  Okay.

4  A.  This would be part of the standard discovery just

5      regarding evidence that we would anticipate at trial.

6      And by this time, obviously we intended to call

7      Detective Chapman as a witness, so this would be a

8      summary of his observations in preparation for his

9      being a witness.

10 Q.  Are you confident sitting here today that Mr. Zook

11     would have received Exhibit 22?

12 A.  Yes.

13 Q.  Prior to the criminal trial?

14 A.  Yes.

15         (Plaintiff's Exhibit No. 23 marked.)

16 BY MR. SUTHERLIN:

17 Q.  Now, what is Exhibit 23.

18 A.  23 appears to be the State's witness and exhibit list

19     bearing my signature that was filed in July of 2005,

20     so prior to the trial.  And then we provided an

21     addendum on August 5th, 2005.  And then again on

22     August 8th, 2005, another addendum.  All on what

23     appears to be my signature.

24 Q.  So you list on behalf of the State or the

25     prosecutor all the witnesses and exhibits that you

1      expect to use --

2   A.  We --

3   Q.  -- in trial?

4   A.  -- articulate the specific ones that are very, very

5       clear.

6   Q.  Right.

7   A.  And then there's also kind of the catch-all phrase,

8       "As well as any other witness that does not now

9       appear to be relevant but may become relevant due to

10      defendant's actions at trial," which is rather the

11      catch-all.

12          Generally speaking, that's part of why we engage

13      in the open discovery, that if we have any reference

14      to a witness within our file, then we deem the

15      defendant to be on notice that they could be a

16      witness in the case.

17  Q.  Mr. Retired Detective Chapman is on your list of

18      witnesses; correct?

19  A.  That is true.  He was on the initial list that was

20      filed in July of 2005.

21  Q.  Do you recall that Mr. Zook, as well as

22      Mr. Crawford, would have known about Dennis Chapman

23      authoring a fingerprint report?

24  A.  Yes.

25  Q.  Prior to July 29, 2005 --

```
 1        first time that Mr. Zook heard of the name

 2        Dennis Chapman?

 3   A.  No.

 4   Q.  As being a State's witness in this case?

 5   A.  No.

 6   Q.  In criminal prosecutions can the defense request

 7        pretrial depositions of witnesses?

 8   A.  Yes.

 9   Q.  All right.  In the Lana Canen murder prosecution

10        could Mr. Zook have requested the opportunity to

11        take the deposition of Dennis Chapman pretrial?

12   A.  Yes.

13   Q.  Is that done from time to time --

14   A.  Yes.

15   Q.  -- in your criminal cases?

16   A.  Yes.

17   Q.  And in that deposition, I assume -- but correct me

18        if I'm wrong -- that the criminal defense attorney,

19        in this case Mr. Zook, could have asked

20        Dennis Chapman any relevant questions about his

21        background?  Training?  Qualifications?

22                MR. SUTHERLIN:  Object to the form of

23            the question.  This witness is not here

24            to speak for Mr. Zook.

25                THE WITNESS:  Yes.
```

1    BY MR. DE BONI:

2    Q.  "Yes"?

3    A.  Yes.

4    Q.  If a criminal defense attorney wants to take the

5        deposition of an expert who's going to testify on

6        certain forensic evidence, based on your

7        experience, do you know the questions could go to

8        background qualifications?

9    A.  Yes.

10   Q.  All right.  Did Mr. Zook do that in this particular

11       case involving Lana Canen?

12   A.  Not in this particular case, no.

13   Q.  Is there anything that you're aware of as one of

14       the prosecutors that prevented Mr. Zook from

15       seeking the pretrial deposition of Dennis Chapman?

16   A.  Not within my knowledge, no.

17   Q.  I want to ask you, Mrs. Becker, about -- I made a

18       Xerox copy here of a portion of Indiana Rules of

19       Evidence.  I'll ask the question for the record.

20           In a room full of lawyers people might say

21       well, why even ask the question.  But I assume in

22       the criminal trials that occurred in 2005, which is

23       the year that Lana Canen's criminal trial occurred,

24       that the Indiana Rules of Evidence were applicable;

25       correct?

