# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

LANA R. CANEN,                    )
                                  )
Plaintiff,                        )
                                  )
vs.                               )
                                  ) NO. 3:14-CV-315
DENNIS CHAPMAN, in his            )
Individual capacity as the        )
Deputy for the Elkhart            )
County Sheriff Department,        )
and                               )
MARK DAGGY, in his                )
Individual capacity as            )
Officer of the Elkhart            )
Police Department                 )
                                  )
Defendants.

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment filed by Plaintiff Lana Canen on June 11, 2015 (DE# 28), Defendant Dennis Chapman's Motion for Summary Judgment, filed on September 10, 2015 (DE# 41), the Motion to Strike Defendant Chapman's Statement of Facts and Memorandum in Support of Motion for Summary Judgment and in Response to Plaintiff Lana Canen's Motion for Summary Judgment filed by Plaintiff on October 19, 2015 (DE# 50), and the Motion to Strike Affidavit of Dennis Chapman filed by Plaintiff on October 19, 2015 (DE# 51). For the reasons set forth below, Plaintiff's Motion for Summary Judgment (DE # 28)

is **DENIED**, Defendant's Motion for Summary Judgment (DE# 41) is **GRANTED**, Plaintiff's Motion to Strike Defendant Chapman's Statement of Facts and Memorandum in Support of Motion for Summary Judgment (DE# 50) is **DENIED**, and Plaintiff's Motion to Strike Affidavit of Dennis Chapman (DE# 51) is **DENIED**. The Clerk is hereby **ORDERED** to **DISMISS** the claim against Defendant Chapman **WITH PREJUDICE** and to **CLOSE** this case.

BACKGROUND

Plaintiff Lara Canen ("Canen") was convicted of the murder of Helen Sailor ("Sailor") based in part on latent fingerprint evidence found on a plastic container in Sailor's apartment.[1] Defendant Dennis Chapman ("Chapman"), a crime lab technician with the Elkhart County Sheriff's Department ("Sheriff's Department"), testified as an expert at Canen's criminal trial, opining that the latent print belonged to Canen. Canen denied ever being in Sailor's apartment. During Canen's post-conviction relief ("PCR") proceeding, another fingerprint examiner reviewed the evidence, and excluded Canen as the source of the latent print. After re-examining the evidence, Chapman admitted that he had been mistaken

---

[1] Both parties refer to the fingerprint found in Sailor's apartment as a "latent print," as compared to a "known print." Chapman describes latent prints as invisible, unknown fingerprints found at a crime scene, and known prints as the records of fingerprint patterns recorded digitally or with fingerprint ink or powder on identification cards, fingerprint cards or ten-print cards. (DE# 42 at 7.) Chapman does not dispute these descriptions.

in opining that Canen was the source of the print. The State court granted Canen's PCR petition and vacated her conviction. By that time, Canen had served eight years in prison.

In 2014, Canen filed this action alleging federal claims under 42 U.S.C. section 1983 against Chapman in his individual capacity as deputy for the Sheriff's Department, and an Elkhart City Police Department ("ECPD") police officer.[2] Canen claims that Chapman violated her right to due process by holding himself out as an expert in fingerprint identification and failing to inform the State prosecutor that he lacked qualifications and certainty as to the source of the latent print. Canen and Chapman have filed and fully briefed the instant motions for summary judgment. Canen also filed two motion to strike, which the Court will address first.

DISCUSSION

Motions to Strike

Canen filed two motions to strike regarding Chapman's motion for summary judgment briefing. She first seeks to strike the Statement of Material Facts in Support of Motion for Summary Judgment of Chapman and in Opposition to Plaintiff's Motion for Summary Judgment ("Statement of Facts," DE# 42) because it was

---

[2] The claims against the ECPD police officer were dismissed by stipulation of the parties. (DE# 60.)

filed as a standalone document that is neither part of Chapman's memorandum nor identified as an appendix. Local Rule 56-1(a) requires that a brief supporting a summary judgment motion or the brief's appendix include a section labeled "Statement of Material Facts" that identifies the facts that the moving party contends are not genuinely disputed. N.D. Ind. L.R. 56-1(a). Canen also urges the Court to strike the Memorandum of Law in Support of Chapman's Motion for Summary Judgment and in Response to Canen's Motion for Summary Judgment ("Chapman Memorandum," DE# 43) as it allegedly exceeds 25 pages in violation of Local Rule 7-1(e). *See* N.D. Ind. L.R. 7-1(e)(1) ("Supporting and response briefs (excluding tables of contents, tables of authorities, and appendices) ordinarily must not exceed 25 pages."). While the Chapman Memorandum is 24 pages long, Canen argues that the Chapman Memorandum would be 45 pages long if the Court were to include the Statement of Facts.