1   A.   Yes.

2   Q.   Now, I have before you a portion that I Xeroxed off

3        pertaining to opinions of expert testimony,

4        Article 7?

5   A.   Yes.

6   Q.   What I want to ask you, Ms. Becker, is the

7        procedure based on your experience of naming an

8        expert in a criminal trial.

9   A.   (Witness nods head.)

10  Q.   And opposing counsel challenging an expert in a

11       criminal trial?

12  A.   (Witness nods head.)

13  Q.   So my first question is:  If Mr. Zook would have

14       taken the deposition of Dennis Chapman and asked

15       Mr. Chapman about his qualifications, and if

16       Mr. Zook felt that his qualifications were

17       insufficient to testify, in your experience, how is

18       a challenge brought to the attention of the Court?

19  A.   I've never personally had the experience where the

20       defense attorney challenged the qualifications -- I

21       mean, made an objection to the qualifications of a

22       person that we offered for expert testimony.

23            But in preparation for several events where I

24       thought it would happen, what I anticipated happening

25       is that the defense attorney would object to the

1    qualification of the witness as a, quote/unquote

2    "expert" under 702.  And then the Court would have a

3    preliminary hearing to determine whether or not the

4    person was, in fact, an expert to overcome the

5    foundation for 702, and then instruct the jury,

6    depending upon, you know, how that went.

7         If the Court found that the person was qualified

8    under 702, the person would be allowed to testify.

9    And any testimony, the jury would consider it as the

10   weight as opposed to the admissibility.  But we never

11   had the situation where we had an expert who was

12   prohibited from testifying.

13   Q.  Is it your understanding as a prosecutor that under

14       Rule 702 of the Indiana Rules of Evidence, a party

15       who believed that an expert should not testify can

16       bring a pretrial challenge by way of Motion to the

17       trial judge?

18   A.  Yes.  It used to be called a Daubert hearing when I

19       first started.  Then it became known as a Frye

20       hearing.  And what that type of a hearing does is

21       examine not only the expert but also the science to

22       determine if the science upon when the expert is

23       relying is recognized in their field and if it can be

24       determined to be credible evidence.

25            I've, personally, handled a couple of cases

```
 1    BY MR. DE BONI:

 2    Q.  Mr. Zook in the Lana Canen criminal case, in which

 3        you were the prosecutor, did not bring a Rule of

 4        Evidence, Rule 702 Challenge against Mr. Chapman;

 5        correct?

 6    A.  That is correct.

 7    Q.  Are you aware of any Indiana law, any statutory or

 8        administrative criteria that must be met as a

 9        threshold matter before an individual can testify

10        concerning fingerprint analysis?

11    A.  I'm not aware of an Indiana Statute.  I am aware of a

12        variety of opinions, case opinions, that discuss the

13        qualifications of a person to be qualified as an

14        expert under 702.

15    Q.  Okay.

16    A.  But that's not a statute.

17    Q.  Okay.  So you're not aware of any statute or

18        administrative regulation pertaining to a threshold

19        criteria for qualification a fingerprint analyst

20        must have?

21    A.  Correct.

22    Q.  Now, under Rule 702 is it correct that the judge

23        is -- to use a phrase commonly used -- the

24        gatekeeper, concerning who can testify as an

25        expert?
```

1       challenges the credibility of a State-offered

2       witness.

3  Q.   If based on your experience as a prosecutor and as

4       an attorney since -- 1997?

5  A.   Yes.

6  Q.   -- in criminal trials in Elkhart County, once an

7       expert witness is called as a witness and the

8       direct examination has begun, can opposing counsel

9       stand up at some point before the expert has given

10      his opinion, his or her opinion, and ask the trial

11      judge to voir dire the witness on his

12      qualifications?