As Chapman points out, the Statement of Facts is not subject to the page limitation of Local Rule 7-1. *Mayes v. City of Hammond, IN,* 442 F. Supp. 2d 587, 595 & n.1 (N.D. Ind. 2006) (noting that a "motion for summary judgment . . . is permitted to present the statement of material facts . . . in a separate appendix, which itself is subject to no page limitation"); *Estate of Rice ex rel. Rice v. Correctional Med. Servs.,* No. 3:06-CV-697, 2009 WL 1748059, at *6 (N.D. Ind. June 17, 2009), *aff'd in part, rev'd in part on*

*other grounds sub nom. Rice ex rel. Rice v. Corr. Med. Servs.,* 675
F.3d 650 (7th Cir. 2012) ("A statement of material facts filed in
support of a motion for summary judgment doesn't count against the
twenty-five page limitation.").  While Canen arguably has a point
about the manner in which Chapman filed his Statement of Facts,
and whether it strictly complies with the Local Rule 56-1(a), this
amounts to "much ado about nothing and warrant[s] no further
discussion." *Nabors v. Wells Fargo,* No. 1:11-CV-273, 2013 WL
3013353, at *15 (N.D. Ind. June 17, 2013) (denying motions to
strike that asserted the parties' failure to strictly comply with
Local Rules); *see Peele v. Burch*, 722 F.3d 956, 961 (7th Cir. 2013)
("a district court's decision whether to apply a local rule
strictly or to overlook any transgression is one left to the
district court's discretion").  The motion to strike the Chapman
Memorandum and Chapman's Statement of Facts is **DENIED**.

In a separate motion, Canen moves to strike portions of the
Affidavit of Dennis Chapman ("Chapman Affidavit", DE# 42-1) as a
"sham affidavit."  A "'sham affidavit' is an affidavit that is
inadmissible because it contradicts the affiant's previous
testimony . . . unless the earlier testimony was ambiguous,
confusing, or the result of a memory lapse." *Cook v. O'Neill*, 803
F.3d 296, 298 (7th Cir. 2015) (citations omitted).  "[A]n affidavit
can be excluded as a sham only where the witness has given 'clear
answers to unambiguous questions which negate the existence of any

5

genuine issue of material fact.'" *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 572 (7th Cir. 2015) (citations omitted). An affidavit that is an amplification rather than contradiction of prior testimony is not within the "sham" exclusionary rule. *Cook*, 803 F.3d at 298. "[W]hen considering a motion to strike portions of an affidavit in support of a motion for summary judgment, courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." *Martin v. Indiana*, No. 1:12-cv-69, 2015 WL 4899008, at *1 (N.D. Ind. Aug. 17, 2015) (citations omitted).

Canen moves to strike several portions of the Chapman Affidavit that address his prior training or experience:

> 13. . . . In August 2000, I [Chapman] attended a four week training program that was taught by the Indiana State Police. The program was designed to enhance skills and teach detectives how to process crime scenes, collect fingerprints, shoe impressions, tire impressions, and reconstruct crime scenes by drawings. My course textbook was titled, *Techniques of Crime Scene Investigations*, Barry A.J. Fisher. I also participated in the lecture titled, *Latent Prints*.

(DE# 42-1 ¶ 13.) Canen claims that to the extent that this paragraph suggests that Chapman's coursework involved training on latent print comparison, it is inconsistent with his testimony at the PCR Hearing that this training did not involve latent fingerprint comparisons, and only involved "processing crime scene[s]." (*See* DE# 51-1 at 5-6 ("Q. Okay, was there anything in that course that assisted with your – with comparing latent

6

fingerprints?  A. No, . . . that was processing crime scenes.")
Chapman responds that Paragraph 13 is not inconsistent with prior
testimony.  At a deposition in November 2014, Chapman testified
that the program trained students how to process crime scenes,
including "[h]ow to collect fingerprints."  (DE# 42-2 at 23-24.)
Chapman notes that the lectures within that program would be
consistent with processing crime scenes.  Chapman's testimony at
the PCR Hearing did not identify any program lectures or describe
their content.  The Court finds that Paragraph 13 expands upon,
rather than conflicts with, Chapman's prior testimony.  Therefore,
the motion to strike Paragraph 13 is denied.