13 A.   Absolutely.  We've even done that outside the

14      presence of a jury on numerous cases.

15 Q.   Is that -- so that's not uncommon in criminal

16      trials that you've been involved in?

17 A.   I wouldn't say it's common or uncommon.  I mean, I've

18      done a lot of trials.  So when you're looking at that

19      many trials, I wouldn't say it's common, but it has

20      occurred on multiple occasions.

21 Q.   In front of Judge Shewmaker?

22 A.   Yes.

23 Q.   And after the questioning or voir dire of witnesses

24      is conducted, the opposing counsel could object to

25      this witness giving an opinion; correct?

```
 1    A.  Actually, no.  This part of the questioning had more

 2        to do with laying the foundation for the fingerprint

 3        card, which was identified as State's Exhibit 46.  It

 4        was more towards the line of the fingerprint card

 5        itself, did it contain sufficient detail to enable

 6        Detective Chapman to come to certain conclusions

 7        about, you know, "Here is a whirl, here is a ridge.

 8        Here is a dot.  Here is an in."

 9    Q.  Okay.

10    A.  That was the foundational for getting in 47.  It

11        wasn't until I built on that further that I would

12        have come to the point where it would have been

13        appropriate to make an objection regarding any type

14        of a comparison, because this was more just a

15        foundation for State's Exhibit 47 in and of itself.

16             So I apologize if I'm being very detailed, but

17        there was a method behind this entire --

18    Q.  Okay.

19    A.  -- line of questioning.

20    Q.  Mr. Chapman eventually gave an opinion that he felt

21        that the lifter was that of Lana Canen, comparing

22        it to her ten-print card; correct?

23    A.  Yes.

24    Q.  And, again, based on your experience in

25        Judge Shewmaker's court prior to Mr. Chapman giving
```

1       that opinion, Mr. Zook could have stood up and

2       asked to question Mr. Chapman on his

3       qualifications; right?

4    A. Absolutely.

5    Q. And if he felt that -- if Mr. Zook felt that he was

6       unqualified to give that opinion, he could have

7       raised that objection at that time to

8       Judge Shewmaker; correct?

9    A. Yes.

10   Q. That was not done?

11   A. Correct.

12   Q. To be clear, Dennis Chapman at the time that he

13      provided the fingerprint analysis for the

14      Lana Canen murder case was employed by the

15      Elkhart County Sheriff's Department; correct?

16   A. Yes.

17   Q. And to the best of your knowledge, Mr. Chapman did

18      not come forward to the Elkhart City Police or the

19      Elkhart County Prosecutor and -- and say, "Hey, I

20      want to get involved in your investigation"?

21   A. No.  That's not the case at all.  This was --

22   Q. You reached out to him -- or either the Elkhart

23      City Police or the Elkhart County Prosecutor

24      reached out to Mr. Chapman and said, "Would you

25      assist us?"

```
 1    A.  Yes.

 2              (Plaintiff's Exhibit No. 25 marked.)

 3    BY MR. SUTHERLIN:

 4    Q.  Exhibit 20- -- I think it's like 25.  Do you see

 5        25?

 6    A.  I do.  I have it.

 7    Q.  Ms. Becker, we just received this yesterday from

 8        the Elkhart City Police, but I'll represent to you

 9        that it's State's Exhibit 46.  And it's a

10        three-page document, and it State's Exhibit 47 from

11        the

12        Lana Canen murder case.

13    A.  Okay.

14    Q.  For some reason the Elkhart City Police -- I think

15        because of the appeal, still had those.  We didn't

16        have them when we asked for the entire record from

17        the court reporter.

18              So page -- page 1 of Exhibit 25 is State's

19        Exhibit 46; correct?

20    A.  Yes.

21    Q.  And that's the lifter card?

22    A.  Yes.  It appears to be.  I recognize my handwriting

23        on the number.

24    Q.  Please explain what a lifter card is.

25    A.  A lifter card is a tool that forensic crime scene
```

1     investigators utilize for purposes of collecting

2     evidence either from a crime scene or somewhere that

3     they believe to be evidence.