> 15.  As a crime scene technician with the ECSD, one of
> my responsibilities included examining fingerprints. .
> . .

(DE# 42-1 ¶ 15.)  Canen argues that, to the extent that Paragraph
15 suggests that Chapman's job responsibilities included comparing
fingerprints, it is inconsistent with his deposition testimony
that he did "some" fingerprint comparisons, but that it was not
part of his job.  (DE# 51-2 at 2-3.)  Chapman responds that
Paragraph 15 is not inconsistent with his prior testimony.  The
Court agrees.  The prior testimony cited by Canen refers to
Chapman's job responsibilities when he first became a detective in
1999 and was assigned to property crimes.  (*Id*. at 2.)  At trial,
Chapman testified that one of his responsibilities as a crime lab

technician was to examine and compare fingerprints. (DE# 42-4 at 618.) The motion to strike Paragraph 15 is denied.

> 22.    Based on my prior training with the FBI and continued work with the ECSD after I left the FBI, I believed I had the appropriate experience and training to analyze the fingerprints related to the Helen Sailor murder investigation.

(DE# 42-1 ¶ 22.) Canen argues that Paragraph 22 is inconsistent with Chapman's prior testimony. At Canen's PCR hearing, Chapman testified that when he "testified at trial that he did print comparisons," he referred to comparisons of known prints, not latent prints. (DE# 51-1 at 13; *cf*. DE# 42-4 at 618 (testifying at trial that he made "maybe 100 or so" fingerprint comparisons in the past several years, without indicating whether they were known or latent print comparisons).) At the PCR hearing, the State asked Chapman, "when you were asked to look at this latent [print] of Ms. Canen, did you ever consider saying, you know what, maybe I shouldn't?" Chapman replied, "Yes." (DE# 51-1 at 14.) When the State asked why Chapman did not bring this to someone's attention, he replied, "Well, I was trying to help out Elkhart County." (*Id*.) Canen interprets this testimony as admitting that Chapman had misgivings due to his limited experience with latent print comparisons.

Chapman responds that Paragraph 22 reflects his opinion that, when asked by ECPD to compare fingerprints from the investigation, he felt he had appropriate experience and training to analyze crime

scene fingerprints. Chapman asserts that he never testified that his reservations about comparing the fingerprints were due to lack of training or experience in latent print comparison. Chapman explains that while he considered that "maybe [he] shouldn't" look at the latent prints, he was not asked a follow-up question regarding why he felt this way. He points to his deposition testimony that he felt pressure about analyzing the prints due to "time constraints"; he had Elkhart County work to do, and his partner was out of town at training. (DE# 42-2 at 30-31.) "Even where a subsequent affidavit is contradictory to prior sworn deposition testimony, . . . a court may accept the statement in the affidavit if the party presents a suitable explanation for the discrepancy, such as a confusing deposition question, circumstances indicating a lapse of memory, relevant new information discovered after the original testimony, or ambiguous or incomplete earlier testimony." *Martin*, 2015 WL 4899008, at *7 (citations and quotations omitted). The Court finds the State's questions at the PCR hearing regarding Chapman's consideration of whether he should look at the fingerprint evidence, and resulting testimony, are ambiguous and open to interpretation. Therefore, the motion to strike Paragraph 22 is denied.

Canen's motion to strike the Chapman Affidavit is **DENIED**.

Summary Judgment Standard

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

While the movant bears the initial burden of production to inform the district court why a trial is not necessary, these requirements "are not onerous" where the nonmovant "bears the ultimate burden of persuasion on a particular issue." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). A party may move for summary judgment based on either "affirmative evidence that negates an essential element of the nonmoving party's claim" or by "asserting that the nonmoving party's evidence [is] insufficient

to establish an essential element of the nonmoving party's claim." *Id.* at 1169 (citation and internal quotations omitted). A party opposing a properly supported summary judgment motion may not rely on allegations or denials in his own pleading, but rather, must "marshal and present the court with the evidence [he] contends will prove [his] case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Facts

The Murder Investigation and Trial

On Thanksgiving Day 2002, Sailor, an elderly tenant of the Waterfall Highrise Apartments, was murdered in her apartment. During the murder investigation, the ECPD discovered a latent print on a plastic container in Sailor's apartment that was believed to have been handled by the murderer. The ECPD eventually suspected that two other apartment complex residents, Canen and Andrew Royer ("Royer"), were involved in Sailor's murder.