4          It consists of really two parts:  There is a --

5     kind of a white sterile card that is covered by an

6     adhesive clear -- some type of plastic material

7     cover.

8          When they're ready to use it, they pull the

9     protector from the adhesive side.  They use the

10    adhesive and place it on the item of evidence, and

11    then they remove it very carefully.  And then they

12    very carefully close the adhesive part onto the

13    sterile white part so that it preserves the lift, in

14    other words, the material that they have pulled from

15    the evidentiary sample.  And then it protects it and

16    preserves it from any potential taint.

17  Q.  Are lifter cards used to obtain and preserve

18      fingerprints from a crime scene?

19  A.  Yes.

20  Q.  Okay.  Now, in the Lana Canen murder

21      investigation -- I guess I had -- should more

22      appropriately say the Helen Sailor murder

23      investigation that was conducted by the Elkhart

24      City Police.  Mr. Chapman would not have been

25      involved at all in collecting evidence from the

1       scene; correct?

2    A.  No.  He was not.  That was Detective Clyde Brown and

3        Detective Joe Borden from the Elkhart City Police

4        Department.

5    Q.  So is it your understanding that Mr. Chapman would

6        have been provided a lifter card, a photograph of

7        which is on page 1 of Exhibit 25?

8    A.  Correct.

9    Q.  And page 2 and 3 are what you've referred to as the

10       ten-print card?

11   A.  That is correct.

12   Q.  And Mr. Chapman was asked to compare the lifter

13       card, which contained a print with the ten-print

14       card; correct?

15   A.  Yes.

16   Q.  At trial during the actual criminal trial of

17       Lana Canen and Andrew Royer, there was an

18       enlargement or blowup of the lifter card.  Is that

19       correct?

20   A.  I don't think that it was of the entire lifter card.

21       It was of a select portion of the lifter card that

22       reflected --

23   Q.  Of a print?

24   A.  -- the actual ridge detail of what appeared to be a

25       print.

```
 1   Q.  Okay.

 2   A.  I mean, I had been trying murder cases at the time

 3       that this was tried for about two and a half years by

 4       then.  And I had tried quite a few, but whether he

 5       was a witness in them or not, I couldn't tell you.

 6   Q.  Okay.  Would it surprise you that he's only done

 7       one murder case, according to his own testimony?

 8   A.  Yeah.  It would surprise me, but doesn't --

 9   Q.  Would it surprise you that he has done -- he's had

10       no training in latent fingerprints examinations?

11   A.  I don't agree with that.  The representations made to

12       me was that he had done latent comparisons.

13   Q.  I didn't ask that.  I said did he have any

14       training?  Would it surprise you that he had no

15       training in latent comparison?

16   A.  Yes.  It would absolutely surprise if that's a true

17       fact, but I don't believe that's a true fact.

18   Q.  Okay.  And you touted his experience with both the

19       Nuclear Regulatory Agency and the FBI.  Did you

20       understand that his experience was with comparing

21       not latent prints, but simply known prints and

22       classifying them?

23                   MR. DE BONI:  I object to the form of

24               the question.  And also that assumes

25               facts not in evidence.
```

1    BY MR. SUTHERLIN:

2    Q.  Go ahead and answer.

3    A.  Should I answer?  I understood, absolutely, that what

4        he did for the FBI was compare what they call in the

5        field as "known prints."  I was aware that he did

6        that hundreds of thousands of times.  I mean, there

7        was one comment in here he did that 40 times an hour

8        in one unit that he was in.

9            I was also aware, though, that with his

10       experience -- this is based on what he told me --

11       based upon his experience at the Elkhart County

12       Sheriff's Department that he had done latent

13       comparisons with unknowns.  That was my belief.