The ECPD sent the latent print evidence and known print samples from various suspects, including Canen, to Chapman at the Sheriff's Department for analysis. An ECPD detective sent the fingerprint evidence to Chapman because he understood Chapman to be a latent print examiner, and the Indiana State Police Laboratory

11

would have taken longer to perform the examination.[3]  Chapman examined the evidence and concluded that the latent print on the container matched Canen's left pinkie finger.

The ECPD interviewed Royer regarding Sailor's murder.  Royer, who has mental health issues, made multiple statements in which he confessed to murdering Sailor.  However, the details in his statements conflicted.  In some statements, he claimed that Canen was in Sailor's apartment.  Royer was charged with Sailor's murder.

When the ECPD interviewed Canen regarding Sailor's murder, she denied ever being in Sailor's apartment, and continued to deny it after being told that her fingerprint was found in Sailor's apartment.  On September 2, 2004, Canen was charged with Sailor's murder.

Prior to trial, the State prosecutor Vicki Becker ("Becker") allowed Canen's attorney to review the prosecutor's entire file, including Chapman's report.  Canen's attorney hired a retired ECPD detective to analyze the latent print.  He examined the print, and found two points of similarity, but no points of difference.  As such, he could not give a conclusive opinion as to whether the latent print was a match with Canen's known print.  Canen's attorney did not seek a pre-trial deposition of Chapman, or move to exclude Chapman's testimony.

---

[3] Chapman denies ever telling any representative of the ECPD or the State prosecutor that he was an expert in latent fingerprint analysis.

In August 2005, Canen and Royer were tried jointly for Sailor's murder. At trial, the State offered evidence against Canen including, but not limited to, testimony regarding Canen's relationship with Royer, testimony that Canen made false statements that she was out of town on the day of Sailor's murder, testimony regarding Canen's denial of having been inside Sailor's apartment, and the latent print evidence.

Chapman testified at the trial regarding his analysis of the latent print. He described his prior experience as a fingerprint examiner with the Federal Bureau of Investigation ("FBI"), and his participation in a twelve-week FBI training program in which he learned how to classify and examine fingerprints. (DE# 30-1 at 129-30.) He testified that he was assigned to the Sheriff's Department crime laboratory after attending the Integrated Indiana Law Enforcement Crime Scene Training School in the fall of 2000. (*Id.* at 132.) He also testified:

> Q. . . . And in the lab as a full time detective technician, is it one of your responsibilities to examine as well as compare fingerprints?
> A. Yes, it is.
> Q. Based on your experience, have you been able to make fingerprint comparisons in the past several years?
> A. Yes, I have.
> Q. Any idea how many comparisons you've made?
> A. Not right off the top of my head. Several -- maybe 100 or so.
> . . .
> Q. . . . Do you also have training and experience in attempting to recover latent prints from a crime scene?
> A. Yes.

> Q. Is that part of your responsibilities at the sheriff's
> department?
> A. Yes, it is.

(DE# 30-1 at 132-33.) Chapman then explained how he matched

Canen's known print card to the latent print taken from Sailor's

apartment, and opined that the latent print matched Canen's known

print. Canen's attorney did not cross-examine Chapman regarding

his qualifications as an expert, object to his testimony, request

an opportunity to voir dire Chapman, or offer a witness to refute

Chapman's testimony. (*See id.* at 148-50; DE# 42-10 at 18-25.)[4]

The jury convicted Canen and Royer of murder. Canen's

conviction was affirmed on appeal, *Canen v. State*, 852 N.E.2d 1054

(Ind. Ct. App. 2006), and the Indiana Supreme Court denied

transfer. *Canen v. State,* 860 N.E.2d 591 (Ind. Sept. 19, 2006).