14   Q.  That was not my question.

15   A.  Well, then I misunderstood your question.

16   Q.  Yeah.  I asked -- I asked you about the Nuclear

17       Regulatory Agency and the FBI.

18           Did you understand that -- and worked for

19       those agencies, it did not involve latent

20       fingerprint identifications at all?

21   A.  I cannot say that I asked that specific question of

22       him.  I understood that was accurate at the FBI.  But

23       I do not know about -- I do not know about the Cook

24       Nuclear Power Plant.

25   Q.  What did he do for them?

```
 1                        CERTIFICATE

 2          I, Charolette A. Martinez, a Notary Public, in and

 3     for the County of St. Joseph and State of Indiana, do

 4     hereby certify there appeared before me, VICKI ELAINE

 5     BECKER, on Wednesday, October 29, 2014, who was duly

 6     sworn to testify the truth, the whole truth, and

 7     nothing but the truth to questions propounded at the

 8     taking of the foregoing deposition in a cause now

 9     pending and undetermined in said court;

10          I further certify that I then and there reported

11     stenographically the proceedings at the said time and

12     place; that the proceedings were then transcribed from

13     my original shorthand notes; and that the foregoing

14     transcript is a true and correct record thereof;

15          IN WITNESS WHEREOF, I have hereunto set my hand

16     and affixed my notarial seal this 3rd day of November,

17     2014.

18

19

20

21                                      ____
                           Charolette A. Martinez, CSR
22                         Notary Public, State of Indiana
                           Residence:  St. Joseph County
23                         Commission Expires:  12-18-2022

24

25
```

```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
2                        SOUTH BEND DIVISION

3    LANA CANEN,                      )
                                      )
4                 Plaintiff,          )
                                      )
5        vs                           ) Case No.
                                      ) 3:14-cv-315-RL-CAN
6    DENNIS CHAPMAN and MARK DAGGY,   )
                                      )
7                 Defendants.         )
                                      )
8

9                    VICKI ELAINE BECKER

10       I hereby acknowledge that I have read the foregoing

11   deposition transcript regarding the case of Canen Vs.

12   Daggy, taken on October 29, 2014, and that the same is a

13   true and correct transcription of the answers given by me

14   to the questions propounded, except for the additions or

15   changes, if any, as noted on the attached errata sheet.

16

17

18                    _____
                      VICKI ELAINE BECKER
19
                      Subscribed and sworn to me
20                    this _____ day of _____,
                      2014, A.D.
21

22
                      Notary Public or Witness_____
23                    State of _____
                      County of _____
24                    My commission expires:_____

25
```

*ERRATA SHEET*

**Deposition of:** Vicki Becker        **Date:** 11·5·14

| Page | Line | Change | To | Reason For Change |
|------|------|--------|-----|------------------|
| 4 | 17 | " I've " | " You've " | misstatement |
| 7 | 7 | "Forfeiters" | "Forfeitures" | spelling |
| 8 | 12 | circuit court | "Circuit Court" | capitalization |
| 8 | 13 | "Constantino + Christofaro" | "Cosentino & Christofaro" | spelling |
| 15 | 17 | "proceeding" | " perspective " | misstatement ? |
| 17 | 21 | "their" | "they're" (they are) | not possessive - descriptive |
| 19 | 8 | "Winbigler" | "Wind bigler" | spelling |
| 36 | 5 | "what" | "the" | misstatement ? |
| 59 | 22 | " when " | " which " | " |
| 71 | 8 | " in " | " end " | " |
| 71 | 10 | "Foundational" | "Foundation" | " |
| 75 | 3 | " Joe " | "Joel " | spelling |
| 81 | 16 | " suprise if that's " | " suprise me if that's " | omitted word |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

MIDWEST REPORTING, INC.
1448 Lincolnway East
South Bend, Indiana  46613
(574) 288-4242

**Signature:** _(signature)_

**Date:** 11/5/14