PCR Proceedings

In August 2009, Canen petitioned for post-conviction relief

based on ineffective assistance of trial counsel. Canen's new

attorney retained a certified latent print examiner to conduct an

---

[4] During a deposition in 2014, State prosecutor Becker testified that she had worked with Chapman on cases involving fingerprint analysis prior to the Canen trial, and that she was aware of his credentials and experience with the FBI and Sheriff's Department crime laboratory. (DE# 42-10 at 8-9.) Becker testified that she had understood that Chapman "had personally performed over 100 evaluations of latent print comparisons." (DE# 30-5 at 5.) She also testified that she "was assuming that it was latent print comparisons, especially in light of the fact that when he was doing known print comparisons, he was doing 40 an hour." (*Id.*) Becker testified that when she "asked [Chapman] specifically, 'Do you have training and experience in attempting to recover latent prints from a crime scene,['] and he says, 'Yes,', 'Is that part of your responsibilities at the Sheriff's Department,' 'Yes, it is,' [she] would have thought that that would have been sufficient to show that we're talking about latent prints here." (*Id.* at 5.)

independent comparison of the fingerprint evidence used at trial. The examiner concluded that Canen was not the source of the latent print found on the container in Sailor's apartment. Chapman then re-examined the evidence and concluded that he erred in opining that the latent print matched Canen's known print.

At the PCR hearing, Chapman testified that his original opinion was wrong, and that he believed that his opinion changed after reviewing the other expert's report because he had received more latent print examination training in 2006 (after Canen's trial), and because he had more experience "looking at a lot of prints" since he conducted the Canen fingerprint analysis. (*See* DE# 30-2 at 22, 29.) Chapman explained that when he testified at trial that he had conducted fingerprint comparisons, he was referring to known prints. (*Id.* at 32.) Chapman was asked if, when the ECPD asked him to look at the latent print evidence in the Sailor murder, he considered saying "maybe I shouldn't," Chapman testified, "Yes." (*Id.* at 33.) When asked why he did not bring this to someone's attention, he responded that he "was trying to help out Elkhart City." (*Id.*)

The State requested a continuance to have the Indiana State Police Laboratory ("State Police") examine the fingerprint evidence. The State Police excluded Canen as a source of the latent print. The State court granted Canen's PCR petition, finding that the discovery of Canen's exclusion as the source of

the latent print qualified as newly discovered evidence. (DE# 30-3 at 6, 8 (finding the evidence satisfied the nine elements required to merit PCR relief) (citing *Carter v. State*, 738 N.E.2d 665, 671 (Ind. 2000)).)[5] Canen's conviction was vacated and the State dismissed the criminal case against her. After eight years of incarceration, Canen was released.

<u>Chapman's Experience and Training with Fingerprint Analysis</u>

From 1976 to 1978, Chapman worked for the FBI as a fingerprint examiner. Before beginning work as a fingerprint examiner, Chapman attended a twelve-week FBI training program on how to classify and compare fingerprints. As an FBI fingerprint examiner, he classified fingerprint cards and manually searched FBI fingerprint files for matches; he did not examine latent prints. After resigning from the FBI in 1978, Chapman worked at the Cook Nuclear Plant in a security position for approximately six years. In that position, he reviewed fingerprint cards to ensure that they were acceptable for submission.

The Sheriff's Department hired Chapman in November 1993. In January 1994, he attended the Indiana Law Enforcement Academy ("ILEA"), which was a twelve-week training program. Part of the

_____

[5] The State court also found that, given Chapman's trial testimony regarding his qualifications, "there was no reason for [Canen's] trial counsel to question the qualifications of Detective Chapman to conduct latent fingerprint comparisons. Furthermore, the Record establishes that trial counsel did hire a retired detective to verify Detective Chapman's conclusion, who formed an opinion that [Canen] may have been the source of the latent print. For these reasons, the court cannot conclude that trial counsel's performance at [Canen's] trial was ineffective." (DE# 30-3 at 5.)

ILEA curriculum pertained to fingerprints. After graduating from ILEA, Chapman began working at the Sheriff's Department as a patrolman. His duties as patrolman included dusting for and retrieving fingerprint impressions from crime scenes. Chapman was promoted to detective in January 1999, and was assigned to investigate property crimes. On occasion, the Sheriff's Department Records Division gave fingerprint cards to Chapman to compare and analyze. Chapman performed comparisons when there was a question about a suspect's identity. He would compare the ten-print cards and determine if the prints were from the same person.

In August 2000, Chapman attended the Integrated Indiana Crime Scene School, a four-week training course taught by the Indiana State Police. Chapman testified that this program trained students how to process crime scenes, collect fingerprints, shoe impressions, tire impressions, and how to reconstruct a crime scene by drawing. The Chapman Affidavit asserts that, as part of this program, Chapman participated in a lecture entitled, *Latent Prints*. (DE# 42-1.) As noted above, Canen disputes that this program involved training on making latent print comparisons because Chapman testified at the PCR hearing that this training program dealt with processing crime scenes, not latent print comparisons. Canen also maintains that Chapman never testified that any of the training programs he attended involved latent print comparison.

After completing the training program in 2000, Chapman became one of two crime lab technicians for the Sheriff's Department. As a crime lab technician, Chapman examined and compared known prints on ten-print cards. He examined latent prints that were taken from a crime scene and compared them to known prints. In addition to examining latent prints at the request of the Sheriff's Department, the police departments of Goshen City and Elkhart City asked Chapman to examine latent prints taken from crime scenes. From the time Chapman first became a Sheriff's Department crime lab technician until the time when he was asked to examine the fingerprints relating to the Sailor case, Chapman estimates that he had conducted approximately thirteen fingerprint examinations involving latent prints taken from crime scenes, and numerous additional fingerprint examinations involving the comparison of ten-print cards.

Section 1983 Claim

Canen's claim against Chapman arises under 42 U.S.C. § 1983, which provides a federal cause of action any time an individual, who, under color of state law, deprives another of any right, privilege, or immunity as provided by the Constitution and laws of the United States. 42 U.S.C. § 1983. Canen alleges that Chapman violated her constitutional rights by withholding from the State prosecutor his alleged lack of qualifications to perform latent fingerprint analysis, thus ensuring that the prosecutor could not

disclose the information to Canen. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). This obligation extends to police officers in certain circumstances. *See Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("If officers are not candid with prosecutors, then the prosecutors' decisions – although vital to the causal chain in a but-for sense – are not the important locus of action. Pressure must be brought to bear elsewhere. Prosecutors kept in the dark by the police . . . won't improve their performance with or without legal liability for their conduct. Requiring culpable officers to pay damages to the victims of their actions, however, holds out promise of both deterring and remediating violations of the Constitution.").

To establish a *Brady* violation, Canen must prove that the evidence at issue was: (1) favorable to accused, either being exculpatory or impeaching; (2) suppressed by the government, either willfully or inadvertently; and (3) material, that is, there is a reasonable probability that, had the evidence been disclosed to the accused, the result of the proceeding would have been different. *Carvajal v. Dominguez,* 542 F.3d 561, 566-67 (7th Cir. 2008) (citations omitted); *Boss v. Pierce,* 263 F.3d 734, 739-40

19

(7th Cir. 2001); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Evidence is not suppressed under *Brady* where the accused could have discovered the evidence through "reasonable diligence." *Carvajal*, 542 F.3d at 567 (citation omitted). In addition, "the Due Process Clause [of the Fourteenth Amendment] is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 663 (1986) (emphasis in original); *see, e.g., Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007) (stating that liability under § 1983 "cannot be founded on negligence") (citations omitted).

Canen argues that Chapman's lack of experience with latent print identification was favorable, material, and suppressed evidence under *Brady*. Canen asserts that if she had been informed of Chapman's lack of qualification before trial, her trial attorney could have used the information for impeachment purposes, or to exclude Chapman from testifying. The parties dispute whether Chapman was qualified to testify as an expert, whether he believed himself qualified to conduct the latent print comparison prior to Canen's trial, and whether he was intentionally misleading about his qualifications prior to and during Canen's trial.

It is undisputed that Canen's attorney did not seek to depose Chapman prior to trial, or move to exclude his testimony. During the trial, Canen's attorney did not cross-examine Chapman

regarding his qualifications, or seek to voir dire him regarding his qualifications. Given these undisputed facts, the Court has doubts as to whether Canen's alleged lack of experience and training was suppressed for purposes of *Brady,* that is, that this evidence was not otherwise available to Canen through the exercise of reasonable diligence. *See Carvajal*, 542 F.3d at 567 (finding no *Brady* violation where testifying officers "were accessible to the defense," noting "[i]t is [the defendant's] responsibility to probe the witnesses," and that "there was nothing preventing [the defendant] from discovering and drawing out [a] discrepancy between the officers' stories"); *see generally Buie v. McAdory*, 341 F.3d 623, 625 (7th Cir. 2003) ("That a witness may give false or mistaken testimony . . . is not an independent constitutional violation. What the Constitution provides is assurance that evidence may be tested by cross-examination and by contrary proofs.") (citations omitted). While the Court has doubts as to whether an officer who testifies as an expert violates an accused's right to due process by failing to disclose a lack of training or experience, it need not resolve this issue because Chapman is immune from suit.

Qualified Immunity

In response to Canen's claim that Chapman should have disclosed his alleged lack of qualification prior to trial, Chapman asserts that he is immune from suit based on the doctrine of

21

qualified immunity.[6]  Qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quotation omitted).  Canen carries the burden of defeating Chapman's claim of qualified immunity. *Molina ex rel. Molina v. Cooper,* 325 F.3d 963, 968 (7th Cir. 2003).  "Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (citation omitted).

In determining whether an official is entitled to qualified immunity, the Court must ask two questions: "(1) whether the facts,

---

[6] Because Canen relies upon Chapman's allegedly intentionally misleading trial testimony that he had made "maybe 100 or so" fingerprint comparisons, Chapman also argues that he has absolute immunity from suit based on his trial testimony. The Court agrees.  Witnesses, including experts and police officers, have absolute immunity for the content of their testimony at trial. *See Briscoe v. LaHue,* 460 U.S. 325, 345, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983); *Latta v. Chapala*, 221 Fed. Appx. 443, 444-45 (7th Cir. 2007) (witnesses testifying at trial possess absolute immunity in actions under § 1983) (citing *Briscoe*, 460 U.S. 325).  The Seventh Circuit has held that a witness's pretrial preparation is also immune from suit.  *See Latta*, 221 Fed. Appx. at 445 ("The absolute immunity applicable to witnesses covers the preparation for testimony as well as its delivery in court.") (citation omitted); *Nwoke v. Palmer*, 116 Fed. Appx. 761, 763 (7th Cir. 2004) (noting that *Briscoe* would offer "a hollow immunity" if a party "could turn around and say, in effect: 'True, your delivery of bad testimony is immunized, but preparing to deliver that testimony is not, so I can litigate the substance of your testimony.'") (citing *Buckley v. Fitzsimmons*, 919 F.2d 1230, 1245 (7th Cir. 1990), *rev'd in part on other grounds,* 509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993).  Canen does not respond to Chapman's absolute immunity argument.  Rather, she characterizes Chapman's failure to disclose his alleged lack of training and experience as a failure to disclose exculpatory evidence prior to trial.  Even if Chapman's alleged failure to disclose a lack of qualification prior to trial is not barred by absolute immunity, it is barred by qualified immunity for the reasons provided herein.

taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015) (quoting *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013)). The Court has discretion to decide which of the two prongs of the qualified immunity analysis to address first. *Pearson*, 555 U.S. at 236.

Regarding the second prong, a clearly established right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (internal quotation marks, alteration, and citation omitted). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question *beyond debate*." *Ashcroft v. al-Kidd,* 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011) (emphasis added, citations omitted). The United States Supreme Court has repeatedly instructed courts:

> "not to define clearly established law at a high level of generality." *al-Kidd,* [563 U.S.] at 742, 131 S. Ct. 2074. The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Ibid.* (emphasis added). This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (*per curiam*) [(citation omitted)].

*Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (emphasis in original). A plaintiff "can demonstrate that the right was clearly established by presenting a closely analogous case that establishes that the [defendant's] conduct was unconstitutional or by presenting evidence that the [defendant's] conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010) (citations omitted). The Court looks to controlling precedent from the Supreme Court and the Seventh Circuit, and, in the absence of controlling precedent, cases from other circuits "to ascertain whether there was such a clear trend in the case law that the recognition of the right by a controlling precedent was merely a matter of time." *Id.* at 782.

Chapman argues that Canen does not have a due process right that has been violated, and that even if a jury were to determine Chapmen violated Canen's right to due process, such right was not "clearly established" at the time the action occurred. Canen asserts that Chapman is not entitled to qualified immunity because Chapman "knew he was unqualified and considered telling others this fact, but elected not to." (DE# 29 at 24.) She argues that Chapman's failure to disclose his alleged lack of experience violated a clearly established right "because it has long been established that an expert's training and education are relevant

to the weight of his testimony and evidence showing that the expert has little to no training and experience in the field is impeaching." (DE# 49 at 23-24.) But the general proposition that an expert's training and experience is relevant and may be impeaching does not answer "whether the violative nature of [Chapman's] *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (emphasis in original, citations omitted). Canen must show that an expert's obligation to disclose a lack of training or experience was a "clearly established" constitutional right at the time of her criminal trial.

The cases upon which Canen relies do not set forth a constitutional right requiring an expert to disclose a lack of experience or training. Canen cites *United States v. Benson* for the proposition that "[a]n expert's opinion is helpful only to the extent that the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." 941 F.2d 598, 604 (7th Cir. 1991), *mandate recalled and amended by* 957 F.2d 301 (1992) (emphasis in original, citations omitted). This general proposition does not support Canen's proposed due process right to an expert's disclosure of a lack of qualification. In *Benson*, the Seventh Circuit found that it was an abuse of discretion to admit the testimony of an Internal Revenue Service

agent who "did not give helpful expert testimony" based on any special skill or knowledge, but rather, "simply told the jury whom to believe." *Id*. at 604-05. The Seventh Circuit did not indicate that the agent was required to volunteer his lack of qualification. Rather, it noted that "Benson's attorney conducted a thorough cross-examination of [the agent], exposing his lack of qualification to opine on many of the matters he did." *Id*. at 605.

Canen cites *Daubert v. Merrel Dow Pharmaceuticals, Inc.,* for the proposition that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The Court notes that this excerpt from *Daubert* highlights the adversarial nature of challenging an expert's opinion by means of cross-examination and contrary proof. Setting that aside, this general proposition is not sufficient to show that the "particular conduct" at issue, *i.e.,* an expert's failure to disclose a lack of qualification, violates a clearly established constitutional right.

Canen also cites *Newsome v. McCabe*, in which the Seventh Circuit held that officers were not entitled to qualified immunity because it had been clearly established that officers could not withhold exculpatory information about fingerprints. 256 F.3d

747, 752–53 (7th Cir. 2001) (citations omitted).  In *Newsome*, the officers had failed to alert the prosecutors that Newsome's fingerprints did not match those they had obtained at the scene of the crime, among other alleged misconduct.  *Id*. at 749.  Canen relies upon the Seventh Circuit's query, "was it clearly established . . . that the police could not withhold from prosecutors exculpatory information about fingerprints[?]  The answer is yes:  The Brady principle was announced in 1963," to assert that Chapman is not entitled to qualified immunity.  *Id*. at 752.  But Canen stretches *Newsome* too far, and ignores the Supreme Court's admonition against "define[ing] clearly established law at a high level of generality."  *Mullenix*, 136 S. Ct. at 308 (citation omitted).  Here, Canen does not assert that Chapman withheld exculpatory information about the fingerprint evidence he analyzed.  Rather, she claims that Chapman deliberately failed to disclose his alleged lack of qualification to make a fingerprint comparison.  Thus, the "particular conduct" addressed in *Newsome* is markedly different from the misconduct alleged by Canen.

Canen has not provided the Court with any case law from the Seventh Circuit, or any other circuit court, holding that an expert's failure to disclose a lack of qualification violated a clearly established constitutional right at the time of Canen's trial.  At a minimum, existing precedent has not placed this constitutional question "beyond debate."  *al–Kidd*, 563 U.S. at

741. Because Canen has not satisfied her burden to show that Chapman's alleged failure to disclose a lack of qualification violated a clearly established right, her claim against Chapman is barred by qualified immunity. Therefore, Canen's motion for summary judgment is **DENIED**, and Chapman's motion for summary judgment is **GRANTED**.


CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (DE# 28) is **DENIED**, Defendant's Motion for Summary Judgment (DE# 41) is **GRANTED**, Plaintiff's Motion to Strike Defendant Chapman's Statement of Facts and Memorandum in Support of Motion for Summary Judgment (DE# 50) is **DENIED**, and Plaintiff's Motion to Strike Affidavit of Dennis Chapman (DE# 51) is **DENIED**. The Clerk is hereby **ORDERED** to **DISMISS** the claim against Defendant Chapman **WITH PREJUDICE** and to **CLOSE** this case.


DATED: February 22, 2016        /s/ RUDY LOZANO, Judge
                                United States District Court